1                UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3       BEFORE THE HONORABLE VAUGHN R. WALKER, CHIEF JUDGE

4

5   ----------------------------)
                             )

6   In Re:                )
   OPTICAL DISK DRIVE      )     MDL No. M-10-2143 (VRW)

7   PRODUCTS ANTITRUST      )
   LITIGATION — ALL CASES   )     San Francisco, California

8                            )     Thursday, June 24, 2010
   ----------------------------)     (56 pages)

9

10

11                 TRANSCRIPT OF PROCEEDINGS

   APPEARANCES:

12

13   Direct
   Plaintiffs:         Saveri & Saveri, Inc.

14             BY:  GUIDO SAVERI
                 CADIO ZIRPOLI

15                 Kaplan, Fox & Kilsheimer, LLP

16             BY:  GARY L. SPECKS

17                 Alioto Law Firm
             BY:  JOSEPH ALIOTO

18                 THERESA D. MOORE

19                 Pearson Simon•Warshaw•Penny, LLP

20             BY:  BRUCE L. SIMON

21                 Hausfeld, LLP
             BY:  MICHAEL P. LEHMANN

22                 Lieff, Cabraser

23             BY:  ANDREW S. KINGSDALE

24                 Berman, DeValerio
             BY:  JOSEPH J. TABACCO JR.

25

```
 1    APPEARANCES (cont.):

 2    Indirect
      Plaintiffs:              Minami Tamaki, LLP
 3                        BY:  JACK W. LEE
                               DEREK G. HOWARD
 4
                               Hagens, Berman, Sobol, Shapiro, LLP
 5                        BY:  JEFF D. FRIEDMAN

 6                             Girardi & Keese
                          BY:  STEPHEN GERARD LARSON
 7
      For Defendants:          Latham & Watkins, LLP
 8                        BY:  DANIEL M. WALL

 9                             Howrey, LLP
                          BY:  AARON MYERS
10
                               Boies, Schiller & Flexner, LLP
11                        BY:  JOHN COVE JR.

12                             Davis, Polk & Wardwell, LLP
                          BY:  CHRISTOPHER B. HOCKETT
13                             NEAL A. POTISCHMAN

14                             Ramsey Ehrlich
                          BY:  ISMAIL RAMSEY
15                             KATHERINE KATES

16                             O'Melveny & Myers, LLP
                          BY:  IAN SIMMONS
17                             PATRICK HEIN

18                             McDermott, Will & Emery, LLP
                          BY:  MATTHEW J. JACOBS
19

20    Also Present:            United States Dept. of Justice
                          BY:  SIDNEY A. MAJALYA
21

22

23

24

25
```

```
 1    Thursday, June 24, 2010

 2                                                    (10:10 a.m.)

 3              (In open court)

 4              DEPUTY CLERK:  Calling MDL docket number M-10-2143,

 5    In Re: Optical Disk Drive Products Antitrust Litigation.

 6              Appearances, Counsel?

 7              MR. MAJALYA:  Good morning, your Honor.  Sidney

 8    Majalya for the United States.

 9              THE COURT:  Good morning.

10              MR. FRIEDMAN:  Good morning.  Jeff Friedman on behalf

11    of the indirect purchaser class.

12              THE COURT:  Mr. Friedman, good morning.

13              MR. SAVERI:  Good morning, your Honor.  Guido Saveri

14    on behalf of the direct purchasers.

15              THE COURT:  Mr. Saveri.

16              MR. WALL:  Daniel Wall on behalf of Toshiba

17    Corporation and Toshiba Samsung Storage Technologies.  I'll be

18    arguing for the defense.

19              THE COURT:  Very well.

20              MR. ALIOTO:  Joseph M. Alioto for the directs.  Good

21    morning, your Honor.

22              THE COURT:  Good morning.  Any other appearances?

23              All right, let's lead off with the government.  What

24    interference with the grand jury investigation is a little

25    discovery going to do?
```

1              MR. MAJALYA:  Good morning, your Honor.  The

2    government's position is that there are a number of ways in

3    which discovery in the civil case could interfere with the

4    grand jury.  As you know, the government does have a grand jury

5    investigation proceeding in the ODD matter.

6              THE COURT:  How long has that investigation been under

7    way?

8              MR. MAJALYA:  I'm not sure I should say exactly how

9    long, your Honor, but it has been ongoing.  Are you asking me

10   how long since we served -- there's a number of ways I can

11   answer that question.

12             Would you like to know how long in total the

13   government has been looking at this issue?

14             THE COURT:  Not necessarily.  But when did the grand

15   jury subpoenas issue?

16             MR. MAJALYA:  Again, I am somewhat limited in what I

17   can say here because, as you also know, there is an ongoing

18   FOIA litigation in this matter.

19             THE COURT:  Ongoing?

20             MR. MAJALYA:  FOIA -- Freedom of Information Act --

21   matter that has been brought by one of the plaintiffs, and

22   there are sensitive issues as to what has been acknowledged by

23   the government in terms of issuing subpoenas.  But let me put

24   it to you this way, your Honor:

25             Several of the defendants acknowledge receiving grand

1   jury subpoenas in this matter in October of last year.

2          THE COURT:  Okay.

3          MR. MAJALYA:  And thereafter, plaintiffs began filing

4   lawsuits.

5          THE COURT:  Okay.  The reason I ask is, looking at

6   your proposed order -- I believe I have it here, yes -- what

7   you're asking for is a stay during the pendency of the grand

8   jury proceedings; and any resulting criminal trials.  That

9   could be a long time.

10         MR. MAJALYA:  Right, but that is for one limited area

11  of the stay, your Honor.  We're asking for a stay on the

12  pendency -- for the pendency of the grand jury investigation

13  for communications relating to the grand jury.  And so if you

14  look at -- it's Paragraph 3.  And what we're requesting is --

15  that particular portion is limited with respect to

16  communications with the United States or with the grand jury

17  investigating ODDs.  We're not asking for a stay of -- for the

18  pendency of the grand jury investigation for document discovery

19  or depositions.

20         THE COURT:  Well, no, I understand.  Paragraph 4 has

21  some exceptions that you've outlined.  But if I understand what

22  you're proposing, Paragraph 3 is the general limitation.

23         MR. MAJALYA:  No, Paragraph 2 is the general

24  limitation, your Honor.  And that's the 12-month period on that

25  particular portion.

1          THE COURT:  Well, how do I interpret Paragraph 3?

2          "During the pendency of the grand jury proceedings and

3    any resulting criminal trials, no discovery shall be conducted

4    in this case that reflects, refers to or relates to grand jury

5    proceedings, including ODDs -- or concerning ODDs, including

6    any parties' or witnesses' communications with the United

7    States or with any grand jury investigating ODDs, including any

8    translations produced to the United States, except by order of

9    court on good cause shown and consistent with government law."

10         I've omitted the parenthetical phrases, but that's

11   pretty broad.

12         MR. MAJALYA:  It is broad, your Honor.  But it really

13   does -- that is designed to prevent witnesses from being asked,

14   directly, questions about what they told the grand jury and

15   what the grand jury asked them.  Our request -- so in other

16   words, that part of the stay is not designed to prevent

17   plaintiffs from going forward with normal merits discovery.  If

18   they have a witness, for example, who has been before the grand

19   jury, they're permitted to ask that person any range of

20   questions that are permissible under the civil rules of civil

21   procedure.  They just may not ask that person specifically

22   about what they told the grand jury.  They can ask him anything

23   about what he did, what his involvement was in any conspiracy.

24   They just cannot talk to him about what he told the grand jury.

25         THE COURT:  Who is limited or restricted from stating

1    what occurs inside a grand jury room?

2              MR. MAJALYA:  Well, we fully understand Rule 60, your

3    Honor.

4              THE COURT:  But who are they?

5              MR. MAJALYA:  I'm sorry?

6              THE COURT:  Who?

7              MR. MAJALYA:  The government is restricted from --

8              THE COURT:  Yes.  And who else?

9              The grand jurors.

10             MR. MAJALYA:  Correct.

11             THE COURT:  The court reporter.

12             MR. MAJALYA:  Correct.

13             THE COURT:  The attorneys.

14             MR. MAJALYA:  Correct.  Well, the attorneys for the

15   government.

16             THE COURT:  For the government.  But are witnesses?

17             MR. MAJALYA:  No.

18             THE COURT:  A witness can go outside the grand jury

19   room and say, I told the grand jury this, that and the other

20   thing.  Can a witness not?

21             MR. MAJALYA:  A witness can do that, your Honor, yes.

22   What we're attempting to do is prevent plaintiffs and defense

23   counsel from boring in on the particulars of the grand jury and

24   the direction that the grand jury is going.  That is what we

25   are seeking to protect, and this order -- this particular

1    provision has been agreed to by the plaintiffs in multiple

2    cases and had been signed off on in several courts in this

3    district.

4              THE COURT:  But what you're attempting to do, if I

5    understand Paragraph 3, is to put a limitation on a party or a

6    witness's communications with the grand jury.  Isn't that what

7    you're trying to do in Paragraph 3?

8              MR. MAJALYA:  We were attempting to prevent

9    plaintiffs' counsel and defense counsel from boring in on

10   questions that were asked of them in front of the grand jury.

11             THE COURT:  You're attempting to prevent the

12   plaintiffs from inquiring what witnesses said to the grand

13   jury, as I understand Paragraph 3.

14             MR. MAJALYA:  That is correct, your Honor.  And to --

15   and also to prevent them from disclosing communications that

16   witnesses have had with the United States as it relates to the

17   grand jury proceedings.

18             THE COURT:  Okay.  What harm does the government

19   suffer if the plaintiffs inquire of witnesses:  What did you

20   tell the grand jury?

21             MR. MAJALYA:  Again, your Honor --

22             THE COURT:  How does that interfere with the

23   government's investigation?

24             MR. MAJALYA:  Well, it interferes with the

25   government's investigation in that it allows counsel to look at

1    the direction the grand jury is going.  It allows them to see

2    information on exactly what the grand jury is doing as opposed

3    to simply getting information about their case and the

4    substance of their case.  And the grand jury is -- will be

5    going in a particular direction, it will ask certain questions,

6    it will have certain witnesses before it.  And it -- the

7    government and its investigation will be harmed if defendants

8    are permitted to look behind the grand jury and see what it is

9    doing as opposed to simply getting discovery on the merits of

10   the case, which they're fully permitted to do.

11          THE COURT:  Let me try again.  How is the government

12   harmed if the plaintiffs discover or attempt to discover what

13   leads or avenues of inquiry the grand jury is pursuing?

14          MR. MAJALYA:  Well, your Honor, it is not merely the

15   plaintiffs who would be discovering this investigation.  This

16   information in civil discovery would be shared with all

17   parties, and there will be defendants who are the subject of

18   the grand jury investigation who will then know exactly what

19   the grand jury is doing, and that will give them a leg up on

20   preparing their defenses, on talking to witnesses, and we

21   believe the government is harmed if that happens.

22          THE COURT:  Because...?

23          The government is harmed because?

24          MR. MAJALYA:  The government is harmed because

25   defendants would then have basically preindictment discovery

1   that they are not entitled to.

2           THE COURT:  Well, isn't the problem that you're

3   worried about is that this discovery would disclose cooperating

4   witnesses?

5           MR. MAJALYA:  We are certainly worried about that,

6   your Honor.

7           THE COURT:  Isn't that the point?

8           MR. MAJALYA:  We are certainly worried about that,

9   absolutely.

10          THE COURT:  Okay.  Now, how long a period for the stay

11  of discovery is necessary in order for you to afford to

12  cooperating witnesses the protection that you think is

13  necessary so that you can get to the bottom of what you

14  consider to be necessary in order to make some prosecutorial

15  decisions?

16          MR. MAJALYA:  Your Honor, that goes to the -- our

17  request for the one-year stay, the 12-month stay.  We believe

18  that within that 12-month period, we will be in a position to

19  make certain prosecutorial decisions as to certain defendants

20  and individuals.

21          THE COURT:  Paragraph 3 goes quite a bit beyond one

22  year, assuming, as in all likelihood, that the trials are not

23  completed within 12 months.

24          MR. MAJALYA:  I agree that Paragraph 3 does go beyond

25  a year.  But again, there are what we believe are broader

1    interests in terms of the integrity of the grand jury process

2    that we are attempting to protect under Paragraph 3.

3            THE COURT:  And that integrity is, again, what?

4    Cooperating witnesses?

5            MR. MAJALYA:  That the grand jury should be permitted

6    to do its work without interference and without having

7    plaintiffs and defense counsel looking behind what the grand

8    jury is doing.

9            THE COURT:  You mean second guessing what the grand

10   jury is doing?

11           MR. MAJALYA:  Well, no, not second guessing.  But

12   being able to anticipate what the grand jury is doing by

13   looking at what questions and what direction it is heading in.

14           THE COURT:  Well, what's wrong with that?  Where's the

15   prejudice to the government?

16           MR. MAJALYA:  Again, your Honor, it's -- it is --

17   we're serving, you know, two purposes here.  Obviously we

18   believe that there is some prejudice to the government.  But

19   the grand jury is an entity that is separate from the

20   government.  And we are responsible for protecting its

21   interests.  And we believe the grand jury process is interfered

22   with if people are allowed to look behind the veil.

23           The grand jury process, as you know, is a very

24   secretive one, and I fully appreciate the Court's point that

25   witnesses are permitted to come out and tell the world what

1   they told the grand jury.  But we strongly believe -- and

2   again, other courts -- this Court's not bound by the decision

3   of other courts, but other courts in this district have agreed

4   with us and have entered stays for the pendency of cases with

5   respect to grand jury communications.

6         THE COURT:  Is there any question here about witness

7   intimidation?

8         MR. MAJALYA:  Well, I mean, that is a concern that we

9   raised in our papers, that witness intimidation -- witnesses

10   could be intimidated.  But we have no reason to believe that

11   that has happened in this case.

12         THE COURT:  Okay.  So that doesn't seem to be a

13   problem here.  And the only problem, if I understand your

14   position, and I may not be fully appreciative of it, is that

15   the plaintiffs and/or the defendants are going to figure out

16   what avenues of inquiry the grand jury is following and

17   pursuing, and somehow or other make strategic decisions based

18   on that.  I'm having a difficult time seeing what the harm is

19   to the government in carrying out its responsibilities.

20         MR. MAJALYA:  Okay.

21         THE COURT:  Or the interference that that creates for

22   the grand jury.

23         MR. MAJALYA:  Well, I mean, we are concerned that if

24   defendants and plaintiffs are allowed to look behind what the

25   grand jury's doing, in preparing, for example, future witnesses

1    for the grand jury, those witnesses would have an exact idea as

2    to what was happening in the grand jury.  And that is not

3    beneficial to the grand jury to get its work done, and we

4    believe that would be both interfering to the grand jury's work

5    and to the government's case.

6           And included in Paragraph 3, the government has sought

7    protection for translations that have been submitted or that

8    would be submitted by cooperating companies.  We do believe if

9    translations are to be produced that have been produced by

10   cooperators, that that significantly harms those cooperators by

11   having to hand over those documents that but for their

12   cooperation they would not have to hand over.  And that

13   prejudices the government in its enforcement actions in future

14   cases, because parties will be less willing to give the

15   government translations if they know that those translations

16   will simply be handed over during civil discovery.

17          THE COURT:  All right.  Anything further that you'd

18   like to add?

19          MR. MAJALYA:  No, your Honor.  I mean, we stand behind

20   our papers and the positions that we've taken in our opening

21   brief and in our reply.

22          THE COURT:  All right.  Thank you, sir.

23          Mr. Wall, do you want to weigh in in support of this

24   decision?

25          MR. WALL:  Sure.  Good morning, your Honor.  Let me

1    just say that in listening to the dialogue, there's a couple of

2    elephants in the room here that just should be called out,

3    okay?

4                THE COURT:  All right.  Let's get those elephants out

5    in the open.

6                MR. WALL:  One is is that much of the way that the

7    government prosecutes antitrust crime and other kinds of crime

8    is by the exploiting the prisoners element.  They love it when

9    we don't know anything.  And the rules are, for better or

10   worse, set up under the criminal system and the grand jury

11   system where it targets the subjects of an investigation.  We

12   know very little, and don't know what's been told to the grand

13   jury, don't know how much the government has.  The government

14   will naturally say they've got a ton, a lot.  And what

15   Mr. Majalya is really saying is they don't want us to find out

16   how strong their case is.  Now, whether that's something that

17   could count in this calculus or not is something that people

18   might debate, but it's the system that we have.

19                Second part about it is the other alternative is the

20   amnesty program.  It's not just cooperating witnesses

21   generally.  It's that virtually the entirety of the cartel

22   enforcement program that exists in the world today, not just in

23   the United States, but -- it's merely started in the United

24   States -- it's based upon inducing parties to come forward and

25   reveal cartel activity in exchange for amnesty, and then

1    cooperating with the government and providing information to

2    grand jurys.  And for the most part, that takes place in

3    secret.  And in civil litigation, nobody can eventually prevent

4    the witnesses from having to testify about what cartel activity

5    there was.  But it's rare, certainly unusual, if not

6    unprecedented, for them to actually say:  Well, did you go into

7    the grand jury?  When did you go in?  Well, if you went in at a

8    certain date, oh, you were the amnesty applicant.  Bingo,

9    gotcha.  What did you say?  What was your case?  All that stuff

10   is what comes out.

11          Now, again, as somebody who spends 95 percent of my

12   life in the civil courts, I find the whole system on the

13   criminal side kind of strange in the way that information is so

14   tightly contained and compartmentalized, and that the targets

15   of the investigation get so little information.  But it is the

16   system.  And I think at bottom, what you see in the

17   government's favor -- and kind of the reason that we filed

18   papers -- is what they said is, We want a stay so that our

19   ability to play that game isn't prejudiced.  Well, as

20   defendants, we have a different set of perspectives about that.

21          THE COURT:  In a way, I wonder why you're here joining

22   the plaintiffs.

23          (General laughter)

24          THE COURT:  Wouldn't it be very useful to prepare your

25   case, to advise your client, to know what the grand jury was

1    looking at?

2                MR. WALL:  It's because of the other side of the coin.

3    And the other side of the coin is --

4                THE COURT:  The other side of the coin.

5                MR. WALL:  The other side of the coin is that in civil

6    litigation, civil plaintiffs have certain abilities and rights

7    and so forth than the government in a criminal case.  They have

8    a different jurisdictional reach of what they can do.  They

9    have a different ability to, of course, conduct depositions.

10   They can conduct depositions.  The government can't conduct

11   depositions.  They can issue interrogatories.  They can ask

12   questions that the government could never ask.

13               But lo and behold, if they do it, those become

14   documents that the government can then subpoena.  And this is

15   what's happening right now in the LCD case, where discovery is

16   taking place in the civil cases that the government could never

17   get in a million years in a criminal case.  Absolutely no

18   chance of getting it.

19               THE COURT:  What's the problem there?

20               MR. WALL:  Well, the problem is that -- you know, I

21   didn't set up these rules, we didn't set up these rules, but

22   each game should be played according to its rules.  And right

23   now, our view is is that those of us -- it's actually not

24   everybody who's been sued, by the way -- but those of us who

25   received a grand jury subpoena should be able to play the game,

1    that game, and defend themselves according to the rules of that

2    game without interference from the very different set of rules

3    that exist in the civil environment.

4          I want to go on though because I really think what's

5    maybe, you know, sort of more important here is that there

6    isn't any prejudice here.  We're not talking -- nobody's

7    talking about having a complete shutdown of civil discovery

8    here.  I appreciate your question about Paragraph 3 of the

9    government's order.  I mean, I certainly did not read it as

10    broadly as your Honor did and wouldn't have thought that it

11    meant anything more than I could -- than as a defense

12    counsel -- and by the way, that one is all about the defense

13    counsel.  It has nothing to do with the plaintiff's counsel.

14    It's about whether defense counsel can go in and ask people:

15    What did you say to the grand jury?  And if it needs to be

16    changed to make that clear, we should change it.  That's not a

17    big deal.  It's a drafting assignment.

18          But the -- but what we're talking about now is if

19    there is a 12-month period of time when there isn't merits

20    discovery into the nature of the cartel, why is that going to

21    be beneficial?  It's because something's going to happen in the

22    next 12 months.  The implied, you know, promise here is that

23    within the next 12 months there's going to be an indictment,

24    there's going to be a plea agreement, there's going to be

25    something that an actually starts to reveal what it is that the

1    government thinks is going on here.

2            The other, you know, elephant in the room -- we're at

3    the zoo here, there's so many elephants here -- but the

4    elephant in the room is that, with all due respect to these

5    gentlemen, they couldn't answer five hard questions about what

6    this conspiracy is about (indicating plaintiffs' table).  And

7    they can't.  They couldn't possibly.  Because no one knows what

8    it's about.

9            I can tell you, based upon the limited amount of

10   information that we have, that the complaint is grossly

11   overbroad; it has -- it names parties who are under

12   investigation; the scope of the conspiracy is all wrong, they

13   have all -- all sorts of errors to it.  But that they don't

14   know about, because all they know is that somebody issued a

15   press release saying that there was a grand jury subpoena.  And

16   in the course of the next year, that's going to change, in all

17   likelihood, because someone's going to plead or someone's going

18   to be indicted.  And at that point, the Department of Justice

19   is going to either issue an indictment or an information or a

20   press release which is going to say:  This is what we're

21   actually investigating.  And at that point, we're going to see

22   what this case is really all about, if it's about anything.

23           Now, what can we do in the meantime?  The fact is, we

24   can do a lot.  There's a whole lot of work that can be done

25   without interfering with either the government's interests or

1    our interests of dealing with the grand jury investigation.

2            THE COURT:  Why should anything be done?

3            MR. WALL:  Why should anything be done?

4            THE COURT:  During this interim period.

5            MR. WALL:  Well, look, ask them (indicating

6    plaintiffs).

7            THE COURT:  Why do you want anything done?

8            MR. WALL:  I don't.  But I'm accepting that -- to me,

9    honestly, I think the smartest thing to do would be to put the

10   whole thing on ice until the government acts.  Then they can

11   amend their complaint to allege what's really going on, and

12   we'd pick it up from there.

13           But if that's not in the cards, I mean, right now, for

14   example, we don't even have -- first of all, we don't have any

15   operative complaints.  But we don't have any coherent

16   definition of what the product is or what a direct or an

17   indirect purchaser is.  There's massive inconsistency in

18   that -- in these placeholder complaints that were on file.

19   They could be taking discovery about the industry structure,

20   they could sort out who's a direct purchaser and who's an

21   indirect purchaser.  You know, an optical disk drive is found

22   in an Aston Martin, right?  So is Aston Martin a direct or an

23   indirect purchaser?  And there's a suggestion in one of the

24   complaints, if you buy an Aston Martin, you were a direct

25   purchaser.  They could be doing the basic rudimentary market

```
1    structure work that is a foundation for class certification.

2    There's a lot of things that they could be doing, and certainly

3    the least that they should be doing is get an operative

4    complaint on file.

5            The reality of it is is that a year is not a long time

6    in litigation.  And, you know, maybe it should be.  But in this

7    kind of litigation, it's not.  And it's going to be far more

8    efficient to slow down a bit, and -- so the government can act

9    on this, and then let this litigation go forward.  There's no

10   prejudice to anybody, statutes of limitation aren't running.

11   Everything will be fine.  And the case can proceed there

12   without interfering with either the government's or our

13   interests.

14           THE COURT:  Thank you, Mr. Wall.

15           MR. COVE:  Your Honor, John Cove for Sony.

16           THE COURT:  Yes, sir.

17           MR. COVE:  If I may have a moment, I think our

18   position differs slightly from what Mr. Wall's articulated.

19           THE COURT:  Fine, before I turn to the plaintiffs.

20           MR. COVE:  Sony Optiarc America received a grand jury

21   subpoena and issued a press release to notify its shareholders

22   that it had received that.  This led to these complaints, which

23   are broad.  They encompass every product, every Sony entity,

24   almost every -- ODDs are defined in some of the complaints as

25   every product that contains an ODD.  Various Sony entities make
```

many, many, many thousands of different products that may

contain an ODD.

We don't think that any discovery is appropriate at

this point.  The government has undertaken investigation.  We

don't know what's going to come from that investigation.  If

something comes of it that is specific, they will have a

guideline (indicating plaintiffs).  If nothing comes of it,

plaintiffs will be able to file a complaint, if they have any

information that supports it.

Right now, they have a complaint, a date to file

amended complaint.  We have a Rule 26 process set up.

Certainly we should engage in that Rule 26 process after we get

those amended complaints.  But you know, from Sony's point of

view, we just don't think there's any reason to go forward

until at least the Rule 26 process -- see what the new

complaints say.  If they say anything different, if they define

the products somehow or define the scope of the conspiracy in

some coherent way, maybe some discovery may be appropriate.

But I don't think that issue is quite ripe yet.

And from Sony's point of view, it disclosed that its

subsidiary had received a subpoena because it's wanting to make

sure its shareholders knew about that relevant information.  To

embark on this humongous, burdensome discovery that can affect

every part of the whole company does not seem justified at this

point.  I think we should wait, see the amended complaint, have

1   a Rule 26 conference, and go from there.

2        THE COURT:  Let's see.  If I understand the

3   schedule -- and by all means I'm sure someone will correct me

4   if I'm in error, and I hope that he or she does so -- the

5   direct purchaser plaintiffs are going to file their

6   consolidated amended complaint on or before August 5; a

7   Rule 26(f) conference will take place on or before August 19;

8   and initial disclosures, pursuant to Rule 26(a), will be made

9   on or before September 2.

10        Is that indeed the schedule?

11        MR. SAVERI:  That's correct.

12        MR. ALIOTO:  Yes, your Honor.

13        MR. FRIEDMAN:  (Nods head)

14        THE COURT:  When are the indirects going to file their

15   amended complaint?

16        MR. FRIEDMAN:  Your Honor?

17        THE COURT:  Mr. Friedman?

18        MR. FRIEDMAN:  Your Honor, we would propose

19   August 26th.  I can tell you the rationale behind it.

20        THE COURT:  All right.

21        MR. FRIEDMAN:  There was 29 days between the CMC

22   conference and the date on which you appointed lead counsel for

23   the indirects.  We would simply ask actually for a lesser

24   period of time, obviously 21 days, in order to put our amended

25   complaint on file.

1       THE COURT:  Okay.  Well, let's see.  August...

2       MR. FRIEDMAN:  26th, I believe, your Honor.

3       THE COURT:  How would that fold into the schedule that

4   was set with the direct purchaser plaintiffs in mind?

5       MR. FRIEDMAN:  Well, we certainly would engage in the

6   26(f) conference on the same date.

7       THE COURT:  That would be August 19th.

8       MR. FRIEDMAN:  Correct, your Honor.

9       THE COURT:  That's before you file your amended

10  complaint.

11      MR. FRIEDMAN:  Correct, your Honor.  We don't believe

12  that there's going to be material reasons why the 26(f)

13  conference shouldn't go ahead on the same day.

14      THE COURT:  All right.  If you're agreeable to do

15  that.

16      MR. FRIEDMAN:  We are.

17      THE COURT:  How about the initial disclosures?  That's

18  September 2nd.

19      MR. FRIEDMAN:  We would probably move those initial

20  disclosures two weeks, your Honor.

21      THE COURT:  To the 16th of September?

22      MR. FRIEDMAN:  Yes, your Honor.

23      UNIDENTIFIED MAN:  We have a status conference set for

24  that date your Honor, September 16th.

25      THE COURT:  Okay.  Well, if we did move the initial

1  disclosures to the 16th for the indirects, then we probably

2  should move that further case management conference.  We can do

3  some scheduling in that regard.

4          MR. WALL:  If I may, your Honor, I think from the

5  defense perspective we think it would be both proper and useful

6  to have a complaint before we have the 26(f) so we can have

7  that in relation to the complaint.  And what it says -- and

8  it's -- we're talking a matter of a few days of, to rationalize

9  that.  So we ought to just figure out a way to make that work.

10          THE COURT:  Doesn't that make a good deal of sense,

11  Mr. Friedman?

12          MR. FRIEDMAN:  It's fine, your Honor.  I am -- I

13  always try to advocate for efficiency, and I thought not having

14  two separate conferences -- but we're not opposed to two

15  separate conferences, your Honor.

16          THE COURT:  It's true we set a schedule with the

17  directs in mind.  But it would be helpful I think to get both

18  the direct case and the indirect case moving along pretty much

19  on the same schedule.

20          MR. FRIEDMAN:  That's what we're trying to do, with

21  the exception of the amended complaint.

22          MR. WALL:  But we don't have a problem if he needs to

23  take it to the 26th.  It just seems one schedule does make

24  sense, and moving things a week or two will get it done.

25          THE COURT:  Okay.  Let's come back to that.  I would

1    like to get both the direct case and the indirect case on the

2    same schedule.  And that may take some adjusting in our

3    presently existing schedule.  We can certainly address that and

4    work that out as we go forward.

5           But with that in mind, that we're going to try to

6    bring these two cases on the same schedule, let's address the

7    motion to stay.  And who wants to lead off.  Mr. Saveri?

8    Mr. Friedman?

9           MR. SAVERI:  Mr. Alioto's going to address the motion

10   to stay.  After he finishes, I have a few comments with

11   reference to the comments made by my good friend, Mr. Wall.

12          THE COURT:  Okay.  I suppose you reserve the right to

13   comment on Mr. Alioto's presentation as well.

14          MR. ALIOTO:  Everybody does that, your Honor.

15          MR. SAVERI:  I think Mr. Alioto can take care of

16   himself, your Honor.

17          MR. FRIEDMAN:  Your Honor, do you have a preference to

18   hear from directs first versus indirects?

19          THE COURT:  It's up to you fellas.  Whatever order you

20   wish to proceed in.

21          MR. FRIEDMAN:  Thank you, your Honor.

22          We do agree with Mr. Wall on one thing that there are

23   several elephants in the room.

24          THE COURT:  Well --

25          MR. FRIEDMAN:  And we think the Court has honed in on

1    several of those with its questions.  What -- the dynamic

2    obviously that is going on that Mr. Wall alludes to is the fact

3    that there are multiple -- there are competing interests, and

4    they're asymmetrical.  The government, according to Mr. Wall --

5    and -- I think the government -- is trying to withhold

6    information to its advantage.  Mr. Wall and the defendants in

7    turn, who are acting as rational actors in their self-interest,

8    are making a calculation as to what information is more

9    important for them:  To receive or to give?  And they've

10   calculated that it's more important for them, at least with

11   respect to this litigation and the rules of the game, is to

12   play the game, according to Mr. Wall, to withhold at least in

13   this process information from the plaintiffs.

14        The plaintiffs, speaking from our position, your

15   Honor, look at it as the following -- and it's a matter of

16   degree, and we're trying to look at this asymmetrical interest

17   and solve the problem, the problem being the

18   information-withholding game, and those that are trying to take

19   advantage of it.

20        Indirects -- and I believe that the government

21   unfortunately overstated the indirects' position -- after even

22   a conference with the government, the indirects don't believe,

23   as the government's motion and breadth of order has been

24   presented -- has met its burden.  It's not our burden to come

25   back and then say, well, here's how we would craft the stay.

1    They fail to meet their burden, given what they've presented to
2    the Court, in our opinion.
3         But notwithstanding, instead of -- or in addition to
4    that issue being covered clearly by the directs, I think very
5    forcefully, we took the position of trying to look at the
6    merits and the harm and the showing of harm.  First we look at
7    the government's position and the breadth it took.  It submits
8    to the Court that in a decade, in the Northern District -- its
9    antitrust investigation, criminal investigations, four cases it
10   has come in and asked for a stay:  D-RAM, S-RAM, LCD, CRT.
11        In two of those cases, D-RAM and S-RAM, the plaintiffs
12   were allowed to get -- at the very least, they were allowed to
13   get -- the documents, the preexisting documents that had been
14   collected, subpoenaed and provided to the grand jury.  D-RAM
15   resulted in a, I believe, $860 million fine, approximately.
16   Criminal convictions.  I think the government talked about how
17   successful, clearly, their prosecution was.
18        In S-RAM, there was not, I believe, charges brought.
19        In the other two cases, CRT and LCD, charges have been
20   brought.
21        So what we looked for, your Honor, is to try and
22   determine, in this historical lens, whether or not the
23   government presented evidence to the Court to say and answer
24   with specificity its argument as to:  What's your harm?
25        So what we had expected if it existed was for the

1    government to come in and say, Well, in S-RAM, as opposed to

2    D-RAM, here's what happened:  They were able to -- the

3    defendants were able to tailor their answers to construct a

4    defense in a way that prejudiced our ability to bring our case.

5            They don't say that.  They don't say that in D-RAM

6    when they provided the documents to the plaintiff's counsel --

7    just the documents, right now -- they don't say, It actually

8    resulted in us getting 860 million instead of 2.5 billion

9    because of the fact that they were able to invade the

10   centrality of our theory.  They don't say any of that.  They

11   make no showing.

12           And instead what they simply do is say, Well, there's

13   this hypothetical that's out there, that there could be a

14   construction of a defense with more information given.

15           Now, we then look at that and say, Okay, if that

16   interest -- as the Court I think wisely put to Mr. Wall -- if

17   that interest is a serious and real interest, sufficient to

18   stop the rules of the game from applying to some degree, then

19   Mr. Wall and his group would come in and say, Well, the

20   corporations, they want the information.  They want to avoid

21   criminal liability.  860 million D-RAM.  D-RAM didn't settle

22   for 860 million on the civil side.  So they come and say, Wait

23   a second, our overriding interest is to line up with the

24   plaintiffs, as the Court says.  Well, that's not what they're

25   saying.

1    So we look at it and say, Well, why not?  Well, one,

2  on a macro level, clearly we can interpret their self-interest

3  as otherwise, if they're acting rationally -- which I'm not

4  questioning Mr. Wall's rationality yet.

5    And second would be the argument that they can get it

6  anyway.  They don't have to use the civil discovery process to

7  have their witnesses, their employees, say, What questions were

8  asked of you?  As the Court pointed out, there's no

9  prohibition.  So they can gather the information, and they have

10  the documents.  And so --

11    THE COURT:  Well, they know the documents about the

12  witnesses they had access to, which had be their employees and

13  perhaps others.  But they don't know what the other witnesses

14  or witnesses that were not under their control have presented

15  to the grand jury.

16    MR. FRIEDMAN:  Agreed.

17    THE COURT:  And what you're asking for at this

18  juncture is essentially all of that information, or at least

19  the documentary part of that information.

20    MR. FRIEDMAN:  Well --

21    THE COURT:  And that would put you on an unlevel

22  playing field.

23    MR. FRIEDMAN:  Understood, your Honor.  Let me first

24  say this:  So again, operating with a rational actor, I

25  believe, they wouldn't come all in here together and take the

```
 1   same position.  If there was an information vacuum as to one

 2   client, another client, another client, but not that client,

 3   then they wouldn't all come in lockstep and say, we line up

 4   with the government.  That's my belief.  So I think there's

 5   something that can be said from that.

 6          Now your second point:  We -- and I started hopefully

 7   my presentation with their -- we don't believe it's our

 8   obligation to narrow the scope of an overly broad and unjust,

 9   unsupported stay of argument.  Directs therefore have taken a

10   very strong position and made that showing as to therefore why

11   discovery should go forward and the Court should, on an

12   issue-by-issue basis, surgically, make decisions, as I watched

13   this court do on some level in the Hepting matter.

14          The Court's ability to control is the answer.  Not an

15   overbroad stay, throw the baby out with the bath water.  And

16   the directs have made a strong showing on that.

17          We have said to the Court, as an attempt to try and

18   assist the Court in this process, to say, All right, we see the

19   asymmetrical game that's going on.  We see it.  We all see it.

20   So let's try and solve the problem at least on -- in one way.

21          And we looked at the documents that have been -- that

22   are sitting on hard drives right now that have been collected

23   and that need to be -- can be copied and handed over to us in

24   24 hours.

25          THE COURT:  Well, what would you suggest the Court do,
```

1    in order to, to use Mr. Wall's phrase, play the game according

2    to the rules, Number 1; and Number 2; keep a level playing

3    field between the plaintiffs and the defendants?  That is, not

4    to disadvantage one to any material degree, or advantage the

5    other to any material degree.

6            MR. FRIEDMAN:  Understood, your Honor.  And I think we

7    took an extremely, extremely conservative position on that, in

8    our suggestion, you know.  Extremely conservative.  And we said

9    the following, is that at a minimum, the production of the

10   documents turned over to the grand jury is not going to

11   disadvantage anyone at that table (indicating defendants); or

12   anyone at that table (indicating plaintiffs), and at a

13   minimum -- and that was done in D-RAM and S-RAM, and there's

14   been no showing that it actually disadvantaged anyone.

15           THE COURT:  Well, would it put you at an advantage

16   over the defendants in that, or is the proposal that you are

17   making is that the production of those materials would be known

18   not only to all of the plaintiffs but to all of the other

19   defendants?

20           MR. FRIEDMAN:  Absolutely, your Honor.  So there's no

21   unequal playing field at all.  At the point right now, our

22   operative -- all of the defendants know the documents -- to the

23   extent they turned them over, they all know their documents.

24   To the extent they have engaged in a joint defense agreement,

25   which is standard, and are sharing, there can be certain

```
1    inference from, all our history and experience in litigation --
2    that may already have happened.  I don't know.  So I don't see
3    the argument as to the -- how that would in any way make the
4    playing field unlevel.
5             THE COURT:  All right.  Now, let me tell you what my
6    initial inclination was, and may still be.  And that was to, to
7    use Mr. Wall's expression, follow the rules of the game.  Set a
8    date for the filing of these amended consolidated complaints on
9    the direct side and the indirect side; go through the Rule 26
10   process; and keep in place a stay until that Rule 26 process
11   has been completed and/or the cases are issued.
12            Then open up discovery without limitation.
13            MR. FRIEDMAN:  Well your Honor, we would ask to amend
14   that, the Court's thinking in one limited regard.
15            THE COURT:  All right.  In what regard?
16            MR. FRIEDMAN:  And that limited regard, as we put in
17   our proposal and is authorized by the rules of the game, is
18   under 26(d)(1):  The Court has the authority, separate from a
19   26(f) conference, has the authority to order discovery.  We ask
20   that the court order, within 30 days of entry of a protective
21   order that we've been drafting or exchanging with defendants --
22   that the Court order the production of the grand jury
23   documents; and then with respect to the rest of the Court's
24   ruling, I can't speak for the directs, but we would be
25   supportive of that.
```

1          THE COURT:  Okay.  Well, okay, (d) is simply the

2     timing, sequence of --

3          MR. FRIEDMAN:  Correct, your Honor, absolutely.  And

4     they've said no discovery can go forward until the 26(f)

5     conference.  That's the rule of the game they're putting

6     forward.  And I'm saying we understand and we fully intend to,

7     in the pursuit of the 26(f) conference -- which, according to

8     the rules of the game, I believe should have occurred on

9     April 15th, before the status conference.  But setting that

10    aside, your Honor, of course, the fact is the rules of the game

11    provide for the Court, independent of the 26(f) conference, to

12    order production.  And we ask for a narrow production.  They've

13    had, as the subpoenaed -- the subpoenas were publicly

14    acknowledged in October of 2009, so in terms of fairness, with

15    respect to the documents and -- that I'm focusing on right now,

16    there's been an extremely long time to the extent for the

17    defendants to look at their documents in their case.  And so we

18    think they would not be prejudiced in terms of the rules of the

19    game of to have to produce those very same documents within 30

20    days of the protective order.

21          THE COURT:  Within 30 days of...?

22          MR. FRIEDMAN:  Entry of a protective order.

23          THE COURT:  And before or after the amended complaint?

24          MR. FRIEDMAN:  Before.

25          THE COURT:  Anything further?

1          MR. FRIEDMAN:  Unless the Court has any questions, no,

2     your Honor.

3          THE COURT:  Mr. Alioto?

4          MR. ALIOTO:  Thank you, your Honor, and may it please

5     your Honor:  The matter that is before the Court is the request

6     by the government to have a stay for one year.  One of the

7     reasons is that the defendants would otherwise get an

8     advantage.

9          At the same time at that the government is asking for

10    this year's stay, the defendants are agreeing with them.  And

11    so I don't think that there's any real basis for the stay.  I

12    think also if the case were looked at as a regular case -- it

13    is a price-fixing case -- that probably within that year we

14    could get to trial, if things were properly focused, in my

15    opinion.

16         As was pointed out by your Honor, first of all, with

17    regard to the government -- let me just say one thing about the

18    government:  The government has done, I think, in

19    San Francisco, the antitrust division here has been extremely

20    successful.  They've done a great job, in my opinion, for the

21    country and for the law.  They have sent people to jail who

22    violated our law.  They have made them pay extraordinary fines.

23    I'm involved in the OCD case.  They have fund of over a billion

24    dollars, and they've sent about 10 of these folks to jail, and

25    they have plea agreements from I think it's like eight, nine or

1    10.  And so I have no -- or we have no intention whatsoever to

2    interfere with anything that the government is doing.

3          And I think that it wasn't correct for the government

4    to take the position that under federal rules, Criminal Rule 1

5    that we're now supposed -- that witnesses now can't speak about

6    what they talked about in the grand jury.  I think the Court is

7    absolutely right about that.  And the Court should never allow

8    that rule to be extended, unless the proper authorities extend

9    it.  I don't think that that should be -- that rule should be

10   changed at all.

11         However, I don't think it matters here.  We have no

12   intention of asking any of these witnesses -- I don't -- asking

13   them, What did you tell the grand jury?  I don't care what he

14   told the grand jury.  I want to know when, where, what, why and

15   how they met -- and we know that they did.  And to be specific,

16   more specific, your Honor, the Court has the authority under

17   26(f) and (d), both of them, to allow discovery now.

18         We do have complaints on file.  We're going to have a

19   consolidated complaint, okay, so it puts it all together.

20   Complaints are already on file.  There's no mystery.

21         THE COURT:  Let me ask this question:  Let's assume

22   that I barred discovery, required the plaintiffs to file their

23   amended complaints, the defendants attacked those complaints on

24   *Twombly*, *Iqbal* grounds, whatever, and a motion to dismiss is

25   granted; goes up on appeal, is affirmed -- the motion to

1    dismiss with prejudice is granted, and that's affirmed.  Then,

2    later, as a result of the grand jury investigation, some hard

3    evidence comes out of a conspiracy.  Cannot civil plaintiffs,

4    whether represented by you or other counsel, come in and take

5    advantage of what the grand jury investigation and criminal

6    proceedings have turned up in pursuit of civil remedies on

7    behalf of injured parties?

8            MR. ALIOTO:  If those cases -- I don't know, that's a

9    pretty good question.  Because if the cases were in fact

10   dismissed with prejudice, and if that, in fact, dismissal was

11   affirmed, and if -- is the Court saying that the class action

12   has been ruled upon?

13           THE COURT:  No.

14           MR. ALIOTO:  So then, at least as to those particular

15   plaintiffs, those particular plaintiffs would be out.  It would

16   be res judicata.  They could not -- I mean, I don't think they

17   could come back at all.

18           THE COURT:  Okay.  And what would be wrong with that?

19           MR. ALIOTO:  Plenty.

20           THE COURT:  What would be wrong with that is that

21   those plaintiffs jumped the gun, they moved too quickly, and

22   they, by moving too quickly, filing too soon, paid the price.

23   That would be the problem, wouldn't it?

24           MR. ALIOTO:  Your Honor --

25           THE COURT:  And what's wrong with that?  After all,

1    there has to be some consequence of moving a case along too

2    quickly, before the facts have developed.

3           MR. ALIOTO:  The Court has raised the issue about

4    whether or not you know the facts and the extent to which the

5    facts are developed.  The complaints we submit that are now on

6    file plainly, obviously, state a cause of action.  I think that

7    any kind of Rule 12 motion would be in bad faith.  I know it's

8    a knee-jerk reaction of defendants, but I think that the -- I

9    mean, the statements are very clear.  These people got

10   together, they met often, they agreed on the prices and they

11   agreed -- and they in fact did what they agreed to do.

12          Also, I don't think that we should put a blind eye to

13   the people that are involved.  With these people, the

14   government has them involved in numerous cases; so do civil

15   cases.  Hitachi, Toshiba, Samsung, LG, Philips, these people

16   have been occupying the federal courts for the last six years.

17   They meet with each other more than they meet with their

18   families.  We know who these people are, and we know how they

19   react, and it's very simple, I would say, too.

20          I think this also, as a practical matter, at least in

21   my experience with the LCD case, is that we can't forget this

22   one fact:  These witnesses die, these witnesses resign and run

23   away, these people begin to forget.  I mean, we run into a lot

24   of that now.  We were stayed for quite awhile in the LCD case.

25          And we know the way they operate.  We think -- I

believe -- if you want to get the documents from the grand

jury, first of all, they have already got them together.  It's

not a big problem for them to give us what they've already got

together.

            But I will say this also -- and this is my own view,

not necessarily the view of all of my comrades -- is that

those -- the documents in the grand jury are quite extensive.

And they attack, in my opinion, the pyramid at the bottom

instead of the top.  It is very clear that when these people

meet, the documents that we would want are the documents that

show their communications with each other, the documents that

show their meetings, and the documents they took to the

meetings, which are called executive summaries but which

they've always done.  And in those documents -- you don't have

to do this separately and you don't have to do it by invoice or

otherwise -- in those documents are their capacity, how much --

how much can their plant handle, how much has it handled, how

much will it handle?  And the need to stabilize the prices.

Because if they can't stabilize the prices, then they're in

trouble.

            Also in those documents, not at the bottom of the

pyramid but at the top, in those documents are their

reflections of the demand, and they see it in terms of the

consumers, and they identify who they are.  And each one of

these people, they have been doing it in every single case.

1   And in this case, it's obviously -- like we have even -- even

2   if you viewed this case as we did in our complaint from an

3   economic standpoint, you can see that it's phony,

4   notwithstanding the meetings and notwithstanding the agreements

5   that we assess.

6          So we would say that -- we would say this, your Honor:

7   That following the rules -- first of all, we don't think we

8   should be stayed in this case and any other cases, even if the

9   government weren't involved in it.  Rule 1 is such a fabulous

10  rule because it seeks to get -- it seeks to turn away the

11  notion of justice delayed is justice denied.  It's exactly the

12  opposite.  It says just, speedy and inexpensive.  Just, speedy

13  and inexpensive.  Speedy and inexpensive.  We could get these

14  folks right away, probably before December, if we got these

15  documents, and if we were allowed to take depositions.  And I

16  really wouldn't care.  We would say, Okay, we're not going to

17  ask them what they told the grand jury.  Because frankly, I

18  don't care.

19         I think that the group that I am with, we have taken

20  many, many depositions, and we think that we would be a

21  complement to -- we think we would be a complement, your Honor,

22  to the Department.  And I think that the procedure, in

23  following the rules -- well, what are the rules?  The rules

24  are, as we put, the cases are clear there, your Honor, that

25  discovery isn't blocked because of an amendment to a complaint,

1    or a consolidated complaint.  Or whatever.  Why would we wait

2    for that?  The defendants have been charged by us in at least

3    10 complaints.  They know what we're saying.  And the

4    consolidated complaint, what is that going to be?  That's just

5    going to be a combination of all of them.  Why should we wait

6    until then to get documents which they obviously already have

7    segregated, minimum?  Why should we wait for that?

8            And if -- and if we have those documents, whether

9    you -- however they're described -- I mean, I think people

10   would like to describe them as the documents that the

11   defendants gave to the grand jury.  Okay.  That's very

12   specific.  In a merger case, how would we ask for the

13   documents?  We'd ask for the documents in terms of, Give us the

14   documents that you gave to the government under

15   Hart-Scott-Rodino.  That's all we're asking for.  You already

16   got them together.  It's inexpensive.  You got them in a drawer

17   someplace or a warehouse, wherever it is.  There it is.  If

18   they did this to the grand jury, have them give us those -- I

19   think there'd be too many because I would like to be --

20           THE COURT:  Well, there is a difference, isn't there,

21   between a Hart-Scott-Rodino inquiry and a grand jury

22   investigation?

23           MR. ALIOTO:  I don't think so, in this sense, your

24   Honor:  That in the Hart-Scott-Rodino situation, they're

25   suppose to do hand over every document that has any relevance

1    to their claim or attempt to merge.  Under a subpoena, they'd

2    better -- pardon me.

3              THE COURT:  But that's a civil proceeding, by and

4    large.  Very seldom does a criminal proceeding come out of a

5    merger.

6              MR. ALIOTO:  Yeah, that's unfortunate.  But I assume

7    that if somebody gets a subpoena -- I mean, they have to -- I

8    assume that they're going to obey it.  And I assume also, and I

9    don't think irrationally, that what the government is inquiring

10   into, although they could probably -- I don't want to criticize

11   them on the breadth of their subpoenas -- but if they got to

12   the heart of the matter, they want to know when and where and

13   why and what and how the meetings took place, and the documents

14   that were there.  They know what level it is.  We know what

15   level it is.  It's always -- like it's always in the

16   vice-president and president level.  We know that the larger

17   advice, the chairman and the CEOs get it started, and we know

18   that the working group are the guys who put it into effect.

19             We now -- and we know that they got their so-called

20   executive summaries, which is all of this information given to

21   these people when they meet.  We know how that -- we know what

22   they do when they meet, and how they exchange that information.

23   So...

24             THE COURT:  All right.

25             MR. ALIOTO:  Since that's so -- I'm saying this, the

1    defendants have represented that we ought to go by the rules.

2    We are going by the rules.  And we are especially going by

3    Rule 1.

4           So there's no mystery here, and if the Court has the

5    power, which it does under 26 -- the Court knows what happens,

6    I think -- the Court knows what happens in a Rule 26

7    conference.  I mean, it's not just, you know, we want these

8    documents.  Okay.  We're going to give them to you or we're

9    going to fight you, one way or the other.  Of course they'll

10   fight you, one way or the other.  But they have to have a plan.

11   We're talking three or four months just to get a plan together.

12   I'm sure there'll be a lot of objections.  All these papers and

13   whatever.

14          We know where the core is.  We know the people who did

15   it.  And we can, if we want to, get right at it.  And that is

16   within the rules, because that's what the rules allow.

17          THE COURT:  Okay.

18          MR. ALIOTO:  I'm afraid of one thing, your Honor, and

19   I've seen it, and -- first of all, I do not see in any way

20   whatsoever that we are hindering or hampering anything that the

21   government is doing.  Indeed, we'd probably help them out,

22   which I wouldn't mind doing, of course, at all.  I don't want

23   to hinder them or stop them from doing anything.

24          But the fact of the matter is:  It's happened before,

25   it's going to happen again.  When this stuff starts going on,

1    all of a sudden some of these folks resign.  Next thing you

2    know they're in the backwaters of Bangkok or something, you

3    can't find them.  Some of them die.  Some of them are fired.

4    They leave.  And then, of course, the big one is, Oh, well,

5    I've forgotten.  And so the idea of any stay, your Honor, from

6    just the regular rules, following the regular rules, I think

7    would be very devastating -- well, devastating to the

8    plaintiffs.  I think under the *Molinaro* case, there's no

9    question that in each one of those criteria, your Honor --

10            THE COURT:  Molinari?  *Molinaro*?

11            MR. ALIOTO:  Yes, your Honor.  I originally said

12   Molinari, too, like a salami.  But it's *Molinaro*.  Give the guy

13   a break (general laughter).

14            But under that case, each of those entrants are served

15   by -- what is in front of the Court?  The only thing in front

16   of the Court at the moment is a motion to stay.

17            THE COURT:  Right.  All right.

18            MR. ALIOTO:  We say that the Court should deny that.

19            THE COURT:  Thank you.

20            MR. ALIOTO:  Thank you, your Honor.

21            THE COURT:  All right.  Mr. Saveri, your comment on --

22            MR. SAVERI:  I don't want to repeat what Mr. Alioto

23   said because he's quite capable of doing what he wants.  But

24   certain references are made to other cases that I've

25   participated in, and am participating now in, namely the D-RAM

1    case and the S-RAM case, and also the LCD case.

2         THE COURT:  Mr. Alioto did say something that was

3    quite interesting, and that was that when we get to the Rule 26

4    conference, we're going to be sitting down -- you fellows are

5    going to be sitting down and you're going to be thrashing out a

6    discovery plan.  And that's going to take some time.

7         MR. SAVERI:  Right.

8         THE COURT:  Why shouldn't we do that before we have

9    any actual discovery?

10         MR. SAVERI:  Well, we could do it at that conference,

11    but there's nothing to prevent the defendant from turning over

12    these grand jury documents which they have in their office

13    right now, as Mr. Alioto said.  That has occurred in the D-RAM

14    case; it has occurred in the S-RAM case; it has occurred in the

15    LCD case.  They turned these documents over.

16         You know, this is very interesting what has developed

17    in these cases.  This is what happened in D-RAM.  Now, Mr. Wall

18    talks about the level playing field.  Well, the level playing

19    field -- why don't we just abide by the regular rules of civil

20    procedure and forget the grand jury documents and forget the

21    DOJ?  We have filed a complaint.  That's on file s.  We're

22    going to file a consolidated complaint.  The consolidated

23    complaint will pass muster, and any *Twombly* motion or anything

24    like that.  And the law's pretty clear, as we indicated in our

25    motion, that there is no stay of discovery because of a *Twombly*

motion or any kind of a motion.  The cases are legion on that.
That doesn't stay discovery.  And that's how we want to
proceed.

          Now, if we want to proceed on a level playing field,
let's forget the grand jury documents.  Let's forget the DOJ
documents, as Mr. Alioto said.  So we will file, tomorrow, a
motion -- we will file, tomorrow, a set of interrogatories, the
typical set of interrogatories that we file in an antitrust
case; and we will file a document request, the typical document
request that is filed in an antitrust case.  And we will ask
the typical things that we ask.  And the main things that we
ask are for communications between the defendants and also any
documents that they have that refer to communications before
the defendants.  Now, if that is the level playing field, why
can't we do that within a week and they can respond in 30 days?
And forget about all the stays and everything else.  That is
the level playing field.

          But they don't want to play like that, because they're
going to come in with motions to stay, grand jury things, grand
jury investigations.  So that would be the normal thing to do,
but we can't do it now because the government then comes in and
says, I want a stay.

          Now, with reference to the government, putting
everything off until the government is completed, that can be,
as somebody says, the Twelfth of Never.  The government has

had, I know they had a D-RAM investigation going on for years.
And they've had the LCD investigation going on for years.  And
if we have to wait until that is over before we move, we will
be very, very severely prejudiced.  We may well run into
statute of limitations problems and things like that.

          And so what I'm trying to say is there should be some
discovery that should be permitted right now.  And the easiest
thing for them is to turn over these documents.  And let's not
kid anybody:  They know exactly what is in those documents.
Every defendant knows exactly what's in those documents,
because the subpoena has called for the same documents from
everybody.  And I'm not -- I won't be a bit surprised if they
have a sharing agreement.  In fact, there's a great article I
think we cited in our brief by a Mr. Bock from Howrey Simon who
says the best way to defend these cases when you're sued is get
together with an agreement where we share all the information.
They know exactly what's going on.  And this stuff about
they're not knowing and tipping people off is a bunch of
baloney.  That is what happens in a practical world.

          Now, by producing the documents in the D-RAM case
where they turned over the grand jury documents within four or
five months, I believe it was, and the same thing that Judge
Wilken ordered -- ordered the defendants to give us the
documents that were turned over to the grand jury, that didn't
prejudice anybody.  And we can move on ahead and have a 26(f)

1    conference, but we also would be a step ahead by having these

2    documents.  And that's all we're asking for.

3            And as far as the -- and I want to talk a little about

4    the proposed order with the government.  You've asked some very

5    interesting questions about communications with the grand jury.

6    We -- as Mr. Alioto said, we don't want to know what anybody

7    told the grand jury.  We will abide by the criminal rules.  We

8    never intended to do that.  But there are a lot of

9    communications that might have taken place in the grand jury

10   that we're entitled to.  And in talking to Mr. Majalya

11   yesterday, I said, What about some guy that goes to the grand

12   jury and spills his guts and he comes out and comes to my

13   office and tells me what went on?  Now, aren't I entitled to

14   that?  And he agreed that I am.  So when you look at that

15   proposal, it's fraught with problems.  The grand jury stuff and

16   the proposals they have is fraught with problems.

17           And in the LCD case, that provision that they have

18   inserted in the order has created a lot of problems, with

19   translations, with communications with the government.  The

20   same problems arose in S-RAM.  The proposal that the -- the

21   order that they made is just too broad and doesn't work.

22           So all I'm trying to say is:  We're not going to step

23   on the shoes of the Department of Justice with reference to

24   anything that happened before the grand jury.  And we certainly

25   should be entitled to get the DOJ -- the documents that were

1   turned over to the grand jury.  That would take a minute, and

2   then we can have a 26 conference.  And I think it would be very

3   prejudicial to us if we put this case off and put it on ice.

4              THE COURT:  Okay.

5              MR. SAVERI:  Thank you.

6              THE COURT:  Very well.  Matter submitted, Counsel?

7   Anything further?

8              MR. MAJALYA:  Just a couple of points, your Honor.

9   Mr. Friedman in his presentation indicated a couple of things

10  that I believe shows a level of ignorance on the part of the

11  plaintiffs on multiple levels.  But on the level that we are

12  interested in, the government did submit an under-seal

13  declaration to the Court about certain facts that I am not

14  permitted to talk about in open court.  And so there's a reason

15  that they are ignorant to those facts.

16             The Court may not have been convinced by what we said

17  in our papers, but there are facts that are specific to this

18  case that we did present in trying to meet our burden in order

19  to get an order for a stay.

20             In addition, and I have to again speak more broadly

21  here because I cannot speak about this case in particular, but

22  in many of the government's cases pursued by the antitrust

23  division, there are leniency applicants and there are

24  cooperators.  And cooperators and leniency applicants are not

25  in the business of sharing their documents with other

1    defendants.  So the speculation that plaintiffs are engaged in

2    with respect to -- that defendants are spreading these

3    documents around and they all know what each other has, I think

4    is inappropriate and not correct.  And so I don't think it's

5    the case that all the defendants know what everybody has and

6    only the plaintiffs are getting left out.

7         The final point is -- I want to make is with respect

8    to the question relating to grand jury witnesses and the fact

9    that Mr. Saveri said that I agreed that a grand jury witness

10   can come out of the grand jury and go to his office and say

11   whatever he wants.  That is absolutely true.  And we are not

12   attempting to prevent a witness from voluntarily going to

13   Mr. Saveri's office and telling them everything that they told

14   the grand jury in terms of the actual facts as to what that

15   person did, and what they know.

16        But -- witnesses in the grand jury are again permitted

17   to disclose whatever they have told the grand jury, but the

18   difference here is that the plaintiffs would be seeking to

19   compel them to tell them what they said in the grand jury.  And

20   so that is not a situation where the witness is voluntarily

21   saying what happened in the grand jury, they're being compelled

22   to tell what happened in the grand jury.  And that is what

23   we're attempting to prevent.  We're attempting to prevent

24   counsel from again boring in on the direction of the grand

25   jury.

1          So I think that is all the government has.

2          THE COURT:  Very well.  Thank you, sir.

3          MR. WALL:  Your Honor, I know you want to go.  Just

4     one minute total.  I just want to make two points.  First of

5     all --

6          THE COURT:  Two points in one minute.  All right.

7          MR. WALL:  Okay.  Just very quick.  You know, the -- a

8     lot of rhetoric about how we're playing some information game

9     or whatever.  This issue of parallel civil/criminal proceedings

10    is a very serious issue.  I would just note for your Honor the

11    Harvard Law Review note that we cited does a very deep

12    treatment of this.  I think it shows that there are serious

13    interests here, and I would just commend it to you.  It's not

14    just some sort of gamesmanship.

15         The other point that I want to make is:  We have all

16    these references to the other cases in the district.  In the

17    LCD case, the D-RAM case, the Flash case and the GPU case, the

18    plaintiffs got the documents only after there was a

19    consolidated amendment on file and a Rule 26(f) conference.

20    The only case to the contrary is the decision by Judge Wilken

21    in the S-RAM case.  I was in that case.  I can just tell you,

22    without going too far, we didn't get to have a conversation

23    like this.  You've taken a lot of time with us.  We appreciate

24    it very much, your Honor.

25         THE COURT:  Very well.  The matter will be submitted.

1    And the Court looks, in deciding this case, to the fairly

2    limited guidance that the Ninth Circuit has given us.  It seems

3    to be most articulated -- well articulated in Federal Savings

4    and Loan Insurance Corporation vs. Molinaro, 889 F.2d, 899.

5    889 F.2d, 899.  And the factors that the Ninth Circuit has

6    counseled the Court to use in exercising its discretion with

7    respect to permitting or sequencing or timing discover where

8    there are parallel criminal and civil proceedings are

9    essentially as follows:

10          "A court must decide whether to stay civil proceedings

11   in the face of those parallel criminal proceedings in light of

12   the particular circumstances and competing interests involved

13   in the case.  Obviously a court should consider the extent to

14   which the defendant's Fifth Amendment rights are implicated.

15   Other factors a court should consider will vary according to

16   the case itself, but will generally include:

17          "The interest of the plaintiffs in proceeding

18   expeditiously with this litigation or any particular aspect of

19   it, and the potential prejudice to the plaintiffs of a delay."

20          The court should also consider:

21          "The burden which any particular aspect of the

22   proceedings may impose on defendants; the convenience of the

23   court in the management of its cases, and the efficient use of

24   judicial resources; the interests of persons not parties to the

25   litigation; and the interest of the public in the pending

1   civilian criminal litigation."

2          And I agree with Mr. Wall's comment, that in a

3   situation such as this, there are serious issues which

4   transcend the particular interests of the parties to the

5   litigation, and to the civil proceedings.  A decision about the

6   timing and the sequencing of this discovery is not a decision

7   that should be made lightly.

8          But I also agree with the tenor and tone and substance

9   I think of the comments made by Mr. Saveri, that in the absence

10  of particular concerns, I think we should proceed with the

11  civil litigation pretty much in the same manner and in the same

12  order that we would proceed with the civil litigation in the

13  absence of a pending grand jury proceeding.  To be sure, that

14  grand jury proceeding may affect some particular aspects of the

15  discovery, may affect the timing of it in various ways, but we

16  have civil cases before us and it's appropriate to proceed with

17  those as expeditiously and in as orderly a fashion as we can.

18         So I am disinclined to grant the blanket kind of stay

19  on discovery that the government seeks here.  What I would

20  attempt to do, what I am attempting to do, is to create as much

21  as possible a level playing field between the plaintiffs and

22  the defendants in the civil litigation as we go forward,

23  without unduly jeopardizing the quite legitimate interests of

24  the government in protecting its case, its confidential

25  informants, and protecting the integrity of the leniency

1   program which it has in place.

2          Here's what I think we should do:  We should have the

3   plaintiffs submit their consolidated amended complaints, both

4   the indirect and direct plaintiffs.  That we should allow the

5   plaintiffs to propound whatever discovery that they believe is

6   appropriate to propound, and then sit down first after the

7   26(f) conference, among the parties, and the initial

8   disclosures, at a further case management conference, at which

9   we will take up the particulars of the discovery that the

10  plaintiffs want to pursue.

11         I am impressed with the government's point, which I

12  think was a good point that it made in support of its position,

13  that while the defendants know what documents they turned over

14  to the grand jury, not all of the defendants are aware of the

15  whole universe of documents that may be before the grand jury.

16  And there are legitimate government interests with respect to

17  the confidentiality of some of those submissions.

18         But I think we can discuss the particulars of what is

19  necessary to protect the government's legitimate interests in

20  conducting its investigation and protecting its confidential

21  witnesses, informants and protecting its leniency program, in

22  the context of specific discovery requests, rather than

23  imposing a blanket stay of all discovery.  So here's what I

24  propose:

25         A slight modification of the schedule that we

1   previously put in place, in order for the indirect plaintiffs

2   to get essentially on the same schedule as the direct

3   plaintiffs.  That both the direct and the indirect purchaser

4   plaintiffs will file their consolidated complaints on or before

5   August 19.  That's the two-week extension, Mr. Friedman, that

6   you were seeking.

7            MR. FRIEDMAN:  I believe I asked for August 26th, your

8   Honor.

9            THE COURT:  Did you ask for August 26th?

10           MR. FRIEDMAN:  I did.

11           THE COURT:  Well, your wish is -- I won't say my

12  command, but --

13           MR. FRIEDMAN:  Thank you, your Honor.

14           (General laughter)

15           THE COURT:  Well, that makes a slight change, but

16  maybe not one that will materially affect matters.  And if this

17  schedule poses a particular problem for any party, by all

18  means, speak up, as Mr. Friedman did.

19           What I would propose then is that the consolidated

20  complaints be submitted on or before August 26.  That the

21  parties conduct their Rule 26(f) conference on or before

22  September 9.  That initial disclosures be made on or before

23  September 23.  And that we schedule a further case management

24  conference on September 30.

25           And I'll ask the Clerk to suggest a time for that

1    conference.  That is a Thursday.

2            DEPUTY CLERK:  That is a Thursday, your Honor.  Do you

3    want to do it on a Wednesday?

4            THE COURT:  What does Wednesday or Friday look like?

5            How about the 29th of September?  Is that too soon

6    after the initial disclosures?  We can do it on the 29th, can't

7    we?

8            DEPUTY CLERK:  If we're not in trial, we can do it.

9    At 11:00 o'clock or 10:00 o'clock.

10           THE COURT:  10:00 o'clock.  10:00 o'clock on the 29th

11   of September?  How's that?

12           MR. FRIEDMAN:  Good, your Honor.

13           MR. WALL:  That's fine, your Honor.

14           THE COURT:  All right.  Is the ruling complete and

15   understood?

16           MR. WALL:  Yes, your Honor.

17           MR. FRIEDMAN:  Yes, your Honor.

18           MR. SAVERI:  I'd like to make an announcement that you

19   asked us to make in connection with discovery coordinators.

20   You asked the directs to select a person, the indirects to

21   select a person, and the defendants.  The directs have selected

22   Mr. Bruce Simon as our discovery coordinator.  The indirects

23   have selected Mr. Friedman as the discovery coordinator.  We've

24   asked Mr. Cove sometime ago to select one.  He hasn't selected

25   one yet, but he indicated to me -- unless he knows today who

1    your person is going to be -- who the name of the person is.

2              So those would be the people who would be contacting

3    you on discovery problems.

4              THE COURT:  That's fine.

5              MR. SAVERI:  Do you have a name yet?

6              MR. COVE:  It's not for me to select.  I think we have

7    to agree.

8              MR. SAVERI:  Okay.

9              THE COURT:  All right.  I'll look forward to whatever

10   it is.

11             MR. WALL:  Thank you, your Honor.

12             MR. SAVERI:  Thank you, your Honor.

13             MR. ALIOTO:  Thank you, your Honor.

14             THE COURT:  Thank you very much, Counsel.

15             DEPUTY CLERK:  This court's in recess, and we'll

16   resume at 2:00 this afternoon.

17             (Adjourned)

18                            oOo

19                   CERTIFICATE OF REPORTER

20

21             I, Connie Kuhl, Official Reporter for the United
     States Court, Northern District of California, hereby certify
     that the foregoing proceedings were reported by me, a certified
22   shorthand reporter, and were thereafter transcribed under my
     direction into written form.

23

24             _____SS:_____

25                      Connie Kuhl, RMR, CRR
                        Tuesday, June 29, 2010