Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:   (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
George W. Sampson (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Interim Lead Counsel for Indirect
Purchaser Plaintiffs

[*Additional Counsel Listed on
Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| IN RE OPTICAL DISK DRIVE PRODUCTS ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | MDL No. 3:10-md-2143 VRW **CONSOLIDATED CLASS ACTION COMPLAINT** DATE ACTION FILED: Oct. 27, 2009 |
| This Document Relates to: ALL INDIRECT PURCHASER ACTIONS | ) ) ) ) ) | |

1

## TABLE OF CONTENTS

2    I.    INTRODUCTION ....................................................................................................1

3    II.   DEFINITIONS ........................................................................................................2

4    III.  JURISDICTION AND VENUE ..............................................................................3

5    IV.   PARTIES ................................................................................................................4

6          A.    Indirect Purchaser Plaintiffs ....................................................................4

7          B.    Defendants ................................................................................................9

8    V.    AGENTS AND CO-CONSPIRATORS ...............................................................13

9    VI.   FACTUAL ALLEGATIONS ...............................................................................15

10         A.    Description of Optical Disk Drive Products ...........................................15

11         B.    Specific Characteristics of the ODD Market Made It Ripe for Collusion .................19

12               1.    The ODD Market Experienced a Dramatic Increase in
13                     Concentration ..............................................................................19

14               2.    The ODD Market Is Dominated by Joint Ventures and Coordinated
                       Business Activities .......................................................................21

15               3.    Effects of Consolidation in the Market ........................................28

16         C.    Incestuous Relationships Serve as a Conduit to Price Fixing Between
17               Competitors ............................................................................................28

18         D.    Defendants Exchanged Competitive Information and Fixed Prices by
                 Rigging Bids in Procurement Auctions for ODD Products.........................30

19               1.    The ODD Customer Procurement Process for OEMs ...................30

20               2.    Defendants' Bid Rigging and Customer Allocation Conspiracy ...................31

21               3.    Specific Representative Examples of Defendants' Bid Rigging ...................33

22         E.    Barriers to Entry in the ODD Market .....................................................34

23               1.    The Predecessor of the DVD Patent Pools ..................................35

24               2.    Description, Structure and Membership of the DVD Patent Pools .................37

25               3.    Role of Patent Pools in Facilitation of Cartel Monitoring .............................40

26         F.    Defendants' Participation in Trade and Business Organizations Provided
27               Opportunities for Collusion .....................................................................42

28               1.    The Optical Storage Technology Association .................................43

2.      The DVD Forum..................................................................45

3.      The International Symposium of Optical Memory ...........................48

4.      The Blu-Ray Disc Association ...................................................51

G.      Effects on Price and Harm to Consumers..........................................51

1.      Defendants' Conspiracy Caused Consumers to Pay Higher Prices.................51

2.      Defendants' Conspiracy Harmed Consumers by Causing Decreased Technological Innovation ................................................58

H.      The Pass Through of Overcharges to Consumers ....................................64

I.      Governmental Investigations into Price Fixing in the ODD Industry ........................67

1.      Defendants Have Admitted that Multiple Governmental Organizations Are Investigating Price Fixing in the ODD Industry ...............67

2.      The Department of Justice Has Admitted It Has Convened a Criminal Grand Jury to Investigate Defendants' Price Fixing in the ODD Market................................................69

3.      Defendants' Agent Admits that the "Implied Promise" of the Grand Jury Investigation Is Criminal Indictments or Admissions of Guilt................................................71

J.      Defendants Have a History of Colluding to Fix Prices in Related Markets...............71

1.      Defendants Have Been Charged With and Have Pleaded Guilty to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of LCD Panels and LCD Products Sold in the United States................................................72

2.      Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the United States......................74

3.      Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the European Union...................75

4.      Governmental Investigations Have Revealed Defendants' Involvement in a Price-Fixing Conspiracy of Cathode Ray Tubes ................76

VII.    TRADE AND COMMERCE ................................................................76

VIII.   FRAUDULENT CONCEALMENT ........................................................78

IX.     CLASS ACTION ALLEGATIONS................................................................85

X.      VIOLATIONS ALLEGED ................................................................92

# I.     INTRODUCTION

1.      Since at least 2004, Defendants have engaged in an international conspiracy to fix the prices of Optical Disk Drives ("ODD").  Defendants' price-fixing scheme has caused millions of United States consumers to be collectively overcharged by potentially billions of dollars for their purchase of computers, computer peripherals and video game consoles.  This illegal behavior has harmed competition and consumers and is exactly the type of conduct the antitrust laws are designed to prevent and punish.

2.      Defendants achieved their illegal object to artificially inflate ODD prices by concerted action, including customer allocations and rigged auction bidding for procurement contracts.  For example, some of the largest Original Equipment Manufacturers ("OEMs") in the United States who procure ODD products instituted online auctions to ensure vigorous competition – *i.e.* drive down ODD prices.  But this case will show that the existence of an auction does not guarantee competition; especially if the bidders rig the auction.  That is exactly one method Defendants have used to stabilize ODD prices here.

3.      Defendants' cartel illegally raised prices by rigging electronic auctions conducted by the OEMs to award ODD supply contracts to Defendants.  In simple terms, Defendants thwarted price competition by agreeing with each other to fix the outcome of electronic auctions OEMs conducted.  By agreeing to fix the outcome of these auctions, Defendants assured themselves of price floors – thereby increasing the prices of ODDs and products containing ODDs.

4.      Plaintiffs allege herein extensive facts showing Defendants violated federal and state antitrust laws as well as state unfair competition laws.  In summary, these facts describe:

- Three representative examples of Defendants agreeing to rig the outcome of electronic auctions, closing on August 31, 2006, December 1, 2008 and February 19, 2009.  In each of these auction events, Defendants and their co-conspirators reached agreement, enabled by exchanging sensitive competitive information before, during and after each electronic auction.  And in fact these co-conspirators communicated while the auction process was taking place to reach agreement on where each would finish in rank order.  The purpose and effect of these agreements was to artificially raise the price at which ODDs would be sold.

- The ODD market has gone from being "unconcentrated" in 2001 to being "highly concentrated" by 2005. Defendants dramatically reduced the number of competitors in the industry by entering into a series of joint venture agreements. By 2008, Defendants and their associates accounted for 95 percent of worldwide ODD sales.

- These joint venture agreements not only reduced the number of competitors – thereby turning the ODD market into a highly concentrated one – the joint ventures also forged relationships and avenues of communication which further enabled Defendants' ability to fix prices.

- The ODD market is uniquely characterized by "patent pools" which Defendants control. These patent pools create tremendous barriers to entry and provide a conduit to share sensitive competitive information and monitor the behavior of ODD market participants. Because Defendants control these patent pools, they cross-license in a manner that provides a nearly insurmountable cost advantage to Defendants, which has the effect of limiting competitive entry into the ODD market.

- Certain Defendants have admitted the Department of Justice has subpoenaed their records, and they have been under criminal investigation for antitrust violations in the ODD market since 2009. Named Defendants in this action are repeat offenders – that is, Defendants have previously been found guilty of violating antitrust laws for price-fixing conspiracies in other high technology product markets.

- Defendants' price-fixing conduct has been successful. A comparison between the pricing declines in the ODD market and the Hard Disk Drive market (a closely related data storage device), show a significant difference between the pricing trends during the class period. The ODD market shows a large slowing of pricing declines – and even an increase in prices – during the class period. This pricing behavior cannot be explained by concentration in the two different markets. The Hard Disk Drive market is also "highly concentrated" during the same time period as the ODD market.

## II.   DEFINITIONS

5.     Plaintiffs Aaron Wagner, Chris Johnson, Douglas Hatfield, Gregg Cooper, Mary Jane Garland, Laura Allen, Linda Moss, Robert Cavalear, James Ito-Adler, Sandy Steffen, Alex Bissen, Kevin Buckman, Casey Hauser, Matthew Ence, Mike Reilly, Thomas Lewis, Angela Pritchard, David and Debra Knight, Ramona Ravan, Anthony Sterling, Andrew Crosby, Benjamin Porter, Cindy Bozan, Bobbi Milam and John McKee ("Indirect Purchaser Plaintiffs") bring this action on behalf of themselves individually and as a class consisting of all persons and entities residing in the United States who indirectly purchased an ODD Product during the Class Period for their own use and not for resale containing an ODD that was manufactured by one or more Defendants. The relevant time period is January 1, 2004 to the present ("Class Period").

6.      The ODDs that are the subject of this lawsuit include:  CD-ROMS ("CD"), CD-recordable/rewritable ("CD-R/RW"), DVD-ROM ("DVD"), DVD-recordable/rewritable (DVD-R/-RW/+R/+RW), Blu-Ray ("BD"), Blu-Ray-recordable/rewritable ("BD-R"/"BD-RE") and HD-DVD.

## III.      JURISDICTION AND VENUE

7.      Indirect Purchaser Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against all Defendants.

8.      Indirect Purchaser Plaintiffs also bring this action pursuant to state antitrust, unfair competition and consumer protection laws to recover damages, restitution, disgorgement, costs of suit, including reasonable attorneys' fees, for the injuries that Indirect Purchaser Plaintiffs and all others similarly situated sustained as a result of Defendants' violations of those laws.

9.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over Indirect Purchaser Plaintiffs' claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.  The Court has supplemental jurisdiction over Indirect Purchaser Plaintiffs' state law claims under 28 U.S.C. § 1367.  The Indirect Purchaser Plaintiffs' state law claims are so related to their claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

10.     This Court also has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiffs is a citizen of a state different from any Defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs."  This Court also has jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of a state within the United States and one or more of the Defendants is a citizen or subject of a foreign state."

11.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and California Code of Civil Procedure section §

410.10.  Each Defendant conducts substantial business in the state of California, and a number of Defendants maintain their headquarters in this District or elsewhere in California.  In addition, Defendants all purposefully availed themselves of the laws of the United States and California insofar as they manufactured ODD Products for sale in the United States and California.

12.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391, because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this District.

13.     Venue is also proper in this District pursuant to the April 2, 2010, Transfer Order by the United States Judicial Panel on Multidistrict Litigation, finding the Northern District of California and this Court to be the appropriate transferee forum.

## IV.     PARTIES

### A.     Indirect Purchaser Plaintiffs

14.     Plaintiff Aaron Wagner is a resident of Phoenix, Arizona.  During the Class Period, Plaintiff Wagner indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Wagner suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Wagner is referred to as the "Arizona Plaintiff."

15.     Plaintiff Chris Johnson is a resident of Woodland Hills, California.  During the Class Period, Plaintiff Johnson indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Johnson suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Johnson is referred to as the "California Plaintiff."

16.     Plaintiff Douglas Hatfield is a resident of Monticello, Florida.  During the Class Period, Plaintiff Hatfield indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Hatfield suffered injury as a result

of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Hatfield is referred to as the "Florida Plaintiff."

17.     Plaintiff Gregg Cooper is a resident of Deerfield, Illinois.  During the Class Period, Plaintiff Cooper indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Cooper suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Cooper is referred to as the "Illinois Plaintiff."

18.     Plaintiff Mary Jane Garland is a resident of Cedar Rapids, Iowa.  During the Class Period, Plaintiff Garland indirectly purchased an ODD Product for her own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Garland suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Garland is referred to as the "Iowa Plaintiff."

19.     Plaintiff Laura Allen is a resident of Leawood, Kansas.  During the Class Period, Plaintiff Allen indirectly purchased an ODD Product for her own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Allen suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Allen is referred to as the "Kansas Plaintiff."

20.     Plaintiff Linda Moss is a resident of Thomaston, Maine.  During the Class Period, Plaintiff Moss indirectly purchased an ODD Product for her own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Moss suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Moss is referred to as the "Maine Plaintiff."

21.     Plaintiff Robert Cavalear is a resident of Malden, Massachusetts.  During the Class Period, Plaintiff Cavalear indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Cavalear suffered injury as a result of Defendants' conduct alleged herein.

22.     Plaintiff James Ito-Adler is a resident of Belmont, Massachusetts.  During the Class Period, Plaintiff Ito-Adler indirectly purchased an ODD Product for his own use and not

1    for resale that was manufactured by one or more Defendants.  Plaintiff Ito-Adler suffered injury

2    as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Cavelear and Plaintiff

3    Ito-Adler are collectively referred to as the "Massachusetts Plaintiffs."

4           23.     Plaintiff Sandy Steffen is a resident of Livonia, Michigan.  During the Class

5    Period, Plaintiff Steffen indirectly purchased an ODD Product for her own use and not for resale

6    that was manufactured by one or more Defendants.  Plaintiff Steffen suffered injury as a result of

7    Defendants' conduct alleged herein.  Hereinafter, Plaintiff Steffen is referred to as the "Michigan

8    Plaintiff."

9           24.     Plaintiff Alex Bissen is a resident of Minneapolis, Minnesota.  During the Class

10   Period, Plaintiff Bissen indirectly purchased an ODD Product for his own use and not for resale

11   that was manufactured by one or more Defendants.  Plaintiff Bissen suffered injury as a result of

12   Defendants' conduct alleged herein.  Hereinafter, Plaintiff Bissen is referred to as the "Minnesota

13   Plaintiff."

14          25.     Plaintiff Kevin Buckman is a resident of Olive Branch, Mississippi.  During the

15   Class Period, Plaintiff Buckman indirectly purchased an ODD Product for his own use and not

16   for resale that was manufactured by one or more Defendants.  Plaintiff Buckman suffered injury

17   as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Buckman is referred to as

18   the "Mississippi Plaintiff."

19          26.     Plaintiff Casey Hauser is a resident of Belgrade, Montana.  During the Class

20   Period, Plaintiff Hauser indirectly purchased an ODD Product for his own use and not for resale

21   that was manufactured by one or more Defendants.  Plaintiff Hauser suffered injury as a result of

22   Defendants' conduct alleged herein.  Hereinafter, Plaintiff Hauser is referred to as the "Montana

23   Plaintiff."

24          27.     Plaintiff Matthew Ence is a resident of Minden, Nevada.  During the Class Period,

25   Plaintiff Ence indirectly purchased an ODD Product for his own use and not for resale that was

26   manufactured by one or more Defendants.  Plaintiff Ence suffered injury as a result of

27   Defendants' conduct alleged herein.  Hereinafter, Plaintiff Ence is referred to as the "Nevada

28   Plaintiff."

28.     Plaintiff Mike Reilly is a resident of Albuquerque, New Mexico.  During the Class Period, Plaintiff Reilly indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Reilly suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Reilly is referred to as the "New Mexico Plaintiff."

29.     Plaintiff Thomas Lewis is a resident of Staten Island, New York.  During the Class Period, Plaintiff Lewis indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Lewis suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Lewis is referred to as the "New York Plaintiff."

30.     Plaintiff Angela Pritchard is a resident of Lexington, North Carolina.  During the Class Period, Plaintiff Pritchard indirectly purchased an ODD Product for her own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Pritchard suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Pritchard is referred to as the "North Carolina Plaintiff."

31.     Plaintiffs David Knight and Debra Knight are residents of Hammond, Oregon.  During the Class Period, the Knights indirectly purchased an ODD Product for their own use and not for resale that was manufactured by one or more Defendants.  The Knights suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, the Knights are referred to as the "Oregon Plaintiffs."

32.     Plaintiff Ramona Ravan is a resident of Inman, South Carolina.  During the Class Period, Plaintiff Ravan indirectly purchased an ODD Product for her own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Ravan suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Ravan is referred to as the "South Carolina Plaintiff."

33.     Plaintiff Anthony Sterling is a resident of Rapid City, South Dakota.  During the Class Period, Plaintiff Sterling indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Sterling suffered injury as a

result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Sterling is referred to as the "South Dakota Plaintiff."

34.    Plaintiff Andrew Crosby is a resident of Memphis, Tennessee.  During the Class Period, Plaintiff Crosby indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Crosby suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Crosby is referred to as the "Tennessee Plaintiff."

35.    Plaintiff Benjamin Porter is a resident of Bountiful, Utah.  During the Class Period, Plaintiff Porter indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Porter suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Porter is referred to as the "Utah Plaintiff."

36.    Plaintiff Cindy Bozan was a resident at all relevant times of Bradford, Vermont. During the Class Period, Plaintiff Bozan indirectly purchased an ODD Product for her own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Bozan suffered injury as a result of Defendants' conduct alleged herein. Hereinafter, Plaintiff Bozan is referred to as the "Vermont Plaintiff."

37.    Plaintiff Bobbi Milam is a resident of Milton, West Virginia.  During the Class Period, Plaintiff Milam indirectly purchased an ODD Product for her own use and not for resale that was manufactured by one or more Defendants.  Plaintiff Milam suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff Milam is referred to as the "West Virginia Plaintiff."

38.    Plaintiff John McKee is a resident of Green Bay, Wisconsin.  During the Class Period, Plaintiff McKee indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants.  Plaintiff McKee suffered injury as a result of Defendants' conduct alleged herein.  Hereinafter, Plaintiff McKee is referred to as the "Wisconsin Plaintiff."

**B.    Defendants**

39.    Defendant Hitachi, Ltd. ("Hitachi") is a Japanese company with its principal executive office at 6-6, Marunouchi l-chome, Chiyoda-ku, Tokyo 100-8280, Japan.  During the Class Period, Hitachi manufactured, sold, and distributed ODDs and ODD Products throughout the United States.

40.    Defendant LG Electronics, Inc. ("LG Electronics") is a Korean entity headquartered at LG Twin Towers 20, Yoido-dong, Youngdungpo-gu, Seoul, South Korea 150-721.  During the Class Period, LG Electronics manufactured, sold, and distributed ODDs and ODD Products throughout the United States.

41.    Hitachi-LG Data Storage, Inc. is a joint venture between Defendants Hitachi, Ltd. and LG Electronics, Inc., with its principal place of business located at 4F MSC Center Bldg., 22-23, Kaigan 3-chome, Minato-Ku, Tokyo 108-0022, Japan.  Hitachi, Ltd. owns 51 percent of the stock in HLDS, while LG Electronics owns the remaining 49 percent.  Hitachi and LG Electronics jointly control and direct the operations of Hitachi-LG Data Storage, Inc.  Hitachi-LG Data Storage, Inc. was established in November of 2000 and started operation in January of 2001.  Between 2001 and 2005 Hitachi-LG Data Storage, Inc. sold over 170 million optical disk drives, generating approximately $5.5 billion in total revenues.  During the Class Period, Hitachi-LG Data Storage, Inc. manufactured, sold, and distributed ODDs and ODD Products throughout the United States.

42.    Hitachi-LG Data Storage Korea, Inc. is a joint venture between Defendants Hitachi and LG Electronics, with its principal place of business located at LG Gasan Digital Center, 459-9 Gasan-dong, Geumceon-gu, Seoul, 153-803 Korea.  Hitachi owns 51 percent of the stock in Hitachi-LG Data Storage Korea, Inc., while LG Electronics owns the remaining 49 percent.  Hitachi and LG Electronics jointly control and direct the operations of Hitachi-LG Data Storage Korea, Inc.  Hitachi-LG Data Storage Korea, Inc. was established in November of 2000 and started operation in January of 2001.  Between 2001 and 2005, Hitachi-LG Data Storage Korea, Inc. sold over 170 million optical disk drives, generating approximately $5.5 billion in

1    total revenues.  During the Class Period, Hitachi-LG Data Storage Korea, Inc. manufactured,

2    sold, and distributed ODDs and ODD Products throughout the United States.

3          43.    Defendants Hitachi-LG Data Storage, Inc. and Hitachi-LG Data Storage Korea,

4    Inc. are referred to individually and collectively as "HLDS."

5          44.    Defendant BenQ Corporation is a Taiwanese company, with its principal place of

6    business at 16 Jihu Rd., Neihu, Taipei 114, Taiwan.  BenQ Corporation, separately or through

7    Philips & BenQ Digital Storage Corporation, manufactured, sold and/or distributed ODDs and

8    ODD Products throughout the United States and caused ODDs and ODD Products to be imported

9    into the United States during the Class Period.

10         45.    Defendant BenQ America Corp. is a California corporation with its principal place

11   of business at 15375 Barranca Parkway, Suite A-205, Irvine, California 92618.  BenQ America

12   Corp. is a wholly owned and controlled subsidiary of BenQ Corporation.  BenQ America Corp.

13   manufactured, sold and/or distributed ODDs and ODD Products throughout the United States and

14   imported ODDs and ODD Products into the United States during the Class Period.

15         46.    Defendant Koninklijke Philips Electronics N.V. (translated into English as Royal

16   Philips Electronics) ("Philips") is a Dutch company with its principal place of business at

17   Amstelplein 2, Breitner Center, PO Box 77900, Amsterdam, 1070 MX, The Netherlands.  During

18   the Class Period, Philips manufactured, sold, and distributed ODDs and ODD Products

19   throughout the United States.

20         47.    Defendant Lite-On IT Corporation ("Lite-On") is a Taiwanese company with its

21   principal place of business at 12-15F, 392, Ruey Kuang Road, Taipei City, TAP 11492, Taiwan.

22   During the Class Period, Lite-On manufactured, sold, and distributed ODDs and ODD Products

23   throughout the United States.

24         48.    Defendant Philips & Lite-On Digital Solutions Corp. is a Taiwanese company

25   with its principal place of business at 16F, 392, Ruey Kuang Road, Taipei City, TAP 11492,

26   Taiwan.  During the Class Period, Philips & Lite-On Digital Solutions Corp. manufactured, sold,

27   and distributed ODDs and ODD Products throughout the United States.  Philips & Lite-On

28   Digital Solutions Corp. is a joint venture established in 2007 between Philips and Lite-On.

1    49.    Defendant Philips & Lite-On Digital Solutions USA, Inc. is a subsidiary of Philips

2    & Lite-On Digital Solutions Corp. and is a Delaware corporation with its principal place of

3    business at 42000 Christy St., Fremont, California 94538.  During the Class Period, Philips &

4    Lite-On Digital Solutions USA, Inc. manufactured, sold, and distributed ODDs and ODD

5    Products throughout the United States.

6    50.    Defendants Philips & Lite-On Digital Solutions Corp. and Philips & Lite-On

7    Digital Solutions USA, Inc. are referred to individually and collectively herein as "PLDS."

8    51.    Defendant Sony Corp. ("Sony") is a Japanese company with its principal place of

9    business at 1-7-1 Konan, Minato-ku, Tokyo 108-0075, Japan.  During the Class Period, Sony

10   manufactured, sold, and distributed ODDs and ODD Products throughout the United States.

11   52.    Defendant NEC Corporation ("NEC") is a Japanese company with its principal

12   place of business at 7-1 Shiba, 5-chome, Minato-Ku, Tokyo, 108-8001, Japan.  Prior to 2008,

13   NEC owned 45 percent of Defendant Sony Optiarc, Inc.  During the Class Period, NEC

14   Corporation manufactured, sold, and distributed ODDs and ODD Products throughout the United

15   States.

16   53.    Defendant Sony NEC Optiarc, Inc. was a Japanese company with its headquarters

17   located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  Defendant Sony NEC Optiarc,

18   Inc. was created on April 3, 2006 as a joint venture between Defendants Sony and NEC in which

19   Sony had a 55 percent interest and NEC had a 45 percent interest.  Sony purchased NEC's

20   interest in Sony NEC Optiarc, Inc. in 2008 and renamed it Sony Optiarc, Inc.  During the Class

21   Period, Sony NEC Optiarc, Inc. manufactured, sold, and distributed ODDs and ODD Products

22   throughout the United States.  Sony and NEC exercised joint control over Sony NEC Optiarc,

23   Inc.

24   54.    Defendant Sony Optiarc, Inc. is a Japanese company with its headquarters located

25   at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  Prior to its formation in 2008,

26   defendant Sony Optiarc, Inc. was a joint venture between Defendants Sony and NEC called Sony

27   NEC Optiarc, Inc.  On September 11, 2008, Sony purchased NEC's interest in Sony NEC

28   Optiarc, Inc.  The company was subsequently renamed Sony Optiarc, Inc.  In 2008, Sony

1   Optiarc, Inc. reported revenues of $1.52 billion.  During the Class Period, Sony Optiarc, Inc.

2   manufactured, sold, and distributed ODDs and ODD Products throughout the United States.

3        55.     Defendant Sony Optiarc America, Inc. is a wholly owned subsidiary of defendant

4   Sony Optiarc, Inc.  Defendant Sony Optiarc America, Inc. is a Delaware corporation with its

5   business headquarters located at 1730 N. 1st Street, San Jose, California 95112.  During the Class

6   Period, Sony Optiarc America, Inc. manufactured, sold, and distributed ODDs and ODD

7   Products throughout the United States.

8        56.     Defendant Samsung Electronics Co., Ltd. ("Samsung") is a Korean company with

9   its principal place of business at 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South

10  Korea.  During the Class Period, Samsung manufactured, sold, and distributed ODDs and ODD

11  Products throughout the United States.

12       57.     Defendant Toshiba Corp. ("Toshiba") is a Japanese company with its principal

13  place of business at 1-1, Shibaura l-chome, Minato-ku, Tokyo 105-8001, Japan.  During the Class

14  Period, Toshiba manufactured, sold, and distributed ODD Products throughout the United States.

15       58.     Defendant Toshiba Samsung Storage Technology Corp. is a joint venture of

16  Defendants Toshiba and Samsung that was established on April 1, 2004.  Toshiba owns 51

17  percent of the stock in Toshiba Samsung Storage Technology Corp., while Samsung owns the

18  remaining 49 percent.  Toshiba Samsung Storage Technology Corp. and Toshiba share corporate

19  headquarters, which are located at 1-1, Shibaura l-chome, Minato-ku, Tokyo 105-8001, Japan.

20  During the Class Period, Toshiba Samsung Storage Technology Corp. manufactured, sold, and

21  distributed ODD Products throughout the United States.  Toshiba Corp. and Samsung Electronics

22  Co. Ltd. jointly control Toshiba Samsung Storage Technology Corp.  Toshiba Samsung Storage

23  Technology Corp. forecasted revenue of ¥250 billion in fiscal 2004, when it was established.

24       59.     Defendant Toshiba Samsung Storage Technology Corp. Korea is a joint venture of

25  Defendants Toshiba and Samsung that was established on April 1, 2004.  Toshiba owns 51

26  percent of the stock in Toshiba Samsung Storage Technology Corp. Korea, while Samsung owns

27  the remaining 49 percent.  Toshiba Samsung Storage Technology Corp. Korea is a business

28  entity organized under the laws of South Korea with its principal place of business located at

1   Digital Empire 2, 486-1, Sin-dong, Yeongton-gu, Suwon-si, Gyonggi-do, Korea 443-734.

2   During the Class Period, Toshiba Samsung Storage Technology Corp. Korea manufactured, sold,

3   and distributed ODDs and ODD Products throughout the United States.  Toshiba and Samsung

4   jointly control Toshiba Samsung Storage Technology Corp. Korea.

5   　　　　60.   Defendants Toshiba Samsung Storage Technology Corp. and Toshiba Samsung

6   Storage Technology Corp. Korea are referred to individually and collectively herein as "TSST."

7   　　　　61.   Defendant TEAC Corporation is a Japanese company with its principal place of

8   business at 47 Ochiai 1-chome, Tama-shi, Tokyo 206-8530, Japan.  TEAC Corporation controls

9   TEAC America Inc.  During the Class Period, TEAC Corporation manufactured, sold, and

10   distributed ODDs and ODD Products throughout the United States.

11   　　　　62.   Defendant TEAC America Inc. is a business entity organized under the laws of

12   California, with its principal place of business at 7733 Telegraph Rd., Montebello, California,

13   90640.  TEAC America Inc. is a wholly owned subsidiary of Defendant TEAC Corporation.

14   During the Class Period, TEAC America Inc. manufactured, sold, and distributed ODDs and

15   ODD Products throughout the United States.

16   　　　　63.   Defendants TEAC Corporation and TEAC America Inc. are referred to

17   individually and collectively here as "TEAC."

18   　　　　64.   Defendant Quanta Storage Inc. ("Quanta Storage") is a Taiwanese entity with its

19   principal place of business at 3F, No.188, Wenhua 2nd Rd., Guishan Shiang, Taoyuan County

20   333, Taiwan.  Quanta Storage was incorporated on February 10, 1999 in Taoyuan County,

21   Taiwan.  Quanta Storage manufactured ODDs and ODD Products during the class period.

22   　　　　　　　　**V.　　AGENTS AND CO-CONSPIRATORS**

23   　　　　65.   Various other persons, firms and corporations, not named herein as Defendants

24   have participated as co-conspirators with the Defendants and have performed acts and made

25   statements in furtherance of the conspiracy.  Some of these firms are as yet unidentified.  The

26   acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their

27   officers, agents, employees, or representatives, while actively engaged in the management and

28   operation of Defendants' businesses or affairs.

66.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Indirect Purchaser Plaintiffs.

67.     Whenever this complaint refers to an act, deed or transaction of a corporation or entity, the complaint is alleging that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

68.     Co-conspirator Sony Computer Entertainment America LLC. is a wholly owned subsidiary of Sony Computer Entertainment, Inc. and is headquartered at 919 East Hillsdale Blvd., Foster City, California 94404.  Sony Computer Entertainment America, Inc. manufactured, sold and/or distributed ODDs and ODD Products throughout the United States and imported ODDs and ODD Products into the United States during the Class Period.

69.     Co-conspirator Sony Electronics, Inc. is a wholly owned subsidiary of Sony Corporation of America, which in turn, is a wholly owned subsidiary of Defendant Sony and is headquartered at 16530 Via Esprillo, San Diego, California 92127.  Sony Electronics, Inc. manufactured, sold and/or distributed ODDs and ODD Products throughout the United States and imported ODDs and ODD Products into the United States during the Class Period.

70.     Co-Conspirator Toshiba America Information Systems, Inc. is a California corporation and is headquartered at 9740 Irvine Boulevard, Irvine, California 92618.  Toshiba America Information Systems, Inc. is a wholly owned subsidiary of Toshiba America, Inc. which is in turned a wholly owned subsidiary of Defendant Toshiba.  Toshiba America Information Systems, Inc. manufactured, sold and/or distributed ODDs and ODD Products throughout the United States and imported ODDs and ODD Products into the United States during the Class Period.

71.     Co-conspirator Samsung Electronics America, Inc. is a subsidiary of Defendant Samsung Electronics Co. Ltd., with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey 07660.  Samsung Electronics America, Inc. manufactured, sold

1    and/or distributed ODD Products throughout the United States and imported ODDs and ODD

2    Products into the United States during the Class Period.

3                        **VI.    FACTUAL ALLEGATIONS**

4    **A.    Description of Optical Disk Drive Products**

5         72.    Optical disks contain microscopic pits where data is stored.  These pits are made

6    from a crystalline metal alloy and are usually pressed into a disk in a spiral arrangement, starting

7    at the center of the disk.  Once a disk containing information is inserted into an ODD, the disk

8    spins while a lens inside the device guides a semiconductor laser beam over the disk and a

9    photodiode detects the light reflected from the disk's bumps and pits.  The laser moves outward

10   from the center of the disk, scanning over the disk's surface.  Then the photodiode reads the

11   light's reflection as a binary code, a series of ones and zeros that the computer translates into

12   usable data.  Changes in the intensity of the beams as the lasers hit the pits are detected and

13   translated into electrical signals.  The more pits that can be packed onto a disk, the more data a

14   disk can store.  The pits are approximately 0.8 micrometers on CDs, 0.4 micrometers on DVDs,

15   and 0.15 micrometers on BDs.  Reading the different disk formats requires the ODD to have

16   lasers of different wavelengths.  For example, Blu-ray disk players use a shorter wavelength

17   laser, which is blue-violet, to read disks.  Additional layers can be added to the disk as well,

18   increasing storage capacity.  In addition to reading disks, ODDs can write and rewrite on the

19   disk, depending on the technology of the drive and accompanying disk.

20        73.    When a recordable disk (e.g., CD-R, DVD-R or BD-R) is inserted into an ODD

21   that has the ability to record data, the ODDs laser is used to selectively heat parts of the organic

22   photosensitive dye layer on a disk, changing the reflective properties of the disk surface.

23   Thereafter, if the disk is inserted into an ODD, the photodiode will recognize these changes as

24   bumps and pits and read the new information on the disk.

25        74.    The ODD may be a read-only unit, capable of reading compact disks (CD-ROM),

26   digital versatile disks (DVD-ROM), or most recently, a Blu-ray disk (BD-ROM).  The CD format

27   allows storage of 700 megabytes (MB) on a disk, the DVD formats permit storage of 4.7 or 8.4

28

gigabytes (GB) on a disk (depending on whether the disk is single or dual layer), while the Blu-ray format permits storage of 25 or 50 GB (depending again on whether the disk is single or dual layer). Or, the ODD may be capable of writing an alphabet soup of industry standard optical data storage formats – CD-R, CD-RW, DVD-R, DVD-RW, DVD+R, DVD+RW, DVD-RAM, BD-RE, BD-R. All these different types of disk come in the same 5.25" physical size, so Blu-ray readers/writers (also called "burners") are typically capable of reading and writing some CD and DVD formats, while DVD format drives are capable of reading and writing CD formats.

75.     During part of the conspiracy period, from 2004 through 2008, more than 87 percent of the value of drives sold worldwide (on an if-sold-OEM basis) has been accounted for by DVD format drives (DVD-ROM, Combo, or DVD-recordable):

| DVD SALES AS A PERCENTAGE OF TOTAL ODD SALES | | | | | | |
|---|---|---|---|---|---|---|
|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2004-2008 |
| DVD Format Drive Sales (in $B) | $8.8 | $9.3 | $9.1 | $8.9 | $7.1 | $43.2 |
| Total ODD Sales (in $B) | $12.2 | $10.4 | $9.6 | $9.3 | $7.9 | $49.4 |
|  |  |  |  |  |  |  |
| DVD Sales as a % of Total ODD | 72.1% | 89.4% | 94.8% | 95.7% | 89.9% | 87.4% |

76.     ODDs of all types come in both half-height and "slim" size formats. The slim size formats are easily integrated into laptop computers and mobile computing equipment, but can also be used in desktop computers. Half-height units fit into a standard "half-height" (1.75" high) desktop computer bay, and are less appropriate for use in mobile equipment, where size, weight, and form factor is more important. Slim units typically trade off some degree of performance to achieve a smaller size. Both half-height and slim-size units can be integrated into external cases, as described above, by equipment manufacturers, or end users. Units incorporated into game consoles are very similar – in most cases, identical – to ODDs incorporated into computers.

77.     The other major market into which ODDs are sold is the consumer market. The compact disk (CD-DA, CD Digital Audio), digital versatile disk video (DVD-video), and Blu-ray disk video (BD-video) formats are industry standard digital representations of audio and visual

data.  The audio and visual data is coded digitally in commercial music CDs, and video DVDs and BDs.  The industry standard audio and visual format is one of many digital formats for data storage that are defined for these disks.  Thus, a consumer disk player containing a drive designed to play CD, DVD, or BD format digital disks may, or may not, be able to recognize other formats used to store digital data on an optical disk.  However, virtually all drives manufactured for computer use are able to recognize audio-visual formats, and allow computer systems to perform as audiovisual programming players.

78.     A half-height computer optical disk typically looks something like this:



79.     A slim unit computer optical disk typically looks something like this:



80.     The ODDs found in consumer audio visual units, on the other hand, may be a computer-type ODD, but it more frequently may look something like this:

1
2
3
4
5
6
7
8
9
10
11
12



13   81.    The actual ODD in this consumer DVD player unit consists of a separate

14  mechanical loader and optical pickup assembly, connected by a cable to a main board containing

15  servo and compression/decompression (MPEG) circuitry that control the operation of the drive

16  mechanics and create a digital data stream.  Together, these two elements constitute the "loader."

17  Additional audio and visual circuitry converts the digital data coming off the drive into sound and

18  image streams that are then sent to other consumer equipment (TV, stereo) connected to the

19  player.  As can be seen in this figure, the loader and audio and visual circuitry together

20  constituted about three quarters of the cost of the DVD player, and the loader alone over 70

21  percent of its value.

22   82.    In computer ODDs, the equivalent of the loader and audio and visual board are fit

23  into a single compact unit.  No case or power supply is required, since the unit is integrated into a

24  computer case and uses the computer system's power supply.  A consumer DVD player can be

25  designed using a computer drive, dispensing with the loader, and simply adding an additional

26  interface board, along with a case and power supply, as is evident in this photo of the interior of

27  an Apex AD-600A:

28



83.     A similar use of a computer-type drive with an ATAPI computer interface can be found in the Akai DVPS-760 DVD player, manufactured in Korea in 2002.

**B.      Specific Characteristics of the ODD Market Made It Ripe for Collusion**

84.     The ODD industry has several characteristics that facilitate a price-fixing conspiracy, including increasing concentration in the make-up of the industry, significant barriers to entry, multiple interrelated business relationships, and ease of information sharing and cartel enforcement through patent pools and trade group meetings.

**1.      The ODD Market Experienced a Dramatic Increase in Concentration**

85.     In the period from 2001 to 2004, the ODD industry witnessed an increase in concentration, and a reduction in competition.  Significant barriers to entry facilitated this increase in concentration, which in turn enabled the collusion that is the subject of this complaint.

1   The formation and operation of patent pools for DVD technology, created just prior to this period

2   of rapidly increasing concentration, played a critically important role in both creating entry

3   barriers to potential competitors, and in providing price and output monitoring mechanisms that

4   facilitated the operation of a successful price-fixing conspiracy.

5          86.     The following table calculates the change in the Herfindahl-Hirschman Index

6   ("HHI") of concentration over the period from 2001 to 2008.  In 2001, an HHI well under 900

7   characterized the degree of concentration among producers of ODDs.  By 2005, the HHI had

8   more than doubled, to over 1950.  In 2001, according to Department of Justice guidelines, the

9   ODD industry would have been considered "unconcentrated."  In 2005, it would have been

10  considered "highly concentrated."  Concentration remained at about this same level in 2008, the

11  last year for which data is readily available.

| HERFINDAHL-HIRSCHMAN INDEX (HHI) OF CONCENTRATION FOR ODD MARKET | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2001 Entity | 2003 Entity | 2005 Entity | 2001 Mkt Share (%) | 2003 Mkt Share (%) | 2004 Mkt Share (%) | 2005 Mkt Share (%) | 2006 Mkt Share (%) | 2007 Mkt Share (%) | 2008 Mkt Share (%) |
| Hitachi/LG | Hitachi/LG | Hitachi/LG | 18.8 | 24.0 | 28.0 | 25.6 | 26.0 | 30.8 | 27.9 |
| Samsung Toshiba | TSST | TSST | 13.1 5.3 | 19.0 | 18.0 | 21.8 | 18.9 | 24.2 | 23.6 |
| Lite-On | Lite-On | Lite-On (PLDS) | 10.6 | 16.0 | 16.0 | 26.3 | 16.9 | 11.5 | 14.5 |
| BenQ Philips | PBDS | | 5.1 3.4 | 7.0 | 6.0 | | | | |
| Sony | Sony | Sony NEC Optiarc | 2.4 | | | 7.1 | 9.9 | 9.3 | 15.6 |
| NEC | NEC | | 3.3 | | 4.0 | | | | |
| MKE/Pana-sonic | | | 4.5 | 5.0 | 6.0 | 8.4 | 9.1 | 8.6 | 7.0 |
| Pioneer | | | 1.9 | | 4.0 | 4.4 | 5.7 | 6.0 | 6.3 |
| TEAC | | | 6.4 | 3.0 | | | | | |
| BTC | | | 4.7 | 4.0 | | | | | |
| AOpen | | | 2.4 | | | | | | |
| Mitsumi Electric | | | 2.0 | | | | | | |
| All Others | | | 16.1 | 22.0 | 18.0 | 6.4 | 13.5 | 9.6 | 5.1 |

| HERFINDAHL-HIRSCHMAN INDEX (HHI) OF CONCENTRATION FOR ODD MARKET | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2001 Entity | 2003 Entity | 2005 Entity | 2001 Mkt Share (%) | 2003 Mkt Share (%) | 2004 Mkt Share (%) | 2005 Mkt Share (%) | 2006 Mkt Share (%) | 2007 Mkt Share (%) | 2008 Mkt Share (%) |
| | | | 2001 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
| HHI upper bound | | | 847 | 1358 | 1540 | 1990 | 1609 | 1921 | 1910 |
| HHI lower bound | | | 816 | 1292 | 1468 | 1962 | 1532 | 1863 | 1878 |
| | | | | | | | | | |
| Market Share of DVD Pool Members, Affiliates (%) | | | 49 | 55 | 66 | 94 | 87 | 90 | 95 |

87.     The members or controlled subsidiaries of the two DVD patent pools (*see* section VI.E, *supra*), all of whom are alleged to have participated in the ODD price-fixing conspiracy, accounted for less than half of industry sales in 2001.  By 2004, this had jumped to 66 percent, and by 2005 to 94 percent of ODD sales globally.  In 2008, ODD producers affiliated with (and controlled by) pool members continued to account for 95 percent of worldwide ODD sales.

**2.     The ODD Market Is Dominated by Joint Ventures and Coordinated Business Activities**

**a.     Formation and Ownership of Hitachi LG Data Systems (HLDS)**

88.     The drive toward consolidation was kicked off in late 2000, when Japanese ODD producer Hitachi merged its optical disk operations with LG Electronics, of Korea.  The joint venture, Hitachi LG Data Systems (HLDS), was dedicated to design, development, and marketing.  Actual manufacturing was contracted out to the parent corporations.  The joint venture also had royalty-free access to the patents of the parents.  Hitachi acquired a 51 percent stake of HLDS, while LG Electronics acquired the remaining 49 percent.  After implementation of the transaction, Hitachi and LG Electronics jointly controlled the operations of HLDS.  The Chief Executive Officer of the joint venture was Korean, from LG Electronics, while the Chief Financial Officer, from Hitachi, was Japanese.

89.     Hitachi, however, effectively controlled the operation, through both its ownership and its control of key technologies.  Indeed, Hitachi's 51 percent ownership of the joint venture was critical to its success, since its position as a Hitachi affiliate gave it access to the benefits of

1    Hitachi's cross-licenses with other ODD patent holders, and Hitachi's membership in the DVD6c

2    patent pool.

3         90.    As a Japanese study of the industry concluded:

4             It is very important for the industry of the catch-up countries to
              understand the reason why the percentage of Hitachi's investment
5             to HLDS is 51%, and why Mitsubishi's investment to Digitek [a
              similar joint venture between Mitsubishi and Funai Electric] is
6             51%.  The 51% from Hitachi means that HLDS is consolidated
              subsidiary company of Hitachi and thus all the patent royalty issues
7             are automatically handled by Hitachi.  It is said that the actual
              royalty fee of the DVD business has been significantly decreased
8             because Hitachi has established patent claim to rank with other
              patent holders, and moreover Hitachi has many cross-licensed
9             partner firms in the world.

10        91.    Even for less technologically complex consumer DVD players, which could

11   feasibly be assembled and manufactured by new entrants in Taiwan and China, this royalty load

12   rapidly became a major economic factor limiting their ability to compete successfully against the

13   incumbent patent pool members.  Prior to 2005, Japanese economists studying the industry had

14   noted:

15            It will become very difficult for Chinese firms to run the DVD
              business by paying all of the royalty which have been claimed from
16            front runner countries, because the percentage of the relative
              amount of the royalty will become unreasonably higher and higher
17            as the retail price of the DVD player becomes lower and lower.  It
              is a noteworthy fact that, in a case of a major DVD manufacturer in
18            Taiwan, the ratio of the royalty was estimated to be over 50% of
              the total overhead in year 2004 . . . and have become almost
19            impossible to continue the business if they would keep paying all
              of the claimed royalty.
20
          92.    The same economists noted that:
21
              According to industry analysts, total sum of the royalty claimed
22            against Chinese firms is estimated to be well over 10 dollars per a
              DVD player even though the retail price of the player in US market
23            has dropped to 30-50 dollars in 3Q/2005, while royalty claimed
              against Japanese firms is estimated to be 2-4 dollars because the
24            firms are major license holders in the DVD forum.  Furthermore,
              the street price of Japanese brand DVD player is 50-80 dollars,
25            which is 50% higher than that of Chinese brand products.

26        93.    This same point is made in the following diagram.  The manufacturing cost

27   advantages of the Chinese firms were offset by the very high royalties they needed to pay in

28   order to sell the products abroad.  Japanese firms, on the other hand, faced higher overhead costs

if they chose to continue funding technological development, but paid minimal royalties. After 2005, with technological progress in semiconductors and optical devices, and economies of scale continuing to dramatically reduce costs of the materials, parts, and chips needed to manufacture a DVD drive, the costs of the royalties came to dominate the costs of manufacturing an ODD for potential competitors in ODDs without low cost access to the ODD patent pools. There is also evidence that the pace of technological development of ODDs slackened, as pool members slowed the pace of introductions of new ODD technology, further improving the cost advantage of incumbent pool members by reducing research and development costs.

**PRODUCT COST AND OVERHEAD COMPARISON OF DVD DRIVES BETWEEN CHINESE AND JAPANESE FIRMS**



94.     Hitachi's ability to manufacture at a much lower cost through its joint venture with LG Electronics, yet still avoid payment of increasingly burdensome royalties (as the fixed size of the minimum royalty increased its importance relative to a falling ODD price) by virtue of its 51 percent ownership of the joint venture giving it Hitachi's preferred position inside the patent pool, was critical to the business success of what became a very profitable joint venture.

95.     Japanese economists have noted:

> Since 2003, only three years after the joint venture company has
> started, HLDS has turned into one of the most profitable subsidiary
> companies of Hitachi group.  It has been said that without moving
> on to the alliance, Hitachi would have been forced to withdraw
> from the optical storage industry.  The joint venture company
> between Mitsubishi Electric and Funai Electric also shows similar
> success story that Funai is exceptionally a profitable firm among
> the DVD suppliers in Japan because Mitsubishi Electric is the
> majority (51%) among the investors and is one of the major license
> holders in the DVD Forum.

### b.     Lite-On IT Corporation, Philips and BenQ Form Joint Ventures

96.     This model was quickly copied by others.  In 2001, Japan's JVC, another patent pool member, formed a similar 51 percent to 49 percent joint venture with Taiwan's Lite-On.  As with HLDS, the patent pool member, JVC, held the controlling interest (though in the case of HLDS, LG Electronics later was ultimately allowed to join a patent pool).

97.     In early 2003, Taiwanese ODD producer BenQ and Philips, formed a joint venture, Philips BenQ Digital Storage (PBDS).  The jointly-owned company would develop, design, and market ODDs; all manufacturing would be contracted out to BenQ.  While the joint venture targeted data storage applications, it explicitly noted that it "may later include optical storage devices for consumer applications."

98.     In 2006, Defendant Lite-On purchased BenQ's ODD production facilities and officially replaced BenQ in this joint venture in 2007.

### c.     Formation and Ownership of Toshiba Samsung Storage Technology (TSST)

99.     Also in 2003, ODD producers Samsung and Toshiba concluded an agreement to integrate their ODD operations into a single entity, Toshiba Samsung Storage Technology (TSST).  As was the case with the HLDS and PBDS, the joint venture was for design, development, and marketing efforts; all manufacturing was to be contracted out to Samsung.  Toshiba and Samsung jointly control the venture.  Although Toshiba held the majority of shares in the joint venture (51 percent, with Samsung holding the remaining 49 percent), Samsung retained veto rights on strategic decisions.  Therefore, both parents jointly retain the possibility to exercise decisive influence over the joint venture.

100.    As Korea's national investment promotion agency describes on its web site:

> Essentially, the two companies had agreed to spin-off their ODD businesses, and transfer them to the joint venture. Mirroring the Hitachi/LG deal, majority control was vested in the Japanese parent with 51 percent of the equity compared to 49 percent for the Korean partner. Again, company headquarters would be in Japan, this time, within Toshiba's head office in Kawasaki. Again the Japanese parent company would bring technical know-how to the venture, as well as international brand power supported by a global sales and service network. Manufacturing also, in the case of TSST, would be the province of the Korean partner. With TSST Korea head office at the Samsung Digital Complex in Suwon, Gyeonggi Province, production for the joint venture was consigned to the automated Samsung ODD plant in Gumi, North Gyeongsang Province. TSST operates a similarly well-appointed factory in Manaus, Brazil, and at its Samsung Electronics Phils. Mfg Corp (SEPHIL), facility at Calamba Premier International Park, Calamba City, Philippines.

> HEDGING BETS

> In fact, the articles of the joint venture stipulate that its purpose is the design, development, marketing and sales of ODDs, with manufacturing left out of the arrangement, in effect, outsourced to the Samsung plant. With research and development plus intellectual property rights secured under a long term agreement, TSST was given access to all necessary resources from its parent companies to compete in the global ODD market. TSST supplies ODD models to its Japanese and Korean parents who then market them under their own brands, in the same manner that an OEM operates. At the same time, as is the case with [HLDS], the parent companies are better able to respond and meet shifting demands by splitting fabrication and development costs.

**d.    Formation and Ownership of Sony NEC Optiarc**

101.    In 2005, ODD producers NEC and Sony announced an agreement to merge all ODD activities of their two companies (presumably including the design and development of loaders for use in consumer products) in a joint venture, Sony NEC Optiarc, Inc.. The new joint venture was to undertake all development, design, marketing and sales related to ODDs; all manufacturing (except a small amount of manufacturing of magneto-optical drives by Sony) was to be subcontracted out to third parties. Sony held a 55 percent ownership of the shares in the joint venture, while NEC owned the remaining 45 percent of the share capital. Sony also appointed the majority of the Board of Directors (four out of seven). NEC, however, retained the right to veto certain decisions. In addition, certain sensitive matters which require resolution by a

1    vote of the board of directors also required an affirmative vote by at least one director appointed

2    by NEC.  Thus, both parent companies retained control of the Sony NEC Optiarc joint venture.

3         102.    The Sony NEC Optiarc parent companies, Sony and NEC, continue to exert

4    substantial operational control over the subsidiary, and retain key technology development efforts

5    outside the joint venture, not unlike the 2000 HLDS venture's organizational template. Japan's

6    Nikkei economic news service reported that:

7         Sony and NEC signed the agreement in expectation of synergy in
          both technologies and marketing.  The companies intend to
8         complement each other's technologies with Sony's expertise in
          optical heads and NEC's signal processing LSIs.  As for marketing,
9         the companies aim to extend the reach of their products to North
          America and Europe, where Sony and NEC respectively boast solid
10        sales.  However, parent Sony and NEC will separately continue
          their research and development of optical disc elemental
11        technologies in house.

12        103.    Sony NEC Optiarc's founding board of directors was composed entirely of senior

13   executives from NEC and Sony.  As a February 2006 press release from Sony announcing the

14   joint venture stated:

15        Sony Corp. and NEC Corp. have announced that they reached a
          definitive agreement to establish a joint company named "Sony
16        NEC Optiarc Inc." to integrate their optical disc drive businesses.
          Shinichi Yamamura, current Deputy President, Video Business
17        Group, Sony, will become Representative Director and President of
          the new company. Eiichi Ichikawa, current General Manager,
18        Computer Storage Products Division, NEC, will become Vice
          President. In addition to these two full-time directors, the new
19        company's board of directors includes three and two adjunct
          members from Sony and NEC, respectively.

20        104.    The executives went on to senior positions in their home companies.  In addition

21   to Sony NEC Optiarc's founding Chief Executive Officer, Yamamura, who came from Sony, and

22   Sony NEC Optiarc's founding Vice President, Iichikawa, who came from NEC, the founding

23   board consisted, on the Sony side, of Katsumi Ihara, previously a Representative Corporate

24   Executive Officer, Executive Deputy President, and Group CFO at Sony; Kiyoshi Nishitani,

25   previously Deputy President of Sony's Home Electronics Network Company; and Hidenosuke

26   Kanai, Senior Vice President of the Planning and Control Division in Sony's Home Electronics

27   Company.  All these Sony-supplied Sony NEC Optiarc board members simultaneously continued

28

1   in their distinguished careers at Sony.  Ihara is currently Chief Executive Office of Sony

2   Financial; Nishitani as of February 2008 was head of Sony's video business, and Kanai was

3   appointed President of Sony's Electronic Devices Business Group in 2009.

4            105.    Similarly, the NEC contingent making up the remainder of Sony NEC Optiarc's

5   founding board of directors consisted of Shunichi Suzuki, formerly a Senior Vice President and

6   member of the Board of Directors at NEC, and Masahiko Yamamoto, another former Senior Vice

7   President at NEC.  After a stint at Optiarc, Suzuki retired as an Executive Vice President and

8   Member of the NEC Board in June 2007, while Yamamoto went on to become an Advisor at

9   NEC Networks and System Integration Corp., and then served as its President, the role in which

10  he currently continues (as of 2010) at this NEC subsidiary.

11           106.    In short, both Sony and NEC continued to exert significant direct control over

12  their Sony NEC Optiarc venture through their complete control of its board of directors.

13           107.    Like the previously described joint ventures between patent pool members and

14  outsiders, this one too had a majority ownership share controlled by the patent pool member

15  (Sony), giving it the same cost advantage in royalties.  In late 2008, NEC sold off its interest in

16  Sony NEC Optiarc to Sony, the venture's name was contracted to Sony Optiarc and it became a

17  wholly owned Sony subsidiary.

18                       e.      **Formation and Ownership of Philips & Lite-On Digital Solutions
                                 (PLDS)**

19
20           108.    In early 2006, Taiwanese ODD producer Lite-On purchased BenQ's ODD

21  production facilities in China, and took over BenQ's manufacturing ties to PBDS.  BenQ exited

22  the ODD contract manufacturing business.  In 2007, BenQ sold its interest in PBDS to Lite-On,

23  completely exiting the ODD business.  The joint venture with Philips was renamed PLDS (with

24  Lite-On's 'L' replacing BenQ's 'B').  Philips remained the other controlling shareholder in the

25  PLDS entity.  Lite-On and Philips each gained the right to appoint members of the board of

26  directors, which has the responsibility for the strategic management, direction and control of the

27  PLDS joint venture.  Philips has a 51 percent ownership stake in PLDS, while Lite-On retains a

28  49 percent ownership stake.

### 3. Effects of Consolidation in the Market

109.    By 2004, the most significant effects of this consolidation within the ODD industry had been felt.  The shrinking number of producers is all the more remarkable given the growth in the size of the ODD market from 2001 through 2004, as the following table demonstrates:

| GLOBAL ODD SALES, 2001-2009 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| Blu-ray (in millions) | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 14 |
| DVD-W (in millions) | 2 | 5 | 25 | 55 | 124 | 179 | 238 | 235 | 215 |
| Other (in millions) | 177 | 198 | 203 | 191 | 178 | 123 | 92 | 72 | 53 |
| Total Units (in millions) | 179 | 203 | 228 | 246 | 303 | 301 | 331 | 312 | 281 |
| | | | | | | | | | |
| Total $ (in billions) | 9.3 | 9.8 | 10.5 | 9.8 | 10.4 | 9.6 | 9.3 | 7.9 | 6.8 |

110.    One significant feature of this process was that the consolidations did little to change the actual pattern of outsourced manufacturing, which largely continued unchanged, as described above.  Instead, the consolidation simply reduced the number of ODD firms competing horizontally and shrank the numbers of unique brands and products sold in the marketplace.  The consolidation also reduced the number of firms developing new products in direct competition with one another in the marketplace.  The net result was a significant increase in concentration, decline in competition, retardation of innovation, and facilitation of collusion by ODD producers.

111.    In 2008, for example, the very last independent Taiwanese ODD brand (Asustek) disappeared, leaving only Lite-On and Quanta Storage remaining in what was once a crowded, fast growing technology sector in Taiwan (with both remaining firms primarily producing as contract manufacturers for pool members).

### C. Incestuous Relationships Serve as a Conduit to Price Fixing Between Competitors

112.    The ODD market is characterized by incestuous relationships between competitors and suppliers, facilitating the exchange of competitive information.  Three unique characteristics

1    of the relationships in this industry allowed the Defendants to engage in a scheme to fix prices

2    and allocate the market.  *First*, changes in entities and partnership memberships allowed the

3    sharing of information between competitors.  These shifting alliances are outlined above in

4    describing the various partnerships which made up the joint ventures in the ODD industry.

5        113.    *Second*, manufacturing and supply agreements between entities allowed the

6    sharing of sensitive competitive information.  Outsourced manufacturing opened communication

7    links between competitors.  Each of the joint ventures includes a manufacturing parent and an

8    intellectual-property-holder parent.  For example, TSST outsourced manufacturing to Defendant

9    Samsung.  And HLDS outsourced its manufacturing to Defendant LG Electronics.

10       114.    Competitors who also functioned as component suppliers for ODDs also allowed

11   otherwise private business information to be shared between competitors.  For example, Hitachi

12   was a major supplier of OPUs (known either as optical pickup units or optical processing units),

13   and sold these parts to other manufacturers.  Hitachi's supply of these component parts to its

14   competitors became an important channel for information exchange during the Class Period.

15       115.    And manufacturing agreements outside of the joint ventures also provided

16   avenues for the sharing of competitive information.  For example, in 2008, TEAC entered into a

17   co-development agreement with PLDS for several slot load products, ultra slim and slim

18   products.

19       116.    Similarly, Quanta Storage had incestuous relationships with its co-conspirators.

20   Quanta Storage was founded in 1999 by former employees of Lite-On.  Originally, Quanta

21   Storage manufactured the ODD Products for the Philips-BenQ joint venture, PBDS.  Currently,

22   Quanta Storage manufactures ODD Products for Sony Optiarc.

23       117.    The relationship between Quanta Storage and Sony Optiarc was summarized by

24   counsel, T.D. Garnett, in his opening statement in *Ricoh v. Quanta* (06-CV-462-BBC):

25               Now, as I already mentioned, Quanta Storage is an assembler of
                 optical disc drives.  And I have a graphic that I think will help
26               illustrate their business model.  Quanta Storage will buy, for
                 example, a laser and a motor and the controller chip and it will
27               assemble those components together into a functioning disc drive.

28

> Now, for the last several years, Quanta Storage has had only one main customer and that customer is Sony Optiarc.  You may have heard of the company called Sony.  Well, Sony owns Sony Optiarc.  You will learn that Quanta Storage sells almost no disc drives under its own brand name.  It assembles the disc drives for Sony Optiarc.
>
> Now, Sony Optiarc helps Quanta Storage design the disc drives.  Sony Optiarc puts its brand name on the disc drive and then Sony Optiarc sells the disc drive to brand name computer companies, companies that you are likely familiar with – HP, Apple, Dell, for example.

118.    And *third*, personal relationships were developed between key employees at competitor companies, forming communication links for sensitive information to be illicitly shared.  For example, Defendants' customers – OEMs such as Dell, Hewlett-Packard ("HP") and Acer – would host customer-sponsored supply events.  At these events, all suppliers would attend, oftentimes with the Defendants' representatives sitting at lunches together.  At these customer-supply events, Defendants' representatives would trade contact information for purposes of setting up future communications to discuss bid rigging and customer allocations.

**D.    Defendants Exchanged Competitive Information and Fixed Prices by Rigging Bids in Procurement Auctions for ODD Products**

**1.    The ODD Customer Procurement Process for OEMs**

119.    Defendants have been conspiring on price and market allocation with respect to ODD Products throughout the Class Period.  One of the many manifestations of this conspiracy involved bid rigging.

120.    Historically in the ODD industry, a cooperative venture process existed which mediated supply and demand between suppliers and customers.  This process then moved towards negotiated supply, where customers would negotiate directly with sales people at the Defendant companies.  Then OEMs introduced electronic auctions.

121.    Dell was one of the first OEMs to introduce electronic auctions in 2002.  Later, HP introduced a similar type of electronic auction in 2004.  The electronic auctions caused significant pricing pressure and further commoditized the prices in the ODD industry.  Internally, these auctions were sometimes referred to as "bloody auctions" because of pricing pressure impacting profitability for the Defendants.

1    122.    The electronic auctions used by Defendants in their bid-rigging conspiracy were

2    of two general types, e-auctions and eRFQs (Electronic Requests for Qualifications).  E-auctions

3    are live real-time events that span a few hours in which each competing supplier can submit

4    multiple bids.  ERFQs can typically span more than one day and involve multiple rounds of

5    bidding.  The OEM would provide feedback to competing ODD suppliers during the process.

6    OEM procurement events for which auctions typically occurred were on a quarterly basis or, at

7    most, six times a year.

8    123.    These auctions did not usually result in a winner-take-all scenario, although on

9    rare occasions a sole winner did exist.  Instead, there were almost always multiple sources or

10   winner; often four winners, where rank determined the volume each bidder would supply under

11   the contract.  The volume to be awarded under the contract was generally referred to as TAM, or

12   Total Available Market.  TAM could be determined as a fixed number or as a target that moved

13   based on the final bidding prices.

14   **2.    Defendants' Bid Rigging and Customer Allocation Conspiracy**

15   124.    During the conspiracy, the co-conspirators rigged their bids by:  (a) agreeing to fix

16   the prices at which they bid; (b) agreeing on how to allocate their respective positions in the tiers

17   of successful bidders; and (c) exchanging competitively sensitive information on price, desired

18   tier positions, prior bids and bidding outcomes, quality assessments by OEMS (which could

19   disqualify or handicap ODD suppliers in the next procurement event), and the timing of the

20   introduction of new products or the cessation of ones that had reached the end of their lifecycles.

21   Defendants' anticompetitive conduct went beyond bid rigging as on at least one occasion,

22   Defendant TEAC reached agreement with a co-conspirator Defendant regarding customer

23   allocation.

24   125.    These agreements were conducted by sales managers, account managers or global

25   account managers who typically reported to sales executives within their respective companies.[1]

26   _____

27   [1]    Some persons that have been identified from public sources include:  (a) Kris Williams, a
     Major Account Executive at Sony Optiarc America, Inc. from December of 2004 to July of 2009,
     who specialized in serving major OEM clients such as H-P and Dell; (b) Billy Reynolds, a Global

28   Account Director at PLDS from April of 2003 to May of 2007, who served Dell on a dedicated

126.    During the conspiracy, co-conspirators regularly exchanged sensitive business information.  Prior to an auction, information was exchanged regarding finishing positions in the auctions and prices.  Oftentimes during the auctions, competitors spoke on the phone to confirm bidding during the auctions.  And after the auctions, regular communications occurred to confirm finishing positions, and where possible, the finishing prices.  Sometimes information was exchanged via e-mail.

127.    During e-auctions, representatives of the Defendants were present and participating in the United States, while other representatives of Defendants monitored the auction from abroad.

128.    Conspirators also met face-to-face at times to exchange competitive information regarding rigging auction bids.  For example, co-conspirators met at:  (a) a coffee shop in Austin, Texas; (b) casual dining restaurants in Houston, Texas (such as T.G.I. Friday's or Bennigan's); and (c) in the lobby of one conspirator's office building in Singapore, subsequently dining in the cafeteria.

129.    Defendants engaged in hundreds of telephone and face-to-face communications during their conspiracy.  These communications occurred both before, during and after auction events to exchange tiering, quality and pricing information.

130.    Defendants' bid-rigging conduct inflated prices in the ODD market.  Before the Defendants' anticompetitive conduct, the ODD market was characterized by a steep downward trend in prices, frequently observed in technology markets.  However, during the class period, the Defendants' conduct reduced the rate of decline in prices – thereby stabilizing prices – in the ODD market.  In fact market data indicates the effect of the conspiracy in slowing price declines was tremendous – and the illegal conduct appears to have caused ODD prices to increase at certain points.

basis; and (c) Luke Choi, who served as Account Manager or Global Account Manager for Dell on behalf of HLDS or LGUSA from February of 2000 to December of 2007 (Mr. Choi is also listed as an "NEO Team Leader" for HLDS from 2000 to the present).

3.       **Specific Representative Examples of Defendants' Bid Rigging**

131.     Defendants' conspiracy started in 2004 and continued at least until 2009. Defendants' bid-rigging efforts affected the prices paid for ODD Products by all class members. Representative examples of such acts of bid rigging are described below.

132.     A first example of Defendants' bid rigging occurred in August 2006.  HP held an auction on behalf of its Business PC Unit involving the supply of ODDs.  The auction ended on August 31, 2006, and related to a supply period of November and December 2006.

133.     Communications occurred between an account manager for one Defendant and his or her counterpart at the joint venture HLDS.  The communication from the conspirator to HLDS was that it wanted to win first place in the August 2006 auction.  HLDS, in turn, informed its co-conspirator that it also wanted to place first in the procurement event.  The conspirators then agreed not to bid below $14.65 per unit.  The two conspirators were successful in their price fixing, as the end result of the auction was that both parties' bids were over $14.65.

134.     A second example of Defendants' price-fixing conspiracy occurred in February 2009 for ODDs to be divided between HP's Consumer and Business PC units.  The auction closed on February 19, 2009 and related to a supply period of April, May and June 2009.

135.     Defendant PLDS, TSST and another co-conspirator Defendant communicated regarding:  (i) HP's penalizing TSST for prior quality problems and the subsequent disqualification of TSST from receiving the first place slot in the February 2009 auction; (ii) the preferred ranking of PLDS, TSST and another co-conspirator Defendant in the February 2009 auction; and (iii) the proposed prices at which the competitors would bid.  During this discussion, the Defendant co-conspirators agreed that they would not bid lower than their previous closing prices.  The final bids and rankings of the co-conspirators reflected these various agreements.

136.     A third example of Defendants' price fixing occurred in December 2008.  Dell held an auction event closing on December 1, 2008 for ODDs.  The December 2008 auction related to a February 2009 supply period.

137.     For this procurement event, Sony Optiarc's ODD product was to be manufactured by Quanta Storage, and thus, Quanta Storage was also involved in the price-fixing conspiracy.  A

global account manager for one of the co-conspirator Defendants called his or her counterpart at Quanta Storage. These co-conspirators reached agreement on the co-conspirator ranking fourth behind Sony Optiarc. The co-conspirator explained to Quanta Storage that it had newly qualified for the ODD Product involved in the auction and had submitted a low reference price as a part of the qualification process with Dell. The co-conspirator explained that they were not willing to go much lower than this reference price.

138.   And in fact, the bid price provided by the co-conspirator was no lower than what won. The co-conspirator Defendant bid for fourth place in the February 2009 auction. Sony Optiarc, apprised of the bid-rigging by its manufacturer Quanta Storage, bid to third place. Dell, the customer running the February 2009 auction, then pressured the co-conspirator Defendant to lower its price. The co-conspirator lowered its price by five cents, and then called Quanta Storage to tell it the co-conspirator Defendant was acceding to Dell's pressure and lowering its bid by five cents. Quanta Storage then communicated this information to Sony Optiarc and Sony Optiarc also lowered its price by five cents.

139.   Defendants' price-fixing conspiracy was not limited to these three specific incidents. Rather, the conspiracy began at least as early as 2004 and continued into at least 2009. The co-conspirators exchanged sensitive business information on hundreds of occasions. The agreements amongst competitors, though reached by sales and account managers, had to be reported and approved by upper management at the companies. On information and belief, the heads of sales for ODD at each of the joint ventures (HLDS, PLDS, TSST and Sony Optiarc) were aware of and approve of the bid-rigging agreements generally. That is, senior persons at the Defendant companies were aware of and approved the ODD price-fixing conspiracy.

**E.     Barriers to Entry in the ODD Market**

140.   A significant barrier preventing new firms from successfully entering or competing in the ODD industry has been very large royalties charged by patent pools on optical disk technology that were set up in the late 1990s, and the discriminatory manner in which these now-prohibitive royalties are collected. Below is a brief history of patent pools in this industry.

**1.      The Predecessor of the DVD Patent Pools**

141.    In the 1970s and early 1980s, Philips and Sony had engaged in joint research and development on optical data storage; other patents developed independently in this broad field at the two companies were pooled with the patents of the joint research and development venture. Their motivation for doing so is the subject of some controversy – by their own account, the purpose was to enable focusing of resources on difficult technical problems without worrying about their partner "free-riding" on the efforts of the joint venture through parallel patenting activity.  By the account of their critics, the two companies pooled all patents in the area in order to reduce competition from products making use of technological alternatives they had already developed independently of one another.

142.    In 1982, one of the fruits of this Sony-Philips research and development effort emerged – their joint publication of the CD-Audio standard for music optical disks.  A worldwide joint CD Disc Licensing Program was launched, managed by Philips.

143.    In 1984, a second outcome of their joint research and development effort surfaced, with the publication of their CD-ROM standard for read-only data storage.  By 1987, this standard had been adopted by international standards bodies.  In the 1980s and early 1990s, Philips and Sony developed yet another set of standards for CD-R (writeable once) and CD-RW (re-writeable) digital data disks.  These data CD formats became hugely successful, and revolutionized the way in which digital data, including software programs, were stored and distributed.

144.    Facts unearthed in litigation establish that concerns over the manner in which the Philips/Sony CD patent pool operated in many respects anticipated antitrust issues that now have come to light in later ODD patent pools.  A lawsuit heard by the United States International Trade Commission in 2004 established a number of facts about the effects of the Philips/Sony patent pool on CD-R/RW disk media producers that closely parallel the manner in which the later DVD patent pools operated:

        a.      That the various Philips pool royalty rates have been maintained despite the fall in CD-R/RW prices to the point where those royalty rates now

represent between 50 and 70 percent of today's average net selling price in the industry.

b.  That although the three-percent rate determined the relevant royalty in the early 1990s when CD-R prices were high enough to result in royalties in the order of 20 to 25 cents per disk, prices in recent years for CD-R disks have fallen to the point where only the 10-yen minimum is the relevant per-disk royalty.

c.  The patent pool royalty rates charged by Philips and its licensor-partners for CD-R/RWs are significant product price components that currently equal half of the costs of manufacturing.

d.  The two primary reasons CD-R prices have decreased are because consumption has increased greatly and because manufacturing costs have been reduced.  One estimate is that the net selling price for CD-R disks has declined 82 percent since 1997.

e.  The pool licensed its patents externally in a discriminatory fashion; pool members and their affiliates and subcontractors paid no royalties to other patent pool members for licensed products.

145.    The subsequently formed DVD patent pools have a history of operating in a very similar manner.  A royalty which originally was but a small portion of the price of an ODD, has since grown to be the dominant cost of producing an ODD, after scale economies and technology-driven cost reductions pushed prices downward in an initially more competitive environment.  This prohibitive royalty now prevents potential industry entrants from exerting downward pressure on the prices fixed by the conspirators, and shelters them from any external competitive challenge.  The members of the pool, and their affiliates and subcontractors, do not appear to be required to pay royalties to the pools, by virtue of their network of cross licenses, sheltering them from any competition external to the pools.  It is no surprise, therefore, that as a result, patent pool members and their affiliates survived an initial period of intense industrial

1    competition, then rapidly established their control over **95 percent of global ODD sales** in the

2    first half of this decade.

3    **2.      Description, Structure and Membership of the DVD Patent Pools**

4          146.    As detailed above, two patent pools govern the use of DVD technology, a large

5    part of the ODD market.  These two pools are the DVD3c and the DVD6c patent pools.  A

6    "patent pool" is an agreement between two or more patent owners to license one or more of their

7    patents to one another or to third parties.  These patent pools act as barriers to entry into the ODD

8    industry because while licensees must pay royalties now amounting to nearly 68 percent of the

9    average selling price of a DVD recorder, the conspirators as members of these patent pools

10   appear to pay no royalties to the pools.  This gives Defendants a tremendous advantage over any

11   possible competitor.  In addition, the unique structure of the patent pools also acts as a vehicle for

12   the exchange of unit and revenue information, providing a systemic opportunity for facilitation

13   and enforcement of the ODD cartel.

14         147.    After the commercial success of the CD patent pool and its variants became

15   evident in the late 1990s, a great deal of interest then shifted to increasing the density of data

16   storage in a standard sized 5.25" optical disk.  It might then become possible to store a reasonable

17   amount (enough to hold a movie) of high-quality digital video data on an optical disk.

18         148.    In 1995, ten titans from the consumer electronics industry formed a group to study

19   and promote a standard for the development of a DVD.  Among these ten were Defendants

20   Hitachi, Sony and Toshiba.  Philips also participated.  Each member of this group was also a

21   holder or assignee of patents that in some way involved a use or application of DVD technology.

22         149.    Two competing camps of companies formed within the new standardization effort,

23   one led by Sony and Philips, the original developers of the CD standard, and the other by

24   Matsushita (Panasonic), Toshiba, and Time Warner.  Under pressure from potential users in both

25   the computer industry and the entertainment industry, a DVD Forum was established to unify the

26   competing technological standards.

27         150.    All parties agreed to a single standard for next-generation DVD video disks, and

28   read-only data storage, but no agreement on writeable DVD data storage was reached.  Sony and

Philips became the nucleus of a DVD "+" camp, while Hitachi, Matsushita (Panasonic), Toshiba, Mitsubishi, JVC, and Time Warner formed a DVD "-" camp. The result was two sets of incompatible write formats for DVDs, ultimately unified only by more complex products, "super multi" DVD drives capable of reading or writing all the incompatible formats, as well as CDs.

151.    The DVD video standard included the MPEG-2 video coding system, which utilized technology patented by different companies. An MPEG-2 patent pool was formed, in order to license the system. Unlike many later patent pools, the MPEG-2 patent pool was "open," with parties owning patents related to the MPEG-2 standard free to join, and royalties divided among the various patent owners in proportion to the number of patents contributed. Indeed, 25 companies ultimately joined in this patent pool.

152.    In theory, patent pools can have either positive or negative effects on competition and consumer welfare. To the extent that a patent pool reduces the transaction costs of locating and individually licensing patent rights for the dozens or even hundreds of patents owned by multiple parties that would be required to produce a product, a patent pool avoids the problem of "royalty stacking" (individual patent holders charging seemingly reasonable royalties that together create a socially undesirable, excessively high royalty burden), and eliminates the possibility that a "hold-out" owner of a required patent will attempt to charge an excessively high royalty. Thus, a patent pool can be an effective instrument to cut through "patent thickets."

153.    On the other hand, a patent pool can also be used as a mechanism to suppress competition between patented technologies, or downstream products using these patented technologies, and therefore be anticompetitive and harmful to consumers. Patent pools can also shelter weak patents from the challenge they would face if not part of a pool, effectively creating a competition-eliminating technology cartel. And patent pools can make it more difficult for a member to benefit from its independent investments in research and development, and therefore reduce incentives for further innovation.

154.    The MPEG patent pool is sometimes held up as a model of a "good" patent pool design. In that regard, it is important to note the MPEG template for a patent pool is significantly different from the DVD patent pools in three important dimensions. First, the MPEG licensing

program was "open" to all parties who believed they had patents essential to the MPEG standard. Second, the MPEG licensing program had an independent, external administrator. Third, the MPEG licensing program had standard, non-discriminatory licensing terms, applying to members and non-members alike. The DVD patent pools, however, lacked these three features, and the absence of these features created some of the opportunities for anticompetitive conduct that are described in this complaint.

155.   In December of 1998, core members of the DVD "+" camp formed a patent pool for their essential DVD-ROM and video patents. This consortium became known as the DVD3c patent pool. The original DVD3c patent pool was comprised of Philips Electronics/Philips IC, Sony and Pioneer. The DVD3c patent pool now consists of Philips, Sony, Pioneer Corp., Hitachi, Matsushita Electric Industrial Co., Ltd., Mitsubishi Electric Corp., Thomson Multimedia, Time Warner Inc., Toshiba Corp. and Victor Company of Japan Ltd. Thus, Defendants Philips, Sony, Hitachi and Toshiba are all participants in the DVD3c patent pool.

156.   In June of 1999, core members of the "-" camp formed their own, separate DVD-ROM and video patent pool, called the DVD6c patent pool. The original DVD6c patent pool was comprised of Toshiba, Hitachi, JVC, Time Warner, Matsushita and Mitsubishi. The DVD6c pool now consists of Hitachi, Mitsubishi Electric Corp., Panasonic Corp., Samsung, Sanyo Electric Co., Ltd., Sharp Corp., Toshiba, Victor Company of Japan, Ltd. and Warner Bros. Home Entertainment Inc. Thus, Defendants Hitachi, Samsung and Toshiba are all participants in the DVD6c pool.

157.   The royalties charged by the DVD patent pools are now truly huge relative to the total cost of manufacturing ODDs. Indeed, they account for the majority of manufacturing cost for a potential entrant.

158.   The DVD patent pool royalties now constitute a large barrier to entry by potential competitors. For example, the average worldwide price for a DVD burner, on an if-sold-OEM basis, was $30 in 2007, $25 in 2008, and $23 in 2009. In a December 2008 presentation, Hisashi Kato, of Japan's Mitsubishi Electric, estimated the royalty payable to four principal patent pools holding IP related to a DVD recorder to be $17 (of which $14 goes to the DVD6c and DVD3c

pools).  This is 68 percent of the average selling price of a DVD recorder in 2008, and

presumably an even larger share of its cost.

159.   The alleged conspirators, who are members of these patent pools, appear to pay no

royalties to the pools to which their parent companies belong, or to other patent owners cross-

licensing their patents.  This gives them an enormous – indeed, ruinous – competitive advantage

relative to any potential entrant.  Unlike the MPEG patent pool, and like the Philips/Sony CD

patent pool, the DVD patent pools explicitly discriminate between members and non-members in

offering terms for patent licenses.

160.   Although setting a high royalty is not *per se* illegal, it creates a huge barrier to the

exercise of competitive pressures on price by new entrants in downstream product markets, since

they can never lower prices below the floor set by the patent pool royalty, plus manufacturing

cost.  The incumbent firms of course can make large profits at this floor, since they can obtain the

lowest possible manufacturing costs by subcontracting, and do not have to pay this large patent

pool royalty, since their parents are the owners of the pools and exempt from payment of

royalties.

161.   The only firms effectively left in the ODD industry are the firms who are

members, or whose parents are owners, of the DVD patent pools.  This is because the large

royalty charged by the patent pool is a highly effective barrier keeping non-patent pool firms

from entering the ODD marketplace.  Competition among six such pool-related companies

should still be more than enough pressure to drive prices down, though, closer to the much lower

cost of making a DVD drive.  What has prevented this is the impact from the price-fixing

conspiracy, which has united these firms in an effort to prevent the more rapid price cuts that

characteristically reflect continuing declines in production costs in this dynamic high tech

industry.

### 3.   Role of Patent Pools in Facilitation of Cartel Monitoring

162.   Another way in which the existence of the two patent pools facilitates price-fixing

is by making it easier to monitor production and pricing by both the six conspirator firms

accounting for 95 percent of industry production, and the small group of non-defendant firms

1    producing the remainder of global output.  This is because the terms of both the DVD3c and

2    DVD6c patent pools require licensees to pay a royalty equal to the maximum of a fixed fee per

3    unit produced, or a fixed percent of revenues from units sold.  And, because the fixed fee has

4    been such a large portion of the price of a unit in recent years, the royalty has effectively been a

5    fixed per unit payment.  Thus, ***all producers outside of the patent pools must report production***

6    ***statistics to the pool***.  A price-fixing conspiracy with access to the details of the royalty payments

7    can easily determine whether production by non-conspirators is causing unexpected shifts in

8    industry output and prices, or whether one of the six conspirators who are also members of the

9    patent pool must be cheating on cartel agreements on pricing or output.

10       163.    The model license agreement of the DVD3c pool requires licensees to report, on a

11   quarterly basis, the quantities of DVD products on which royalties are due, including specifying

12   the identities of the buyers; the trademarks used in connection with the DVD players; the net

13   selling price of the DVD players; and the quantities of DVD players sold.

14       164.    The model license agreement of the DVD6c pool requires licensees to report, on a

15   semi-annual basis, the quantities of DVD products on which royalties are due, the trademarks or

16   trade names used for such products, and a computation of the royalties due on the agreement.

17       165.    A unique feature of the DVD3c and DVD6c patent pools, which differentiates it

18   from other patent pools, is that they are administered by conspirator parents with majority

19   ownership of their joint ventures.  The DVD3c pool is administered by Philips, while the DVD6c

20   pool is administered by Toshiba in Japan, Europe and Africa; Hitachi in Asia, Oceania and the

21   Middle East; and Panasonic in the Americas.  Thus, the existence of the patent pools ensures that

22   sensitive competitive information such as sales volume and selling prices is received by

23   participants in the conspiracy, and not by an independent administrative entity.  And circulation

24   of information from patent pool participant parent to their joint venture, or wholly owned ODD

25   business unit, and between conspirators is not difficult. Indeed, it is actually facilitated by the

26   terms of the licensing agreements.  Parents and subsidiaries have numerous opportunities to meet

27   with one another while participating in patent pool administrative oversight and technical

28   discussions, or in management meetings for the joint venture subsidiaries.

IPP CONSOLIDATED CLASS ACTION COMPLAINT – No.        - 41 -
3:10-md-2143 VRW
010177-12  384754 V2

166.     More egregiously, the model license agreement of the DVD6c specifically contemplates sharing sensitive business information amongst members of the patent pool:

> Licensee agrees that members of the DVD Patent Licensing Group may have access to the information contained in such reports regarding the names of licensees, categories and model numbers of the licensed products, total quantities of sales of such products and total royalties due under this Agreement.

167.     Both patent pools apparently also have "compliance" programs that require licensees to identify their suppliers and customers to the licensing administrator.

168.     The only available empirical study suggests that direct involvement by patent owners in administering a patent pool is quite rare.  Of eighteen current patent pools examined, all *except* the two DVD patent pools had an independent or third party specialist pool administrator.[2]  This presumably is because the patent owners in most other pools recognized the temptations (and legal antitrust dangers) of having industry participants collect detailed information on sales and unit shipments – and therefore pricing – of various licensed products by their licensees and competitors.

169.     To successfully enforce a price-fixing conspiracy, co-conspirators try to identify whether an unexpected change in price is the result of a co-conspirator cheating on cartel agreements, or the result of increased production or other events outside the control of the conspiracy.  By granting pool members direct access to information on production and pricing by licensees external to the pool, the license administration arrangements in both DVD pools allow pool members to monitor external ODD sales and pricing, and therefore facilitate a more effective price-fixing conspiracy.

**F.     Defendants' Participation in Trade and Business Organizations Provided Opportunities for Collusion**

170.     During the Class Period, Defendants belonged to trade and business organizations that focused on ODD Products and related industries, such as the Optical Storage Technology Association, the DVD Forum, the International Symposium of Optical Memory and the Blu-Ray

---

[2]     Although the DVD6c pool originally proposed to have a licensing agency administer its licensing program, it instead opted to have pool members divide up these duties among themselves along regional lines.

Disc Association.  During the Class Period, these organizations held multiple meetings and conferences attended by Defendants and their employees, which provided Defendants with the opportunity to meet, discuss, and agree upon their pricing of ODD Products.

### 1.    The Optical Storage Technology Association

171.    The Optical Storage Technology Association is an international trade association incorporated in 1992 to promote the use of recordable optical technologies and products.  The organization's membership includes "optical product manufacturers and resellers from three continents, representing more than 85 percent of worldwide writable optical product shipments." The Optical Storage Technology Association states that its members "work to shape the future of the industry through regular meetings."

172.    In 2005, the Optical Storage Technology Association's membership list included Defendants, or related subsidiaries of the Defendants, including:

| COMPANY | REPRESENTATIVE |
| --- | --- |
| Sony Corporation | Christopher Smith |
| Toshiba | Maciek Brzeski |
| LG Electronics | Yong Cheol Park |
| Lite-On IT Corporation | Patrick Yen |
| Philips Electronics | Frank Simonis |
| Samsung Electronics Co., Ltd. | Young-Yoon Kim |
| Samsung Techwin | Kun Sop Kim |
| NEC Technologies Inc. | n/a |

173.    On information and belief, in 2005, Optical Storage Technology Association members attended meetings on the following dates:  February 28, March 1-2, June 13-15, September 12-14 and December 5-7.  Each of these meetings occurred at the Embassy Suites Hotel, 250 Gateway Boulevard, South San Francisco, California.

174.    In 2006, the Optical Storage Technology Association's membership list included Defendants, or related subsidiaries of the Defendants, including:

| COMPANY | REPRESENTATIVE |
|---|---|
| Sony Corporation | Christopher Smith |
| Toshiba | Paul Castellana |
| LG Electronics | Yong Cheol Park |
| Lite-On I.T. Corporation | Patrick Yen |
| Philips Electronics | Frank Simonis |
| Samsung Electronics Co., Ltd. | Young-Yoon Kim |
| Samsung Techwin | Kun Sop Kim |

175.    On information and belief, in 2006, Optical Storage Technology Association members attended meetings on the following dates:  March 2-3, June 12-14, October 5-6, and December 4-6.  Each of these meetings occurred at the Embassy Suites Hotel, 250 Gateway Boulevard, South San Francisco, California, with the exception of the meetings on October 5-6, which took place in Tokyo Japan, at the Akihabara Convention Center.

176.    In 2007, the Optical Storage Technology Association's membership list included Defendants, or related subsidiaries of the Defendants, including:

| COMPANY | REPRESENTATIVE |
|---|---|
| Sony Corporation | Christopher Smith |
| Toshiba | Paul Castellana |
| LG Electronics | Yong Cheol Park |
| Philips Electronics | Frank Simonis |
| Samsung Electronics Co., Ltd. | Young-Yoon Kim |

177.    On information and belief, in 2007, Optical Storage Technology Association members attended meetings on the following dates:  March 5-7, June 11-13, September 17-19, and December 3-5.  Each of these meetings occurred at the Embassy Suites Hotel, 250 Gateway Boulevard, South San Francisco, California.

178.    In 2008, the Optical Storage Technology Association's membership list included Defendants, or related subsidiaries of the Defendants, including:

| COMPANY | REPRESENTATIVE |
|---|---|
| Sony Corporation | Christopher Smith |
| Toshiba Corporation | Paul Castellana |
| LG Electronics | n/a |
| Samsung Electronics Co., Ltd. | n/a |

179.    On information and belief, in 2008, Optical Storage Technology Association members attended meetings on the following dates:  March 17-19, June 16-18, October 6-8 and December 8-10.  Each of these meetings occurred at the Embassy Suites Hotel, 250 Gateway Boulevard, South San Francisco, California, with the exception of the March 2008 meetings, which occurred at the Doubletree Hotel, San Francisco Airport, 835 Airport Blvd., Burlingame, California.

### 2.    The DVD Forum

180.    The DVD Forum is an organization responsible for the licensing and distribution of DVD products whose "purpose is to exchange and disseminate ideas and information about the DVD Format and its technical capabilities, improvements and innovations."  Defendants Hitachi, LG Electronics, Philips, Samsung, Sony, NEC and Toshiba are, or have been during the relevant time period, members of its steering committee.  In addition, Defendant Lite-On is a member of the organization.

181.    In 2005, members of the DVD Forum met on April 12 in Taipei, Taiwan; on September 19 in Santa Monica, United States; on October 5 in Tokyo, Japan; on October 24-25 in Paris, France; and on November 24 in DongGuan, China.

182.    In 2005, members of the DVD Forum Steering Committee also met numerous times.  As stated above, each of the corporate family of Defendants involved in the cartel had a representative on the DVD Forum Steering Committee.  The DVD Forum Steering Committee met on the following dates and at the following locations, with representatives as indicated:

| DATE | LOCATION | DEFENDANTS PRESENT |
|------|----------|--------------------|
| Feb. 23, 2005 | Hotel Intercontinental Tokyo Bay in Tokyo, Japan | Toshiba, LG Electronics, Philips, Sony, Samsung and Hitachi |
| May 26, 2005 | Novotel Cannes Montfleury Hotel in Cannes, France | Toshiba, LG Electronics, Philips, Samsung, NEC and Hitachi |
| Sept. 14, 2005 | Shilla Jeju Hotel in Jeju, Korea | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| Nov. 16-17, 2005 | Sheraton Maui Resort Hotel in Maui, Hawaii | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |

183.    At the May 26, 2005 meeting in France, a representative from Sony was not in attendance, although Sony is a Steering Committee member.  Toshiba took issue with Sony's absence and proposed an amendment to the Forum charter that required those committee members not making a "reasonable effort to advance the purposes of the Forum" essentially be required to withdraw as a Steering Committee member.  A reasonable inference from Toshiba's reaction to Sony's absence at the Steering Committee meeting was that the presence of all parties in the ODD cartel at these trade meeting was necessary for an exchange of information and to police the activities of the cartel.  In fact, after Toshiba's admonition, Sony did not miss another Steering Committee meeting in the following five years.

184.    In 2006, members of the DVD Forum met on April 26 in Taipei, Taiwan; on August 7 in Los Angeles, United States; on October 5 in Tokyo, Japan; on November 8 in Barcelona, Spain; and on November 21 in Shanghai, China.

185.    In 2006, members of the DVD Forum Steering Committee also met numerous times.  As stated above, each of the corporate family of Defendants involved in the cartel had a representative on the DVD Forum Steering Committee.  The DVD Forum Steering Committee met on the following dates and at the following locations, with representatives as indicated:

| DATE | LOCATION | DEFENDANTS PRESENT |
|---|---|---|
| Feb. 22, 2006 | Tokyo Bay Intercontinental Hotel in Tokyo, Japan | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| May 24, 2006 | Lynnwood Convention Center in Lynnwood, Washington | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| Sept. 12, 2006 | Sheraton Universal Hotel, Los Angeles, California | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| Nov. 29, 2006 | Nara Royal Hotel in Nara, Japan | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |

186.    In 2007, members of the DVD Forum met on May 18 in Taipei, Taiwan; on September 3 in Berlin, Germany; on October 4 in Tokyo, Japan; on October 9 in Los Angeles, California and on November 1 in Shanghai, China.

187.    In 2007, members of the DVD Forum Steering Committee also met numerous times.  As stated above, each of the corporate family of Defendants involved in the cartel had a representative on the DVD Forum Steering Committee.  The DVD Forum Steering Committee met on the following dates and at the following locations, with representatives as indicated:

| DATE | LOCATION | DEFENDANTS PRESENT |
|---|---|---|
| Feb. 28, 2007 | Toshiba Headquarters in Tokyo, Japan | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| June 19, 2007 | Disneyland in Anaheim, California | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| Sept. 12, 2007 | Evoluon Conference Center in Eindhoven, The Netherlands | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| Nov. 15, 2007 | Ambassador Hotel, Hsinchu, Taiwan | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |

188.    In 2008, members of the DVD Forum met on October 2 in Tokyo, Japan; on October 28 in Beijing, China; on October 29 in Santa Monica, California and on November 25 in Taiwan.

189.    In 2008, members of the DVD Forum Steering Committee also met numerous times.  As stated above, each of the corporate family of Defendants involved in the cartel had a representative on the DVD Forum Steering Committee.  The DVD Forum Steering Committee met on the following dates and at the following locations, with representatives as indicated:

| DATE | LOCATION | DEFENDANTS PRESENT |
|------|----------|--------------------|
| Feb. 27, 2008 | InterContinental Tokyo Bay Hotel, Tokyo, Japan | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| June 11, 2008 | Hilton Los Angeles/Universal City in Los Angeles, California | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| Sept. 17, 2008 | Novotel Paris Vaugirard in Paris, France | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| Nov. 19, 2008 | Shilla Hotel in Seoul, Republic of Korea | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |

190.    In 2009, members of the DVD Forum Steering Committee also met numerous times.  As stated above, each of the corporate family of Defendants involved in the cartel had a representative on the DVD Forum Steering Committee.  The DVD Forum Steering Committee met on the following dates and at the following locations, with representatives as indicated:

| DATE | LOCATION | DEFENDANTS PRESENT |
|------|----------|--------------------|
| Feb. 25, 2009 | Intercontinental Hotel Tokyo Bay in Tokyo, Japan | Toshiba, LG Electronics, Philips, Samsung, Sony, NEC and Hitachi |
| Sept. 10, 2009 | Universal Hilton Hotel in Los Angeles, California | Toshiba, Philips, Samsung, Sony, NEC and Hitachi.  LG Electronics did not attend, but gave its proxy to Toshiba. |

191.    The DVD Forum Steering Committee also met at the InterContinental Hotel Tokyo Bay in Tokyo, Japan on February 24, 2010.  Specifically, in attendance were representatives from Defendants Toshiba, LG Electronics, Samsung, Sony, NEC and Hitachi.

**3.    The International Symposium of Optical Memory**

192.    The International Symposium of Optical Memory is an organization "concerned with the materials, the physics, and the technology of optical memories and provides an opportunity to share the latest information in these fields with the international research community."

193.    In 2005, International Symposium of Optical Memory members met from July 10-14 at the Hyatt Regency Waikiki, Honolulu, Hawaii.  In 2005, the International Symposium of Optical Memory membership list included Defendants, or related subsidiaries of the Defendants, including:

| COMPANY | REPRESENTATIVE(S) |
|---|---|
| Hitachi | T. Maeda, H. Miyamoto, M. Nakamura, M. Ojima |
| Hitachi Ltd. | Takeshi Shimano, Hirofumi Sukeda |
| LG | J.-Y. Kim |
| LG Electronics Inc. | Jin-Yong Kim |
| NEC Corp. | Ryuichi Katayama, Y. Yamanaka, H. Fukuchi |
| Philips | J. A. M. M. van Haaren |
| Samsung | J.-H. Kim, I. Park, D.-H. Shin |
| Samsung Electronics Co. Ltd. | Chong Sam Chung, Dong-Ho Shin |
| Sony | M. Shinoda, M. Takeda, K. Nishitani, S. Kubota |
| Sony Corp. | Isao Ichimura, Kimihiro Saito |
| Toshiba Corp. | Yutaka Kashihara, Hiromichi Kobori, Y. Honguh, H. Yamada |

194.    In 2006, International Symposium of Optical Memory members met from October 15-19 at the Sunport Takamatsu, Takamatsu, Kagawa, Japan.  In 2006, the International Symposium of Optical Memory's membership list included Defendants, or related subsidiaries of the Defendants, including:

| COMPANY | REPRESENTATIVE(S) |
|---|---|
| Hitachi | M. Nakamura, M. Ojima, T. Maeda, H. Miyamoto |
| LG | J.-Y Kim, |
| NEC | H. Inada, R. Katayama, Y. Yamanaka |
| Philips | J.A.M.M. van Haaren, |
| Samsung | J.-H Kim, I.-S Park, D.-H Shin, |
| Sony | K. Nishitani, S. Kubota, M. Shinoda, S. Higashino, M. Takeda |
| Toshiba | H. Yamada, H. Kobori, A. Hirao |

195.    In 2007, International Symposium of Optical Memory members met from October 21-25 at the Pan Pacific Hotel, Singapore.  In 2007, the International Symposium of Optical Memory's membership list included Defendants, or related subsidiaries of the Defendants, including:

| COMPANY | REPRESENTATIVE(S) |
|---------|-------------------|
| Hitachi | M. Nakamura, M. Ojima, T. Maeda, H. Miyamoto |
| LG | I.-H Choi, |
| NEC | H. Inada, R. Katayama, Y. Yamanaka |
| Samsung | J.-H Kim, I.-S Park, D.-H Shin |
| Sony | S. Kubota, K. Nishitani, M. Toishi, S. Higashino, M. Takeda |
| Toshiba | H. Yamada, H. Kobori, A. Hirao |

196.    In 2008, International Symposium of Optical Memory members met from July 13-17 at the Hilton Waikoloa Village, Waikoloa, Hawaii.  In 2008, the International Symposium of Optical Memory's membership list included Defendants, or related subsidiaries of the Defendants, including:

| COMPANY | REPRESENTATIVE(S) |
|---------|-------------------|
| Hitachi | H. Miyamoto, T. Shintani, M. Nakamura, M. Ojima |
| Hitachi Ltd. | Hiroyuki Minemura |
| LG Electronics Inc. | In-Ho Choi, Yun-Sup Shin |
| NEC Corp. | Ryuichi Katayama, Y. Yamanaka, T. Iwanaga |
| Samsung | J.-H. Kim, I.-S. Park, D.-H. Shin |
| Samsung Electronics Co., Ltd. | Kyung-Guen Lee, Jooho Kim |
| Sony | M. Toishi, S. Higashino, M. Takeda, K. Nishitani |
| Sony Corp. | Kimihiro Saito, Atsushi Fukumoto, Masataka Shinoda, Isao Ichimura |
| Toshiba | H. Kobori, A. Hirao, H. Yamada |
| Toshiba Corp. | Sumio Ashida |

197.    In 2009, International Symposium of Optical Memory members met from October 4-8 at the Nagasaki Brick Hall, Nagasaki, Japan.  In 2009, the International Symposium of Optical Memory's membership list included Defendants, or related subsidiaries of the Defendants, including:

| COMPANY | REPRESENTATIVE(S) |
|---------|-------------------|
| Hitachi | M. Nakamura, M. Ojima, H. Miyamoto, T. Shintani |
| LG | I.-H Choi, |
| NEC | T. Iwanaga, R. Katayama, Y. Yamanaka |
| Samsung | J.-H Kim, I.-S Park, D.-H Shin |
| Sony | K. Nishitani, M. Toishi, S. Higashino |
| Toshiba | H. Kobori, A. Hirao |

### 4.    The Blu-Ray Disc Association

198.    The Blu-Ray Disc Association is an industry consortium that develops and licenses Blu-Ray Disc technology and is responsible for establishing format standards and promoting business opportunities for Blu-Ray Disc.  The Blu-Ray Disc Association is divided into three levels of membership: the Board of Directors, Contributors, and General Members.

199.    The "Blu-ray Disc founder group" was started on May 20, 2002 by the Massachusetts Institute of Technology and nine leading electronic companies, including Defendants Sony, Philips, LG Electronics, Hitachi and Samsung.  In order to enable more companies to participate, it announced in May 2004 that it would form the Blu-Ray Disc Association, which was inaugurated on October 4, 2004.

200.    The Board of Directors of the Blu-Ray Disc Association currently includes Defendants Hitachi, LG Electronics, Philips Consumer Electronics (a division of Defendant Philips), Samsung and Sony.  Contributors to the Blu-Ray Disc Association currently include Defendants Lite-On and Toshiba.

### G.    Effects on Price and Harm to Consumers

### 1.    Defendants' Conspiracy Caused Consumers to Pay Higher Prices

201.    As would be typical with most high-tech information technology products dramatic declines in price and improvement in quality occur over time.  An effective price-fixing conspiracy might be expected to significantly slow what would otherwise be a more rapid decline in quality-adjusted price, rather than increase the price in absolute terms.  Put another way, the price would be higher relative to a but-for world of more rapid price decline.

202.    ODDs are priced in a highly integrated global market.  As producers reported to the European Union during a merger review, "With respect to the geographic product market, the parties submit that the overall PC ODD supply market is world-wide or at least EEA-wide in scope.  Prices do not vary significantly in world regions."

203.    The Bank of Japan constructs and publicly reports two producer price indexes for ODDs manufactured in Japan.  These price indices can therefore be converted to a common currency basis (dollars), and be used as measures of price movements in global markets.  These price indexes are better measures of price trends than simple average sales prices, since they control for differences in the mix of products being produced, and hold constant the quality and types of products being produced, over time.

204.    One of the two Japanese producer price indexes holds the sales mix of products constant using 2005 market shares, and measures changes in the price of this 2005 "bundle" of ODDs from one time period to the next.  A second Japanese price index updates the weights from one year to the next, beginning from a 2005 base.  The latter calculation using "chain weights" is considered a better measure of price change for products like ODDs which are undergoing technological and quality changes.

205.    Differences in weights as they evolve over time are likely to create some differences in movements between the two price indexes.  The following table compares the movement in these two price indexes, converted to a common dollar basis, over time.  CAGR refers to the compound annual growth rate.  As expected, the chain weighted price index shows price declines that are slightly greater, reflecting its more accurate tracking of movements in market prices due to introduction of newer and more innovative products:

| ANNUAL RATES OF PRICE CHANGE IN ODDs | | |
|---|---|---|
| | CAGR | CAGR |
| | 2001-2004 | 2004-2009 |
| ODD Chain Weight | -22.7% | -9.5% |
| ODD Fixed Weight | -21.5% | -6.9% |

206.    Despite differences in index weights, the two indexes display a remarkably consistent pattern.  This data shows a clear trend toward slower rates of price declines over the period 2004 to 2009.

207.    This ODD price index is most usefully compared to the price index for a comparable high tech product.  Like ODDs, hard disk drives (with magnetic, non-removable media, HDDs) utilize precision electro-mechanical components, with a significant semiconductor content, and are also used for digital data storage in computer systems.  There was also a significant increase in concentration from 2000 to 2007 in hard disks, but with no patent pool with production and pricing information-sharing, no prohibitive, entry-preempting royalty, and no price-fixing conspiracy:

| ANNUAL RATES OF PRICE CHANGE IN ODDs VERSUS HDDs | | |
|---|---|---|
| | CAGR | CAGR |
| | 2001-2004 | 2004-2009 |
| ODD Chain Weight | -22.7% | -9.5% |
| HDD | -36.1% | -31.5% |

208.    This data suggests that after declining at very high rates prior to the emergence of an effective ODD conspiracy in 2004, price declines for the two types of data storage systems changed by very different amounts during the alleged conspiracy period, from 2004 to 2009. HDD prices continued to decline at similar rates as over 2001 to 2004, while price declines in ODDs not only came to a complete halt in 2008, but prices even increased substantially during the 2008 to 2009 period.

209.    The following figure provides a graphic comparison of these price declines for optical disk storage versus rates of decline in dollars per gigabyte of hard disk storage over the 2001-2009 period.  The difference in rates of decline in ODD prices before and after the start of the conspiracy is obvious and compelling, while the continuing and virtually unchanged, sharp decline in hard disk drive storage prices is equally evident:

**PRICE INDEXES FOR OPTICAL STORAGE VERSUS HARD DISK STORAGE
2001-2009**



210.    Although the above analysis largely focuses on computer ODDs, a similar halt to price declines in optical disks used in consumer electronics also occurred over the conspiracy period.  The following figure shows that a similar rapid decline in consumer DVD player prices came to an abrupt halt in 2004:

1

**DVD PLAYER PRICES IN THE US MARKET, 1997-2005**

2

3

## Rate of hardware adoption: DVD

4

5
* DVD also took off slowly

6
* 4 years to reach early mass-
  market in the US and Europe

7

8
* Significant perceived improve-
  ment in audio-visual quality

9
* Consumer price of hardware
  played a pivotal roll

10

11
* Average prices:

12
  – At launch €650

  – After 4 years >€300

13
  – Today €100

14



15

16
     211.    The following figure, taken from a 2009 analyst presentation, shows that

17
consumer DVD player prices actually increased from 2006 through 2009, and were projected to

18
continue increasing through 2012.  This pattern is very similar to computer ODDs:

19

20

21

22

23

24

25

26

27

28

**DVD PLAYER PRICES IN THE US AND EUROPEAN MARKETS, 2006-2008
(PROJECTIONS THROUGH 2012)**



Hardware Prices Are Only Going One Way: US Example

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Blu-ray Player (Av) | 636 | 479 | 257 | 193 | 123 | 92 | 77 |
| DVD Player (Av) | 44 | 47 | 51 | 49 | 48 | 56 | 56 |
| Blu-ray (Entry Level) | 400 | 200 | 120 | 80 | 60 | 50 | 40 |

212.    The most recent optical disk technology used by consumers, Blu-ray disc players, continues to be only a small part of the overall ODD market.  Though Blu-ray player prices had declined from stratospheric 2006 levels (an average sales price of $636 per BD video player) to a less daunting ($193) price level by 2009, developments in 2008 suggest that the same collusive conduct among the Defendants that had halted price competition for the mainstream DVD technology, was also being felt in the small but growing market for the newer technology Blu-ray players.

213.    The year 2008 marked the end of a vigorous competition between Blu-ray players and the competing technological approach to high definition video, HD-DVD.  The HD-DVD format had previously been promoted by Toshiba, with HD-DVD compatible players also produced by its TSST joint venture partner Samsung, as well as LG Electronics, NEC, Sanyo, Thomson, and Onkyo.  Toshiba had been aggressive in promoting the format by pricing its HD-DVD players several hundred dollars below prices for comparable Blu-ray players, producing considerable downward pressure on latest generation video players.  As one industry observer noted:

1    Toshiba clearly understood the importance of penetration pricing in
     a standards war.  HD-DVD players entered the market at half the
2    price of the Blu-ray players and remained priced consistently
     throughout the war.  Alone, this may have tilted the market towards
3    crowning the HD-DVD format.

4    But Sony also understood this issue.  The company was at a cost
     disadvantage to HD-DVD in that the Blu-ray players cost more to
5    produce.  To overcome this, Sony bundled Blu-ray with PS3.

6         214.    Finally, in 2008, Toshiba gave up on its effort to establish the HD-DVD format.

7    As soon as the competitive pressure was removed, prices for Blu-ray players surged upwards.  As

8    Information Week reported:

9         HD DVD has been dead less than four weeks, yet it appears prices
          already have started to rise on DVD players supporting the
10        surviving high-definition format Blu-ray.

11        The average price in January of the top 10 Blu-ray players on
          PriceGrabber.com, a comparison-shopping site, was $467.  In
12        February, the month Toshiba said it would no longer lead the
          charge for HD DVD, the average price jumped to $604.

13
          Some of the increase was due to the introduction of expensive
14        players with features that went above the norm, Darren Davis, VP
          of product marketing for PriceGrabber, said Thursday.  Taking
15        away that factor, however, still left an increase between $20 and
          $50 on most players in February.
16
          Even though Blu-ray players no longer have to compete with
17        cheaper HD DVD devices, manufacturers would be smart to keep
          prices low.  "Consumers are not going to jump into the market
18        yet," Davis said.  "The demise of HD DVD, if anything, is going to
          delay Blu-ray adoption, given the increase in prices."
19
          While raising prices could offer short-term gain for manufacturers
20        by squeezing more money from early adopters, it would delay
          adoption among more price-sensitive mainstream consumers, Davis
21        said.

22        215.    A blogger on the widely read Gizmodo Blog observed that:

23        I suppose that it is not all that surprising to find out that without
          competition from the HD DVDs camp, prices for Blu-ray players
24        have gone up.  According to data collected by Pricegrabber.com,
          Blu-ray players have hit a high average of $400 per unit for the
25        year – about the same price they were at this time last year.  This
          comes after the aggressive price cuts Blu-ray manufacturers
26        employed at the height of the HD DVD battle.  While these players
          probably would have been $1000 without a format war (thank
27        Toshiba for that one) these prices are not moving in the right
          direction.
28

216.    CNET News noted the immediate increase in prices after the removal of HD-DVD from the market:

> In the three short weeks since Toshiba announced that it was pulling the plug on the high-definition technology, prices for standalone players using the rival Blu-ray format have been headed north. In fact, as noted by PriceGrabber.com, Blu-ray prices are at their high point for the year, at an average of about $400 apiece for the devices.

217.    Toshiba soon found a way to capitalize on its abandonment of the competing HD-DVD alternative.  In early 2010, the formation of a patent pool for Blu-ray technology was announced by its four members, Mitsubishi, Thomson, Warner Brothers, and Toshiba.  Toshiba was selected to operate the new BD4C patent pool, which goes into operation alongside a second patent pool announced by Panasonic, Sony, and Philips in 2009.

**2.      Defendants' Conspiracy Harmed Consumers by Causing Decreased Technological Innovation**

218.    The abrupt end to declines in price due to the conspiracy translates directly into damages to consumers, and is transmitted through two mechanisms.  *First*, prices for existing products fall more slowly than they would have but for the price-fixing (or more accurately, "price decline-slowing") conspiracy.

219.    *Second*, the underlying rate of technological innovation – which ultimately leads to declines in quality-adjusted price as new and qualitatively superior products are introduced, then adopted by consumers – slowed because of this suppression of competition.  Empirical economic studies have previously found that formation of a patent pool, historically, has been associated with a slowing in the rate of innovation in the industry producing the products utilizing the pooled patents.  The same phenomenon seems to have happened after the patent pools were formed in ODDs.

220.    The following figure tracks major introductions of new technological changes in the ODD industry over the 1997-2005 period.  The clustering of major innovations before 2003 is notable, and the absence of major new innovations with an impact on the industry since 2002 quite remarkable:

1

2

3

4

5

6

7

**ODD TECHNOLOGY EVOLUTION, 1997-2005**

**TECHNOLOGY INTRODUCTIONS**



8

9

10

11

12

13

14

221.    The following figure catalogues the first introduction into the marketplace of players based on new ODD standards.  As expected, the market introductions depicted in the figure lag behind the technology development by some time.  The pattern is very consistent, however, with a large fraction of all new player introductions occurring prior to 2003, and only two new players (players for the ill-fated HD-DVD standard, and Blu-ray Java players) introduced after 2003.  A slackening in the pace of innovation seems to have coincided with the formation of the patent pool and joint ventures:

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**MARKET INTRODUCTION OF PLAYERS FOR NEW OPTICAL DISK
TECHNOLOGIES, 1982-2007**

3



19    222.    The following figure displays a recently published timeline of patent "technology

20    fronts" for DVD technology.  This 2008 study analyzed a United States patent abstract database

21    for 1976 to 2004 to build a collection of United States patents covering DVD optical pickup

22    technology.  The "technology fronts" are clusters of related patents, and the timeline shows

23    patents plotted as circles by issue date on the x-axis.  There seems to have been a noticeable

24    reduction in the number of relevant new patents issued in all technology areas after 2001.

25

26

27

28

1

**TIMELINE OF PATENT TECHNOLOGY FRONTS:**

2



223.    There is also some evidence of a slowdown in patenting in the newest high definition video player technology.  The following tables count patents filed by the five companies with the largest numbers of United States patents in Blu-ray and HD-DVD disk technology, respectively, over the years 2000-2007.  Again, the data suggest a decline over time:

| TOP 5 FIRMS THAT FILED BLU-RAY TECHNOLOGY-RELATED PATENTS, 2000-2007 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Total |
| Philips | 1 | 2 | 3 | 10 | 3 | 1 | 0 | 0 | 20 |
| LG | 0 | 0 | 0 | 13 | 11 | 1 | 0 | 0 | 25 |
| Matsushita | 0 | 0 | 1 | 20 | 23 | 4 | 8 | 0 | 56 |
| Samsung | 0 | 0 | 0 | 16 | 14 | 12 | 13 | 6 | 61 |
| Sony | 0 | 3 | 2 | 4 | 11 | 13 | 9 | 1 | 43 |
| **Total US Patents Filed** | **1** | **5** | **6** | **63** | **62** | **31** | **30** | **7** | **205** |

| TOP 5 FIRMS THAT FILED HD-DVD TECHNOLOGY-RELATED PATENTS, 2000-2007 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Total |
| General Electric | 0 | 1 | 1 | 3 | 3 | 0 | 0 | 0 | 8 |
| LG | 2 | 3 | 4 | 4 | 1 | 0 | 1 | 0 | 15 |
| Matsushita | 1 | 2 | 2 | 2 | 3 | 1 | 3 | 0 | 14 |
| Samsung | 14 | 12 | 11 | 10 | 11 | 5 | 11 | 5 | 79 |
| Target Technology Co, LLC | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 0 | 8 |
| **Total US Patents Filed** | **17** | **18** | **18** | **19** | **20** | **9** | **18** | **5** | **124** |

224. In summary, a period of rapid introduction of new ODD product technologies occurred prior to, and right after, the formation of the ODD patent pools in 1998 and 1999. Shortly thereafter, a period of rapid and substantial increase in concentration within the ODD industry also occurred. These twin developments seem to have been followed by a relative paucity of new ODD technology introductions. This is precisely the same pattern of diminished rates of innovation after patent pool formation that has been found by economic historians in studies of the most studied United States patent pool, the sewing machine patent pool of the nineteenth century.

225.   Technological innovation is often stimulated as a by-product of price competition in high tech sectors, as introduction of new, innovative, and at least temporarily more profitable products provides an attractive alternative to competing for sales by slashing prices and margins on more mature products.  Reducing the pressure of price competition may also remove some of the pressure to innovate.

226.   Thus, reduced price competition resulting from a price-fixing conspiracy may have further reduced rates of technological innovation that were already slowing as a consequence of patent pool formation and lessened industrial competition.  Diminished rates of technical innovation, in turn, make maintenance of a stable price-fixing cartel easier.  A slowdown in the rate of technical innovation, and a reduction in the rate at which prices are falling are mutually reinforcing.  Both factors are associated with the operation of this price-fixing conspiracy, and both factors cause harm to consumers of ODDs.

227.   The above combination and conspiracy has had the following effects, among others:

    a.   Price competition in the sale of ODD Products by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States.

    b.   Prices for ODD Products sold by Defendants have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States.

    c.   A decrease in technological innovation.

    d.   Indirect purchasers of ODD Products from Defendants have been deprived of the benefit of free and open competition in the purchase of ODD Products.

228.   As a direct and proximate result of the unlawful conduct of Defendants, Indirect Purchaser Plaintiffs and other members of the Class have been injured in their businesses and property in that they paid more for ODD Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

**H.     The Pass Through of Overcharges to Consumers**

229.     Defendants' conspiracy to raise, fix, or maintain the price of ODDs at artificial levels resulted in harm to Indirect Purchaser Plaintiffs and the proposed classes because it resulted in them paying higher prices for ODD Products than they would have in the absence of Defendants' conspiracy.  The entire overcharge for the ODD Products at issue was passed on to Indirect Purchaser Plaintiffs and members of proposed classes.

230.     ODDs are commodity products, with functionally equivalent products available from Defendants, which manufacture ODDs pursuant to standard specifications.

231.     An ODD is purchased by a consumer as a stand-alone device or as a substantial part of an ODD Product.  When an ODD is purchased by consumers as a stand-alone device, the device itself is directly traceable to the specific manufacturing Defendant.  When an ODD is purchased by a consumer as part of an ODD Product, it is a distinct, physically-discrete hardware element of the end-use product and is identifiable by a specific, discrete part or model number that permits tracing.  ODDs are identifiable and traceable throughout the chain of the distribution to the end user.  They do not undergo any alterations as they move through the chain of distribution.

232.     The indirect purchaser buys an ODD through one of two distribution chains, either from the direct purchaser OEM, or through a reseller such as a retailer.  Thus, an ODD follows a traceable physical chain from Defendants to the OEMs, to the purchasers of ODD Products.  Tracing can help show that changes in the prices paid by direct purchasers of ODD affect prices paid by indirect-purchasers of the ODDs themselves, or ODD Products.

233.     The OEM and the retail markets of ODDs and ODD Products are subject to vigorous price competition.  The direct purchaser OEMs and retailers have very thin net margins.  They are therefore at the mercy of their component costs, such that increases in the price of ODDs and ODD Products lead to quick, corresponding price increases at the OEM and retail levels for stand-alone ODDs and ODD Products.

234.     As a result, the inflated prices of ODD resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other members of the proposed classes by direct-purchaser manufactures, distributors, and retailers.

235.    ODDs make up a substantial component of the cost of ODD Products.  The retail price of an ODD Product is determined in substantial part by the cost of the ODD it contains.

236.    Microeconomic theory teaches that the only situations in which precisely zero pass through would be expected are if an industry faced a perfectly elastic demand for its product (i.e., the price was fixed, with demand dropping to zero with an infinitesimal price increase, and expanding infinitely if price were to drop infinitesimally), or if supply was perfectly inelastic (i.e., if even a very large increase in price for a product was incapable of stimulating additional supply).[3] Both of these possibilities are generally considered implausible by economists, and are not even mentioned in some discussions of the subject.   Either scenario is at odds with the nature of the computer and consumer equipment industries.  Existing empirical studies of the computer and electronics industry have concluded that demand is *not* infinitely elastic.

237.    In all other cases that have been investigated, at least partial pass through of cost increases have been found.  Therefore, at least a partial pass through of an increase in the cost of ODDs into the price of computer and consumer electronic equipment – and consequent harm to class members – would be the predicted outcome of a successful price-fixing conspiracy.  The fact of harm would basically be a given, if ODD prices were shown to have been raised by collusion, although the magnitude of this harm remains an empirical question.  Some considerations, discussed below, suggest that the pass-through rate might be expected to surpass 100 percent.

238.    Empirical studies of pass through, which are numerous, report results which vary greatly by industry.  For example, one study found undershifting (a pass-through rate less than 100 percent) of increases in the minimum wage into fast food restaurant prices.  But findings of overshifting (a pass-through rate exceeding 100 percent) are not uncommon.  A survey of pass through of taxes into retail prices found overshifting in more than half of the products studied.  Numerous studies found pass-through rates for taxes on alcoholic beverages exceeding 100 percent.  In the international economics literature, too, estimated pass-through rates for exchange rate-driven cost increases exceeding 100 percent are not uncommon.  Studies have found greater

---

[3]    The usual hypothesis that is commonly examined in empirical pass through studies is whether pass through exceeds, falls short of or equals 100 percent.

than 100 percent pass-through rates for taxes on Japanese color television set sales.  This last example is particularly interesting because television sets are consumer electronic equipment, with a high degree of branding and product differentiation, a high degree of substitutability across brands, and substantial competition among producers.

239.   To the extent that distributors, wholesalers, and retailers selling to consumers or to others in the distribution chain price their sales as their cost plus a fixed markup, this will create an additional reason for pass through to exceed 100 percent through these channels.[4]  Further, because local retailers ultimately compete with direct sales to purchasers by computer manufacturers, competitive forces would likely work to equalize end-purchaser prices between channels, after controlling for the value of differences in support across different distribution channels.  This would tend to push the total pass-through rate from costs to end-purchaser pricing above 100 percent, since manufacturers could not sustain a pricing policy to distributors that did not cover their costs, and an additional fixed markup on top of distributor cost would result in a total pass-through rate to final consumers in excess of 100 percent.

240.   Thus, the extent to which input cost increases are passed through into output prices is entirely an empirical issue, and it is an area in which methods of empirical analysis are well established.  Based on both theory and the published studies in this area, it is likely that the pass-through rates of ODD costs into computer and consumer electronics prices will exceed 100 percent, a situation known as "overshifting."

241.   In particular, it is undisputed that overshifting is possible in markets with many suppliers of differentiated products and easy entry and exit, an environment known as "monopolistic competition."  Indeed, pass through in excess of 100 percent would actually be expected in industries where firms produce differentiated products in competitive conditions, and face economies of scale – that is, where their average cost of producing a product declines with

---

[4]   For example, if a wholesaler prices its product at manufacturer sales price plus 10 percent, and a retailer prices its product at wholesale plus 10 percent, the total pass through to the final consumer will be 121 percent (i.e., 110 percent times 110 percent) of manufacturer sales price.  Certain distributor costs, like the costs of holding inventory, and "shrinkage," may be approximately proportional to the value of the products held, and thus be one factor creating this pricing policy.

1    their level of output.  In particular, as noted next, in competitive industries with differentiated

2    products and relatively easy entry and exit (monopolistic competition), when there are economies

3    of scale, overshifting will be the rule, not the exception.  Empirical studies by economists have

4    characterized the personal computer industry as an industry which fits this description. For this

5    reason, it is likely that pass through is greater than 100 percent, in the market conditions that

6    prevail for most, if not all, types of mass market computer and consumer electronics equipment.

7           242.    Thus, Plaintiffs and other indirect purchasers have been forced to pay supra-

8    competitive prices for ODDs and ODD Products.  These inflated prices have been passed on to

9    them by direct purchaser manufacturers, distributors, and retailers.

10   **I.      Governmental Investigations into Price Fixing in the ODD Industry**

11          243.    Defendants are currently under investigation by multiple governmental

12   organizations, including the United States Department of Justice ("DOJ") for anticompetitive

13   conduct in connection with the ODD industry.  The United States' criminal investigation of the

14   ODD conspiracy is being conducted by the DOJ's Antitrust Division in the Northern District of

15   California.

16          **1.      Defendants Have Admitted that Multiple Governmental Organizations Are
                      Investigating Price Fixing in the ODD Industry**

17
18          244.    On October 23, 2009, Sony disclosed its subsidiary's receipt of a subpoena from the

19   DOJ in its Form 6-K, filed with the Securities and Exchange Commission ("SEC"):

20                  Sony Corporation said today that its U.S. subsidiary, Sony Optiarc
                    America Inc., has received a subpoena from the U.S. Department of
21                  Justice (DOJ) Antitrust Division seeking information about its optical
                    disk drive business.  Sony understands that the DOJ and agencies
22                  outside the United States are investigating competition in optical disk
                    drives.  Sony intends to cooperate fully with the DOJ and other
23                  agencies in this inquiry.

24          245.    In its Form 20-F, filed with the SEC on June 29, 2009, Hitachi admitted that its

25   subsidiary received a subpoena from the DOJ in June 2009 regarding price-fixing violations related

26   to ODDs.  Hitachi has also received requests for information from the European Union and

27   Singapore regulators for alleged antitrust violations relating to ODDs:

28                  In June 2009, our subsidiary, Hitachi-LG Data Storage, received a
                    grand jury subpoena in connection with an investigation conducted

1    by the Antitrust Division of the U.S. Department of Justice and
     received requests for information from the European Commission,
2    both in respect of alleged antitrust violations relating to optical disk
     drives.  Also in June 2009, the Competition Commission of
3    Singapore began an investigation of our subsidiary, Hitachi-LG Data
     Storage Korea, also in respect of alleged antitrust violations relating
4    to optical disk drives.

5    246.    In its Form 20-F, filed with the SEC on February 22, 2010, Philips released its 2009

6    Annual Report and revealed for the first time that it and its subsidiary, PLDS are also the subject of

7    the same international investigations:

8        On October 27, 2009, the Antitrust Division of the United States
         Department of Justice confirmed that it had initiated an investigation
9        into possible anticompetitive practices in the Optical Disc Drive
         (ODD) industry.  Philips Lite-On Digital Solutions Corp. (PLDS), a
10       joint venture owned by the Company and Lite-On IT Corporation, as
         an ODD market participant, is included in this investigation.  PLDS
11       is also subject to similar investigations outside the US relating to the
         ODD market.  PLDS and Philips intend to cooperate with the
12       authorities in these investigations.

13                                    *        *        *

14       These matters are in their initial stages and due to the considerable
         uncertainty associated with these matters, on the basis of current
15       knowledge, the Company has concluded that potential losses cannot
         be reliably estimated with respect to these matters.  An adverse final
16       resolution of these investigations and litigation could have a
         materially adverse effect on the Company's consolidated financial
17       position, results of operations and cash flows.

18       247.    On October 27, 2009, Defendant Toshiba also acknowledged that its ODD operation

19   –TSST, its joint venture with Samsung – had received a subpoena from the DOJ in connection with

20   its investigation into the ODD industry and that its ODD unit was also answering queries from

21   authorities in other regions.

22       248.    It is significant that Defendants' anticompetitive behavior has been the subject of a

23   criminal grand jury investigation by the DOJ.  In order for the DOJ to institute a grand jury

24   investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and

25   prepare a detailed memorandum to that effect.[5]  Following a review of the memorandum, the

26   ───────────────────
         [5]    *See* Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1 (1991) ("[i]f a Division
27   attorney believes that a criminal violation of the antitrust laws has occurred, he should prepare a
     memorandum requesting authority to conduct a grand jury investigation.") (available at
28   http://www.justice.gov/atr/public/guidelines/206542.htm).

request for a grand jury must be approved by the Assistant Attorney General for the Antitrust

Division, based on the standard that a criminal violation may have occurred.  In addition, the fact

that the DOJ Antitrust Division investigation is criminal, as opposed to civil, is significant as well.

The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal

Investigation" state:  "[i]n general, current Division policy is to proceed by criminal investigation

and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid

rigging and horizontal customer and territorial allocations."[6]  Accordingly, the existence of a

criminal investigation into the ODD industry supports the existence of the conspiracy alleged

herein.

> **2.      The Department of Justice Has Admitted It Has Convened a Criminal Grand Jury to Investigate Defendants' Price Fixing in the ODD Market**

249.    The DOJ has confirmed that a grand jury is investigating criminal antitrust

violations in the ODD industry:  "The DOJ is currently assisting a grand jury investigating possible

criminal antitrust violations in the optical disk drive ('ODD') industry."[7]  The DOJ has further

confirmed that:  "The grand jury has issued subpoenas and is in the critical evidence gathering

phase of its investigation."[8]

250.    The DOJ has stated that it proceeds with a criminal proceeding in cases involving

*per se* unlawful agreements, such as price-fixing, bid-rigging and horizontal market allocations:

> It is the Division's policy 'to proceed by criminal investigation and
> prosecution in cases involving horizontal, *per se* unlawful
> agreements such as price-fixing, bid-rigging and horizontal customer
> and territorial allocations.'  [footnote omitted]  *Per se* violations of
> price-fixing, bid-rigging, and market allocations are generally

---

[6]    *See* Antitrust Division Manual, Chapter III.C.5, III-20 (2009), (available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf).

[7]    *See* Memorandum of Points and Authorities in Support of the United States' Motion for a Limited Stay of Discovery at 3 (filed May 20, 2010, Ct. Rec. 68) ("DOJ Mot. to Stay").  Page references to the DOJ Mot. to Stay are to the PACER/ECF numbers found at the top right-hand corner of the page.

[8]    *See* Declaration of Sue Ann Slates in Support of Defendant United States Department of Justice, Antitrust Division's Motion for Summary Judgment, ¶ 10, *Lieff, Cabraser, Heimann & Bernstein, LLP v. U.S. Department of Justice Antitrust Division*, Case No. 3:10-cv-00013-VRW (filed Apr. 29, 2010, Ct. Rec. 15) ("Slates Decl.").  Ms. Slates is the Chief of the Freedom of Information Act/Privacy Act Unit of the Antitrust Division of the DOJ in Washington, D.C.  *Id.*, ¶ 1.

prosecuted criminally, because they have been found to be unambiguously harmful, that is, *per se* illegal.  Such cartel agreements have been shown to defraud customers and unquestionably raise prices or restrict output without creating any plausible offsetting benefit to consumers, unlike other business conduct that may be the subject of civil lawsuits by the Division.  If proved, such activities violation Section 1 of the Sherman Act, 15 U.S.C. § 1.[9]

251.     In light of this grand jury investigation, the DOJ requested that this Court stay discovery in these civil proceedings.  In requesting this stay, the DOJ emphasized that although it has conducted many investigations into alleged criminal antitrust violations, it has rarely requested that a civil court stay discovery pending resolution of the criminal investigation.  In fact, the government has only sought a stay in four matters.  And of these four matters, it has declined to bring significant charges in only one instance:

In the past decade, the Antitrust Division has conducted numerous investigations into alleged criminal antitrust violations in the Northern District of California.  In only four of these matters has the government sought limited states to prevent civil litigation from impeding grand jury investigations[.]  In each of these cases, the court has entered an order granting a stay.  These matters are: dynamic random access memory ("DRAM"), static random access memory ("SRAM"), liquid crystal display ("TFT-LCD"), and cathode ray tube ("CRT").  In only one of these matters did the government decline to bring significant charges.  The ODD investigation contains facts, issues, and concerns similar to these other investigations.[10]

252.     Moreover, accompanying their motion to stay discovery in this case, the DOJ submitted a confidential declaration of Sidney A. Majalya detailing the criminal investigation into price fixing in the ODD industry, and arguing that this confidential submission "presents circumstances" that warrant a stay of discovery in this case.[11]

253.     Given these statements by the DOJ, the most reasonable inference is that the government is in possession of evidence confirming that criminal antitrust violations have been committed in the ODD market, or believes that such evidence is likely to be discovered in the next year.  The government's statements regarding the serious and unique nature of the grand jury

---

[9]    *See* Slates Decl., ¶ 6.

[10]   *See* DOJ Mot. to Stay at 3-4.

[11]   *See* DOJ Mot. at Stay at 5.

investigation into the ODD industry and the Defendants support the existence of the conspiracy alleged in this complaint.

### 3. Defendants' Agent Admits that the "Implied Promise" of the Grand Jury Investigation Is Criminal Indictments or Admissions of Guilt

254.    Defendants' counsel has also confirmed that indictments or plea agreements are more likely than not in the DOJ's criminal grand jury investigation.  At a prior hearing before this Court, Defendants' agent, Daniel Wall, counsel for Toshiba and TSST, when arguing for all Defendants that a stay of discovery would not be harmful to Plaintiffs' rights stated:

> But the – but what we're talking about now is if there is a 12-month period of time when there isn't merits discovery into the nature of the cartel, why is that going to be beneficial?  ***It's because something's going to happen in the next 12 months. The implied, you know, promise here is that within the next 12 months there's going to be an indictment, there's going to be a plea agreement***, there's going to be something that an actually starts to reveal what it is that the government thinks is going on here.

255.    That is, defense counsel believes that the "implied promise" of the grand jury investigation is that significant criminal activities will be (or have been) uncovered and that indictments or plea agreements will be forthcoming within the next twelve months.  These statements regarding the near certainty of indictments or admissions of criminal guilt further support the existence of the conspiracy alleged in this complaint.

256.    This statement is admissible as a party admission under Federal Rule of Evidence 801(d)(2)(C) as a statement made by a person authorized by the party to make a statement concerning the subject and Rule 801(d)(2)(D) as a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

### J. Defendants Have a History of Colluding to Fix Prices in Related Markets

257.    Many of the Defendants have a long history of criminal collusion and are either currently involved in worldwide investigations into other technology-related products, or have been convicted of participating in price-fixing cartels involving technology-related products.  Evidence of Defendants' other price-fixing crimes are admissible pursuant to Federal Rule of Evidence

404(b), because the Defendants' past criminal acts tend to show a specific pattern of price-fixing behavior and planning between defendants repeated throughout very similar technology industries, among repeat players in these industries.

258.    The following chart summarizes the involvement of Defendants and their related entities in the various price-fixing conspiracies:

| INDUSTRY | GOVERNMENT INVOLVED | DEFENDANTS IMPLICATED |
| --- | --- | --- |
| LCD | Korea, Japan, United States | LG Electronics Inc. (joint venture), Koninklijke Philips Electronics N.V. (joint venture), Samsung Electronics Company, Ltd, Hitachi, Ltd. (subsidiary), Toshiba Corp. |
| DRAM | United States, European Commission | Samsung Electronics Company, Ltd, NEC Corp., Hitachi Ltd., Toshiba Corp. |
| CRT | Korea, Japan, United States, European Commission | Samsung (subsidiary), LG Electronics Inc. (joint venture), Koninklijke Philips Electronics N.V. (joint venture) |

**1.    Defendants Have Been Charged With and Have Pleaded Guilty to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of LCD Panels and LCD Products Sold in the United States**

259.    A number of the ODD Defendants have been implicated in a worldwide price-fixing conspiracy for thin film transistor liquid crystal displays ("TFT-LCD").

260.    In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti competitive activity among LCD Panel manufacturers.  In a December 11, 2006, filing with the SEC, LG Display Co. Ltd. ("LG Display") disclosed for the first time that officials from the Korea Fair Trade Commission and Japan Fair Trade Commission visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office.  During the time period relevant to the LCD price-fixing conspiracy, LG Display was a joint venture between Defendants LG Electronics and Philips, with LG Electronics owning 37.9 percent and Philips owning 19.9 percent as of December 31, 2007.

261.    On December 12, 2006, news reports indicated that in addition to LG Display, Samsung was also under investigation.

262.    In November 2008, LG Display admitted and plead guilty to participating in the conspiracy from September 2001 through June 2006 to fix the price of LCD Panels sold worldwide, and to participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices.  In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, reported at the time as the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the conspiracy.

263.    In addition, two LG Display executives have thus far pled guilty based on their respective roles in the global cartel.  Each has been fined and has received prison sentences ranging from seven to twelve months:

- Chung Suk "C.S." Chung, an executive from LG Display.  In connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

- Bock Kwon, an executive from LG Display.  In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

264.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide from December 2001 through December 2005.

265.    As acknowledged in its Form 20-F, filed with the SEC on June 29, 2010, in March 2009, a subsidiary of Defendant Hitachi also plead guilty to price fixing in the LCD industry and paid a fine of $31 million to the DOJ:

Also in December 2006, Hitachi Displays, our subsidiary which was demerged and succeeded to our LCD operations, received a grand jury subpoena in connection with the investigation conducted by the Antitrust Division of the U.S. Department of Justice in respect of alleged antitrust violations relating to LCDs.  In March 2009, Hitachi Displays pled guilty to one count of price fixing under the Sherman Act, for which it paid a fine of $31 million in June 2009.

266.    Although it has not been publicly acknowledged, it is widely believed that Samsung is in the DOJ leniency program with respect to the DOJ's investigation into the market for TFT-LCD, meaning that it has admitted its participation in the cartel.  The TFT-LCD investigation is

1    ongoing, and Toshiba as well as other entities remain under investigation.  Such criminal

2    investigation is being conducted by the San Francisco office of the DOJ's Antitrust Division.

3          **2.**      **Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the United States**

4

5          267.      Further, in 2005, Defendant Samsung agreed to plead guilty to participating in a

6    price-fixing conspiracy involving dynamic random access memory ("DRAM") in the United

7    States.  DRAM is a common model for "dynamic" semiconductor memories for personal

8    computers (PCs), servers and workstations.  As part of its guilty plea, Samsung agreed to pay a fine

9    of $300 million.  It is believed that during the DRAM conspiracy, at least 48 Samsung officers and

10   employees, including senior executives with final pricing authority, had price-related contacts with

11   employees of Toshiba, NEC and Hitachi.

12         268.      A total of six Samsung executives have thus far pled guilty based on their respective

13   roles in the global cartel. Each has been fined $250,000, and the executives received prison

14   sentences ranging from seven to fourteen months.  Among the Samsung individuals charged were

15   the vice presidents for marketing and sales for Samsung's memory division and the vice president

16   for marketing of memory products at Samsung Semiconductor (a United States subsidiary of

17   Samsung):

18         •      Il Ung Kim – (Samsung Electronics – vice president of marketing for memory division) $250,000 fine and 14 month prison sentence.

19

20         •      Sun Woo Lee (Samsung Electronics – senior manager DRAM sales) $250,000 fine and 8 month prison sentence.

21         •      Yeongho Kang (Samsung Semiconductor – associate director of DRAM - marketing) $250,000 fine and 7 month prison sentence.

22

23         •      Young Woo Lee (Samsung subsidiary in Germany – sales director) $250,000 fine and 7 month prison sentence.

24         •      Thomas Quinn (Samsung Semiconductor – vice president of marketing for memory products) $250,000 fine and 8 month prison sentence.

25

26         •      Young Hwan Park (formerly VP of sales at Samsung Electronics; currently president of Samsung Semiconductor) $250,000 fine and 10 month prison sentence.

27

28

1

•   Young Bae Rha (Samsung Electronics – vice president of sales and marketing for memory division); Charged in October 2006 indictment and remains at large.

2

3      **3.      Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the European Union**

4

5          269.    In May 2010, a number of Defendants admitted to participating in a cartel to fix the

6      price of DRAM sold in the European Union and agreed to pay, collectively, 331 million Euros in

7      fines.

8          270.    As the European Commission found, the overall cartel was in operation between

9      July 1, 1998 and June 15, 2002.  It involved a network of contacts and sharing of secret

10     information, mostly on a bilateral basis, through which they coordinated the price levels and

11     quotations for DRAM, sold to major PC or server OEMs in the European Economic Area.

12         271.    Several of the Defendants admitted to the participation in the DRAM price-fixing

13     cartel.  Between December 2003 and February 2006, Defendants Samsung and NEC applied for

14     leniency under the European Union's Leniency Notice.  Companies that are first to reveal cartels to

15     the Commission enjoy immunity from fines under the Commission's 2002 Leniency Notice.

16     Companies that cooperate in the investigation can receive significant reductions.  Companies

17     which do not qualify for immunity may benefit from a reduction of fines if they provide evidence

18     that represents "significant added value" to that already in the Commission's possession and have

19     terminated their participation in the cartel.  Evidence is considered to be of a "significant added

20     value" for the Commission when it reinforces its ability to prove the infringement of Europe's

21     antitrust laws.

22         272.    Both Samsung and NEC cooperated with the European Commission, supplying

23     information that provided significant added value in enabling the European Commission to prove

24     cartel infringement.  The European Commission took account of their cooperation in the

25     investigation and granted a reduction of respectively 18 percent in the fine to both Samsung and

26     NEC.  In total, Samsung was fined over 145 million Euros and NEC was jointly and severally

27     liable (along with its joint venture partners) for fines of approximately 21 million Euros.

28

273.    Hitachi and Toshiba each settled with the European Commission and agreed to pay significant fines.  Hitachi was jointly and severally liable (along with its joint venture partners) for fines of over 31 million Euros, and the European Commission fined Toshiba over 17 million Euros.

**4.    Governmental Investigations Have Revealed Defendants' Involvement in a Price-Fixing Conspiracy of Cathode Ray Tubes**

274.    In addition, on October 7, 2009 in a cease and desist order, The Japan Fair Trade Commission levied $37.4 million in fines against five companies, including a joint venture of Defendants LG Electronics Inc. and Koninklijke Philips Electronics N.V., LG Philips Displays Korea Co., and an arm of South Korea's Samsung group and their affiliates for alleged participation in a price-fixing cartel for cathode ray tubes for televisions.   Included amongst the findings of the Japan Fair Trade Commission were that employees of LG Philips Display Korea and Samsung, beginning around May 2003, formed an agreement to continuously hold meetings about once every other month where they jointly set minimum target prices on a quarterly basis.

275.    In November 2009, the European Commission confirmed it had sent Statements of Objections to "a number of companies active in the [CRT] industry."  Although the European Commission did not disclose who received the Statements of Objections, news reports confirmed that Philips was among those targeted.

276.    In the United States, two former executives of Chunghwa, Cheng Yuan Lin and Wen Jun Cheng (indicted separately in the TFT-LCD investigation), were indicted on charges by the Department of Justice on charges related to the CRT investigation.  More charges are anticipated in the United States.

## VII.    TRADE AND COMMERCE

277.    Throughout the Class Period, each Defendant, or one or more of its subsidiaries, sold ODD Products in the United States in a continuous and uninterrupted flow of interstate and international commerce, including through and into this judicial district.

278.    During the Class Period, Defendants collectively controlled the vast majority of the market for ODD Products, both globally and in the United States.

279.    Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce to purchasers of ODD Products located in states other than the states in which Defendants are located, as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce, including the United States' market for ODD Products.

280.    A number of facts demonstrate that Defendants' price-fixing conspiracy had a direct, substantial and reasonably foreseeable effect on domestic commerce.  As alleged in this complaint, one of the precipitating factors to the beginning of the conspiracy was the introduction of electronic auctions by Dell and HP for the procurement of ODDs, among other products.  In response, Defendants began their illegal price-fixing activities.

281.    The procurement events held by Dell and HP occurred in the United States.  For large parts of the Class Period, HP's ODD purchasing occurred in Palo Alto, California and Houston, Texas.  For Dell, ODD purchasing took place in Austin, Texas during most of the Class Period.  As alleged above, these procurement events resulted in inflated prices due to Defendants' price and market allocation conspiracy.

282.    Although Defendants' price-fixing conspiracy reaches beyond merely Dell and HP, price-fixing the auctions of these two OEMs alone had a direct, substantial and reasonably foreseeable effect on United States commerce.  These two OEMs account for approximately 40 percent of the United States market for personal computers, accounting for roughly 10 million units shipped within the United States per year.

283.    Defendants entered into this conspiracy to fix, maintain, raise and/or stabilize the price of ODDs.  Further, because certain sellers of ODDs are vertically integrated with members of the conspiracy, including Sony Computer Entertainment America, Inc., Sony Electronics, Inc., Toshiba America Information Systems, Inc. and Samsung Electronics America, Inc., Defendants had an additional object of the conspiracy, that is to also fix, maintain, raise and/or stabilize the price of ODD Products.

# VIII.   FRAUDULENT CONCEALMENT

284.   Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against the Indirect Purchaser Plaintiffs and the classes.

285.   Indirect Purchaser Plaintiffs did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until October 26, 2009 when it was first publicly reported that manufacturers of ODDs were under investigation by the antitrust authorities in the United States and elsewhere in the world for conspiring to fix prices of ODDs.  This is because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy.  Because Defendants' agreement, understanding and conspiracy were kept secret, Indirect Purchaser Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for ODD Products.

286.   Defendants engaged in a successful, illegal price-fixing conspiracy with respect to ODD Products, which they affirmatively concealed, at least in the following respects:

   a.   By agreeing amongst themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

   b.   By agreeing amongst themselves to limit the number of representatives from each Defendant who were aware of the conspiracy, so as to avoid detection.

   c.   By agreeing to limit the number of written communications regarding the conspiracy and, rather, to have oral communications via telephone or meeting face-to-face.

   d.   By agreeing to meet at locations where the conspiracy was less likely to be detected – such as in the lobby of a competitor's building rather than in the offices themselves.

287.   As a further example, on at least one occasion, one of the co-conspirators had a face-to-face meeting with another co-conspirator at a location that he or she believed was far enough away from a customer's offices that they would not be seen.

288.    During the Class Period, Defendants falsely stated to the public and industry sources that ODD manufacturers faced intense pricing in the ODD market:

a.    For example, at an October 26, 2004 an investors' conference, Danny Liao, president of Lite-On stated that although it expected its fourth-quarter revenues to grow 10-12 percent sequentially due to seasonal effects, the company estimates its average gross margins to decrease 17-19 percent on falling OEM prices. Liao indicated that increasing competition for OEM orders has pushed down quotations for 16x DVD burners to as low as $60. And he predicted that some second-tier ODD makers in Taiwan will withdraw from the market in 2005.

b.    On November 30, 2004, Taiwanese makers of ODDs reported that OEM quotations for 16x DVD burners, which had been remaining stable at $60-65 for a few months fell to $55-58 due to increasing competition to meet orders from Dell, HP and other international PC brands. The makers indicated that HLDS, TSST, Lite-On, BenQ and Pioneer were the main competitors for 16x DVD burner OEM orders and that recently some makers had been cutting prices in an attempt to receive more orders.

c.    On December 27, 2004, industry publications noted that "Competition in the Taiwan optical-disc drive (ODD) market is heating up, with HLDS (Hitachi-LG Data Storage), TSST (Toshiba-Samsung Storage Technology), NEC and Philips planning to offer additional ODD lines next year. Market competition is expected to become more intense than in 2004, according to Taiwan-based ODD makers."

d.    On July 7, 2005, Taiwan-based makers of ODDs informed industry press that OEM quotations for 16x DVD burners dropped to $40 due to intense competition for orders from leading vendors such as Pioneer, NEC, Lite-On, BenQ, HLDS and TSST. The price represented a drop of 12-20 percent and

the same sources suggested that future cuts were expected to be much
smaller, as the vendors' gross margins had already declined to low levels.

e.  On December 16, 2005, Lite-On stated that OEM prices for 16x DVD
burners had fallen as low as $35 and further reductions in price would
depend on royalty changes.  Other ODD makers in Taiwan stated to the
same trade publication that intensive price competition is likely to push
down OEM prices of 16x DVD Dual burners to $30 and that the only way to
cope with such price drops is to minimize production costs by expanding
economy of scale.

f.  On July 30, 2006, it was reported that NEC had lowered its contract-
manufacturing quotes for 16x DVD burners to below $30, from $35, as a
price war loomed among the world's ODD markets, amid growing
competition.  Lite-On said in response that it had no plans for follow suit.

g.  On February 8, 2007, industry journals reported that HLDS and TSST had
slashed prices for their OEM DVD burners to 10 percent lower than normal
retail quotes in China due to oversupply and weaker-than-expected Vista
demand.

h.  On February 15, 2007, Lite-On indicated that OEM quotes for DVD burners
were slipping due to price competition from global leading makers such as
TSST.  Lite-On indicated that the price competition may last until global
demand for next-generation blue-laser burners reached a certain level.

i.  On March 29, 2007, trade sources reported that Lite-On and TSST started
reducing quotes for 18x DVD models by 8-10 percent to clear out inventory
and accelerate their migration to 20x DVD burners.

289.  In addition, during the Class Period, Defendants gave false and pretextual reasons
for ODD Product price increases or price stabilization during the relevant period, and described
such pricing falsely as being the result of external causes rather than collusion:

a.    In August 2004, Lite-On raised its OEM quotation for half-height combo drives by 3 to 5 percent to $35-40, according to Michael Gong, general manager of the company's ODD unit.  Gong attributed the increase in price to a shortage of pick-up heads produced by Japan-based Sankyo.  Gong also represented that Lite-On had been forced to cut its production 10 to 15 percent due to the short supply of pick-up heads.

b.    For example, in the latter part of 2004, after a period of decline, quotations by Defendants to OEMs for 16x DVD-R players stabilized for a period of months. By September of 2004, Taiwanese ODD makers were claiming that the prices of such burners would remain stable for the remainder of the year.

c.    On December 15, 2004, leading ODD manufacturers reported that the short supply of pick-up heads used in half-height and slim DVD burners and slip-type combo drives is currently 20 to 30 percent short of the demand based on received orders.  Michael Gong, the ODD business general manager for Lite-On, indicated that the short supply of pick-up heads used in ODDs is mainly attributable to growing adoption of slim-type DVD burners by main international notebook PC brands as well as low yield rates for prisms, a key component of pick-up heads.

d.    On March 7, 2005, Lite-On president Danny Liao reported that the intense price competition for the global ODD market seen in 2004 will slacken in 2005 because Japanese players have forced out most of Taiwan's second-tier makers and almost all of China's manufacturers.

e.    In June 2006, it was announced that Dell, HP and other PC vendors had temporarily stopped their online procurement of ODDs mainly due to fewer competitors.  BenQ had just sold its ODD business unit to Lite-On and TSST decided not to join in such bidding.  Michael Gong of Lite-On confirmed the temporary stoppage of online bidding and said that it would help OEM prices for ODDs to stay at a reasonable level.

1     f.    In May of 2007, ODD manufacturers reported supply capacities 10 to 20

2          percent below demand for international and notebook PC brands.  Industry

3          sources in Taiwan reported that since April 2007, supply capacities from

4          leading ODD manufacturers had been 10 to 20 percent below demand.

5     g.    In May of 2007, Sony NEC Optiarc, Inc. introduced its first BD-R player,

6          the BD-M100A.  According to Digitimes, sources from Taiwan-based

7          manufacturers of ODDs said that since Sony NEC and Pioneer were

8          members of the BDA, their pricing would be a reference for other members

9          who manufactured such an ODD, including Philips, LG Electronics and

10         Samsung.

11    h.    In June of 2007, Charlie Tseng of the ODD unit of PLDS reported that while

12         aiming for large shipment volumes, PLDS would maintain steady profits and

13         therefore would maintain a minimum gross margin by refusing low-priced

14         orders as well as not participating in price-cutting competition.

15    i.    On August 23, 2007, the business division general manager of HLDS stated

16         that supply of pick-up heads was not expected to increase for the time being,

17         and so the current level of ODD prices were not expected to drop the

18         following quarter.

19    j.    In October 2007, the component shortage of pick-up heads was intensifying,

20         and that HLDS was only able to meet 85 to 90 percent of its order volume

21         due to a shortage of main components.  At the same time, Lite-On indicated

22         its production capacity in China was completely booked.

23    k.    In February of 2008, prices on many ODDs that played BDs began to climb.

24         In August of 2008, personal computer vendors, including HP, Dell, Acer and

25         Asustek Computer, sought reductions in the OEM and Original Design

26         Manufacturer ("ODM") prices of BD Combo and BD-ROM drives.  At the

27         time, ODM/OEM quotations were at $120-$130 for a BD Combo drive and

28         $95-$100 for a BD-ROM drive, but computer vendors asked for the

1    lowering of the former by $20-$30 and the latter by $5-$10.  Leading

2    ODM/OEM makers, such as Pioneer, Lite-On, HLDS and TSST were all

3    steadfast in refusing to lower current quotations, however. Andy Parsons,

4    Chairman of the BDA and a Senior Vice-President of Pioneer, said in

5    October of 2008 that the prices for BD players would not be coming down

6    soon.

7    l.    In May 2008, Lite-On and Quanta Storage announced they were planning to

8          increase their OEM pricing of ODDs by 3 to 10 percent.  Industry sources

9          stated that the pricing increases were due to an increase in the costs of key

10         materials and components.

11   m.    In August 2008, it was reported that although PC vendors including HP,

12         Dell, Acer and Asustek Computer wanted considerably large reduction in

13         ODM/OEM prices of BD Combo and BD-ROM drives, none of the ODD

14         manufacturers were willing to cut prices because they were unable to keep

15         down component costs and were reluctant to sacrifice profitability for

16         orders.

17   n.    In September 2008, it was reported that PC vendors including HP, Acer, and

18         Asustek Computer had asked ODD suppliers, including HLDS, TSST and

19         Lite-On to decrease quotes to less than $100 for BD Combo drives and $70-

20         $80 for a BD-ROM drive as the main condition for their adopting the

21         devices in large volumes.  The ODD suppliers were looking to maintain

22         profits in the BD segment, however, and were looking to avoid competition

23         through price-cuts, according to industry sources.

24   290.    In their filings with the SEC, Defendants repeatedly stated that they faced intense

25   price competition in the ODD market.

26   291.    For example, in its Form 20-F, filed with the SEC on August 20, 2004, Defendant

27   Hitachi stated:

28

The industrial sectors and business lines in which Hitachi is engaged are experiencing increasingly intense competition. Hitachi competes with diverse competitors ranging from huge global corporations to specialized companies. Competitors are increasingly manufacturing products, including sophisticated electronic products, in low-cost jurisdictions. Globalization of markets and commoditization of such products are making price competition in the business sectors in which Hitachi is engaged increasingly intense. ***Products which are facing intense price competition or decreases in prices include computer-related products***, such as hard disk drives, disk array subsystems and ***optical disk drives***, semiconductors, liquid crystal displays, digital media products and home appliances. To succeed in this competitive environment, Hitachi believes its products and services must be competitive in terms of price, engineering expertise, quality and brand value. Hitachi cannot be certain that each or any of the products or services that it offers will be competitive, and should each or any such products or services fail to be competitive, Hitachi's business results may be negatively affected.

292.    Hitachi repeated substantially the same statement in its subsequent Form 20-Fs, filed with the SEC on August 26, 2005, August 7, 2006, June 26, 2007 and July 27, 2009.

293.    In its Form 6-K, filed with the SEC on April 27, 2005, Defendant NEC stated that "increasingly harsh competition" had resulted in "a drop in average selling prices for optical disc drives." Substantially the same statement was repeated in NEC's Form 6-Ks, filed on May 31, 2005.

294.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

295.    The affirmative acts of Defendants and their co-conspirators alleged herein, among others, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. The conspirators knew their activities were illegal.

296.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing. The ODD industry is not exempt from antitrust regulation, and thus, before October 26, 2009, Indirect Purchaser Plaintiffs reasonably considered it to be a well-regulated competitive industry.

297.    In the context of the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial. Accordingly, a reasonable person under the

1    circumstances would not have been alerted to investigate the legitimacy of Defendants' ODD

2    Products before October 26, 2009.

3           298.    Indirect Purchaser Plaintiffs could not have discovered the alleged contract,

4    conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the

5    deceptive practices and techniques of secrecy employed by the Defendants and their co-

6    conspirators to avoid detection of, and fraudulently conceal, their contract, combination or

7    conspiracy.

8           299.    Because the alleged conspiracy was both self-concealing and affirmatively

9    concealed by Defendants and their co-conspirators, Indirect Purchaser Plaintiffs had no knowledge

10   of the alleged conspiracy, or of any facts or information that would have caused a reasonably

11   diligent person to investigate whether a conspiracy existed, until October 26, 2009, when reports of

12   the investigations into price fixing in the ODD industry were first publicly disseminated.

13          300.    None of the facts or information available to Indirect Purchaser Plaintiffs prior to

14   October 26, 2009, if investigated with reasonable diligence, could or would have led to the

15   discovery of the conspiracy alleged herein prior to October 26, 2009.

16          301.    As a result of Defendants' fraudulent concealment of their conspiracy, the running

17   of any statute of limitations has been tolled with respect to any claims that Indirect Purchaser

18   Plaintiffs and members of the class have as a result of the anticompetitive conduct alleged in this

19   complaint.

20                        **IX.    CLASS ACTION ALLEGATIONS**

21          302.    Indirect Purchaser Plaintiffs bring this action on their own behalf and on behalf of a

22   class of persons pursuant to Federal Rules of Civil Procedure 23.  The Class is defined as follows:

23                  All persons and entities residing in the United States who indirectly
                    purchased an ODD Product during the Class Period for their own use
24                  and not for resale that was manufactured by one or more Defendants.

25   Excluded from the class are Defendants; the officers, directors or employees of any Defendant; any

26   entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir

27   or assign of any Defendant.  Also excluded are any federal, state, or local governmental entities,

28

1   any judicial officer presiding over this action and the members of his/her immediate family and

2   judicial staff, and any juror assigned to this action.

3         303.   In the event California law is not applied to the claims of all Class members for

4   damages regardless of where they reside, Plaintiffs will seek certification of the following

5   subclasses (collectively, the "State Classes") for damages for claims under the antitrust statutes

6   and/or consumer protection statutes of each of the following jurisdictions:

7               a.   **Arizona Indirect Purchaser Class**:  All persons and entities who, as

8                    residents of Arizona, indirectly purchased an ODD Product during the Class

9                    Period for their own use and not for resale that was manufactured by one or

10                   more Defendants.

11              b.   **California Indirect Purchaser Class**:  All persons and entities who, as

12                   residents of California, indirectly purchased an ODD Product during the

13                   Class Period for their own use and not for resale that was manufactured by

14                   one or more Defendants.

15              c.   **District of Columbia Indirect Purchaser Class**:  All persons and entities

16                   who, as residents of the District of Columbia, indirectly purchased an ODD

17                   Product during the Class Period for their own use and not for resale that was

18                   manufactured by one or more Defendants.

19              d.   **Florida Indirect Purchaser Class**:  All persons and entities who, as

20                   residents of Florida, indirectly purchased an ODD Product during the Class

21                   Period for their own use and not for resale that was manufactured by one or

22                   more Defendants.

23              e.   **Hawaii Indirect Purchaser** Class:  All persons and entities who, as

24                   residents of Hawaii, indirectly purchased an ODD Product during the Class

25                   Period for their own use and not for resale that was manufactured by one or

26                   more Defendants.

27              f.   **Illinois Indirect Purchaser Class**:  All persons and entities who, as

28                   residents of Illinois, indirectly purchased an ODD Product during the Class

1    Period for their own use and not for resale that was manufactured by one or

2    more Defendants.

3    g.    **Iowa Indirect Purchaser Class**:  All persons and entities who, as residents

4    of Iowa, indirectly purchased an ODD Product during the Class Period for

5    their own use and not for resale that was manufactured by one or more

6    Defendants.

7    h.    **Kansas Indirect Purchaser Class**:  All persons and entities who, as

8    residents of Kansas, indirectly purchased an ODD Product during the Class

9    Period for their own use and not for resale that was manufactured by one or

10   more Defendants.

11   i.    **Maine Indirect Purchaser Class**:  All persons and entities who, as residents

12   of Maine, indirectly purchased an ODD Product during the Class Period for

13   their own use and not for resale that was manufactured by one or more

14   Defendants.

15   j.    **Massachusetts Indirect Purchaser Class**:  All persons and entities who, as

16   residents of Massachusetts, indirectly purchased an ODD Product during the

17   Class Period for their own use and not for resale that was manufactured by

18   one or more Defendants.

19   k.    **Michigan Indirect Purchaser Class**:  All persons and entities who, as

20   residents of Michigan, indirectly purchased an ODD Product during the

21   Class Period for their own use and not for resale that was manufactured by

22   one or more Defendants.

23   l.    **Minnesota Indirect Purchaser Class**:  All persons and entities who, as

24   residents of Minnesota, indirectly purchased an ODD Product during the

25   Class Period for their own use and not for resale that was manufactured by

26   one or more Defendants.

27   m.    **Mississippi Indirect Purchaser Class**:  All persons and entities who, as

28   residents of Mississippi, indirectly purchased an ODD Product during the

1   Class Period for their own use and not for resale that was manufactured by

2   one or more Defendants.

3   n.   **Montana Indirect Purchaser Class**:  All persons and entities who, as

4   residents of Montana, indirectly purchased an ODD Product during the Class

5   Period for their own use and not for resale that was manufactured by one or

6   more Defendants.

7   o.   **Nebraska Indirect Purchaser Class**:  All persons and entities who, as

8   residents of Nebraska, indirectly purchased an ODD Product during the

9   Class Period for their own use and not for resale that was manufactured by

10   one or more Defendants.

11   p.   **Nevada Indirect Purchaser Class**:  All persons and entities who, as

12   residents of Nevada, indirectly purchased an ODD Product during the Class

13   Period for their own use and not for resale that was manufactured by one or

14   more Defendants.

15   q.   **New Hampshire Indirect Purchaser Class**:  All persons and entities who,

16   as residents of New Hampshire, indirectly purchased an ODD Product

17   during the Class Period for their own use and not for resale that was

18   manufactured by one or more Defendants.

19   r.   **New Mexico Indirect Purchaser Class**:  All persons and entities who, as

20   residents of New Mexico, indirectly purchased an ODD Product during the

21   Class Period for their own use and not for resale that was manufactured by

22   one or more Defendants.

23   s.   **New York Indirect Purchaser Class**:  All persons and entities who, as

24   residents of New York, indirectly purchased an ODD Product during the

25   Class Period for their own use and not for resale that was manufactured by

26   one or more Defendants.

27   t.   **North Carolina Indirect Purchaser Class**:  All persons and entities who,

28   as residents of North Carolina, indirectly purchased an ODD Product during

1    the Class Period for their own use and not for resale that was manufactured

2    by one or more Defendants.

3    u.    **North Dakota Indirect Purchaser Class**:  All persons and entities who, as

4    residents of North Dakota, indirectly purchased an ODD Product during the

5    Class Period for their own use and not for resale that was manufactured by

6    one or more Defendants.

7    v.    **Oregon Indirect Purchaser Class**:  All persons and entities who, as

8    residents of Oregon, indirectly purchased an ODD Product during the Class

9    Period for their own use and not for resale that was manufactured by one or

10   more Defendants.

11   w.    **South Carolina Indirect Purchaser Class**:  All persons and entities who, as

12   residents of South Carolina, indirectly purchased an ODD Product during the

13   Class Period for their own use and not for resale that was manufactured by

14   one or more Defendants.

15   x.    **South Dakota Indirect Purchaser Class**:  All persons and entities who, as

16   residents of South Dakota, indirectly purchased an ODD Product during the

17   Class Period for their own use and not for resale that was manufactured by

18   one or more Defendants.

19   y.    **Tennessee Indirect Purchaser Class**:  All persons and entities who, as

20   residents of Tennessee, indirectly purchased an ODD Product during the

21   Class Period for their own use and not for resale that was manufactured by

22   one or more Defendants.

23   z.    **Utah Indirect Purchaser Class**:  All persons and entities who, as residents

24   of Utah, indirectly purchased an ODD Product during the Class Period for

25   their own use and not for resale that was manufactured by one or more

26   Defendants.

27   aa.   **Vermont Indirect Purchaser Class**:  All persons and entities who, as

28   residents of Vermont, indirectly purchased an ODD Product during the Class

1              Period for their own use and not for resale that was manufactured by one or

2              more Defendants.

3          bb.    **West Virginia Indirect Purchaser Class**:  All persons and entities who, as

4              residents of West Virginia, indirectly purchased an ODD Product during the

5              Class Period for their own use and not for resale that was manufactured by

6              one or more Defendants.

7          cc.    **Wisconsin Indirect Purchaser Class**:  All persons and entities who, as

8              residents of Wisconsin, indirectly purchased an ODD Product during the

9              Class Period for their own use and not for resale that was manufactured by

10              one or more Defendants.

11      304.    Excluded from the State Classes are Defendants; the officers, directors or employees

12  of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate,

13  legal representative, heir or assignee of any Defendant.  Also excluded are any federal, state, or

14  local governmental entities, any judicial officer presiding over this action and the members of

15  his/her immediate family and judicial staff, and any juror assigned to this action.

16      305.    The persons in the Class and State Classes are so numerous that individual joinder

17  of all members is impracticable under the circumstances of this case.  Although the precise number

18  of such persons is unknown, the exact size of the Class and State Classes is easily ascertainable, as

19  each class member can by identified by using Defendants' records and/or the records of its

20  distributors or retailers.  Plaintiffs are informed and believe that there are many thousands of Class

21  and State Class members.

22      306.    Indirect Purchaser Plaintiffs' claims are typical of the claims of the Class and State

23  Classes in that Indirect Purchaser Plaintiffs are indirect purchasers of ODD Products, all Class

24  members were damaged by the same wrongful conduct of Defendants and their co-conspirators as

25  alleged herein, and the relief sought is common to the Class.

26      307.    There are common questions of law and fact specific to the Class and State Classes

27  that predominate over any questions affecting individual members, including:

28

a.   Whether Defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of ODDs and ODD Products sold in the United States.

b.   Whether Defendants engaged in a contract, combination, and/or conspiracy to restrict output of ODDs and ODD Products sold in the United States.

c.   Whether Defendants' conduct caused the prices of ODDs and ODD Products sold in the United States to be at artificially high and noncompetitive levels;

d.   Whether Indirect Purchaser Plaintiffs and the other members of the Class and State Classes were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for class members.

e.   Whether Indirect Purchaser Plaintiffs and the other members of the Class and State Classes are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

308.   These and other questions of law and fact are common to the Class and State Classes, and predominate over any questions affecting only individual class members.

309.   Plaintiffs' claims are typical of the Class and State Classes claim, as they arise out of the same course of conduct and the same legal theories as the rest of the Class and State Classes, and Plaintiffs challenge the practices and course of conduct engaged in by Defendants with respect to the Class and State Classes as a whole.

310.   Plaintiffs will fairly and adequately protect the interests of the classes.  Plaintiffs have retained class counsel who are able and experienced class action litigators.

311.   Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims.  A class action also makes sense because Defendants have and

1    refused to take steps that are, upon information and belief, generally applicable to thousands of

2    individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

3                            **X.    VIOLATIONS ALLEGED**

4                         **FIRST CLAIM FOR RELIEF**
                  **(Violations of Sherman Act, 15 U.S.C. § 1)**

5

6        312.    Indirect Purchaser Plaintiffs incorporate by reference all the above allegations as if

    fully set forth herein.

7

8        313.    Beginning at least as early as January 1, 2004, the exact date being unknown to

9    Indirect Purchaser Plaintiffs and exclusively within the knowledge of Defendants, Defendants and

10   their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably

11   restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

12   artificially reducing or eliminating competition in the United States.

13       314.    In particular, Defendants have combined and conspired to raise, fix, maintain or

    stabilize the prices of ODD Products sold in the United States.

14

15       315.    As a result of Defendants' unlawful conduct, prices for ODDs and ODD Products

16   were raised, fixed, maintained, and stabilized in the United States.

17       316.    The contract, combination or conspiracy among Defendants consisted of a

18   continuing agreement, understanding, and concerted action among Defendants and their co-

    conspirators.

19

20       317.    For purposes of formulating and effectuating their contract, combination, or

21   conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

    conspired to do, including:

22

23              a.   Participating in meetings and conversations to discuss the prices and supply

                     of ODDs and ODD Products.

24

25              b.   Communicating in writing and orally to fix prices of ODDs and ODD

26                   Products.

27

28

1         c.     Agreeing to manipulate prices and supply of ODDs and ODD Products sold

2              in the United States in a manner that deprived direct and indirect purchasers

3              of free and open competition.

4         d.     Issuing price announcements and price quotations in accordance with the

5              agreements reached.

6         e.     Selling ODDs and ODD Products to customers in the United States at

7              noncompetitive prices.

8         f.     Providing false statements to the public to explain increased prices for

9              ODDs and ODD Products.

10    318.    As a result of Defendants' unlawful conduct, Indirect Purchaser Plaintiffs and the

11 other members of the Class have been injured in their businesses and property in that they have

12 paid more for ODD Products than they otherwise would have paid in the absence of Defendants'

13 unlawful conduct.

14    319.    These violations are continuing and will continue unless enjoined by this Court.

15    320.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Indirect Purchaser

16 Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendants,

17 preventing and restraining the violations alleged herein.

18                     **SECOND CLAIM FOR RELIEF**
                       **(Violations of the Cartwright Act,**

19                  **Cal. Bus. & Prof. Code §§ 16720, *et seq.*)**

20    321.    Indirect Purchaser Plaintiffs incorporate by reference all the above allegations as if

21 fully set forth herein.

22    322.    By reason of the foregoing, Defendants have violated California Business and

23 Professions Code, §§ 16700, *et seq.*  California Plaintiff on behalf of a nationwide class of Indirect

24 Purchasers alleges as follows.

25    323.    Beginning at a time currently unknown to California Plaintiff, but at least as early as

26 January 1, 2004, and continuing thereafter at least up to the filing of this complaint, Defendants

27 and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

28 trade and commerce described above in violation of section 16720, California Business and

1 | Professions Code.  Defendants, and each of them, have acted in violation of section 16720 to fix,

2 | raise, stabilize, and maintain prices of, and allocate markets for ODDs and ODD Products at supra-

3 | competitive levels.

4 |     324.    In particular, Defendants have combined and conspired to raise, fix, maintain or

5 | stabilize the prices of ODDs and ODD Products sold in the United States.

6 |     325.    As a result of Defendants' unlawful conduct, prices for ODDs and ODD Products

7 | were raised, fixed, maintained, and stabilized in the United States.

8 |     326.    The contract, combination or conspiracy among Defendants consisted of a

9 | continuing agreement, understanding, and concerted action among Defendants and their co-

10 | conspirators.

11 |     327.    For purposes of formulating and effectuating their contract, combination, or

12 | conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

13 | conspired to do, including:

14 |     a.    Participating in meetings and conversations to discuss the prices and supply

15 |     of ODDs and ODD Products.

16 |     b.    Communicating in writing and orally to fix prices of ODDs and ODD

17 |     Products.

18 |     c.    Agreeing to manipulate prices and supply of ODDs and ODD Products sold

19 |     in the United States in a manner that deprived direct and indirect purchasers

20 |     of free and open competition.

21 |     d.    Issuing price announcements and price quotations in accordance with the

22 |     agreements reached.

23 |     e.    Selling ODD Products to customers in the United States at non-competitive

24 |     prices.

25 |     f.    Providing false statements to the public to explain increased prices for

26 |     ODDs and ODD Products.

27 |     328.    As a direct and proximate result of Defendants' unlawful conduct, California

28 | plaintiffs and the members of the California Indirect Purchaser Class have been injured in their

1    business and property in that they paid more for ODDs and ODD Products than they otherwise

2    would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants'

3    violation of Section 16720 of the California Business and Professions Code, California Plaintiff

4    and the California Indirect Purchaser Class seek treble damages and their cost of suit, including a

5    reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions

6    Code.

**THIRD CLAIM FOR RELIEF**
**(Violations of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.***)**

7

8

9        329.    Indirect Purchaser Plaintiffs incorporate by reference the allegations in the above

10   paragraphs as if fully set forth herein.

11       330.    By reason of the foregoing, Defendants have violated California's Unfair

12   Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  California Plaintiff on behalf of the

13   California Indirect Purchaser Class alleges as follows.

14       331.    Defendants committed acts of unfair competition, as defined by section 17200, *et*

15   *seq.*, by engaging in a conspiracy to fix and stabilize the price of ODDs and ODD Products as

16   described above.

17       332.    The acts, omissions, misrepresentations, practices and non-disclosures of

18   Defendants, as described above, constitute a common and continuing course of conduct of unfair

19   competition by means of unfair, unlawful and/or fraudulent business acts or practices with the

20   meaning of Section 17200, *et seq.*, including, but not limited to (1) violations of Section 1 of the

21   Sherman Act; and (2) violations of the Cartwright Act.

22       333.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures are

23   unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a

24   violation of the Sherman Act or the Cartwright Act.

25       334.    Defendants' acts or practices are fraudulent or deceptive within the meaning of

26   section 17200, *et seq.*

27

28

335.    Defendants' conduct was carried out, effectuated, and perfected within the state of California.  Defendants maintained offices in California where their employees engaged in communications, meetings and other activities in furtherance of Defendants' conspiracy.

336.    By reason of the foregoing, the Class is entitled to application of California law to a nationwide class and are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

**FOURTH CLAIM FOR RELIEF**
**(Violations of State Antitrust and Restraint of Trade Laws)**

337.    Indirect Purchaser Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

338.    In the event that the Court does not apply California law on a nationwide basis, Indirect Purchaser Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the alternative.

339.    By reason of the foregoing, Defendants have violated Arizona Revised Statutes, §§ 44-1401, *et seq*.  Arizona Plaintiff on behalf of the Arizona Indirect Purchaser Class alleges as follows:

    a.    Defendants' combinations or conspiracies had the following effects: (1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout Arizona; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Arizona Plaintiff and members of the Arizona Indirect Purchaser Class were deprived of free and open competition; and (4) Arizona Plaintiff and members of the Arizona Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products;

    b.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

1             c.      As a direct and proximate result of defendants' unlawful conduct, Arizona

2                       Plaintiff and members of the Arizona Indirect Purchaser Class have been

3                       injured in their business and property and are threatened with further injury.

4             d.      By reason of the foregoing, Defendants entered into agreements in restraint

5                       of trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq.*

6                       Accordingly, Arizona Plaintiff and the members of the Arizona Indirect

7                       Purchaser Class seek all forms of relief available under Arizona Revised

8                       Statutes §§ 44-1401, *et seq.*

9      340.     By reason of the foregoing, Defendants have violated California Business and

10 Professions Code, §§ 16700, *et seq.* California Plaintiff on behalf of the California Indirect

11 Purchaser Class alleges as follows:

12             a.      Defendants' contract, combination, trust or conspiracy was entered in,

13                       carried out, effectuated and perfected mainly within the State of California,

14                       and Defendants' conduct within California injured all members of the class

15                       throughout the United States.  Therefore, this claim for relief under

16                       California law is brought on behalf of the California Indirect Purchaser

17                       Class.

18             b.      Beginning at a time currently unknown to California Plaintiff, but at least as

19                       early as January 1, 2004, and continuing thereafter at least up to the filing of

20                       this complaint, Defendants and their co-conspirators entered into and

21                       engaged in a continuing unlawful trust in restraint of the trade and commerce

22                       described above in violation of section 16720, California Business and

23                       Professions Code.  Defendants, and each of them, have acted in violation of

24                       section 16720 to fix, raise, stabilize, and maintain prices of, and allocate

25                       markets for ODDs and ODD Products at supra-competitive levels.

26             c.      The aforesaid violations of section 16720, California Business and

27                       Professions Code, consisted, without limitation, of a continuing unlawful

28                       trust and concert of action among the defendants and their co-conspirators,

1        the substantial terms of which were to fix, raise, maintain, and stabilize the

2        prices of, and to allocate markets for ODDs and ODD Products.

3      d.     For the purpose of forming and effectuating the unlawful trust, the

4        Defendants and their co-conspirators have done those things which they

5        combined and conspired to do, including but not in any way limited to the

6        acts, practices and course of conduct set forth above and the following: (1)

7        fixing, raising, stabilizing, and pegging the price of ODDs and ODD

8        Products; and (2) allocating among themselves the production of ODDs and

9        ODD Products.

10     e.     The combination and conspiracy alleged herein has had, *inter alia*, the

11        following effects: (1) price competition in the sale of ODDs and ODD

12        Products has been restrained, suppressed, and/or eliminated in the State of

13        California; (2) prices for ODDs and ODD Products sold by Defendants and

14        their co-conspirators have been fixed, raised, stabilized, and pegged at

15        artificially high, noncompetitive levels in the State of California; and (3)

16        those who purchased ODDs and ODD Products directly or indirectly from

17        Defendants and their co-conspirators have been deprived of the benefit of

18        free and open competition.

19     f.     As a direct and proximate result of Defendants' unlawful conduct, California

20        plaintiffs and the members of the California Indirect Purchaser Class have

21        been injured in their business and property in that they paid more for ODD

22        Products than they otherwise would have paid in the absence of Defendants'

23        unlawful conduct.  As a result of Defendants' violation of Section 16720 of

24        the California Business and Professions Code, California Plaintiff and the

25        California Indirect Purchaser Class seek treble damages and their cost of

26        suit, including a reasonable attorney's fee, pursuant to section 16750(a) of

27        the California Business and Professions Code.

28

341.     By reason of the foregoing, Defendants have violated District of Columbia Code Annotated §§ 28-4501, *et seq.*  District of Columbia Plaintiff on behalf of the District of Columbia Indirect Purchaser Class alleges as follows:

      a.     Defendants' combinations or conspiracies had the following effects:

           (1)  price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) District of Columbia Plaintiff and members of the District of Columbia Indirect Purchaser Class were deprived of free and open competition; and (4) District of Columbia Plaintiff and members of the District of Columbia Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

      b.     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

      c.     As a direct and proximate result of defendants' unlawful conduct, District of Columbia Plaintiff and the District of Columbia Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

      d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4502, *et seq.*  Accordingly, District of Columbia Plaintiff and the District of Columbia Indirect Purchaser Class seek all forms of relief available under District of Columbia Code Annotated §§ 28-4503, *et seq.*

342.     By reason of the foregoing, Defendants have violated Hawaii Revised Statutes, §§ 480-1, *et seq.*  Hawaii Plaintiff on behalf of the Hawaii Indirect Purchaser Class alleges as follows:

a.     Defendants' combinations or conspiracies had the following effects: (1)  price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout Hawaii; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class were deprived of free and open competition; and (4) Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

b.     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class have been injured in their business and property and are threatened with further injury;

d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Hawaii Revised Statutes §§ 480-1, *et seq*. Accordingly, Hawaii Plaintiff and the members of the Hawaii Indirect Purchaser Class seek all forms of relief available under Hawaii Revised Statutes §§ 480-1, *et seq*.

343.     By reason of the foregoing, Defendants have violated the Illinois Antitrust Act, Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq*.  Illinois Plaintiff on behalf of the Illinois Indirect Purchaser Class alleges as follows:

a.     Defendants' combinations or conspiracies had the following effects: (1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout Illinois; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) Illinois Plaintiff and members of the Illinois Indirect Purchaser Class were deprived of free and open competition;

1        and (4) Illinois Plaintiff and members of the Illinois Indirect Purchaser Class

2        paid supra-competitive, artificially inflated prices for ODD Products.

3    b.  During the Class Period, Defendants' illegal conduct substantially affected

4        Illinois commerce.

5    c.  As a direct and proximate result of defendants' unlawful conduct, Illinois

6        Plaintiff and members of the Illinois Indirect Purchaser Class have been

7        injured in their business and property and are threatened with further injury.

8    d.  By reason of the foregoing, Defendants entered into agreements in restraint

9        of trade in violation of Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat.

10       10/1, *et seq*  Accordingly, Illinois Plaintiff and the members of the Illinois

11       Indirect Purchaser Class seek all forms of relief available under Illinois

12       Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq.*

13   344.  By reason of the foregoing, Defendants have violated Iowa Code §§ 553.1, *et seq*.

14   Iowa Plaintiff on behalf of the Iowa Indirect Purchaser Class alleges as follows:

15   a.  Defendants' combinations or conspiracies had the following effects:

16       (1) price competition for ODDs and ODD Products was restrained,

17       suppressed, and eliminated throughout Iowa; (2) prices for ODDs and ODD

18       Products were raised, fixed, maintained and stabilized at artificially high

19       levels throughout Iowa; (3) Iowa Plaintiff and the Iowa Indirect Purchaser

20       Class were deprived of free and open competition; and (4) Iowa Plaintiff and

21       the Iowa Indirect Purchaser Class paid supra-competitive, artificially inflated

22       prices for ODD Products.

23   b.  During the Class Period, Defendants' illegal conduct substantially affected

24       Iowa commerce.

25   c.  As a direct and proximate result of Defendants' unlawful conduct, Iowa

26       Plaintiff and the Iowa Indirect Purchaser Class have been injured in their

27       business and property and are threatened with further injury.

28

1                         d.        By reason of the foregoing, Defendants have entered into agreements in

2                                   restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly,

3                                   Iowa Plaintiff and the Iowa Indirect Purchaser Class seek all forms of relief

4                                   available under Iowa Code §§ 553.1, *et seq.*

5          345.    By reason of the foregoing, Defendants have violated Kansas Statutes, §§ 50-101, *et*

6 *seq.*  Kansas Plaintiff on behalf of the Kansas Indirect Purchaser Class alleges as follows:

7                         a.        Defendants' combinations or conspiracies had the following effects:

8                                   (1) price competition for ODDs and ODD Products was restrained,

9                                   suppressed, and eliminated throughout Kansas; (2) prices for ODDs and

10                                  ODD Products were raised, fixed, maintained and stabilized at artificially

11                                  high levels throughout Kansas; (3) Kansas Plaintiff and the Kansas Indirect

12                                  Purchaser Class were deprived of free and open competition; and (4) Kansas

13                                  Plaintiff and the Kansas Indirect Purchaser Class paid supra-competitive,

14                                  artificially inflated prices for ODD Products.

15                         b.        During the Class Period, Defendants' illegal conduct substantially affected

16                                  Kansas commerce.

17                         c.        As a direct and proximate result of Defendants' unlawful conduct, Kansas

18                                  Plaintiff and the Kansas Indirect Purchaser Class have been injured in their

19                                  business and property and are threatened with further injury.

20                         d.        By reason of the foregoing, Defendants have entered into agreements in

21                                  restraint of trade in violation of Kansas Statutes §§ 50-101, *et seq.*

22                                Accordingly, Kansas Plaintiff and the Kansas Indirect Purchaser Class seek

23                                all forms of relief available under Kansas Statutes §§ 50-101, *et seq.*

24          346.    By reason of the foregoing, Defendants have violated the Maine Revised Statutes,

25 10 M.R.S. §§ 1101, *et seq.*  Maine Plaintiff on behalf of the Maine Indirect Purchaser Class alleges

26 as follows:

27                         a.        Defendants' combinations or conspiracies had the following effects:

28                                   (1) price competition for ODDs and ODD Products was restrained,

1   suppressed, and eliminated throughout Maine; (2) prices for ODDs and

2   ODD Products were raised, fixed, maintained and stabilized at artificially

3   high levels throughout Maine; (3) Maine Plaintiff and the Maine Indirect

4   Purchaser Class were deprived of free and open competition; and (4) Maine

5   Plaintiff and the Maine Indirect Purchaser Class paid supra-competitive,

6   artificially inflated prices for ODD Products.

7   b.   During the Class Period, Defendants' illegal conduct substantially affected

8   Maine commerce.

9   c.   As a direct and proximate result of Defendants' unlawful conduct, Maine

10   Plaintiff and the Maine Indirect Purchaser Class have been injured in their

11   business and property and are threatened with further injury.

12   d.   By reason of the foregoing, Defendants have entered into agreements in

13   restraint of trade in violation of Maine Revised Statutes 10, §§ 1101, *et seq.*

14   Accordingly, Maine Plaintiff and the Maine Indirect Purchaser Class seek all

15   relief available under Maine Revised Statutes 10, §§ 1101, *et seq.*

16   347.   By reason of the foregoing, Defendants have violated Michigan Compiled Laws

17   §§ 445.773, *et seq.*  Michigan Plaintiff on behalf of the Michigan Indirect Purchaser Class alleges

18   as follows:

19   a.   Defendants' combinations or conspiracies had the following effects:

20   (1) price competition for ODDs and ODD Products was restrained,

21   suppressed, and eliminated throughout Michigan; (2) prices for ODDs and

22   ODD Products were raised, fixed, maintained and stabilized at artificially

23   high levels throughout Michigan; (3) Michigan Plaintiff and the Michigan

24   Indirect Purchaser Class were deprived of free and open competition; and (4)

25   Michigan Plaintiff and the Michigan Indirect Purchaser Class paid supra-

26   competitive, artificially inflated prices for ODD Products.

27   b.   During the Class Period, Defendants' illegal conduct substantially affected

28   Michigan commerce.

1    c.    As a direct and proximate result of Defendants' unlawful conduct, Michigan

2          Plaintiff and the Michigan Indirect Purchaser Class have been injured in

3          their business and property and are threatened with further injury.

4    d.    By reason of the foregoing, Defendants have entered into agreements in

5          restraint of trade in violation of Michigan Compiled Laws §§ 445.773, *et*

6          *seq.* Accordingly, Michigan Plaintiff and the Michigan Indirect Purchaser

7          Class seek all relief available under Michigan Compiled Laws §§ 445.73, *et*

8          *seq.*

9    348.    By reason of the foregoing, Defendants have violated Minnesota Statutes

10   §§ 325D.49, *et seq.* Minnesota Plaintiff on behalf of the Minnesota Indirect Purchaser Class

11   alleges as follows:

12   a.    Defendants' combinations or conspiracies had the following effects:

13         (1) price competition for ODDs and ODD Products was restrained,

14         suppressed, and eliminated throughout Minnesota; (2) prices for ODDs and

15         ODD Products were raised, fixed, maintained and stabilized at artificially

16         high levels throughout Minnesota; (3) Minnesota Plaintiff and the Minnesota

17         Indirect Purchaser Class were deprived of free and open competition; and (4)

18         Minnesota Plaintiff and the Minnesota Indirect Purchaser Class paid supra-

19         competitive, artificially inflated prices for ODD Products.

20   b.    During the Class Period, Defendants' illegal conduct substantially affected

21         Minnesota commerce.

22   c.    As a direct and proximate result of Defendants' unlawful conduct,

23         Minnesota Plaintiff and the Minnesota Indirect Purchaser Class have been

24         injured in their business and property and are threatened with further injury.

25   d.    By reason of the foregoing, Defendants have entered into agreements in

26         restraint of trade in violation of Minnesota Statutes §§ 325D.49, *et seq.*

27         Accordingly, Minnesota Plaintiff and the Minnesota Indirect Purchaser Class

28         seek all relief available under Minnesota Statutes §§ 325D.49, *et seq.*

349.   By reason of the foregoing, Defendants have violated Mississippi Code §§ 75-21-1, *et seq*.  Mississippi Plaintiff on behalf of the Mississippi Indirect Purchaser Class alleges as follows:

        a.   Defendants' combinations or conspiracies had the following effects: (1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout Mississippi; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Mississippi Plaintiff and the Mississippi Indirect Purchaser Class were deprived of free and open competition; and (4) Mississippi Plaintiff and the Mississippi Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

        b.   During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

        c.   As a direct and proximate result of Defendants' unlawful conduct, Mississippi Plaintiff and the Mississippi Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

        d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code §§ 75-21-1, *et seq*.

        e.   Accordingly, Mississippi Plaintiff and the Mississippi Indirect Purchaser Class seek all relief available under Mississippi Code § 75-21-1, *et seq*.

350.   By reason of the foregoing, Defendants have violated Nebraska Revised Statutes §§ 59-801, *et seq*.  Nebraska Plaintiff on behalf of the Nebraska Indirect Purchaser Class alleges as follows:

        a.   Defendants' combinations or conspiracies had the following effects: (1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout Nebraska; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially

1      high levels throughout Nebraska; (3) Nebraska Plaintiff and the Nebraska

2      Indirect Purchaser Class were deprived of free and open competition; and (4)

3      Nebraska Plaintiff and the Nebraska Indirect Purchaser Class paid supra-

4      competitive, artificially inflated prices for ODD products.

5    b.  During the Class Period, Defendants' illegal conduct substantially affected

6      Nebraska commerce.

7    c.  As a direct and proximate result of Defendants' unlawful conduct, Nebraska

8      Plaintiff and the Nebraska Indirect Purchaser Class have been injured in

9      their business and property and are threatened with further injury.

10    d.  By reason of the foregoing, Defendants have entered into agreements in

11      restraint of trade in violation Nebraska Revised Statutes §§ 59-801, *et seq*.

12      Accordingly, Nebraska Plaintiff and the Nebraska Indirect Purchaser Class

13      seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

14   351. By reason of the foregoing, Defendants have violated Nevada Revised Statutes

15 §§ 598A.010, *et seq*.  Nevada Plaintiff on behalf of the Nevada Indirect Purchaser Class alleges as

16 follows:

17    a.  Defendants' combinations or conspiracies had the following effects:

18      (1) price competition for ODDs and ODD Products was restrained,

19      suppressed, and eliminated throughout Nevada; (2) prices for ODDs and

20      ODD Products were raised, fixed, maintained and stabilized at artificially

21      high levels throughout Nevada; (3) Nevada Plaintiff and the Nevada Indirect

22      Purchaser Class were deprived of free and open competition; and (4) Nevada

23      Plaintiff and the Nevada Indirect Purchaser Class paid supra-competitive,

24      artificially inflated prices for ODD products.

25    b.  During the Class Period, Defendants' illegal conduct substantially affected

26      Nevada commerce.

27

28

c.     As a direct and proximate result of Defendants' unlawful conduct, Nevada Plaintiff and the Nevada Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Revised Statutes §§ 598A.010, *et seq*. Accordingly, Nevada Plaintiff and the Nevada Indirect Purchaser Class seek all relief available under Nevada Revised Statutes §§ 598A.010, *et seq.*

352.    By reason of the foregoing, Defendants have violated New Hampshire Revised Statutes §§ 356:1, *et seq*. New Hampshire Plaintiff on behalf of the New Hampshire Indirect Purchaser Class alleges as follows:

a.     Defendants' combinations or conspiracies had the following effects: (1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout New Hampshire; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) New Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class were deprived of free and open competition; and (4) New Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

b.     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, New Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, New Hampshire Plaintiff and the New Hampshire

1          Indirect Purchaser Class seek all relief available under New Hampshire

2          Revised Statutes §§ 356:1, *et seq.*

3      353.   By reason of the foregoing, Defendants have violated New Mexico Statutes §§ 57-

4  1-1, *et seq.*  New Mexico Plaintiff on behalf of the New Mexico Indirect Purchaser Class alleges as

5  follows:

6          a.     Defendants' combinations or conspiracies had the following effects:

7              (1) price competition for ODDs and ODD Products was restrained,

8              suppressed, and eliminated throughout New Mexico; (2) prices for ODDs

9              and ODD Products were raised, fixed, maintained and stabilized at

10             artificially high levels throughout New Mexico; (3) New Mexico Plaintiff

11             and the New Mexico Indirect Purchaser Class were deprived of free and

12             open competition; and (4) New Mexico Plaintiff and the New Mexico

13             Indirect Purchaser Class paid supra-competitive, artificially inflated prices

14             for ODD Products.

15         b.     During the Class Period, Defendants' illegal conduct substantially affected

16             New Mexico commerce.

17         c.     As a direct and proximate result of Defendants' unlawful conduct, New

18             Mexico Plaintiff and the New Mexico Indirect Purchaser Class have been

19             injured in their business and property and are threatened with further injury.

20         d.     By reason of the foregoing, Defendants have entered into agreements in

21             restraint of trade in violation of New Mexico Statutes §§ 57-1-1, *et seq.*

22             Accordingly, New Mexico Plaintiff and the New Mexico Indirect Purchaser

23             Class seek all relief available under New Mexico Statutes §§ 57-1-1, *et seq.*

24     354.   By reason of the foregoing, Defendants have violated New York General Business

25  Laws §§ 340, *et seq.*  New York Plaintiff on behalf of the New York Indirect Purchaser Class

26  alleges as follows:

27         a.     Defendants' combinations or conspiracies had the following effects:

28             (1) price competition for ODDs and ODD Products was restrained,

1     suppressed, and eliminated throughout New York; (2) prices for ODDs and

2     ODD Products were raised, fixed, maintained and stabilized at artificially

3     high levels throughout New York; (3) New York Plaintiff and the New York

4     Indirect Purchaser Class were deprived of free and open competition; and (4)

5     New York Plaintiff and the New York Indirect Purchaser Class paid supra-

6     competitive, artificially inflated prices for ODD Products.

7          b.     During the Class Period, Defendants' illegal conduct substantially affected

8                 New York commerce.

9          c.     As a direct and proximate result of Defendants' unlawful conduct, New

10                York Plaintiff and the New York Indirect Purchaser Class have been injured

11                in their business and property and are threatened with further injury.

12         d.     By reason of the foregoing, Defendants have entered into agreements in

13                restraint of trade in violation of New York General Business Laws §§ 340, *et*

14                *seq*.  Accordingly, New York Plaintiff and the New York Indirect Purchaser

15                Class seek all relief available under New York General Business Laws §§

16                340, *et seq*.

17    355.   By reason of the foregoing, Defendants have violated North Carolina General

18    Statutes §§ 75-1, *et seq*.  North Carolina Plaintiff on behalf of the North Carolina Indirect

19    Purchaser Class alleges as follows:

20         a.     Defendants' combinations or conspiracies had the following effects:

21                (1) price competition for ODDs and ODD Products was restrained,

22                suppressed, and eliminated throughout North Carolina; (2) prices for ODDs

23                and ODD Products were raised, fixed, maintained and stabilized at

24                artificially high levels throughout North Carolina; (3) North Carolina

25                Plaintiff and the North Carolina Indirect Purchaser Class were deprived of

26                free and open competition; and (4) North Carolina Plaintiff and the North

27                Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated

28                prices for ODD Products.

1        b.      During the Class Period, Defendants' illegal conduct substantially affected

2        North Carolina commerce.

3        c.      As a direct and proximate result of Defendants' unlawful conduct, North

4        Carolina Plaintiff and the North Carolina Indirect Purchaser Class have been

5        injured in their business and property and are threatened with further injury.

6        d.      By reason of the foregoing, Defendants have entered into agreements in

7        restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et*

8        *seq.*  Accordingly, North Carolina Plaintiff and the North Carolina Indirect

9        Purchaser Class seek all relief available under North Carolina General

10        Statutes §§ 75-1, *et seq.*

11    356.    By reason of the foregoing, Defendants have violated North Dakota Century Code

12  §§ 51-08.1-01, *et seq.*  North Dakota Plaintiff on behalf of the North Dakota Indirect Purchaser

13  Class alleges as follows:

14        a.      Defendants' combinations or conspiracies had the following effects:

15        (1) price competition for ODDs and ODD Products was restrained,

16        suppressed, and eliminated throughout North Dakota; (2) prices for ODDs

17        and ODD Products were raised, fixed, maintained and stabilized at

18        artificially high levels throughout North Dakota; (3) North Dakota Plaintiff

19        and the North Dakota Indirect Purchaser Class were deprived of free and

20        open competition; and (4) North Dakota Plaintiff and the North Dakota

21        Indirect Purchaser Class paid supra-competitive, artificially inflated prices

22        for ODD Products.

23        b.      During the Class Period, Defendants' illegal conduct had a substantial effect

24        on North Dakota commerce.

25        c.      As a direct and proximate result of Defendants' unlawful conduct, North

26        Dakota Plaintiff and the North Dakota Indirect Purchaser Class have been

27        injured in their business and property and are threatened with further injury.

28

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq.* Accordingly, North Dakota Plaintiff and the North Dakota Indirect Purchaser Class seek all relief available under North Dakota Century Code §§ 51-08.1-01, *et seq.*

357.   By reason of the foregoing, Defendants have violated Oregon Revised Statutes §§ 646.705, *et seq.* Oregon Plaintiffs on behalf of the Oregon Indirect Purchaser Class allege as follows:

a.   Defendants' combinations or conspiracies had the following effects: (1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout Oregon; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Oregon Plaintiffs and the Oregon Indirect Purchaser Class were deprived of free and open competition; and (4) Oregon Plaintiffs and the Oregon Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Oregon Plaintiffs and the Oregon Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Oregon Plaintiffs and the Oregon Indirect Purchaser Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

358.   By reason of the foregoing, Defendants have violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.* South Dakota Plaintiff on behalf of the South Dakota Indirect Purchaser Class alleges as follows:

1           a.     Defendants' combinations or conspiracies had the following effects:

2                    (1) price competition for ODDs and ODD Products was restrained,

3                    suppressed, and eliminated throughout South Dakota; (2) prices for ODDs

4                    and ODD Products were raised, fixed, maintained and stabilized at

5                    artificially high levels throughout South Dakota; (3) South Dakota Plaintiff

6                    and the South Dakota Indirect Purchaser Class were deprived of free and

7                    open competition; and (4) South Dakota Plaintiff and the South Dakota

8                    Indirect Purchaser Class paid supra-competitive, artificially inflated prices

9                    for ODD Products.

10           b.     During the Class Period, Defendants' illegal conduct had a substantial effect

11                    on South Dakota commerce.

12           c.     As a direct and proximate result of Defendants' unlawful conduct, South

13                    Dakota Plaintiff and the South Dakota Indirect Purchaser Class have been

14                    injured in their business and property and are threatened with further injury.

15           d.     By reason of the foregoing, Defendants have entered into agreements in

16                    restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et*

17                    *seq.*  Accordingly, South Dakota Plaintiff and the South Dakota Indirect

18                    Purchaser Class seek all relief available under South Dakota Codified Laws

19                    §§ 37-1-3.1, *et seq.*

20       359.     By reason of the foregoing, Defendants have violated Tennessee Code §§ 47-25-

21 101, *et seq.*  Tennessee Plaintiff on behalf of the Tennessee Indirect Purchaser Class alleges as

22 follows:

23           a.     Defendants' combinations or conspiracies had the following effects:

24                    (1) price competition for ODDs and ODD Products was restrained,

25                    suppressed, and eliminated throughout Tennessee; (2) prices for ODDs and

26                    ODD Products were raised, fixed, maintained and stabilized at artificially

27                    high levels throughout Tennessee; (3) Tennessee Plaintiff and the Tennessee

28                    Indirect Purchaser Class were deprived of free and open competition; and (4)

1          Tennessee Plaintiff and the Tennessee Indirect Purchaser Class paid supra-

2          competitive, artificially inflated prices for ODD Products.

3     b.   During the Class Period, Defendants' illegal conduct had a substantial effect

4          on Tennessee commerce as products containing ODD were sold in

5          Tennessee.

6     c.   As a direct and proximate result of Defendants' unlawful conduct,

7          Tennessee Plaintiff and the Tennessee Indirect Purchaser Class have been

8          injured in their business and property and are threatened with further injury.

9     d.   By reason of the foregoing, Defendants have entered into agreements in

10         restraint of trade in violation of Tennessee Code §§ 47-25-101, *et seq.*

11         Accordingly, Tennessee Plaintiff and the Tennessee Indirect Purchaser Class

12         seek all relief available under Tennessee Code §§ 47-25-101, *et seq.*

13    360.  By reason of the foregoing, Defendants have violated Utah Code §§ 76-10-911, *et*

14   *seq.*  Utah Plaintiff on behalf of the Utah Indirect Purchaser Class alleges as follows:

15    a.   Defendants' combinations or conspiracies had the following effects:

16         (1) price competition for ODDs and ODD Products was restrained,

17         suppressed, and eliminated throughout Utah; (2) prices for ODDs and ODD

18         Products were raised, fixed, maintained and stabilized at artificially high

19         levels throughout Utah; (3) Utah Plaintiff and the Utah Indirect Purchaser

20         Class were deprived of free and open competition; and (4) Utah Plaintiff and

21         the Utah Indirect Purchaser Class paid supra-competitive, artificially inflated

22         prices for ODD Products.

23    b.   During the Class Period, Defendants' illegal conduct had a substantial effect

24         on Utah commerce.

25    c.   As a direct and proximate result of Defendants' unlawful conduct, Utah

26         Plaintiff and the Utah Indirect Purchaser Class have been injured in their

27         business and property and are threatened with further injury.

28

<table>
<tr><td>1</td><td>d.</td><td>By reason of the foregoing, Defendants have entered into agreements in</td></tr>
</table>

1      d.    By reason of the foregoing, Defendants have entered into agreements in

2      restraint of trade in violation of violated Utah Code §§ 76-10-911, *et seq*.

3      Accordingly, Utah Plaintiff and the Utah Indirect Purchaser Class seek all

4      relief available under violated Utah Code §§ 76-10-911, *et seq*.

5      361.    By reason of the foregoing, Defendants have violated Vermont Stat. Ann. 9

6 §§ 2453, *et seq*.  Vermont Plaintiff on behalf of the Vermont Indirect Purchaser Class alleges as

7 follows:

8      a.    Defendants' combinations or conspiracies had the following effects:

9      (1) price competition for ODDs and ODD Products was restrained,

10      suppressed, and eliminated throughout Vermont; (2) prices for ODDs and

11      ODD Products were raised, fixed, maintained and stabilized at artificially

12      high levels throughout Vermont; (3) Vermont Plaintiff and the Vermont

13      Indirect Purchaser Class were deprived of free and open competition; and (4)

14      Vermont Plaintiff and the Vermont Indirect Purchaser Class paid supra-

15      competitive, artificially inflated prices for ODD Products.

16      b.    During the Class Period, Defendants' illegal conduct had a substantial effect

17      on Vermont commerce.

18      c.    As a direct and proximate result of Defendants' unlawful conduct, Vermont

19      Plaintiff and the Vermont Indirect Purchaser Class have been injured in their

20      business and property and are threatened with further injury.

21      d.    By reason of the foregoing, Defendants have entered into agreements in

22      restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.

23      Accordingly, Vermont Plaintiff and the Vermont Indirect Purchaser Class

24      seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

25      362.    By reason of the foregoing, Defendants have violated West Virginia Code §§ 47-18-

26 1, *et seq*. West Virginia Plaintiff on behalf of the West Virginia Indirect Purchaser Class alleges as

27 follows:

a.   Defendants' combinations or conspiracies had the following effects:
(1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout West Virginia; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) West Virginia Plaintiff and the West Virginia Indirect Purchaser Class were deprived of free and open competition; and (4) West Virginia Plaintiff and the West Virginia Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, West Virginia Plaintiff and the West Virginia Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.* Accordingly, West Virginia Plaintiff and the West Virginia Indirect Purchaser Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

363.   By reason of the foregoing, Defendants have violated Wisconsin Statutes §§ 133.01, *et seq.* Wisconsin Plaintiff on behalf of the Wisconsin Indirect Purchaser Class alleges as follows:

a.   Defendants' combinations or conspiracies had the following effects:
(1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices for ODDs and ODD Products were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Wisconsin Plaintiff and the Wisconsin Indirect Purchaser Class were deprived of free and open competition; and (4)

Wisconsin Plaintiff and the Wisconsin Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Wisconsin Plaintiff and the Wisconsin Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Statutes §§ 133.01, *et seq*. Accordingly, Wisconsin Plaintiff and the Wisconsin Indirect Purchaser Class seek all relief available under Wisconsin Statutes §§ 133.01, *et seq*.

**FIFTH CLAIM FOR RELIEF**
**(Violations of State Consumer Protection and Unfair Competition Laws)**

364.    Indirect Purchaser Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

365.    In the event that the Court does not apply California law on a nationwide basis, Indirect Purchaser Plaintiffs allege the following violations of state consumer protection and unfair competition laws in the alternative.

366.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

367.    By reason of the foregoing, Defendants have violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. California Plaintiff on behalf of the California Indirect Purchaser Class alleges as follows:

a.    Defendants committed acts of unfair competition, as defined by section 17200, *et seq*., by engaging in a conspiracy to fix and stabilize the price of ODDs and ODD Products as described above.

b.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act.

c.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

d.    Defendants' acts or practices are fraudulent or deceptive within the meaning of section 17200, *et seq.*

e.    Defendants' conduct was carried out, effectuated, and perfected within the state of California.  Defendants maintained offices in California where their employees engaged in communications, meetings and other activities in furtherance of defendants' conspiracy.

f.    By reason of the foregoing, California Plaintiff and the California Indirect Purchaser Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

368.    By reason of the foregoing, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*  Florida Plaintiff on behalf of the Florida Indirect Purchaser Class alleges as follows:

a.    Defendants' unlawful conduct had the following effects: (1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout Florida; (2) prices for ODDs and ODD Products were raised, fixed, maintained, and stabilized at artificially high levels throughout

1    Florida; (3) Florida Plaintiff and the Florida Indirect Purchaser Class were

2    deprived of free and open competition; and (4) Florida Plaintiff and the

3    Florida Indirect Purchaser Class paid supra-competitive, artificially inflated

4    prices for ODD Products.

5    b.    During the Class Period, Defendants' illegal conduct substantially affected

6    Florida commerce and consumers.

7    c.    As a direct and proximate result of defendants' unlawful conduct, Florida

8    Plaintiff and the Florida Indirect Purchaser Class have been injured and are

9    threatened with further injury.

10   d.    Defendants have engaged in unfair competition or unfair or deceptive acts or

11   practices in violation of Fla. Stat. §§ 501.201, *et seq.*, and, accordingly,

12   Florida Plaintiff and the Florida Indirect Purchaser Class seek all relief

13   available under that statute.

14   369.   By reason of the foregoing, Defendants have violated Hawaii Revised Statutes

15   Annotated §§ 480-1, *et seq.*  Hawaii Plaintiff on behalf of the Hawaii Indirect Purchaser Class

16   alleges as follows:

17   a.    Defendants' unlawful conduct had the following effects: (1) price

18   competition for ODDs and ODD Products was restrained, suppressed, and

19   eliminated throughout Hawaii; (2) prices for ODDs and ODD Products were

20   raised, fixed, maintained, and stabilized at artificially high levels throughout

21   Hawaii; (3) Hawaii Plaintiff and the Hawaii Indirect Purchaser Class were

22   deprived of free and open competition; and (4) Hawaii Plaintiff and the

23   Hawaii Indirect Purchaser Class paid supra-competitive, artificially inflated

24   prices for ODD Products.

25   b.    During the Class Period, Defendants' illegal conduct substantially affected

26   Hawaii commerce and consumers.

27

28

c.     As a direct and proximate result of Defendants' unlawful conduct, Hawaii Plaintiff and the Hawaii Indirect Purchaser Class have been injured and are threatened with further injury.

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*, and, accordingly, Hawaii Plaintiff and the Hawaii Indirect Purchaser Class seek all relief available under that statute.

370.    By reason of the foregoing, Defendants have violated the Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1, *et seq.*  Massachusetts Plaintiffs on behalf of the Massachusetts Indirect Purchaser Class allege as follows:

a.     Defendants were engaged in trade or commerce as defined by M.G.L. c. 93A, § 1.

b.     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels, the prices at which ODD and ODD Products were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from the Massachusetts Plaintiffs and members of the Massachusetts Indirect Purchaser Class.

c.     Defendants' unlawful conduct had the following effects: (1) price competition for ODDs and ODD Products was restrained, suppressed, and eliminated throughout Massachusetts; (2) the prices of ODDs and ODD Products were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Massachusetts Plaintiffs and members of the Massachusetts Indirect Purchaser Class were deprived of free and open competition; and (4) Massachusetts Plaintiffs and members of the Massachusetts Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODDs and ODD Products.

1        d.     As a direct and proximate result of defendants' unlawful conduct,

2             Massachusetts Plaintiffs and members of the Massachusetts Indirect

3             Purchaser Class were injured and are threatened with further injury.

4        e.     Each of the Defendants or their representatives have been served with a

5             demand letter in accordance with M.G.L. c. 93A, § 1, or such service of a

6             demand letter was unnecessary due to the defendant not maintaining a place

7             of business within the Commonwealth of Massachusetts or not keeping

8             assets within the Commonwealth.  More than thirty days has passed since

9             such demand letters were served, and each Defendant served has failed to

10           make a reasonable settlement offer.

11        f.     By reason of the foregoing, Defendants engaged in unfair competition and

12             unfair or deceptive acts or practices, in violation of M.G.L. c. 93A, § 2.

13             Defendants' and their co-conspirators' violations of Chapter 93A were

14             knowing or willful, entitling the Massachusetts Plaintiff and the

15             Massachusetts Indirect Purchaser Class to multiple damages.

16      371.    By reason of the foregoing, Defendants have violated Montana's Unfair Trade

17 Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103 *et seq*.  Montana

18 Plaintiff on behalf of the Montana Indirect Purchaser Class alleges as follows:

19        a.     Defendants' unlawful conduct had the following effects: (1) ODD price

20             competition was restrained, suppressed, and eliminated throughout Montana;

21             (2) ODD prices were raised, fixed, maintained, and stabilized at artificially

22             high levels throughout Montana; (3) Montana Plaintiff and the Montana

23             Indirect Purchaser Class were deprived of free and open competition; and (4)

24             Montana Plaintiff and the Montana Indirect Purchaser Class paid supra-

25             competitive, artificially inflated prices for ODD Products.

26        b.     During the Class Period, Defendants' illegal conduct substantially affected

27             Montana commerce and consumers.

28

1        c.    As a direct and proximate result of Defendants' unlawful conduct, Montana

2        Plaintiff and the Montana Indirect Purchaser Class have been injured and are

3        threatened with further injury.

4        d.    Defendants have engaged in unfair competition or unfair or deceptive acts or

5        practices in violation of Montana's Unfair Trade Practices and Consumer

6        Protection Act, Mont. Code, §§ 30-14-103 *et seq.* and, accordingly, Montana

7        Plaintiff and the Montana Indirect Purchaser Class seek all relief available

8        under that statute.

9        372.    By reason of the foregoing, Defendants have violated Nebraska's Consumer

10   Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*  Nebraska Plaintiff on behalf of the Nebraska

11   Indirect Purchaser Class alleges as follows:

12       a.    Defendants' unlawful conduct had the following effects: (1) ODD price

13       competition was restrained, suppressed, and eliminated throughout

14       Nebraska; (2) ODD prices were raised, fixed, maintained, and stabilized at

15       artificially high levels throughout Nebraska; (3) Nebraska Plaintiff and the

16       Nebraska Indirect Purchaser Class were deprived of free and open

17       competition; and (4) Nebraska Plaintiff and the Nebraska Indirect Purchaser

18       Class paid supra-competitive, artificially inflated prices for ODD Products.

19       b.    During the Class Period, Defendants' illegal conduct substantially affected

20       Nebraska commerce and consumers.

21       c.    As a direct and proximate result of Defendants' unlawful conduct, Nebraska

22       Plaintiff and the Nebraska Indirect Purchaser Class have been injured and

23       are threatened with further injury.

24       d.    Defendants' actions and conspiracy have had a substantial impact on the

25       public interests of Nebraska and its residents.

26       e.    Defendants have engaged in unfair competition or unfair or deceptive acts or

27       practices in violation of Nebraska's Consumer Protection Act, Neb. Rev.

28

1      Stat. §§ 59-1601, *et seq.*  and, accordingly, Nebraska Plaintiff and the

2      Nebraska Indirect Purchaser Class seek all relief available under that statute.

3      373.    By reason of the foregoing, Defendants have violated New Hampshire's Consumer

4   Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq.*  New Hampshire Plaintiff on behalf of the

5   New Hampshire Indirect Purchaser Class alleges as follows:

6              a.    Defendants' unlawful conduct had the following effects: (1) ODD price

7                    competition was restrained, suppressed, and eliminated throughout New

8                    Hampshire; (2) ODD prices were raised, fixed, maintained, and stabilized at

9                    artificially high levels throughout New Hampshire; (3) New Hampshire

10                   Plaintiff and the New Hampshire Indirect Purchaser Class were deprived of

11                   free and open competition; and (4) New Hampshire Plaintiff and the New

12                   Hampshire Indirect Purchaser Class paid supra-competitive, artificially

13                   inflated prices for ODD Products.

14             b.    During the Class Period, Defendants' illegal conduct substantially affected

15                   New Hampshire commerce and consumers.

16             c.    As a direct and proximate result of Defendants' unlawful conduct, New

17                   Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class have

18                   been injured and are threatened with further injury.

19             d.    Defendants' actions and conspiracy have had a substantial impact on the

20                   public interests of New Hampshire and its residents.

21             e.    Defendants have engaged in unfair competition or unfair or deceptive acts or

22                   practices in violation of New Hampshire Consumer Protection Act, N.H.

23                   Rev. Stat. Ann. §§ 358-A:2, *et seq.*  and, accordingly, New Hampshire

24                   Plaintiff and the New Hampshire Indirect Purchaser Class seek all relief

25                   available under that statute.

26      374.    By reason of the foregoing, Defendants have violated New York's General Business

27   Law, N.Y. Gen. Bus. Law § 349, *et seq.*  New York Plaintiff on behalf of the New York Indirect

28   Purchaser Class alleges as follows:

IPP CONSOLIDATED CLASS ACTION COMPLAINT – No.      - 122 -
3:10-md-2143  VRW
010177-12  384754 V2

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive levels, the prices at which ODD was sold, distributed or obtained in New York and took efforts to conceal their agreements from New York Plaintiff and the New York Indirect Purchaser Class.

b.  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

c.  Defendants made certain statements about ODDs and ODD Products that they knew would be seen by New York residents and these statements either omitted material information that rendered the statements they made materially misleading or affirmatively misrepresented the real cause of price increases for ODD Products.

d.  Defendants' unlawful conduct had the following effects: (1) ODD price competition was restrained, suppressed, and eliminated throughout New York; (2) ODD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) New York Plaintiff and the New York Indirect Purchaser Class were deprived of free and open competition; and (4) New York Plaintiff and the New York Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

e.  During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

1              f.      During the Class Period, each of the Defendants named herein, directly, or

2                     indirectly and through affiliates they dominated and controlled,

3                     manufactured, sold and/or distributed ODD products in New York.

4              g.      New York Plaintiff and the New York Indirect Purchaser Class seek actual

5                     damages for their injuries caused by these violations in an amount to be

6                     determined at trial and are threatened with further injury. Without prejudice

7                     to their contention that Defendants' unlawful conduct was willful and

8                     knowing, New York Plaintiff and the New York Indirect Purchaser Class do

9                     not seek in this action to have those damages trebled pursuant to N.Y. Gen.

10                    Bus. Law § 349(h).

11       375.    By reason of the foregoing, Defendants have violated South Carolina's Unfair Trade

12 Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*. South Carolina Plaintiff on behalf of the South

13 Carolina Indirect Purchaser Class alleges as follows:

14              a.      South Carolina Plaintiff and the South Carolina Indirect Purchaser Class

15                     Defendants' unlawful conduct had the following effects: (1) ODD price

16                     competition was restrained, suppressed, and eliminated throughout South

17                     Carolina; (2) ODD prices were raised, fixed, maintained, and stabilized at

18                     artificially high levels throughout South Carolina; (3) South Carolina

19                     Plaintiff and the South Carolina Indirect Purchaser Class were deprived of

20                     free and open competition; and (4) South Carolina Plaintiff and the South

21                     Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated

22                     prices for ODD Products.

23               b.      During the Class Period, Defendants' illegal conduct substantially affected

24                     South Carolina commerce and consumers.

25               c.      As a direct and proximate result of Defendants' unlawful conduct, South

26                     Carolina Plaintiff and the South Carolina Indirect Purchaser Class have been

27                     injured and are threatened with further injury.

28

1
2
3
4

    d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Revised Statutes Annotated §§ 480-1, *et seq*., and, accordingly, South Carolina Plaintiff and the South Carolina Indirect Purchaser Class seek all relief available under that statute.

5
6
7

    376.    By reason of the foregoing, Defendants have violated Vermont's Consumer Fraud Act, 9 Vt. Stat. Ann. § 2451, *et seq*.  Vermont Plaintiff on behalf of the Vermont Indirect Purchaser Class alleges as follows:

8
9
10
11

    a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and noncompetitive levels, the prices at which ODD Products were sold, distributed, or obtained in Vermont.

12
13
14
15
16
17
18
19

    b.    Defendants deliberately failed to disclose material facts to Vermont Plaintiff and the Vermont Indirect Purchaser Class concerning Defendants' unlawful activities and artificially inflated prices for ODD Products.  Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence.  Defendants misrepresented to all consumers during the Class Period that Defendants' ODD prices were competitive and fair.

20
21
22
23
24
25
26

    c.    Defendants' unlawful conduct had the following effects: (1) ODD price competition was restrained, suppressed, and eliminated throughout Vermont; (2) ODD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Vermont Plaintiff and the Vermont Indirect Purchaser Class were deprived of free and open competition; and (4) Vermont Plaintiff and the Vermont Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

27
28

    d.    As a direct and proximate result of the Defendants' violations of law, Vermont Plaintiff and the Vermont Indirect Purchaser Class suffered an

1  ascertainable loss of money or property as a result of Defendants' use or

2  employment of unconscionable and deceptive commercial practices as set

3  forth above. That loss was caused by Defendants' willful and deceptive

4  conduct, as described herein.

5      e.    Defendants' deception, including their affirmative misrepresentations and

6  omissions concerning the price of ODD Products, likely misled all

7  consumers acting reasonably under the circumstances to believe that they

8  were purchasing ODD Products at prices born by a free and fair market.

9  Defendants' misleading conduct and unconscionable activities constitutes

10  unfair competition or unfair or deceptive acts or practices in violation of 9

11  Vt. Stat. Ann. § 2451, *et seq.*, and, accordingly, Vermont Plaintiff and the

12  Vermont Indirect Purchaser Class seek all relief available under that statute.

13  **PRAYER FOR RELIEF**

14  WHEREFORE, Indirect Purchaser Plaintiffs pray that the Court enter judgment on their

15  behalf and on behalf of the Class herein, adjudging and decreeing that:

16  A.    This action may proceed as a class action, with Indirect Purchaser Plaintiffs as the

17  designated Class Representatives and their counsel as Class Counsel;

18  B.    Defendants have engaged in a contract, combination, and conspiracy in violation of

19  Section 1 of the Sherman Act (15 U.S.C. § 1), and that Indirect Purchaser Plaintiffs and the

20  Injunctive and State Classes have been injured in their businesses and property as a result of

21  Defendants' violations;

22  C.    Indirect Purchaser Plaintiffs and the members of the State Classes recover damages

23  sustained by them, restitution or disgorgement, as provided by the state antitrust and consumer

24  protection laws, and that a joint and several judgment in favor of Indirect Purchaser Plaintiffs and

25  the State Classes be entered against the Defendants in an amount to be trebled in accordance with

26  such laws;

27  D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the

28  respective officers, directors, partners, agents, and employees thereof and all other persons acting

1    or claiming to act on their behalf be permanently enjoined and restrained from continuing and

2    maintaining the combination, conspiracy, or agreement alleged herein;

3          E.        Indirect Purchaser Plaintiffs and the members of the State Classes be awarded pre-

4    judgment and post-judgment interest, and that such interest be awarded at the highest legal rate

5    from and after the date of service of the initial complaint in this action;

6          F.        Indirect Purchaser Plaintiffs and the members of the Class recover their costs of this

7    suit, including reasonable attorneys' fees as provided by law; and

8          G.        Indirect Purchaser Plaintiffs and the members of the Class receive such other or

9    further relief as may be just and proper.

10                              **JURY TRIAL DEMANDED**

11         Indirect Purchaser Plaintiffs demand a trial by jury of all of the claims asserted in this

12   complaint so triable.

13   DATED:  August 26, 2010              HAGENS BERMAN SOBOL SHAPIRO LLP

14
                                          By _____/s/ Jeff D. Friedman_____
15                                                JEFF D. FRIEDMAN

16                                        Shana E. Scarlett (217895)
                                          715 Hearst Avenue, Suite 202
17                                        Berkeley, CA  94710
                                          Telephone:  (510) 725-3000
18                                        Facsimile:  (510) 725-3001
                                          jefff@hbsslaw.com
19                                        shanas@hbsslaw.com

20                                        Steve W. Berman (*Pro Hac Vice*)
                                          George W. Sampson (*Pro Hac Vice*)
21                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                          1918 Eighth Avenue, Suite 3300
22                                        Seattle, WA  98101
                                          Telephone:  (206) 623-7292
23                                        Facsimile:   (206) 623-0594
                                          steve@hbsslaw.com
24                                        george@hbsslaw.com

25                                        Interim Lead Counsel for Indirect
                                          Purchaser Plaintiffs
26

27

28

IPP CONSOLIDATED CLASS ACTION COMPLAINT – No.        - 127 -
3:10-md-2143  VRW
010177-12  384754 V2

1   Thomas V. Girardi (36603)
    Stephen G. Larson (145225)
2   Michael M. Kowsari (186899)
    GIRARDI & KEESE
3   1126 Wilshire Blvd.
    Los Angeles, CA  90017
4   Telephone: (213) 977-0211
    Facsimile:  (213) 481-1554
5   tgirardi@girardikeese.com
    slarson@girardikeese.com
6   mkowsari@girardikeese.com

7   Charles E. Tompkins
    Robert E. Ditzion
8   Shapiro Haber & Urmy LLP
    53 State Street
9   Boston, MA  02109
    Tel:  617-439-3939
10  Fax: 617-439-0134
    ctompkins@shulaw.com
11  rditzion@shulaw.com

12  Steve D. Larson
    Mark A. Friel
13  Stoll Stoll Berne Lokting & Shlachter P.C.
    209 Southwest Oak Street
14  Portland, OR  97204
    Tel:  (503) 227-1600
15  Fax: (503) 227-6840
    slarson@stollberne.com
16  mfriel@stollberne.com

17  Additional Counsel for Indirect
    Purchaser Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have caused to be mailed the foregoing document or paper via United Parcel Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/ Jeff D. Friedman
JEFF D. FRIEDMAN

## Mailing Information for a Case 3:10-md-02143-VRW

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joseph M. Alioto , Sr**
  jmalioto@aliotolaw.com,esexton@aliotolaw.com

- **Mario N. Alioto**
  malioto@tatp.com

- **U.S. Department of J Antitrust Division**
  sidney.majalya@usdoj.gov

- **Arthur Nash Bailey , Jr**
  abailey@hausfeldllp.com

- **David H. Bamberger**
  david.bamberger@dlapiper.com,jessica.green-johnson@dlapiper.com

- **Brian Joseph Barry , Esq**
  bribarry1@yahoo.com

- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com

- **John Dmitry Bogdanov**
  jdb@coopkirk.com

- **W. Joseph Bruckner**
  wjbruckner@locklaw.com,sipeem@locklaw.com,pottehn@locklaw.com

- **Cullen Byrne**
  whparish@parishsmall.com

- **Deana Louise Cairo**
  deana.cairo@dlapiper.com

- **William G. Caldes**
  bcaldes@srkw-law.com

- **Henry A. Cirillo**
  hcirillo@steyerlaw.com,lrorem@steyerlaw.com

- **Craig C. Corbitt**
  ccorbitt@zelle.com

- **Joseph W. Cotchett**
  jcotchett@cpmlegal.com

- **John F. Cove , Jr**
  jcove@bsfllp.com,brichardson@bsfllp.com,vpooni@bsfllp.com,cduong@bsfllp.com,jlipton@bsfllp.com,sphan@bsfllp.com,aloeb@bsfllp.com

- **Michael E. Criden**
  meriden@cridenlove.com

- **Thad Alan Davis**
  Thad.Davis@ropesgray.com,michelle.visser@ropesgray.com,mark.popofsky@ropesgray.com,jane.willis@ropesgray.com,CourtAlert@RopesGray.com,rachel.rubenson@ropesgray.

- **Manuel Juan Dominguez**
  mdominguez@bermandevalerio.com,ecf@bermandevalerio.com,eavila@bermandevalerio.com

- **Mary Jane Edelstein Fait**
  fait@whafh.com,curro@whafh.com

- **Eric B. Fastiff**
  efastiff@lchb.com,aruiz@lchb.com,btroxel@lchb.com

- **Linda M. Fong**
  lfong@kaplanfox.com,kweiland@kaplanfox.com,lbarry@kaplanfox.com

- **Erin Gail Frazor**
  erin.frazor@dlapiper.com

- **Jeff D Friedman**
  jefff@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Qianwei Fu**
  qfu@zelle.com

- **Jeffrey B. Gittleman**
  jgittleman@barrack.com,rbranch@barrack.com

- **Brendan Patrick Glackin**
  bglackin@lchb.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com

- **Marc Jeffrey Greenspon**
  mgreenspon@bermandevalerio.com

- **Francis M. Gregorek**
  gregorek@whafh.com

- **Terry Gross**
  terry@gba-law.com,monique@gba-law.com,joann@grossbelsky.com,adam@gba-law.com

- **Amy Harrington**
  amy@amyharringtonlaw.com

- **Casey Ann Hatton**
  chatton@wilkesmchugh.com

- **Michael D. Hausfeld**
  mhausfeld@hausfeldllp.com,firmfilings@hausfeldllp.com

- **Christopher T. Heffelfinger**
  cheffelfinger@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Christopher B. Hockett**
  chris.hockett@dpw.com,ecf.ct.papers@dpw.com,felicia.yu@davispolk.com

- **Steven Christopher Holtzman**
  sholtzman@bsfllp.com,jchavez@bsfllp.com,irivera@bsfllp.com,cduong@bsfllp.com,sphan@bsfllp.com

- **Derek G. Howard**
  dhoward@minamitamaki.com,muhl@minamitamaki.com,jlee@minamitamaki.com,byamauchi@minamitamaki.com,bmunoz@minamitamaki.com,cparker@minamitamaki.com,sea

- **Matthew J. Jacobs**
  mjacobs@mwe.com,aleonetti@mwe.com

- **Robert N. Kaplan**
  rkaplan@kaplanfox.com

- **Sherman Kassof**
  heevay@att.net,heevay@yahoo.com

- **Laurence D. King**
  lking@kaplanfox.com,kweiland@kaplanfox.com,lbarry@kaplanfox.com

- **Andrew Scirica Kingsdale**
  akingsdale@lchb.com

- **Kimberly Ann Kralowec**
  kkralowec@kraloweclaw.com,ggray@kraloweclaw.com,enewman@kraloweclaw.com

- **Lara Meredith Kroop**
  Lara.Kroop@usdoj.gov

- **Manish Kumar**
  manish.kumar@usdoj.gov

- **Susan Gilah Kupfer**
  skupfer@glancylaw.com,jbarton@glancylaw.com,sfreception@glancylaw.com

- **Stephen Gerard Larson**
  slarson@girardikeese.com,sshayesteh@girardikeese.com,tfaust@girardikeese.com

- **Christopher L. Lebsock**
  clebsock@hausfeldllp.com

- **Belinda S. Lee**
  Belinda.Lee@lw.com,#SFDocket@LW.com

- **Jack Wing Lee**
  jlee@minamitamaki.com,muhl@minamitamaki.com,bcaracuzzo@MinamiTamaki.com,pdomin@MinamiTamaki.com,cparker@MinamiTamaki.com,seant@Minami.Tamaki.com,br

- **Michael Paul Lehmann**
  mlehmann@hausfeldllp.com

- **Aron K. Liang**
  aliang@cpmlegal.com,edetert@cpmlegal.com,oszeto@cpmlegal.com,jperez@cpmlegal.com

- **David Michael Lisi**
  dlisi@reedsmith.com,mdubuque@reedsmith.com

- **Sarah Robin London**
  slondon@lchb.com

- **Kevin Bruce Love**
  klove@cridenlove.com

- **Sidney A. Majalya**

sidney.majalya@usdoj.gov,liliana.vallejo@usdoj.gov

- **Pamela J. Marple**
  pmarple@mwe.com

- **Emily L. Maxwell , Esq**
  MaxwellE@howrey.com,cayabyabg@howrey.com

- **Timothy Charles McHugh**
  timmchugh@wilkesmchugh.com

- **Brendan Andrew McShane**
  brendan.mcshane@lw.com,coleen.byrne@lw.com,#sfdocket@lw.com

- **Samuel R. Miller**
  srmiller@sidley.com,hebalogi@sidley.com

- **Theresa Driscoll Moore**
  TMoore@aliotolaw.com

- **Paolo Morante**
  paolo.morante@dlapiper.com,grissell.kessler@dlapiper.com

- **Linda Phyllis Nussbaum**
  lnussbaum@nussbaumllp.com

- **Elizabeth R. Odette**
  erodette@locklaw.com,jmware@locklaw.com

- **Steig David Olson**
  solson@hausfeldllp.com

- **William Henry Parish**
  whparish@parishsmall.com,toup@parishsmall.com

- **Robert M. Partain**
  rpartain@oslaw.com,aowen@oslaw.com

- **Joseph Mario Patane**
  jpatane@tatp.com

- **Elizabeth Cheryl Pritzker**
  ecp@girardgibbs.com,tie@girardgibbs.com,act@girardgibbs.com,smq@girardgibbs.com,amv@girardgibbs.com,ale@girardgibbs.com,cme@girardgibbs.com

- **Julio J Ramos**
  ramosfortrustee@yahoo.com

- **Ismail Jomo Ramsey**
  izzy@ramsey-ehrlich.com,ji-ea@ramsey-ehrlich.com,katharine@ramsey-ehrlich.com,marykelly@ramsey-ehrlich.com,miles@ramsey-ehrlich.com

- **Beko Osiris Ra Reblitz-Richardson**
  brichardson@bsfllp.com

- **Rosemary M. Rivas**
  rrivas@finkelsteinthompson.com,srenwick@finkelsteinthompson.com,mpunzalan@finkelsteinthompson.com,arivas@finkelsteinthompson.com,ttien@finkelsteinthompson.com,jdit

- **Matthew W Ruan**
  mruan@bermandevalerio.com

- **Lauren Clare Russell**
  laurenrussell@tatp.com

- **George W. Sampson**
  george@hbsslaw.com

- **Jennifer Sarnelli**
  jsarnelli@gardylaw.com

- **Guido Saveri**
  guido@saveri.com

- **Joseph Richard Saveri**
  jsaveri@lchb.com,salameda@lchb.com,dclevenger@lchb.com

- **Richard Alexander Saveri**
  rick@saveri.com

- **Shana E. Scarlett**
  shanas@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Francis Onofrei Scarpulla**
  fscarpulla@zelle.com,mdavis@zelle.com

- **Susan R. Schwaiger**
  sschwaiger@kaplanfox.com

- **Todd A. Seaver**
  tseaver@bermanesq.com

- **Craig P. Seebald**
  cseebald@mwe.com

- **Aaron M. Sheanin**
  ams@girardgibbs.com,ras@girardgibbs.com,amv@girardgibbs.com

- **Ian T Simmons**
  isimmons@omm.com

- **Bruce Lee Simon**
  bsimon@pswplaw.com,nhalpern@pswplaw.com,bpouya@pswplaw.com,yberry@pswplaw.com,dwarshaw@pswplaw.com,jwatkins@pswplaw.com,cpearson@pswplaw.com,eklisur

- **Joshua D. Snyder**
  jsnyder@bonizack.com

- **Sylvia M. Sokol**
  sokol@mesllp.com,omar@mesllp.com

- **Eugene A. Spector**
  espector@srkw-law.com

- **Jeffrey Lawrence Spector**
  jspector@srkw-law.com

- **Allan Steyer**
  asteyer@steyerlaw.com,lrorem@steyerlaw.com,behrhart@steyerlaw.com

- **Neil Swartzberg**
  nswartzberg@cpmlegal.com

- **Joseph J. Tabacco , Jr**
  jtabacco@bermandevalerio.com,lcuesta@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Casandra Leann Thomson**
  casandra.thomson@lw.com

- **Clinton Paul Walker**
  cwalker@damrell.com,nweston-dawkes@damrell.com,ewelsch@damrell.com

- **Daniel Murray Wall**
  dan.wall@lw.com,#sfdocket@lw.com

- **Jonathan Whitcomb**
  JWhitcomb@dmoc.com

- **James Lewis Wilkes**
  jwilkes@wilkesmchugh.com

- **Steven Noel Williams**
  swilliams@cpmlegal.com,jverducci@cpmlegal.com,cwalker@cpmlegal.com,rjit@cpmlegal.com,aliang@cpmlegal.com,medling@cpmlegal.com,pmenzel@cpmlegal.com,lclark@cp

- **Lingel Hart Winters**
  sawmill2@aol.com

- **Brad Yamauchi**
  byamauchi@MinamiTamaki.com,muhl@minamitamaki.com,pdomin@MinamiTamaki.com,cparker@MinamiTamaki.com,bmunoz@MinamiTamaki.com,dhoward@minamitamaki.

- **Cadio R. Zirpoli**
  zirpoli@saveri.com

- **Jason Allen Zweig**
  jzweig@kaplanfox.com,rkilsheimer@kaplanfox.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Daniel Bushell
Berman DeValerio
4280 Professional Center Drive, Ste 350
Palm Beach Gardens, FL 33410

Adam J. Levitt
Wolf Haldenstein Adler Freeman Herz LLC
55 West Monroe Street, Ste 1111
Chicago, IL 60661

Michael D Yanovsky
Wolf Haldenstein Adler Freeman Herz LLC
55 West Monroe Street, Ste 1111
Chicago, IL 60603
```

*In Re: Optical Disk Drive Products Antitrust Litigation*
U.S. District Court California Northern District (San Francisco)
CASE No: 3:10-md-02143-VRW

**Service List via UPS Mail**
August 26, 2010

| Counsel for Plaintiffs | Attorneys General |
|---|---|
| Daniel Bushell<br>Berman DeValerio<br>4280 Professional Center Drive, Ste. 350<br>Palm Beach Gardens, FL 33410<br>415-433-3200 | Attorney General Andrew Cuomo<br>Office of the Attorney General<br>The Capitol<br>Albany, NY 12224-0341 |
| Adam J. Levitt<br>Michael D Yanovsky<br>Wolf Haldenstein Adler Freeman Herz LLC<br>55 West Monroe Street, Ste. 1111<br>Chicago, IL 60661<br>312-984-0000 | Attorney General Terry Goddard<br>Office of the Attorney General<br>1275 West Washington Street<br>Phoenix, AZ 85007 |
| | Attorney General Mark Bennett<br>Department of the Attorney General<br>425 Queen Street<br>Honolulu, HI 96813 |
| | Attorney General Catherine Cortez Masto<br>Office of the Attorney General<br>100 North Carson Street<br>Carson City, NV 89701-4717 |
| | Attorney General John Kroger<br>Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301-4096 |
| | Attorney General Mark Shurtleff<br>Office of the Attorney General<br>Utah State Capitol Complex<br>350 North State Street, Suite 230<br>Salt Lake City, UT 84114-2320 |