Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
George W. Sampson (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Interim Lead Counsel for Indirect
Purchaser Plaintiffs

[*Additional Counsel Listed on
Signature Page*]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPTICAL DISK DRIVE PRODUCTS ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| This Document Relates to: ALL INDIRECT PURCHASER ACTIONS | |

MDL No. 3:10-md-2143 RS

INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

Date:        January 20, 2011
Time:        1:30 p.m.
Courtroom:  3, 17th Floor
Judge:       Honorable Richard Seeborg

DATE ACTION FILED: Oct. 27, 2009

**TABLE OF CONTENTS**

I.    INTRODUCTION AND STATEMENT OF ISSUES ............................................. 1

II.   ARGUMENT ............................................................................................... 3

    A.    Plaintiffs Allege a Plausible Conspiracy Under Federal Rule of Civil
        Procedure 8 ........................................................................................... 3

        1.    The Complaint Alleges Express Agreements Between Defendants
             to Rig OEM Electronic Auctions ..................................................... 3

        2.    Defendants' Patent Pools Further Support the Plausibility of an
             ODD Price-Fixing Conspiracy ......................................................... 4

        3.    Unnatural Price Stabilization and Increases Support the Existence
             of a Price-Fixing Conspiracy ........................................................... 6

        4.    Defendants' *Twombly* Arguments Concerning the Direct
             Purchasers' Complaint Ignore Facts Alleged in the Indirect
             Purchasers' Complaint ..................................................................... 8

    B.    Indirect Purchaser Plaintiffs Have "Antitrust Standing" to Bring Their
        State Law Claims ................................................................................. 10

        1.    *Illinois Brick* Repealer States Provide Indirect Purchasers of
             Priced-Fixed Goods Standing to Bring Claims Under State Law ............... 11

        2.    Even Using the *AGC* Factors as a Guide, Plaintiffs Allege Antitrust
             Standing Under State Law ............................................................... 15

             a.    Plaintiffs Paid Overcharges for Their Purchase of ODDs
                 and ODD Products, the Prototypical Antitrust Injury that
                 the Antitrust Laws Intend to Prevent ............................................. 16

                 (1)    Defendants' Proposed "Market Participant" Test
                     Improperly Restricts Antitrust Standing ............................. 17

                 (2)    Plaintiffs are "Market Participants," Having
                     Purchased Defendants' ODDs and ODD Products .............. 19

             b.    Plaintiffs' Injury Is Sufficiently "Direct" to Satisfy *AGC* ............... 20

             c.    Plaintiffs' Claims Are Not Speculative or Duplicative, and
                 Are Able to Be Apportioned Between Injured Parties ..................... 21

    C.    FTAIA Does Not Mandate Dismissal of Plaintiffs' Claims .................................... 23

        1.    Plaintiffs' Sherman Act Claims Are Exempted from the FTAIA ............... 23

             a.    Defendants' Actions Involve Import Commerce ............................. 23

             b.    Defendants' Actions Had a Direct, Substantial and
                 Foreseeable Effect on Domestic Commerce ................................... 25

2. The FTAIA Does Not Govern Plaintiffs' State Law Claims ...................... 27

D. Applying California Law to a Nationwide Class Is Constitutional ......................... 28

1. Non-Repealer States Do Not Have a Significant Interest in Limiting Liability for These Defendants ........................................ 28

2. It Is Not Unfair or Arbitrary to Apply California Law to Foreign and California Resident Defendants Who Have Directed Price-Fixing Activities at California Businesses and Consumers ........................ 30

E. The Proposed Representatives Have Article III Standing to Pursue Claims Under the District of Columbia, Hawaii, Nebraska, New Hampshire and North Dakota's State Antitrust Statutes ................................ 32

F. Plaintiffs Plead Intrastate Commerce for Nine of the State Antitrust Claims ................................................................................................. 34

G. Plaintiffs' Response to the Effect of Certain State Amendments ........................... 36

1. Plaintiffs' New Hampshire Antitrust Claim Is Limited to 2008 and Later ....................................................................... 36

2. Defendants Incorrectly Read Oregon's Amendment ................... 36

3. Plaintiffs' Utah Antitrust Claim Is Limited to 2006 and Later .................. 37

4. Plaintiffs Served the Utah Attorney General ................................. 37

5. Plaintiffs Have Sufficiently Pled Their Florida Consumer Protection Claim ......................................................................... 37

6. Plaintiffs Plead a Violation of New York Consumer Protection Law ............................................................................. 38

7. Defendants' Argument Regarding South Carolina Ignores *Shady Grove* ..................................................................................... 39

III. CONCLUSION ........................................................................................... 40

1

## TABLE OF AUTHORITIES

2

## FEDERAL CASES

3

*Al-Kidd v. Ashcroft*
    580 F.3d 949 (9th Cir. 2009) ...................................................................3, 7

4

5

*Allstate Ins. Co. v. Hague*
    449 U.S. 302 (1981) ......................................................................................28

6

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*
    190 F.3d 1051 (9th Cir. 1999) ......................................................................16

7

8

*Animal Sci. Prods., Inc. v. China Nat'l Metals & Minerals Import & Export Corp.*
    596 F. Supp. 2d 842 (D.N.J. 2008) ...............................................................25

9

*Arandell Corp. v. Xcel Energy, Inc.*
    605 F. Supp. 2d 1118 (D. Nev. 2009) ...........................................................31

10

11

*Ashcroft v. Iqbal*
    129 S. Ct. 1937 (2009) ....................................................................................9

12

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*
    459 U.S. 519 (1983) .................................................................................passim

13

14

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*
    223 F.3d 1082 (9th Cir. 2000) ......................................................................31

15

16

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) .................................................................................passim

17

*Bhan v. NME Hosps., Inc.*
    772 F.2d 1467 (9th Cir. 1985) ......................................................................20

18

19

*Birmingham Steel Corp. v. TVA*
    353 F.3d 1331 (11th Cir. 2003) ....................................................................33

20

*Blue Shield of Va. v. McCready*
    457 U.S. 465 (1982) ..................................................................................18, 19

21

22

*California v. ARC Am. Corp.*
    490 U.S. 93 (1989) ........................................................................................27

23

24

*Carpet Grp. Int'l v. Oriental Rug Importers Assn., Inc.*
    227 F.3d 62 (3rd Cir. 2000) ..........................................................................24

25

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*
    370 U.S. 690 (1962) ........................................................................................3

26

27

28

*CSR Ltd. v. CIGNA Corp.*
   405 F. Supp. 2d 526 (D.N.J. 2005)................................................................25

*D.R. Ward Constr. Co. v. Rohm & Haas Co.*
   470 F. Supp. 2d 485 (E.D. Pa. 2006)........................................................12, 22

*Dole Food Co. v. Watts*
   303 F.3d 1104 (9th Cir. 2002) ...................................................................31

*Excellus Health Plan, Inc. v. Tran*
   287 F. Supp. 2d 167 (W.D.N.Y. 2003)...................................................38, 39

*Exxon Corp. v. Maryland*
   437 U.S. 117 (1978)..................................................................................27

*F. Hoffman-LaRoche, Ltd. v. Empagran S.A.*
   542 U.S. 155 (2004)..................................................................................26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*
   528 U.S. 167 (2000)..................................................................................33

*FTC v. H.J. Heinz Co.*
   246 F.3d 708 (D.C. Cir. 2001).....................................................................4

*Hanover Shoe v. United Shoe Mach. Corp.*
   392 U.S. 481 (1968) .................................................................................12

*Hartford Fire Ins. Co. v. California*
   509 U.S. 764 (1993) ...........................................................................23, 24

*Illinois Brick Co. v. Illinois*
   431 U.S. 720 (1977) .........................................................................*passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*
   2010 U.S. Dist. LEXIS 98739 (N.D. Cal. Mar. 30, 2010) ......................15, 24

*In re Chocolate Confectionary Antitrust Litig.*
   602 F. Supp. 2d 538 (M.D. Pa. 2009)......................................................35, 36

*In re Dynamic Random Access Memory Antitrust Litig.*
   2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006).................................15

*In re Dynamic Random Access Memory Antitrust Litig.*
   516 F. Supp. 2d 1072 (N.D. Cal. 2007)..................................................,21, 35

*In re Dynamic Random Access Memory Antitrust Litig.*
   536 F. Supp. 2d 1129 (N.D. Cal. 2008)..................................................16, 20

*In re Flash Memory Antitrust Litig.*
    643 F. Supp. 2d 1133 (N.D. Cal. 2009)................................................................*passim*

*In re Graphics Processing Units Antitrust Litig.*
    527 F. Supp. 2d 1011 (N.D. Cal. 2007)................................................................*passim*

*In re Graphics Processing Units Antitrust Litig.*
    540 F. Supp. 2d 1085 (N.D. Cal. 2007)................................................7, 20, 34, 35

*In re Ins. Brokerage Antitrust Litig.*
    618 F.3d 300 (3d Cir. 2010) ........................................................................................4

*In re Intel Corp. Microprocessor Antitrust Litig.*
    452 F. Supp. 2d 555 (D. Del. 2006) .................................................................26, 28

*In re Intel Corp. Microprocessor Antitrust Litig.*
    476 F. Supp. 2d 452 (D. Del. 2007) ...........................................................25, 26, 28

*In re Intel Corp. Microprocessor Antitrust Litig.*
    496 F. Supp. 2d 404 (D. Del. 2007) .......................................................15, 22, 34, 35

*In re Korean Air Lines Co., Ltd. Antitrust Litig.*
    2008 U.S. Dist. LEXIS 111722 (C.D. Cal., June 25, 2008) ............................23, 26

*In re Linerboard Antitrust Litig.*
    305 F.3d 145 (3d Cir. 2002) ....................................................................................22

*In re Potash Antitrust Litig.*
    667 F. Supp. 2d 907 (N.D. Ill. 2009)...................................................................*passim*

*In re Static Random Access Memory Antitrust Litig.*
    2008 U.S. Dist. LEXIS 107523 (N.D. Cal. Sept. 29, 2008).................................15

*In re Static Random Access Memory Antitrust Litig.*
    580 F. Supp. 2d 896 (N.D. Cal. 2008).....................................................................5

*In re Sugar Indus. Antitrust Litig.*
    579 F.2d 13 (3d Cir. 1978) ......................................................................................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
    586 F. Supp. 2d 1109 (N.D. Cal. 2008)...............................................................*passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
    599 F. Supp. 2d 1179 (N.D. Cal. 2009).................................................................34

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
    267 F.R.D. 583 (N.D. Cal. 2010) ......................................................................5, 15

*In re Wellbutrin XL Antitrust Litig.*
  260 F.R.D. 143 (E.D. Pa. 2009) .................................................................. 35, 36

*In re Wiring Device Antitrust Litig.*
  498 F. Supp. 79 (E.D.N.Y. 1980) ...................................................................... 34

*Indergit v. Rite Aid Corp.*
  2009 U.S. Dist. LEXIS 42739 (S.D.N.Y. May 4, 2009) ........................................ 34

*Japan Line, Ltd. v. Cnty. of Los Angeles*
  441 U.S. 434 (1979) ...................................................................................... 27

*Keilholtz v. Lennox Hearth Prods.*
  268 F.R.D. 330 (N.D. Cal. 2010) ..................................................................... 31

*Knevelbaard Dairies v. Kraft Foods, Inc.*
  232 F.3d 979 (9th Cir. 2000) ................................................................ 22, 27, 37

*Kraft Gen. Foods, Inc. v. Iowa Dept. of Rev. & Fin.*
  505 U.S. 71 (1992) ....................................................................................... 27

*Krell v. Prudential Ins. Co. of Am.*
  148 F.3d 283 (3d Cir. 1998) ........................................................................... 33

*Kruman v. Christie's Int'l PLC*
  284 F.3d 384 (2d Cir. 2002) ....................................................................... 24, 25

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*
  140 F.3d 1228 (9th Cir. 1998) ........................................................................ 16

*Moss v. United States Secret Serv.*
  572 F.3d 962 (9th Cir. 2009) ............................................................................ 3

*Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*
  657 F. Supp. 2d 1279 (M.D. Fla. 2009) ............................................................ 37

*New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*
  651 F. Supp. 802 (S.D.N.Y. 1986) ................................................................... 18

*New York v. Feldman*
  210 F. Supp. 2d 294 (S.D.N.Y. 2002) .............................................................. 39

*Novell, Inc. v. Microsoft Corp.*
  505 F.3d 302 (4th Cir. 2007) .......................................................................... 18

*Pac. NW. Venison Producers v. Smitch*
  20 F.3d 1008 (9th Cir. 1994) .......................................................................... 27

*Parkinson v. Hyundai Motor Am.*
    258 F.R.D. 580 (C.D. Cal. 2008)..................................................................31

*Phillips Petroleum Co. v. Shutts*
    472 U.S. 797 (1985) .............................................................................*passim*

*Rains v. Flinn*
    428 F.3d 893 (9th Cir. 2005) ......................................................................10

*Ramirez v. STI Prepaid LLC*
    644 F. Supp. 2d 496 (D.N.J. 2009)............................................................34

*Roberts v. Corrothers*
    812 F.2d 1173 (9th Cir. 1987) ...................................................................23

*Safe Air for Everyone v. Meyer*
    373 F.3d 1035 (9th Cir. 2004) ...................................................................23

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*
    130 S. Ct. 1431 (2010) ...............................................................................39

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*
    2010 U.S. Dist. LEXIS 93520 (E.D. Pa., Sept. 7. 2010) ....................35, 36

*Siever v. BWGaskets, Inc.*
    2009 U.S. Dist. LEXIS 20691 (M.D. Fla. Mar. 2, 2009) ..........................37

*Stanislaus Food Prods. Co. v. USS-POSCO Indus*.
    2010 U.S. Dist. LEXIS 92236 (E.D. Cal. Sept. 3, 2010) ..........................20

*Sun Dun, Inc. v. Coca-Cola Co.*
    740 F. Supp. 381 (D. Md. 1990)................................................................34

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*
    534 F. Supp. 2d 1101 (N.D. Cal. 2007).....................................................26

*Thompson v. Clear Channel Communs., Inc.*
    247 F.R.D. 98 (C.D. Cal. 2007)................................................................19

*Turicentro, S.A. v. Am. Airlines, Inc.*
    303 F.3d 293 (3rd Cir. 2002).....................................................................24

*United Phosphorous, Ltd. v. Angus Chem. Co.*
    131 F. Supp. 2d 1003 (N.D. Ill. 2001)..................................................25, 26

*United States v. Container Corp. of Am.*
    393 U.S. 333 (1969) .....................................................................................6

*WrestleReunion, LLC v. Live Nation TV Holdings, Inc.*
   2008 U.S. Dist. LEXIS 61428 (M.D. Fla. Aug. 4, 2008)......................................37

## STATE CASES

*California v. Levi Strauss & Co.*
   715 P.2d 564 (Cal. 1986)...........................................................................29

*City of New York v. Smokes-Spirits.Com, Inc.*
   911 N.E.2d 834 (N.Y. 2009) .....................................................................38

*Clayworth v. Pfizer, Inc.*
   233 P.3d 1066 (Cal. 2010)........................................................................29

*Clothesrigger, Inc. v. GTE Corp.*
   191 Cal. App. 3d 605 (1987) ....................................................................31

*Cox v. Microsoft Corp.*
   778 N.Y.S.2d 147 (N.Y. App. Div. 2004)..............................................38, 39

*Diamond Multimedia Sys., Inc. v. Superior Court*
   968 P.2d 539 (Cal. 1999)..........................................................................29

*Discover Bank v. Superior Court*
   113 P.3d 1100 (Cal. 2005)........................................................................29

*Freeman Indus., LLC v. Eastman Chem. Co.*
   172 S.W.3d 512 (Tenn. 2005) ..................................................................35

*Hurtado v. Superior Court*
   522 P.2d 666 (Cal. 1974).............................................................28, 30, 31

*Kanne v. Visa U.S.A. Inc.*
   723 N.W.2d 293 (Neb. 2006) ........................................................14, 15, 16

*LaChance v. U.S. Smokeless Tobacco Co.*
   931 A.2d 571 (N.H. 2007).........................................................................36

*Lorix v. Crompton Corp.*
   736 N.W.2d 619 (Minn. 2007) .............................................................14, 18

*Lovinger v. Lane Cnty.*
   138 P.3d 51 (Ore. Ct. App. 2006)............................................................36

*Meyers v. Bayer AG*
   735 N.W.2d 448 (Wis. 2007) ...................................................................36

*Norwest Mortg., Inc. v. Superior Court*
   72 Cal. App. 4th 214 (1999) .....................................................................32

*Olstad v. Microsoft Corp.,*
    700 N.W. 2d 139 (Wis. 2005) ......................................................................... 35

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*
    647 N.E.2d 741 (N.Y. 1995) ........................................................................... 38

*Paltre v. Gen. Motors Corp.*
    810 N.Y.S.2d 496 (N.Y. App. Div. 2006) ...................................................... 39

*Southard v. Visa U.S.A. Inc.*
    734 N.W.2d 192 (Iowa 2007) ............................................................ 14, 15, 16

*Stutman v. Chem. Bank*
    731 N.E.2d 608 (N.Y. 2000) .................................................................... 38, 39

*Wershba v. Apple Computer, Inc.*
    91 Cal. App. 4th 224 (2001) ........................................................................... 31

*Whipple v. Howser*
    632 P.2d 782 (Or. 1981) ................................................................................. 36

**FEDERAL CODES**

15 U.S.C.
    § 2 .................................................................................................................. 20
    § 6a .......................................................................................................... *passim*
    § 15 ............................................................................................. 2, 10, 11, 13

28 U.S.C.
    § 1292(b) ...................................................................................................... 16

**FEDERAL RULES**

Federal Rules of Civil Procedure
    8 .................................................................................................................. 1, 3
    12 .................................................................................................................... 9
    12(b)(6) ........................................................................................................... 3
    23 ............................................................................................................ 33, 34

**STATE CODES & STATUTES**

Cal. Bus. & Prof. Code
    § 16750 .......................................................................................................... 29
    § 17201 .......................................................................................................... 29
    § 17203 .......................................................................................................... 29

D.C. Code
    § 28-4501 ....................................................................................................... 33

§ 28-4508(a) ................................................................................................ 33
§ 28-4509(b) ................................................................................................ 22

Fla. Stat.
§§ 501.201, *et seq.* ..................................................................................... 37

Haw. Rev. Stat.
§ 480-1 ........................................................................................................ 33
§ 480-2 ........................................................................................................ 33
§ 480-13(c)(2) ............................................................................................. 22

740 Ill. Comp. Stat. 10/7(2) ............................................................................. 22

N.C. Gen. Stat.
§ 75.1 .......................................................................................................... 35

N.D. Cent. Code
§ 51-08.1-01 ............................................................................................... 33
§ 51-08.1-08 .......................................................................................... 22, 33

N.H. Rev. Stat. Ann.
§ 356:1 ................................................................................................... 33, 36
§ 356:11 ...................................................................................................... 33
§ 358-A:1 .................................................................................................... 33
§ 358-A:2 .................................................................................................... 36
§ 358-A:10 .................................................................................................. 33

N.M. Stat. Ann.
§57-1-33(C) ................................................................................................. 22

N.Y. Gen. Bus. Law
§ 340(6) ...................................................................................................... 22
§ 349 ...................................................................................................... 38, 39

Neb. Rev. Stat.
§ 59-821 ...................................................................................................... 33
§ 59-821.01 ................................................................................................. 22
§ 59-822 ...................................................................................................... 33
§ 59-1601 .................................................................................................... 33
§ 59-1609 .................................................................................................... 33

2009 Ore. ALS 302
§ 2 ............................................................................................................... 36

Utah Code Ann.
§ 76-10-919 ...................................................................................... 23, 33, 37

2006 Utah Laws 101 ........................................................................................ 37

1

## OTHER AUTHORITIES

2    Black's Law Dictionary 358 (9th ed. 2009) .................................................................................... 19

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION AND STATEMENT OF ISSUES

The Court will see, Defendants contort the law, as they want it to be – not as it is.

*First*, Defendants argue Indirect Purchaser Plaintiffs' complaint fails to state a claim for price-fixing, purportedly relying on Federal Rule of Civil Procedure 8's standard, as described in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  Although Defendants correctly spell the name of the case, they exhibit no similar accuracy when applying *Twombly's* principles.  To satisfy Rule 8 in the antitrust conspiracy context, *Twombly* requires only "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.[1] Here, Plaintiffs plead exact details of agreements between Defendants to bid-rig electronic auctions for optical disk drives ("ODDs") conducted by original equipment manufacturers ("OEMs").  These facts do not just suggest an agreement – ***Plaintiffs spell out specific representative agreements reached between Defendants, including the agreed upon price, down to the penny***.

Plaintiffs do not stop there.  Plaintiffs go on to allege factual specificity concerning market concentration and structure, industry meetings, unique patent pools creating high barriers to entry and a current U.S. Department of Justice criminal investigation into price-fixing by Defendants.  In addition, Plaintiffs actually show the conspiracy's impact on prices, by detailing unnatural stabilization of, and increases in, prices of ODDs and products containing ODDs ("ODD Products") during the class period.  Numerous courts recognize these types of factual allegations in the price-fixing context clearly satisfy Rule 8.

Indeed, the complaint contains such specific detail about the conspiracy to fix prices that a Defendant's lawyer represented with confidence to Judge Walker, based on his reading of the complaint's allegations:  "***They [Plaintiffs] now know more information because they have clearly gotten cooperation from at least one of the defendants who's participating in the grand***

---

[1]    All internal citations and quotations omitted and all emphasis added, unless otherwise indicated.

1    *jury proceedings*." *See* Friedman Decl., Ex. 1.[2]  As such, Defendants suspend all intellectual

2    honesty when it comes to their *Twombly* arguments here.  *See* section II.A, *infra*.

3            *Second*, Defendants claim Plaintiffs lack "antitrust standing."  Defendants' argument,

4    however, is as equally twisted as their first.  Plaintiffs bring claims under either California law or,

5    alternatively, the laws of twenty-nine states.  Each of these states expressly provides a claim under

6    state law for end-consumers (indirect purchasers) of price-fixed goods.  These states have decided

7    not to follow the Supreme Court's prudential rule against allowing indirect purchaser claims for

8    damages under section 4 of the Clayton Act, 15 U.S.C. § 15.  If the Court accepts Defendants'

9    misplaced "antitrust standing" argument here, it would in effect reverse each state's decision to

10   provide end-consumers these exact claims under state law – an incredible result, by any standard.

11   *See* section II.B, *infra*.

12           *Third*, Defendants briefly argue the Foreign Trade Antitrust Improvements Act ("FTAIA"),

13   15 U.S.C. § 6a, strips this Court of subject matter jurisdiction over Plaintiffs' federal and state law

14   claims.  Defendants are wrong to ask this Court to apply the FTAIA to Plaintiffs' state law claims;

15   the FTAIA is a federal statute *limiting application of federal antitrust law*.  Nevertheless, even if

16   the Court applies the FTAIA, Plaintiffs plead that Defendants' conduct both (1) involves import

17   commerce, and (2) proximately caused a substantial and foreseeable effect on United States

18   commerce.  It is well accepted that based on these factual allegations – which Defendants only

19   challenge facially, and thus must be accepted as true – the FTAIA does not deprive this Court of

20   subject matter jurisdiction.  *See* section II.C, *infra*.

21           *Fourth* and finally, Defendants make a series of incorrect arguments for limiting, or against

22   applying, particular state laws, once again twisting or misconstruing the law.  For one, applying

23   California law nationwide to the class's claims is constitutional.  Defendants are headquartered in

24   California or they are foreign entities, the conspiracy targeted California companies, such as

25   Hewlett-Packard Co. ("HP"), and Defendants sold products into California.  Nothing demonstrates

26   _____

27   [2]    "Friedman Decl." refers to the Declaration of Jeff D. Friedman in Support of Indirect
     Purchaser Plaintiffs' Opposition to Defendants' Motion to Dismiss First Amended Class Action
     Complaint, filed concurrently herewith.

28   IPP OPP'N TO DEFS.' MOT. TO DISMISS – No. 3:10-md-2143
     RS                                                              - 2 -

010177-12 401147 v3

1   applying California law here would unfairly upset Defendants' legitimate expectations – let alone

2   would be arbitrary or fundamentally unfair.  Moreover, no state has a greater interest in applying its

3   law than California.  *See* section II.D, *infra*.  And even if California law does not apply nationwide,

4   Defendants' arguments against bringing (or to limit) particular state law claims are patently wrong.

5   *See* sections II.E-G, *infra*.

6                                    **II.      ARGUMENT**

7   **A.      Plaintiffs Allege a Plausible Conspiracy Under Federal Rule of Civil Procedure 8**

8           In evaluating a dismissal motion under Rule 12(b)(6), the Court "accept[s] as true all facts

9   alleged in the complaint, and draw[s] all reasonable inferences in favor of the plaintiff."  *Al-Kidd v.*

10  *Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009).  The facts alleged in the complaint "must state a claim

11  that is plausible on its face."  *Moss v. United States Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009).

12          In the context of antitrust claims based on price-fixing, a complaint satisfies Rule 8 by

13  alleging "enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*,

14  550 U.S. at 555.  When assessing whether facts suggest an agreement (either tacit or express)

15  between defendants:

16                  [P]laintiffs should be given the full benefit of their proof without
                    tightly compartmentalizing the various factual components and
17                  wiping the slate clean after scrutiny of each.  The character and effect
                    of a conspiracy are not to be judged by dismembering it and viewing
18                  its separate parts, but only by looking at it as a whole.

19  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

20          The complaint, looked at in its entirety, certainly has "enough fact[s] to raise a reasonable

21  expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556.

22  Plaintiffs need only "nudge" a conspiracy from conceivable to plausible, under *Twombly*.  *Id.* at

23  570.  Here, far from simply nudging, the complaint's facts forcefully shove the existence of a

24  conspiracy beyond being plausible – to being convincingly alleged.

25          **1.      The Complaint Alleges Express Agreements Between Defendants to Rig OEM
                      Electronic Auctions**

26

27          Plaintiffs' complaint provides far more than the fair notice Rule 8 requires.  Plaintiffs plead

28  representative examples of express agreements reached in August 2006, December 2008 and

February 2009.  IPP-FAC, ¶¶ 131-39.[3]  The allegations include the price, the finishing order in the auctions and identity of the participants in each example of bid-rigging.  *Id.  See also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) ("Bid rigging . . . is quintessentially collusive behavior subject to per se condemnation under § 1 of the Sherman Act.").  Plaintiffs also describe the communication flow between competitors, including customer-sponsored supply events (IPP-FAC, ¶ 118); phone calls and e-mails during the auctions themselves (*id.*, ¶ 126); and face-to-face meetings in a coffee shop in Austin, casual dining restaurants in Houston and the lobby of a conspirator's office building in Singapore (*id.*, ¶ 128).

### 2. Defendants' Patent Pools Further Support the Plausibility of an ODD Price-Fixing Conspiracy

Attacking Plaintiffs' allegations in piecemeal fashion, Defendants suggest their control over patent pools does not add support to the plausibility of a conspiracy to fix ODD prices.  Defendants, however, completely ignore the inescapable point – these patent pools create a significant barrier to entry in the ODD market, preventing new firms from successfully entering or competing in the ODD industry.  Membership in the patent pools provides a nearly insurmountable advantage, because the patent pools exact a huge royalty from firms who are not members of the pool.  *Id.*, ¶¶ 140, 159-161.  Recent estimates suggest that royalties consumed 68 percent of the average-selling price of a DVD recorder and an even larger percentage of the cost.  *Id.*, ¶ 158.  The fact that by the first half of this decade, patent pool members controlled over ***95 percent of global ODD sales*** demonstrates the effectiveness of patent pools as a barrier to entry.  *Id.*, ¶ 145.

These patent pools and the concentrated market make a conspiracy more plausible under *Twombly*.  "Significant market concentration makes it easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level."  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 724 (D.C. Cir. 2001)  Numerous courts in this district have similarly

---

[3]   "IPP-FAC" refers to the Indirect Purchaser Plaintiffs' First Amended Class Action Complaint, ECF No. 239.

1    recognized that a concentrated market and high barriers to entry makes a conspiracy to fix prices

2    plausible under *Twombly*.[4]

3         Defendants suggest that their patent pools had pro-competitive effects, by purportedly

4    increasing output and "weeding out higher-cost producers."  This is an irrelevant argument aimed

5    at the purported ***reasonableness*** of Defendants' restraint on trade, something irrelevant to a *per se*

6    price-fixing claim, which Plaintiffs allege here.

7         Defendants' patent pools also provide industry-specific mechanisms for Defendants to

8    monitor supply and demand, and prices, to facilitate their conspiracy to fix ODD prices.  IPP-FAC,

9    ¶¶ 162-69.  Defendants respond by claiming the exchange of information through the two DVD

10   patent pools is "benign."  Plaintiffs, however, allege particular facts demonstrating these patent

11   pools have a unique structure, from which a malignant inference may be drawn:  ***A highly unique***

12   ***and malignant feature of these pools is that they are administered by conspirator parents with***

13   ***majority ownership in the respective joint ventures***.  *Id.*, ¶ 165.  ***This contrasts with every other***

14   ***patent pool examined by scholars, each of which have an independent or third-party***

15   ***administrator for the pool***.  *Id.*, ¶ 169.

16        Defendants also falsely claim these patent pools do not give them access to the type of

17   information necessary to help their conspiracy, such as the type of product produced.[5]  The

18   complaint alleges the exact opposite:  Licensees are required to report "categories and model

19   numbers of the licensed products, total quantities of sales of such products and total royalties due."

20   IPP-FAC ¶ 166.[6]  By having access to unit sales, net-sales prices, product categories, model

---

21        [4]    *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*LCD III*"), 267 F.R.D. 583, 601
22   (N.D. Cal. 2010) (relying on expert testimony that the LCD market was highly susceptible to
     cartelization and price-fixing, in part, because of barriers to entry); *In re Flash Memory Antitrust*
23   *Litig.*, 643 F. Supp. 2d 1133, 1142 (N.D. Cal. 2009) (finding sufficient "the existence of a
     concentrated market dominated by a few entities, with significant barriers to entry" to meet the
24   pleading standards of *Twombly*); *In re Static Random Access Memory Antitrust Litig.* ("*SRAM I*"),
     580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) (same).

25        [5]    Defendants' Notice of Motion and Motion to Dismiss Indirect Purchaser Plaintiffs' First
26   Amended Class Action Complaint ("Mot. to Dismiss IPP-FAC"), ECF No. 256 at 9-10.

          [6]    To be clear, Plaintiffs allege the terms of the DVD patent pools require licensees to report:
27   (i) units sold; (ii) trademarks or trade names of the products sold; (iii) the net selling price of the
     units sold; and (iv) the identity of buyers (customer lists) and suppliers.  *Id.*, ¶¶ 163-64, 166-67.

28

numbers, and supplier and customer information, the six conspirator members of the patent pools are able to determine whether shifts in industry output and prices are being caused by non-conspirator licensees or whether such fluctuations are due to cartel members cheating on cartel agreements. *Id.*, ¶ 162. Moreover, each cartel member is aware that other cartel members have access to such information, which helps deter potential cheating on cartel agreements. *See*, *e.g*., *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) ("[t]he inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition").

These facts further support the plausibility of a conspiracy to fix ODD prices. *See Flash*, 643 F. Supp. 2d at 1147 ("While these allegations [of cross-licensing and joint ventures] may not expressly state that the agreements themselves were illegal, they nonetheless may be considered with the pleadings as a whole in determining the existence of a plausible conspiracy").

### 3.     Unnatural Price Stabilization and Increases Support the Existence of a Price-Fixing Conspiracy

Defendants desperately attempt to explain away the pricing trends of ODDs and ODD Products. Plaintiffs' pricing allegations clearly show price declines rapidly slowed from their previous pace during 2004 to 2009. Stabilization of prices in the ODD industry is dramatic when compared to a similar high-tech product, hard disk drives. *See*, *e.g*., IPP-FAC, ¶¶ 201-217. For example, between 2001 and 2004 (pre-conspiracy) the average price decline for ODDs per year was -22.7 percent, compared to on average -9.5 percent per year between 2004 and 2009 (during the conspiracy). *Id.*, ¶ 205. This represents a dramatic difference, strongly demonstrating the stabilization of price decreases for ODDs. And when compared to a similar high-technology product (hard disk drives) with similar industry concentration, the unnatural stabilization is readily apparent. *Id.*, ¶ 207. Price decreases in the similar high-tech, hard disk drive market during the same two periods, 2001-2004 and 2004-2009, were -36.1 percent and -31.5 percent on average per year. *Id.* Plaintiffs also show a similar deceleration in price declines – and even price increases – for DVD players (an ODD product) during the same period. *Id.*, ¶¶ 210-11. And finally, there is also a rapid braking on price declines for the relatively new Blu-ray technology. *Id.*, ¶¶ 211-17.

1    These allegations show unnatural price movements, further suggesting an illegal agreement to fix

2    prices.[7]

3         Defendants suggest that the pricing effects of the conspiracy (the stabilizing of price

4    declines in the 2004 to 2009 period) are "inconclusive" because Plaintiffs rely on Japanese prices,

5    but do not allege that Japanese manufacturing accounts for a meaningful proportion of ODD

6    manufacturing and pricing.[8]  This argument fails for at least two reasons.  *First*, at the pleading

7    stage allegations do not need to be "conclusive."  Rather the facts need only support a finding that

8    a conspiracy is plausible.  *Second*, Plaintiffs allege (based on Defendants' statements to

9    government officials) that ODD "prices do not vary significantly in world regions."  IPP-FAC,

10   ¶ 202.  Japanese prices consequently do not vary from worldwide prices based on market share.

11        Defendants also suggest Plaintiffs fail to control for the conversion of Japanese yen into

12   dollars and the impact of the exchange rate over time.  This is incorrect.  Because there is a single

13   global price of ODDs (*id.*), the relevant dollar price of an ODD is equal to the yen price divided by

14   the yen per dollar exchange rate.  Said differently, Japanese (and Korean) prices already reflect any

15   potential impact from conversion rates.  Thus, Defendants' argument regarding the Japanese ODD

16   sales data is completely irrelevant and a red herring.[9]

17        Next, Defendants suggest that some price charts show steep price declines in 2007 and

18   2008.[10]  Again, Defendants' argument is misleading.  The chart Defendants cite shows the prices of

19   DVD players ***increasing*** in this time period, corroborating the pricing trends demonstrated by the

20   Japanese ODD sales data.  IPP-FAC, ¶ 211.  Only the ***new Blu-ray technologies*** show price

---

7    *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, ("*LCD I*") 586 F. Supp. 2d 1109, 1115 (N.D. Cal. 2008) (finding allegations of price stability in flat panel market was inconsistent with natural market forces and were sufficient to survive a motion to dismiss); *In re Graphics Processing Units Antitrust Litig.* ("*GPU II*"), 540 F. Supp. 2d 1085, 1092-1095 (N.D. Cal. 2007) (same).

8    Mot. to Dismiss IPP-FAC at 19.

9    Moreover, the parties' arguments concerning the proper controls to apply to pricing data will be waged on the expert battlefield.  Resolving these issues at the pleading stage, however, fails to "accept[ ] as true all facts alleged in the complaint, and draw[ ] all reasonable inferences in favor of the plaintiff."  *Al-Kidd*, 580 F.3d at 956.

10   Mot. to Dismiss IPP-FAC at 11 (citing IPP-FAC, ¶ 211).

1    declines in 2007-2008.  Prices quickly leveled off in 2008, however, once again suggesting similar

2    collusive conduct, which halted price competition for DVD products.  *Id.*, ¶ 212.[11]

3         And Defendants' final pricing argument is absurd.  They suggest that companies would be

4    charging negative dollars for DVD and Blu-ray players if the Court accepts Plaintiffs' allegations

5    as true.  First, as a matter of basic math, a year-over-year reduction as a percentage never reaches

6    zero.  Second, technology prices have consistently been falling for decades.  Clearly computers, for

7    example, are not a "negative" purchase.[12]

8         **4.    Defendants' *Twombly* Arguments Concerning the Direct Purchasers'
              Complaint Ignore Facts Alleged in the Indirect Purchasers' Complaint**

9

10        With respect to almost all of their *Twombly* arguments, Defendants refer only to the facts

11   the direct purchasers allege (and do not allege) in their complaint.[13]  Failing to specifically address

12   the indirect purchaser complaint's factual allegations, Defendants sweepingly conclude the

13   complaint is nearly a carbon copy of the direct purchasers' complaint and then simply incorporate

14   over twenty pages of briefing by reference.[14]  Yet, even a cursory comparison demonstrates the two

15   complaints are far from carbon copies.[15]  And as Defendants acknowledge, "[a]pplying the

16

17        [11]    Defendants conjure up that when the industry agreed to adopt Blu-ray as a standard, and
         jettison the lower-cost alternative HD-DVD, the resulting lower-cost technology exit from the

18   market caused average prices to go up.  This, according to Defendants would be a matter of math,
         since the mix of lower and high cost products would have changed.  Mot. to Dismiss IPP-FAC at

19   12.  This, however, incorrectly posits that Plaintiffs' pricing allegations concerning Blu-ray players
         includes both HD-DVD and Blu-ray products.  It does not.  HD-DVDs are not a part of the product

20   mix represented in this graph.  IPP-FAC, ¶¶ 211-12.

         [12]    Defendants also are wrong to complain that Plaintiffs fail to link declining innovation with
21   Defendants' price-fixing conspiracy.  Mot. to Dismiss IPP-FAC at 12-14.  As Defendants
         consolidated the ODD industry through joint ventures, and raised barriers to entry, pressure to

22   innovate (compete) declined.  IPP-FAC, ¶ 221 ("A slackening of the pace of innovation seems to
         have coincided with the formation of the patent pool and joint ventures.").  Diminished rates of

23   technical innovation, in turn, made the maintenance of a stable price-fixing cartel easier.  *Id.*, ¶ 226.
         The presence of both of these factors here (decreasing innovation and stabilizing prices) help

24   suggest a successful price-fixing cartel is plausible here.

25        [13]    Mot. to Dismiss IPP-FAC at 7.

26        [14]    Mot. to Dismiss IPP-FAC at 7; Defendants' Motion to Dismiss Direct Purchaser Plaintiffs'
         Consolidated Amended Complaint ("Mot. to Dismiss DPP-CAC"), ECF No. 262 at 6-27.

27        [15]    *Compare* IPP-FAC at *i-ii* (Table of Contents) *with* Consolidated Direct Purchaser Class
         Action Complaint ("DPP-CAC"), ECF No. 159 at *i* (Table of Contents).

28

1   plausibility standard of *Twombly* is 'a context-specific task.'"[16]  Despite this "context-specific

2   task," Defendants argue the direct purchasers' complaint lacks facts that the indirect purchasers'

3   complaint includes.  Even though the direct purchasers' complaint clearly alleges facts sufficient to

4   withstand Defendants' challenge under Rule 12 and *Twombly*, Plaintiffs allege additional facts that

5   further preclude dismissal.

6          For example, Defendants argue direct purchasers simply allege "sporadic snippets" of

7   market information exchanged between Defendants.  But indirect purchasers specifically allege the

8   interrelationship between meetings and information exchanges before and after the rigging of bids

9   to enable these agreements.  IPP-FAC, ¶ 126.  The complaint includes many additional facts

10  Defendants claim are "missing" from the direct purchaser complaint:

| Defendants' Argument Against Direct Purchaser Plaintiffs | Indirect Purchaser Plaintiff Factual Allegations |
|---|---|
| Direct purchaser plaintiffs have not alleged facts "such as market shares" that would demonstrate concentration amongst the Defendants.  Mot. to Dismiss DPP-CAC, ECF No. 262 at 11. | Indirect Purchasers allege detailed market shares.  *See* IPP-FAC, ¶ 86 (Herfindahl-Hirschman Index of Concentration in ODD market). |
| The general meetings alleged by direct purchaser plaintiffs demonstrate the opportunity to conspire alone.  Mot. to Dismiss DPP-CAC, ECF No. 262 at 14-16. | Indirect Purchasers detail trade association meetings (IPP-FAC, ¶¶ 170-200), in addition to the allegations that contact information was exchanged at trade events (including customer-sponsored supply events) for the purpose of setting up future communications to discuss bid rigging and customer allocations (*Id.*, ¶ 118). |
| Direct purchaser plaintiffs fail to allege facts demonstrating a substantial relationship between price-fixing in other industries (such as LCD, CRT or DRAM and SRAM), as the direct purchasers do not allege "common conspirators" (either individually or organizationally).  Mot. to Dismiss DPP-CAC, ECF No. 262 at 21. | Indirect Purchaser Plaintiffs describe the relationship between the ODD defendants and price-fixing in other industries.  *See, e.g.*, IPP-FAC ¶ 258 (summarizing the involvement of the ODD Defendants and their related entities in various price-fixing conspiracies).  *See also id.* ¶¶ 257-276. |

23         By failing to challenge the complaint's detailed allegations, Defendants waive any such

24  arguments to support dismissal.[17]

25  _____

26      [16]   Mot. to Dismiss DPP-CAC, ECF No. 262 at 5 (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)).

27      [17]   To the extent the Court does consider Defendants' arguments raised against the direct purchasers to also apply to the indirect purchasers, Plaintiffs refer to the Direct Purchaser

28  Plaintiffs' Combined  Opposition to Defendants' Motions to Dismiss and the sections regarding the

1

**B.      Indirect Purchaser Plaintiffs Have "Antitrust Standing" to Bring Their State Law Claims**

2

3          Plaintiffs clearly have standing to bring their price-fixing claims under each state's law.

4   The only thing unclear is whether Defendants are arguing to dismiss all of Plaintiffs' state law

5   claims or only a subset for lack of "antitrust" standing.  Defendants just drop a string-cite footnote

6   listing a smattering of decisions purporting to apply federal antitrust standing analysis to eighteen

7   states' laws.[18]  Regardless, this Court should resist Defendants' approach of simply layering on top

8   of Plaintiffs' state law claims federal antitrust standing jurisprudence under section 4 of the

9   Clayton Act.

10         Simply put, each state law at issue rejects the rule enunciated in *Illinois Brick Co. v.*

11  *Illinois*, 431 U.S. 720 (1977), which does not allow indirect purchaser claims involving price-fixed

12  goods.  In doing so, these states have decided that end-consumers of price-fixed goods suffer

13  sufficiently proximate antitrust injury to bring claims under state law.

14         Therefore, in circumstances involving claims by indirect purchasers of priced-fixed goods,

15  many of the factors under *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of*

16  *Carpenters*, 459 U.S. 519 (1983), relevant to analyzing ***federal antitrust standing*** simply do not

17  apply, and others cannot be rigidly cemented on top of indirect purchasers' claims.  Attempting to

18  rigidly apply the *AGC* factors to state law indirect purchaser claims in this context is similar to

19  forcing a square peg into a round hole.

20

21

22  legal standards governing a motion to dismiss and the discussion of how the direct purchaser's complaint plausibly alleges violations of the antitrust laws.

23      [18]   Defendants are either being cagey or sloppy by not clearly stating whether their arguments apply to all of Plaintiffs' state law claims or only the states referenced in their string-cite.  *See* Mot.

24  to Dismiss IPP-FAC at 15-16 (citing the state laws of Arizona, California, D.C., Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Mexico, New York, North Dakota, South

25  Dakota, Utah, Vermont, West Virginia and Wisconsin).  Defendants do not address their *AGC* argument to the state laws of Florida, Hawaii, Illinois, Massachusetts, Minnesota, Montana, New

26  Hampshire, North Carolina, Oregon, South Carolina or Tennessee.  Defendants are precluded from introducing new arguments on reply, such as proposing that *AGC* applies to all twenty-nine states.

27  *See Rains v. Flinn*, 428 F.3d 893, 902 (9th Cir. 2005) ("issues cannot be raised for the first time in a reply brief").

28

1    Nevertheless, even if this Court performs the analytical equivalent of shoving the proverbial

2    square peg into a round hole and applies the ***relevant*** factors outlined in *AGC*, Plaintiffs have

3    standing to bring these claims.  This is because when asking the central question under *AGC* if

4    Plaintiffs' injuries are of the type the state laws intend to redress, the answer is unambiguously yes.

5    And if Defendants on reply claim Plaintiffs' injuries are "too remote," this is a matter of

6    Plaintiffs proving at trial Defendants' overcharge was indeed "passed-on" to consumers.  As

7    Justice Brennan's dissent recognized in *Illinois Brick*, direct purchasers "pass on the bulk of their

8    increased costs to consumers."  *Illinois Brick*, 431 U.S. at 764 (Brennan, J., dissenting).  Said

9    differently, the consumers are left "standing," holding the bag when the music stops.  At the

10   pleading stage, it is sufficient for Plaintiffs to plead facts concerning the economic evidence of

11   pass-on, which they have done.  IPP-FAC, ¶¶ 229-242.

12   At bottom, Defendants ask this Court to "re-write" the state legislative and judicial

13   decisions that ***do not to follow*** *Illinois Brick's* prudential concerns.  If it accepts Defendants'

14   invitation, the Court will be rejecting each state's legislative policy decision and foreclosing all

15   relief for consumers at the end of the distribution chain who purchase finished goods containing

16   price-fixed components – ***the exact fact pattern which the states sought to repeal by passing***

17   ***Illinois Brick "repealer" statutes***.

18   **1.    *Illinois Brick* Repealer States Provide Indirect Purchasers of Priced-Fixed**
         **Goods Standing to Bring Claims Under State Law**

19

20   Plaintiffs plead antitrust and consumer protection claims under the laws of twenty-nine

21   states ("*Illinois Brick* repealer states").[19]  Each state's law provides a claim for relief by indirect

22   purchasers of price-fixed goods.  Defendants argue that Plaintiffs' state law claims – or some

23   subset of these claims – should be dismissed for lack of "antitrust standing," by applying the

24   ***federal antitrust standing*** factors announced in *AGC*.  But because each state's law has already

---

25   [19]    The Supreme Court in *Illinois Brick*, "decline[d] to construe § 4 to permit offensive use of a
26   pass-on theory against an alleged violator that could not use the same theory as a defense in an
     action by direct purchasers."  *Illinois Brick*, 431 U.S. at 735.  As such, an indirect purchaser of
27   price-fixed products could not use evidence that an illegal overcharge was passed down through the
     distribution channel to the end-purchaser (the "pass-on" theory) to demonstrate injury to his
28   "business or property" within the meaning of section 4 of the Clayton Act.

spoken by rejecting the *Illinois Brick* rule against indirect purchaser claims, the Court should not simply cement the *AGC* factors on top of Plaintiffs' state law claims to assess standing. Each state's rejection of the *Illinois Brick* rule demonstrates that state's intent to provide standing under state law to indirect purchasers of price-fixed goods.

The *Illinois Brick* majority based its decision on prudential grounds.[20] But the Supreme Court recognized that legislative policy makers may disagree with these prudential concerns and choose to allow antitrust claims by indirect purchasers of price-fixed goods:

> While we do not lightly disagree with the reading of *Hanover Shoe* urged by these legislators, we think the construction of § 4 adopted in that decision cannot be applied for the exclusive benefit of plaintiffs. Should Congress disagree with this result, it may, of course, amend the section to change it.

*Illinois Brick*, 431 U.S. at 735 n.14.

State legislatures and courts interpreting state law have done exactly that – by specifically allowing indirect purchaser claims. Thus, *Illinois Brick* repealer states reflect state legislative and judicial policy decisions to allow consumers at the end of product distribution chains to seek damages, since they often "suffer[ ] the greatest, if not the most direct, injury of the price-fixing conspiracy." *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 503 (E.D. Pa. 2006). *See also Illinois Brick*, 431 U.S. at 761 ("It would indeed be paradoxical to deny recover to the ultimate consumer while permitting the middlemen a windfall recovery.") (Brennan, J., dissenting). Accordingly, these state laws recognize that indirect purchaser injuries are not "too remote," so as to deprive consumers of standing to bring these claims.

The federal antitrust standing principles announced in *AGC* six years after *Illinois Brick* did nothing to alter states' rights to provide a cause of action to indirect purchasers of goods for

---

[20] The majority's rationale was intertwined with *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), a case in which the Supreme Court previously precluded defendants from using the "pass-on" theory of overcharge to defend against antitrust allegations. Thus, after *Hanover Shoe*, the Court faced either allowing "pass-on" to be used for both a sword and a shield, or for neither. *Illinois Brick*, 431 U.S. at 724-26, 747. Because it viewed economic pass-on evidence to be very complex, and pass-on theories create the risk of either double recovery or the potential disincentive for direct purchasers to bring claims, the majority believed effective enforcement of the antitrust laws would be better served by not allowing either the offensive or defensive use of pass-on evidence. *Id.* at 745.

violating state antitrust and consumer protection law.  In *AGC*, the Supreme Court listed several

factors to guide lower courts how to determine the outer bounds of federal antitrust standing under

section 4 of the Clayton Act.  The Supreme Court found central to the inquiry of antitrust standing

is whether the alleged injury "is of the type that the antitrust statute was intended to forestall."

*AGC*, 459 U.S. at 540.

Comparing the relevant inquiry to a proximate cause analysis, Justice Stevens observed that

"the infinite variety of claims that may arise make it virtually impossible to announce a black-letter

rule that will dictate the result in every case."  *Id.* at 536.  The Supreme Court instead listed several

factors to guide courts.  In doing so, the Supreme Court specifically relied on the ***same prudential***

***concerns*** underlying *Illinois Brick*, including a strong interest in avoiding duplicative recoveries

and the complex apportionment of damages.  *Id.* at 544.

It is against this background that Defendants here argue that application of the *AGC* factors

militates against finding Plaintiffs – indirect purchasers of priced-fixed goods – have standing to

bring their state law claims.  But as the Supreme Court expressly recognized in *Illinois Brick*,

legislative bodies are free to reject its prudential concerns and allow indirect purchaser claims.

Rejecting a similar argument to the one Defendants advance here, Judge Alsup recognized this

clear principle of respecting state law in our federal system:

> Standing under each state's antitrust statute is a matter of that state's
> law.  It would be wrong for a district judge, in *ipse dixit* style, to
> bypass all state legislatures and all state appellate courts and to
> pronounce a blanket and nationwide revision of all state antitrust
> laws.  The rule urged by the defense may (or may not) be sound
> policy but that is a matter for the state policy makers to decide, not
> for a federal judge to impose by fiat.

*In re Graphics Processing Units Antitrust Litig.* ("*GPU I*"), 527 F. Supp. 2d 1011, 1026 (N.D. Cal.

2007).

Judge Illston in *LCD I*, likewise agreed with Judge Alsup and refused to sweep away state

law by bypassing state legislatures and imposing federal antitrust standing requirements.  *See LCD*

*I*, 586 F. Supp. 2d at 1123 (holding that it is "inappropriate to broadly apply the *AGC* test to

plaintiffs' claims under the repealer states' laws in the absence of a clear directive from those

1  states' legislatures or highest courts").  And notably, Defendants ***do not cite to any state legislative***

2  ***history or a single state court decision from an Illinois Brick repealer state*** that supports denying

3  standing to an end-consumer who purchases priced-fixed goods in the distribution chain.

4          In fact only three State Supreme Courts – Minnesota, Iowa and Nebraska – have decided

5  whether it is even appropriate to apply the *AGC* factors to state law claims.  And only the

6  Minnesota Supreme Court analyzes whether to apply the *AGC* factors to state law claims by

7  consumers who indirectly purchase goods in a distribution chain.  *See Lorix v. Crompton Corp.*,

8  736 N.W.2d 619 (Minn. 2007).  Minnesota finds *AGC*'s factors do not even apply in such

9  circumstances.

10         *Lorix* is very instructive because it is in the context of end-consumers purchasing finished

11  products (tires), the price of which was illegally inflated due to the price-fixing by companies

12  selling rubber-processing chemicals.  The Minnesota Supreme Court extensively analyzes whether

13  to apply *AGC* to its *Illinois Brick* repealer law, refusing to do so even though Minnesota law

14  requires "harmonizing" with federal antitrust law.  First, the court found harmonizing "relates more

15  to prohibited conduct than to who can bring a lawsuit." *Id.* at 626.  Next, the court refused to apply

16  *AGC*, because it "[did] not believe that the legislature repudiated Illinois Brick and invited indirect

17  purchaser suits only for courts to dismiss those suits on the pleadings based on the very concerns

18  that motivated Illinois Brick." *Id.* at 629.  Finally, the court concluded that the limits to state

19  standing are determined by a proximate cause analysis.  But an indirect purchaser of goods clearly

20  falls within this standard. *Id.* at 631 (finding "[t]he injury alleged – overcharge – is exactly the sort

21  that would be expected to flow from the violation").

22         The Iowa and Nebraska Supreme Courts have also analyzed standing under their states'

23  laws, guided by the *AGC* factors.  In each case these state Supreme Courts addressed Visa and

24  Mastercard's practice of tying credit and debit cards when selling payment services to merchants.[21]

25  Both courts expressly found the plaintiffs did not qualify as "indirect purchasers" under each

26

27  ───────────────
         [21]    *See Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 196-97 (Iowa 2007); *Kanne v. Visa*

28  *U.S.A. Inc.*, 723 N.W.2d 293, 298 (Neb. 2006).

IPP OPP'N TO DEFS.' MOT. TO DISMISS – No. 3:10-md-2143
RS                                                                                      - 14 -

010177-12 401147 v3

state's respective laws.[22]  Instead, plaintiffs purchased products (with cash or payment cards), and claimed all prices for all goods and services were inflated due to the tying conduct inflicted on merchants.  The courts concluded these alleged injuries were too remote for standing purposes.[23]

Accordingly, because each *Illinois Brick* repealer state has declared its intent to provide standing to indirect purchasers of price-fixed goods, the Court should deny Defendants' motion on this ground.  Moreover, as set forth below, even if the Court uses the *AGC* factors as a tool to assess Plaintiffs' standing, these factors militate in favor of standing.

### 2.    Even Using the *AGC* Factors as a Guide, Plaintiffs Allege Antitrust Standing Under State Law

Almost every court applying the *AGC* factors to end-consumers who purchase in the distribution chain finished goods containing a distinct, physically discrete price-fixed component has found standing under state law.[24]  In contrast, Defendants string cite to a list of authorities that only support the general application of the *AGC* factors to eighteen states.  But even this authority is bloated with water weight.  Defendants' authority for eleven out of eighteen states is really based on only two sets of facts.[25]

The first is Judge Hamilton's decisions in the *DRAM* litigation.  *DRAM* **is the only case** rejecting standing for state law claims by end-consumers who purchased in the distribution chain finished goods containing price-fixed, physically discrete and identifiable component parts.  After

---

[22]    *See Southard*, 734 N.W.2d at 196-97 (finding plaintiffs were not indirect purchasers "because they did not purchase, directly or indirectly, the product that is the subject of anticompetitive activity . . . debit processing services"); *Kanne*, 723 N.W.2d at 298 (finding plaintiffs "do not allege that they were injured directly, or even indirectly, by purchasing debit processing services in a chain of distribution").

[23]    *See Southard*, 734 N.W.2d at 199; *Kanne*, 723 N.W.2d at 303.

[24]    *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2010 U.S. Dist. LEXIS 98739, at *60 (N.D. Cal. Mar. 30, 2010); *LCD III*, 267 F.R.D. at 583; *Flash*, 643 F. Supp. 2d at 1153; *In re Static Random Access Memory Antitrust Litig.* ("*SRAM II*"), No. C 07-01819, 2008 U.S. Dist. LEXIS 107523 (N.D. Cal. Sept. 29, 2008); *In re Dynamic Random Access Memory Antitrust Litig.* ("*DRAM I*"), No. M 02-1486, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006); *GPU I*, 527 F. Supp. 2d at 1026; *LCD I*, 586 F. Supp. 2d at 1123.  *See also In re Intel Corp. Microprocessor Antitrust Litig.* ("*Intel III*"), 496 F. Supp. 2d 404, 409 (D. Del. 2007) (finding standing under state laws for end-consumers alleging injury based on artificially inflated price of computer microprocessors).

[25]    The remaining authorities Defendants cite are bereft of legal analysis.

1    grappling with the issue, the court erred when it applied defendants' "market participant" test.[26]

2    *See* section II.B.2.a.1, *infra*.

3    And the second group of authorities is a string of the exact same cases brought in multiple

4    states, involving Visa's and Mastercard's tying of credit and debit cards when selling payment

5    services to merchants.  But the plaintiffs were not indirect purchasers of the tied credit and debit

6    card payment services.  *See*, *e.g.*, *Southard*, 734 N.W.2d at 196-97; *Kanne*, 723 N.W.2d at 298.

7    Thus, this Court should follow the heavy weight of authority that finds, using *AGC* as a

8    guide, plaintiffs purchasing in the distribution chain price-fixed components, and who allege an

9    illegal overcharge has been passed-on, have antitrust standing under state law.  *See*, *e.g.*, *LCD I*,

10    586 F. Supp. 2d at 1123.  The *AGC* factors, each of which weigh in favor of Plaintiffs' standing

11    here, are:  (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust

12    laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the

13    harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.  *See*

14    *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc*., 140 F.3d 1228, 1232 (9th Cir. 1998).

15            **a.**       **Plaintiffs Paid Overcharges for Their Purchase of ODDs and ODD**
                          **Products, the Prototypical Antitrust Injury that the Antitrust Laws**

16                              **Intend to Prevent**

17    Plaintiffs clearly satisfy the first *AGC* factor, which is given the most weight.  This factor

18    looks at the nature of the plaintiff's injury and whether it is of the type that the antitrust laws intend

19    to prevent.  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999).  Here,

20    Plaintiffs' injuries – and the Plaintiffs themselves – are exactly ***what and who*** the states' antitrust

---

[26]    As Judge Hamilton recognized, her rulings in *DRAM* are subject to serious debate:

> [T]he court acknowledges the potentially devastating effect of this
> ruling on plaintiffs' case in chief, as well as the fact that the ruling
> itself is not without controversy or uncertainty, given the state of the
> law on the issues raised herein with respect to antitrust injury.
> Indeed, the court does not expect to be the last word on this issue.

*In re Dynamic Random Access Memory Antitrust Litig*. ("*DRAM III*"), 536 F. Supp. 2d 1129, 1142
(N.D. Cal. 2008).  In fact, the Ninth Circuit Court of Appeals granted indirect purchaser plaintiffs
permission to file an interlocutory appeal, pursuant to 28 U.S.C. § 1292(b).  But prior to the Ninth
Circuit ruling, the parties settled for more than $300 million and plaintiffs voluntarily dismissed
their appeal.

1    and consumer protection laws aim to cover.  Plaintiffs are the ultimate consumer of ODDs and

2    ODD products who paid illegally inflated prices due to Defendants' price-fixing conspiracy.

3         To escape this inescapable conclusion, Defendants resort to alchemy, selectively picking

4    pieces of sentences and dicta, mixing them together with different legal concepts to concoct their

5    elixir:  a cramped test, massively constricting the injuries state antitrust laws may reach.  If

6    swallowed, Defendants' potion would prohibit all state law claims for antitrust injuries caused by

7    price-fixing components of finished goods.  Defendants' restrictive reading of antitrust protection

8    is not only poisonous – it is wrong.

9              **(1)    Defendants' Proposed "Market Participant" Test Improperly
                        Restricts Antitrust Standing**

10        Defendants propose that the first *AGC* factor – whether antitrust law intends to prevent

11   Plaintiffs' injury – recognizes only injuries to "market participants."[27]  But the Supreme Court in

12   *AGC* itself rejected a bright-line rule as to standing.  In fact, there is no Supreme Court holding

13   which limits antitrust standing solely to participants in the immediately restrained market.  Instead,

14   the Supreme Court has held that "[i]n each case its alleged injury must be analyzed to determine

15   whether it is of the type that the antitrust statute was intended to forestall."  *AGC*, 459 U.S. at 540.

16   And Defendants' legal construct, if applied to indirect purchasers of goods, would defeat the very

17   purpose of *Illinois Brick* repealer statutes and will lead to absurd results.

18        In fact, Defendants' cramped "market participant" test would actually deprive the indirect

19   purchasers in *Illinois Brick* of standing, something clearly not contemplated by the various state

20   legislatures that specifically "repealed" the *Illinois Brick* rule to allow standing for indirect

21   purchasers of good.  In *Illinois Brick*, plaintiffs alleged the exact type of distribution chain and

22   injury Plaintiffs allege here.  Plaintiffs were "indirect purchasers of concrete block, which passes

23   through two separate levels in the chain of distribution before reaching respondents."  *Illinois*

24   *Brick*, 431 U.S. at 726.  *Illinois Brick* repealer states adhere to Justice Brennan's dissent in *Illinois*

25   *Brick*, and recognize that "in many instances, the brunt of antitrust injuries is borne by indirect

26

27        _____
          [27]   Mot. to Dismiss IPP-FAC at 17-18.

28   IPP OPP'N TO DEFS.' MOT. TO DISMISS – No. 3:10-md-2143
     RS                                                                    - 17 -

1    purchasers, often ultimate consumers of a product, as increased costs are passed along the chain of

2    distribution." *Id.* at 749 (Brennan, J., dissenting).

3         But according to Defendants' construction of the law, states choosing to repeal *Illinois*

4    *Brick* do so as an illusory act.  In rejecting the exact same "market participant" argument, the

5    Minnesota Supreme Court correctly stated, "*AGC* did not make a plaintiff's status as a consumer or

6    competitor in the restrained market a *sine qua non* of antitrust standing.  Rather, *AGC* used that

7    status as a tool to compare the plaintiff's alleged injury to the goals of antitrust law." *Lorix*, 736

8    N.W.2d at 628.  Here, Plaintiffs have been injured by overpaying for price-fixed goods – a *per se*

9    violation of antitrust law.  This is without serious question the type of injury – of primary

10   importance – state antitrust and consumer law intends to prevent.[28]

11        Practical application of Defendants' rule here is absurd.  For example, consumers here may

12   purchase stand-alone ODDs at retail, and simply attach the ODD externally to other consumer

13   electronic devices, such as a computer.  According to Defendants' argument, a consumer

14   purchasing an external ODD would be a "market participant" and have antitrust standing, because

15   a stand-alone ODD is reasonably interchangeable with other ODDs.  But if the same consumer

16   bought a computer and also paid an inflated price because it contained the same price-fixed ODD,

17   he or she would not have antitrust standing, even though suffering the same antitrust injury.  There

18   is no basis in law or reason for such an empty distinction – the defendant causes the consumer's

19   injury by the exact same conduct, and in the exact same way, against which the state antitrust laws

20   are designed to protect.

21

22   _____

23   [28]   Federal courts repeatedly reject black-letter rules designed to unduly restrict standing, such
     as Defendants' proposed "market participant" test.  *See*, *e.g.*, *Blue Shield of Va. v. McCready*, 457

24   U.S. 465, 478 (1982) (rejecting the argument that the plaintiff's injury was too remote because she
     was a subscriber to a group health plan and the conspiracy was directed by its protagonists at

25   psychologists); *LCD I*, 586 F. Supp. 2d at 1118 (rejecting defendants' proposed test of "market
     participant" and cross-elasticity requirements); *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th

26   Cir. 2007) (rejecting Microsoft's arguments under *AGC* that Novell must be a consumer or
     competitor in the same market to seek damages); *New York Citizens Comm. on Cable TV v.*

27   *Manhattan Cable TV, Inc.*, 651 F. Supp. 802, 811 (S.D.N.Y. 1986) ("The fact that the plaintiff is
     not a participant in the programmers-operators market does not deny it standing, where an impact
     on prices paid by the ultimate consumer is clearly foreseeable.").

28

**(2)    Plaintiffs are "Market Participants," Having Purchased Defendants' ODDs and ODD Products**

Plaintiffs indeed are market participants by being "consumers" of Defendants' ODDs.  A consumer is a "person who buys goods or services for personal, family, or household use, with no intention of resale."  Black's Law Dictionary 358 (9th ed. 2009).  One cannot seriously contend that when a consumer buys a computer to use (and not for resale), she is not a consumer of all of the component parts making up the whole.

In addition, certain Defendants sell ODD Products, as they manufacture and sell computers, videogame consoles, ODDs designed to attach externally to devices such as computers, and CD, DVD and Blu-ray player-recorders.  IPP-FAC, ¶¶ 6, 39-63, 68-71, 283.  Because members of these Defendant families sells ODD Products to consumers, Plaintiffs and the class may also be said to be sufficient "market participants."

Plaintiffs further allege that the markets for ODD Products and ODDs are "inextricably intertwined."[29]  An ODD is a drive, which allows electronic equipment to read the content on optical disks such as CDs or DVDs.  IPP-FAC, ¶ 72.  To function, ODDs are attached to, or contained inside, electronic equipment, such as a computer, stereo, DVD player, or videogame console.  *Id.*, ¶¶ 76-83.  ODDs make-up a substantial portion of the cost of ODD Products, and, as a result, the retail price is determined in substantial part by the cost of ODDs.  *Id.*, ¶ 235.  Thus, Plaintiffs allege facts to show the price increases for ODDs has an immediate, foreseeable, and necessary effect on the price of ODD Products.

Defendants, in turn, contend that they do not participate in the market for ODD Products or that the market for ODD Products was not "restrained" by their illegal conduct.  This is directly contradicted by the complaint's detailed allegations.[30]

---

[29]    *See Blue Shield*, 457 U.S. at 484 (finding standing because plaintiff's injury was "inextricably intertwined" with the injury the conspirators sought to inflict on the original market).

[30]    When evaluating antitrust standing on the pleadings, the court must accept Plaintiffs' allegations regarding the relevant market as true.  *See, e.g., Thompson v. Clear Channel Communs., Inc.* (*In re Live Concert Antitrust Litig.*), 247 F.R.D. 98 (C.D. Cal. 2007) (refusing to resolve dispute over market definition on motion for class certification).

1    The complaint alleges ODDs are functionally equivalent with ODDs contained in ODD

2    Products.  ODDs are a distinct, physically discrete hardware element of ODD Products.  IPP-FAC,

3    ¶ 231.  ODDs are identifiable and traceable throughout the chain of the distribution to the end user,

4    and do not undergo any alterations as they move through the chain of distribution.  *Id.*  And just as

5    the ODDs themselves can be traced through the supply chain, so can the price of the ODDs from

6    the manufacturer, to the direct purchaser OEM, to the reseller or retailer.  *Id.*, ¶ 232.  Numerous

7    courts in this District have found similar allegations regarding pass-through sufficient to

8    demonstrate harm to antitrust plaintiffs.[31]

9    Defendants mistakenly propose that the Ninth Circuit's decision in *Bhan* requires a finding

10   that the products or services at issue are reasonably interchangeable or have cross-elastic demand

11   for a plaintiff to have standing.  *See Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1471 (9th Cir.

12   1985).  No court in this district has adopted the test for defining an antitrust market as the standard

13   for determing antitrust standing.  As even Judge Hamilton noted in *DRAM III*, importing the test

14   for defining an antitrust market from Sherman Act section 2 cases into section 1 cases is flawed.[32]

15   Finally, even the Ninth Circuit in *Bhan* recognizes "that a product should not be excluded

16   from a market because it requires an additional input in order to be a reasonable substitute for other

17   products in the market."  *Bhan*, 772 F.2d at 1471.  Here, an ODD externally plugged into an

18   electronic device, such as a computer, is functionally equivalent to an ODD housed within that

19   same electronic device.

20                    **b.    Plaintiffs' Injury Is Sufficiently "Direct" to Satisfy *AGC***

21   Plaintiffs also sufficiently allege facts to demonstrate the "directness" of their injury, as

22   required under the second *AGC* factor.  Unlike the present case, the plaintiff in *AGC* was a union

23

24   _____

25   [31]  *See*, *e.g.*, *LCD I*, 586 F. Supp. 2d at 1123; *GPU II*, 540 F. Supp. 2d at 1097-99; *Flash*, 643
     F. Supp. 2d at 1154.  *See also Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-

26   0560, 2010 U.S. Dist. LEXIS 92236, at *38-*39 (E.D. Cal. Sept. 3, 2010).

     [32]  For example, importing the test for relevant market into a section 1 case would improperly
27   increase the substantive elements.  Section 1 price-fixing cases do not require a definition and
     demonstration of the relevant market.  *See DRAM III*, 536 F. Supp. 2d at 1138.

28   _____
     IPP OPP'N TO DEFS.' MOT. TO DISMISS – No. 3:10-md-2143

010177-12 401147 v3

who could not articulate its harm.[33]  Here, Plaintiffs allege their injury in detail.  The complaint

describes the physical makeup of an ODD (IPP-FAC, ¶ 72), as well as the products in which ODDs

are found and which are relevant to this case (*id.*, ¶ 6).  The cost of ODDs can be traced through the

distribution chain and isolated in the final sale price of an ODD product.  *Id.*, ¶ 231.  ODDs make

up a substantial component of the cost of ODD products and the retail price of an ODD Product is

determined in substantial part by the cost of the ODD it contains.  *Id.*  The distribution for ODDs is

short – usually the OEM direct purchasers sell ODD Products directly to end users.  *Id.*, ¶ 232.  The

intermediate markets in the distribution chain for ODD Products are very competitive, which along

with other factors, demonstrates pass-through of the overcharge.  *Id.*, ¶¶ 233-242.  The overcharge

can be measured using well-established economic theories and models.  *Id.*  In sum, because ODDs

are physically traceable, the distribution chain is short, and ODDs are key components in ODD

Products, Plaintiffs' allegations satisfy the "direct" element of *AGC*.[34]

> **c.** **Plaintiffs' Claims Are Not Speculative or Duplicative, and Are Able to Be Apportioned Between Injured Parties**

        To the extent other courts have considered the remaining three *AGC* factors in indirect

purchaser actions – the speculative measure of the harm, the risk of duplicative recovery and the

complexity in apportioning damages – these factors are dramatically discounted, as the repealer

states disclaim concern over these issues in repealing the *Illinois Brick* decision.  *See*, *e.g.*, *Intel III*,

496 F. Supp. 2d at 410 (concluding that the last three of the *AGC* factors "carry less weight in the

standing analysis in jurisdictions rejecting *Illinois Brick*").  Regardless, Plaintiffs meet each of

these factors here.

---

        [33]   *See AGC*, 459 U.S. at 539 ("It is not clear whether the Union's interests would be served or disserved by enhanced competition in the market.")

        [34]   Defendants' reliance on *DRAM II* and *In re Potash Antitrust Litig.* is misplaced.  In contrast to the allegations here, the plaintiffs in those cases failed to allege the pass through of the overcharges.  *See In re Dynamic Random Access Memory Antitrust Litig.* ("*DRAM II*"), 516 F. Supp. 2d 1072, 1092 (N.D. Cal. 2007) ("plaintiffs' complaint sets forth no allegations that demonstrate that, within the final purchase price of a given product purchased by plaintiffs for end use, the ultimate cost of the DRAM component is somehow directly traceable and/or distinguishable"); *in re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 940 (N.D. Ill. 2009) ("Of particular importance is the absence of any allegation regarding whether the parties from whom Indirect Purchaser Plaintiffs purchased fertilizer actually passed on any overcharges they may have paid from parties further up the supply chain").

1    Plaintiffs' measure of harm is non-speculative and is able to be apportioned between

2    relevant parties.  The complaint alleges pass-through of the overcharge from the OEM to the end

3    purchaser.  IPP-FAC, ¶¶ 229-242.  Economic and legal literature support the existence of the pass-

4    through of overcharges.  *Id.*, ¶¶ 236-242.  Defendants suggest that Plaintiffs' injury is too

5    speculative because the ODD is a component of a final product, such as a laptop computer, and the

6    price of a laptop is instead determined by "its processor, software, visual display panel, hard drive

7    and memory, among other things."[35]  But this argument improperly contradicts the allegations of

8    the complaint, which state that the overcharge due to the price-fixing of ODDs is traceable through

9    the ODD distribution chain.  IPP-FAC, ¶¶ 229-242.  The Ninth Circuit instructs courts against

10   deciding "disputed claims of causation and injury" on a motion to dismiss.  *Knevelbaard Dairies v.*

11   *Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000).[36]  And even if Defendants' imagined factors

12   could be considered, they fail to establish that Plaintiffs' claims are too speculative or complex.

13   Federal courts repeatedly recognize the ability of indirect purchasers to trace overcharges for

14   components through a distribution chain.[37]

15   Defendants also argue that a retailer, such as Best Buy, would be a better, "more direct"

16   (albeit still indirect) plaintiff here.  This is self-serving and wrong.  Many state laws allow

17   defendants to defeat Best Buy's indirect purchaser claims by using a pass-on defense.[38]  For this

18   reason alone, Best Buy would not be a "better" plaintiff (unless you are a defendant, of course).

19   Thus, the *AGC* factors favor "antitrust standing" here.

20   [35]   Mot. to Dismiss IPP-FAC at 20.

21   [36]   *See also D.R. Ward*, 470 F. Supp. 2d at 502 (holding "although facts external to the
     Complaint, such as the percentage of plastic additives in the products plaintiffs purchased, carry the
22   potential to impact the causation analysis, these facts are irrelevant to the resolution of defendants'
     motion to dismiss, which relies entirely upon what the complaint states").

23   [37]   *See*, *e.g.*, *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978) (plaintiffs who
     bought candy containing the price-fixed produce, sugar, had standing because "just as the sugar
24   sweetened the candy, the price-fixing enhanced the profits of the candy manufacturers"); *In re*
     *Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002) (holding plaintiffs that had purchased
25   corrugated sheets or boxes from defendants that fixed linerboard prices had standing, even though
     "linerboard was a mere ingredient" in the cardboard boxes purchased by plaintiffs).

26   [38]   *See*, *e.g.*, D.C. Code § 28-4509(b); Haw. Rev. Stat. § 480-13(c)(2); 740 Ill. Comp. Stat.
27   10/7(2); Neb. Rev. Stat. § 59-821.01; N.M. Stat. Ann. §57-1-33(C); N.Y. Gen. Bus. Law § 340(6);
     N.D. Cent. Code § 51-08.1-08(4); Utah Code Ann. § 76-10-919(6).

28   IPP OPP'N TO DEFS.' MOT. TO DISMISS – No. 3:10-md-2143
     RS                                                                        - 22 -

     010177-12 401147 v3

1    **C.    FTAIA Does Not Mandate Dismissal of Plaintiffs' Claims**

2           Defendants also argue dismissal under the FTAIA, 15 U.S.C. § 6a.  But the FTAIA does

3    not bar Plaintiffs' claims under the Sherman Act, and it does not even apply to Plaintiffs' state-law

4    claims.  Because Defendants mount a facial attack (only challenging the allegations in the

5    complaint), in reviewing Defendants' FTAIA challenge, the Court must "presume [Plaintiffs']

6    allegations to be true and resolve all reasonable inferences in [Plaintiffs'] favor."  *In re Korean Air*

7    *Lines Co., Ltd. Antitrust Litig.*, MDL No. 07-01891, 2008 U.S. Dist. LEXIS 111722, at *6-*7 (C.D.

8    Cal., June 25, 2008).  The Court should not attempt to resolve factual issues regarding jurisdiction

9    at this stage, because any factual issues are intertwined with the merits and neither side submits

10   factual evidence outside the complaint in support of their arguments.[39]

11          **1.    Plaintiffs' Sherman Act Claims Are Exempted from the FTAIA**

12          The FTAIA does not bar Plaintiffs' claims.  Plaintiffs allege a conspiracy aimed at raising

13   the price of ODDs and ODD Products in the United States.  Even after passage of the FTAIA, "it is

14   well established by now that the Sherman Act applies to foreign conduct that was meant to produce

15   and did in fact produce some substantial effect in the United States."  *Hartford Fire Ins. Co. v.*

16   *California*, 509 U.S. 764, 796 (1993).

17          FTAIA contains two separate exceptions to ensure antitrust cases with domestic nexus will

18   proceed:  antitrust cases (1) involving "import commerce"; or (2) foreign acts that cause a "direct,

19   substantial, and reasonably foreseeable effect" on domestic commerce.  *See* 15 U.S.C. § 6a.  *See*

20   *also Potash*, 667 F. Supp. 2d at 925-26.  Plaintiffs allege both.[40]

21          **a.    Defendants' Actions Involve Import Commerce**

22          Defendants strain to argue this case does not involve "import commerce."  But they simply

23   cannot overcome the central purpose of their alleged conspiracy was to sell ODDs with artificially

24   inflated prices for import into the U.S.  This kills their argument.

---

25          [39]    *See*, *e.g.*, *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039-40 (9th Cir. 2004); *Roberts*
26   *v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

          [40]    Defendants facially attack the Court's subject matter jurisdiction under FTAIA.
27   Accordingly, the Court must "presume [plaintiffs'] allegations to be true and resolve all reasonable
     inferences in [plaintiffs'] favor."  *Korean Air Lines*, 2008 U.S. Dist. LEXIS 111722, at *6-*7.

28

Key to analyzing whether a complaint's allegations involve "import commerce" is determining whether the "object of the conspiracy" was to import goods into the U.S.  *See Kruman v. Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002).[41]  Defendants aimed their conspiracy to inflate prices at ODDs to be imported into the United States.  Defendants' conspiracy includes bid rigging, aimed at major American manufacturers such as Dell and HP, through manipulation of electronic auctions held in the United States.  IPP-FAC, ¶¶ 118-139, 278, 280-82.  These rigged bids could not occur, and the resulting orders could not be filled, without the plan to import ODDs into the United States.  Indeed, there would be no point to the bid-rigging if it was not tied to a subsequent import.  Further, Dell and HP alone "account for approximately 40 percent of the United States market, accounting for roughly 10 million units shipped within the United States per year."  *Id.*, ¶ 282.  It simply strains credulity for Defendants to argue that import commerce was not a central part of the alleged conspiracy.

This simple logic leads courts to conclude that "import commerce" is involved when a conspiracy necessarily encompasses, and results in, the import of goods.  For example, in *Potash*, it was enough that defendants (predominantly foreign entities) had fixed prices internationally and then sold their product in the U.S. "directly or through [their] affiliates."  *Potash*, 667 F. Supp. 2d at 927.[42]  Plaintiffs make the same allegations here.  *See, e.g.*, IPP-FAC, ¶¶ 39-42, 44-49, 51-59, 61-62, 68-71.

In contrast, Defendants' authorities regarding "import commerce" are distinguishable because there are no allegations that any (1) goods had been imported into the U.S. in connection with the conspiracy, or (2) U.S. citizen purchased any related goods in the U.S.[43]  Defendants also

---

[41]    *See also Hartford Fire*, 509 U.S. at 796 (FTAIA does not bar cases regarding "foreign conduct . . . meant to produce . . . substantial effect in the [U.S.]").

[42]    *See also Carpet Grp. Int'l v. Oriental Rug Importers Assn., Inc.*, 227 F.3d 62, 72-73 (3rd Cir. 2000) (foreign defendants, who sold rugs, took anticompetitive actions with regard to U.S. trade fairs); *CRT*, 2010 U.S. Dist. LEXIS 98739, at *57 (in case alleging U.S. consumers paid inflated prices for goods as a result of foreign price-fixing, FTAIA did not apply because plaintiffs "alleged a conspiracy . . . which involved a substantial amount of import and domestic commerce, and which targeted and injured American consumers").

[43]    *See, e.g.*, *Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293 (3rd Cir. 2002) (case alleged price-fixing in travel-agent commissions; no goods were imported); *Kruman*, 284 F.3d at 395-96

rely on cases that do not address the import-commerce exception at all.[44]  Therefore, Defendants

are simply off base when they read these cases to require Plaintiffs to allege Defendants themselves

imported the products for the "import commerce" rule to apply.  Rather, the cases simply stand for

the proposition that the "import commerce" exception does not apply where an import to the U.S.

is not an object of the conspiracy.  They do not govern here, where importation into the U.S. is an

object of the price-fixing conspiracy.

           **b.**    **Defendants' Actions Had a Direct, Substantial and Foreseeable Effect on Domestic Commerce**

Nevertheless, even if Plaintiffs' claims did not involve import commerce (which they do),

Plaintiffs allege a conspiracy that had a direct, substantial and foreseeable effect on domestic

commerce.  The conspiracy includes extensive collusive meetings at U.S. locations (IPP-FAC,

¶¶ 173, 175, 177, 179, 181-82, 184-190, 193, 196), U.S. co-conspirators, directly affiliated with

foreign Defendants (*id.*, ¶¶ 45, 49, 55, 62, 68-71), specific targeting of the U.S. markets (*id.*,

¶ 102), rigging of U.S. customer auctions, who account for 40 percent of U.S. computer sales (*id.*,

¶¶ 118-139, 278, 280-82), adverse effects on U.S. competition, innovation, and U.S. prices (*id.*,

¶¶ 201-242), and purchases of artificially inflated ODDs and ODD Products by consumers

throughout the U.S. (*id.*, ¶¶ 14-38, 201-242).

The Supreme Court makes clear in its central case on the scope of FTAIA that allegations

such as these are cognizable:

> The issue before us concerns (1) significant foreign anticompetitive
> conduct with (2) an adverse domestic effect. . . .  In more concrete
> terms, this case involves vitamin sellers around the world that agreed
> to fix prices, leading to higher vitamin prices in the United States. . . .

(did not involve import commerce because conspiracy was "directed at controlling the prices they charged for their services in foreign auctions"); *Animal Sci. Prods., Inc. v. China Nat'l Metals & Minerals Import & Export Corp.*, 596 F. Supp. 2d 842, 876-77 (D.N.J. 2008) (plaintiffs alleged only a generalized international conspiracy without alleging that prices rose domestically); *CSR Ltd. v. CIGNA Corp.*, 405 F. Supp. 2d 526, 539-542 (D.N.J. 2005) (case involved insurance purchased by foreign company from foreign company, with no related goods or services imported into the U.S.).

[44]   *See In re Intel Corp. Microprocessor Antitrust Litig.* ("*Intel II*"), 476 F. Supp. 2d 452, 456-57 (D. Del. 2007); *United Phosphorous, Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003, 1008-18 (N.D. Ill. 2001).

> We conclude that, in this scenario, a purchaser in the United States could bring a Sherman Act claim under the FTAIA based on domestic injury. . . .

*F. Hoffman-LaRoche, Ltd. v. Empagran S.A.*, 542 U.S. 155, 159 (2004).

As *Empagran* makes clear, United States courts have subject matter jurisdiction over allegations of higher U.S. prices caused by international price-fixing conduct. Indeed, the court in *Korean Air Lines*, a case involving a foreign conspiracy to fix the prices of air travel between Korea and the U.S., concluded bluntly: "A conspiracy to fix the prices charged for the service of flying passengers between Korea and the U.S. has a direct, substantial, and reasonably foreseeable effect on domestic commerce: higher prices in the U.S." *Korean Air Lines*, 2008 U.S. Dist. LEXIS 111722, at *20.[45] This is precisely what Plaintiffs allege.

In virtually every case Defendants rely on, there were neither related imports to the U.S., nor allegations of domestic purchases or significant effects on domestic prices. *See also United Phosphorous*, 131 F. Supp. 2d at 1008-18 (plaintiff corporation was unable to demonstrate any effect on its business, its business plan, or prices charged to American consumers). At least on its surface, the one exception appears to be *Intel II*. But the court there only held that FTAIA barred plaintiffs' claims seeking to recover for **foreign consumers**. *See Intel II*, 476 F. Supp. 2d at 456. *Intel II* concerned indirect purchasers, and the court simply applied the holding *In re Intel Corp. Microprocessor Antitrust Litig.* ("*Intel I*"), 452 F. Supp. 2d 555, 559-63 (D. Del. 2006). *Intel I* held that the plaintiff, AMD, (who was the direct target of the antitrust activity) could not pursue claims that were "based on alleged lost sales of AMD's microprocessors to foreign customers." *Id.* at 563. Neither *Intel I*, nor *II*, bears on purchases by **United States consumers** of price-fixed products whatsoever.

Defendants propose a rule that would exclude from United States jurisdiction foreign acts to fix prices of products sold in the United States. No court has ever reached such a staggering conclusion, and this Court should not be the first.

---

[45]  *See also Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 534 F. Supp. 2d 1101, 1113 (N.D. Cal. 2007) ("payment of artificially high prices by a victim of price-fixing is one way to establish a domestic effect").

1       **2.      The FTAIA Does Not Govern Plaintiffs' State Law Claims**

2               Defendants contend, with remarkably sparse analysis, Plaintiffs' state law claims do not

3       reach where the Sherman Act cannot.  Defendants are wrong again.

4               It is clear that federal antitrust laws do not expressly or impliedly preempt state antitrust

5       laws that provide for additional claims or broader remedies.  "Congress has not pre-empted the

6       field of antitrust law."  *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989).  Therefore, "state

7       causes of action are not pre-empted solely because they impose liability over and above that

8       imposed by federal law."  *See id.* at 105.[46]

9               Nor are the state-law claims "preempted" because Plaintiffs' allegations address in part

10      actions undertaken by foreign entities.  Defendants have not elaborated on this argument, but the

11      Foreign Commerce Clause only affects state laws that either "impair federal uniformity in an area

12      where federal uniformity is essential," *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448

13      (1979), or discriminate between domestic and foreign commerce, *Kraft Gen. Foods, Inc. v. Iowa*

14      *Dept. of Rev. & Fin.*, 505 U.S. 71, 79 (1992).  *See also Pac. NW. Venison Producers v. Smitch*, 20

15      F.3d 1008, 1014 (9th Cir. 1994).  Neither is true here.  The state antitrust laws apply equally to all

16      antitrust violations, regardless of whether the violations involve foreign actors or conduct.

17              Further, federal uniformity is not required in this area.  Indeed, federal and state antitrust

18      rules already provide for significant disparity in the types of violations they recognize, the most

19      obvious being the differences in treatment of indirect purchasers.  *See, e.g.*, *ARC Am.*, 490 U.S. at

20      102-104.  There is certainly no basis for contending that allowing the state-law claims to proceed,

21      even if the Sherman Act claim could not, would create "the potential for international retaliation."

22      *Kraft*, 505 U.S. at 79.  If anything, allowing Plaintiffs' state law claims to proceed here is

23      consistent with the federal government's position on these matters, given the federal investigation

24      of Defendants' ODD practices and the past federal prosecution and conviction of Defendants'

25      officers and employees for similar conduct.  IPP-FAC, ¶¶ 243-276.

26      _____

27          [46]   *See also Exxon Corp. v. Maryland*, 437 U.S. 117, 134 (1978) (even where Maryland statute
        might have had an "anticompetitive effect," the statute was not preempted); *Knevelbaard*, 232 F.3d
        at 993 ("neither the Sherman Act nor the Commerce Clause preempts state antitrust laws").

28      IPP OPP'N TO DEFS.' MOT. TO DISMISS – No. 3:10-md-2143
        RS                                                                        - 27 -

        010177-12 401147 v3

1    Defendants' primary case, *Intel II*, 476 F. Supp. 2d at 457-58, despite mentioning the

2    Foreign Commerce Clause, does not perform the analysis required to determine if that clause

3    actually forecloses on state-law claims.  In addition, as described above, *Intel II* held only that

4    Sherman Act claims and state-law claims cannot recover on behalf of ***foreign*** customers based on

5    ***foreign*** purchases.  *See id.  See also Intel I*, 452 F. Supp. 2d at 559-563.  The case has no

6    application here, where the Plaintiffs and class members are U.S. residents, and the allegations

7    concern domestic purchases at inflated prices.

8    **D.     Applying California Law to a Nationwide Class Is Constitutional**

9    Contrary to Defendants' suggestion, the United States Supreme Court's decision in *Phillips*

10   *Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), supports applying California law nationwide here.

11   *Shutts* makes clear it is constitutional to do so unless:  (1) a material conflict of law exists with a

12   state that has a recognizable interest in applying its law instead of California law; ***and*** (2) there are

13   not significant contacts or aggregation of contacts with California, making application of its law

14   fundamentally unfair or arbitrary.  *Id.* at 821-22.  The facts here pass this test.

15   **1.     Non-Repealer States Do Not Have a Significant Interest in Limiting Liability
     for These Defendants**

16

17   The mere existence of conflicting laws between jurisdictions is not enough to establish a

     constitutional violation.  Otherwise, choice-of-law rules applying a forum state's law that conflicts

18   with another state's law would be *de facto* unconstitutional.  As *Shutts* recognizes, "in many

19   situations a state court may be free to apply one of several choices of law."  *Id.* at 823.[47]  Thus,

20   "[a]lthough the two potentially concerned states have different laws, there is still no problem in

21   choosing the applicable rule of law where only one of the states has an interest in having its law

22   applied."  *Hurtado v. Superior Court*, 522 P.2d 666, 670 (Cal. 1974).  Constitutional concerns will

23   only trigger when faced with conflicting state laws, if the non-forum state has significant interests

24   in applying its laws to the case at hand.

25

26   _____
         [47]   *See also Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981) (finding constitutional application
27   Minnesota law, even though it conflicted with Wisconsin law, and decedent lived, took out
     insurance policies and was killed in Wisconsin).

28

1    Defendants here fail to demonstrate that the ***non-repealer*** states have significant interests in

2    applying those states' laws ***to this case***.  *See id.* at 672.  In fact, Defendants fail to identify any

3    particularized interests non-repealer states have in applying their law to the parties here.

4    Generally, three types of recognizable interests exist:  (1) compensation for victims; (2)

5    deterrence of conduct; and (3) limitations, or lack thereof, on recoverable damages.  *Id.*  California

6    has strong interests in applying its law here – non-repealer states do not.

7    California has a strong interest in deterring illegal conduct by companies located within its

8    borders, and compensating victims.  California permits indirect purchasers to pursue damages,

9    thereby demonstrating an interest in compensation for victims.  Cal. Bus. & Prof. Code § 16750(a).

10   Moreover, the Cartwright Act permits treble damages – demonstrating on its face a state interest in

11   deterring conduct, as the damages by definition exceed the loss to the plaintiff.  *Id.*  The California

12   Supreme Court has expressly held that the "purposes of the private damages action for violations of

13   the Cartwright Act include disgorgement and deterrence as well as compensation."  *California v.*

14   *Levi Strauss & Co.*, 715 P.2d 564, 571 (Cal. 1986).  More recently, it has emphasized that

15   enforcement of these laws provide important "therapeutic effect upon those sellers who indulge in

16   fraudulent practices" and protect "legitimate business enterprises by curtailing illegitimate

17   competition."  *Discover Bank v. Superior Court*, 113 P.3d 1100, 1105 (Cal. 2005).  And in

18   *Clayworth*, the California Supreme Court emphasized the goal of deterrence is the Cartwright Act's

19   "primary concern."  *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066 (Cal. 2010).  California's Supreme

20   Court also emphasizes California's interest in policing its corporate citizens, even where this means

21   that California's laws will be applied to nonresidents.  *See Diamond Multimedia Sys., Inc. v.*

22   *Superior Court*, 968 P.2d 539, 557 (Cal. 1999).  This is because "California also has a legitimate

23   and compelling interest in preserving a business climate free of fraud and deceptive practices."  *Id.*

24   And California permits non-California residents to bring a cause of action under

25   California's Cartwright Act and the Unfair Competition Law.  Both of these statutes provide

26   remedy to any "person" injured, and do not impose a residency requirement.  *See* Cal. Bus. & Prof.

27   Code §§ 16750, 17201, 17203.

28

In contrast, Defendants do not establish (or even offer) a significant interest that non-repealer states have in applying their laws *to the parties here*.  Although limiting liability is an interest, the "interest in limiting the amount of recovery . . . is directed at resident defendants not resident plaintiffs."  *Hurtado*, 522 P.2d at 674.  ***And none of the Defendants are residents of a non-repealer state here***.[48]  Instead, each Defendant either has headquarters in California or is a foreign entity.

Defendants swing and miss by relying heavily on the *GPU I* decision.  There, Judge Alsup found "[p]laintiffs have not shown that California has a greater interest in applying its law than other states."  *GPU I*, 527 F. Supp. 2d at 1027.  The *GPU I* decision did not analyze what interest, if any, non-repealer states had in applying its laws to the defendants in the litigation.  Simply making a generic claim that another state's law limits damages does not establish an overriding interest to deny that state's residents recovery in a California forum.  *Hurtado*, 522 P.2d at 674 (holding the foreign forum had "no interest in . . . denying full recovery to its resident plaintiffs").  Moreover, in *GPU I*, at least one defendant was a non-California resident, giving a non-forum state an interest in limiting damages for one of its own residents.  *GPU I*, 527 F. Supp. 2d at 1028.

### 2. It Is Not Unfair or Arbitrary to Apply California Law to Foreign and California Resident Defendants Who Have Directed Price-Fixing Activities at California Businesses and Consumers

In sharp contrast to the facts in *Shutts*, sufficient aggregation of contacts with the forum state – California – clearly exist here.  In particular, Defendants engaged in significant illegal activities in California, causing injury to both California and non-California residents.

Of the twenty-two defendants, all are foreign except four U.S. companies.  ***Each of these four U.S. companies is headquartered in California***.  IPP-FAC, ¶¶ 39-64.  Plaintiffs allege Defendants' conspiracy included injury producing conduct (bid-rigging of auctions) in California (*id.*, ¶¶ 132, 134, 281), increased costs of ODDs and ODD Products sold in California (*id.*, ¶¶ 1-6, 15, 45, 55, 62, 303(b), 340(e)), and the conspiracy targeted HP, a California resident (*id.*, ¶¶ 132,

---

[48]  Contrast *Shutts*, where Oklahoma was defendant's principal place of business – not Kansas, the forum state attempting to apply Kansas law nationwide.  *See Shutts,* 472 U.S. at 799.

134, 281).  In addition, trade association meetings occurred in California, which the main players in this conspiracy attended.  *Id.*, ¶¶ 173-79, 181, 183-190.

As to foreign Defendants, they had no reasonable expectation of a particular state law applying to their illegal conduct, other than California.  Further, by aiming their conspiratorial conduct at California, it is not fundamentally unfair or arbitrary to apply California law.  In the context of sufficient constitutional contacts for personal jurisdiction, the Ninth Circuit recognizes "conspiracy theory."  It is constitutional to exercise personal jurisdiction over a foreign co-conspirator alleged to have engaged in wrongful conduct "individually targeting a known forum resident."  *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000).[49] This theory of personal jurisdiction bolsters the constitutional application of California law nationwide under *Shutts*.

Additionally, this case is closely comparable to *Clothesrigger*, which applies the *Shutts* test. There, the court concluded applying California law to non-resident class members was constitutional, because the defendant's principal offices were in California, and illegal conduct occurred in California.  *See Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 613 (1987).[50] Importantly, the court of appeals instructed on remand that when examining the interests of the various states, the superior court should consider that "California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery."  *Clothesrigger*, 191 Cal. App. 3d at 616 (citing *Hurtado*, 522 P.2d at 669).

---

[49]   *See also Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) ("the 'effects' test requires that the defendant allegedly have:  (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state"); *Arandell Corp. v. Xcel Energy, Inc.* (*In re W. States Wholesale Natural Gas Antitrust Litig.*), 605 F. Supp. 2d 1118, 1140 (D. Nev. 2009) ("The Court thus concludes that if a conspiracy theory of jurisdiction is viable, a plaintiff must set forth non-conclusory allegations that the defendant was a member of a conspiracy, that the defendant's or his co-conspirator's acts in furtherance of the conspiracy caused harm in the forum, and that the conspiracy individually targeted a known forum resident.").

[50]   *See also Keilholtz v. Lennox Hearth Prods.*, 268 F.R.D. 330 (N.D. Cal. 2010) (finding constitutional the application of California law nationwide based on defendant's conduct in California); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580 (C.D. Cal. 2008) (same); *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 242 (2001) (same).

1    Defendants wrongly claim *each member of the Plaintiff class* must demonstrate they have

2    sufficient contacts with California, before California law may be invoked.  *Shutts* says no such

3    thing.  *See Shutts*, 472 U.S. at 806 (rejecting argument "that unless out-of-state plaintiffs

4    affirmatively consent, the Kansas courts may not exert jurisdiction over their claims").  In fact, the

5    Supreme Court held that the Due Process Clause "need not and does not" afford absent class

6    members as much protection from state-court jurisdiction as it does defendants.  *Id.* at 811.  Thus,

7    Defendants' argument that before applying California law each class member must demonstrate

8    "sufficient California contacts" fails to square with *Shutts* itself.

9    Rather, the correct analysis focuses on whether the class members' *claims* (not the

10   claimants) are sufficiently connected to California – which they are.  In fact, Defendants' main

11   authority supports this conclusion.  In *Norwest Mortg.*, defendant's principal place of business was

12   Iowa, not California.  *See Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214 (1999).

13   Nevertheless, the court still found constitutional applying California law to *some, but not other,*

14   *non-resident* consumers.  The court recognized that "state statutory remedies may be invoked by

15   out-of-state parties when they are harmed by wrongful conduct occurring in California."  *Id.* at

16   224-25.[51]  Here, unlike the defendant in *Norwest Mortg.*, U.S. Defendants are headquartered in

17   California and substantial wrongful conduct occurred inside California.  Thus, applying California

18   law to a nationwide class is constitutional here.

19   **E.    The Proposed Representatives Have Article III Standing to Pursue Claims Under the**
        **District of Columbia, Hawaii, Nebraska, New Hampshire and North Dakota's State**
20      **Antitrust Statutes**

21   As an alternative to applying California law to a nationwide class, the Indirect Purchaser

22   Plaintiffs bring claims under twenty-nine states' antitrust and consumer protection laws.

23   Defendants argue that the Indirect Purchaser Plaintiffs lack standing to assert claims under the state

24

25

26   _____
        [51]    The court found California law should not apply only to those non-California-resident
27   consumers injured exclusively by conduct occurring outside California's borders, in light of
        defendant residing in Iowa, not California.  *Id.* at 225.

28

laws of District of Columbia, Hawaii, Nebraska, New Hampshire and North Dakota.  They are incorrect.[52]

> A plaintiff has Article III standing if:  (1) [he or she] has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).  Here, the class representatives paid higher prices for ODDs and ODD Products caused by Defendants' price-fixing conspiracy.  IPP-FAC, ¶¶ 1-6.  This concrete and actual injury is fairly traceable to the actions of Defendants and thus, Article III standing has been met.

Defendants' argument invents a further standing element – residency within a particular state.  Nowhere within Article III or the states' statutes is such a requirement found.  The five states Defendants challenge allow any ***person*** to file suit.  ***There is no residency requirement***.[53]  Contrast this with other state statutes that do impose a residency requirement, such as Utah.[54]  Because facially none of the states require the named plaintiff to be a resident of that state, the existing proposed class representatives have Article III and statutory standing to pursue these claims.

Moreover, in the Rule 23 context, a named plaintiff need only satisfy the constitutional requirements of Article III and establish individual standing.  "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense."  *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 306-307 (3d Cir. 1998).  Courts and leading authorities

---

[52]   If the Court determines that these statutes require a resident of the state, representatives from Hawaii and Nebraska are willing to act as named plaintiffs.  Friedman Decl., ¶ 2.  In addition, Plaintiffs should be provided with a "reasonable period of time" to add additional class representatives for the remaining states.  *See Birmingham Steel Corp. v. TVA*, 353 F.3d 1331, 1339 (11th Cir. 2003).

[53]   *See* D.C. Code §§ 28-4501, 28-4508(a); Haw. Rev. Stat. §§ 480-1, 480-2; Neb. Rev. Stat. §§ 59-821, 59-822; Neb. Rev. Stat. §§ 59-1601, 59-1609; N.H. Rev. Stat. Ann. §§ 358-A:1, 358-A:10; N.H. Rev. Stat. Ann. §§ 356:1, 356:11; N.D. Cent. Code §§ 51-08.1-01, 51-08.1-08.

[54]   *See, e.g.*, Utah Code Ann. § 76-10-919 ("[*a*] ***person who is a citizen of this state*** or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages").

1    on class actions agree that this is because absent class members are passive participants in the

2    litigation, in contrast to the named plaintiff who is actively prosecuting the litigation on their

3    behalf.  *See Ramirez v. STI Prepaid LLC*, 644 F. Supp. 2d 496, 504-505 (D.N.J. 2009).  Passive

4    class members need not make any individual showing of standing, because standing focuses on

5    whether the plaintiff is properly before the court, not whether represented parties or absent class

6    members are properly before the court.  *Id.*  Whether or not the named plaintiff may assert the

7    rights of absent class members is neither a standing issue nor an Article III case or controversy

8    issue.  Instead, this question turns on whether the prerequisites of Rule 23 have been met, namely

9    typicality, adequacy, and whether common questions of fact and law predominate.  *Id. See also*

10   *Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361, 2009 U.S. Dist. LEXIS 42739, at *13-*15 (S.D.N.Y.

11   May 4, 2009).

12   **F.      Plaintiffs Plead Intrastate Commerce for Nine of the State Antitrust Claims**

13            Defendants contend Plaintiffs fail to adequately plead a connection between their claims of

14   intrastate commerce for nine states.  However, a close look reveals Defendants' arguments fail.

15            For the **District of Columbia** and **New York**, Defendants cite two cases limiting the D.C.

16   and New York statutes because the courts erroneously concluded that federal law preempted the

17   field, foreclosing the state laws' from reaching conduct outside the state.[55]  However, as explained

18   in section II.C.2, *supra*, both the Supreme Court and the Ninth Circuit have made it clear that state

19   laws are not preempted.

20            With regard to **Mississippi**, Defendants rely on a case that is a clear outlier.  The majority of

21   the courts considering the issue, including several in this District, find that a plaintiff only needs to

22   allege that a broader antitrust conspiracy affected the prices of goods in Mississippi.[56]  Plaintiffs

23   have done so here.  IPP-FAC, ¶ 349.

24

25

26            [55]    *See Sun Dun, Inc. v. Coca-Cola Co.*, 740 F. Supp. 381, 396 (D. Md. 1990); *In re Wiring Device Antitrust Litig.*, 498 F. Supp. 79, 84 (E.D.N.Y. 1980).

27            [56]    *See*, *e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*LCD II*"), 599 F. Supp. 2d 1179, 1188-89 (N.D. Cal. 2009); *GPU II*, 540 F. Supp. 2d at 1099; *Intel III*, 496 F. Supp. 2d at 412-13.

28

1   Similarly, with **Nevada**, in every decision that Plaintiffs are aware of, courts have held that

2 to state a claim under Nevada's antitrust statute, a plaintiff need only allege that prices were

3 artificially inflated in Nevada due to a national or international price-fixing conspiracy.[57]  Plaintiffs

4 have done so.  IPP-FAC, ¶ 351.

5   The same is true with regard to **North Carolina**.  The statute in question makes it clear that

6 it applies to a "conspiracy in restraint of trade or commerce in the State of North Carolina."  N.C.

7 Gen. Stat. § 75.1.  Under a common-sense reading of the statute, it is not the conspiracy that must

8 be in North Carolina, but rather the restrained trade or commerce that must be in North Carolina.

9 Indeed, at least one court has recently held that a plaintiff states a claim under this provision by

10 alleging that a product with an artificially inflated price was sold in North Carolina.[58]  Plaintiffs

11 have done so.  IPP-FAC, ¶ 355.

12   Defendants also miss the mark on **South Dakota's** antitrust statute, which is read as broadly

13 as possible, and requires only an allegation that goods were sold in the state at artificially inflated

14 prices, even if the price-fixing conspiracy occurred elsewhere.[59]  Indeed, even Defendants' cited

15 case, *DRAM II*, 516 F. Supp. 2d at 1098, does not hold to the contrary.  Rather, the *DRAM II* court

16 held that South Dakota requires only that a plaintiff alleges some effect on South Dakota

17 commerce, which had not happened in that case.  Plaintiffs have made the necessary allegations

18 here.  IPP-FAC, ¶ 358.

19   Defendants' arguments about **Tennessee** and **Wisconsin** law also come up short.  Both

20 states' antitrust laws apply to foreign price-fixing conspiracies that have a substantial effect on in-

21 state commerce.[60]  In applying this standard, courts hold that a plaintiff need only allege the price-

22

---

23  [57] *See*, *e.g.*, *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
No. 04-5898, 2010 U.S. Dist. LEXIS 93520, at *30-*31 (E.D. Pa., Sept. 7, 2010); *In re Wellbutrin*
24 *XL Antitrust Litig.*, 260 F.R.D. 143, 163-64 (E.D. Pa. 2009); *Intel III*, 496 F. Supp. 2d at 413-14.

25  [58] *See*, *e.g.*, *Sheet Metal Workers*, 2010 U.S. Dist. LEXIS 93520, at *38-*40.

26  [59] *See*, *e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 581 (M.D.
Pa. 2009); *Intel III*, 496 F. Supp. 2d at 414; *GPU II*, 540 F. Supp. 2d 1099.

27  [60] *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 523-24 (Tenn. 2005);
*Olstad v. Microsoft Corp.*, 700 N.W. 2d 139, 158 (Wis. 2005).

28
IPP OPP'N TO DEFS.' MOT. TO DISMISS – No. 3:10-md-2143
RS               - 35 -

010147-12 401147 v3

1    fixing conspiracy resulted in artificially inflated prices in Tennessee or Wisconsin.[61]  The

2    complaint satisfies this standard.  IPP-FAC, ¶¶ 359, 363.

3         *West Virginia* also does not require the level of intrastate activity Defendants claim.  Courts

4    repeatedly hold that the sort of allegations in the complaint (*id.*, ¶ 362), which allege that West

5    Virginia consumers have paid higher prices as a result of Defendant's price-fixing conspiracy, are

6    sufficient.[62]

7    **G.    Plaintiffs' Response to the Effect of Certain State Amendments**

8         **1.    Plaintiffs' New Hampshire Antitrust Claim Is Limited to 2008 and Later**

9         Plaintiffs concede that their claim under the New Hampshire antitrust law, N.H. Rev. Stat.

10   Ann. § 356:1, is limited to January 1, 2008 and forward.  However, Plaintiffs do not make any

11   similar concession with regard to their New Hampshire consumer-protection claim, N.H. Rev. Stat.

12   Ann. § 358-A:2, as that statute has always provided standing for indirect purchasers.[63]

13        **2.    Defendants Incorrectly Read Oregon's Amendment**

14        Defendants mistakenly claim that Oregon's broadening of its antitrust statute to allow suits

15   by indirect purchasers only applies to January 1, 2010 and later.  The bill, H.B. 2584, was signed

16   into law on June 19, 2009.  It applies to "actions commenced on or after the effective date" of the

17   bill.  2009 Ore. ALS 304, § 2.  Thus, the applicability of the new provisions depend on when an

18   action is commenced (before or after January 1, 2010), not when the conduct or harm at issue

19   occurred.  This is a clear expression of legislative intent as to the bill's retroactivity.[64]

---

[61]    *See*, *e.g.*, *Meyers v. Bayer AG*, 735 N.W.2d 448, 451 (Wis. 2007); *Sheet Metal Workers*, 2010 U.S. Dist. LEXIS 93520, at *43-*46 (Wisconsin); *Chocolate Confectionary*, 602 F. Supp. 2d at 581-82 (Wisconsin and Tennessee); *Wellbutrin*, 260 F.R.D. at 166-67 (Wisconsin and Tennessee); *GPU II*, 540 F. Supp. 2d at 1099 (Tennessee).

[62]    *See*, *e.g.*, *Sheet Metal Workers*, 2010 U.S. Dist. LEXIS 93520, at *41-*43; *Chocolate Confectionary*, 602 F. Supp. 2d at 582; *Intel III*, 496 F. Supp. 2d at 414.

[63]    *See*, *e.g.*, *LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571, 575-81 (N.H. 2007).

[64]    *See*, *e.g.*, *Whipple v. Howser*, 632 P.2d 782, 788 (Or. 1981) (where statute does not apply to actions "commenced" before the effective date, "the statute would apply to actions 'commenced' after the effective date, regardless of when such actions accrued"; if legislature wanted to base applicability on when an action "accrued," it would have used the word "accrued"); *Lovinger v. Lane Cnty.*, 138 P.3d 51, 56-57 (Ore. Ct. App. 2006) ("Whether a statute applies prospectively or retroactively is a question of legislative intent.").

1   The bill became effective on signing by the governor, on June 19, 2009, and according to

2   Defendants, it did not become effective until January 1, 2010.[65]  The first indirect-purchaser

3   complaint filed in this case occurred on February 4, 2010.[66]  The indirect-purchaser claims under

4   the Oregon statute are therefore not limited to January 1, 2010 forward.

5       **3.    Plaintiffs' Utah Antitrust Claim Is Limited to 2006 and Later**

6   Plaintiffs concede that their claim under the antitrust statute, Utah Code Ann. § 76-10-919,

7   is limited to the time period of May 1, 2006, forward.  *See* 2006 Utah Laws 101.

8       **4.    Plaintiffs Served the Utah Attorney General**

9   Defendants claim that Plaintiffs did not indicate service of the complaint on the Utah

10  attorney general, as required by Utah Code § 76-10-919(9).  Plaintiffs did so, though, as noted in

11  their certificate of service.[67]

12      **5.    Plaintiffs Have Sufficiently Pled Their Florida Consumer Protection Claim**

13  Defendants claim broadly that all claims brought under the Florida Deceptive and Unfair

14  Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*, must be pled according to the

15  heightened standards of Rule 9(b), but courts actually apply the heightened standard only when the

16  FDUTPA claims sound in fraud.[68]  The price-fixing allegations in this case do not sound in fraud,

17  and therefore are not subject to a heightened pleading standard.[69]

18

19
20  [65]   Defendants do not indicate how they arrived at a January 1, 2010 effective date for a bill signed in June 2009.  However, even assuming they are correct about the date the amendment became effective, that does not affect Plaintiffs' argument.

21
22  [66]   *See* Indirect Purchaser Plaintiffs' Class Action Complaint dated Feb. 4, 2010, filed in *Johnson v. Sony Optiarc, Inc., et al.*, No. 3:10-cv-00507 (N.D. Cal.).

23  [67]   *See* Consolidated Class Action Complaint, ECF No. 158 at 137.

24  [68]   *See*, *e.g.*, *Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*, 657 F. Supp. 2d 1279, 1290 (M.D. Fla. 2009) (Rule 9 standards do not apply to all FDUTPA claims); *Siever v. BWGaskets, Inc.*, No. 6:08-cv-1388-Orl-19GJK, 2009 U.S. Dist. LEXIS 20691, at *7 n.1 (M.D. Fla. Mar. 2, 2009) ("Rule 9(b) applies to FDUTPA claims that are grounded in fraud.");

25  *WrestleReunion, LLC v. Live Nation TV Holdings, Inc.*, No. 8:07-cv-2093, 2008 U.S. Dist. LEXIS 61428, at *4-*8 (M.D. Fla. Aug. 4, 2008) (claims based on fraudulent inducement); *Potash*, 667 F.

26  Supp. 2d at 946-47.

27  [69]   *See*, *e.g.*, *Knevelbaard*, 232 F.3d at 984 ("Antitrust cases are not to be judged by a higher or different pleading standard than other cases.").

28

1    In any event, regardless of the pleading standard, Plaintiffs plead their FDUTPA claims

2    with more than adequate sufficiency.  Defendants want the Court to focus on a single line in the

3    complaint to construe the FDUTPA claim, rather than the entirety of the complaint, which sets

4    forth in great detail, the nature of the alleged conspiracy, the times and places the conspirators met,

5    the manner in which the conspiracy was effectuated, and the conspiracy's effect on pricing.  *See*

6    *generally* section II.A, *supra*.

7            **6.       Plaintiffs Plead a Violation of New York Consumer Protection Law**

8            Defendants also contend that N.Y. Gen. Business Law § 349 is more narrow than it actually

9    is.  To state a claim under section 349, a plaintiff need only allege "[f]irst, that the challenged act or

10   practice was consumer-oriented; second, that it was misleading in a material way; and third, that

11   the plaintiff suffered injury as a result of the deceptive act."  *Stutman v. Chem. Bank*, 731 N.E.2d

12   608, 611-12 (N.Y. 2000).[70]  Acts and conduct are sufficiently "consumer-oriented" if they "have a

13   broader impact on consumers at large."  *Oswego Laborers' Local 214 Pension Fund v. Marine*

14   *Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995).

15           In applying these standards, courts repeatedly hold that a plaintiff need only allege antitrust

16   behavior that had an effect on prices paid by New York consumers and which had an element of

17   deception.  In *GPU I*, for example, the court ruled that the plaintiffs stated a claim by alleging

18   merely the existence of a price-fixing scheme, and defendants "hid the alleged conspiracy from

     plaintiffs, resulting in plaintiffs paying higher prices."  *GPU I*, 527 F.  Supp. 2d at 1030.[71]

19

20           Plaintiffs have met this standard.  Plaintiffs allege a price-fixing scheme that resulted in

21   consumers, including New York consumers, paying inflated prices for ODDs and ODD Products.

22   *See*, *e.g*., IPP-FAC, ¶¶ 354, 374.  In addition, Plaintiffs allege that Defendants took great pains to

     conceal their conspiracy from the public, and in particular consumers, by meeting secretly and

23
     _____

24      [70]    *See also City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009).

25      [71]    *See also Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 180 (W.D.N.Y. 2003)
     (allegation that health plan made misleading statements to physicians in order to eliminate
26   competition was sufficient); *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 148 (N.Y. App. Div. 2004)
     (allegations of monopolistic behavior unknown to consumers which artificially inflated prices);
27   *LCD I*, 586 F. Supp. 2d at 1128 (sufficient to allege "a price-fixing scheme that resulted in New
     York consumers paying inflated prices for LCD panels and that defendants took efforts to conceal
     their agreements").

28

reaching secret agreements, and by repeatedly making it appear that the ODD industry was undergoing a price war, when in fact Defendants colluded to control the ODD market and artificially inflate prices.  *Id.*, ¶¶ 284-301.  This is more than adequate under section 349.

Defendants' arguments should be disregarded.  Defendants claim, based entirely on *Flash*, 643 F. Supp. at 1160, that section 349 requires a plaintiff to specify a particular misrepresentation aimed at New York consumers.  However, *Flash* appears to have been the only case to have reached that conclusion.[72]  Other courts have rejected the argument outright.[73]  Defendants' proposed rule would improperly limit section 349 to cases of fraudulent misrepresentation.  And in any event, Plaintiffs allege numerous misleading public statements Defendants made about competition in the ODD market.  IPP-FAC, ¶¶ 288-293.

Defendants also argue Plaintiffs do not allege that their conduct was likely to mislead or deceive an average consumer.  Yet, as already noted, numerous courts hold that price fixing and other antitrust allegations extremely similar to those in this case are sufficient to state a claim under section 349.  Further, Defendants are wrong to suggest that a reasonable consumer would not have been deceived when she paid an artificially inflated price for an ODD Product as a result of a massive, secretive conspiracy to fix prices in the market and mislead the public with statements claiming that a price war existed.  Thus, Plaintiffs plead deceptive and misleading acts.

Finally, Defendants suggest Plaintiffs must plead reliance.  It is clear, however, "reliance is not an element of a section 349 claim."  *Stutman*, 731 N.E.2d at 612.

### 7.    Defendants' Argument Regarding South Carolina Ignores *Shady Grove*

Defendants contend that Plaintiffs' consumer-protection claim under South Carolina law should be limited or dismissed because the South Carolina statute specifies that no representative actions may be brought.  This argument directly contradicts *Shady Grove Orthopedic Assocs., P.A.*

---

[72]    Defendants also cite at the tail end of their argument to *Paltre v. Gen. Motors Corp.*, 810 N.Y.S.2d 496, 498 (N.Y. App. Div. 2006), in which the court held, without elaboration, that the plaintiffs in that case had failed to satisfy either the "consumer-oriented" prong or the "misleading" prong of the section 349 elements.  The *Paltre* court did not hold that section 349 is limited to claims of fraudulent misrepresentation.

[73]    *See*, *e.g.*, *LCD I*, 586 F. Supp. at 1127-138.  And yet other courts have found allegations sufficient even where there was no allegation of a statement made to a consumer.  *See*, *e.g.*, *Excellus Health Plan*, 287 F. Supp. 2d at 180; *Cox*, 778 N.Y.S.2d at 148; *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (sufficient to allege "that defendants engaged in a scheme to manipulate public stamp auctions").

1   *v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437-442 (2010).  There, the Supreme Court ruled that when a

2   case is pending in federal court, federal procedural law determines class certification, not state law.

### III.   CONCLUSION

4         For all the reasons stated above, Indirect Purchaser Plaintiffs respectfully request that this

5   Court deny Defendants' motion to dismiss the Indirect Purchaser Plaintiffs' complaint.

6   DATED:  November 19, 2010                    HAGENS BERMAN SOBOL SHAPIRO LLP

8                                                By _____/s/ Jeff D. Friedman_____
                                                        JEFF D. FRIEDMAN

9                                                Shana E. Scarlett (217895)
10                                               715 Hearst Avenue, Suite 202
                                                 Berkeley, CA  94710
11                                               Telephone: (510) 725-3000
                                                 Facsimile:  (510) 725-3001
12                                               jefff@hbsslaw.com
                                                 shanas@hbsslaw.com

13                                               Steve W. Berman (*Pro Hac Vice*)
                                                 George W. Sampson (*Pro Hac Vice*)
14                                               HAGENS BERMAN SOBOL SHAPIRO LLP
                                                 1918 Eighth Avenue, Suite 3300
15                                               Seattle, WA  98101
                                                 Telephone: (206) 623-7292
16                                               Facsimile:  (206) 623-0594
                                                 steve@hbsslaw.com
17                                               george@hbsslaw.com

18                                               Interim Lead Counsel for Indirect
                                                 Purchaser Plaintiffs

19
20                                               Thomas V. Girardi (36603)
                                                 Stephen G. Larson (145225)
                                                 Michael M. Kowsari (186899)
21                                               GIRARDI & KEESE
                                                 1126 Wilshire Blvd.
22                                               Los Angeles, CA  90017
                                                 Telephone: (213) 977-0211
23                                               Facsimile:  (213) 481-1554
                                                 tgirardi@girardikeese.com
24                                               slarson@girardikeese.com
                                                 mkowsari@girardikeese.com

1                                   Charles E. Tompkins

Robert E. Ditzion

SHAPIRO HABER & URMY LLP

53 State Street

Boston, MA  02109

Telephone: (617) 439-3939

Facsimile:  (617) 439-0134

ctompkins@shulaw.com

rditzion@shulaw.com

Steve D. Larson

Mark A. Friel

STOLL STOLL BERNE LOKTING

& SHLACHTER P.C.

209 Southwest Oak Street

Portland, OR  97204

Telephone: (503) 227-1600

Facsimile:  (503) 227-6840

slarson@stollberne.com

mfriel@stollberne.com

Additional Counsel for Indirect

Purchaser Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

                                        /s/ Jeff D. Friedman
                                    JEFF D. FRIEDMAN

## Mailing Information for a Case 3:10-md-02143-RS

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lee Albert**
  lalbert@murrayfrank.com

- **Joseph M. Alioto , Sr**
  jmalioto@aliotolaw.com,esexton@aliotolaw.com

- **Mario N. Alioto**
  malioto@tatp.com

- **U.S. Department of J Antitrust Division**
  sidney.majalya@usdoj.gov

- **Arthur Nash Bailey , Jr**
  abailey@hausfeldllp.com

- **David H. Bamberger**
  david.bamberger@dlapiper.com,jessica.green-johnson@dlapiper.com

- **Brian Joseph Barry , Esq**
  bribarry1@yahoo.com

- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com

- **John Dmitry Bogdanov**
  jdb@coopkirk.com

- **W. Joseph Bruckner**
  wjbruckner@locklaw.com,sipeem@locklaw.com,pottehn@locklaw.com

- **Cullen Byrne**
  whparish@parishsmall.com

- **Deana Louise Cairo**
  deana.cairo@dlapiper.com

- **William G. Caldes**
  bcaldes@srkw-law.com

- **Henry A. Cirillo**
  hcirillo@steyerlaw.com,lrorem@steyerlaw.com

- **Craig C. Corbitt**
  ccorbitt@zelle.com

- **Joseph W. Cotchett**
  jcotchett@cpmlegal.com

- **John F. Cove , Jr**
  jcove@bsfllp.com,dscott@bsfllp.com,brichardson@bsfllp.com,sphan@bsfllp.com,aloeb@bsfllp.com,vpooni@bsfllp.com,cduong@bsfllp.com,dnasca@bsfllp.com,jlipton@bsfllp.co

- **Michael E. Criden**
  meriden@cridenlove.com

- **Thad Alan Davis**
  Thad.Davis@ropesgray.com,michelle.visser@ropesgray.com,mark.popofsky@ropesgray.com,jane.willis@ropesgray.com,CourtAlert@RopesGray.com,rachel.rubenson@ropesgray.

- **Manuel Juan Dominguez**
  mdominguez@bermandevalerio.com,ecf@bermandevalerio.com,eavila@bermandevalerio.com

- **Mary Jane Edelstein Fait**
  fait@whafh.com,curro@whafh.com

- **Eric B. Fastiff**
  efastiff@lchb.com,aruiz@lchb.com,btroxel@lchb.com

- **Linda M. Fong**
  lfong@kaplanfox.com,kweiland@kaplanfox.com

- **Erin Gail Frazor**
  erin.frazor@dlapiper.com

- **Jeff D Friedman**
  jefff@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Mark A. Friel**
  mfriel@stollberne.com,dhaner@stollberne.com,slarson@stollberne.com

- **Qianwei Fu**
  qfu@zelle.com

- **Jeffrey B. Gittleman**
  jgittleman@barrack.com,rbranch@barrack.com

- **Brendan Patrick Glackin**
  bglackin@lchb.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com

- **Marc Jeffrey Greenspon**
  mgreenspon@bermandevalerio.com

- **Francis M. Gregorek**
  gregorek@whafh.com

- **Paul R. Griffin**
  pgriffin@winston.com,DocketSF@winston.com

- **Terry Gross**
  terry@gba-law.com,monique@gba-law.com,joann@grossbelsky.com,adam@gba-law.com

- **Laura Ann Guillen**
  lguillen@winston.com,lschuh@winston.com,RPringle@winston.com,JSwartz@winston.com,docketsf@winston.com,PGriffin@winston.com,ndelich@winston.com

- **Daniel E. Gustafson**
  dgustafson@gustafsongluek.com,sdensmore@gustafsongluek.com

- **Amy Harrington**
  amy@amyharringtonlaw.com

- **Casey Ann Hatton**
  chatton@wilkesmchugh.com

- **Michael D. Hausfeld**
  mhausfeld@hausfeldllp.com,firmfilings@hausfeldllp.com

- **Christopher T. Heffelfinger**
  cheffelfinger@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Christopher B. Hockett**
  chris.hockett@dpw.com,ecf.ct.papers@dpw.com,felicia.yu@davispolk.com

- **Steven Christopher Holtzman**
  sholtzman@bsfllp.com,jchavez@bsfllp.com,irivera@bsfllp.com,cseki@bsfllp.com,cduong@bsfllp.com,sphan@bsfllp.com

- **Derek G. Howard**
  dhoward@minamitamaki.com,muhl@minamitamaki.com,lbattista@minamitamaki.com,jlee@minamitamaki.com,byamauchi@minamitamaki.com,cparker@minamitamaki.com,sear

- **Patrick Howard**
  phoward@smbb.com,cdfonda@smbb.com

- **Matthew J. Jacobs**
  mjacobs@mwe.com,aleonetti@mwe.com

- **Lisa Marie Kaas**
  KaasL@dicksteinshapiro.com,AndersonP@dicksteinshapiro.com

- **Robert N. Kaplan**
  rkaplan@kaplanfox.com

- **Sherman Kassof**
  heevay@att.net,heevay@yahoo.com

- **Jeffrey L. Kessler**
  jkessler@dl.com,rskridul@dl.com,kcullen@dl.com,mlo@dewey.ballantine.com,courtalert@dl.com

- **Jason Kilene**
  jkilene@gustafsongluek.com

- **Laurence D. King**
  lking@kaplanfox.com,kweiland@kaplanfox.com

- **Andrew Scirica Kingsdale**
  akingsdale@lchb.com

- **Kimberly Ann Kralowec**
  kkralowec@kraloweclaw.com,ggray@kraloweclaw.com,enewman@kraloweclaw.com

- **James G. Kress**
  kressj@howrey.com

- **Lara Meredith Kroop**
  Lara.Kroop@usdoj.gov

- **Manish Kumar**
  manish.kumar@usdoj.gov

- **Susan Gilah Kupfer**

skupfer@glancylaw.com,jbarton@glancylaw.com,sfreception@glancylaw.com

- **Stephen Gerard Larson**
  slarson@girardikeese.com,sshayesteh@girardikeese.com,tfaust@girardikeese.com

- **Andrew David Lazerow**
  lazerowa@howrey.com,bennettc@howrey.com,kellyj@howrey.com

- **Christopher L. Lebsock**
  clebsock@hausfeldllp.com,asandberg@hausfeldllp.com

- **Belinda S. Lee**
  Belinda.Lee@lw.com,#SFDocket@LW.com

- **Jack Wing Lee**
  jlee@MinamiTamaki.com,muhl@minamitamaki.com,lbattista@minamitamaki.com,pdomin@MinamiTamaki.com,cparker@MinamiTamaki.com,seant@MinamiTamaki.com

- **Michael Paul Lehmann**
  mlehmann@hausfeldllp.com

- **Aron K. Liang**
  aliang@cpmlegal.com,edetert@cpmlegal.com,oszeto@cpmlegal.com,jperez@cpmlegal.com

- **Alexis Jane Loeb**
  aloeb@bsfllp.com

- **Sarah Robin London**
  slondon@lchb.com

- **Kevin Bruce Love**
  klove@cridenlove.com

- **Sidney A. Majalya**
  sidney.majalya@usdoj.gov,liliana.vallejo@usdoj.gov

- **Pamela J. Marple**
  pmarple@mwe.com

- **Emily L. Maxwell , Esq**
  MaxwellE@howrey.com,jamesjimmy@howrey.com

- **Kevin C. McCann**
  kevinmccann@paulhastings.com,bellasatra@paulhastings.com,ingridholthuis@paulhastings.com,rebeccatorres@paulhastings.com,seanunger@paulhastings.com

- **Timothy Charles McHugh**
  timmchugh@wilkesmchugh.com

- **Brendan Andrew McShane**
  brendan.mcshane@lw.com,coleen.byrne@lw.com,#sfdocket@lw.com,gina.tercero@lw.com

- **Douglas A. Millen**
  doug@fklmlaw.com

- **Samuel R. Miller**
  srmiller@sidley.com,hebalogi@sidley.com

- **Theresa Driscoll Moore**
  TMoore@aliotolaw.com

- **Paolo Morante**
  paolo.morante@dlapiper.com,grissell.kessler@dlapiper.com

- **Gregg Aaron Myers**
  myersa@howrey.com,MarkowitzK@howrey.com,amyers777@yahoo.com

- **Elizabeth R. Odette**
  erodette@locklaw.com,jmware@locklaw.com

- **Steig David Olson**
  solson@hausfeldllp.com

- **Simon Bahne Paris**
  sparis@smbb.com,cdfonda@smbb.com,alafontaine@smbb.com

- **William Henry Parish**
  whparish@parishsmall.com,toup@parishsmall.com

- **Robert M. Partain**
  rpartain@oslaw.com,aowen@oslaw.com

- **Joseph Mario Patane**
  jpatane@tatp.com

- **Mark Samuel Popofsky**
  Mark.Popofsky@ropesgray.com

- **Robert Benard Pringle**
  rpringle@winston.com,jmlopez@winston.com

- **Elizabeth Cheryl Pritzker**
  ecp@girardgibbs.com,tie@girardgibbs.com,act@girardgibbs.com,smq@girardgibbs.com,amv@girardgibbs.com,ale@girardgibbs.com,cme@girardgibbs.com

- **Julio J Ramos**
  ramosfortrustee@yahoo.com

- **Beko Osiris Ra Reblitz-Richardson**
  brichardson@bsfllp.com

- **Rosemary M. Rivas**
  rrivas@finkelsteinthompson.com,srenwick@finkelsteinthompson.com,mpunzalan@finkelsteinthompson.com,arivas@finkelsteinthompson.com,ttien@finkelsteinthompson.com,jdit

- **Matthew W Ruan**
  mruan@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Lauren Clare Russell**
  laurenrussell@tatp.com

- **George W. Sampson**
  george@hbsslaw.com

- **Jennifer Sarnelli**
  jsarnelli@gardylaw.com

- **Guido Saveri**
  guido@saveri.com

- **Joseph Richard Saveri**
  jsaveri@lchb.com,dclevenger@lchb.com

- **Richard Alexander Saveri**
  rick@saveri.com

- **Shana E. Scarlett**
  shanas@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Francis Onofrei Scarpulla**
  fscarpulla@zelle.com,mdavis@zelle.com

- **Todd Anthony Seaver**
  tseaver@bermandevalerio.com

- **Craig P. Seebald**
  cseebald@mwe.com

- **Aaron M. Sheanin**
  ams@girardgibbs.com,ras@girardgibbs.com,amv@girardgibbs.com

- **Ian T Simmons**
  isimmons@omm.com,phein@omm.com

- **Bruce Lee Simon**
  bsimon@pswplaw.com,nhalpern@pswplaw.com,bpouya@pswplaw.com,yberry@pswplaw.com,dwarshaw@pswplaw.com,jwatkins@pswplaw.com,cpearson@pswplaw.com,eklisur

- **Joshua D. Snyder**
  jsnyder@bonizack.com

- **Sylvia M. Sokol**
  sokol@mesllp.com,omar@mesllp.com

- **Eugene A. Spector**
  espector@srkw-law.com

- **Jeffrey Lawrence Spector**
  jspector@srkw-law.com

- **Allan Steyer**
  asteyer@steyerlaw.com,lrorem@steyerlaw.com,behrhart@steyerlaw.com

- **Jonathan Edward Swartz**
  jswartz@winston.com,pstruble@winston.com,DocketSF@winston.com,ndelich@winston.com

- **Neil Swartzberg**
  nswartzberg@cpmlegal.com

- **Joseph J. Tabacco , Jr**
  jtabacco@bermandevalerio.com,lcuesta@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Casandra Leann Thomson**
  casandra.thomson@lw.com

- **Charles E. Tompkins**
  ctompkins@shulaw.com,jhaney@shulaw.com

- **Clinton Paul Walker**
  cwalker@damrell.com,nweston-dawkes@damrell.com,ewelsch@damrell.com

- **Daniel Murray Wall**

dan.wall@lw.com,#sfdocket@lw.com

- **Lawrence Walner**
  walner@walnerlawfirm.com

- **Matthew McDonnell Walsh**
  mwalsh@dl.com,courtalert@dl.com

- **Ernest Warren**
  walwar@qwestoffice.net

- **Sandra D West**
  swest@dpw.com

- **Jonathan Whitcomb**
  JWhitcomb@dmoc.com

- **James Lewis Wilkes**
  jwilkes@wilkesmchugh.com

- **Steven Noel Williams**
  swilliams@cpmlegal.com,jverducci@cpmlegal.com,cwalker@cpmlegal.com,rjit@cpmlegal.com,aliang@cpmlegal.com,medling@cpmlegal.com,pmenzel@cpmlegal.com,lclark@cp

- **Jane E. Willis**
  Jane.Willis@ropesgray.com

- **Lingel Hart Winters**
  sawmill2@aol.com

- **Brad Yamauchi**
  byamauchi@MinamiTamaki.com,muhl@minamitamaki.com,lbattista@minamitamaki.com,pdomin@MinamiTamaki.com,cparker@MinamiTamaki.com,dhoward@minamitamaki.c

- **Cadio R. Zirpoli**
  zirpoli@saveri.com

- **Jason Allen Zweig**
  jzweig@kaplanfox.com,rkilsheimer@kaplanfox.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Daniel Bushell
Berman DeValerio
4280 Professional Center Drive, Ste 350
Palm Beach Gardens, FL 33410

Adam J. Levitt
Wolf Haldenstein Adler Freeman Herz LLC
55 West Monroe Street, Ste 1111
Chicago, IL 60661

Michael D Yanovsky
Wolf Haldenstein Adler Freeman Herz LLC
55 West Monroe Street, Ste 1111
Chicago, IL 60603
```