**United States District Court**
For the Northern District of California

**\*\*E-filed 8/3/11\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE OPTICAL DISK DRIVE** **ANTITRUST LITIGATION** | CASE NO. 3:10-md-2143 RS **ORDER GRANTING MOTIONS TO DISMISS, WITH LEAVE TO AMEND** |
| This Document Relates to: ALL ACTIONS | |

I. INTRODUCTION

This Multi-District Litigation arises from an alleged conspiracy beginning in 2006 among defendants to fix the prices of "Optical Disc Drives" ("ODDs") and "Optical Disc Drive Products" ("ODD Products").  Two "master" consolidated complaints have been filed—one on behalf of a putative class of "direct" purchasers of ODDs and ODD Products, and one on behalf of "indirect" purchasers.  Defendants who have appeared have jointly filed, or joined in, motions to dismiss each of the complaints.  Various smaller groupings of defendants have filed separate additional motions to dismiss, raising arguments particular to each of them.  Because plaintiffs have not alleged a plausible factual basis for inferring the existence of a conspiracy of the scope and nature alleged, the complaints must be dismissed, with leave to amend.

United States District Court

For the Northern District of California

II. BACKGROUND[1]

A. The products

An optical disc is a medium for storing data.  Familiar forms include CDs (compact discs) typically containing music or computer software, and DVDs (digital video disc or, officially, Digital Versatile Disc), often containing movies or other video content, and also used for computer software.  When first introduced to the public, optical discs only contained data files that were recorded onto them during the manufacturing process—they could be "read" but not written to, much like phonograph records of an earlier time ("read only discs"). As the technology advanced, optical discs were developed that allowed an end user to record data on a one-time basis ("recordable discs").  Eventually optical discs appeared on the market that permitted data to be recorded and re-recorded indefinitely ("rewritable discs), which are analogous to magnetic tape, or hard and floppy computer discs. In a broad sense, the technology evolved generationally from CDs to DVDs to Blu-Ray Discs ("BDs"), each with the same progression moving from read only, to recordable, and then to rewritable.

ODDs are devices that allow data to be read from and, where applicable, written to, optical discs.  ODDs are typically "backwards-compatible," – that is, an ODD that is designed to read (and perhaps write to) a more recently-developed format of optical disc usually will also be able to process older formats as well. ODDs have applications in a variety of consumer electronic devices, including desktop and laptop computers, game consoles, and camcorders.  In these applications, the ODD is typically a built-in component of the device.  Some television sets are also sold with built-in ODDs.

ODDs are also available as "stand alone" devices, in at least two forms.  First, consumers have been able to purchase stand alone CD, DVD, and Blu-Ray "players" (which may or may not also include recording capabilities), primarily designed for enjoying music or video entertainment, through personal headphones, stereo equipment, or television sets.  Second, stand alone ODDs are

---

[1]   This factual background is largely derived from the allegations of the direct purchasers' complaint.  Although substantially similar, the indirect purchasers' complaint defines the alleged conspiracy somewhat differently, and contains some additional factual allegations.   These differences are discussed further in Section IV B. below.

United States District Court

For the Northern District of California

available that are configured to be connected to computers lacking built-in ODDs, primarily for the purpose of storing data or accessing optical disc-based software, but which can also be used to play music or video on the computers.  In such a "stand alone" product, the ODD is the primary component, as contrasted, for example, to an ODD built into a computer that contains many other components performing various functions.  Nevertheless, even in such "stand alone" products, the ODD itself can still be thought of as a separate component from such other elements as the power supply, interface circuitry, and the case.[2]

To this point, the term "ODD" has been used to refer to the optical disc drive component itself, whether built-in to another device such as a computer or camcorder, or only incorporated with a power supply and sufficient additional circuitry to function as a "stand alone" device.  The Direct Purchasers' Consolidated Complaint, however, defines "ODD" differently.  Specifically, plaintiffs allege that an "ODD" is *either* a "drive[] built to be incorporated into notebook and desktop computers, camcorders and/or game consoles" *or* a "stand-alone drive[]"—i.e., a drive component assembled with a power supply and interface circuitry in a case.  The distinction is significant for this reason. There is no dispute that in the case of computers, for example, numerous other non-defendant companies purchase ODDs from defendants to be built into those other companies' computers.  As discussed below, consequences flow from whether plaintiffs can legitimately be considered "direct purchasers" of the ODDs in such instances.  It is unclear from the complaints whether there also exist manufacturers of "stand alone" DVD, CD, and Blu-Ray players who obtain the actual ODD components from defendants rather than manufacturing their own, but there appears to be no reason why that could not occur.  In such circumstances, the same issue would arise regarding whether plaintiffs can be considered "direct purchasers" or not.

Furthermore, regardless of whether or not there is any significant number of non-defendant companies producing stand alone DVD, CD, and Blu-Ray players incorporating ODDs made by defendants, there is simply no logical reason to analyze those products separately from other devices

---

[2]  For example, the indirect purchasers' complaint describes how a "consumer DVD player" can be designed simply by incorporating a "computer-type" ODD with a power supply and interface board in a case.  Indirect Purchasers' First Amended Complaint ¶¶ 82-83.

1  that include "built-in" ODDs, such as computers, game consoles, and camcorders. Rather, the only

2  useful distinction is between *any* product that includes an ODD on the one hand, and the actual

3  ODD component on the other hand, regardless of whether it is built into a stand-alone player or into

4  a more complex device with other functions.

5  The Direct Purchasers' Consolidated Complaint also contains another definitional anomaly

6  that complicates the analysis. As noted above, the direct purchasers allege a conspiracy to fix prices

7  of both ODDs (as they define them) *and* "ODD Products." The latter term is defined as inclusive of

8  the former. Thus, "ODD Product" as used by plaintiffs not only refers to the ODDs themselves, but

9  also to any computer, game console, or camcorder containing an ODD manufactured by defendants.

10  While the actual ODD components in issue in this litigation are only those manufactured by

11  defendants, the computers, game consoles, and camcorders implicated by the complaint include

12  those manufactured by numerous third parties. Again, because it has implications for plaintiffs'

13  designation as "direct purchasers," it is necessary to distinguish between the actual ODD

14  components and other products that incorporate them. Defining "ODD Products" to include

15  "ODDs" impedes that distinction.

16  Although plaintiffs' factual allegations must be accepted as true on a motion to dismiss,

17  there is no requirement to adopt the nomenclature of the complaint, particularly where doing so

18  would obfuscate rather than illuminate the dispositive issues. Accordingly, in the balance of this

19  order, the term "ODDs" will be used to refer to optical disk drive mechanisms built to be

20  incorporated into either (1) stand-alone CD, DVD, or Blu-Ray players and recorders, whether for

21  audiovisual or computer use, (2) computers, (3) game consoles, or (4) camcorders. The term "ODD

22  devices" will mean all such products (including the stand-alone players and recorders) that include

23  ODDs.[3]

24

25

26  ---

[3]  Defendants' joint motion to dismiss uses the term "Finished ODD products" similarly, although it is not entirely clear where they would categorize the stand-alone devices. Plaintiffs criticize defendants for using a term not found in the complaint, and suggest they have mischaracterized the nature of the conspiracy allegations by doing so. Because plaintiffs' definitions conflate products made by defendants with those that are not, however, more precise terminology is needed.

B. <u>The alleged conspiracy</u>

The charging allegations of the Direct Purchasers' Consolidated Complaint assert that beginning in January of 2004, "Defendants and their Co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section One of the Sherman Act."  Specifically, defendants allegedly had meetings and conversations in which they "agreed to charge prices at specified levels and otherwise to fix, increase, stabilize and/or maintain prices of ODD Products sold in the United States," and they thereafter in fact sold "ODD Products" at those artificially inflated prices.  Defendants also allegedly engaged in bid rigging, allocation of customers and markets, and artificial limiting of supplies.

As support for these charges, the complaint comprises over fifty pages of description of various aspects of the ODD and ODD devices industry, which plaintiffs assert support an inference of price-fixing.  The allegations include all of the following:


    • The "ODD industry" is highly concentrated.  Four of the named defendants jointly controlled over 80% of worldwide shipments of CD, DVD, and BD drives by volume in 2008, with another two defendants controlling over 13%.  Market concentration has been increasing as the result of certain acquisitions and joint ventures.  Some of the defendants are also major producers of ODD devices.  Sony, as an example, markets Playstation game consoles, which have a large market share.

    • Specific joint-ventures and other collaborative efforts between Taiwanese and Korean defendants on the one hand, and Japanese defendants who held key intellectual property rights on the other hand, resulted in forcing most of Taiwan's "second-tier" manufacturers and virtually all of China's manufacturers out of the "ODD industry."

    • Various manufacturing and technological issues present high barriers to entry into the market, including high licensing costs imposed by patent pools among the defendants.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

• Defendants participate in various specified trade associations that facilitate their alleged anticompetitive conduct and the making of price-fixing agreements.

• Defendants regularly attend certain trade shows, similarly giving them further opportunity to communicate and conspire.

• "ODD Products" are highly standardized, permitting consumers to view them as interchangeable, which "makes it easier to form and sustain a cartel."

• Many of the defendants have been investigated for antitrust violations involving other technology products, and in some cases found guilty.

• Several defendants engaged in bid-rigging in connection with auctions run by Dell and Hewlett-Packard for contracts to supply ODDs for use in their computers. Such bid-rigging occurred over several years, but included three auctions identified by specific dates.

• The U.S. Department of Justice is presently investigating possible criminal antitrust violations in the ODD industry.

• Certain defendants employ "Minimum Advertised Price" policies imposing limits on the prices retailers may actively promote for ODD devices.

• Some economic data purportedly shows that the "ODD market" has experienced unnatural price stability and periods of upward trends.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint that fails to state a claim upon which relief may be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555.

In deciding whether the plaintiff has stated a claim upon which relief may be granted, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987). However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).[4]

## IV.  DISCUSSION

A.  <u>The Direct Purchasers' Consolidated Complaint</u>

*1.  Illinois Brick*

The parties vigorously dispute whether the specific factual allegations of the complaint are sufficient to support the conclusions advanced by plaintiffs that a price-fixing conspiracy existed, or instead whether those allegations amount to no more than a description of ordinary and legal industry activities, combined with irrelevant accusations of unrelated wrongdoing and the inconclusive fact that a DOJ investigation is pending.  Underlying those disputes, however, is a more fundamental disagreement as to whether plaintiffs can plausibly allege a conspiracy to fix not only ODD prices, but also those of ODD Devices, and whether plaintiffs can be seen as "direct purchasers" at all.

The distinction between direct purchasers and indirect purchasers is of critical import as a result of the Supreme Court's holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  In *Illinois Brick*, the Court confronted the problem that in a manufacturing chain, the increased cost of one component of a product resulting from a price-fixing violation may very well be "passed-on" to a consumer further down the chain.  Concluding that allocating damages among those potentially injured by the price-fixing would present unworkable complexity, the Court instead adopted a bright line rule that only direct purchasers have standing under federal law to seek damages for price-

---

[4]  Subsequent to the hearing, the parties have submitted several statements of recent decisions they contend bear on the issues in this action.  In at least one instance, such a statement was simply filed, in others, they were accompanied by requests for leave to submit them, as is required by Civil Local Rule 7-3(d).  All the statements of recent decision will be deemed properly filed.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

fixing violations.  *See id.* at 745-746; *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523

F.3d 1116, 1120-21 (9th Cir. 2008) ("a bright line rule emerged from *Illinois Brick:* only direct

purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations.")

The *Illinois Brick* rule presents a fatal problem to the complaint as it is presently constituted.

As noted, plaintiffs have defined "ODD Products" to include *any* ODD device containing an ODD

manufactured by one of the named defendants.  The allegations make clear, however, that a

significant percentage of defendants' ODDs are sold to *other* companies, who are neither named as

defendants nor directly affiliated with the named defendants, for incorporation into the ODD devices

manufactured and sold by those other companies.  All of the named plaintiffs are individuals or

companies who allege only that they each purchased "ODD Products" from one or more of the

defendants.  While under plaintiffs' definitions it is at least possible that some plaintiffs may have

purchased actual ODDs from a defendant for incorporation into an ODD device manufactured by

such plaintiffs, the likelihood is that most, if not all, the plaintiffs only purchased ODD devices.[5]

Furthermore, the named plaintiffs unquestionably do *not* include such major makers of ODD

devices as HP and Dell.

Thus, while the complaint presently attempts to encompass ODD devices manufactured and

sold by non-defendant companies, plaintiffs simply are not direct purchasers of such devices within

the meaning of *Illinois Brick*.  Even in the event that one or more named plaintiff contends it is a

purchaser of actual ODDs (for its own manufacturing of ODD devices or for replacing a failed

ODD), such facts would have to be alleged.

Plaintiffs' response to this *Illinois Brick* conundrum is two-fold.  First, plaintiffs invoke a

"co-conspirator exception" to *Illinois Brick* permitting suit by persons who would otherwise be

considered indirect purchasers if they can allege that the actual direct purchaser conspired with the

defendant to set the prices the plaintiffs paid.  *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208,

1211 (9th Cir. 1984).  Plaintiffs then argue they have alleged such cooperation between defendants

---

[5]   One other somewhat more likely possibility arises.  A plaintiff may have purchased an ODD as a replacement for a failed drive in an existing ODD device.  In such circumstances, the plaintiff would qualify as a direct purchaser.

1   and unnamed co-conspirators here.  The paragraph of the complaint on which plaintiffs rely,

2   however, only alleges that, "Some of the Defendants and their Co-conspirators are also major

3   producers of products that contain ODDs."  Other complaint paragraphs that specifically identify

4   three alleged "Co-conspirators" by name fall well short of alleging facts supporting the contention

5   that they conspired with defendants to set consumer prices of DVD devices.

6        Moreover, even if the allegations were sufficient as to those particular "co-conspirators,"

7   plaintiffs have defined "ODD Products" to include devices sold by an untold number of other

8   companies.  Not only are there no facts to show such companies were also "co-conspirators," some

9   of the facts specifically pleaded and relied upon by plaintiffs for other purposes are to the contrary.

10  Specifically, plaintiffs plead that HP and Dell were *victims* of the alleged bid-rigging.  While

11  pleading in the alternative is permissible in some circumstances, those allegations are flatly

12  incompatible with a theory that HP and Dell were co-conspirators in fixing prices of the ODD

13  devices they sold.

14       Plaintiffs' second argument against the applicability of *Illinois Brick* relies on the principle

15  that its rule, "does not bar an indirect purchaser's suit where the direct purchaser is a division or

16  subsidiary of a co-conspirator."  *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326

17  (9th Cir. 1980).  Plaintiffs embrace that safe harbor by insisting "defendants include vertically-

18  integrated manufacturers that make ODD Products" and the complaint purportedly "explains the

19  corporate relationships among Defendants and the joint ventures they formed."  Fatally, however,

20  that argument at most applies to those ODD devices sold by subsidiaries and affiliates of the

21  defendants.  Once again, by defining "ODD Products" to include ODD devices sold by unrelated

22  third parties, plaintiffs have overreached.

23       Furthermore, even with respect to ODD devices sold by subsidiaries of the defendants, *Royal*

24  *Printing* merely permits suit under federal law by *indirect* purchasers notwithstanding *Illinois Brick*;

25  it does not somehow transform indirect purchasers into direct purchasers.  This complaint, however,

26  was brought on behalf of a putative class of direct purchasers, by counsel given an interim

27  appointment to represent such persons, not indirect purchasers.  While potentially curable, either by

28  expanding this complaint to include indirect purchasers who contend they have standing to assert

**United States District Court**
For the Northern District of California

1   damage claims under the Sherman Act, or by expanding the indirect purchasers' complaint to allege

2   such claims on behalf of a subclass, amendment of the pleadings will be necessary. [6]

3       Accordingly, plaintiffs have not shown, and cannot show that the claims they have currently

4   pleaded are viable in light of *Illinois Brick*.  For this reason alone, the Direct Purchasers'

5   Consolidated Complaint must be dismissed.

6

7           *2.  Plausibility*

8       The direct purchasers' attempt to include in "ODD Products" devices made and sold by

9   unrelated third parties gives rise to an additional problem, independent of the standing barrier of

10  *Illinois Brick.*  Plaintiffs allege that a relatively small number of defendants manufacture and sell

11  nearly all the ODDs presently on the market.  Assuming sufficient facts were pleaded to support a

12  conspiracy inference, it likely would be at least plausible that such a group could and would engage

13  in price fixing *of ODDs.*  By positing price-fixing of *ODD devices*, however, plaintiffs vastly

14  increase the number of entities that would have to be participating in such a conspiracy, and

15  implicate a far broader range of markets and marketing channels that the conspirators would have to

16  be shown to control.  It is one thing to say that a small number of entities have conspired to fix the

17  prices of particular products they directly sell; it is quite another to suggest that those entities have

18  somehow agreed with unnamed parties to fix the prices of products each sells.

19      Plaintiffs contend that defendants have mischaracterized the complaint by pointing out the

20  implausibility of such a vast conspiracy across different markets and involving so many unnamed

21  co-conspirators.   Rather, they insist their allegation is but a "single, intertwined, overarching"

22  conspiracy involving "ODD products" (as they define that term).  The issue, however, is not

23  whether there are multiple conspiracies or one, but whether plaintiffs have pleaded facts to make

24  any such "overarching" conspiracy plausible.  Plaintiffs rely on *Knevelbaard Dairies v. Kraft*

25  *Foods, Inc*., 232 F.3d 979 (9th Cir. 2000) for the proposition that a price-fixing conspiracy may

26  ────────────────
    [6]  Plaintiffs' counsel for the two groups should decide between them which approach is preferable,
27  if the claims are to be pursued.  Should a modification to the interim appointment order be required,
    the parties make seek one by stipulation or administrative motion brought under Civil Local Rule 7-
28  11.

United States District Court

For the Northern District of California

involve a number of arguably different products.  The alleged conspiracy in *Knevelbaard*, however, did not depend for its success on the cooperation of an untold number of additional entities who have the power to set prices for the products in dispute.

Plaintiffs also suggest that courts in this district have "routinely" accepted conspiracy allegations involving price-fixing of both an electronic component and the "finished product" containing the component.  The cases on which plaintiffs rely, however, do not go as far as they suggest.  For example, in *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 738 F.Supp.2d 1011 (N.D.Cal. 2010) the court declined to dismiss allegations of a conspiracy to fix the price not only of cathode ray tubes ("CRTs") but also of television and computer monitors that incorporated CRTs. The court specifically noted that the purported direct purchaser plaintiffs' allegations of price fixing of finished products arose "in the case of vertically integrated manufacturers who produced both CRTs and CRT Products." 738 F.Supp.2d at 1018.  Once again, the problem here is that plaintiffs are attempting to extend the price-fixing conspiracy to finished products *not* produced by the defendants, an issue not expressly addressed in *Cathode Ray*.[7]

Plaintiffs' citation to *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F.Supp.2d 1109 (N.D.Cal. 2008), is no more helpful to them.  There the court merely relied on allegations of purchases of finished products directly from alleged members of the cartel to reject an argument that plaintiffs lacked standing.  *Id.* at 1119.  As discussed above, while plaintiffs in this case do not have a standing problem with respect to any ODD devices they may have purchased directly from defendants, that does not address the plausibility of a purported price-fixing conspiracy extending even to ODD devices sold by unrelated third parties.

Finally, plaintiffs fare no better in pointing to the class certification order in the *TFT-LCD* case.  *See* 267 F.R.D. 291 (N.D.Cal.2010).  That decision reveals that the direct purchaser plaintiffs sought to define the class as only those persons who purchased "TFT-LCD panels or a product containing a TFT-LCD panel in the United States from the named defendants, any subsidiaries or

---

[7]  The *indirect purchasers*' complaint in *Cathode Ray* also described an economic mechanism whereby the defendants allegedly were able to affect the prices charged by third parties for finished products incorporating defendants' CRTs.  *Id.*  The direct purchasers' complaint here does not include any similar allegations.

United States District Court

For the Northern District of California

1    affiliates thereof, or any co-conspirators as identified in the complaint." *Id.* at 298. While it is not

2    clear from the opinion the extent to which there may in fact have been other producers of finished

3    TFT-LCD products in the market, that narrow class definition largely avoided putting in issue the

4    existence of a broad conspiracy between the named defendants and unnamed third parties.

5          In short, while there is no rule that a conspiracy to fix prices of both a particular component

6    and the finished product containing that component can never exist or be successfully pleaded, there

7    must be a plausible factual basis for contending that the sellers of the finished products were in fact

8    in conspiracy together with the named defendants.  Once again, plaintiffs' allegations here suggest

9    the *opposite*, if anything. At least in the specific instance of ODD devices manufactured and sold by

10   Dell and HP, plaintiffs have alleged that those third party sellers were unwitting dupes of the illegal

11   activity, not co-conspirators.  The most reasonable inference is that most, if not all, of the other

12   sellers of ODD devices who are not directly affiliated with defendants likewise were victims of any

13   agreement to fix ODD prices, not participants in a conspiracy to fix prices of the ODD devices they

14   sold.

15         Although not clearly articulated by plaintiffs, it may be they are contending that defendants

16   *in effect* fixed the prices of ODD devices sold by unaffiliated third parties by overcharging for the

17   component ODDs incorporated in those devices, even without their knowledge or cooperation.  Any

18   such argument, however, would represent an impermissible end-run around the *Illinois Brick* rule.

19   Indeed, one of the precise underpinnings of that rule is that it can be very difficult to determine how

20   much, if any, of the inflated cost of a price-fixed component will ultimately be passed on to the

21   consumer who buys the finished product. *See Illinois Brick*, 431 U.S. at 731-733.  Given the

22   uncertainties discussed in *Illinois Brick* as to when and under what circumstances the price of a

23   finished product will reflect the effects of any price-fixing of a component, it simply would not be

24   reasonable to infer from the facts alleged here that defendants' conduct *necessarily* affected the

25   retail prices of all ODD devices, even if there was price-fixing of ODDs.

26         Accordingly, plaintiffs have not pleaded sufficient facts to make plausible their claim of a

27   conspiracy to fix prices of both ODDs and ODD devices, including those made and sold by

28   unaffiliated third parties.  For this reason as well, the complaint must be dismissed.

**United States District Court**
For the Northern District of California

### 3.  Other Plausibility and Specificity Issues

Apart from the issue regarding the scope of the conspiracy discussed in the preceding section, to proceed on *any* conspiracy theory plaintiffs must also plead "enough factual matter (taken as true) to suggest that an agreement was made" because a "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-557.  There is no doubt that the existing factual allegations are insufficient to support the inference of a price-fixing agreement among defendants and third party sellers of ODD devices, for the reasons discussed above.  It would be premature to reach a definitive conclusion whether allegations substantially similar to those in the existing complaint might be sufficient to support a claim of a narrower conspiracy involving only an agreement by defendants to fix ODD prices.  Nevertheless, it is appropriate to offer some observations.

Most of the existing allegations may serve to explain why a price-fixing agreement might be *possible*, and describe avenues of communication through which defendants could carry out such a plan, it is far from apparent that such averments would suffice to "nudge" plaintiffs' "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  Allegations that defendants participated in industry trade associations and attended trade shows represent particularly weak support for the existence of any conspiracy.  *See id.*, at 567 n. 12 (rejecting suggestion that similar allegations were of particular significance). Pricing trends and economic data present a potentially fertile ground for inferences of price manipulation, but the information plaintiffs have presented at this juncture is ambiguous at best, and does not permit reliable conclusions to be drawn about the pricing of ODDs in particular.

The allegations regarding contraction and consolidation among ODD manufacturers, and the market share held by defendants, as well as their participation in patent pools and various joint ventures, may very well be necessary predicates to showing that defendants had the *power* to fix prices, but they do not show that defendants in fact did so.  Descriptions of *other* instances in which some of these defendants were found to have engaged in price-fixing is provocative, but plaintiffs have not shown enough commonalities between those circumstances and the present case to make those allegations probative.  *Cf. In re Static Random Access Memory (SRAM) Antitrust Litigation*,

**United States District Court**
For the Northern District of California

580 F.Supp.2d 896, 903 (N.D.Cal. 2008) (finding conspiracy claim to be supported by allegations that the "same actors" associated with defendants were responsible for marketing the products in each instance).  Similarly, the allegations that defendants are presently targets of a DOJ investigation is a "non-factor," because, "[i]t is unknown whether the investigation will result in indictments or nothing at all [and] the scope of the investigation is pure speculation."  *In re Graphics Processing Units Antitrust Litigation*, 527 F.Supp.2d 1011, 1024 (N.D.Cal. 2007).

Finally, plaintiffs' allegations of bid-rigging on three specifically-identified occasions perhaps come closest to providing the requisite support for *a* conspiracy, particularly because no alternative innocent explanation for such conduct is readily apparent.  Indeed, at oral argument defendants virtually conceded such allegations likely would be sufficient to support the existence of a conspiracy with respect to at least those particular auctions.  As defendants point out, however, those auctions involved only a small subset of defendants.  Even assuming those auctions, and perhaps others, were rigged, that is a far cry from establishing plausibility for a broad six year continuing agreement among all defendants to fix the prices of all ODDs sold through innumerable other channels.[8]

In sum, while the allegations of the existing complaint are actually *inconsistent* with the existence of a conspiracy to fix prices on all ODD devices, they do suggest that a conspiracy to fix ODD prices is at least conceivable.  Further allegations of fact, however, likely would be required to cross the line into the realm of the plausible, even if plaintiffs elect to limit their claims to alleged price fixing of ODDs.

### 4.  FTAIA

Defendants further contend that the Direct Purchaser's Consolidated Complaint should also be dismissed for failure to plead sufficient facts to establish subject matter jurisdiction under the Foreign Trade Antitrust Improvement Act ("FTAIA") , 15 U.S.C. § 6a.  FTAIA generally excludes

---

[8]  Of course, as set out above, the Direct Purchaser plaintiffs do not even have standing to pursue claims arising from any bid-rigging at those auctions.  While that does not necessarily foreclose them from pointing to defendants' alleged conduct at those auctions as support for the possible existence of a broader agreement to fix prices generally, it does somewhat lessen the significance of those allegations.

from the reach of the Sherman Act anti-competitive conduct that causes only foreign injury. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008). Because the existing compliant fails to allege a plausible conspiracy of the scope claimed at all, it is technically not possible to say that plaintiffs have alleged a conspiracy with the requisite domestic effects to support jurisdiction under FTAIA.  The failure, however, lies more in the issues identified above than in any particular requirement of FTAIA. Unless and until the parameters of any plausible conspiracy plaintiffs may be able to allege is known, the potential impact of FTAIA cannot be meaningfully evaluated.

### 5.  Leave to amend

Defendants urge dismissal without leave to amend, pointing out that plaintiffs have had ample time and the benefit of filing a consolidated complaint to articulate a plausible claim.   As the preceding discussion reflects, however, while it is far from apparent that plaintiffs necessarily will be able to address the identified defects successfully, it is not a foregone conclusion that they cannot advance facts sufficient to support a conspiracy of a more limited scope, assuming any of them can allege they bought ODDs or ODD devices directly from any defendants or co-conspirators. Accordingly, leave to amend will be granted.

### B.  The Indirect Purchasers' First Amended Complaint

#### 1.  Plausibility

Recognizing that they are barred by *Illinois Brick* from recovering damages under federal law, the indirect purchasers instead assert claims for, (1) *injunctive* relief under the Sherman Act, (2) damages, under a proposed nation-wide class that would rely on California state antitrust and unfair competition law, and (3) in the alternative, damages, under 29 proposed state-specific classes that would rely on the antitrust laws, and in some instances, unfair competition laws, of those states.[9]

---

[9]   Each of the 29 states is a so-called "*Illinois Brick* repealer" jurisdiction, having by statute or judicial decision expressed a determination that standing under that state's law is not to be limited by the rule announced in *Illinois Brick*.  Because *Illinois Brick* addressed federal prudential standing issues, individual states are free to adopt a contrary rule under their own laws.  Such state statutes and judicial decisions, of course, could not "repeal" the Supreme Court's holding in a literal sense.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

The indirect purchasers define ODDs and ODD Products in substantially the same way as do the direct purchasers, although they do not expressly make the latter term inclusive of the former. While those definitions leave some room for ambiguity, it appears that the indirect purchasers intend to bring their claims on behalf of persons who purchased ODD devices from third parties, other than the named defendants, their affiliates, and any co-conspirators.[10]   It does not appear that any of the indirect purchasers are claiming that they purchased ODDs that were not already incorporated into ODD devices.

The opening paragraphs of the Indirect Purchasers' First Amended Complaint suggest that they may intend to allege only a conspiracy to fix prices of ODDs, and that their injuries would arise from the fact that some or all of the allegedly inflated price of the ODDs may have been passed through to them when they purchased ODD devices.  Read as a whole, however, the complaint plainly advances a claim of an alleged conspiracy to fix prices of both ODDs and ODD devices. See, *e.g.* ¶ 317 ("Defendants and their co-conspirators . . . agree[d] to manipulate prices and supply of ODDs and ODD Products.").

For the same reasons as discussed above, plaintiffs have alleged no plausible basis for inferring a conspiracy between defendants and unnamed independent third parties who manufacture and sell ODD Devices.  Again, the allegations of bid-rigging in auctions conducted by HP and Dell actually support a strong inference to the contrary.  While the indirect purchasers point to factual details in their complaint that go beyond those offered by the direct purchasers (regarding defendants' participation in patent pools, trade associations, and pricing and economic data), those allegations do not fill the gap.  At best, the indirect purchasers have come closer to alleging a factual predicate that might support a claim of a conspiracy to fix ODD prices than have the direct purchasers.  Even for such a more circumscribed conspiracy, however, the barometer points to

---

[10]   It may be that at this juncture there could be uncertainty as to whether a particular manufacturer or seller of ODD devices constitutes an affiliate or co-conspirator or can only be seen as an independent third party, and therefore it might not be clear whether persons who purchased from such entities are potential members of a direct purchaser class or an indirect purchaser class.  Any such questions will have to be resolved eventually, because a person who purchased an ODD device from a particular entity should either be deemed a direct purchaser or an indirect purchaser as to that particular purchase, but not both.

conceivable, rather than plausible.  Accordingly, the complaint must be dismissed, with leave to amend.

### 2.  Associated General Contractors

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), the Supreme Court articulated a multi-factor balancing test for evaluating a plaintiff's standing to bring antitrust claims under federal law generally. Because of the bright-line *Illinois Brick* rule that indirect purchasers lack standing to bring damages claims in price-fixing cases, resort to an *AGC* analysis ordinarily is not necessary with respect to federal claims.  Defendants argue, however, that the *AGC* factors can and do apply to indirect purchasers' price-fixing claims under state law in any jurisdiction that has generally embraced the *AGC* antitrust standing requirements.  Listing eighteen states that they contend have in fact adopted the *AGC* test, defendants move to dismiss those particular state law claims for lack of antitrust standing.

Plaintiffs respond that defendants are effectively attempting to override the decisions made in the legislatures or courts of those states to reject *Illinois Brick* as a bar to indirect purchasers' claims under state law.  Defendants, in turn, argue that the *Illinois Brick* and *AGC* courts were addressing different sets of policy and legal issues, and that there is no conflict in applying *AGC* to preclude an indirect purchaser from going forward even in a state that declines to follow *Illinois Brick*. While defendants may be correct that the issues the *Illinois Brick* and *AGC* addressed were not co-extensive, the application of the *AGC* test they advocate would appear, in effect, to "repeal" the *Illinois Brick* "repealers," as it is difficult to imagine an indirect purchaser ever having antitrust standing under defendants' formulation.

Defendants' basic contention that *AIG* may bar claims in circumstances like these has gained some traction in this district.  *See*, *e.g.*, *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation* ("*DRAM I*"), 516 F.Supp.2d 1072 (N.D. Cal.2007), and *DRAM II*, 536 F.Supp.2d 1129 (N.D.Cal. 2008). The careful and persuasive analysis in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F.Supp.2d 1109 (N.D.Cal.  2008), however, warrants the conclusion that plaintiffs'

United States District Court

For the Northern District of California

1    claims here should not be dismissed for lack of antitrust standing under *AIG*.  As explained in more

2    detail in *TFT-LCD*, this is both because "it is inappropriate to broadly apply the *AGC* test to

3    plaintiffs' claims under the repealer states' laws in the absence of a clear directive from those states'

4    legislatures or highest courts," and because even if the *AGC* test were to be applied, it does not

5    conclusively rule out standing, at least at the pleading stage, on facts like those present here.  *See*

6    *TFT-LCD*, 586 F.Supp.2d at 1123-24.

7

8                    *3. FTAIA*

9        As in the case of the direct purchasers, the indirect purchasers' failure to allege a plausible

10    conspiracy at all necessarily means they have failed to allege a conspiracy with the requisite

11    domestic effects to permit jurisdiction over their Sherman Act claims under the FTAIA.  Whether

12    the FTAIA will continue to stand as a bar to Sherman Act claims under any plausible conspiracy

13    plaintiffs may ultimately be able to allege will depend on the contours and details of such purported

14    conspiracy.

15        As plaintiffs point out, on its face, the FTAIA only serves to limit the jurisdictional reach of

16    the Sherman Act.  As such, it is not immediately apparent that it would serve as a bar to claims

17    brought under state law in any event.   Defendants, however, have advanced an argument that under

18    the Foreign Commerce Clause, the congressional policy expressed in FTAIA should effectively

19    preempt state antitrust law from having a greater reach than that of the Sherman Act.  Because

20    defendants' arguments on this point have not been fully developed, at this juncture the FTAIA

21    cannot be said to foreclose plaintiffs' state law claims.  Defendants are not precluded, however,

22    from raising the point again in any subsequent motion practice should it otherwise be appropriate to

23    do so.

24

25               *4. Nationwide class under California law*

26        The Supreme Court's decision in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985),

27    precludes nation-wide class actions based on the laws of a particular state where there is a material

28    conflict of law between the forum jurisdiction and that of other states.  Here, the fact that plaintiffs

do not even attempt to advance claims under the laws of non-"repealer" states highlights the

substantial difference between those jurisdictions and California.  Non-"repealer" states have

effectively endorsed *Illinois Brick's* prohibition against indirect purchasers recovering antitrust

damages.[11]  As plaintiffs point out, however, it is not immediately apparent that such states have any

particular interest in protecting out-of-state parties such as the defendants here from such suits.  The

issue calls for a careful analysis under conflict of laws principles.  While *Shutts* provides the

foundational rule that nationwide classes are permissible only in the absence of a material conflict, it

is too factually dissimilar to provide guidance as to whether a material conflict exists in this instance

or not.

Because of the number of substantive issues raised in these motions, the parties have not

been able to brief the conflict of law issues sufficiently to permit a definitive determination on

whether or not a nationwide class under California law can proceed.  Accordingly, this prong of the

motion to dismiss will be denied, without prejudice to defendants' right to raise the issue again

either in a subsequent motion to dismiss or at the class certification stage.

### 5. Representative resident plaintiffs

Defendants have adequately shown that dismissal of state law claims is appropriate with

respect to those jurisdictions in which none of the named class representatives reside,

notwithstanding plaintiffs' arguments that it would not contravene standing requirements to allow

those claims to proceed.  *See In re Flash Memory Antitrust Litig.,* 643 F. Supp. 2d 1133, 1164 (N.D.

Cal. 2009) ("Where, as here, a representative plaintiff is lacking for a particular state, all claims

based on that state's laws are subject to dismissal.").  Plaintiffs represent that they have found

additional class representatives that can be added to represent Hawaii and Nebraska, and they

request time to locate representatives for the remaining jurisdictions.  In view of the time plaintiffs

---

[11]  Although not every non-"repealer" state necessarily elected to follow *Illinois Brick* through a
conscious balancing of policy interests, at least some have.  See *Vacco v. Microsoft Corp.*, 793 A.2d
1048, 1059-60 (Conn. 2002) (noting that Connecticut's legislature has declined several times to
enact bills that would have provided for an *Illinois Brick* "repealer").

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   have already had since defendants raised this issue, the thirty days leave to amend being afforded by

2   this order is sufficient.

3

4           *6.  Other individual state claims*

5        Defendants level a scattershot of additional arguments directed at particular individual state

6   claims.  In light of the fact that the entire complaint must be dismissed, the sufficiency of the

7   existing allegations to withstand any or all of these arguments does not warrant further examination.

8   Plaintiffs are advised, however, that in preparing any amended complaint, they should plead with an

9   eye to addressing the arguments defendants have made, whether or not any of them would warrant

10   dismissal, standing alone.

11

12       C.  <u>Additional motions to dismiss</u>

13        A series of separate motions have been filed by various defendants arguing, in essence, that

14   regardless of whether the complaints might be adequate to state a claim against *some* defendants,

15   they do not state sufficient facts to implicate the moving parties.  Several of these motions were each

16   filed by two or more related entities, and one is a joint motion by defendants who contend they were

17   named for no reason other than that they are each a parent or a subsidiary of a more-directly

18   involved defendant.

19        Even assuming that some or all of these motions have merit with respect to the allegations as

20   the conspiracies as presently pleaded, as plaintiffs are being given leave to amend, it would serve

21   little purpose to engage in a detailed analysis of the current allegations made against each moving

22   party, particularly given that any subsequent complaints may significantly alter the scope of the

23   claimed conspiracy.  In pleading any amended complaints, however, plaintiffs should bear in mind

24   that while, as they note, detailed "defendant by defendant" allegations are not required, they

25   nonetheless "must allege that each individual defendant joined the conspiracy and played some role

26   in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by

27   each defendant to join it." *In re TFT-LCD (Flat Panel) Antitrust Litigation*, *supra,* 586 F.Supp.2d at

28   1117 (quoting *In re Elec. Carbon Prods. Antitrust Litig*., 333 F.Supp.2d 303, 311-12 (D.N.J. 2004).

As such, plaintiffs must "include allegations specific to each defendant alleging that defendant's role in the alleged conspiracy." *Id.*

## V.  CONCLUSION

The Direct Purchasers' Consolidated Complaint and the Indirect Purchasers' First Amended Complaint are dismissed for the reasons set out above, with leave to amend.  Any amended complaints shall be filed within 30 days.

IT IS SO ORDERED.

Dated: 8/3/11

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE