Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
George W. Sampson (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Interim Lead Counsel for Indirect
Purchaser Plaintiffs

[*Additional Counsel Listed on
Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPTICAL DISK DRIVE PRODUCTS ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | MDL No. 3:10-md-2143 RS<br><br>CLASS ACTION<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>DATE ACTION FILED: Oct. 27, 2009 |
| This Document Relates to:<br><br>ALL INDIRECT PURCHASER ACTIONS | |

\*     \*     \*     **REDACTED** \*     \*     \*

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................1

II.     DESCRIPTION OF OPTICAL DISK DRIVES .....................................................4

III.    DEFENDANTS CONSPIRED TO STABILIZE ODD PRICES...........................5

        A.      Original Equipment Manufacturers Exerted Pricing Pressure on ODD
                Suppliers Through the Procurement Process.............................................5

        B.      Summary of Defendants' Conduct Used to Stabilize ODD Prices ...............7

                1.      Defendants Agreed to Exchange Sensitive Competitive
                        Information in Furtherance of Their Objective to Stabilize Prices ...................7

                2.      Summary of Corporate Relationships .............................................8

                3.      Summary of Key Employees Who Committed Overt Acts to
                        Stabilize Prices in the Representative Examples Listed in this
                        Complaint ...............................................................................10

                4.      Representative Examples of Overt Acts in Furtherance of
                        Conspiracy to Stabilize ODD Prices ...........................................12

                        a.      Representative Acts of Hitachi, LG and HLDS in
                                Furtherance of the Conspiracy.......................................12

                        b.      Representative Acts of the Panasonic Defendants in
                                Furtherance of the Conspiracy.......................................19

                        c.      Representative Acts of Philips, Lite-On, BenQ, PBDS and
                                PLDS in Furtherance of the Conspiracy...........................22

                        d.      Representative Acts of Quanta in Furtherance of the
                                Conspiracy ...............................................................32

                        e.      Representative Acts of Sony, NEC, Sony NEC Optiarc, and
                                Sony Optiarc in Furtherance of the Conspiracy ................33

                        f.      Representative Acts of the Teac Defendants in Furtherance
                                of the Conspiracy........................................................37

                        g.      Representative Acts of Toshiba, Samsung and TSST in
                                Furtherance of the Conspiracy.......................................38

        C.      Defendants' Illegal Conduct Stabilized Prices and Harmed Consumers ..........40

                1.      Economic Evidence Will Show Defendants' Conspiracy Stabilized
                        ODD Prices Paid by Other OEMs and in Other Sales Channels................41

                2.      Defendants' Conspiracy Caused Consumers to Pay Supra-
                        Competitive Prices.....................................................................47

3.    Defendants' Conspiracy Harmed Consumers by Causing Decreased Technological Innovation ............................................................. 51

4.    The Inflated ODD Prices Were Passed-Through to Consumers .................... 55

D.    Specific Characteristics of the ODD Market Made It Ripe for Collusion ................. 58

1.    The ODD Market Experienced a Dramatic Increase in Concentration ........................................................................................ 58

a.    Hitachi and LG Electronics Form Hitachi LG Data Systems (HLDS) .............................................................................. 60

b.    Philips and BenQ Form Philips BenQ Digital Storage (PBDS) ............................................................................. 62

c.    Toshiba and Samsung Form Toshiba Samsung Storage Technology (TSST) .................................................................. 63

d.    Sony and NEC Form Sony NEC Optiarc ............................................ 64

e.    Philips and Lite-On Form Philips & Lite-On Digital Solutions (PLDS)................................................................ 66

2.    Significant Barriers to Entry Exist in the ODD Market ................................. 66

a.    The Predecessor of the DVD Patent Pools .......................................... 67

b.    Description, Structure and Membership of the DVD Patent Pools ................................................................................ 69

c.    The Patent Pools Facilitated Cartel Monitoring ................................. 72

3.    Defendants' Participation in Trade and Business Organizations Provided Opportunities for Collusion ............................................................ 74

a.    The Optical Storage Technology Association ...................................... 75

b.    The DVD Forum.................................................................................... 75

c.    The International Symposium of Optical Memory ............................. 76

d.    The Blu-Ray Disc Association ............................................................. 76

E.    Governmental Investigations into Price Fixing in the ODD Industry ....................... 76

1.    Defendants Have Admitted that Multiple Governmental Organizations Are Investigating Price Fixing in the ODD Industry .............. 77

2.    The Department of Justice Has Admitted It Has Convened a Criminal Grand Jury to Investigate Defendants' Price Fixing in the ODD Market........................................................................................ 79

3.    Defendants' Agent Admits that the "Implied Promise" of the Grand Jury Investigation Is Criminal Indictments or Admissions of Guilt ................................................................................................. 80

F.    Defendants Have a History of Colluding to Fix Prices in Related Markets .............. 81

1.    Defendants Have Been Charged With and Have Pleaded Guilty to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of LCD Panels and LCD Products Sold in the United States ............................................................................................. 82

2.    Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the United States ...................................... 83

3.    Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the European Union ................................. 84

4.    Governmental Investigations Have Revealed Defendants' Involvement in a Price-Fixing Conspiracy of Cathode Ray Tubes ................ 85

IV.    TRADE AND COMMERCE ........................................................................................ 86

V.    FRAUDULENT CONCEALMENT ............................................................................. 89

VI.    JURISDICTION AND VENUE .................................................................................... 96

VII.    PARTIES ...................................................................................................................... 97

A.    Indirect Purchaser Plaintiffs ............................................................................. 97

B.    Defendants ......................................................................................................... 103

VIII.    CLASS ACTION ALLEGATIONS ............................................................................. 108

IX.    VIOLATIONS ALLEGED ........................................................................................... 113

# I.     INTRODUCTION

1.     For the past several months certain corporate Defendants (the "cooperators") have helped the Indirect Purchaser Plaintiffs ("IPPs") by detailing industry participants' conspiratorial conduct that successfully stabilized optical disk drive ("ODD") prices. These cooperating Defendants are helping IPPs in an effort to receive amnesty from the Department of Justice against criminal charges and to limit their civil liability pursuant to the Antitrust Criminal Penalty Enhancement and Report Act of 2004 ("ACPERA").  An applicant that satisfies ACPERA's terms limits its civil liability to actual damages sustained – *i.e.*, single damages, rather than treble damages.[1]  To satisfy ACPERA's terms, the leniency applicant must provide timely and complete cooperation, including setting forth a full account of the facts known, producing all relevant documents, and making witnesses reasonably available to respond to all questions.

2.     To be clear, IPPs base their claims on the object of Defendants' conspiracy to restrain competition in the sale of optical disk drives ("ODDs").[2]  Defendants' conduct indeed illegally raised ODD prices.  The illegal higher prices for ODDs were in turn passed down the distribution chain, ultimately to IPPs.  As a result, IPPs paid supra-competitive prices for ODDs and ODD Products sold from January 1, 2004 until at least January 1, 2010 (the "Class Period").

3.     Based on the cooperators' information and the IPPs independent investigation, IPPs allege the following, as set forth fully in paragraphs to follow:

- **Defendants acted to stabilize prices:** Since at least 2004, Defendants coordinated their efforts to stabilize prices of ODDs.  Defendants coordinated their efforts to stabilize prices by using several methods, including agreeing to the: (i) order in which competitors would finish during multi-party procurement events – such as electronic auctions – held by customers; (ii) minimum prices for ODDs, below which competitors would not quote to customers; and (iii) exchange of detailed competitive pricing information and critical intelligence about manufacturing capacity and quality issues. *See* pages 5-40, *supra*.

---

[1]   *See* Pub. L. No. 108-237, § 213(b), 118 Stat. 661, 666-67 (2004).

[2]   The ODDs that are the subject of this lawsuit include:  CD-ROMS ("CD"), CD-recordable/rewritable ("CD-R/RW"), DVD-ROM ("DVD"), DVD-recordable/rewritable (DVD-R/-RW/+R/+RW), Blu-Ray ("BD"), Blu-Ray-recordable/rewritable ("BD-R"/"BD-RE") and HD-DVD.  The products containing ODDs which IPPs purchased and are the subject of this lawsuit are computers, videogame consoles and ODDs designed to be attached externally to devices such as computers (collectively "ODD Products").

- **Defendants successfully stabilized prices**: Each of the overt acts Defendants engaged in had the purpose and – in combination with the other Defendants' overt acts – effect to slow the downward pressure on the prices of ODDs, a commodity product. *See* pages 40-41, *supra*.

- **Defendants stabilized ODD prices beyond HP and Dell**: Two major ODD purchasers, Hewlett-Packard Company ("HP") and Dell Computer Corporation ("Dell"), had significant purchasing power. At times relevant to this lawsuit, HP and Dell purchased more than 50 percent of Defendants' ODDs that are incorporated into computers sold in the United States. As a result, stabilizing the prices of ODDs Defendants sold to HP and Dell (and others) helped to stabilize prices of ODDs Defendants sold to other Original Equipment Manufacturers ("OEMs") that had less purchasing power. *See* pages 41-47, *supra*.

- **ODD prices stabilized compared to other industries**: Economic evidence will show the Defendants' illegal conduct stabilized the prices of ODDs, using comparative industries as benchmarks. *See* pages 47-51, *supra*.

- **ODD industry structure was conducive to Defendants' conspiracy**: The ODD industry is characterized by several attributes that makes coordinated efforts to stabilize prices more likely (and effective). For example, the ODD industry went from unconcentrated to concentrated as defined by the Department of Justice's merger guidelines. Further, although ODDs are commodity products, intellectual property controlled by a small number of firms that have "pooled" together their patents created barriers to entry and an additional avenue to exchange and monitor competitive sales information. *See* pages 58-76, *supra*.

- **Defendants are recidivists**: These Defendants have previously plead guilty to or acknowledged violating the antitrust laws. *See* pages 81-86, *supra*.



5. Defendants ignored their own antitrust policies when faced with vigorous price competition for ODD sales driven by OEMs. To counter price competition, Defendants turned to illegal methods to counterattack vendors' efforts to put competitive pricing pressure on Defendants' ODD sales. As one Defendant's employee suggests, the ODD industry needed to cooperate to forestall a price war:



6.      Instead of public "signals" to thwart price competition, Defendants instead chose the "more effective method" – talking directly with competitor ODD suppliers. Defendants engaged in a pattern of agreeing to reduce ODD price competition in online auctions and to exchange information about prices, revenues, sales volume and production plans directly from other competitors' employees. The object and effect of these agreements and information exchanges was to reduce competition and stabilize ODD prices.

7.      Defendants shared the common objective to stabilize ODD prices.  To achieve this common objective, Defendants agreed to exchange information necessary to stabilize ODD prices. Communication of competitive information about prices, revenues, unit sales and production plans is anticompetitive because the only plausible effect of this type of information exchange between competitors is to reduce the intensity of competition by facilitating price collusion.  Exchange of competitive information facilitates collusion in several ways.  It assists competitors in forming a united front in negotiating with customer, eliminating the need to reduce prices knowing that firms will not be underbid by another rival.  Recent revenue, price and unit sales data enable competitors to monitor each other, thereby enabling each to ascertain more reliably whether competitors are honestly reporting their prices and sales.

8.      These comprehensive allegations, in addition to the robust economic evidence supporting impact to class members, plausibly show Defendants agreed to stabilize ODD prices.

## II.   DESCRIPTION OF OPTICAL DISK DRIVES

9.     Optical disks contain microscopic pits where data is stored.  These pits are made from a crystalline metal alloy and are usually pressed into a disk in a spiral arrangement, starting at the center of the disk.  Once a disk containing information is inserted into an ODD, the disk spins while a lens inside the device guides a semiconductor laser beam over the disk and a photodiode detects the light reflected from the disk's bumps and pits.  The laser moves outward from the center of the disk, scanning over the disk's surface.  Then the photodiode reads the light's reflection as a binary code, a series of ones and zeros that the computer translates into usable data.  Changes in the intensity of the beams as the lasers hit the pits are detected and translated into electrical signals.  The more pits that can be packed onto a disk, the more data a disk can store.  In addition to reading disks, ODDs can write and rewrite on the disk, depending on the technology of the drive and accompanying disk.

10.     When a recordable disk (e.g., CD-R, DVD-R or BD-R) is inserted into an ODD that has the ability to record data, the ODD's laser is used to selectively heat parts of the organic photosensitive dye layer on a disk, changing the reflective properties of the disk surface.  Thereafter, if the disk is inserted into an ODD, the photodiode will recognize these changes as bumps and pits and read the new information on the disk.

11.     During part of the conspiracy period, from 2004 through 2008, more than 87 percent of the value of drives sold worldwide (on an if-sold-OEM basis) has been accounted for by DVD format drives (DVD-ROM, Combo, or DVD-RW):

| DVD DRIVE SALES AS A PERCENTAGE OF TOTAL ODD SALES | | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2004-2008 |
| DVD Format Drive Sales (in $B) | $8.8 | $9.3 | $9.1 | $8.9 | $7.1 | $43.2 |
| Total ODD Sales (in $B) | $12.2 | $10.4 | $9.6 | $9.3 | $7.9 | $49.4 |
| | | | | | | |
| **DVD Sales as a % of Total ODD** | 72.1% | 89.4% | 94.8% | 95.7% | 89.9% | 87.4% |

12.     ODDs of all types come in both half-height and "slim" size formats.  The slim size formats are easily integrated into laptop computers and mobile computing equipment, but can

also be used in desktop computers. Half-height units fit into a standard "half-height" (1.75" high) desktop computer bay, and are less appropriate for use in mobile equipment, where size, weight, and form factor is more important. Slim units typically trade off some degree of performance to achieve a smaller size. Both half-height and slim-size units can be integrated into external cases, as described above, by equipment manufacturers, or end users. Units incorporated into game consoles are very similar – in most cases, identical – to ODDs incorporated into computers.

13.     A half-height computer optical disk typically looks something like this:



14.     A slim unit computer optical disk typically looks something like this:



## III.   DEFENDANTS CONSPIRED TO STABILIZE ODD PRICES

**A.   Original Equipment Manufacturers Exerted Pricing Pressure on ODD Suppliers Through the Procurement Process**

15.     Historically in the ODD industry, a cooperative venture process existed which mediated supply and demand between suppliers and customers. This process then moved towards negotiated supply, where customers would negotiate directly with sales people at the Defendant companies. Then two of the largest OEMs, Dell and HP, introduced direct competitive bidding by using processes – such as electronic auctions.

1      16.     Dell was one of the first OEMs to introduce electronic auctions in 2002.  HP

2   introduced a similar type of electronic auction in 2004.  The electronic auctions brought with

3   them increased pricing competition and significant pricing pressure.  They also further

4   commoditized the ODD industry.  Given the material impact of the electronic auctions on

5   Defendants' profitability, internally Defendants referred to the auctions as "bloody auctions."  In

6

7

8

9

10

11

12

13

14      18.     The electronic auctions used by Dell and HP were of two general types, e-auctions

15   and eRFQs (Electronic Requests for Quotations).  E-auctions were live real-time events spanning

16   a few hours where each competing supplier submitted multiple bids.  ERFQs typically spanned

17   more than one day and involved multiple rounds of bidding.  During the process, the OEM

18   provided feedback to competing ODD suppliers.  Typically, the OEM procurement events

19   occurred quarterly or, at most, six times a year.

20      19.     These auctions did not usually result in a winner-take-all scenario, although on

21   rare occasions a sole winner did exist.  Instead, awards went to multiple sources or winners; often

22   four winners, where rank determined the volume and price each bidder would supply under the

23   contract.  The volume to be awarded under the contract was generally referred to as TAM, or

24   Total Available Market.  TAM could be determined as a fixed number or as a target that moved

25   based on the final bidding prices.

26

27

28

**B.     Summary of Defendants' Conduct Used to Stabilize ODD Prices**

    **1.     Defendants Agreed to Exchange Sensitive Competitive Information in Furtherance of Their Objective to Stabilize Prices**

20.     Defendants engaged in a conspiracy to stabilize prices in the ODD market, effectuated by overt acts in furtherance thereof including agreements, and exchange of competitively sensitive information such as price, supply and capacity information, desired tier positions, prior bids and bidding outcomes, quality assessments by OEMS (which could disqualify or handicap ODD suppliers in the next procurement event), and the timing of the introduction of new products or the cessation of ones that had reached the end of their lifecycles. The purpose of these information exchanges was anticompetitive price collusion and the effect of these exchanges was to change pricing behavior.

21.     Defendants' information exchanges and agreements on price and bid position were conducted and reached by sales managers, account managers or global account managers who typically reported to sales executives within each of the Defendant's respective companies.

22.     Although Defendants' employees had previously exchanged confidential business information, the inception of Internet Auctions (IN Auctions) by Dell in 2002 caused Defendants to increase the intensity, frequency and specificity in their exchanges of competitive information. Defendants feared that Internet auctions would accelerate the downward price trends for ODDs.

23.     By the time HP began electronic auctions and eRFQs in 2004, Defendants had in place a network of contacts at each Defendant ODD manufacturer who they could call to exchange confidential business information.

24.     These exchanges of sensitive information were undertaken at the direction of the account manager's superiors. Account managers and sales directors were responsible for cultivating contacts at rival firms.  They would exchange cell phone numbers (and non-business e-mail addresses in some cases) in order to maintain these contacts.  These employees were required to call their counterparts at other ODD manufacturers before, during, and after many procurement events, and at other times as necessary, in order to exchange a wide variety of information on price targets, bidding strategies, expected bidding positions, production and

1    inventory data, quality problems, input shortages and the timetables for the introduction of new

2    ODD products.

3        25.     The results of these repeated telephone calls were then reported to the larger sales

4    team within each Defendant.  The many e-mails quoted in this complaint memorialize this

5    network of information exchanges.  By reaching out to multiple contacts at rival firms, an

6    industry-wide picture could be drawn.  Each Defendant would then know how it could bid on an

7    upcoming procurement event to capture its desired sales at a price above the competitive price.

8        26.     These contacts were so important that when an employee switched positions, he

9    would introduce his replacement to his contacts at other firms in order to maintain the continuity

10   of information exchanges.

11       27.     Conspirators also met face-to-face at times to exchange competitive information.

12   For example, co-conspirators met at:  (a) a coffee shop in Austin, Texas; (b) casual dining

13   restaurants in Houston, Texas (such as T.G.I. Friday's or Bennigan's); and (c) in the lobby of one

14   conspirator's office building in Singapore, subsequently dining in the cafeteria.

15       28.     Defendants engaged in hundreds of telephone and face-to-face communications

16   during their conspiracy.  These communications occurred both before, during and after auction

17   events to exchange tiering, quality and pricing information.

18       29.     Defendants' conspiracy inflated prices of ODDs.  Before the Defendants'

19   anticompetitive conduct, the ODD market was characterized by a steep downward trend in prices,

20   frequently observed in technology markets.  However, during the Class Period, the Defendants'

21   conduct reduced the rate of decline in prices – thereby stabilizing prices – in the ODD market.  In

22   fact, market data indicates the effect of the conspiracy in slowing price declines was tremendous

23   – and the illegal conduct appears to have caused ODD prices to increase at certain points.

### 2.     Summary of Corporate Relationships

25       30.     The ODD market is characterized by incestuous relationships between competitors

26   and suppliers, facilitating the exchange of competitive information.  Three unique characteristics

27   of the relationships in this industry allowed the Defendants to engage in a scheme to stabilize

28   prices and allocate the market.  *First*, changes in entities and partnership memberships allowed

1    the sharing of information between competitors.  For a detailed discussion of the make-up of the

2    joint ventures and industry consolidation, see pages 58-66, *supra*.

3         31.    *Second*, manufacturing and supply agreements between entities allowed the

4    sharing of sensitive competitive information.  Outsourced manufacturing provided

5    communication links between competitors.  Each of the joint ventures includes a manufacturing

6    investor and an intellectual-property-holder investor.  For example, TSST outsourced

7    manufacturing to Defendant Samsung.[3]  And HLDS outsourced its manufacturing to Defendant

8    LG Electronics.[4]

9         32.    Competitors who also functioned as component suppliers for ODDs also allowed

10   otherwise private business information to be shared between competitors.  For example, Hitachi

11   was a major supplier of OPUs (known either as optical pickup units or optical processing units),

12   and sold these parts to other manufacturers.  Hitachi's supply of these component parts to its

13   competitors became an important channel for information exchange during the Class Period.

14        33.    And manufacturing agreements outside of the joint ventures also provided

15   avenues for the sharing of competitive information.  For example, in 2008, Teac entered into a

16   co-development agreement with PLDS to produce discrete types of ODDs, specifically several

17   ultra slim and slim slot load products.[5]

18        34.    Similarly, Quanta had incestuous relationships with its co-conspirators.  Former

19   employees of Lite-On founded Quanta in 1999.[6]  Originally, Quanta manufactured the ODDs for

20

21        [3]   "TSST" refers to Defendants Toshiba Samsung Storage Technology Corp. and Toshiba
22   Samsung Storage Technology Corp. Korea individually and collectively.  TSST is a joint venture
     between Defendants Samsung Electronics Co., Ltd. ("Samsung") and Toshiba Corp. ("Toshiba").

23        [4]   "HLDS" refers to Defendants Hitachi-LG Data Storage, Inc. and Hitachi-LG Data
     Storage Korea, Inc. individually and collectively.  HLDS is a joint venture between Defendants
24   Hitachi, Ltd. ("Hitachi") and LG Electronics ("LG Electronics" or "LG").

25        [5]   "Teac" refers to Defendants TEAC Corporation and TEAC America Inc. individually and
     collectively.  "PLDS" refers to Defendants Philips & Lite-On Digital Solutions Corp. and Philips
26   & Lite-On Digital Solutions USA, Inc. individually and collectively.  PLDS is a joint venture
     between Defendants Koninklijke Philips Electronics N.V. ("Philips") and Lite-On IT Corporation
27   ("Lite-On").

28        [6]   "Quanta" refers to Defendants Quanta Storage America, Inc. and Quanta Storage Inc.
     individually and collectively.

1    the Philips-BenQ joint venture, PBDS.[7]  Currently, Quanta manufactures ODDs for Sony

2    Optiarc.

3         35.     *Third*, personal relationships were developed between key employees at

4    competitor companies, forming communication links for sensitive information to be illicitly

5    shared.  For example, Defendants' customers – OEMs such as Dell, HP and Acer – would host

6    customer-sponsored supply events.  All the supplies would attend these events, oftentimes with

7    the Defendants' representatives sitting at lunches together.  At these customer-supply events,

8    Defendants' representatives would trade contact information for purposes of setting up future

9    information exchanges and pricing agreements.

10        **3.     Summary of Key Employees Who Committed Overt Acts to Stabilize Prices
               in the Representative Examples Listed in this Complaint**

11        36.     The following is a summary of the key contacts just from the examples listed

12    below in this complaint.  This list is intended to summarize some of the vast network of

13    competitor contacts that existed, but does not contain every individual listed in the examples

14    below or every individual that participated in the illegal exchange of sensitive competitive

15    business information:



27        ⁷   "PBDS" refers to Philips BenQ Digital Storage.  PBDS was a joint venture of Defendants
      Philips and BenQ.  "BenQ" refers to Defendants BenQ Corporation and BenQ America
28    Corporation individually and collectively.

[8] "NEC" refers to Defendant NEC Corporation. "Sony NEC Optiarc" refers to Sony NEC Optiarc, Inc. Sony NEC Optiarc was a joint venture of Defendants NEC and Sony Corporation ("Sony"). "Sony Optiarc" refers to Defendant Sony Optiarc, Inc. and Sony Optiarc America, Inc. individually and collectively. The joint venture Sony NEC Optiarc became Sony Optiarc, a wholly owned subsidiary of Sony, in late 2008 when NEC sold its interest in the joint venture to Sony.

[9] "Panasonic" refers to Defendants Panasonic Corporation and Panasonic Corporation of North America individually and collectively.



### 4.   Representative Examples of Overt Acts in Furtherance of Conspiracy to Stabilize ODD Prices

37.     The following e-mails and acts are only examples of the hundreds, if not thousands, of exchanges that took place between the Defendant companies in furtherance of the conspiracy to stabilize ODD prices.  Each of these communications reflects only a part of the ongoing conspiracy, but includes the exchange of prices, supply and capacity information, quality, desired tier positions, prior bids and bidding outcomes, quality assessments, timing of product introductions and cessations and overt agreements.  These communications were carried out not only via e-mail, but also through telephone conversations and face-to-face meetings.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28











1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

















1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





121. Defendants' conspiracy had the following effects, among others: (1) even assuming that Defendants' illegal conduct was limited to only those sales of ODDs to computer giants Dell and HP (which it was not), Defendants' illegal conduct stabilized prices of ODDs sold to other OEMs and through other sales channels; (2) prices for ODDs sold by Defendants

1  have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels

2  throughout the United States; (3) decreased technological innovation; and (4) indirect purchasers

3  of ODDs have been deprived of the benefit of free and open competition in the purchase of ODD

4  Products.

       **1.    Economic Evidence Will Show Defendants' Conspiracy Stabilized ODD
            Prices Paid by Other OEMs and in Other Sales Channels**

     122.    Defendants' illegal conduct stabilized the prices of ODDs beyond merely the

ODDs Dell and HP purchased.  Even if Defendants' overt acts in furtherance of their object to

stabilize ODD prices were limited to sales to HP and Dell – which they were not – these

anticompetitive acts would have been sufficient to stabilize ODD prices paid by other OEMs and

purchasers in other sales channels.

     123.    Economic evidence will show that just by inflating the prices to HP and Dell,

ODD prices will be artificially elevated for other ODD purchasers.  The economic impact to

other purchasers would occur because HP and Dell are major purchasers of ODDs, who normally

buy their ODDs while managing supply risk.  Major purchasers do this by distributing their

purchases across a portfolio of suppliers and supply channels.  This behavior helps major

purchasers reduce component costs, in part by ensuring these firms are faring no worse than

paying market price.  In short, if major purchasers such as Dell or HP could buy ODDs at a lower

price from an ODD distributor or electronic manufacturing service, it would do so.

     124.    Dell and HP have a majority share of ODD purchases for the personal computer

market.  As the following graph demonstrates, in 2007 alone, HP and Dell made up over 50

percent of ODD purchases for the personal computer market:

125.    Thus, if Defendants stabilized (artificially increased) the sales prices to Dell and HP, while not doing the same for other customers, Dell and HP would either demand a lower price from Defendants or shift a larger share of their purchases of ODDs to these other purchasing channels with lower ODD prices.  The shift of some portion of Dell and HP demand to these other channels would raise prices on existing supplies in these other channels, and ultimately lead the Defendants to raise prices in these other channels as a response to rising demand in those channels, and to discourage further erosion of their direct sales to Dell and HP. As a result, under either scenario, Defendants, acting as rational economic actors, would attempt to ensure prices of commodity products (ODDs) would closely track prices of ODDs Defendants sold to HP and Dell.

126.    As a consequence, any conspiracy to maintain or raise prices to the largest customers, Dell and HP, would have a broad and pervasive impact, raising the price to all customers and market segments purchasing ODDs.

127.    Economic evidence supports this allegation.  Transaction sales data from one Defendant demonstrates that ODD prices paid by different customers moved together during the

conspiracy.  Price indices for Dell, HP and other ODD customers are virtually indistinguishable. This is demonstrated below in a series of charts which compare the price of ODDs sold by one Defendant to Dell and HP, against the prices of ODDs that Defendant sold to other customers.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1

2    131.    Thus, even if Defendants' conspiracy to stabilize ODD prices were limited to the

3    largest customers, Dell and HP, it had a broad and pervasive impact, raising the price to all

4    customers and market segments purchasing ODDs.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

