United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPTICAL DISK DRIVE ANTITRUST LITIGATION | CASE NO. 3:10-md-2143 RS<br><br>**ORDER DENYING MOTIONS TO DISMISS** |

## I. INTRODUCTION

The original "master" consolidated complaints in this Multi-District Litigation alleged a conspiracy beginning in 2006 among defendants to fix the prices of "Optical Disc Drives" ("ODDs") and "Optical Disc Drive Products" ("ODD Products"). The complaints were dismissed, with leave to amend, on grounds that plaintiffs had not set out a plausible factual basis for inferring the existence of a conspiracy of the scope and nature alleged. As the amended complaints have alleged a substantially narrower, and more plausible, conspiracy, and are otherwise adequately pleaded, the present motions to dismiss will be denied.

## II. BACKGROUND

As described more fully in the order dismissing the first consolidated complaints, two groups of plaintiffs bring price fixing claims against defendants involved in the manufacturing and/or sales of ODDs—either as standalone products or which are incorporated into electronic devices such as computers and videogame consoles. One group of plaintiffs seek to represent a class of "Direct Purchasers"—individuals or entities who acquired ODDs directly from named defendants, and who, as such, arguably have standing to bring damage claims under federal antitrust law. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977); *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120-21 (9th Cir. 2008) ("a bright line rule emerged from *Illinois Brick*: only direct purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations.") A separate complaint is brought on behalf of "Indirect Purchasers," individuals and entities who did not purchase directly from the named defendants, and whose primary claims are therefore brought under the laws of various states that do not follow the *Illinois Brick* rule.

The Direct Purchasers' first consolidated complaint alleged a conspiracy to fix prices of both ODDs *and* what it defined as "ODD Products." While the Indirect Purchasers' first consolidated complaint defined the terms slightly differently, and included some language suggesting an intent only to claim a conspiracy to fix ODD prices, read as a whole, it likewise alleged a conspiracy that extended to price fixing of both ODDs and ODD Products. One of the primary reasons the first consolidated complaints were dismissed was the absence of facts to support the plausibility of such a wide-ranging conspiracy among not only the named defendants but also numerous unnamed entities that manufacture and sell products containing ODDs.[1]

The Second Consolidated Direct Purchaser Class Action Complaint ("DP SAC") and the Indirect Purchasers' Corrected Second Amended Class Action Complaint ("IP SAC") each make clear that plaintiffs are now alleging only a conspiracy to fix prices of ODDs, not the prices of

---

[1] Additionally, as noted in the prior dismissal order, under the conspiracy theory then-articulated, entities such as HP and Dell who purchased ODDs from named defendants in allegedly rigged auctions and incorporated those ODDs into products sold to the public, would somehow have been both knowing co-conspirators and unwitting victims of the price-fixing.

2

products that contain them.[2] There remain some troubling issues, particularly in the DP SAC, with respect to how the products have been defined. For example, it is unclear why the Direct Purchasers continue to distinguish between ODDs and what they now call "ODD Devices." Direct Purchasers have (in their briefing and at oral argument) specifically *excluded* from the definition of the latter term computers, videogame consoles, and camcorders and have expressly alleged that the cost of the ODD typically constitutes the major portion of the cost of an "ODD Device." If, as seems likely, Direct Purchasers intend their claims extend to ODDs manufactured by defendants and preinstalled in computers, videogame consoles, and camcorders sold by defendants or their affiliates (despite the fact that the ODDs might *not* constitute the major portion of the cost of such devices), defining "ODD Devices" separately would appear to serve little purpose. A number of other uncertainties exist as to whether the definitions in the two complaints are entirely consistent with the various ways in which ODDs are actually sold, and whether the two groups of plaintiffs have correctly distinguished between what should be characterized as "direct" and "indirect" purchases.[3]

Those issues will require further clarification at the class certification stage, and may necessitate some modification to the class definitions from what is presently alleged in the complaints. At the pleading stage, however, such details do not substantially undermine the plausibility of the basic claims, and are not fatal.[4] Critically, both complaints have now made clear

---

[2] The Indirect Purchasers, in particular, do contend that the *effect* of the alleged ODD price fixing was to raise the prices they paid for products containing them, but not that there was a conspiracy to fix the prices of those products per se.

[3] For example, the Indirect Purchasers assert claims regarding "ODDs designed to be attached externally to devices such as computers." Putting aside standalone ODD player/recorders designed primarily for audio or visual entertainment purposes that may include additional features and circuitry, such devices typically consist of little other than the ODD, a case, USB connection circuitry and cabling. As such, it seems unlikely that they are typically, if ever, manufactured and sold by entities unrelated to the manufacturers of the ODDs. If so, it is unclear why such products would be part of the Indirect Purchasers' case, rather than that of the Direct Purchasers.

[4] In a related issue, the IP SAC does *not* name the Sony entity that manufactures and sells the PlayStation as a defendant. Presumably Indirect Purchasers contend that entity was not involved in the conspiracy, and that they can therefore recover for any effect that price-fixing of ODDs had on the price of PlayStations. Direct Purchasers, however, have named that Sony entity as a defendant, and apparently contend that their class includes PlayStation purchasers, under the theory that the

that the conspiracy was limited to the named defendants, and perhaps a few unnamed co-conspirators, but did not extend generally to the vast number of entities involved in the manufacturing and selling of products containing ODDs obtained from those defendants. Apart from these amendments that effectively narrow the scope of the claimed conspiracy, both the DP SAC and IP SAC lay out factual allegations that largely parallel those described in the prior dismissal order. Significant additions have been made in only three basic categories: (1) the complaints now allege a series of over two dozen instances of "bid-rigging" involving procurements of ODDs by Dell and HP, and one involving Microsoft, whereas the prior complaints specifically identified only three such events; (2) plaintiffs have articulated a more specific theory as to how the pattern of bid rigging reflects an overall effort to stabilize ODD prices, and; (3) the amendments include allegations of additional communications between various entities.

Furthermore, after the amended complaints were filed, indictments issued and guilty pleas were entered by certain defendants in connection with the Department of Justice investigation referenced in the prior and amended complaints. Plaintiffs have moved to strike materials relating to those indictments submitted by defendants to support their argument that there was no single overarching conspiracy of the nature alleged by plaintiffs. While plaintiffs' motion is well-taken as a technical matter as to what may properly be considered on a motion to dismiss, it is also effectively moot because, as explained in the hearing, the inferences defendants seek to draw from the materials are not tenable. As the criminal cases have been related to this action, the Court is aware of the indictments and guilty pleas. Even though those matters do not appear on the face of the complaints, they are subject to judicial notice. They serve to tip the DOJ investigation from a "non-factor," as it was described in the prior order, to an item of relevance as to the plausibility of plaintiffs' conspiracy claims, albeit well short of dispositive on the breadth of the claimed conspiracy.

---

first transaction outside the conspiracy is a direct purchase. While this presents a conflict between the two complaints, it does not support dismissal of either.

4

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint that fails to state a claim upon which relief may be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555.

In deciding whether the plaintiff has stated a claim upon which relief may be granted, the Court must assume that plaintiff's allegations are true and must draw all reasonable inferences in plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987). However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).[5]

### IV. DISCUSSION

A. <u>Plausibility</u>

The overarching thrust of defendants' attack on the sufficiency of the averments of the amended complaints to state a plausible claim is that plaintiffs have only shored up potential antitrust violations specifically related to bid-rigging, but have added nothing of substance to support a claim of any broader agreement among all the named defendants to fix ODD prices generally across the class period. Defendants fail to assign sufficient import, however, to the changes that have *narrowed* the scope of the alleged conspiracy, thereby rendering the claims substantially more plausible.

---

[5] Subsequent to the hearing, the parties have submitted several statements of recent decisions they contend bear on the issues in this action. In at least one instance, such a statement was simply filed, in others, they were accompanied by requests for leave to submit them, as is required by Civil Local Rule 7-3(d). All the statements of recent decision will be deemed properly filed.

As the prior dismissal order stated, plaintiffs' original allegations, particularly those in the Indirect Purchasers' complaint, were enough to suggest that a conspiracy to fix ODD prices was "at least conceivable." August 3, 2011 Order at 14:17-18; 16:21-17:1. Dismissal was required because not only was the notion of a conspiracy involving untold numbers of third parties who make and sell devices containing ODDs beyond fanciful, the affirmative allegations that at least some of those third parties were *victims* of the conspiracy stood in flat contradiction to any such claim. *See* August 3, 2011 Order at 12:9-14 ("At least in the specific instance of ODD devices manufactured and sold by Dell and HP, plaintiffs have alleged that those third party sellers were unwitting dupes of the illegal activity, not co-conspirators. The most reasonable inference is that most, if not all, of the other sellers of ODD devices who are not directly affiliated with defendants likewise were victims of any agreement to fix ODD prices, not participants in a conspiracy to fix prices of the ODD devices they sold.")

The amended complaints have addressed that problem. Both sets of plaintiffs make clear that they are only contending the prices of ODDs were fixed. The DP SAC specifically alleges that Dell and HP are members of the putative class, as would be any other similarly situated entities that bought ODDs from defendants to incorporate into products made and sold by those entities.[6] The alleged conspiracy, while still large, now entails a discrete number of entities, many of which are interrelated.

The prior order cautioned that it "likely" would not be enough for plaintiffs merely to limit the scope of the conspiracy to price-fixing of ODDs. Indeed, plaintiffs have done more, particularly in alleging with specificity a more sustained series of bid rigging and tying it (albeit with some allegations more conclusory or argumentative than factual) to an overall theory explaining the various ways in which the alleged conspiracy was carried out. While defendants have pointed to certain gaps, arguable inconsistencies, and potentially differing inferences that could be drawn across the whole spectrum of allegations plaintiffs have offered, viewed holistically, there is no

---

[6] Defendants question whether it is realistic that Dell and HP ultimately will participate as class members in this action. While that may present certification issues, it does not undermine the plausibility of the claims at the pleading stage.

6

doubt that the amended complaints more strongly support the plausibility of a conspiracy, even apart from the fact that it is far narrower.

As *Twombly* cautioned, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage . . . a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." 550 U.S. at 556 (citations and footnote omitted). The net effect of the amendments is that both the Direct and Indirect Plaintiffs have, in *Twombly's* terms, "nudged their claims across the line from conceivable to plausible." *See id.* at 570.

B. *Illinois Brick*

As noted above, *Illinois Brick* created a "bright line rule" that only plaintiffs who purchased products directly from alleged price-fixers have standing to pursue damages claims under federal law. The prior dismissal order concluded that, under the conspiracy then alleged, the Direct Purchasers could not in fact be deemed to be direct purchasers of "ODD Products" that had been manufactured and sold by third parties not part of any conspiracy.[7] In addressing the Direct Purchasers' argument that their claims could go forward under *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980) to the extent they had alleged purchases from divisions or subsidiaries of a co-conspirator, the prior order also observed that *Royal Printing* only provides an exception to the bar on claims by *indirect* purchasers; it does not transform indirect purchasers into direct purchasers. The order suggested that for plaintiffs to pursue such claims, counsel for the two groups would have to determine whether it was preferable for them to go forward as a subset of the so-called Direct Purchasers' complaint, or as part of the Indirect Purchasers' claims.

As observed above, the definitions in the DP SAC are not entirely clear, and there is some uncertainty as to the scope of the putative class and the products involved. Seizing on that ambiguity, defendants argue that the Direct Purchasers are impermissibly attempting to evade the

---

[7] To the extent plaintiffs contended that *all* manufacturers and sellers of ODD products were part of the purported conspiracy, they failed to allege facts making such a claim plausible.

*Illinois Brick* rule, and that they still have not alleged facts plausibly showing they are actually direct purchasers, particularly with respect to what they now label as "ODD Devices." Because the Direct Purchasers have unambiguously disclaimed any intent to include products manufactured by non-defendants, their inartful allegations do not present a fatal defect.

While further delineation of product categories and marketing channels may at some point become necessary, at this juncture the DP SAC implicates three basic types of ODD purchases. First, the putative class includes those who purchased ODDs that were not incorporated into any other device. The most obvious examples are entities such as HP and Dell that purchased ODDs designed to be installed internally into computers or other devices. Such devices are also available to consumers to be used as replacements or upgrades in existing computers or other products, thereby extending the putative class to individuals (or non-manufacturing entities) that made such purchases as well. Additionally, so called "external" ODDs, consisting of little more than an internal ODD in a case, are available to consumers. There is no apparent basis to treat such devices, when manufactured and sold by defendants, any differently than "internal" ODDs that are sold prior to installation in another product.[8] With respect to all of these "ODD-only" sales, there is no tenable argument that the putative class members in the DP SAC are not true "direct purchasers" or that *Illinois Brick* stands as a bar to their claims.[9]

A second category of ODDs implicated by the DP SAC is what it (perhaps improvidently) defines as "ODD Devices." As alleged, these are "stand-alone players that typically plug into a television or other audiovisual device . . . that are manufactured by any of the named Defendants or

---

[8] As noted, however, the indirect purchasers may be contending that such external ODDs are encompassed in their complaint. Unless there are third party entities that purchase "internal" ODDs, put them in a case and resell them, this issue may need to be resolved at a later stage, and in any event, further clarity will be required.

[9] Defendants complain that the allegations regarding the *named* plaintiffs' purchases are too vague to determine what kinds of products they purchased. Whether the named plaintiffs can serve as adequate class representatives upon refinement of the class definitions remains to be seen, but it would be premature to parse and dismiss some portion of the claims for lack of standing at this stage.

their affiliates or subsidiaries."[10] The Direct Purchasers have explicitly excluded computers, videogame consoles, and camcorders from that definition.[11] While presumably any number of unrelated third parties also manufacture and sell "stand-alone" players using ODDs they buy from defendants, the Direct Purchasers have avoided that aspect of their prior *Illinois Brick* problem by excluding those devices from their claims.

As defendants point out, however, where an ODD manufactured by one defendant is incorporated into a larger product, even if by an affiliate, subsidiary, or co-conspirator of the manufacturing entity, *Royal Printing* and the prior dismissal order suggest that any claim is better characterized as *indirect*, rather than direct. This issue, though, is one of nomenclature rather than substance. *Royal Printing* itself did not involve separate complaints by groups of plaintiffs characterized as direct or indirect. Indeed, by stating that certain claims could not go forward because they involved purchases that were "*truly* indirect," 621 F.2d at 328 (emphasis added), the decision implies that it would not be entirely wrong to characterize claims permitted under its reasoning as equivalent to those involving "direct" purchases.

Moreover, the prior order expressly left to plaintiffs the decision as to whether these claims should be pursued as part of the Direct Purchasers' complaint or that of the Indirect Purchasers. While it would have been preferable for plaintiffs to have clarified that a consensus was reached to include these claims in the DP SAC rather than the IP SAC, there is no legal reason to bar them from going forward in the same complaint as the other more clearly "direct" claims.

The final category of ODDs within the scope of the DP SAC comprises those sold preinstalled in computers, videogame consoles, or camcorders manufactured and sold by defendants, their affiliates, or subsidiaries.[12] Conceptually, such products are no different than what the DP

---

[10] To the extent this definition might be construed as encompassing "external" ODDs that are designed for use with computers and are essentially just "internal" ODDs in cases, such devices are better classed in the preceding category, as discussed above.

[11] Defendants argue that the DP SAC does not contain any such clear exclusion. To the extent the pleading itself is ambiguous, plaintiffs will be held to the representations made in their briefing and at the hearing.

[12] Again, the definitions of the products and descriptions of the claims are sufficiently unclear that it is arguable that plaintiffs have omitted any claim related to ODDs preinstalled in computers,

1    SAC denominates as "ODD Devices," except that in the case of computers, videogame consoles,
2    and camcorders it is unlikely that the ODD constitutes the major portion of the cost of the device.
3    At the pleading stage at least, that distinction is insufficient to bar the claims from going forward.
4    As *Royal Printing* explained, the *Illinois Brick* rule is grounded in two concerns. First, at least
5    where a product passes through the hands of a "middleman" unconnected to a price-fixing
6    manufacturer, there would exist "intolerable complexities of proof and economics" as to how much,
7    if any, of the inflated cost was passed on to the indirect purchaser, as opposed to being absorbed by
8    the middleman. *Royal Printing*, 621 F.2d at 325 (citing *Illinois Brick*, 431 U.S. at 731-32, 737-45).
9    Second, "allowing indirect purchasers to sue remote price-fixers would open the door to multiple
10   liability for defendants." *Id.*

11        Here, it is unclear to what the degree the first concern of the *Illinois Brick* court is even
12   implicated, as subsidiaries and affiliates in conspiracy with and/or controlled by alleged price-fixers
13   presumably would pass on all of the inflated cost. *See Illinois Brick*, 431 U.S. at 736 n.16
14   (suggesting potential exception where "the direct purchaser is owned or controlled by its
15   customer.") Moreover, as *Royal Printing* observed, "blind application" of the *Illinois Brick* rule
16   should be avoided where it "would eliminate the threat of private enforcement." 621 F.2d at 326
17   n.7. Where a price-fixing manufacturer sells through a subsidiary, affiliate, and/or co-conspirator,
18   not only is there little risk of multiple liability (since the "middleman" in such instances is unlikely
19   to sue) it would undermine the private enforcement mechanisms of the antitrust law to preclude the
20   only party with an interest in pursuing the claim from proceeding. *See id.* at 327 ("Because, as we
21   have already shown, as a practical matter the direct purchasers here will never sue, barring Royal
22   Printing's suit would close off every avenue for private enforcement of the antitrust laws in such
23   cases. This would be intolerable.").

24        Accordingly, without prejudging what issues of proof might arise in connection with
25   establishing a "pass on" of any price-fixing, the Direct Purchasers are entitled to pursue claims

---

27   videogame consoles, and camcorders manufactured by defendants from *both* the DP SAC and the IP
28   SAC. Read liberally, however, it is apparent that the DP SAC should be construed as intending to assert such a claim.

arising from purchases of preinstalled ODDs in computers, videogame consoles, and camcorders, manufactured and sold by defendants, their affiliates, or subsidiaries. Whether such purchases are better characterized as "direct" or "indirect" is immaterial, for the same reasons discussed above in connection with the claims regarding "ODD Devices."

Defendants' remaining arguments regarding *Illinois Brick* and similar issues they contend are implicated under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), rest on the premise that plaintiffs must establish a conspiracy to fix prices of products containing ODDs, not just of the ODDs themselves, if they wish to pursue claims arising from purchases of those products. Plaintiffs' previous attempt to allege such a conspiracy, of course, was rejected as implausible. They need not resurrect that theory to proceed. Plaintiffs may face formidable problems of proof in showing, for example, that a defendant sold its own computers containing ODDs at inflated prices, even assuming they succeed in showing that same defendant was simultaneously engaged in a price-fixing conspiracy that stabilized the prices of ODDs it was selling to other OEM manufacturers. Any such potential hurdles, however, do not warrant dismissal at the pleading stage.

### C. Statute of Limitations

Defendants raised no statute of limitations argument as to the prior complaints, but have done so now. If accepted, defendants' arguments would at most cut off some portion of plaintiffs' claims, at varying points in times based on when each defendant was first named in one of the underlying complaints in this action.

Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff. *Zenith Radio Corporation v. Hazeltine Research, Inc*., 401 U.S. 321, 338. "In the context of a continuing conspiracy to violate the antitrust laws . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. *Id.* The statute is subject to tolling by fraudulent

concealment, which is the plaintiff's burden to plead and prove. *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 505 (1988).

While Defendants contend that plaintiffs' allegations in support of fraudulent concealment are unduly conclusory, they have not shown them to be so deficient as to warrant dismissal at this juncture. Additionally, even assuming plaintiffs may be unable to prove a basis for fraudulent concealment, defendants have not shown exactly what effect that would have on the claims, given the context of an alleged continuing conspiracy, and the differing cutoff dates for various defendants. Issuing a naked statement that plaintiffs claims are barred prior to various specific dates would serve little purpose at this stage of the proceedings, in the absence of more clarity as to what, if any, effect that would have on the scope of the recoverable damages or other matters.

### D. Particular Defendants

Several groups of related defendants have each filed separate motions to dismiss arguing, in essence, that even assuming the complaints state viable claims as to other entities more clearly involved in the alleged conspiracy, they lack sufficient factual averments to tie the moving defendants to any wrongful conduct.[13] As observed in the prior dismissal order, while detailed "defendant by defendant" allegations are not required, a complaint "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT-LCD (Flat Panel) Antitrust Litigation*, *supra,* 586 F.Supp.2d at 1117 (quoting *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F.Supp.2d 303, 311-12 (D.N.J. 2004).

Here, as to those defendants who are alleged to have formed and participated in the joint ventures at the heart of the claimed conspiracy, the complaints plainly are sufficient to meet this

---

[13] The separate motion filed by defendants Quanta Storage Inc. and Quanta Storage America Inc. is an exception because it focuses on an argument that plaintiffs lack Article III standing for failure to plead sufficient facts to establish cognizable injury. Although framed in different terms, the contentions advanced by the Quanta entities are effectively a subset of the issues raised in the joint motions, in that they contend any price-fixing in connection with the Dell and HP auctions does not support an inference that the prices of other ODDs were affected. This argument fails in light of the analysis above.

12

standard. While such defendants may ultimately be able to show that they are not responsible for the conduct of the joint ventures under any legal theory, or for otherwise directly participating in any conspiracy, dismissal at the pleading stage is not appropriate.

Those defendants who were not constituents of any of the relevant joint ventures present a closer call, and in some instances the allegations tying them to the alleged conspiracy are especially thin. Nevertheless, review of the complaints reveals no defendant as to which allegations of fact are so wholly lacking that dismissal would be warranted. Accordingly, the separate motions to dismiss must be denied.

### E. Injunctive Relief in the IP SAC

Defendants contend that the Indirect Purchasers' claim for injunctive relief fails for lack of a sufficient threat of imminent or continuing harm. "[A]n antitrust plaintiff seeking injunctive relief need only show a *threatened* injury, not an actual one." *Lucas Auto. Engineering v. Bridgestone/Firestone, Inc*., 140 F.3d 1228, 1235 (9th Cir. 1998) (emphasis in original). Given the nature of the conspiracy alleged, the IP SAC's allegations are sufficient to support a claim for injunctive relief.

### F. State Law Claims

Defendants challenge the adequacy of the IP SAC claims under the laws of eight specific states and the District of Columbia. While the details of the argument varies from jurisdiction to jurisdiction, defendants' basic contention is that the Indirect Plaintiffs have not pleaded an adequate nexus to, or effect on commerce in, the District of Columbia, New York, Michigan, Mississippi, North Carolina, South Dakota, Tennessee, Wisconsin, and West Virginia. Defendants have not persuasively shown that an alleged conspiracy based outside these jurisdictions is insufficient to give rise to liability under the local laws. Plaintiffs' allegations are adequate, at least at the pleading stage, to show the requisite impact on commerce from the claimed conspiracy in each of those nine jurisdictions.

United States District Court
For the Northern District of California

Defendants' additional challenge to the claim under New York Gen. Business Law § 349 would unduly limit the scope of that statute to fraudulent misrepresentation. The allegations of the IP SAC are sufficient. *See* ("Antitrust-type claims have been recognized under § 349(a)."). *In re Graphics Processing Units Antitrust Lit.*, 527 F.Supp.2d 1011, 1030 (N.D. Cal. 2007).

Contending that a Rule 9 heightened pleading standard applies to claims under Florida and Missouri consumer protection statutes, defendants further argue the IP SAC fails to meet that standard. While it is unclear whether heightened pleading requirements apply to claims not grounded in fraud, the detailed facts plaintiffs have pleaded are sufficient.

Finally, plaintiffs' claims under South Carolina law are not subject to dismissal notwithstanding a limitation on class actions in the state statute. *See Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 130 S.Ct. 1431, 1437-38 (2010) (holding that Rule 23 applies in Federal Court diversity actions). Defendants' attempts to distinguish *Shady Grove* are not persuasive. Accordingly, the motion to dismiss the state law claims must be denied.[14]

---

[14] The Indirect Purchasers concede their claims under New Hampshire and Utah antitrust laws are limited to the time periods beginning January 1, 2008, and May 1, 2006, respectively. For that reason it would be equally appropriate to characterize that one aspect of the motion as having been granted. Regardless how the disposition is characterized, plaintiffs will be held to their concession.

14

## V. CONCLUSION

The motions to dismiss are denied. Defendants shall file answers within 45 days of the date of this order. The parties shall appear for a Case Management Conference on Friday, June 29, 2012 at 10:00 a.m. This order disposes of Docket Nos. 434, 436, 438, 441, 442, 445, 446, 449, 458, 460, 463, and 471.

IT IS SO ORDERED.

Dated: 4/19/12

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE