1  GUIDO SAVERI (22349)
   guido@saveri.com
2  R. ALEXANDER SAVERI (173102)
   rick@saveri.com
3  CADIO ZIRPOLI (179108)
   cadio@saveri.com
4  LISA SAVERI (112043)
   lisa@saveri.com
5  DAVID NATHAN-ALLEN SIMS (248181)
   dsims@saveri.com
6  **SAVERI & SAVERI, INC.**
   706 Sansome Street
7  San Francisco, CA  94111
   Telephone:  (415) 217-6810
8  Facsimile:   (415) 217-6813

9  Counsel for Proposed Direct Purchaser Class

10 [Other Counsel Listed on Signature Page]

11

12                    **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14                     **SAN FRANCISCO DIVISION**

15 | **IN RE OPTICAL DISK DRIVE** | ) | **Case No. 3:10-MD-2143 RS** |
   | **ANTITRUST LITIGATION** | ) | |
16 | | ) | **MDL No. 2143** |
   | | ) | |
17 | | ) | **THIRD CONSOLIDATED DIRECT** |
   | ———————————————— | ) | **PURCHASER CLASS ACTION** |
18 | **This Document Relates to:** | ) | **COMPLAINT** |
   | | ) | |
19 |    **ALL DIRECT PURCHASER** | ) | **JURY TRIAL DEMANDED** |
   |    **ACTIONS** | ) | |
20 | | ) | **(DOCUMENT SUBMITTED** |
   | | ) | **UNDER SEAL)** |
21 | ———————————————— | ) | |

22

23

24

25

26

27

28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

# TABLE OF CONTENTS

**Page(s)**

I. NATURE OF THE ACTION ................................................................... 1

II. JURISDICTION AND VENUE .............................................................. 5

III. PARTIES ............................................................................................... 5

    A.    Plaintiffs ........................................................................................ 5

    B.    Defendants ..................................................................................... 6

            1.    Sony/NEC Defendants .................................................... 6

            2.    LG Defendants ................................................................. 9

            3.    Hitachi Defendants ........................................................ 10

            4.    Toshiba Defendants ....................................................... 12

            5.    Samsung Defendants ..................................................... 13

            6.    TSST Defendants ........................................................... 14

            7.    Lite-On Defendant ........................................................ 15

            8.    Philips Defendants ......................................................... 15

            9.    BenQ Defendants ........................................................... 16

            10.    TEAC Defendants .......................................................... 17

            11.    QSI Defendants .............................................................. 17

            12.    Panasonic Defendants .................................................... 18

IV. AGENTS AND CO-CONSPIRATORS ............................................... 19

V. CLASS ACTION ALLEGATIONS ..................................................... 21

VI. INTERSTATE TRADE AND COMMERCE ....................................... 24

VII. FACTUAL ALLEGATIONS ............................................................... 25

    A.    ODD Technology .......................................................................... 25

    B.    Evolution Of ODDs And Sales ..................................................... 28

    C.    Structural Market Factors Favoring, And Acts Indicative Of, Collusion ................. 31

            1.    Market Concentration .................................................... 31

            2.    Joint Venture Or Other Collaboration ......................... 32

            3.    Barriers to Entry ........................................................... 33

4.    Trade Associations and Business Organizations .......................................... 37

a.    CD Trade Associations ..................................................................... 38

b.    DVD Trade Associations ................................................................... 38

c.    Blu-ray Trade Association ................................................................. 41

d.    Multi-Format Trade Associations ...................................................... 41

e.    Trade Shows ..................................................................................... 45

5.    Standardization of ODDs ................................................................................. 46

E.    Governmental Antitrust Investigations Of the ODD Industry ................................. 78

F.    Economic Data on Pricing and Supply .................................................................. 82

G.    History of Collusion In Other Industries ............................................................... 89

VIII.    CAUSE OF ACTION FOR VIOLATION OF U.S. ANTITRUST LAWS ........................ 92

IX.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF
LIMITATIONS ................................................................................................................ 94

PRAYER FOR RELIEF .............................................................................................................. 99

JURY TRIAL DEMANDED ..................................................................................................... 101

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                                     ii

1.     Plaintiffs JLK Systems Group, Inc., Jeff Kozik, Meijer, Inc. and Meijer Distribution, Inc., Paul Nordine, Seneca Data Distributors, Inc., Gregory Starrett, and Ashley Tremblay, all of whom are direct purchasers from a Defendant of **Optical Disk Drives ("ODDs")**, either as standalone products or which are incorporated into electronic devices such as desktop or notebook computers, individually and on behalf of the Class described below, bring this class action against Defendants for damages under the antitrust laws of the United States, and hereby demand a trial by jury.  Plaintiffs allege on information and belief that, during the period from January 1, 2004 until at least January 1, 2010 (the "Class Period"), Defendants agreed among themselves to coordinate the prices of ODDs sold in the United States with the object of stabilizing those prices and that the acts committed in furtherance of this agreement included, *inter alia*, the rigging of bids for ODDs in procurement events conducted by certain Original Equipment Manufacturers ("OEMs"), the sharing of confidential information (including pricing information) that facilitated price coordination, cooperation agreements pursuant to which prices for ODDs sold in the United States to both OEMs and non-OEMs were set, and allocation of customers and markets. As a result of Defendants' unlawful conduct, Plaintiffs and members of the proposed Class paid higher prices for ODDs manufactured and sold by Defendants in the United States than they would have paid in a competitive market.  Except as to Plaintiffs' own actions, this Complaint is based on information and belief, including public reports, Defendants' own filings with the Securities & Exchange Commission ("SEC") and other regulatory authorities and a partial review of the over 4.3 million documents (many comprising multiple pages) produced by certain Defendants and made available to Plaintiffs after the filing of their "Consolidated Direct Purchaser Class Action Amended Complaint" (Aug. 26, 2010) (Dkt. No. 159) that were also furnished to the United States Department of Justice ("DOJ") as part of its investigation into anticompetitive practices in the ODD industry, as well as other documents obtained through discovery in this case.

I.     **NATURE OF THE ACTION**

2.     As discussed in greater detail below, an ODD uses laser light (or electromagnetic wavelength) to read and/or write data to or from an optical disc. **ODDs consist of both internal drives** built to be incorporated or inserted into electronic devices (including notebook and desktop

1 computers, and Microsoft Xboxes) and **external drives** that attach to a notebook or desktop

2 computer or other electronic device by means of an external interface, such as a Universal Serial

3 Bus ("USB") connection. ODDs utilize the following optical disc formats: (a) compact discs

4 ("CDs"), such as CD-ROMs or CD-recordable/rewritable discs ("CD-R/RWs"); (b) digital versatile

5 discs ("DVDs"), such as DVD-ROMs or DVD-recordable/rewritable discs ("DVD±R/RWs"); (c)

6 Blu-ray products, such as Blu-ray discs ("BDs") and Blu-ray-recordable/rewritable discs ("BD-

7 R"/"BD-RWs"); (d) High Definition DVDs ("HD-DVDs"); and (e) Super Multi-Drives or other

8 combination drives that read from and/or write to various types of the foregoing media.  These

9 various types of formats are described in greater detail below.

10     3.     The following images are photographs of examples of ODDs as defined herein.





THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                          2

4.      As used herein, **ODDs** consist of ODDs **that are supplied by any of the named Defendants or their affiliates or subsidiaries.**[1]

5.      ODDs that are external drives are sold alone, typically with some sort of connecting interface.  ODDs that are internal drives are used inside of electronic devices, such as computers, to read and write data for a variety of uses, including software programs and data compilations.  For this purpose, ODDs have largely replaced "floppy" disk drives and the even-older tape drives that used magnetic disks or tapes to read, record and store data.

6.      The ODD market is one of the fastest growing markets in the electronics industry. During the Class Period, ODDs served as one of the primary means for recording and reading music, movies, and other digital data. During this time, Defendants' sales of ODDs generated billions of dollars in annual revenues and expanded exponentially with the increased utilization of computers in households and businesses throughout the United States.  In the United States and across the world, almost all forms of home entertainment and data storage are on optical discs. Most computers that are used or sold in the United States come equipped with an ODD.  As of 2008, the Defendants and their Co-conspirators control over 90% of this multibillion dollar a year market.

7.      Defendants, the leading manufacturers, sellers and distributors of ODDs, and their Co-conspirators, coordinated and agreed for the purpose of stabilizing the prices of ODDs manufactured and sold by them. In furtherance of this agreement, *inter alia*: (a) Defendants engaged in the rigging of bids (with respect to pricing, bid rankings and other matters) for certain procurement events for ODDs conducted by major OEMs situated in the United States, such as Dell Inc. ("Dell") and Hewlett-Packard Company ("H-P"); (b) certain Defendants colluded on pricing of ODDs sold to Microsoft Corporation ("Microsoft") for use in its Xbox game console; (c) certain Defendants engaged in cooperation agreements that resulted in the setting of prices or the

---

[1] This would include ODDs manufactured by one Defendant that are sold to another Defendant who then sells them to a direct purchaser. The sale to the first purchaser outside the conspiracy constitutes a direct purchase within the meaning of the antitrust laws.

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                          3

allocation of customers with respect to OEM and/or non-OEM ODD sales; and (d) Defendants and their Co-conspirators exchanged confidential business information concerning ODDs, including, *inter alia*, prices charged and to be charged for ODDs, rebate information on ODDs, production capacity with respect to ODDs, business plans for ODDs, plans for the introduction of new ODDs, roadmaps for product rollouts and production, product quality information, product inventory and shipping information, company responses to customer initiatives,  and plans for the cessation of manufacture of ODDs that had reached the ends of their respective lifecycles. During the Class Period, this conduct as a whole affected billions of dollars of commerce throughout the United States.  The aforementioned agreement and coordination were facilitated by an industry structure and a commoditized product that were conducive to such conduct.  As a result of Defendants' and their Co-conspirators' conduct, Plaintiffs and members of the putative Class have been injured in their business and property by paying more for ODDs than they would have paid in the absence of Defendants' and their Co-conspirators' conspiracy.

8.      An investigation by the DOJ has been launched into anticompetitive conduct with respect to ODDs.  It was initiated by an application for amnesty by one group of Defendants.  Many of the Defendants named in this complaint have a long history of engaging in anticompetitive conduct, having consistently sought to fix prices for a wide variety of products sold in the United States, such as Dynamic Random Access Memory ("DRAM"), Thin Film Transistor Liquid Crystal Display ("TFT-LCD") panels, and Cathode Ray Tubes ("CRTs"), among others.  Through the conduct described herein the Defendants entered into an agreement the object of which was to stabilize the prices for and allocate markets or customers with respect to ODDs.  When the prices of ODDs began to decrease, the Defendants' conduct kept prices of ODDs at a supracompetitive level.

9.      Plaintiffs bring this action seeking treble damages, injunctive relief, and costs of suit (including reasonable attorneys' fees) under Section 1 of the Sherman Act (15 U.S.C. §1), and Section 4 of the Clayton Act (15 U.S.C. § 15), to recover for the injuries that Plaintiffs and all others similarly situated sustained as a result of the Defendants' illegal conduct.

II.      **JURISDICTION AND VENUE**

10.      This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15).

11.      Jurisdiction of this Court is founded on Sections 4 and 16 of the Clayton Act (15 U.S.C. § 15, 26) for violations of Section 1 of the Sherman Act (15 U.S.C. § 1), and on 28 U.S.C. §§ 1331, 1337.

12.      Venue is proper in this district pursuant to 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391(b), (c), in that more than one Defendant resides in the judicial district, is licensed to do business and/or is doing business in this judicial district.  The interstate trade and commerce described herein has been carried out, in part, within this district.

13.      Defendants are subject to this Court's jurisdiction because of their nationwide contacts and other activities, as well as their contacts and other activities with the State of California.

III.     **PARTIES**

A.      **Plaintiffs**

14.      Plaintiff **JLK Systems Group, Inc. ("JLK")** is a Pennsylvania corporation with its principal place of business in Moscow, Pennsylvania.  During the Class Period, JLK purchased an ODD directly from one of the Defendants, and suffered injury as a result of Defendants' conduct alleged herein.

15.      Plaintiff **Jeff Kozik ("Kozik")** is a resident of Pennsylvania.  During the Class Period, Kozik purchased an ODD directly from one of the Defendants, and suffered injury as a result of Defendants' conduct alleged herein.

16.      Plaintiffs **Meijer, Inc.** and **Meijer Distribution, Inc. ("Meijer")** are Michigan corporations with their principal place of business in Grand Rapids, Michigan.  During the Class Period, Meijer purchased ODDs directly from one of the Defendants, and suffered injury as a result of Defendants' conduct alleged herein.

17.     Plaintiff **Paul Nordine ("Nordine")** is a resident of Illinois.  During the Class Period, Nordine purchased an ODD directly from one of the Defendants, and suffered injury as a result of Defendants' conduct alleged herein.

18.     Plaintiff **Seneca Data Distributors, Inc. ("Seneca")** is a New York Corporation with its principal place of business in N. Syracuse, New York.  During the Class Period, Seneca purchased ODDs directly from one or more of the Defendants, and suffered injury as a result of Defendants' conduct alleged herein.

19.     Plaintiff **Gregory Starrett ("Starrett")** is a resident of North Carolina.   During the Class Period, Starrett purchased an ODD directly from one or more of the Defendants, and suffered injury as a result of Defendants' conduct alleged herein.

20.     Plaintiff **Ashley Tremblay ("Tremblay")** is a resident of Washington State. During the Class Period, Tremblay purchased an ODD directly from one or more of the Defendants, and suffered injury as a result of Defendants' conduct alleged herein.

**B.**     **Defendants**

**1.**     **Sony/NEC Defendants**

21.     Defendant **Sony Corporation ("SC")** is a business entity organized under the laws of Japan, with its principal place of business located at 1-7-1, Konan, Minato-Ku, TKY 108-0075, Japan.  SC controls an integrated global enterprise comprised of itself and other entities, including the other Sony and Sony Optiarc Defendants described herein. During the Class Period, Sony manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

22.     Defendant **Sony Optiarc Inc.** is a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  During the Class Period, Sony Optiarc Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States. Sony Optiarc Inc. is now part of Sony Corporation's Consumer Products & Devices Group and is headed by Shinichi Yamamura, who formerly ran Sony NEC Optiarc Inc.

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                                     6

23.     Defendant **NEC Corporation ("NEC")** is a business entity organized under the laws of Japan with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan.  During the Class Period, NEC manufactured, sold, and/or distributed ODDs to customers throughout the United States and directly caused ODDs to be imported into the United States.

24.     Defendant **Sony NEC Optiarc Inc. ("Sony NEC")** was a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  Sony NEC was created on April 3, 2006 as a joint venture between Defendants Sony Corporation and NEC in which Sony Corporation had a 55% interest and NEC had a 45% interest.  These percentages were based on the present value of future cash flows each joint venturer would receive from the joint venture, including cash flows obtained through the conspiracy alleged herein. Defendant Sony Corporation designated the President of Sony NEC and Defendant NEC designated the Vice-President. Shinichi Yamamura, who was Deputy President of Video Business Group of Sony Corporation, became President of the new company. Sony Corporation purchased NEC's interest in Sony NEC in 2008 and renamed it Sony Optiarc Inc.  During a portion of the Class Period, Sony NEC manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States. The press release announcing the formation of Sony NEC said that "[a]s a result of this agreement, Sony will make Sony NEC Optiarc Inc. a wholly-owned subsidiary of the Sony group"; that Shinichi Yamamura, Deputy President of the Video Business Group of Sony Corporation, would serve as Sony NEC's "Representative Director and President"; and that other directors were "[s]cheduled to be elected from within the Sony group." The directors eventually appointed were Shigeki Ishizuka, Hidenosuke Kanai, Masaharu Yanaga, and Shigeru Kato, all from Sony Corporation.

25.     Defendant **Sony Optiarc America Inc.**, formerly known as Sony NEC, is a wholly owned subsidiary of Sony Optiarc Inc.  Sony Optiarc America Inc. is a Delaware corporation with its principal place of business located at 1730 N. First Street, San Jose, California 95112.  Sony Optiarc America Inc. was originally established as a joint venture with NEC in April of 2006 before Sony announced that it would take over NEC's 45% share on September 11, 2008.  During

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

7

1   a portion of the Class Period, Sony Optiarc America Inc. manufactured, sold and/or distributed

2   ODDs throughout the United States and imported ODDs into the United States.

3          26.     Defendant **Sony Electronics Inc. ("SEI")** is a Delaware corporation with its

4   principal place of business at 555 Madison Avenue, 8th floor, New York, New York 10022.  SEI is

5   a wholly owned subsidiary of Sony Corporation of America, which in turn, is a wholly owned

6   subsidiary of defendant Sony Corporation.   During the Class Period, SEI manufactured, sold and/or

7   distributed ODDs throughout the United States and imported ODDs into the United States.

8          27.     According to SC's SEC Form 20-F for the year ending March 21, 2010, SC is

9   divided into business segments, including Consumer Products & Devices, Networked Products &

10  Services, and B2B and Disc Manufacturing.  The former two segments contain ODDs.  The Form

11  20-F states that "[i]n most cases, sales of Sony's electronics products are made to sales subsidiaries

12  of Sony Corporation located in or responsible for sales in the countries and territories where Sony's

13  products and services are marketed. These subsidiaries then sell those products to unaffiliated local

14  distributors and dealers or through direct sales via the Internet. In some regions, sales of certain

15  products and services are made directly to local distributors by Sony Corporation."  As the Form

16  20-F further explains, "Sony markets its electronics products and services through Sony Electronics

17  Inc. and other wholly-owned subsidiaries in the U.S."  The independent accounting report in the

18  Form 20-F refers to SC and its consolidated subsidiaries as "Sony."

19         28.     A former employee of Sony Optiarc Inc. has asserted that both Sony Optiarc Inc. and

20  SEI are "controlled by Sony Corporation."

21         29.     Defendants Sony Optiarc America Inc., Sony NEC, and Sony Optiarc Inc. are

22  referred to individually and collectively herein as **"Sony Optiarc."  All of the entities referred to**

23  **as Sony Optiarc participated in the collusive conduct described herein, either directly or**

24  **where they were represented by other members of the Sony Optiarc group of Defendants.**

25         30.     Defendants Sony Corporation, Sony Electronics Inc., Sony Optiarc America Inc.,

26  Sony NEC, and Sony Optiarc Inc. are referred to individually and collectively herein as **"Sony." All**

27  **of the entities referred to as Sony participated in the collusive conduct described herein, either**

28  **directly or where they were represented by other members of the Sony group of Defendants.**

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                              8

2. **LG Defendants**

31.     Defendant **LG Electronics, Inc. ("LGE")** is a business entity organized under the laws of South Korea, with its principal place of business at 26/F Twin Tower South 20, Yeouido-Dong, Yeoungdeungpo-Gu, Seoul, SEO 150-721, South Korea.  LGE controls an integrated global enterprise comprised of itself and other entities, including the other LG Defendants described herein, Hitachi-LG Data Storage, Inc. and Hitachi-LG Data Storage Korea, Inc. During the Class Period, LGE manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

32.     Defendant **LG Electronics USA, Inc. ("LGUSA")** is a business entity that has its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.  LGUSA is a wholly owned subsidiary of LG Electronics Inc.  During the Class Period, LGUSA manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States.

33.     LGE's 2009 Annual Report shows that the company's Vice-Chairman and CEO, Yong Nam, closely oversees its five primary business segments, which operate globally. The President and CEO in charge of each such segment reports to him, as does Seog Won (Wayne) Park, Executive Vice-President and CEO for North America.  The same report shows companywide procurement, marketing and supply chain officers. It depicts the "Global Operations" of LGE, including the role of LGUSA.

34.     Also of significance is a 2008 presentation by LGE at the Korea Invest Forum depicting LGE's "Global Operations."  As part of the company's cost reduction efforts,  page 8 refers to "[g]lobal consolidated sourcing," "rationalizing overhead," and capital spending controls. The next page refers to "[r]estructuring companies around clear product management roles to improve profit accountability" and "[g]lobalizing HR system."  There are references in the presentation to performance scorecards being maintained "for all business units and countries."  The presentation noted that "30%+ of key management positions [are] filled with global talent."  Thus, it is clear that LGE and its subsidiaries also operate as a vertically-integrated "top-down" structure.

35.     Defendants LG Electronics, Inc. and LGUSA are referred to individually and collectively herein as **"LG."  All of the entities referred to as LG participated in the collusive conduct described herein, either directly or where they were represented by other members of the LG group of Defendants.**

### 3.     Hitachi Defendants

36.     Defendant **Hitachi, Ltd.** is a business entity organized under the laws of Japan with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280, Japan. Hitachi, Ltd. controls an integrated global enterprise comprised of itself and other entities including Defendant Hitachi-LG Data Storage, Inc.  During the Class Period, Hitachi, Ltd., manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

37.     Defendant **Hitachi-LG Data Storage, Inc.** is a business entity organized under the laws of Japan with its principal place of business located at 4F MSC Center Building, 22-23 Kaigan 3-Chome, Minato-Ku, Tokyo, Japan, 108-0022.  Hitachi-LG Data Storage, Inc. is a joint venture formed in January of 2001 and is owned 51% by Defendant Hitachi, Ltd. and 49% by Defendant LG.  During the Class Period, Hitachi-LG Data Storage, Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused to be imported into the United States.

38.     Defendant **Hitachi-LG Data Storage Korea, Inc.** is a business entity organized under the laws of South Korea with its principal place of business located at LG Gasan Digital Center, 459-9 Gasan-dong, Geumcheon-gu, Seoul, 153-803 Korea.  Hitachi-LG Data Storage Korea, Inc. is part of the joint venture formed in January of 2001 and is owned 51% by defendant Hitachi, Ltd. and 49% by defendant LG.  During the Class Period, Hitachi-LG Data Storage Korea, Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

39.     According to Hitachi, Ltd.'s SEC Form 20-F for the year ending June 29, 2010, Hitachi, Ltd. views HLDS as a "subsidiary" in connection with the international antitrust investigations involving the ODD industry. Hitachi, Ltd. divides its international business into multiple segments; ODDs are part of the "Digital Media & Consumer Products" segment. *Id.* at 15,

1    26.  There is a "Hitachi group global business (Americas)" headed by Tadahiko Ishigaki, a Senior

2    Vice-President and Executive Officer of Hitachi, Ltd.  As part of its ongoing restructuring of

3    operations, Hitachi, Ltd. is "promoting shared services over a wide range of areas such as

4    procurement, logistics, document services, cafeteria operations, security, personnel management

5    and financial management."  In a section entitled "Strengthening of Consolidated Group

6    Management" Hitachi, Ltd. states:

> Our consolidated group includes a number of subsidiaries and affiliates including publicly listed companies. We have taken and continue to take measures with a view to fostering closer ties and establishing a closer capital relationship among such group companies and facilitating the timely implementation of business strategies and other initiatives, leading to improved competitiveness and profitability. For example, we converted five listed consolidated subsidiaries into wholly owned subsidiaries, which we believe will benefit our Social Innovation Business by establishing closer ties and relationships and will also enable us to reflect more of those companies' profits in our statement of operations.
>
> ****
>
> Furthermore, our headquarters division will focus additional attention on generating synergies and address issues that have group-wide implications such as the adoption of a uniform advanced IT platform, and coordinating production engineering, procurement and our brand to help in-house companies and group companies strengthen competitiveness. Our headquarters division will also attempt to develop business fields that incorporate elements of our information and communication technology and social infrastructure businesses.

18        40.    Hitachi, Ltd. and its subsidiaries are referred to collectively in this Form 20-F as

19   "Hitachi."

20        41.    In its SEC Form 6-K dated November 16, 2009 that is described in more detail

21   below, Hitachi, Ltd. disclosed that: (a) "a subsidiary" in Japan and "a subsidiary" in Korea are the

22   targets of investigations by various countries' antitrust agencies with respect to antitrust violations

23   relating to ODDs; (b) these investigations may result in private actions being brought "against

24   Hitachi" and (c) they could have a "material adverse effect on Hitachi's business."  Hitachi, Ltd.

25   reports financial data for Hitachi-LG Data Storage, Inc. in its consolidated annual financial results,

26   where it indicates that its "Optical Disk Drive operations" are conducted by Hitachi-LG Data

27   Storage, Inc.

28

---

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                              11

42.     Defendants Hitachi, Ltd., Hitachi-LG Data Storage, Inc. and Hitachi-LG Data Storage Korea, Inc. are referred to individually and collectively herein as **"HLDS." All of the entities referred to as Hitachi participated in the collusive conduct described herein, either directly or where they were represented by other members of the HLDS group of Defendants.**

**4.     Toshiba Defendants**

43.     Defendant **Toshiba Corporation** is a business entity organized under the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  Toshiba Corporation controls an integrated global enterprise comprised of itself and other entities, including Defendants Toshiba Samsung Storage Technology Corp., Toshiba Samsung Storage Technology Corp. Korea, Toshiba America Information Systems, Inc. and Toshiba America Consumer Products LLC ("TACP").  During the Class Period, Toshiba Corporation manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

44.     Defendant **Toshiba America Information Systems, Inc. ("TAIS")** is a California corporation that has its headquarters at 9740 Irvine Blvd, Irvine, California 92718-1697. TAIS is a wholly-owned and controlled subsidiary of Toshiba America, Inc., which is in turn a wholly-owned subsidiary of Toshiba Corp. During the Class Period, TAIS manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States. During the Class Period, TACP also manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States. TACP was merged into TAIS on July 1, 2010.

45.     Toshiba Corporation's 2009 Annual Report contains a letter from Norio Sasaki (President and CEO of Toshiba Corporation) and Atsutoshi Nishida (Toshiba Corporation's Chairman) that refers to the "Toshiba Group" and its "Group-wide efforts" to carry out a profitability action plan "set up with the key objectives of transforming Toshiba Group into a Group with a strongly profitable business structure...."  The Annual Report depicts an organization chart that shows Toshiba Corporation's board and President and CEO exercising control and reporting authority over multiple product segment subgroups, including the "Digital Products Group," which has responsibility for storage devices and personal computers.  The Annual Report lists Toshiba

1   Samsung Storage Technology Corp. and TAIS as overseas "Consolidated Subsidiaries."  Toshiba

2   Corporation's 2009 Financial Review incorporated in its Annual Report noted that the Toshiba

3   Group was comprised of Toshiba Corporation and various "Consolidated Subsidiaries" that operate

4   in its multiple business segments.

5          46.      Defendants Toshiba Corporation, Toshiba Samsung Storage Technology Corp. and

6   TAIS (which now includes the merged TACP) are referred to individually and collectively herein as

7   **"Toshiba."  All of the entities referred to as Toshiba participated in the collusive conduct**

8   **described herein, either directly or where they were represented by other members of the**

9   **Toshiba group of Defendants.**

10             **5.       Samsung Defendants**

11         47.      Defendant **Samsung Electronics Co., Ltd. ("SECL")** is a business entity organized

12   under the laws of South Korea, with its principal place of business at Samsung Main Building 250,

13   Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea.  SECL controls an integrated global enterprise

14   comprised of itself and other entities, including Defendants Toshiba Samsung Storage Technology

15   Corp. and Toshiba Samsung Storage Technology Corp. Korea.  During the Class Period, SECL

16   manufactured, sold and/or distributed ODDs throughout the United States and directly caused

17   ODDs to be imported into the United States.

18         48.      Defendant **Samsung Electronics America, Inc. ("SEAI")** is a subsidiary of SECL,

19   with its principal place of business at 105 Challenger Rd., Ridgefield Park NJ 07660.  During the

20   Class Period, SEAI manufactured, sold and/or distributed ODDs throughout the United States and

21   imported ODDs into the United States.

22         49.      SECL's 2008 Annual Report contains an organizational chart depicting the tight

23   control SEC exercises over its various business segments, with the "Digital Media &

24   Communications Business" reporting directly to SECL's CEO. SECL touts its "board-centered

25   corporate governance system" that ensures "accountability in management"; "the board actively

26   supports top management in effectively managing the company to maximize corporate value." SEC

27   runs a "Samsung Advanced Institute of Technology"--the "global hub of our R&D business."  The

28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                          13

1    independent auditor's report incorporated in the Annual Report refers to SECL and its "controlled

2    subsidiaries" as "the Company."  SEAI is among them.

3         50.    Defendants SECL and SEAI are referred to individually and collectively herein as

4    **"Samsung." All of the entities referred to as Samsung participated in the collusive conduct**

5    **described herein, either directly or where they were represented by other members of the**

6    **Samsung group of Defendants.**

7              **6.    TSST Defendants**

8         51.    Defendant **Toshiba Samsung Storage Technology Corp.** is a business entity

9    organized under the laws of Japan with its principal place of business located at 1-1, Shibaura 1-

10   chome, Minato-ku, Tokyo 105-8001, Japan (the same address as Toshiba's).  Toshiba Samsung

11   Storage Technology Corp. is a joint venture formed in 2004 and owned 51% by Defendant Toshiba

12   and 49% by Defendant Samsung.  During the Class Period, Toshiba Samsung Storage Technology

13   Corp. manufactured, sold and/or distributed ODDs throughout the United States and directly caused

14   ODDs to be imported into the United States.

15        52.    Defendant **Toshiba Samsung Storage Technology Corp. Korea ("TSST Korea")**

16   is a business entity organized under the laws of South Korea with its principal place of business

17   located at 14th Floor, Building No. 102, Digital Empire 2, 486, Sin-dong, Yeongtong-gu, Suwon-

18   si, Gyonggi-do, Korea 443-734, which is part of the Samsung Digital Complex.  In its 2009

19   Annual Report, Toshiba lists TSST Korea as an overseas subsidiary.  During the Class Period,

20   TSST Korea manufactured, sold and/or distributed ODDs throughout the United States and

21   directly caused ODDs to be imported into the United States. TSST Korea's website notes that it

22   operates through the "common relevant organization for mutual consent.  We are currently

23   responsible for the product development, marketing and sales, and have been taking advantage of

24   the existing network of Samsung Electronics and Toshiba for manufacturing, sales and after-sales

25   service."  The website notes further that "TSST is the result of close cooperation between Samsung

26   Electronics and Toshiba....."

27        53.    Defendants Toshiba Samsung Storage Technology Corp. and TSST Korea are

28   referred to individually and collectively herein as **"TSST".** TSST operates sales offices in North

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                          14

America and has Logistics Centers in Miami, Florida and San Diego, California. **All of the entities referred to as TSST participated in the collusive conduct described herein, either directly or where they were represented by other members of the TSST group of Defendants.**

### 7.   Lite-On Defendant

54.    Defendant **Lite-On IT Corp. of Taiwan ("Lite-On")** is a business entity organized under the laws of Taiwan with its principal place of business located at 12F, 392, Ruey Kuang Road, Neihu, Taipei 114, Taiwan, R.O.C. Lite-On controls an integrated global enterprise comprised of itself and other entities including Defendants Philips & Lite-On Digital Solutions Corp. and Philips & Lite-On Digital Solutions USA, Inc. During the Class Period, Lite-On manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

### 8.   Philips Defendants

55.    Defendant **Koninklijke Philips Electronics N.V. ("Philips")** is a Dutch company with its principal place of business at Groenewoudsweg 1, Einhoven 5261BA, the Netherlands. During the Class Period, Philips controlled an integrated global enterprise comprised of itself and other entities including Defendants Philips and Lite-On Digital Solutions Corp. and Philips & Lite-On Digital Solutions USA, Inc. Philips manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

56.    Defendant **Philips & Lite-On Digital Solutions Corp.** is a business entity organized under the laws of Taiwan, with its principal place of business located at 16F, 392, Ruey Kuang Road, Neihu, Taipei, 114, Taiwan, R.O.C. Philips & Lite-On Digital Solutions Corp., established in March of 2007, is a joint venture created by Philips and Lite-On. Philips & Lite-On Digital Solutions Corp.'s operations include: design, development, sales, marketing, customer support, and service of ODDs. During a portion of the Class Period, Philips & Lite-On Digital Solutions Corp manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

57.    Defendant **Philips & Lite-On Digital Solutions USA, Inc.** is a business entity organized under the laws of Delaware, with its principal place of business located at 42000 Christy

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

15

1    Street, Fremont, California 94538. Philips & Lite-On Digital Solutions USA, Inc. is a subsidiary

2    company of Philips & Lite-On Digital Solutions Corp.  Philips & Lite-On Digital Solutions USA,

3    Inc. serves customers in the North and Latin American regions.  During a portion of the Class

4    Period, Philips & Lite-On Digital Solutions USA, Inc. manufactured, sold, and/or distributed ODDs

5    to customers throughout the United States and imported ODDs into the United States.

6         58.    Defendants Philips, Philips & Lite-On Digital Solutions Corp. and Philips & Lite-On

7    Digital Solutions USA, Inc. are referred to individually and collectively herein as **"PLDS." All of**

8    **the entities referred to as PLDS participated in the collusive conduct described herein, either**

9    **directly or where they were represented by other members of the PLDS group of Defendants.**

10        59.    In October of 2007, a representative of TSST indicated that **"PLDS & Lite-on are**

11   **completely identical companies with different names.**  Sony denies purchasing product from

12   PLDS, that's why PLDS does business with Sony as name of Lite-on, **but operation and**

13   **manufacturing is exactly same."** (Emphases added).

14        **9.    BenQ Defendants**

15        60.    Defendant **BenQ Corporation** (now operating under the name QISDA Corporation)

16   is a business entity organized under the laws of Taiwan, with its principal place of business at 16

17   Jehu Rd., Neihu, Taipei 114, Taiwan.  BenQ Corporation controls an integrated global enterprise

18   comprised of itself and other BenQ entities.  BenQ Corporation formed a joint venture with Philips

19   in February of 2003 to manufacture and distribute ODDs that was called **BenQ Philips Digital**

20   **Storage ("PBDS")**.  PBDS was owned 51% by Philips and 49% by BenQ Corporation.  In April of

21   2006, Lite-On acquired BenQ Corporation's ODD business and eventually replaced BenQ

22   Corporation in PBDS, which was renamed PLDS.  At the time of Lite-On's acquisition, there was

23   an internal memorandum saying that **"[t]he consensus of both companies is to further integrate**

24   **R&D and [the] sales and marketing force into one entity, the PBDS."** (Emphases added).

25   During the Class Period, BenQ Corporation, separately or through PBDS, manufactured, sold

26   and/or distributed ODDs throughout the United States and directly caused ODDs to be imported

27   into the United States.

28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                              16

1      61.     Defendant **BenQ America Corporation ("BenQ America")** is a California

2  corporation with its principal place of business at 15375 Barranca, Suite A205, Irvine, California

3  92618. BenQ America is a wholly-owned and controlled subsidiary of Defendant BenQ

4  Corporation. During the Class Period, BenQ America manufactured, sold and/or distributed ODDs

5  throughout the United States and imported ODDs into the United States.

6      62.     Defendants BenQ Corporation and BenQ America are referred to individually and

7  collectively herein as **"BenQ." All of the entities referred to as Ben-Q participated in the**

8  **collusive conduct described herein, either directly or where they were represented by other**

9  **members of the Ben-Q group of Defendants.**

10     **10.     TEAC Defendants**

11     63.     Defendant **TEAC Corporation** is a business entity organized under the laws of

12  Japan, with its principal place of business at 1-47 Ochiai, Tama-shi, Tokyo 206-8530, Japan.

13  TEAC Corporation controls an integrated global enterprise comprised of itself and other TEAC

14  entities. During the Class Period, TEAC Corporation manufactured, sold and/or distributed ODDs

15  throughout the United States and caused ODDs to be imported into the United States.

16     64.     Defendant **TEAC America, Inc. ("TEAC America")** is a California corporation

17  with its principal place of business at 7733 Telegraph Rd., Montebello, California 90640. TEAC

18  America is a wholly-owned and controlled subsidiary of Defendant TEAC Corporation. During the

19  Class Period, TEAC America manufactured, sold and/or distributed ODDs throughout the United

20  States and imported ODDs into the United States.

21     65.     Defendants TEAC Corporation and TEAC America are referred to individually and

22  collectively herein as **"TEAC." All of the entities referred to as TEAC participated in the**

23  **collusive conduct described herein, either directly or where they were represented by other**

24  **members of the TEAC group of Defendants.**

25     **11.     QSI Defendants**

26     66.     Defendant **Quanta Storage Inc.** is a business entity organized under the laws of

27  Taiwan, with its principal place of business at 3F NO.188 Wenhua 2nd Rd., Guishan Shiang,

28  Taoyuan County 333,Taiwan. Quanta Storage Inc. controls an integrated global enterprise

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                17

1    comprised of itself and other Quanta entities.  During the Class Period, Quanta Storage, Inc.

2    manufactured, sold and/or distributed ODDs throughout the United States and directly caused

3    ODDs to be imported into the United States.

4         67.    Defendant **Quanta Storage America, Inc.  ("Quanta America")** is a California

5    corporation with its principal place of business in Fremont, California.  Quanta America is a

6    wholly-owned and controlled subsidiary of Defendant Quanta Storage Inc.  During the Class Period,

7    Quanta America manufactured, sold and/or distributed ODDs throughout the United States and

8    imported ODDs into the United States.

9         68.    Defendants Quanta Storage Inc. and Quanta America are referred to individually and

10   collectively herein as **"QSI."  All of the entities referred to as QSI participated in the collusive**

11   **conduct described herein, either directly or where they were represented by other members of**

12   **the QSI group of Defendants.**

13        **12.    Panasonic Defendants**

14        69.    Defendant **Panasonic Corporation** is a Japanese entity with its principal place of

15   business at 1006 Oaza Kadoma, Kadoma, Osaka 571-8501, Japan.  Up until October 1, 2008,

16   Panasonic Corporation was known as Matsushita Electric Industrial Co., Ltd.  Panasonic controls an

17   integrated global enterprise comprised of itself and other Panasonic entities.  During the Class

18   Period, Panasonic Corporation manufactured, sold, and/or distributed ODDs throughout the United

19   States and directly caused ODDs to be imported into the United States.

20        70.    Defendant **Panasonic Corporation of North America ("PCNA")**, formerly known

21   as Matsushita Electric Corporation of America, is a Delaware corporation with its principal place of

22   business at 1 Panasonic Way, Secaucus, New Jersey.  PCNA is a wholly-owned and controlled

23   subsidiary of Panasonic Corporation.  During the Class Period, PCNA manufactured, sold and/or

24   distributed ODDs manufactured by Panasonic Corporation throughout the United States and

25   imported ODDs into the United States.

26        71.    Defendants Panasonic Corporation and PCNA are referred to individually and

27   collectively herein as **"Panasonic."  All of the entities referred to as Panasonic participated in**

28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                              18

the collusive conduct described herein, either directly or where they were represented by other members of the Panasonic group of Defendants.

72.     The conduct alleged herein was carried out by Defendants' officers, agents, employees, or representatives, while engaged in the usual management of Defendants' business.

73.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

74.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts on behalf of every company in that family. In fact, the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, the entire corporate family was represented by their agents with respect to such conduct and was party to the agreements reached by such agents.

75.     Each of the Defendants named herein acted as the agent of, co-conspirator with, or joint venturer of the other Defendants and Co-conspirators with respect to the acts, violations and common course of conduct alleged herein. Each Defendant or Co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for ODDs made by its parent company.

## IV.     AGENTS AND CO-CONSPIRATORS

76.     Various persons that are not named as Defendants herein have participated as Co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  These other entities have facilitated, adhered to, participated in, and/or communicated with others regarding the conspiracy.  Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

77.     Co-conspirator **Sharp Corporation ("Sharp")** is a business entity organized under the laws of Japan, with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  During the Class Period, Sharp manufactured, sold, and/or distributed ODDs to

1    customers throughout the United States and directly caused ODDs to be imported into the United

2    States.

3         78.     Co-conspirator **Pioneer Corporation ("Pioneer")** is a business entity organized

4    under the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-ku,

5    Kawasaki-shi, Kanagawa 212-0031, Japan.  During the Class Period, Pioneer manufactured, sold

6    and/or distributed ODDs throughout the United States and directly caused ODDs to be imported

7    into the United States.

8         79.     Co-conspirator **Pioneer Digital Design & Manufacturing Company ("PDDMC")**

9    is a joint venture owned 66% by Pioneer and 34% by Sharp. It is a business entity organized under

10   the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi,

11   Kanagawa 212-0031, Japan.  During the Class Period, PDDMC manufactured, sold and/or

12   distributed ODDs throughout the United States and directly caused ODDs to be imported into the

13   United States.

14        80.     The term "Co-conspirator" as used in this Complaint, refers only to the three

15   previously-identified co-conspirators.

16        81.     On information and belief, other partnerships, corporations, or business entities,

17   currently unknown to Plaintiffs, are Co-conspirators with Defendants in their unlawful restraint of

18   trade.

19        82.     Whenever in this Complaint reference is made to any act, deed or transaction of any

20   corporation, the allegation means that the corporation engaged in the act, deed or transaction by or

21   through its officers, directors, agents, employees or representatives while they were actively

22   engaged in the management, direction, control or transaction of the corporation's business or

23   affairs.

24   ///

25   ///

26   ///

27   ///

28   ///

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                20

1    **V.      CLASS ACTION ALLEGATIONS**

2            83.      Plaintiffs bring this action both on behalf of themselves, and as a class action

3    pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of the following

4    class (the "Class").

5                    All individuals and entities who, during the period from January 1, 2004 until at least
6                    January 1, 2010 (the "Class Period") purchased one or more Optical Disk Drives in
                     the United States directly from the Defendants, their subsidiaries, or their affiliates.
7                    Excluded from the Class are Defendants and their parents, subsidiaries, affiliates,
                     and all governmental entities.  As used herein the term "Optical Disc Drive" includes
8                    (a) a drive sold by a Defendant or its subsidiary or affiliate as a separate unit that is
                     to be inserted into, or incorporated in, an electronic device; (b) a drive sold by a
9                    Defendant or its subsidiary or affiliate as a separate unit that is to be attached to an
                     electronic device through an external interface such as a Universal Serial Bus
10                   connection; and (c) an internal drive sold as a component of a laptop or desktop
11                   computer by a Defendant or its subsidiary or affiliate.

12           84.      This class definition includes those whose purchases of ODDs, either as standalone

13   products or which were incorporated into desktop or notebook computers, were made directly from

14   a Defendant, and does not include those who purchased from third parties as alleged below.  Thus,

15   Dell, H-P, and Microsoft are members of the putative Class. Persons or entities who bought ODDs

16   only from Dell, H-P or Microsoft (or other third parties) are *not* members of the putative Class.

17   Likewise, persons who bought an ODD, either as a standalone product or a product that was

18   incorporated into a desktop or notebook computer, from a Defendant where the ODD or the

19   computer in which it was incorporated was not supplied by a Defendant are *not* members of the

20   putative Class.

21           85.      During the Class Period, several Defendants operated (and some continue to operate)

22   retail websites through which United States purchasers could purchase directly their respective

23   ODDs. These include:

24                   (a) Toshiba Direct

25                       (http://www.toshibadirect.com/td/b2c/home.to?src=MAXG&cm_mmc=SEM_Di

26                       rect_Google&gclid=CNjp-_zj46ECFYd-5Qod4y1gLQ);

27

28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                              21

1          (b)     Sony Style USA

2                 (http://www.sonystyle.com/webapp/wcs/stores/servlet/StoreCatalogDisplay?l

3                 angId=-1&storeId=10151&catalogId=10551); and

4          (c)     Philips Online Store

5                 (http://store.philips.com/store/rpeusb2c/DisplayHomePage?resid=S-

6                 bKHAoBAiMAAErNL38AAAAJ&rests=1274464795996).

7 Sony also operates (or operated) brick and mortar sales outlets in the United States where its ODDs

8 can be purchased directly, such as the Sony Style outlet at the Metreon Center in San Francisco,

9 California. Direct purchasers from a Defendant through these various channels are all included in

10 the definition of the putative Class. In all instances, however, the Class is limited to purchases

11 made in the United States.

12       86.     The Class is so numerous that joinder of all members is impracticable. Due to the

13 nature of the trade and commerce involved, Plaintiffs believe that the members of the Class are

14 geographically dispersed throughout the United States, and that joinder of all Class members would

15 be impracticable. While the exact number of Class members is unknown to Plaintiffs at this time,

16 Plaintiffs believe that there are, at least, thousands of members of the Class and that their identities

17 can be learned from Defendants' books and records.

18       87.     Plaintiffs' claims are typical of the claims of the other members of the Class because

19 Plaintiffs directly purchased ODDs from one or more of the Defendants.

20       88.     Plaintiffs and the members of the Class directly purchased ODDs at artificially

21 maintained, non-competitive price levels established by the actions of Defendants and their Co-

22 conspirators in connection with the restraint of trade alleged herein. Plaintiffs and the members of

23 the Class have all sustained damage in that they paid inflated prices for ODDs due to Defendants'

24 conduct in violation of federal law as complained of herein.

25       89.     Plaintiffs will fairly and adequately protect the interests of the members of the Class

26 and have retained counsel competent and experienced in class action and antitrust litigation.

27

28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

90.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants and their Co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, maintain, or stabilize the price of ODDs sold by Defendants in the United States through various means;

(b)     Whether the conduct of Defendants and their Co-conspirators caused the prices of ODDs to be artificially inflated;

(c)     Whether Defendants and their Co-conspirators engaged in a contract, combination, and/or conspiracy to restrict output or restrain capacity of ODDs sold in the United States;

(d)     Whether Defendants' and their Co-conspirators' conduct caused injury to the members of the Class and, if so, the proper measure of damages;

(e)     Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief; and

(f)     Whether Defendants and their Co-conspirators undertook actions to conceal the unlawful contract, combination or conspiracy described herein.

91.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

VI.   **INTERSTATE TRADE AND COMMERCE**

92.   During the Class Period, each Defendant and Co-conspirator, or one or more of its subsidiaries and/or affiliated joint ventures, sold ODDs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

93.   During the Class Period, Defendants and their Co-conspirators collectively imported at least tens of millions of ODDs into the United States.

94.   During the Class Period, Defendants and their Co-conspirators collectively controlled a majority of the market for ODDs, globally, in the United States, and within this district.

95.   The business activities of the Defendants and their Co-conspirators substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

96.   Sony Optiarc had sales of $1.52 billion for the year ending in March of 2008, the last year for which Sony disclosed the unit's annual revenue.

97.   HLDS had revenue of $2.4 billion in 2005, the last year for which figures are available, while TSST forecast revenue of 250 billion yen in fiscal 2004, when it was established.

98.   Samsung in 2008 estimated that the ODD market for personal computers is 313 million units per year and the ODD market for all other applications is 200 million units per year.

99.   Defendants and their Co-conspirators sell their ODDs through various direct channels, including to manufacturers of electronic products and devices, to resellers of ODDs and through the retail internet sites described above.  As noted above, some Defendants also sell ODDs directly to end users, either through online or brick-and-mortar stores.

100.   California is the worldwide center of the personal computer industry and other industries that depend upon the ODD market.  Statements concerning the prices and market conditions for ODDs were disseminated by Defendants and their Co-conspirators from and into California on a regular and continuous basis.

VII.    **FACTUAL ALLEGATIONS**

A.    **ODD Technology**

101.    Optical discs contain microscopic pits where data are stored. These pits are made from a crystalline metal alloy and are usually pressed into the disc in a spiral arrangement, starting at the center of the disc.  Once a disc containing information is inserted into the ODD, the disc spins while a lens inside the device guides a semiconductor laser beam over the disc and a photodiode detects the light reflected from the disc's bumps and pits.  The laser moves outward from the center of the disc, scanning over the disc's surface. Then the photodiode reads the light's reflection as a binary code--a series of ones and zeros--that the computer translates into usable data. Changes in the intensity of the beams as the lasers hit the pits are detected and translated into electrical signals. The more pits that can be packed onto the disc, the more data the disc can store. The pits are approximately 0.8 micrometers on CDs, 0.4 micrometers on DVDs, and 0.15 micrometers on BDs. Reading the different disc formats requires the ODD to have lasers of different wavelengths.  BD players use a shorter wavelength laser, which is blue-violet, to read discs.  Additional layers can be added to the disc as well, increasing storage capacity. In addition to reading discs, ODDs can write and rewrite on the disc, depending on the technology of the drive and accompanying disc.

102.    When a recordable disk is inserted into an ODD that has the ability to record data, the ODD's laser is used to heat selectively parts of the organic photosensitive dye layer.  By exposing the disc to light with the laser, the reflective properties of the disc's surface change, which causes the photodiode to recognize these changes as bumps and pits and read the new information on the disc.

103.    ODDs include half height ("HH"), slim and ultraslim models. HH ODDs are thicker and generally incorporated into desktop computer towers.  Slim and ultraslim ODDs are thinner and generally incorporated into laptop computers.  As laptop computers have become more popular with consumers, demand for slim optical disk drives has increased and is expected to overtake HH demand over the next five years.

104.    An ODD is about the size of a thick book.  The front of the drive typically has a small Open/Close button that ejects and retracts the drive bay door.  This is how media like CDs,

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                          25

1  DVDs, and BDs are inserted into and removed from the drive.  Where the ODD is intended for

2  internal use in a computer, the sides of the drive have pre-drilled, threaded holes for easy mounting

3  in the drive bay in the computer case.  In that case, the ODD is mounted so the end with the

4  connections faces inside the computer and the end with the drive bay faces outside.  The back end

5  of the ODD typically contains a port for a cable that connects to the motherboard.  There is also a

6  connection for power from the power supply.  Most ODDs installed in computers also have jumper

7  settings on the back end that define how the motherboard is to recognize the drive when more than

8  one is present. These settings vary from drive to drive. ODDs connect to the motherboard of a

9  computer through either a Serial Advanced Technology Attachment ("SATA") or Parallel

10  Advanced Technology Attachment ("PATA") interface.  Where the ODD is intended for external

11  use with a computer, it is connected to the computer through some type of interface, such as a USB

12  connection.

13      / / /

14      / / /

15      / / /

16      / / /

17      / / /

18      / / /

19      / / /

20      / / /

21      / / /

22      / / /

23      / / /

24      / / /

25      / / /

26      / / /

27      / / /

28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                           26

105.    The following table provides an overview of the names, sizes and capabilities of the main optical disc media standards that existed during the Class Period.

| Overview of Optical Disc Media Standards | | |
|---|---|---|
| Drive Standard | Capacity [a] | Capability |
| CD-ROM | 700 MB | Read Only |
| CD-R | 700 MB | Read, Write |
| CD-RW | 700 MB | Read, Write, Rewritable |
| DVD-ROM | 4.7 GB | Read Only |
| DVD-RAM | 4.7 GB | Read, Write |
| DVD-R [b] | 4.7 GB | Read, Write |
| DVD-RW [b] | 4.7 GB | Read, Write, Rewritable |
| BD-ROM | 25 GB Single Layer; 50 GB Dual Layer | Read Only |
| BD-R | 25 GB Single Layer; 50 GB Dual Layer | Read, Write |
| BD-RW | 25 GB Single Layer; 50 GB Dual Layer | Read, Write, Rewritable |
| [a] These are standard capacities. Depending on the number of layers, or if the disc can be read double-sided, the capacity will be larger. | | |
| [b] There are other DVD standards such as DVD+R/RW, which include other features or improvements. Source: *See* http://www.videohelp.com/dvd and http://www.tech-faq.com/Blu-ray.shtml. | | |

106.    As explained in a May 17, 2009 article that appeared on the Geeks.com website:

> **The important thing to know is that the drives are pretty much backwards compatible,** so if you get a DVD±RW DL it can pretty much read and write to the formats before it (for example, a DVD±RW DL can read a CD-ROM disc, burn to a CD-RW disc, etc.).
>
> All that alphabet soup of letters can be confusing, but all you need to know are the three basic (currently used) optical formats: CD, DVD, BLU-RAY (also called BD). Each of these formats have a read-only mode (-ROM), a write only (recordable) mode (-R or +R) and a read-write (re-recordable) mode (-RW, +RW, -RAM or –RE). The DL tacked onto the end of the alphabet soup means that the drive is a Double Layer drive (it can read or write to 8.5 GB double layer discs).(Emphases in original.)

**B.    Evolution Of ODDs And Sales**

107.    The optical disc was invented in 1958.  In 1961 and 1969, patents were registered for the analog optical disc for video recording.  In 1969 Philips began its first optical videodisc experiments.  The first ODD was invented with the creation of the audio compact disc (audio CD), which was jointly invented by Sony and Philips and intended to store analog video signals and store music and computer software.  In 1972, Philips announced a technique for storing audio recordings on an optical disc with a small diameter.  At the same time, Sony was exploring optically recording audio on a larger disc but was focusing on developing an error correction technique.  In 1978, Sony and Philips agreed on a single format for the disc and the error correction method that would be used.  The CD system was introduced to the public in Japan and Europe in 1982.  Since the 1980s, several companies have created spin-offs of the CD project by covering specific CD-based applications and extending the previously established standards set by Sony and Philips.

108.    The **first generation** of ODDs utilized CDs that could store 650 megabytes of data, but for several years, the CDs were available only in a read-only format (CD-ROMs).  Once the standard of how to create a CD and an optical device that reads the information on the CD were established, CD-ROM drives began to penetrate the computer market.  ODDs have been in common use in computers since the 1990s, when CD-ROM drives became affordable for the average consumer.  Both HLDS and TSST stopped making CD-ROM drives and CD-RW drives at the beginning of 2008.

---

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

109.     In the mid-1990s, a consortium of manufacturers (including Hitachi, Pioneer, Philips, Sony and Toshiba) developed the **second generation** of the optical disc, the DVD.  The second generation of drives used DVDs that could store 4.7 gigabytes, but DVDs were more quickly available in both a read-only format and a format that allowed both reading and recording. The DVD was intended to store great amounts of data, including broadcast-quality digital video. ODDs using DVDs are currently the most prevalent in both consumer electronics products and computers.

110.     The **third generation** of ODDs uses BDs that can store in excess of 20 gigabytes, and also have both read-only and read/record formats.  Toshiba developed and promoted an HD-DVD format for third generation ODDs, but in June of 2008, it announced that it would no longer develop or manufacture ODDs using HD-DVDs, and would instead use the BD format developed and promoted by Sony.[2]  In 2006, the specifications for the third generation optical disc, the BD format, were finalized.  The Blu-ray standard was developed by the Blu-ray Disc Association (discussed in greater detail below), an industry group which included makers of consumer electronics, computer hardware, and motion pictures. The Blu-ray format was designed to supersede the DVD format and dramatically improve on the quality and capacity of the DVD.  The BD was meant to be able to distribute high-definition video and support greater data storage capacity than the DVD.  Afterwards, manufacturers began to develop ODDs for computers that could read and write both DVDs and BDs.

111.     Sony introduced the first laptop equipped with a BD drive (the Sony Vaio® AR Premium) in June of 2006; its first multimedia desktop PC (the RC300) soon followed.

112.     According to the Digital Entertainment Group ("DEG"), "[s]ales of Blu-ray Disc playback devices – including set-top box and game consoles – sold through almost 10 million units since launch.  Three million devices sold in the fourth quarter alone, bringing total units sold to 9.654 million in calendar 2008, according to numbers compiled by the DEG with input from retail

---

[2]  Indeed, in 2006, TSST began manufacturing BD drives using the Blu-ray format, so Toshiba had access to that technology at an early point.  Similarly, the Sony NEC joint venture manufactured both BD and HD-DVD drives.

1    tracking sources." In April of 2009, DEG reported that "[s]ales of all Blu-ray compatible devices,

2    including set-top players, PC drives and PlayStation 3 consoles are now in more than 10.5 million

3    U.S. homes." A year later, DEG was reporting that "Blu-ray Disc hardware sales saw set-top sales

4    growth of 125 percent vs. first quarter 2009."

5         113.   The latest ODDs, which can read from, write, and rewrite onto all kinds of optical

6    discs and are thus fully backwards compatible, are known as "super multi-drives."

7         114.   Throughout its history, but especially after 2000, the ODD industry, which requires

8    significant technical resources and advanced manufacturing capabilities, has been dominated by a

9    small group of manufacturers, as discussed in further detail below.

10        115.   The industry has also consistently been faced with downward pricing pressures,

11   including those resulting from the technological advances in ODD technology described above. As

12   the Defendants and their Co-conspirators honed their ability to manufacture ODDs more efficiently

13   and at a lower cost, the price of this technology invariably began to decline. However, the

14   Defendants and their Co-conspirators, sensing that prices for ODDs were declining, colluded to fix

15   prices and allocate markets or customers in order to prevent such prices from dropping too quickly,

16   a phenomenon not uncommon in conspiracies involving electronic products.

17        116.   During the Class Period, ODDs were a standard component on almost every

18   computer used in the United States. Due to the increasing popularity of personal computers,

19   hundreds of millions of ODDs are shipped by Defendants each year, generating billions of dollars in

20   annual revenues. According to an analysis by IDC, an industry data source, between 2004 and

21   2008, worldwide ODD shipments generated over $45 billion in revenues. Research from *Digitimes*

22   estimated that worldwide ODD shipments increased at an annual rate of approximately 10%,

23   exceeding 300 million units by 2007.

24        117.   Defendant Sony's President and CEO, Ryobi Chubachi, stated after the signing of a

25   Memorandum of Understanding between Sony and NEC in 2005 that "[o]ptical disc drives are key

26   components for a broad range of devices and we are strategically focused our development

27   resources in this sector." NEC's President Akinobu Kanasugi added that "[t]he market for high

28

value-added drives to be integrated into PCs and consumer electronics products is rapidly expanding."

118.    Notwithstanding the changes in the ODDs, the Defendants and their identified Co-conspirators have remained leaders in the industry because of their conspiratorial acts.  While the market for CDs has decreased, the market for DVDs and BDs has grown exponentially as consumers shift towards the new formats.  In a 2008 consumer survey, 56% of respondents would have considered purchasing a BD player if there had been a significant price drop.

C.    **Structural Market Factors Favoring, And Acts Indicative Of, Collusion**

119.    During the Class Period, the ODD industry has exhibited several factors that have contributed to the ability of Defendants and their Co-conspirators to carry out their conspiracy, including but not limited to: (1) market concentration, (2) joint venture or other collaborations; (3) significant barriers to entry (including patent pools); (4) common trade associations and business organizations; (5) the use of auctions for supply contracts, some of which included most favored nations clauses, whereby Defendants and their Co-conspirators could (and, as explained below, did) collude; and (6) the standardization of ODDs.

1.    **Market Concentration**

120.    The market for ODDs is large.  The global market for ODDs in 2005 was approximately worth $9.23 billion and approximately 303.8 million units were shipped.  For example, HLDS reported $2.4 billion in revenue in 2005, the last year for which figures are available, and Sony Optiarc Inc. reported $1.52 billion in sales for the year that ended March 2008.  According to some market estimates, the ODD industry currently generates yearly worldwide revenues in excess of $8 billion.

121.    Despite its large size, the ODD industry is highly concentrated.

122.    Since the ODD market is dominated by a small group of suppliers and is oligopolistic in nature, the market is conducive to the collusive conduct alleged herein.  According to published reports, during the Class Period, the ODD industry has been dominated by Defendants and their Co-Conspirators.  According to data from IDC, an industry analyst, the worldwide

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

31

1    aggregate market share of HLDS, TSST, Sony Optiarc, PLDS and Panasonic in 2008 was 84.4%.

2    Co-conspirator Pioneer was responsible for another 6.3%.

3    123.    A graphic from a Sony Optiarc internal presentation prepared in mid-2009 that is

4    published on the internet illustrates monthly ODD shipments by manufacturer for the third and

5    fourth quarters of 2008 and the first and second quarters of 2009.  It illustrates the market power

6    wielded by TSST, HLDS, PLDS, Panasonic, TEAC, Toshiba and Sony Optiarc.

7    **2.    Joint Venture Or Other Collaboration**

8    124.    The ODD industry has experienced significant consolidation.  As manufacturing

9    migrated toward lower-cost drive makers in Korea and Taiwan between 2001 and 2003, early

10   Japanese manufacturers still held key competitive advantages – intellectual property rights.  To

11   mitigate the high cost of royalty payments for licensing this intellectual property, Taiwanese and

12   Korean defendants partnered with the patent holders through strategic alliances and joint ventures.

13   These alliances include:

14       a.    HLDS, formed on November 1, 2000 in Tokyo, Japan;

15       b.    JVC Lite-On IT Manufacturing & Sales Ltd., a production and marketing

16           company founded in October of 2001 in Hong Kong;

17       c.    PBDS, founded in February of 2003 and specializing in the manufacture of

18           DVD+RW ODDs;

19       d.    The Sony & Lite-On "Alliance", a memorandum of understanding signed in

20           May of 2003 and that, as described below, led to acts of price-fixing of

21           ODDs;

22       e.    TSST, established in April of 2004;

23       f.    The Sony-NEC joint venture, formed in 2006, which was followed by NEC's

24           transfer of its stock to Sony in September of 2008;

25       g.    Lite-On's acquisition of BenQ's ODD production facilities in 2006, by which

26           Lite-On obtained a 27% share in global ODD production;

27       h.    PLDS, formed in March of 2007; and

28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                        32

i. PDDMC, the joint venture between Pioneer (which owned 66%) and Sharp (which owned 34%) that was announced in June of 2009 and anticipated to commence operations in October of 2009 (but was delayed "due to ongoing assessments of whether the joint venture conforms to antitrust laws overseas"), and which was finalized in November of 2009.

125. The mutually beneficial nature of the business relations between certain Defendants provided the opportunity for their parent entities to conspire and created a financial incentive to do so. As Gerald Cavanagh, a Sony spokesman in Tokyo, explained when announcing the formation of Sony NEC, the joint venture was formed because **"[t]here was a feeling that those two complementary strengths [of Sony and NEC] would make more sense in a joint venture than competing against each other."** (Emphases added).

126. Similarly, after the formation of PLDS, the company's general manager, Tseng Huan-Xiong, stated that **"Philips and Lite-On in the future will target at making profits and avoid price wars."** "While aiming for large shipment volumes, **PLDS will maintain steady profits and therefore will maintain a minimum gross margin by refusing low-priced orders as well as not participating in price-cutting competition,** Tseng pointed out." (Emphases added).

127. In addition, at various points during the Class Period, one Defendant produced ODDs for another Defendant. For example, in November of 2004, it was reported that Lite-On would produce more non-Blu-ray ODDs for Sony. As another example, in 2000, TEAC entered into an ODD co-development arrangement with Philips. As a third example, QSI has manufactured ODDs for PLDS and Sony Optiarc.

128. These joint ventures and collaborations among the Defendants and their identified Co-conspirators enabled them to, among other things, force out most of Taiwan's second-tier manufacturers and almost all Chinese manufacturers from the ODD industry (the entities which, with their lower labor costs, normally would drive down prices on products such as ODDs).

### 3. Barriers to Entry

129. The market for the manufacture and sale of ODDs is subject to high manufacturing and technological barriers to entry. Efficient manufacturing plants are large and costly.

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1    Companies, such as Defendants, that develop and manufacture ODDs face technological advances,

2    causing the companies to undertake significant research and development expenses.  For example,

3    from 2002 to 2005, a time in which all or most of its sales came from ODDs, Lite-On spent

4    approximately $79.7 million in research and development.

5         130.    Another important barrier to entry is the difficulty in landing sizeable OEM orders.

6    OEMs usually require a lengthy qualification process before entering into supply agreements.  An

7    analyst in 2003 noted that "local competition remains slow because of entry barriers.  PC OEMs,

8    in our view, may retain two-three suppliers from Taiwan, Japan and Korea on the list as a strategy

9    to diversify country risk, which suggests a smaller pie to divide up among late entrants."

10        131.    ODD sellers' strong relationships with patent holders for component technology

11   create yet another barrier to entry in the ODD market.  This is especially notable in the PC market.

12   Establishing these important relationships with patent holders is difficult for low-volume

13   manufacturers of ODDs, and therefore, makes it difficult for them to compete effectively in the

14   market.

15        132.    PLDS noted the importance of access to patents on its website with respect to BD

16   drives:

17              Philips & Lite-On Digital Solutions has a strong and long-term
                commitment to the Blu-ray format. **PLDS is one of the few companies in**
18              **the ODD industry that has access to an extensive Blu-ray patent**
                **portfolio and a large Optical Disc Drive production facility.**
19              **Combining these two aspects makes PLDS a leading company in the**
                **Blu-ray Optical Disc Drive marketplace. Other traditional ODD**
20              **manufacturers will need to pay Blu-ray royalties to the original patent**
                **holders or outsource their production of BD drives to other**
21              **manufacturers. The combination of access to Blu-ray patents and**
                **being a true manufacturer of Blu-ray drives, gives PLDS a**
22              **competitive advantage.** (Emphases added).

23        133.    Defendants' and their identified Co-conspirators' licensing structures included

24   imposition of high licensing costs that also effectively deterred entry.  In the ODD industry, these

25   structures have often taken the form of patent pools.  In such pools, industry competitors pool their

26   various technology patents and grant a license with sublicensing rights to a license administrator

27   (typically a member of the pool) who issues licenses to manufacturers of ODDs.  The licensees pay

28

---

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                34

1  per-unit royalties to the administrator and the resulting revenue is allocated among members of the

2  pool, typically pursuant to a prearranged formula.

3      134.    For example, in 1998, Sony, Pioneer and Philips formed the **3C DVD Patent**

4  **Group** to exploit jointly their various patents relating to the DVD format. LG joined the group in

5  July of 2003, when John Koo, its Chairman and CEO, stated: "[w]e will cooperate with those

6  companies on patent protection and patent exploitation now and in the future. LG Electronics is

7  excited to join the most professional licensing organization in the field of optical storage patent

8  licensing and will consider future cooperation with the same partners in other optical storage

9  programs in which LG Electronics has important patent portfolios...." Pioneer has joined the 3C

10  DVD Patent Group as well. Philips acts as the licensor for the group.  The licensing agreement

11  imposed a DVD player license fee of 3.5% of the net selling price for each player sold. As of 2006,

12  the 3C DVD Patent Group controlled the licensing of 115 patents relating to the manufacture of

13  DVD players.

14      135.    As a second example, commencing in June of 1999, leading developers of DVD

15  technology and formats—including Hitachi, Panasonic, and Toshiba—commenced a worldwide

16  joint licensing program for patents essential for DVD-Video players, DVD-ROM drives, DVD

17  decoders and DVD-Video and DVD-ROM discs that conform to the specifications promulgated by

18  the DVD Forum (described below), known as the **"DVD 6C Patent Pool."** The companies

19  authorized Toshiba to act as portfolio licensor, although Hitachi and Toshiba now act as regional

20  agents for certain world regions.  Sharp and Samsung joined the DVD 6C Patent Pool in April of

21  2005 and November of 2006, respectively.  The DVD 6C Patent Pool royalties for licenses with

22  respect to, *inter alia*, DVD-ROM drives and DVD decoders were initially set at 4% of the net

23  selling price or $4 for these items.  As of 2006, the DVD 6C Patent Pool controlled the licensing of

24  377 patents.

25      136.    As a third example, in March of 2010, the **BD4C Licensing Group**, which includes

26  Toshiba, announced that it had commenced a worldwide joint licensing program for Blu-ray and the

27  patents needed for BD decoders, encoders, recorders, players, read-only discs, recordable discs,

28  drives and BD/DVD hybrid discs.  Once again, Toshiba was authorized to act as the licensing agent.

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                          35

137.     As a fourth example, **various patent pools were established for CD, CD-R and CD-RW technology**.  One was established by Sony and Philips for CD technology.  A second was established by Philips, Sony and Ricoh for CD-RW technology.  A third was established by Philips, Sony, and Taiyo-Yuden Co., Ltd. ("Taiyo-Yuden") with respect to CD-R technology.

138.     The history of the patent pool for CD-R technology illustrates how patent pools can be used for anticompetitive collusion.  To facilitate patent licensing to CD-R producers around the world, Philips, Sony and Taiyo-Yuden adopted a joint licensing arrangement whereby Sony and Taiyo-Yuden first licensed their patent rights to Philips, and then Philips bundled the rights together for licensing to other companies.  In a decision entered in December of 2008, the Taiwanese Fair Trade Commission ("TFTC") **concluded that these companies engaged in unlawful "concerted action", improperly excluded competitors from the market and overcharged patent licensees.**  As stated on TFTC's website:

> **After considering the unlawful acts' impact on the functioning of market mechanisms of the technology patent licensing markets and associated products at issue, as well as the respondents' motives for the violation, benefits obtained thereby, and considerable business scales and prominent market standing, the [T]FTC imposed administrative fines of NT$ 8 million on Philips, NT$ 4 million on Sony, and NT$ 2 million on Taiyo Yuden, and ordered the companies to immediately cease the illegal practices pursuant to the fore part of Article 41 of the [Taiwanese Fair Trade Law].** (Emphases added.)

139.     Not surprisingly, some customers have rebelled against onerous patent pool licenses.  In October of 2008, Steve Jobs of Apple, Inc. said it was holding off licensing Blu-ray technology for Macintosh notebooks because "**Blu-ray is a bag of hurt.**" (Emphases added).

140.     Indeed, intellectual property licensing rights are critical to understanding the ODD industry, because high-technology licensing royalties are a meaningful part of the costs for manufacturing ODDs.  Japanese companies adopted the strategy of charging high royalties in order to prevent Taiwanese and South Korean manufacturers with their superior cost controls from quickly entering the DVD-ROM drive market.  One report noted that "[e]xpensive royalty payments have driven most Taiwanese companies out of the DVD-ROM drive market.  Taiwan shipped only 600,000 DVD-ROM drives in 1999, out of 14.7 million units shipped worldwide."  Michael Gong, General Manager of Lite-On's ODD business unit, announced cutbacks in 2002

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                          36

1    with respect to DVD-ROM drive shipments: "[l]icensing fees for DVD-ROM drive technology

2    costs about US$10 per unit, about one-third of a drive's manufacturing contract price.  If Taiwan-

3    based companies cannot solve this issue, they will not be able to sustain profitable operations when

4    DVD-ROM drive prices fall further."  This cost only increases when a licensee has to pay

5    cumulative royalties to multiple patent pools.  In a 2008 presentation, Hisashi Kato of Mitsubishi

6    Corporation estimated that a DVD Recorder manufacturer would have to pay $17 per unit in

7    royalties to four different patent pools, including the 3C DVD Patent Group and the DVD 6C

8    Patent Pool.

9         141.    In response to high license royalties, Taiwanese and South Korean ODD makers

10   sought to become part of the cartel and to tie up strategically with patent pool members (who enjoy

11   cross-licensing privileges), procure drive kits, or sell product through such members.  In exchange,

12   members of the cartel have controlled prices to prevent low cost producers from cutting prices.  A

13   September 2003 analyst report pointed out:

> **As a result [of intellectual property issues], optical drive makers
> increasingly gravitated towards strategic alliances with intellectual
> property holders, attempting to shield themselves under the umbrella
> of joint venture partners in an effort to reduce royalty requirements.**
> While the specifics of joint ventures remain well guarded, the most
> common structures involve joint ownership (LG-Hitachi, Philips-BenQ,
> JVC-Lite-On, and the recently formed Toshiba-Samsung) or ODD makers
> selling product through IP holders...Strategic alliances, which have
> followed the model of Hitachi-LG, are becoming the norm in the industry.
> (Emphases added).

20        142.    The ODD industry thus increasingly coalesced around a "Gang of Four" oligopoly

21   consisting of Sony NEC (later Sony Optiarc), HLDS, TSST, and PBDS (later PLDS).  An analyst

22   report in 2003 noted that "the collective market share of this group will swell further to about 80%-

23   90% over the next two years."  As discussed above, that is exactly what happened during the Class

24   Period and, as it has happened, prices for ODDs have been controlled by the cartel.

25             **4.    Trade Associations and Business Organizations**

26        143.    Defendants acted to prevent downward pricing pressures from causing ODDs to be

27   sold at truly competitive prices.

28

144.     Various industry trade organizations or events facilitated Defendants' cartel activities with respect to ODDs.  Defendants participated in many of those meetings and events and provided a forum at which Defendants and their Co-conspirators could discuss and exchange information with respect to the pricing and production of ODDs with the purpose and effect of raising, fixing and stabilizing the prices of such products, bid rigging and market allocation.  In several instances, these trade association meetings preceded examples of alleged collusive pricing conduct described below. Some examples of the trade association meetings are as follows.

### a.     CD Trade Associations

145.     **CDs21 Solutions ("CDs21")** is a trade association formed in April of 2001 that was created by the merger of the Multimedia CD Consortium, which promoted CD-i (an interactive multimedia CD player developed by Philips) and Video CD formats, and the Orange Forum, which focused on CD-R/RW standards.  Hitachi, HLDS, Sony, Panasonic, Lite-On, TSST and Philips Japan Co., Ltd. were among its members.  Among the stated ostensible purposes of CDs21 were:

> To pursue ever more development of the industrial sector concerned by striving to closely unite the technology and the contents in the area of CD platform as well as by looking into future technologies.

> To aim for the creation of a new AV [audiovisual] culture which can further enrich the life of people.

> **To promote the development of mutual businesses by fostering an environment where the knowledge and information can be shared by all as a common property**. (Emphases added.)

### b.     DVD Trade Associations

146.     The **DVD Forum** is a global group of hardware manufacturers, software firms and content providers formed in 1997 to ostensibly promote and improve standards for the DVD format and products associated with that format.  Hitachi, LG, Lite-On, NEC, Philips, Panasonic, Pioneer, Samsung, Sony, TEAC, QSI, and Toshiba are all members of the DVD Forum.  The stated purpose of the DVD Forum is "to exchange and disseminate ideas and information about the DVD Format and its technical capabilities, improvements and innovations."

---

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

38

147.   Over the years, the DVD Forum had various conferences and seminars in Taiwan, Japan, China, Europe and the United States that allowed its members to exchange competitively sensitive information on ODDs.

148.   The DVD Forum has a Steering Committee, which consists of, among others, Hitachi, LG, NEC, Panasonic, Pioneer, Sony, Samsung, Toshiba, and Sharp.

149.   The Steering Committee of the DVD Forum met regularly, including meetings held on June 9-10, September 22 and December 1, 2004; February 23, May 26, September 12, and November 16-17, 2005; February 22, May 24, September 12 and November 29, 2006; February 28, June 19, September 12, and November 15, 2007; February 27, June 11, September 17, and November 19, 2008; February 25 and September 10, 2009; and February 24, 2010.

150.   Among those present at one or more of these meetings were: (a) Yutaka Komai, Yukinori Kawauchi, and a Mr. Saito from Sony; (b) Young-Min Cheong, In-Sik Park, and Yong-Chae Jeong from Samsung; (c) Kiyoung Lee, Kun Suk Kim, and Jea-Yong Joo from LG; (d) Yasuo Ogasawara and Hiroshi Inada from NEC; (e) Hideki Mimura, Hiruharu Sato, Yoshihide Fujii, and Messrs. Nishioka and Kaneda from Toshiba; (f) Yoshiho Gotoh, Yoshiharu Sakurada and Messrs. Nakano, Murase and Kozuka from Panasonic; (g) Messrs. Imaide, Noguchi, and Owashi from Hitachi; (h) a Ms. Ikei and a Mr. Heijnemans from Philips; (i) Junsaku Nakajima, Akira Takahashi, Taiji Nishizawa, Masatoshi Tsujimoto, Hiroyuki Okada, and a Mr. Egawa from Sharp; and (j) Matsumi Fujita, Shinichi Tsuji, and Messrs. Inoue and Yamada from Pioneer.

151.   These meetings took place in Japan, South Korea, Taiwan, the Netherlands, France, Hawaii, and in many instances, California.  For example, the September 10, 2009 Steering Committee meeting was held at the Universal Hilton Hotel in Los Angeles, California.  Defendant Toshiba was the chair of that Steering Committee meeting.

152.   In April of 2001, the **Recordable DVD Council ("RDVDC")** was formed.  The eight executive members of RDVDC included: Hitachi, Ltd.; Hitachi Maxell Ltd.; Matsushita Electric Industrial Co., Ltd. (now Panasonic); Samsung Electronics Co., Ltd.; and Toshiba Corporation.  Its 58 general members as of August of 2001 were major Japanese and Korean companies in the ODD supply chain.

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

39

153.     Bon-Guk Koo, chairman of the RDVDC, as well as Senior Corporate Advisor and former Executive Vice-President of Samsung, stated that "[t]he Council will make its chief targets **industry outreach at major trade shows, information exchanges among Council members** and discussions aimed at expanding the recordable DVD market." (Emphases added).  Mr. Koo noted that "[t]he Recordable DVD Council has held six seminars in Japan, sponsored a joint Pavilion at the Fall COMDEX in Las Vegas, and launched other promotional activities in 2001.... The Council's membership has grown from 58 to 87 companies since the RDVDC was established a year ago, making it the largest recordable DVD industry alliance among similar kinds of promotional groups. **This is proof that our activities have been supported by the industry and we are proud of it.**" (Emphases added).  In August of 2003, the RDVDC announced the establishment of the Compatibility Working Group to ensure interoperability of products using RDVDC-supported recordable DVD formats.

154.     The **RAM Promotion Group ("RAMPRG")** is an organization formed at COMDEX in 2003.  Its members include Hitachi, TEAC, HLDS, Panasonic, LG, Toshiba, and Samsung. RAMPRG is ostensibly committed to promoting the DVD-RAM format and popularizing DVD-RAM related products on an international basis. RAMPRG is supported by the RDVDC, and all of the founding members of the RAMPRG are also members of the RDVDC. RAMPRG was launched internationally in August of 2003, with its first appearance at the Internationale Funkausstellung (discussed below) in Berlin, Germany. It then appeared in Tokyo, Japan in October of 2003.

155.     The **DVD+RW Alliance ("Alliance")** is a group of electronic hardware, optical storage and software manufacturers who in 1997 created and promoted a format standard of recordable and rewritable DVDs, known as the "plus" format. As of 2004, plus format DVDs were available in various forms, including DVD+R and DVD+RW. Sony and Philips were members of the Alliance, which has both a Product Promotions Group and a Compatibility & Convergence Group.

### c.   Blu-ray Trade Association

156.   The **Blu-ray Disc Association ("BDA")** is a worldwide group inaugurated in 2005 to promote the BD format and products associated with that format, with members including Hitachi, LG, NEC, Philips, Samsung, Sony, TEAC, QSI, and Toshiba. Sony, LG, and Hitachi are all founding board members of the BDA.  The BDA was created and maintained by its members to, *inter alia*, establish standardized formats and cross license technology.

157.   The BDA has several different committees, including a Promotion Committee.  The role of that committee is described as follows on BDA's website:

> The promotion committee formulates a strategic approach to promote BD formats in various product categories. It creates and participates in events and activities that: promote BD formats, showcase BD products, educate and train key audiences on BD formats and technology, promote compatibility of BD products and create a community for General Members of the BDA.
>
> Current Promotion Committee groups:
> -   Americas Promotion Team
> -   Europe Promotion Team
> -   Japan and Asia/Pacific Promotion Team
> -   China Promotion Team

158.   In April of 2007, Warren Lieberfarb, the former President of Warner Home Video, said of the BDA that "**[i]t was clear to me that a cartel like consortium was being created for the purpose of forcing a *de facto* standard on other manufacturers.**" (Emphases added.)

159.   In April of 2008, Stan Glasgow, the President of Sony Electronics, stated that in order to ensure that the prices of ODDs that play BDs would not fall precipitously, the **BDA would not be soon licensing to any manufacturers in China**.

### d.   Multi-Format Trade Associations

160.   According to its website, the **Optical Storage Technology Association ("OSTA")** was:

> incorporated as an international trade association in 1992 to promote the use of writable optical technologies and products for storage of computer data. The organization's membership includes optical product manufacturers and resellers from three continents, representing more than 85 percent of worldwide writable optical product shipments. **They work to shape the future of the industry through regular meetings of CD/DVD**, file interchange, **market development,** magneto-optical and planning committees. (Emphases added).

1        161.    During the Class Period, OSTA's membership included ODD manufacturers such as

2  Sony, LG, Panasonic, Toshiba, Philips Electronics, Samsung Electronics, and Pioneer.

3        162.    OSTA works to "shape the future of the industry" through regularly scheduled

4  meetings covering a variety of industry topics and an annual Optical Storage Symposium described

5  below.  Benefits of OSTA membership for all members, as listed on its website, include:

6
           **• Influenc[ing] the health and direction of the industry.**
           **• Meet[ing] with industry peers for information exchange.**
7           **• Receiv[ing] early foresight into industry strategies.** (Emphases added).

8        163.    OSTA also plays an important role in the industry through its efforts to establish

9  industry-wide specifications for optical disc and ODD technologies including MultiRead (as

10  described below), MultiPlay, and Universal Disk Format.

11        164.    In 2005, OSTA meetings were held on February 28, March 1-2, June 13-15,

12  September 12-14 and December 5-7.  Each of these meetings occurred at the Embassy Suites Hotel,

13  250 Gateway Boulevard, South San Francisco, California.  In 2006, OSTA meetings were held on

14  March 2-3, June 12-14, October 5-6, and December 4-6.  Each of these meetings occurred at the

15  same location in South San Francisco, with the exception of the meetings on October 5-6, which

16  took place in Tokyo, Japan, at the Akihabara Convention Center. In 2007, OSTA meetings were

17  held on March 5-7, June 11-13, September 17-19, and December 3-5.  Each of these meetings

18  occurred at the same location in South San Francisco. In 2008, OSTA meetings were held on March

19  17-19, June 16-18, October 6-8 and December 8-10.  Each of these meetings occurred at the same

20  location in South San Francisco, with the exception of the March 2008 meetings, which occurred at

21  the DoubleTree Hotel, San Francisco Airport, 835 Airport Blvd., Burlingame, California.  The last

22  known general meeting of the OSTA took place during March 16-18, 2009 at the Pacific Business

23  Centers, 19925 Stevens Creek Blvd, Cupertino, California.

24        165.    Attendees at one or more of these various meetings included: Christopher Smith of

25  Sony Corporation; Paul Castellana of Toshiba; Maciek Brzeski of Toshiba; Yong Cheol Park of

26  LG; Patrick Yen of Lite-On; Frank Simonis of Philips; and Young Yoon Kim of SECL.  Under the

27  guise of an industry forum, these representatives had opportunities to meet and communicate

28  regarding the price-fixing conspiracy for ODDs.

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                       42

166.    The **International Symposium of Optical Memory ("ISOM")** is an organization created in Japan that is concerned with the technology of optical memory and provides a forum at which its members can share information on that subject. Its members include Sony, Sharp, Panasonic, Toshiba, Hitachi, LG, NEC and Samsung.  It has met annually since 1985.  The 2004 meeting took place on October 11-15 at Jeju Island, South Korea; the 2005 meeting took place on July 10-14 in Honolulu, Hawaii; the 2006 meeting took place on October 15-19 in Kagawa, Japan; the 2007 meeting took place on October 21-25 in Singapore; the 2008 meeting took place on July 13-17 in Waikoloa, Hawaii; and the 2009 meeting took place on October 4-8 in Nagasaki, Japan.

167.    Attendees at these various meetings included: (a) T. Maeda, H. Miyamoto, M. Nakamura, M. Ojima, Hiroyuki Minemura, and T. Shintani of Hitachi; (b) Jin-Yong Kim, Yun-Sup Shin, and In-Ho Choi of LG; (c) Ryuchi Katayama, H. Inada, T. Iwanaga, Y. Yamanaka, and H. Fukuchi of NEC; (d) J.A.M.M. van Haaren of Philips; (e) Isao Ichimura, Atsushi Fukumoto, Kimihiro Saito, Masataka Shinoda, M. Takeda, K. Nishitani, M. Toishi, S. Kubota, and S. Higashino of Sony; (f) Yutaka Kahihara, Y. Honguh, H. Yamada, Hiromichi Kobori, and A. Hirao of Toshiba; and (g) Chong Sam Cheung, Dong-Ho Shin, Kyung-Guen Lee, Jooho Kim, and I.-S. Park of Samsung.

168.    Under the cover of these annual meetings, Defendants who were members of ISOM had the opportunity to conspire on pricing and supply with respect to ODDs.  The 2010 ISOM meeting occurred on October 24-28 in Hualien, Taiwan.

169.    The **RW Products Promotion Initiative ("RWPPI")** is a trade association formed in Tokyo, Japan in May of 2000 to promote rewritable optical discs. The founding members included Hitachi Maxell, LG, Pioneer, Sharp, Sony, and Samsung. Lite-On, NEC, TSST and Sony Optiarc subsequently joined the association.  Its main activities were stated to include exchanges of various types of commercial and technical information.  In January of 2001, RWPPI created a United States Liaison Office located at the Long Beach, California office of Pioneer North America, Inc. According to a January 6, 2001 press release, a goal of this office was to "facilitate the exchange of information among RWPPI members in North America."

170.   The RWPPI held numerous meetings at the Japanese locations of Sharp and Pioneer during the Class Period, that provided a forum to communicate and agree upon prices for ODDs and carry out the conspiracy relating to them.  The dates and locales of those meetings are set forth in the following chart.

| Date of Meeting | Meeting Location |
|---|---|
| 3/13/2009 | Pioneer (Meguro, Tokyo, Japan) |
| 12/5/2008 | Sharp (Makuhari, Chiba, Japan) |
| 9/19/2008 | location unknown |
| 6/18/2008 | Pioneer (Meguro, Tokyo, Japan) |
| 2/14/2008 | Pioneer (Meguro, Tokyo, Japan) |
| 12/7/2007 | Sharp (Makuhari, Chiba, Japan) |
| 9/13/2007 | location unknown |
| 6/12/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 4/18/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 2/14/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 12/6/2006 | Sharp (Makuhari, Chiba, Japan) |
| 10/20/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 8/23/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 6/21/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 4/28/2006 | location unknown |
| 2/17/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 12/7/2005 | Sharp (Makuhari, Chiba, Japan) |
| 10/28/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 8/3/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 6/16/2005 | location unknown |
| 4/15/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 2/17/2005 | location unknown |

| Date of Meeting | Meeting Location |
|---|---|
| 12/9/2004 | Sharp (Makuhari, Chiba, Japan) |
| 10/29/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 8/26/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 6/15/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 4/14/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 2/25/2004 | Pioneer (Meguro, Tokyo, Japan) |

171.    The RWPPI appears to have disbanded, and closed its website in March of 2009, shortly before a federal grand jury began issuing subpoenas concerning an antitrust investigation into the ODD industry.

#### e.    Trade Shows

172.    The **International Consumer Electronics Show ("CES")**, the world's largest consumer electronics show, has been held annually during the Class Period.  The 2010 CES took place from January 7-10, 2010 at the Venetian Hotel in Las Vegas, Nevada.  Members of the conspiracy had the opportunity to communicate with each other about the conspiracy during the 2010 CES.

173.    As noted above, the **Optical Storage Symposium** is a worldwide conference held annually from 2001-07 at various locations sponsored by OSTA.  The 2007 event was held in South San Francisco on September 18-19, 2007. The 2006 event, held in Tokyo, Japan on October 5, 2006, included presenters from Sony, Hitachi and CDs21.  The 2004 event, held in Burlingame, California on September 25, 2005 and co-sponsored by, among others, Sony and Toshiba, included presenters from Sony and Toshiba.

174.    The **Internationale Funkausstellung ("IFA")** is a worldwide exhibition of consumer electronics products that is held annually in Berlin, Germany and is attended by representatives of Defendants. Recent IFA shows occurred on September 3-8, 2010; September 4-9, 2009; August 29-September 3, 2008; August 31-September 5, 2007; September 1-6, 2006; and September 2-7, 2005.

175.    The conduct of the "business" of these organizations or events gave Defendants and their Co-conspirators the cover needed to contact one another to communicate competitive information and reach and/or implement anticompetitive agreements.

### 5.    Standardization of ODDs

176.    A product is considered standard across suppliers when there is a high degree of substitutability among different suppliers in the market.  When products are viewed as interchangeable by purchasers, it is easier to agree on a single price for the good in question and to effectively monitor those prices.  This makes it easier to form and sustain a cartel. As part of the conspiracy, Defendants standardized products in the ODD market.  For example, OSTA developed "MultiRead," which was an industry consensus aimed at defining the parameters and specifications necessary for all classes of optical discs to be able to be read on current and future ODDs.  On March 7, 2000, OSTA announced that 17 ODD manufacturers, representing well over 90 percent of the ODD market at the time, achieved compliance with its MultiRead specification.  Those 17 manufacturers included Defendants Hitachi, LG, Lite-On, Philips, Samsung, Sony, and Toshiba.

177.    The ODD industry has been typified by standardization of ODDs driven by industry participants and a variety of industry-related organizations such as ECMA International, the International Standardization Organization ("ISO"), and the International Electrotechnical Commission.  These organizations and their members are dedicated to "standardizing the use of information communication technology and consumer electronics."

178.    As stated by Philips Consumer Electronics B.V., which is responsible for the development of CD technology and continues to hold patents and licensing rights arising therefrom:

> Standardization offers many other advantages to industry as a whole.  For example:  [1] Improvements to performance, compatibility, reliability, safety and interoperability; [2] Economies of scale and lower costs—for example, by allowing manufacturers to address multiple regions with a single product or manufacturing line; and [3] **Cooperation between industry leaders, reducing the risk for "first-mover" companies which pioneer new products or technologies.**  (Emphases added)

179.    As noted above, the ODD industry is also subject to patents and intellectual property rights, which are utilized to require adoption of standardized product specifications.

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

180.    The standardization of the ODD industry provided Defendants with the mechanism to implement, enforce, and oversee their agreements to stabilize the prices of ODDs.  Furthermore, as a result of this standardization, ODDs are commodity products, and buyers make decisions to purchase such products based largely, if not exclusively, on price. As one industry analyst noted in a treatise on optical and magnetic storage, **"[a]s with DRAM chips, the market for magnetic and optical drives is a commodity one; brand name matters little if at all....Optical drives are provided by consumer appliance companies, mostly Japanese, Korean and Taiwanese."** (Emphases added).  Likewise, Kris Williams of NEC, in a 2006 e-mail, referred to **"commodity products like DVD-ROM and CD-RW."**  (Emphases added).

**D.    Acts of Collusion With Respect To ODDs**

181.    Defendants reached agreements, the object of which was to stabilize the prices for ODDs in numerous ways throughout the Class Period.



183.    Other acts in furtherance of this collusion involved regular exchanges of information among Defendants and their Co-conspirators of confidential business information concerning ODDs, prices charged and to be charged for ODDs, production capacity with respect to ODDs, business plans for ODDs, plans for the introduction of new ODDs, confidential roadmaps for product rollouts and production, confidential product quality information, confidential product inventory and shipping information, company responses to customer initiatives, and plans for the cessation of manufacture of ODDs that had reached the ends of their respective lifecycles.  All of

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1  these information exchanges were undertaken for the purpose of fixing the prices of, and allocating

2  customers with respect to, ODDs.

189.    OEMs sponsored meetings for all suppliers.  At such meetings, representatives of Defendants would congregate together at lunches, introduce themselves to each other, and exchange contact information for purposes of setting up future communications to discuss bid-rigging, as described below.



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS



205.    Examples of the confidential information exchanges and agreements reached through this web of relationships are as follows. These examples are intended to be illustrative, not comprehensive, and reflect a review of only a small percentage of the over 4.3 million documents (many consisting of multiple pages) that certain Defendants produced to the DOJ.

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

53



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

58



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

67



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS





THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

71

324.     As noted above. Defendants created joint ventures or other cooperation arrangements that functioned as means to fix prices for competitive products manufactured or sold by the joint venturers.

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

[Large portions of this page are redacted with black bars.]

347.    In addition to what has already been discussed, Defendants engaged in other acts of anticompetitive conduct in furtherance of the alleged conspiracy.

348.    In the latter part of 2004, after a period of decline, **quotations by Defendants to OEMs for 16x DVD-R players stabilized for a period of months. By September of 2004, Taiwanese ODD manufacturers were claiming that the prices of such burners would remain stable for the remainder of the year.**

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

349.   Similarly, in March of 2005, Liao of Lite-On, said at a press conference that **he expected any price competition for the global market of ODDs to slacken in 2005, because Japanese manufacturers had forced out most of Taiwan's second tier manufacturers and almost all of China's manufacturers**.

350.   As yet another example, beginning in February of 2008, prices on many ODDs that played BDs began to climb. In August of 2008, personal computer vendors, including H-P, Dell, Acer and Asustek, sought reductions in OEM and Original Design Manufacturer ("ODM") prices of BD Combo and BD-ROM drives. At the time, ODM/OEM quotations were at $120-$130 for a BD Combo drive and $95-$100 for a BD-ROM drive, but computer vendors asked for the lowering of the former by $20-$30 and the latter by $5-$10. **Leading ODM/OEM manufacturers, such as Pioneer, Lite-On, HLDS and TSST, were all steadfast in refusing to lower current quotations, however. Andy Parsons, Chairman of the BDA and a Senior Vice-President of Pioneer, said in October of 2008 that the prices for BD players would not be coming down soon**. In a competitive market, at least one or more of the Defendants in question would have broken ranks to capture market share.

351.   The patent pools described previously also facilitated the operations of the conspiracy. They restricted competition among pool members and, as reflected in the CD-R patent pool involving Philips, Sony, and Taiyo-Yuden described above, can operate as a vehicle to unlawfully fix prices. They also limit competition in downstream products incorporating the pooled patents and can remove incentives to engage in further innovation. Licensees from the 3C DVD Patent Group and DVD 6C Patent Pool, for example, must report customer, sales and pricing data to those pools, thus ensuring that the co-conspirators who operate them can have access to sensitive non-public commercial information that facilitates the conspiracy. For example, the license agreement for the DVD 6C Patent Pool specifically requires the patent licensee to agree that such information can be shared among the members of the licensing group.

**E.    Governmental Antitrust Investigations Of the ODD Industry**

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                          78

353.     On October 26, 2009, news sources reported that other companies, including Toshiba, Hitachi, Samsung and LG had re**ceived DOJ subpoenas. According to one of the news articles, an unnamed** "source said the department began the probe in recent months, investigating disk-drive makers for possible price-fixing, bid-rigging and allocation of markets."

354.     Sony has acknowledged that it believes the request for information from the DOJ is part of a wider review of anticompetitive conduct in the ODD market by the DOJ and competition authorities in other countries.

355.     On October 27, 2009, Hitachi and Toshiba confirmed that, like Sony, their ODD operations in the United States received subpoenas from the DOJ in a widening investigation into potential antitrust violations.  Additionally, they acknowledged that they were also under investigation by European Union and Singaporean antitrust regulators.

356.     On October 27, 2009, a DOJ spokeswoman, Gina Talamona confirmed that, "[t]he antitrust division is investigating the possibility of anticompetitive practices in the optical disc drive industry."

---

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                      79

357.    In Philips' 2009 Annual Report, it was disclosed:

> On October 27, 2009, the Antitrust Division of the United States Department of Justice confirmed that it had initiated an investigation into possible anticompetitive practices in the Optical Disc Drive (ODD) industry. Philips Lite-On Digital Solutions Corp. (PLDS), a joint venture owned by the Company and Lite-On IT Corporation, as an ODD market participant, is included in this investigation. PLDS is also subject to similar investigations outside the US relating to the ODD market. PLDS and Philips intend to cooperate with the authorities in these investigations.
>
> Subsequent to the public announcement of these investigations in 2007, the Company, PLDS and Philips & Lite-On Digital Solutions USA, Inc., were named as defendants in at least two class action complaints filed in the United States District Court for the Northern District of California. Several additional complaints were filed against other ODD manufacturers in the Northern District of California and at least one other United States District Court. These actions allege anticompetitive conduct by manufacturers of ODDs, seek treble damages on behalf of direct purchasers of ODDs, and may involve joint and several liability among the named defendants.
>
> **These matters are in their initial stages and due to the considerable uncertainty associated with these matters, on the basis of current knowledge, the Company has concluded that potential losses cannot be reliably estimated with respect to these matters. An adverse final resolution of these investigations and litigation could have a materially adverse effect on the Company's consolidated financial position, results of operations and cash flows.** (Emphases added).

The boldfaced language quoted above is largely identical to that used by Philips in the same Annual report describing the criminal investigations against it with respect to TFT-LCDs and CRTs by various international competition authorities.

358.    In an SEC Form 6-K dated November 16, 2009, Hitachi stated:

> In June 2009, a subsidiary in Japan received a grand jury subpoena in connection with an investigation conducted by the Antitrust Division of the U.S. Department of Justice and received requests for information from the European Commission, both in respect of alleged antitrust violations relating to optical disk drives. Also in June 2009, the Competition Commission of Singapore began an investigation of a subsidiary in Korea, also in respect of alleged antitrust violations relating to optical disk drives. Relevant authorities in the markets in which Hitachi operates continue to investigate Hitachi and may initiate similar investigations in the future. **These investigations may result in significant penalties in multiple jurisdictions, and private parties may bring civil actions against Hitachi seeking compensation for damages resulting from the relevant violations. Such substantial legal liability or regulatory action could have a material adverse effect on Hitachi's business, results of operations, financial condition, cash flows, reputation and credibility.** (Emphases added).

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                          80

In its report on Form 20-F filed with the SEC on June 29, 2010, Hitachi confirmed that the investigations are ongoing.

359.   Thus, while Defendants have announced these investigations in their public SEC filings, they have not denied any allegations of anticompetitive conduct or stated that there was no plausible basis for the investigations.  Furthermore, Defendants have not publicly disclosed the results of any internal investigation of the conspiracy now under investigation.  Defendants' silence on these matters can be contrasted with other companies' denials of liability when announcing publicly antitrust or other criminal investigations.[4]  In light of the requirements that public SEC filings not contain any untrue statement of material fact (*see, e.g.*, 17 C.F.R. § 240.10b-5 (Rule 10b-5); 15 U.S.C. § 7241(a)(2) (Sarbanes-Oxley Act certification requirement)), a reasonable inference from this silence is that the price fixing conspiracy under investigation is plausible.

360.   It is also significant that Defendants' anticompetitive behavior has been the subject of a criminal grand jury investigation by the DOJ.  In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a detailed memorandum to that effect.  *See* Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1 ("[i]f a Division attorney believes that a criminal violation of the antitrust laws has occurred, he should prepare a memorandum requesting authority to conduct a grand jury investigation.")  Furthermore, following a review of the memorandum, the request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division, based on the standard that a criminal violation may have occurred.  *See id.*  In addition, the fact that the DOJ Antitrust Division investigation is criminal, as opposed to civil, is significant as well.  The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal Investigation"

---

[4]*See, e.g.*, Goodyear Tire & Rubber Co., SEC Form 10-K, SEC Filing No. 05685725, p. 18 (March 16, 2005) ("[a]lthough the Company does not believe that it has violated the antitrust laws, it is cooperating with the Department of Justice."); Titan Corp., SEC Form 10-K, SEC Filing No. 04658736, p. 14, p. 82 (March 10, 2004) ("[w]e are not aware of any illegal or inappropriate conduct, and we have been and will continue to cooperate fully with the investigation."); L 3 Communications Holdings Inc., SEC Form 10-Q, SEC Filing No. 07824807, p. 15 (May 10, 2007) ("[t]he Company has conducted an internal investigation of this matter using outside counsel and currently believe that no criminal activity occurred.").

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

81

state: "[i]n general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations." *See* Antitrust Division Manual, Chapter III.C.5. Accordingly, the existence of a criminal investigation into the ODD industry supports the existence of the conspiracy alleged herein.

361.    The DOJ confirmed its activities in a formal motion to stay proceedings in this case filed on May 20, 2010, wherein it stated that "[t]he DOJ is currently investigating possible criminal violations in the optical disk drive ('ODD') industry." *See* Memorandum Of Points And Authorities In Support Of the United States' Motion For A Limited Stay of Discovery,  p. 15 (May 20, 2010) (Dkt. No. 68). In support of that motion, it has submitted under seal to this Court a declaration describing the status of its investigation.

**F.    <u>Economic Data on Pricing and Supply</u>**

362.    ODD pricing during the Class Period has not behaved as would be expected in a competitive market.

363.    After introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends.  However, the ODD market has been characterized by unnatural price stability and certain periods of upward pricing trends.

364.    The cost of manufacturing ODDs should have declined as the industry consolidation and manufacturing bases shifted to lower-cost countries.  In a competitive market this would be reflected in downward pricing trends as well.  However, according to U.S. Bureau of Labor Statistics, around the beginning of 2004, the Producer Price Index ("PPI") for computer storage devices, which includes ODDs, started to level off.

/ / /

/ / /

/ / /

/ / /

/ / /

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS



Producer Price Index for Computer Storage Device Manufacturing
Jan. 1999-May 2009

Source: U.S. Bureau of Labor Statistics
Producer Price Index for Exports 3341123341112: Computer Storage Device Manufacturing
Note: Includes devices that allow the storage and retrieval of data from a phase change, magnetic, optical, or magnetic/optical media.

365.    As noted above, according to industry sources and statements from Defendants' own representatives, firms increasingly attempted to stabilize pricing and avoid continued decreases in pricing and, presumably, profit margins.

366.    If they were acting independently, ODD makers would have had disparate incentives, depending on the size of their market share in an existing generation of ODD technology.  The fact that Defendants and their identified Co-conspirators uniformly held off on significant price reductions regardless of share demonstrates that they were acting conspiratorially. Because of these disparate incentives, stable prices cannot be explained merely as conscious parallelism.



368.    As one news report issued at the time of the announcement of the DOJ's investigation of Sony's ODD subsidiary observed,

> Analysts have been wondering why Blu-ray prices have remained high even though the technology has been commercially available for over three years. HD-DVD has been gone for nearly two-thirds of that time and one would have expected costs to have declined by now. **The fact that they haven't is causing some to question whether or not Sony is doing something to keep the prices up.** (Emphases added).



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20     / / /
21     / / /
22     / / /
23     / / /
24     / / /
25     / / /
26     / / /
27     / / /
28     / / /

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                85



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

86



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

**G.**     **History of Collusion In Other Industries**

380.     Many of the Defendants and Co-conspirators named herein have a long history of collusion, and have been involved in antitrust investigations into other technology-related products, or have admitted to participating in anticompetitive cartels involving technology-related or other products.  To the extent these prior instances of conspiratorial conduct involved consumer electronics products, the products in question were marketed through the same or related channels used for the marketing of ODDs and were overseen by the same divisions or departments within the relevant Defendant for at least a portion of the Class Period.

381.     **Televisions**.  In February of 1993, the Japan Fair Trade Commission ("JFTC") entered a cease and desist order against the sales subsidiaries of Sony, Toshiba, Hitachi and what is now Panasonic, finding that the subsidiaries requested large discount stores in the Akihabara district in Tokyo and the Nipponbashi shopping district in Osaka not to display discount rates larger than 10 percent of the maker's recommended retail prices for products including televisions on price tags at stores and in their handbills.  The JFTC noted that similar practices had occurred in 1988 when it instructed two major industry associations, including the Japan Electronics Industry Association, to stop them, but the practices had continued.

382.     **Magnetic Videotapes**.  In November of 2007, the European Commission ("EC") fined Sony and various related entities and the Hitachi Maxell Limited joint venture $110 million for fixing the prices of professional videotapes sold in Europe between 1999 and 2002.

383.     **Optical Disc Licensing Policies**. In July of 1994, the DOJ announced that it was conducting an investigation into the licensing practices of several leading companies that own and license CD manufacturing patents to determine if there have been violations of United States antitrust laws.  The companies were believed to include Sony and Philips.  It was reported that the two companies signed a "pact" in the late 1970s, agreeing to "cross-license each other's basic patents on CD technology" and collect fees from vendors.  It was further reported that the DOJ had

1    issued subpoenas to several companies dealing with Philips and Sony, including DiscoVision

2    Associates, a subsidiary of Pioneer.

3          384.    In August of 2006, the EC initiated an investigation regarding the procedures

4    required in order to obtain a license for BD and HD-DVD standards.

5          385.    As noted above, in October of 2008, it was announced that two of the major players

6    in the ODD market, Sony and Philips, were fined by the TFTC for their anticompetitive business

7    practices in connection with their abuse of monopoly power in the licensing of the technology for

8    CD-Rs.

9          386.    **Gas Insulated Switchgears**. In January of 2007, Hitachi and Toshiba were fined by

10    the EC for their roles in a conspiracy to control prices and allocate market shares in the market for

11    gas insulated switchgears between 1988 and 2004.

12          387.    **DRAM**. In October of 2005, Samsung admitted guilt and paid a $300 million fine

13    following an investigation by the DOJ into price-fixing among manufacturers of DRAM.

14          388.    On May 19, 2010, the EC announced that it was fining ten companies a total of €331

15    million for participating in an international cartel to fix DRAM prices. Among those fined were

16    Samsung, NEC, Hitachi and Toshiba.

17          389.    **CRTs**. In a cease and desist order dated October 7, 2009, the JFTC levied $37.4

18    million in fines against five companies for alleged participation in a price-fixing cartel for CRTs,

19    including Panasonic, LG Philips Displays Korea Co. and an arm of South Korea's Samsung group

20    and their affiliates.

21          390.    On November 26, 2009, the EC confirmed that it had sent a Statement of

22    Objections to participants in the CRTs cartel in Europe. It has been reported that "[t]he EC

23    believes that Chunghwa Picture Tubes (a unit of Tatung), LG Electronics, Matsushita (Panasonic),

24    Philips, Samsung and Toshiba have formed cartels to boost pricing of CRT-based devices, such as

25    computer monitors or TV-sets."

26          391.    In November of 2007, Hitachi Canada Ltd., a subsidiary of Hitachi, received

27    requests for information from the Canadian Competition Bureau with respect to alleged antitrust

28    violations relating to CRTs.

392.   **TFT-LCDs**. The DOJ, the EC, and the JFTC have also investigated Samsung, Toshiba, LG and Hitachi, among others, concerning collusion among manufacturers of TFT-LCDs.

393.   In December of 2008, the JFTC fined Sharp and Hitachi with respect to a conspiracy involving TFT-LCDs sold for use in Nintendo game consoles.

394.   Also in December of 2008, the DOJ announced that:(a) LG Display, a joint venture between LG and Philips, pleaded guilty to an information alleging antitrust price-fixing allegations with respect to TFT-LCDs and had agreed to pay a $400 million fine and (b) Sharp pleaded guilty to bid-rigging with respect to certain customers of TFT-LCDs and had agreed to pay a fine of $120 million.

395.   On March 10, 2009, the DOJ announced that Hitachi Displays, Ltd. had pled guilty to participation in the price-fixing conspiracy involving TFT-LCDs and had agreed to pay a $31 million fine.

396.   Although it has not been publicly acknowledged by Samsung, it is widely believed that Defendant SECL is in the DOJ's leniency program with respect to the investigation into the market for TFT-LCDs, meaning that it has admitted its participation in the cartel.

397.   The TFT-LCD investigation is ongoing, and Toshiba, as well as other entities, remain under investigation.  This criminal investigation is being conducted by the San Francisco office of the DOJ's Antitrust Division.

398.   In July of 2009, the EC confirmed that it had sent a Statement of Objections to participants in the TFT-LCD cartel in Europe.

399.   **Similarities with ODDs**.  As in the TFT-LCD industry, many of the Defendants here are not just the major manufacturers and sellers of the ODDs, but are also vertically-integrated major manufacturers of products containing ODDs.  For example, the Samsung entities manufactured and sold both TFT-LCD panels as well as TFT-LCD flat panel televisions.  Here Samsung, Toshiba, Panasonic and Sony manufacture and sell both ODDs and computers containing ODDs.

400.   The ODD industry has a similar oligopoly structure to that of the TFT-LCD, DRAM and CRT industries.  The Defendants' entry into price-fixing agreements in those markets (which

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

include many of the same foreign companies) supports the DOJ's investigation and other evidence showing the existence of an anticompetitive conduct in the ODD market.

401.    The established illegal conduct of Hitachi, LG, Philips, Sony and Samsung (as well as Sharp and Panasonic) in a wide variety of product markets across the world, including the United States, is illustrative of Defendants' respective corporate cultures which encourage illegal activities aimed at furthering the company's bottom line at the expense of consumers.

402.    For example, in November of 2007, Kim Yong Chul, the former chief lawyer for Samsung, admitted that the company "instructed me to commit crimes." Mr. Chul continued by saying that "[a] basic responsibility for all Samsung executives is to do illegal lobbying, buying people with money." Mr. Chul also acknowledged that he fabricated court evidence on behalf of the company and its executives; several Samsung executives have recently been convicted of bribery and other white collar crimes.

403.    The facts as alleged herein show that the conduct of Defendants was directed both at customers in the United States and at United States import commerce for ODDs.  The conduct alleged herein was directed specifically at customers throughout the United States, including customers in California, Texas, and Washington.  The conduct of Defendants also had a direct, substantial and reasonably foreseeable effect on United States commerce of ODDs.  Publicly available United States customs data indicates that Defendants collectively imported many millions of ODDs into the United States, which were purchased by persons and entities in the United States, throughout the Class Period.  The collective monetary value of such commerce was in the billions of dollars.

## VIII.    CAUSE OF ACTION FOR VIOLATION OF U.S. ANTITRUST LAWS

404.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

405.    On or about January 1, 2004, the exact date being unknown to Plaintiffs, Defendants and their Co-conspirators agreed to stabilize the prices of ODDs sold in the United States in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

406.     In furtherance of this agreement, *inter alia*: (a) Defendants engaged in the rigging of bids (with respect to pricing, bid rankings and other matters) for certain procurement events for ODDs conducted by major OEMs situated in the United States, such as Dell and H-P; (b) certain Defendants colluded on pricing of ODDs sold to Microsoft for use in its Xbox game console; (c) certain Defendants engaged in cooperation agreements that resulted in the setting of prices or the allocation of customers and/or markets with respect to OEM and/or non-OEM ODD sales; and (d) Defendants and their Co-conspirators exchanged confidential business information concerning ODDs, including, *inter alia*, prices charged and to be charged for ODDs, rebate information on ODDs, production capacity with respect to ODDs, business plans for ODDs, plans for the introduction of new ODDs, roadmaps for product rollouts and production, product quality information, product inventory and shipping information, company responses to customer initiatives, and plans for the cessation of manufacture of ODDs that had reached the ends of their respective lifecycles.

407.     This agreement and coordination caused the prices of ODDs manufactured and sold by Defendants to be inflated at supracompetitive levels.

408.     The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants and their Co-conspirators instituted, fixed, maintained, raised or stabilized prices for ODDs at supracompetitive levels.  Such a contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

409.     Defendants' and their Co-conspirators' contract, combination, agreement, understanding or concerted action occurred in or affected interstate and international commerce.

410.     The contract, combination or conspiracy has had the following effects:

    a.     Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for ODDs;

    b.     Competition in establishing the prices paid for ODDs has been unlawfully restrained, suppressed and eliminated; and

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

93

c.      Prices charged to Plaintiffs and the Class for ODDs were raised, fixed, maintained or stabilized at higher, artificially inflated, non-competitive levels.

411.    As a proximate result of Defendants' and their Co-conspirators' unlawful conduct, Plaintiffs and the Class have suffered injury in that they have paid higher prices for ODDs, either as standalone products or which were incorporated into desktop or notebook computers, than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

412.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and the members of the Class have sustained injury.  As a direct result of Defendants' and their Co-conspirators' conduct, the injury sustained by Plaintiffs and the Class is the payment of supracompetitive prices for ODDs.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## IX.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

413.    Plaintiffs and members of the Class did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein until October 26, 2009 when it was first publicly reported that manufacturers of ODDs were under investigation by antitrust authorities in the United States, and elsewhere in the world, for anticompetitive conduct.



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

415.     Because Defendants' and their Co-conspirators' agreements, understandings, and conspiracies were kept secret until October 26, 2009, Plaintiffs and members of the Class before that time were unaware of Defendants' and their Co-conspirators' unlawful conduct alleged herein, and they did not know before that time that they were paying artificially high prices for ODDs throughout the United States during the Class Period.

416.     The affirmative acts of the Defendants and their Co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection, as described in part above.

417.     By their very nature, Defendants' and their Co-conspirators' price-fixing conspiracy was inherently self-concealing.  The ODD industry is not exempt from antitrust regulation, and thus, before October 26, 2009, Plaintiffs reasonably considered it to be a well-regulated competitive industry.

418.     In the context of the circumstances surrounding Defendants' and their Co-conspirators' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' and their Co-conspirators' pricing was conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' and their Co-conspirators' ODD prices before October 26, 2009.

419.     Plaintiffs and members of the Class could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their Co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

420.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their Co-conspirators, Plaintiffs and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until October 26, 2009, when reports of the investigations into price-fixing in the ODD industry first became known to Plaintiffs.  Prior to

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1   October 26, 2009, there was nothing that Plaintiffs could have done through the exercise of

2   reasonable diligence that could or would have led to the discovery of the conspiracy.

3         421.    Defendants and their Co-conspirators also committed affirmative acts of

4   concealment of the conspiracy, including, *inter alia*, periodically issuing press statements falsely

5   asserting that ODDs were competitively priced.  For example, in October, 2004 Lite-On President

6   Danny Liao claimed that increasing competition for OEM orders had pushed down prices for 16x

7   DVD burners to as little as $60, and that competition would drive some manufacturers from the

8   market.



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

431.    Defendants and their Co-conspirators also concealed their collusive conduct by claiming pretextual reasons for the price levels of ODDs in response to customer requests to lower prices or in general statements to the trade.

432.    With respect to the bid-rigging activities described above, no participating Defendant advised any Class member of the collusive activity that was occurring with respect to bidding to supply ODDs.  Instead, they made public statements that the ODD industry was intensely competitive, such as: (a) Hitachi's SEC Form 20-Fs of August 30, 2004, August 26, 2005, August 7, 2006, June 26, 2007 and July 27, 2009; and (b) NEC's SEC Form 6-Ks of  April 27 and May 31, 2005.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

434.    In addition to instances already cited, examples of these practices culled from documents produced to the DOJ include the following.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                                    97



THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

449.     As a result of the Discovery Rule and Defendants' and their Co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations did not commence until after 2009, and was tolled with respect to any claims that Plaintiffs and members of the Class have as a result of the anticompetitive conduct alleged in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

(1)     That the Court determine that this action may be maintained as a class action under Rule 23 (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be certified as class representatives and Plaintiffs' counsel be appointed as counsel for the Class;

1        (2)      That the unlawful contract, combination or conspiracy alleged be adjudged and

2  decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the

3  Sherman Act and Section 4 of the Clayton Act;

4        (3)      That Plaintiffs and the Class recover damages, as provided by law, determined to

5  have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust

6  laws, and that judgment be entered against Defendants on behalf of Plaintiffs and of the Class;

7        (4)      That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees,

8  as provided by law;

9        (5)      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and

10  the respective officers, directors, partners, agents, and employees thereof and all other persons

11  acting or claiming to act on their behalf be permanently enjoined and restrained from continuing

12  and maintaining the combination, conspiracy, or agreement alleged herein;

13        (6)      That Plaintiffs and members of the Class be awarded pre-judgment and post-

14  judgment interest, and that such interest be awarded at the highest legal rate from and after the date

15  of service of the initial complaint in this action; and

16        (7)      For such other and further relief as is just under the circumstances.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

1

## JURY TRIAL DEMANDED

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury

3   of all of the claims asserted in this Complaint that are so triable.

4   DATED:  March 11, 2013                    By:/s/ Guido Saveri

5                                             Guido Saveri
                                              R. Alexander Saveri
6                                             Cadio Zirpoli
                                              Lisa Saveri
7                                             David Nathan-Allen Sims
                                              **Saveri & Saveri, Inc.**
8                                             706 Sansome Street
                                              San Francisco, CA 94111
9                                             Tel:  415-217-6810
                                              Fax: 415-217-6813
10                                            guido@saveri.com
                                              rick@saveri.com
11                                            cadio@saveri.com
                                              lisa@saveri.com
12                                            dsims@saveri.com

13                                            *Chairman of the Committee of Direct Purchaser*
                                              *Plaintiffs' Counsel Acting On Behalf Of All Direct*
14                                            *Purchasers And Their Counsel In These Consolidated*
                                              *Actions*
15

16                                            Joseph M. Alioto
                                              Theresa Moore
17                                            **Alioto Law Firm**
                                              555 California Street
18                                            Suite 3160
                                              San Francisco, CA 94104
19                                            Tel: 415-434-8900
                                              Fax: 415-434-9200
20                                            jmalioto@aliotolaw.com
                                              tmoore@aliotolaw.com
21
                                              Joseph J. Tabacco Jr.
22                                            Christopher T. Heffelfinger
                                              Todd A. Seaver
23                                            Sarah Khorasanee
                                              **Berman DeValerio**
24                                            One California Street, Suite 900
                                              San Francisco, CA 94111
25                                            Tel:  415-433-3200
                                              Fax: 415-433-6382
26                                            jtabacco@bermandevalerio.com
                                              cheffelfinger@bermandevalerio.com
27                                            tseaver@bermandevalerio.com
                                              SKhorasanee@bermandevalerio.com
28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                        101

Joseph W. Cotchett
Steven N. Williams
**Cotchett, Pitre& McCarthy**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: 650-697-6000
Fax: 650-697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com

Michael P. Lehmann
Christopher L. Lebsock
**Hausfeld LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel: 415-633-1909
Fax: 415-358-4980
mlehmann@hausfeldllp.com
clebsock@hausfeldllp.com

Robert N. Kaplan
**Kaplan Fox &Kilsheimer, LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: 212-687-1980
Fax: 212-687-7714
rkaplan@kaplanfox.com

Gary L. Specks
**Kaplan Fox &Kilsheimer, LLP**
423 Sumac Rd.
Highland Park, IL 60035
Tel: 847 831 1585 (telephone)
Fax: 847 831 1580 (fax)
gspecks@kaplanfox.com

Eric B. Fastiff
Brendan P.Glackin
**LieffCabraserHeimann& Bernstein, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: (415) 956-1000
Fax: (415) 956-1008
efastiff@lchb.com
bglackin@lchb.com

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS

102

1

Bruce L. Simon
Aaron M. Sheanin
William J. Newsom
**Pearson Simon Warshaw & Penny LLP**
44 Montgomery Street
Suite 2450
San Francisco, CA 94104
Tel:  415-433-9000
Fax: 415-433-9008
bsimon@pswplaw.com
asheanin@pswplaw.com
wnewsom@pswplaw.com

*Executive Committee of Direct Purchaser Plaintiffs'*
*Counsel And Special Trial Counsel Acting On Behalf*
*Of All Direct Purchasers And Their Counsel In These*
*Consolidated Actions*

853285.1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT
CASE NO. 3:10-MD-2143 RS                                                                                   103

# <u>Appendix A</u>:

# "DOCUMENT SUBMITTED UNDER SEAL"