Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
George W. Sampson (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Interim Lead Counsel for Indirect
Purchaser Plaintiffs

[*Additional Counsel Listed on
Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPTICAL DISK DRIVE PRODUCTS ANTITRUST LITIGATION | MDL No. 3:10-md-2143 RS |
| | CLASS ACTION |
| | **FIFTH AMENDED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| | DATE ACTION FILED: Oct. 27, 2009 |
| This Document Relates to: | |
| ALL INDIRECT PURCHASER ACTIONS | |

\*      \*      \*      **REDACTED VERSION**      \*      \*      \*

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................... 1

II.  DESCRIPTION OF OPTICAL DISK DRIVES ....................................................... 4

III. DEFENDANTS CONSPIRED TO STABILIZE ODD PRICES ............................. 5

   A.  Original Equipment Manufacturers Exerted Pricing Pressure on ODD Suppliers Through the Procurement Process................................................................................ 5

   B.  Summary of Defendants' Conduct Used to Stabilize ODD Prices ............................... 7

      1.  Defendants Agreed to Exchange Sensitive Competitive Information in Furtherance of Their Objective to Stabilize Prices.............................................. 7

      2.  Summary of Corporate Relationships ................................................................. 8

      3.  Summary of Key Employees Who Committed Overt Acts to Stabilize Prices in the Representative Examples Listed in this Complaint .................... 10

      4.  Representative Examples of Overt Acts in Furtherance of Conspiracy to Stabilize ODD Prices ...................................................................................... 12

   C.  Defendants' Illegal Conduct Stabilized Prices and Harmed Consumers .................... 49

      1.  Economic Evidence Will Show Defendants' Conspiracy Stabilized ODD Prices Paid by Other OEMs and in Other Sales Channels ............................... 50

      2.  Defendants' Conspiracy Caused Consumers to Pay Supra-Competitive Prices ................................................................................................................. 56

      3.  Defendants' Conspiracy Harmed Consumers by Causing Decreased Technological Innovation ................................................................................. 60

      4.  The Inflated ODD Prices Were Passed-Through to Consumers ...................... 64

   D.  Specific Characteristics of the ODD Market Made It Ripe for Collusion .................. 67

      1.  The ODD Market Experienced a Dramatic Increase in Concentration........... 67

      2.  Significant Barriers to Entry Exist in the ODD Market .................................. 75

      3.  Defendants' Participation in Trade and Business Organizations Provided Opportunities for Collusion ............................................................................. 83

   E.  Governmental Investigations into Price Fixing in the ODD Industry ......................... 85

      1.  Defendants Have Admitted that Multiple Governmental Organizations Are Investigating Price Fixing in the ODD Industry............................................... 86

      2.  The Department of Justice Has Admitted It Has Convened a Criminal Grand Jury to Investigate Defendants' Price Fixing in the ODD Market ....... 88

3.     Defendants' Agent Admits that the "Implied Promise" of the Grand Jury Investigation Is Criminal Indictments or Admissions of Guilt ....................... 89

F.     Defendants Have a History of Colluding to Fix Prices in Related Markets................ 90

1.     Defendants Have Been Charged With and Have Pleaded Guilty to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of LCD Panels and LCD Products Sold in the United States........... 91

2.     Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the United States.................................................................. 92

3.     Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the European Union................................................................. 93

4.     Governmental Investigations Have Revealed Defendants' Involvement in a Price-Fixing Conspiracy of Cathode Ray Tubes ............................................ 94

IV.     TRADE AND COMMERCE ............................................................................................ 95

V.     FRAUDULENT CONCEALMENT ................................................................................ 98

VI.     JURISDICTION AND VENUE..................................................................................... 105

VII.     PARTIES ....................................................................................................................... 107

A.     Indirect Purchaser Plaintiffs ............................................................................. 107

B.     Defendants.......................................................................................................... 111

VIII.     CLASS ACTION ALLEGATIONS............................................................................... 117

IX.     VIOLATIONS ALLEGED ............................................................................................ 122

# I.  INTRODUCTION

1.      Certain corporate Defendants (the "cooperators") have helped the Indirect Purchaser Plaintiffs ("IPPs") by detailing industry participants' conspiratorial conduct that successfully stabilized optical disk drive ("ODD") prices. These cooperating Defendants are helping IPPs in an effort to receive amnesty from the Department of Justice against criminal charges and to limit their civil liability pursuant to the Antitrust Criminal Penalty Enhancement and Report Act of 2004 ("ACPERA"). An applicant that satisfies ACPERA's terms limits its civil liability to actual damages sustained – *i.e.*, single damages, rather than treble damages.[1] To satisfy ACPERA's terms, the leniency applicant must provide timely and complete cooperation, including setting forth a full account of the facts known, producing all relevant documents, and making witnesses reasonably available to respond to all questions.

2.      To be clear, IPPs base their claims on the object of Defendants' conspiracy to restrain competition in the sale of optical disk drives ("ODDs").[2] Defendants' conduct indeed illegally raised ODD prices. The illegal higher prices for ODDs were in turn passed down the distribution chain, ultimately to IPPs. As a result, IPPs paid supra-competitive prices for ODDs and ODD Products sold from January 1, 2004 until at least June 30, 2009 (the "Class Period").

3.      Based on the cooperators' information and the IPPs independent investigation, IPPs allege the following, as set forth fully in paragraphs to follow:

- **Defendants acted to stabilize prices:** Since at least 2004, Defendants coordinated their efforts to stabilize prices of ODDs. Defendants coordinated their efforts to stabilize prices by using several methods, including agreeing to the: (i) order in which competitors would finish during multi-party procurement events – such as electronic auctions – held by customers; (ii) minimum prices for ODDs, below which competitors would not quote to customers; and (iii) exchange of detailed competitive pricing information and critical intelligence about manufacturing capacity and quality issues. *See* pages 5-49, *infra*.

---

[1]   *See* Pub. L. No. 108-237, § 213(b), 118 Stat. 661, 666-67 (2004).

[2]   The ODDs that are the subject of this lawsuit include: CD-ROMS ("CD"), CD-recordable/rewritable ("CD-R/RW"), DVD-ROM ("DVD"), DVD-recordable/rewritable (DVD-R/-RW/+R/+RW), Blu-Ray ("BD"), Blu-Ray-recordable/rewritable ("BD-R"/"BD-RE") and HD-DVD. The products containing ODDs which IPPs purchased and are the subject of this lawsuit are computers, Microsoft Xbox game consoles (all generations) and ODDs designed to be attached externally to devices such as computers (collectively "ODD Products").

- **Defendants successfully stabilized prices**: Each of the overt acts Defendants engaged in had the purpose and – in combination with the other Defendants' overt acts – effect to slow the downward pressure on the prices of ODDs, a commodity product. *See* pages 49-50, *infra*.

- **Defendants stabilized ODD prices beyond HP and Dell**: Two major ODD purchasers, Hewlett-Packard Company ("HP") and Dell Computer Corporation ("Dell"), had significant purchasing power. At times relevant to this lawsuit, HP and Dell purchased more than 50 percent of Defendants' ODDs that are incorporated into computers sold in the United States. As a result, stabilizing the prices of ODDs Defendants sold to HP and Dell (and others) helped to stabilize prices of ODDs Defendants sold to other Original Equipment Manufacturers ("OEMs") that had less purchasing power. *See* pages 50-56, *infra*.

- **ODD prices stabilized compared to other industries**: Economic evidence will show the Defendants' illegal conduct stabilized the prices of ODDs, using comparative industries as benchmarks. *See* pages 56-60, *infra*.

- **ODD industry structure was conducive to Defendants' conspiracy**: The ODD industry is characterized by several attributes that makes coordinated efforts to stabilize prices more likely (and effective). For example, the ODD industry went from unconcentrated to concentrated as defined by the Department of Justice's merger guidelines. Further, although ODDs are commodity products, intellectual property controlled by a small number of firms that have "pooled" together their patents created barriers to entry and an additional avenue to exchange and monitor competitive sales information. *See* pages 67-85, *infra*.

- **Defendants are recidivists**: These Defendants have previously pleaded guilty to or acknowledged violating the antitrust laws. *See* pages 90-95, *infra*.

4.      As one Defendant's antitrust compliance policy expressly prohibited, employees are "**absolutely forbidden, under any circumstances, to discuss or consult with, exchange information or enter into any agreement or understanding with any competitor regarding [Defendant's], the competitor's, or any other competitor's present or future prices, profit margins, cost structures, sales dates, credit terms or other terms or conditions of sale.**" But as detailed herein, Defendants' employees flagrantly disregarded these policies in violations of the antitrust laws.

5.      Defendants ignored their own antitrust policies when faced with vigorous price competition for ODD sales driven by OEMs. To counter price competition, Defendants turned to illegal methods to counterattack vendors' efforts to put competitive pricing pressure on Defendants' ODD sales. As one Defendant's employee suggests, the ODD industry needed to cooperate to forestall a price war:

> 4. Industry Cooperation
>
> If the industry cooperation is needed for the not joining auction, the best way is to use broadcasting mentioning that HLDS is considering not joining auction with big PC makers. (Korea, Japan, Taiwan)
>
> In the PC industry, HP is also using broadcasting message that HP will focus on profit than profit competition. Then, HP can deliver the message that HP doesn't want bleeding price competition to Dell. This way can avoid the violation of anti-trust law, too.
>
> Actually, if we can talk with each supplier directly, it will be more effective, but using broadcasting is better way to avoid any suspicion that suppliers negotiated.

6.      Instead of public "signals" to thwart price competition, Defendants instead chose the "more effective method" – talking directly with competitor ODD suppliers. Defendants engaged in a pattern of agreeing to reduce ODD price competition in online auctions and to exchange information about prices, revenues, sales volume and production plans directly from other competitors' employees. The object and effect of these agreements and information exchanges was to reduce competition and stabilize ODD prices.

7.      Defendants shared the common objective to stabilize ODD prices. To achieve this common objective, Defendants agreed to exchange information necessary to stabilize ODD prices. Communication of competitive information about prices, revenues, unit sales and production plans is anticompetitive because the only plausible effect of this type of information exchange between competitors is to reduce the intensity of competition by facilitating price collusion. Exchange of competitive information facilitates collusion in several ways. It assists competitors in forming a united front in negotiating with customer, eliminating the need to reduce prices knowing that firms will not be underbid by another rival. Recent revenue, price and unit sales data enable competitors to monitor each other, thereby enabling each to ascertain more reliably whether competitors are honestly reporting their prices and sales.

8.      These comprehensive allegations, in addition to the robust economic evidence supporting impact to class members, plausibly show Defendants agreed to stabilize ODD prices.

## II.    DESCRIPTION OF OPTICAL DISK DRIVES

9.      Optical disks contain microscopic pits where data is stored. These pits are made from a crystalline metal alloy and are usually pressed into a disk in a spiral arrangement, starting at the center of the disk. Once a disk containing information is inserted into an ODD, the disk spins while a lens inside the device guides a semiconductor laser beam over the disk and a photodiode detects the light reflected from the disk's bumps and pits. The laser moves outward from the center of the disk, scanning over the disk's surface. Then the photodiode reads the light's reflection as a binary code, a series of ones and zeros that the computer translates into usable data. Changes in the intensity of the beams as the lasers hit the pits are detected and translated into electrical signals. The more pits that can be packed onto a disk, the more data a disk can store. In addition to reading disks, ODDs can write and rewrite on the disk, depending on the technology of the drive and accompanying disk.

10.     When a recordable disk (e.g., CD-R, DVD-R or BD-R) is inserted into an ODD that has the ability to record data, the ODD's laser is used to selectively heat parts of the organic photosensitive dye layer on a disk, changing the reflective properties of the disk surface. Thereafter, if the disk is inserted into an ODD, the photodiode will recognize these changes as bumps and pits and read the new information on the disk.

11.     During part of the conspiracy period, from 2004 through 2008, more than 87 percent of the value of drives sold worldwide (on an if-sold-OEM basis) has been accounted for by DVD format drives (DVD-ROM, Combo, or DVD-RW):

| DVD DRIVE SALES AS A PERCENTAGE OF TOTAL ODD SALES | | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2004-2008 |
| DVD Format Drive Sales (in $B) | $8.8 | $9.3 | $9.1 | $8.9 | $7.1 | $43.2 |
| Total ODD Sales (in $B) | $12.2 | $10.4 | $9.6 | $9.3 | $7.9 | $49.4 |
| | | | | | | |
| **DVD Sales as a % of Total ODD** | **72.1%** | **89.4%** | **94.8%** | **95.7%** | **89.9%** | **87.4%** |

12.     ODDs of all types come in both half-height and "slim" size formats. The slim size formats are easily integrated into laptop computers and mobile computing equipment, but can

also be used in desktop computers. Half-height units fit into a standard "half-height" (1.75 inch high) desktop computer bay, and are less appropriate for use in mobile equipment, where size, weight, and form factor is more important. Slim units typically trade off some degree of performance to achieve a smaller size. Both half-height and slim-size units can be integrated into external cases, as described above, by equipment manufacturers, or end users. Units incorporated into Xbox game consoles are very similar – in most cases, identical – to ODDs incorporated into computers.

13.     A half-height computer optical disk typically looks something like this:



14.     A slim unit computer optical disk typically looks something like this:



## III.     DEFENDANTS CONSPIRED TO STABILIZE ODD PRICES

### A.     Original Equipment Manufacturers Exerted Pricing Pressure on ODD Suppliers Through the Procurement Process

15.     Historically in the ODD industry, a cooperative venture process existed which mediated supply and demand between suppliers and customers. This process then moved towards negotiated supply, where customers would negotiate directly with sales people at the Defendant companies. Then two of the largest OEMs, Dell and HP, introduced direct competitive bidding by using processes – such as electronic auctions.

16.     Dell was one of the first OEMs to introduce electronic auctions in 2002. HP introduced a similar type of electronic auction in 2004. The electronic auctions brought with them increased pricing competition and significant pricing pressure. They also further commoditized the ODD industry. Given the material impact of the electronic auctions on Defendants' profitability, internally Defendants referred to the auctions as "bloody auctions." In one Defendant's opinion, Dell's Internet auctions were "an extremely effective tool for rapidly gaining price concessions in a shorter time frame than via the traditional long, drawn out multi-round quote process."

17.     HP implemented its e-Auction program in part as a reaction to the success of Dell's online procurement events in decreasing the component costs for its personal computers. One Defendant commented, "[i]n [the] case of ODD there is no big quality difference between companies, so they are looking to have vendors compete through e-Auction for lower cost and stable supply."

18.     The electronic auctions used by Dell and HP were of two general types, e-auctions and eRFQs (Electronic Requests for Quotations). E-auctions were live real-time events spanning a few hours where each competing supplier submitted multiple bids. ERFQs typically spanned more than one day and involved multiple rounds of bidding. During the process, the OEM provided feedback to competing ODD suppliers. Typically, the OEM procurement events occurred quarterly or, at most, six times a year.

19.     These auctions did not usually result in a winner-take-all scenario, although on rare occasions a sole winner did exist. Instead, awards went to multiple sources or winners; often four winners, where rank determined the volume and price each bidder would supply under the contract. The volume to be awarded under the contract was generally referred to as TAM, or Total Available Market. TAM could be determined as a fixed number or as a target that moved based on the final bidding prices.

**B.**     **Summary of Defendants' Conduct Used to Stabilize ODD Prices**

     **1.**     **Defendants Agreed to Exchange Sensitive Competitive Information in Furtherance of Their Objective to Stabilize Prices**

20.     Defendants engaged in a conspiracy to stabilize prices in the ODD market, effectuated by overt acts in furtherance thereof including agreements, and exchange of competitively sensitive information such as price, supply and capacity information, desired tier positions, prior bids and bidding outcomes, quality assessments by OEMS (which could disqualify or handicap ODD suppliers in the next procurement event), and the timing of the introduction of new products or the cessation of ones that had reached the end of their lifecycles. The purpose of these information exchanges was anticompetitive price collusion and the effect of these exchanges was to change pricing behavior.

21.     Defendants' information exchanges and agreements on price and bid position were conducted and reached by sales managers, account managers or global account managers who typically reported to sales executives within each of the Defendant's respective companies.

22.     Although Defendants' employees had previously exchanged confidential business information, the inception of Internet Auctions (IN Auctions) by Dell in 2002 caused Defendants to increase the intensity, frequency and specificity in their exchanges of competitive information. Defendants feared that Internet auctions would accelerate the downward price trends for ODDs.

23.     By the time HP began electronic auctions and eRFQs in 2004, Defendants had in place a network of contacts at each Defendant ODD manufacturer who they could call to exchange confidential business information.

24.     These exchanges of sensitive information were undertaken at the direction of the account manager's superiors. Account managers and sales directors were responsible for cultivating contacts at rival firms. They would exchange cell phone numbers (and non-business e-mail addresses in some cases) in order to maintain these contacts. These employees were required to call their counterparts at other ODD manufacturers before, during, and after many procurement events, and at other times as necessary, in order to exchange a wide variety of information on price targets, bidding strategies, expected bidding positions, production and

1   inventory data, quality problems, input shortages and the timetables for the introduction of new

2   ODD products.

3       25.     The results of these repeated telephone calls were then reported to the larger sales

4   team within each Defendant. The many e-mails quoted in this complaint memorialize this

5   network of information exchanges. By reaching out to multiple contacts at rival firms, an

6   industry-wide picture could be drawn. Each Defendant would then know how it could bid on an

7   upcoming procurement event to capture its desired sales at a price above the competitive price.

8       26.     These contacts were so important that when an employee switched positions, he

9   would introduce his replacement to his contacts at other firms in order to maintain the continuity

10  of information exchanges.

11      27.     Conspirators also met face-to-face at times to exchange competitive information.

12  For example, co-conspirators met at: (a) a coffee shop in Austin, Texas; (b) casual dining

13  restaurants in Houston, Texas (such as T.G.I. Friday's or Bennigan's); and (c) in the lobby of one

14  conspirator's office building in Singapore, subsequently dining in the cafeteria.

15      28.     Defendants engaged in hundreds of telephone and face-to-face communications

16  during their conspiracy. These communications occurred both before, during and after auction

17  events to exchange tiering, quality and pricing information.

18      29.     Defendants' conspiracy inflated prices of ODDs. Before the Defendants'

19  anticompetitive conduct, the ODD market was characterized by a steep downward trend in prices,

20  frequently observed in technology markets. However, during the Class Period, the Defendants'

21  conduct reduced the rate of decline in prices -- thereby stabilizing prices -- in the ODD market. In

22  fact, market data indicates the effect of the conspiracy in slowing price declines was tremendous

23  -- and the illegal conduct appears to have caused ODD prices to increase at certain points.

24      **2.    Summary of Corporate Relationships**

25      30.     The ODD market is characterized by incestuous relationships between competitors

26  and suppliers, facilitating the exchange of competitive information. Three unique characteristics

27  of the relationships in this industry allowed the Defendants to engage in a scheme to stabilize

28  prices and allocate the market. *First*, changes in entities and partnership memberships allowed

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143     - 8 -
RS

010177-12 640074 V1

1   the sharing of information between competitors. For a detailed discussion of the make-up of the

2   joint ventures and industry consolidation, see pages 67-75, *supra*.

3       31.   *Second*, manufacturing and supply agreements between entities allowed the

4   sharing of sensitive competitive information. Outsourced manufacturing provided

5   communication links between competitors. Each of the joint ventures includes a manufacturing

6   investor and an intellectual-property-holder investor. For example, TSST outsourced

7   manufacturing to Defendant Samsung.[3] And HLDS outsourced its manufacturing to Defendant

8   LG Electronics.[4]

9       32.   Competitors who also functioned as component suppliers for ODDs also allowed

10   otherwise private business information to be shared between competitors. For example, Hitachi

11   was a major supplier of OPUs (known either as optical pickup units or optical processing units),

12   and sold these parts to other manufacturers. Hitachi's supply of these component parts to its

13   competitors became an important channel for information exchange during the Class Period.

14       33.   And manufacturing agreements outside of the joint ventures also provided

15   avenues for the sharing of competitive information. For example, in 2008, Teac entered into a co-

16   development agreement with PLDS to produce discrete types of ODDs, specifically several ultra

17   slim and slim slot load products.[5]

18

19

20

21

22   _____

[3]   "TSST" refers to Defendants Toshiba Samsung Storage Technology Corp. and Toshiba
23   Samsung Storage Technology Corp. Korea individually and collectively. TSST is a joint venture
     between Defendants Samsung Electronics Co., Ltd. ("Samsung") and Toshiba Corp. ("Toshiba").

24   [4]   "HLDS" refers to Defendants Hitachi-LG Data Storage, Inc. and Hitachi-LG Data
     Storage Korea, Inc. individually and collectively. HLDS is a joint venture between Defendants
25   Hitachi, Ltd. ("Hitachi") and LG Electronics ("LG Electronics" or "LG").

26   [5]   "Teac" refers to Defendants TEAC Corporation and TEAC America Inc. individually and
     collectively. "PLDS" refers to Defendants Philips & Lite-On Digital Solutions Corp. and Philips
27   & Lite-On Digital Solutions USA, Inc. individually and collectively. PLDS is a joint venture
     between Defendants Koninklijke Philips Electronics N.V. ("Philips") and Lite-On IT Corporation
28   ("Lite-On").

34.     Similarly, Quanta had incestuous relationships with its co-conspirators. Former employees of Lite-On founded Quanta in 1999.[6] Originally, Quanta manufactured the ODDs for the Philips-BenQ joint venture, PBDS.[7] Currently, Quanta manufactures ODDs for Sony Optiarc.

35.     *Third*, personal relationships were developed between key employees at competitor companies, forming communication links for sensitive information to be illicitly shared. For example, Defendants' customers – OEMs such as Dell, HP and Acer – would host customer-sponsored supply events. All the suppliers would attend these events, oftentimes with the Defendants' representatives sitting at lunches together. At these customer-supply events, Defendants' representatives would trade contact information for purposes of setting up future information exchanges and pricing agreements.

**3.      Summary of Key Employees Who Committed Overt Acts to Stabilize Prices in the Representative Examples Listed in this Complaint**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



4.     **Representative Examples of Overt Acts in Furtherance of Conspiracy to Stabilize ODD Prices**

37.     The following e-mails and acts are only examples of the hundreds, if not thousands, of exchanges that took place between the Defendant companies in furtherance of the conspiracy to stabilize ODD prices. Each of these communications reflects only a part of the ongoing conspiracy, but includes the exchange of prices, supply and capacity information, quality, desired tier positions, prior bids and bidding outcomes, quality assessments, timing of product introductions and cessations and overt agreements. These communications were carried out not only via e-mail, but also through telephone conversations and face-to-face meetings.

---

[11]   shinichi_nojiri@post.pioneer.co.jp.

[12]   kenichi_nakamura@post.pioneer.co.jp.

[13]   hiro_sugawara@post.pioneer.co.jp.

[14]   kenjy_yokoyama@post.pioneer.co.jp.



a.     **Representative Acts of Hitachi, LG and HLDS in Furtherance of the Conspiracy**

39.     In late 2000, Japanese ODD producer Hitachi merged its ODD operations with LG Electronics, of Korea to form the joint venture Hitachi LG Data Systems (HLDS). The following paragraphs reflect the actions of this family of Defendants in exchanging pricing, supply, capacity, quality and bid positioning information with their competitors Philips, Lite-On, PLDS, Samsung, TSST, Teac, Panasonic, Sony NEC Optiarc and Quanta. The purpose and effect of agreeing to exchange this competitive business information was to stabilize ODD prices by facilitating price collusion.

40.     In February 2004, Luke Choi of LG[15] e-mailed HLDS employees, (including hjungchoi@hlds.co.kr), addressing them as "Dell Team." Mr. Choi relayed there would be an additional round of bidding on a Dell auction. Mr. Choi reported that "Philips, Samsung, Teac are expected not to join. During phone call with PMs on today, it is verified that they have no room for more price cutting."

41.     In June 2004, Luke Choi of LG e-mailed HLDS employees regarding a Dell procurement event that was to occur the next day, reporting that he had spoken with Samsung and Samsung had proposed that the competitors alternate rankings in upcoming Dell procurement events:

---

[15]    Luke Choi, Dell account manager of LG (luke@lge.com).

Samsung's PM suggested as follows: Since HLDS and Samsung are only two suppliers for HH Combo, HLDS takes 1st rank in one of August or September and Samsung takes 1st rank in the other month. (In this case, Dell might notice it so I am quite cautious about this, what about your opinion?)

42.     In August 2004, Luke Choi of LG e-mailed the HLDS "Dell Team" regarding an upcoming Dell procurement event. Mr. Choi discussed his intention to "pre-negotiate" regarding the procurement event with Samsung, wherein they would agree to alternate taking first place in rank. According to the e-mail, Samsung was amenable to the agreement:

Quantity status up to today presented to have insufficient operate quantity even if it received JE8 material again. When you send nego point, considering the recent quantity status, I will negotiate with Samsung in Monday afternoon. (Samsung's PM suggested us to take 1st rank for one month and it takes 1st rank for two month in CD-RW since HLDS took 1st rank all in DVD-ROM)

43.     In May 2005, Daniel Hur of LG[16] reported on an HP ODD procurement event and stated that to the best of his knowledge, "only HLDS and LO are competing with each other." But Mr. Hur indicated that he would "check with TSST whether it has been requested to submit quotation." Within days, Mr. Hur reported that "[i]t was said that TSST had not been invited to submit quotation set out below." Mr. Hur then noted that the "competition is between HLDS and LO." On information and belief, LO refers to Defendant Lite-On. Mr. Hur acknowledged that he had been in contact with his competitor and stated, "[u]pon checking with LO, I found out that there has been quite a big price gap between LO's price and our company's price since May, especially with respect to the price of CD-RW." Mr. Hur then attached a chart which detailed HLDS and Lite-On's pricing for the months of May, June and July for CDRW and DVD products.

44.     In August 2005, Duha Hwang of LG[17] e-mailed employees of HLDS regarding an HP ODD procurement event. Hwang reported under the heading "Discussion with TSST": "Discussed our proposal with HQ. Agrees on the overall approach but practically appears to want

---

[16]   Daniel Hur, Senior OEM Account Manager at LG Electronics USA (hdaniel@lge.com).

[17]   Duha Hwang, Product Manager for Optical Storage at LG Electronics USA.

to avoid the situation of being one of the two vendors who takes the hit when one vendor enters the auction first and stays with current price while other two vendors wait. . . . Planned to discuss next week after more consideration, but I doubt if any bright conclusion will come forth."

45.     A November 2005 e-mail from Mr. Hur of LG to a number of HLDS employees acknowledged the improper nature of the sharing of sensitive competitor information and requested that employees keep the information as secret as possible:

> It is desirable for us to limit the recipients of data as much as possible if it is related to information exchange with competitors or information from HP IPO. I think we'd better not copy it to local employees who have different nationality and contractors. We don't need to share it with our engineers as well.

46.     A November 2005 e-mail from Sam Kim[18] of HLDS to "HLDS Management" regarding an HP ODD procurement event reported pricing coordination between HLDS and Lite-On during the auction itself:

> 2. eAuction Price
> - After about one and half hour into the eAuction, LO called us and suggested that either HLDS come in 1st and de-commit volume so it is allocated to LO, or have LO come in 1st so that LO decommits and HLDS comes in 2nd and shares the volume. LO said they would follow HLDS' opinion, so it was agreed to have LO come in 1st and decommit. The eAuction was closed at the attached price.

47.     A May 2006 e-mail from Eugene Yang[19] of HLDS to Daniel Hur of HLDS requested competitors' contact information. In response, Mr. Hur, acknowledged the illegal nature of the competitor contacts and explained to Mr. Yang that he should meet his competitors at "a place where it would be very unlikely for HP people to see you":

---

[18]     Sam Kim, Team Director of HLDS (ys0303@hlds.co.kr).

[19]     Eugene Yang, Senior OEM Account Manager at LG Electronics USA (yangwoo@lge.com).

The PM for Lite-on is Michael Chang.
Michael_Chang@liteonit.com
Cell phone number is 281-924-0629.
You may call Mr. Chang directly, saying you are my replacement.
When meeting and talking with Mr. Chang, you must choose a place where it would be very unlikely for HP people to see you.
During the day time, I would use Jones and Starbucks on 1960, but that does not meet those places are guaranteed to be safe.

48.     In July 2006, Mr. Hur circulated a memorandum to "management level" HLDS employees, including Young Keun Park (Chief Marketing Officer) and Sang Hun Kim (Team Leader) requesting the development of a response to HP's use of the online auction procedures. Included in the report was a "Current Status Review / Competitor & Us" along with competitor information from TSST and Lite-On. The information included that "TSST won't increase the price during the Auction period (Sep – Nov), and it will supply 55% of proposed quantity at the Auction. . . . And based on the acquired information, TSST is passive to increase the price from Dec to Feb after the Auction." Mr. Hur reported that Lite-On "won't take price-increase strategy, but rather, it might act more aggressively to secure more quantity."

49.     In August 2006, Nancy Gray of LG[20] reported to Eugene Yang of LG regarding her "Lunch with Panasonic." Gray reported that for certain ODD products, "Panasonic is okay with coming in 3rd place. As they still have a reserve of additional share, combined with the auction they still consider themselves in 2nd place behind HLDS. They are okay with being behind HLDS, for now anyway, as they know they cannot beat our pricing." Eugene Yang forwarded this e-mail to HLDS's Chief Marketing Officer, Young Keun Park, and Daniel Hur among others, explaining Gray's e-mail and stating that Gray "has personal meeting with Amy about once a month because Nancy had working experience in Panasonic before." Mr. Yang then confirmed that he himself had "checked Panasonic's internal evaluation about Auction," presumably from his own sources. Mr. Hur responded with the request that Mr. Yang "kindly keep updating competition status" from Panasonic and Lite-On.

---

[20]   Nancy Gray, Account Coordinator at LG Electronics USA.

50.     In January 2007, Jedy Lee[21] of LG e-mailed HLDS employees,[22] regarding a January 31, 2007, Lenovo auction. Lee stated that he/she "got phone call [from] Lite-on local representatives who covers both sales and engineering stuffs . . . and got surprising news about Lite-on during discussion [sic]." Lee went on to report that the relationship between "Lite-on an Lenovo looks very bad due to some DVD price issue and couple of engineering items which are very important to Lenovo . . . ." Lee then reported the exchange of pricing information with Lite-On's regarding sales to Lenovo:

① Lite-on HH DVD price for 4Q
 − Originally, Lite-on "verbally" offered good pricing when they started price negotiation in Dec But, actually, they offered highest pricing.
 − Background is kind of conflict between Lite-on sales and finance team against price strategy for Lenovo.
 − Lite-on sales team tried to secure  largest share with lowest price, but Lite-on finance team tackled sales side. According to Lite-on local manager, Lite-on finance team complained that as HH DVD cost already reached to limit margin in 4Q,  if Lite-on goes with additional big update of cost, then, deficit level would be too big...
 − Then after some inside debating and challenge from Lenovo , Lite-on finally made quotation slightly
         higher than HLDS and Helen is unhappy with Lite-on's DVD pricing. No idea of Lite-on's final pricing
         for 1Q yet.
   −> Lite-on local manager commented that situation would be the same and Lite-on can not be agressive
         in even auction for the time being.
   −> I saw Ivan's score card review for Lite-on (unofficially-- 껄쳐서 보고 갔다능듯). In cost category
         for Lite-on, comment is "Lite-on was doing worst in HH DVD price negotiation"

In response, and in preparation for the January 30, 2007, Lenovo auction, Mr. Park of HLDS stated: "Please try to minimize the cost drop and also try to maintain the gap between SATA & PATA, considering competitors' offering."

51.     In October 2007, Hyun Chul Son (hcson@hitachi.com.tw) reported to a number of HLDS employees, **including** Daniel Hur and Eugene Wang: "I've checked it through Freddie, SNO's [Sony NEC Optiarc's] DVD-ROM isn't supported from Lite-on. This model is produced by Foxconn as OEM and supply to SNO." On information and belief, the Freddie referred to by Mr. Son is Freddie Hsieh of Lite-On/PLDS.

---

[21]   Jedy Lee, Senior Account Manager of LG Electronics USA.
[22]   Including Young Keun Park of HLDS (ykpk@hlds.co.kr).

52.     In January 2008, Eugene Yang reported to the HLDS "HP Account" that although HLDS had been excluded from the upcoming HP ODD procurement event, HLDS had disclosed this information to its competitors, PLDS and TSST, to persuade these competitors not to lower their price:

> The RFQ for SATA DVD-ROM, which had been conducted for 2 rounds, was completed yesterday this time.
>
> But both T* and P* didn't get any comments on ranking or volume, but received a proposal for a face-to-face negotiation on Wednesday.
>
> Houston office, although it may have some potential risks, has released to T* and P* the information that HLDS would not be participating and the information on other competitors, and has persuaded them that they need not lower their price since the 2 companies would gain major volume regardless of price.

53.     In October 2008, Eugene Yang of LG e-mailed employees of HLDS proposing pricing for an upcoming HP ODD procurement event, based on "a thorough confirmation [of] the current status of our competitors." Yang then reported sensitive information regarding HLDS's competitors PLDS, Sony NEC Optiarc, Quanta and TSST, including the following details regarding PLDS:

> 1) PLDS
> It is targeting for 1st or 2nd place, and it is currently estimating a 30% Share acquisition as its Min level.
> It has not yet settled on a price standard and hopes that the price will be determined at a reasonable level. However, it is trying to secure more than 30% of the Shares even if it has to go through a second round of negotiations with Edward again.

54.     In February 2009, internal e-mails again acknowledged that the competitor contacts were improper given government investigations in other industries, but then counseled employees to simply keep these contacts out of documents or e-mails:

1

2

3

4

From: kimsanghun [kimsanghun@hlds.co.kr]
Sent: Tuesday, February 17, 2009 9:43 AM
To: Jason Kim; 'Kim Young Sam'; Yang Woo Jin; James Park
Cc: Daniel Hur; BeumSeock; Min So Jung
Subject RE: : Competitor contact

5

6

7

8

9

10

11

Recently in the USA & EU, investigations on collusion between suppliers are being strengthened. LG TV & LGD are under the investigation as a close example. I guess other industries also know this thru news or something. With competitor, especially T company, we need to be extremely careful about contacts, and let's be careful so that there are not should in documents / email. (since the share of T and us combined becomes more than 50%, there is a chance that the issue will grow even bigger). Recently, HE President and CEO emphasized this again.

12  On information and belief, the "T" referred to in the above e-mail is TSST.

13       55.    In March 2009, Daniel Hur[23] of HLDS e-mailed Eugene Yang of LG among

14  others encouraging his colleagues to further mask their competitive contacts:

15

16

17

I would like to suggest using phones where only out-going calls can be made instead of our cell phones that we use for business purposes in order to avoid any unnecessary misunderstanding or misapprehension when gathering market intelligence.

18

          b.     **Representative Acts of the Panasonic Defendants in Furtherance of the Conspiracy**

19       56.    The following paragraphs reflect the Panasonic Defendants' exchange of pricing,

20  supply, capacity, quality and bid positioning information with their competitors LG Electronics,

21  HLDS, Sony Optiarc, Pioneer, HLDS, TSST and Quanta. The purpose and effect of agreeing to

22  exchange this competitive business information was to stabilize ODD prices by facilitating price

23  collusion.

24       57.    In October 2005, Amy Salter[24] of Panasonic e-mailed Nancy Gray of LG with the

25  month-to-date pull rate[25] on 12.7 Combo drives and 12.7 DVD ROM drives of Panasonic, Teac,

26

27     [23]   At this time, Mr. Hur's e-mail address was hdaniel@hldsgw.com.

28     [24]   Amy Salter, Account Representative of Panasonic (SalterA@us.panasonic.com).

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143      - 19 -
RS
010177-12 640074 V1

Sony/Lite-On, and TSST. Ms. Salter then informed Ms. Gray that she was welcome to the information, but "[y]ou didnt [sic] get that from me!"

58.     In April 2006, Amy Salter of Panasonic sent an e-mail to Steve Hamlin[26] and Yoshihiro Takada[27] of Panasonic reporting a "summary of meeting with Nancy" from HLDS. Ms. Salter reported detailed pricing and production information regarding ODDs, including:

> I met Nancy for lunch today to get her idea of HLDS 9.5 strategy. HLDS is not planning to increase 9.5 demand unless a customer specifically requests it. In other words, they are not promoting it. They are happy to be in a supporting role for 2006-07. They have promised Hp they will be competitive to Panasonic for 9.5 but they have not offered best price yet. They seem to be ok matching our 9.5 combo prices but not quite there for DVDRW. They will continue to increase their 12.7 production since they feel this is going to be the standard for the next several years. Hp Consumer division is struggling with tight margins so they do not expect Consumer to jump on the 9.5 bandwagon anytime soon. The only way Consumer will accept this type of proposal is to get the guarantee of price parity but continued price aggressiveness. HLDS is planning on the 12.7 combo drive to be low $20 range by end of this year and 12.7 DVDRW to be around $39-$40. HLDS has forecasted and budgeted for continued 12.7 price drops. They are more worried about 12.7 competition with QSI and TSST. Nancy mentioned that the attention previously given to Panasonic has shifted to QSI and TSST. HLDS provides for Consumer and Commercial 12.7 platforms so their level of business will be high without 9.5. At this point, they consider 9.5 business a bonus but one that could be easily supported with 12.7.

59.     In February 2007, Amy Salter of Panasonic sent to Nancy Gray of HLDS an internal report that Salter used "to update [her] feasibility reports for Marketing." The report was to be used "to see who is making what and how much."

60.     In February 2007, Yoshihiro Takada of Panasonic e-mailed Amy Salter of Panasonic providing information regarding Panasonic's ODD products as well as information from competitors:

---

[25]   A pull rate refers to the usage of a customer (for example Dell or HP) which was actually pulled against the expected volume of ODDs.

[26]   Steve Hamlin, Group Sales Manager of Panasonic Industrial Company (HamlinS@us.panasonic.com).

[27]   Yoshihiro Takada, Business Development Manager, Panasonic (takada.yoshihiro@jp.panasonic.com).

As I explained today, NEC(Optiarc) is the only supplier who fully support LF for both Slim and HH. But as you can see, volume of slim LF is pretty small right now. (Pioneer seems capable for slim drive in the future. I did not know Teac can support LF. But I can imagine their drive with LF will be bull xxxx. )

1. PCC is under feasibility study right now based on Toshiba's request. Rut according to development engineer, it is much easier than LS support and Royalty cost is also cheaper than LS.

2. Toshiba PC div already anounced [sic] a couple month ago and Acer also start considering LF since last month. (May be Dell will think about LF.)

3. TSST is also start considering to support LF in the future.

Mr. Takada then specifically indicated that Ms. Salter could "send this information to Nancy [Gray at HLDS] to support her summary." Ms. Salter did exactly this, with the question "Are you guys about to support Dell slim BD? We currently support slim BD at Dell but they are threatening us with our competitor. Is it HLDS?" The next day Ms. Salter responded with "arigato!" to Mr. Takada, and the comment that she "couldn't get 100% confirmation about Dell, but I'm pretty sure it's us."

61.     In March 2007, Amy Salter of Panasonic e-mailed Nancy Gray of HLDS stating:

How did you do in the final auction? We down [sic] to maybe 20K shipments in April and May since we lost. I am struggling now with how to even compete in June. I don't think we are going to be a factor in the June RFQ since we couldn't even make it below $33 for April/May. We are using the same drive model for all three quotes so I don't think we can make it.

Ms. Gray from HLDS responded: "We ranked 4th in the auction, but we still anticipate having a large share."

62.     In an e-mail approximately a week later in March 2007, Amy Salter reported to Yoshihiro Takada and Steve Hamlin that she had met with Nancy Gray of HLDS and exchanged further competitor information, including from both HLDS and Sony Optiarc:

I talked with Nancy yesterday regarding June RFQ.

HLDS has been given funding to quote below $32 for June. Nancy indicated they could go as low as $31.70. HLDS does not want to quote this low price but will have to do it if the other companies go below $32. Nancy had lunch with Phoebe (QSI/OPTIARC account manager). It looks like Optiarc can quote $31.50 in June. Optiarc strategy is get #1 price to show ability to Hp and build confidence.

Optiarc is aware they may not get largest TAM but their point 1 H07 is show #1 price. Optiarc plans to push for more volume in 2H07 once they have Hp confidence in price and supply area.

Based on their discussions and Eugene insider information, HLDS believes the auction result could be as below.

HLDS June auction result prediction

1. Optiarc $31.50
2. TSST $31.60-31.70
3. HLDS $31.70 (HLDS could end of#3 or#4 position it depends on Pioneer ability)
4. Pioneer $31.70-31.80
5. Panasonic or PBDS at $32

63.    In March 2007, Yoshihiro Takada of Panasonic summarized his meetings with competitor Pioneer, where Mr. Takada confirmed with Pioneer that "they [would] quote really agressive [sic] price in Apr-May, but will slow down in June based on June price."

64.    In a May 2008 e-mail, Panasonic employees discussed the need to provide their "spies" of competitive information on Blu Ray products with expense money:

| | |
|---|---|
| **From:** | Snover, Richard <SnoverR@us.panasonic.com> |
| **Sent:** | Tuesday, May 27, 2008 12:53 PM |
| **To:** | Martinez, David <MartinezD@us.panasonic.com> |
| **Subject:** | spy expense |

David,

PCC/CS1 has requested that I investigate HLDS Blu Ray pricing so they can re-submit their Blu Ray RFQ. Plus they are requesting that I find out more about the Lenovo buy out of IBM Xserver(?).

Spies need lunch and or golf money. How do you want to work this entertainment request?

Richard Snover
Application Engineer
919-544-8742

PS From the book "Art of War" . The most valueable person in a Army is not the generals, its their spies…

65.    In March-April 2009, Yoshihiro Takada of Panasonic requested that Amy Salter of Panasonic collected "as much [information] as possible" from Panasonic's competitors. Salter then gathered and relayed information from competitors HLDS, TSST and Quanta. Included amongst the information exchanged was:

- **HLDS**: Amy Salter writes, "Eugene is not motivated to hurry price reductions or focus on next generation models. HLDS has inventory and 12k deal with Edward last year was a complete failure so Eugene does not want to make any deals for price or quantity." and "I received an email tonight from Nancy regarding LS support for next generation SDRW and 9.5. HLDS can do both from next generation" and "I will have lunch on Monday with Nancy so we can close any questions you have about above comments."

- **TSST**: "Based on SMD price trends, Kenny needs to stay $22 or higher through 2009. Since Panasonic, Pioneer and PLDS are gone from SMD business, he does not believe he will have to be extremely aggressive to keep his share. He seems confident TSST will have 45% share through 1.5C. Due to price down requests, Kenny (TSST) hopes price reduction for SMD will take place again after 2C. If Hp requires price reduction in 2C, it will be minor."

- **Quanta/QSI**: "QSI will be able to support LS SMD version but schedule timing may be undecided until partnership aligned." and "Currently QSI is supporting the following models: 12.7 SMD, 12.7 DVD-ROM SATA, 12.7 Combo SATA, 9.5 SATA SMD (Caroline at QSI is handling)."

   c.    **Representative Acts of Philips, Lite-On, BenQ, PBDS and PLDS in Furtherance of the Conspiracy**

66.     In early 2003 Defendants BenQ and Philips formed a joint venture, Philips BenQ Digital Storage (PBDS). In early 2006, Taiwanese ODD producer Lite-On purchased BenQ's ODD production facilities in China, and took over BenQ's manufacturing ties to PBDS. In 2007, BenQ sold its interest in PBDS to Lite-On and the joint venture was renamed Philips Lite-On Digital Storage (PLDS). The following paragraphs reflect this family of Defendants' exchange of pricing, supply, capacity, quality and bid positioning information with each other (prior to their joint ventures) and their competitors HLDS, TSST, Sony Optiarc, and Panasonic. The purpose and effect of agreeing to exchange this competitive business information was to stabilize ODD prices by facilitating price collusion.



IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143    - 24 -
RS
010177-12 640074 V1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

d.    **Representative Acts of Pioneer in Furtherance of the Conspiracy**

94.    Even prior to the class period, examples exist of defendant Pioneer meeting with its competitors in the ODD industry in an effort to stabilize the prices of ODDs. As early as November 2003, Yasuki Hiraoka, Team Leader at HLDS, and an HLDS employee with the last

1   name Nagasawa, had dinner with sales personnel from Pioneer.[36] In an internal HLDS document,

2   the HLDS employees reported to their colleagues that Pioneer had provided HLDS with highly

3   sensitive business information, including: (1) targeting dates for delivery of new products to

4   Apple such as the 8x dual ODD; (2) pricing on the Apple account for both 4x drives (under

5   HLDS's price of $90) and the 8x drive ($88); (3) Pioneer disclosed that it was facing production

6   capacity restraints for its DVD-W slim drive; (4) Pioneer would not be ready to launch its dual

7   layer drive in the second quarter of 2004 as had previously announced; and (5) that Pioneer

8   intended to stop their own production for DVD-ROM drives and instead purchase the drives from

9   a Taiwanese third party.

10           95.     A Panasonic document produced in this litigation discloses that in February 2005,

11   Panasonic and Pioneer both submitted bids to HP for the supply of ODDs in April and May of

12   2005. Faced with a sharp demand by HP to lower its costs, Panasonic employee Yoshihiro

13   Takada contacted his known competitor on the account, Pioneer, to ascertain their price and

14   bidding strategy:

15           I contacted Pioneer the other day; they finished their evaluation last
             Wednesday and are bidding $73/April while it hasn't been decided
16           who to use. . . .

17   Armed with this information regarding their competitor, Panasonic refused to lower its price to

18   HP's requested $69 for the month of May 2005, and instead suggested that they would bid only

19   $71 per ODD. In an internal Panasonic e-mail dated two days later, Panasonic employee Tosio

20   Nakayama (who had been included on the first e-mail string), instructed his colleagues to

21   "reinvestigate/ascertain whether Pioneer can actually keep up with the May price, and get back to

22   me without delay" before Panasonic would commit to the $71 price HP requested for the May

23   supply of ODDs. Based on the "results of the investigation," only then would Panasonic respond

24   with a price to HP.

25

26

27      [36]   On information and belief, Plaintiffs allege that the HLDS employee with the last name
        Nagasawa who met with Pioneer is Ms. Miyako Nagasawa, a team leader for HLDS's Sales
28      Team 5.

96.     In an internal Panasonic e-mail document produced in this litigation and dated May 2005, Tina Phan, Panasonic Sr. Account Mgr. for Apple, updated colleagues on Pioneer's qualification status at Apple and speculated on Panasonic's chances competing for Apple's business:

> My understanding is Pioneer is very aggressive on pricing as they are not competing well on the engineering side. For CQ4, it'll be a challenge as 2nd source and potentially 3rd source across the board."

In a later email, Ms. Phan reported on the exact prices that competitors, including Pioneer, planned to quote Apple. She wrote:

> After our conference call yesterday, I checked on our competitors pricings: 1. Pioneer's SD process – CQ2 firm quote: $76.50 – Conditional offer of $73 for June if qualified for Q45C/and Q88-CQ3 price: 72.50. . . .

Based on this information, Ms. Phan concluded that Panasonic's price is "quite competitive."

97.     In September 2005, Jonae Wilson, a Global Account Manager of Pioneer Electronics (USA) Inc.[37] e-mailed Billy Reynolds of the PLDS family direct and asked whether PLDS had "received the official award of business for BD" from Dell. In the same e-mail, Jonae thanked Mr. Reynolds for his time the previous week – confirming that they had directly met. When Mr. Reynolds explained that he had not yet received the official award, Ms. Wilson explained that Pioneer was "going to chat with Dell about the 2nd source opportunities, but didn't want to do so until all was official for [Philips]." Eventually Mr. Reynolds confirmed that the PLDS defendant family had received the award. The implication of this question was that the Pioneer defendants did not want to approach Dell to negotiate the provision of ODDs until the contract with PLDS was final to prevent any price competition over the supply of ODDs for that time period.

98.     In May 2006, Yasuki Hiraoka of HLDS reported to his colleagues that he wanted to postpone HLDS's price quotation to customer Fujitsu until HLDS could "get more underground info." Mr. Hiraoka then went on to report his meetings with Pioneer and Panasonic. Regarding Pioneer, Mr. Hiraoka reported that he "had a dinner with Pioneer yesterday."

---

[37]   Jonae.Wilson@pioneer-usa.com.

Regarding the Dell account, Pioneer told HLDS that it had not promised Dell a rebate on the Slim-DVD-W product. Pioneer disclosed to its competitors, HLDS, that it intended to visit the Dell Austin office the following week, but would not be prepared to discuss rebates with Dell. Mr. Hiraoka reported that Pioneer had "not setup any plan for support like we do for our product."

99. In November 2006, Yasuki Hiraoka of HLDS reported to his colleagues that he had met with competitors MEI (Panasonic) and TSST the previous night, and gave an extensive report and stated that "I have a [sic] appointment with Pioneer tonight so I will get updates on their activity directly." The following day (after his meeting with Pioneer), Mr. Hiraoka reported that Pioneer had disclosed it had no plan to launch the 12.7 mm and 9.5 mm slot product to date, given that there was base demand only from Apple. Pioneer confirmed it was in a "[s]erious situation" for slim SM drives, and scared of losing business in this area. They were curious about the TSST/Toshiba defendant's price for this product, and Mr. Hiraoka of HLDS informed Pioneer that "TSST will start to deliver from Q1/07 so [the price] will be up to them."

100. In February 2007, Jun Okubo of Panasonic met with General Department Manager Shinichi Nojiri, Department Manager Kenichi Nakamura and Section Chief Hiro Sugawara, all of Pioneer, to discuss the Apple account. Included in the volumes of competitive information exchanged was: (1) Pioneer's capacity for 12.7 mm SD supply to Apple for March (around 9000 units) and that Pioneer could not increase this amount for Apple; (2) that the price estimate from Pioneer for the supply of the 12.7 mm drives was "the same as the information from the other day – they haven't reduced it at all."; (3) that Pioneer didn't "have any new products this whole year (the current model is the one from last spring), so they have no ability to reduce the price further." Panasonic concluded from this last piece of information that it should not reduce its price either.

101. An internal Panasonic e-mail document produced in this litigation reveals that in March 2007, Yoshi Takada of Panasonic provided a further report to his colleagues regarding the HP account and the consensus of the various Panasonic entities to reach agreement on a bidding

strategy for the HP account. Mr. Takada reported that Panasonic Shikoku Electronics Co., Ltd. ("PSEC") had directly spoken with Pioneer to confirm its pricing in the coming months:

> After I finished writing this e-mail, I saw Amy's update information. It seems that we need to change 2nd round strategy to go around $31.60 . Only one thing I confirmed from PSEC (*directly talked with Pioneer*) is they quote really agressive [sic] price in Apr-May, but will slow down in June and based on June price, they will consider strategic price again in July.

Mr. Takada instructed his colleagues to "collect more information" from Panasonic's competitors including Pioneer, before deciding on their second round bidding price. Later that month, Mr. Takada reported on his investigation and communication with competitors regarding pricing strategy and getting "behind-the-scenes information on second round bids." Specifically, he reported Pioneer's first round results, among others, and stated that, "according to HLDS, Pioneer has made a definite statement that they'll handle all their Q2 prices aggressively," showing that Pioneer communicated with competitors about pricing strategy in between rounds of a procurement event.

102.    In June 2007, Bruce Jeong of HLDS reported extensive and detailed competitive "information from a discussion with the Japanese ODD company in Taiwan." An employee of the "P company" [code name for defendant Pioneer] shared with Mr. Jeong Slim drive quality issues and future bidding strategies, as well as, production line and manufacturing information for Slim Slot products and small quantities of HH DVD-RW and HH BD products. Mr. Jeong also related information he learned from Pioneer about its transactions with customers, including its bid price for Q3 to Acer, its forecast of PC sales Apple, and competitive information sharing with HP.

103.    Pioneer employees met with competitors for dinner and drinks, as well, which provided the co-conspirators another opportunity to share competitive information. For example, in September 2007, Shinichi Yamamura of Sony emailed a colleague that he went drinking with Pioneer employees, including Toshihiko Kurihara, General Manager of the Components Business Division of Pioneer. In May 2008, Katsuhiro Nakano of Sony and Shinichi Nojiri of Pioneer arranged to meet for meal, assuring each other that senior managers on both sides would be in

1    attendance: "Sr. executive manager" Toshihiko Kurihara of Pioneer and Shinichi Yamamura

2    (Representative Director and President of Sony NEC Optiarc), Hidetoshi Shimizu (General

3    Manager of Sales at Sony NEC Optiarc), and/or Yasuro Katori (Senior General Manager,

4    Strategic Planning Division, Sony NEC Optiarc) respectively.

5        104.   In July 2008, Bruce Jeong again met with "competitor (P******)'s person in

6    charge of Acer." The Pioneer employee disclosed to Mr. Jeong that Pioneer's current pricing to

7    Acer, including that Pioneer offered Acer pricing under $90 at the end of June, and had capacity

8    of approximately 80-100,000 per month for half-height Blu-ray combo drives. Pioneer further

9    informed Mr. Jeong that its slim Blu-ray drive would be priced at $95-$100 for the third and

10   fourth quarter of 2008, and that its monthly capacity was approximately 100,000 drives.

11       105.   When asked about this document at deposition, Mr. Jeong of HLDS stated:[38]

12       Q:   Mr. Jeong, please look at Exhibit 19. You agree with me
              that this is an e-mail that you sent on July 21st, 2008, to
13            other HLDS employees, including your superiors; correct?

14       A:   Yes. It seems like it.

15       Q:   The subject was the details of consulting with the
              competitor?
16
         A:   Yes.
17
         Q:   Now, you state after, you say, "Dear all recipients. I hereby
18            report on the details of consulting with Competitor,"
              parenthesis, "P," and then you use one, two, three, four,
19            five, six asterisks, and then say, "person in charge of Acer
              today"; right?
20
         A:   Yes.
21
         Q:   And if you filled in "i-o-n-e-e-r," it would fit perfectly for
22            those asterisks; right?

23       A:   Yes, that seems right.

24       Q:   Do you agree with me, sir, that you spoke with Pioneer's
              person in charge of Acer concerning the information
25            contained in this e-mail?

26       A:   That seems right.

27

28       [38] Jeong, Dep. vol.2, 2, 223:12-124:13, April 19, 2013.

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143      - 37 -
RS

010177-12 640074 V1

1          Q:     So providing we are in agreement that it's likely it was
Pioneer's person in charge of Acer that you were speaking
2                    with, who do you believe you had been talking to?

3          A:     I do not recall. I believe it was either Jane or her boss.

4       106.    In September 2008, Mr. Jeong of HLDS again contacted Pioneer regarding the

5  volume of its sales to Acer. Mr. Jeong reported to his superiors and other team members that

6  "[a]ccording to the confirmation with other vendors," that Pioneer's fourth quarter volume of

7  slim Blu-ray drives to Acer had been reduced to 50,000 (from 80,000 units). Mr. Jeong also

8  confirmed that Pioneer's current pricing to Acer on the half-height blu-ray combo drive was $85.

9       107.    An internal TSST-Korea document produced in this litigation reveals that in

10  October 2008, Kenny Lee, Senior Manager of TSST, reported the results from a 12.7 DVDR HP

11  procurement event to his colleagues. Mr. Lee stated that the competitors, including Pioneer,

12  reached an agreement not to "overheat each other" in auction, leading to a favorable result:

13  "Result: 1st place $24.40, TSST M/S 36% 2nd place HLDS, 3rd QSI, 4th Pioneer because

14  initially the atmosphere was do not overheat each other, there is no actual difference between 2nd

15  and 3rd place in price 24.2~24.4 but fortunately we can get the 1st place supply by small price

16  difference."

17       108.    In November 2008, Mr. Jeong again spoke to an employee of "Pi***" (code name

18  for Pioneer), who informed Mr. Jeong that Pioneer had received a forecast reduction from Acer

19  on Blu-ray drives of approximately 20 percent. Pioneer informed Mr. Jeong that despite Acer's

20  request for a price change, Pioneer kept the existing price on these drives.

21       109.    An HLDS document produced in this litigation contains a report in December

22  2008, from Daniel Hur at HLDS showing that Pioneer contacted HLDS to discuss HP auction.

23  Specifically, James Park, TSST's HP cPC account and contributor to the report, writes that

24  Pioneer "[s]uggested to line-up BD Combo in '09 Q4 (at $65)."

25       110.    Quanta was a key player in obtaining information from Pioneer, filling its role as

26  it did with other ODD market participants as both a contract manufacturer of ODDs and also a

27  competitor. Quanta's documents, produced in this litigation, show that Haw Chen, general

28  manager of Quanta, in particular obtained information from Pioneer and used it to influence

1   Quanta's pricing strategies. In January 2009, Haw Chen reported to his colleagues that he had

2   recently spoken with Pioneer:

3           By the way, I confirm today that Pioneer new model is just
        focusing on Toshiba, VAIO and Apple. And seems they do not
4           plan to continue business with those 3 customers for 2nd half of
        FY2009 because they believe cost won't be competitive enough at
5           that time.

6   In response, Ms. Huang replied, in part: "Ah, will they be participating in the HP's e-auction this

7   time?" Later e-mails show that Mr. Chen sought out and received information regarding the

8   upcoming HP auction. Days after Ms. Huang's e-mail, an internal Quanta e-mail produced in this

9   litigation asked Haw Chen to work out a deal with Pioneer not to compete: "Dear Haw: Can you

10  work out some kind of agreement with Pioneer, not to be too extreme yeah? They only have

11  approximately 400k left, no reason for them to fight for 3rd right." Mere days later, in reporting

12  Quanta's strategy for the HP auction, Caroline Lin of Quanta asked Haw Chen to get "the bottom

13  line of Pioneer" to assist in Quanta's bid strategy. In the end, Quanta did place third in the HP

14  procurement event as it had desired. Contemporaneous documents confirm continued meetings

15  between Pioneer and Quanta, including an April 2009 meeting between Haw Chen of Quanta and

16  S. Nojiri and K. Yokoyama of Pioneer where Mr. Chen explained to his colleagues the meeting

17  was specifically "for information exchange."

18          111.    Pioneer continued to provide HLDS with information, even when it was not in its

19  interest to do so. For example, in February 2009, an employee of Pioneer informed Mr. Jeong

20  that although it had qualified to supply a slim Blu-ray drive writer model to Acer, that the orders

21  from Acer had been nearly zero.

22          112.    And as with other conspirators, the supply of OPUs (the component part of the

23  ODD called an optical pickup unit), became a channel for the exchange of sensitive business

24  information. For example, in January 2009, PAVC (a division of Panasonic) informed HLDS that

25  Pioneer had started to deliver Slim BD-W drives to Acer and Sony.[39] PAVC is the division of

26  Panasonic which supplied OPUs to other ODD manufacturers. Panasonic's inside information

27  _____

28  [39]    Although the corporate relationships between the many divisions and affiliates are often
    unclear, on information and belief, PAVC refers to Panasonic AVC Networks Company.

1    regarding Pioneer (and subsequent report to HLDS) was based on Pioneer's purchase of OPUs

2    from PAVC at the rate of 10,000 per month. Yasuki Hiraoka of HLDS reported this information

3    to his colleagues and expressed his concern that because Pioneer was in a "severe situation," they

4    could start "dumping" product. Mr. Hiraoka's colleague at HLDS, Bruce Jeong, reported back

5    that he "checked with Pioneer and Acer" and that Pioneer had qualified on the BD-W model, but

6    was supplying very little product (negating any pricing threat).

7         113.    Similar to the incestuous relationships with other defendants, Pioneer's position as

8    both a customer to some of the ODD manufacturers as well as ODD manufacturer itself opened

9    channels for illegal and anticompetitive communications. For example, internal PLDS documents

10   produced in this litigation show that in late 2008, a number of PLDS employees (including Claire

11   Lin and Charlie Tseng), met with Ken Usui, a sales manager at Pioneer,[40] regarding the possible

12   supply of ODD drives from PLDS to Pioneer. After the meeting, Claire Lin of PLDS e-mailed

13   Mr. Usui expressing PLDS's gratitude for arranging the meeting and for "share [sic] so many

14   market information with" PLDS. Similarly, in early 2009, PLDS approached Pioneer as a

15   supplier of a particular type of ODD drive (DVD-RW). Pioneer declined to use PLDS as a

16   supplier at that time, but Ken Usui, a sales manager at Pioneer, responded to Claire Lin (an

17   employee of PLDS): "Let's keep in touch with market trend and I am willing to share the market

18   information." Within days, Ms. Lin responded that Charlie Tseng of PLDS would like to speak

19   with him regarding the supply of a particular type of drive and "to exchange the market trend

20   again." And indeed, internal PLDS documents reflect the exchange of sensitive business

21   information.

22        114.    Other internal PLDS documents produced in this litigation show that in March

23   2009, Claire Lin reported to Charlie Tseng (both of PLDS) an "Update of Pioneer" which

24   included information from Mr. Usui about the allocation of OPUs, and information regarding

25   Pioneer's production and outsourcing of certain ODD drives:

26             3) ODD

27

28   _____
     [40]  ken_usui@post.pioneer.co.jp.

> Pioneer Taiwan commented that almost no OPU shortage impact of
> H/H DVDROM w/Q but Usui san said they tried really hard to
> secure the allocation. Pioneer Taiwan told us that out-sourcing H/H
> 22X will launch in May since Pioneer's own factory made H/H
> DVDRW will stop selling on May. As for 24X, no further
> information. Has asked for Procurement team's help to check.

115.    In June 2009, Pioneer Corporation and Sharp Corporation announced that they would be establishing a joint venture to develop, design, manufacture and sell optical-disk products such as optical disk drives, recorders and players. Pioneer and Sharp planned to launch operations on the joint venture on October 1, 2009. Pioneer Corporation was to own 66 percent of the joint venture and Sharp Corporation was to own 34 percent of the joint venture. Toshihiko Kurihara, the former general manager of the Components Business Division Home Entertainment Business Group of Pioneer Corporation was to become the president of the newly formed joint venture. Pioneer was given the authority to appoint three of the directors, and Sharp Corporation the remaining two directors.

### e.    Representative Acts of Quanta in Furtherance of the Conspiracy

116.    The following paragraphs reflect the Quanta Defendants' exchange of pricing, supply, capacity, quality and bid positioning information with their competitors PLDS and HLDS. The purpose and effect of agreeing to exchange this competitive business information was to stabilize ODD prices by facilitating price collusion.

117.    During the relevant time period, Quanta, in its role as a manufacturer for Defendants, shared revenues with Defendants based on the final price paid by OEMs. Thus, Quanta's revenues increased if the prices paid to Defendants for whom Quanta manufactured was artificially inflated.

118.    In May 2008, at a time when Quanta was acting as a manufacturing partner with Sony Optiarc, Haw Chen[41] of Quanta e-mailed Shu-ming Tzeng[42] of Quanta to report he had spoken with Jerry Hsieh of PLDS regarding an upcoming Dell procurement event. He reported:

---

[41]   Haw Chen, General Manager, Quanta.

[42]   Shu-ming Tzeng, Sales and Marketing Manager, Quanta.

Jerry said SATA RW price, TSST and HLDS is around $24.6, PLDS keep high at $27. But my phone is quite noisy. I am sure $24.6 of TSST, not sure about 27 of PLDS. Need to check again. He say the TAM is only hundred something thousands.

In that case, our PATA can keep as high as possible.

119.    In October 2008, Caroline Lin[43] of Quanta e-mailed other Quanta employees regarding an "RFQ Discussio [sic] with Amino-san." On information and belief, the e-mail subject referred to Amino Masafumi from Sony Optiarc. Quanta and Sony Optiarc were to act as partners in an upcoming ODD procurement event. Ms. Lin of Quanta reported that, "I'll have dinner w/HLDS Eugene [Yang] this Friday evening and get the consensus on the price protection."

120.    The following Monday, Ms. Lin reported to her colleagues at Quanta, Sally Huang and Haw Chen that "Last week, I met HLDS guy. According to what he said, their best price is around 24.65 eventually. However, the [sic] they won't go that far in the 1st round as well and might provide a higher price to see HP's feedback & then react."

f.      **Representative Acts of Sony, NEC, Sony NEC Optiarc, and Sony Optiarc in Furtherance of the Conspiracy**

121.    Prior to 2005, Sony and NEC individually designed and manufactured ODDs. In 2005, ODD producers NEC and Sony formed the joint venture, Sony NEC Optiarc, Inc. In late 2008, NEC sold off its interest in Sony NEC Optiarc to Sony, the venture's name was contracted to Sony Optiarc and it became a wholly owned Sony subsidiary. The following paragraphs reflect this family of Defendants' exchange of pricing, supply, capacity, quality and bid positioning information with each other (prior to their joint ventures) and their competitors TSST, HLDS and PLDS. The purpose and effect of agreeing to exchange this competitive business information was to stabilize ODD prices by facilitating price collusion.

---

[43]    Caroline Lin, Specialist in the ODD Unit reporting to Haw Chen, Quanta (caroline.lin@qsitw.com).

122.     In December 2004, h-moriwaki@az.jp.nec.com e-mailed Kris Williams, the Dell Account Manager for NEC Solutions (America), among others, and describing his dinner with a Sony senior manager, the exchange of competitive information regarding ODDs:

> I had a dinner with Sony senior manager (same as my position) last night and had some information about DVD Burden slim. According to Sony, their monthly capacity is limited to about 140k/month due to OPU supply from Sanyo. 40-60k out of 140k is allocated to Dell currently. Sony's low cost version will start its MP in April next year, and that is exactly same as our MP timing. We need to be very careful to compete Sony on 2nd generation of 8x Slim. In addition, Sony mentioned that Dell is still planning to have 3rd Slim vendor. Possibly HLDS or TSST. If so, it is very critical for us, and should work carefully to avoid 3rd vendor at Dell.

123.     In July 2005, Hank Hayami of NEC e-mailed to NEC employees[44] that "when our [NEC's] top management met TSST top management last week, TSST clearly mentioned as below. . . ." The e-mail went on to discuss a number of sensitive issues regarding ODD products:

> 1)For Dell Slim
>
> TSST is using OPU made by Sharp for Slim DVD and the horogram inside OPU caused a technical trouble of double layer. TSST dispatched engineers to Sharp OPU production lines to find out any rootcause, but due to this issue, the current yield rate is low and TSST could not find any solution yet.
> According to TSST, since Sharp OPU business is becoming a minus P/L impact, Sharp decided to shift key enginees resources to 3rd Division.
> This is one of the biggest reason on why the above issue happened.
> From TSST standpoint, they would like to ask NEC to support Dell in supply more strongly, because TSST cannot afford to supply enough to Dell.
>
> 2)HP Slim
>
> TSST mentioned that Slim DVD w/LS for HP is going quite well.
> The current production rate is 50K/month, but HP requested TSST to support 100-150K/month. However, TSST feels that they should very carefully monitor if LS media is really recognized by end-users or not in maretability.
> The tork of the stepping motor for TSST LS slim drive is weak and TSST needs an encoder in the feeder function.
> The picture quality on LS media drawn by TSST drive is better than HP's own reference samples and HP praised it.
> TSST is prepared to support LLS and plan to isolate it from LS development.

The information was forwarded by to Kris Williams[45] of NEC who stated that he had "a good contact at Toshiba, and I will contact him tomorrow. I will also provide the yield rate at Sharp factory and TSST (Samsung) drive factory on the new lead-free slim 8X DVDRW."

---

[44]   Including s-takakura@ct.jp.nec.com and Glenn Brower, glenn.brower@necsam.com.

[45]   Kris Williams of NEC, Dell Account Manager at NEC Solutions (America).

124.    In April 2006, Kris Williams of NEC reported that Dell had requested that all suppliers start their bid for the month of June 2006 at $1.20 lower than their May pricing. Williams went on to explain that "I was contacted by all the other Account Managers to Dell about this mandatory bidding and none of the other suppliers are going to participate with the mandatory $1.20."

125.    In August 2006, Kris Williams e-mailed Sony NEC Optiarc employees reporting that he had "confirmation today that HLDS may not be able to fully support the demand (TAM) that they have been given for HH PATA DVDRW. With the last TAM re-adjustment for Q3, HLDS won 60% TAM of HH PATA DVDRW. . . . HLDS confirmed that they are having issues procuring enough of there [sic] OPU for the PATA DVDRW drive. They may only be able to support 40%~50% of the Dell overall PATA DVDRW TAM starting in Oct." Williams went on to propose that PLDS would work to push Dell for additional TAM.

126.    In October 2007, Kris Williams of Sony NEC Optiarc e-mailed Vincent Chng[46] of Sony NEC Optiarc advising the new employee that "[t]he only other piece you need to round out your job responsibilities, is the data gathering piece from other suppliers. I think that you can be more bold with Tokyo if you have good info on competitors." Later in the e-mail string, Vincent Chng requested contact from Williams' contact at HLDS. In response, Mr. Williams responded, "Jason should contact you soon. . . . I will also try to put you in contact with Matt from TSST. . . . I will give you contact info for him." On information and belief, Jason refers to Jason Kim from HLDS and Matt refers to Matthew Lee at TSST.

127.    In December 2007, in response to an internal question regarding rankings for a Dell supplier review, Kris Williams of Sony NEC Optiarc openly acknowledged his competitor contacts:

---

[46]   Vincent Chng, Global Account Manager, Sony NEC Optiarc.

Dell does not share the other ODD supplier information.

We have to contact each supplier and exchange our information.

I have committed to Vincent that I will help him compile the other ODD supplier scores.

I should have all the other suppliers score by the end of the day.

128.    In March 2008, Kris Williams of Sony NEC Optiarc e-mailed Vincent Chng of Sony NEC Optiarc asking for the pricing of any current HH BD products being sold to Dell. In response, Chng stated that he didn't think Dell "will share this kind of info with" him, but then stated: "But I have checked with PLDS and they mentioned that the HH BD writer that they are supplying now is at USD250. This price is rather high cuz [it's] a very old drive that they are shipping to Dell. According to him, the market price should be around USD150."

129.    In August 2008, Vincent Chng of Sony (Vincent.chng@ap.sony.com) e-mailed a number of Sony Optiarc and Quanta employees, including Shu-ming Tzeng of Quanta thanking the team for participating in an Internet Negotiation for Dell of ODD products and reporting the final prices of all competitors in the procurement event. Mr. Chng stated that "HLDS $31.35 is their Q4 RFQ price. (They provided Q3 and Q4 price in their RFQ submission) According to HLDS, PLDS RFQ price for jam 09 is below $31. (I will check out this price)."

130.    Defendants Sony Optiarc, Quanta and PLDS also illegally rigged a Dell ODD procurement event in December 2008. Dell held an auction event closing on December 1, 2008 for ODDs, relating to a February 2009 supply period. For this procurement event, Sony Optiarc's ODD product was to be manufactured by Quanta, and thus, Quanta was also involved in the price-fixing conspiracy. The PLDS global account manager called his or her counterpart at Quanta, and the two companies reached agreement on PLDS ranking fourth behind Sony Optiarc. PLDS explained to Quanta that it had newly qualified for the ODD Product involved in the auction and had submitted a low reference price as a part of the qualification process with Dell. PLDS explained that it was not willing to go much lower than this reference price. And in fact, PLDS did not bid below this reference price. PLDS bid for fourth place in the February 2009

auction. Sony Optiarc, apprised of the bid-rigging by its manufacturer Quanta, bid to third place.

Dell, the customer running the February 2009 auction, then pressured PLDS to lower its price,

which it did by five cents. PLDS then called Quanta to tell it that PLDS was acceding to Dell's

pressure and lowering its bid by five cents. Quanta then communicated this information to Sony

Optiarc and Sony Optiarc also lowered its price by five cents.

### g.   Representative Acts of the Teac Defendants in Furtherance of the Conspiracy

131.   The following paragraphs reflect the Teac Defendants' exchange of pricing,

supply, capacity, quality and bid positioning information with their competitors Sony NEC

Optiarc and PLDS. The purpose and effect of agreeing to exchange this competitive business

information was to stabilize ODD prices by facilitating price collusion.

132.   In July 2007, Kris Williams of Sony NEC Optiarc America, Inc. compiled

information about slim PATA tray-loaded DVD-RW drives, Teac confirmed that it was paying

$1.91 for one of the component parts of the drive.

133.   In November 2007, an internal e-mail from Kris Williams of Sony NEC Optiarc

reported his conversation with Teac, during the middle of an internet negotiation with Dell:

> I confirmed that TEAC has a native DVD-ROM and they are
> currently in 1st position with their bid. They did not quote
> specifics, but it sounds like no other supplier will beat their bid for
> their slim native DVD-ROM. On Combo, TEAC is in last position
> from a price standpoint and they have no plan to try for any higher
> position. Alex [from Dell] is telling them that they are in last
> position and that they will receive 0% TAM. This conflicts with
> what Alex is telling us, as he is saying we are in last position for
> slim Combo.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**C.**     **Defendants' Illegal Conduct Stabilized Prices and Harmed Consumers**

24         143.    Defendants' conspiracy had the following effects, among others: (1) even

25  assuming that Defendants' illegal conduct was limited to only those sales of ODDs to computer

26  giants Dell and HP (which it was not), Defendants' illegal conduct stabilized prices of ODDs

27  sold to other OEMs and through other sales channels; (2) prices for ODDs sold by Defendants

28

have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; (3) decreased technological innovation; and (4) indirect purchasers of ODDs have been deprived of the benefit of free and open competition in the purchase of ODD Products.

### 1. Economic Evidence Will Show Defendants' Conspiracy Stabilized ODD Prices Paid by Other OEMs and in Other Sales Channels

144.   Defendants' illegal conduct stabilized the prices of ODDs beyond merely the ODDs Dell and HP purchased. Even if Defendants' overt acts in furtherance of their object to stabilize ODD prices were limited to sales to HP and Dell – which they were not – these anticompetitive acts would have been sufficient to stabilize ODD prices paid by other OEMs and purchasers in other sales channels.

145.   Economic evidence will show that just by inflating the prices to HP and Dell, ODD prices will be artificially elevated for other ODD purchasers. The economic impact to other purchasers would occur because HP and Dell are major purchasers of ODDs, who normally buy their ODDs while managing supply risk. Major purchasers do this by distributing their purchases across a portfolio of suppliers and supply channels. This behavior helps major purchasers reduce component costs, in part by ensuring these firms are faring no worse than paying market price. In short, if major purchasers such as Dell or HP could buy ODDs at a lower price from an ODD distributor or electronic manufacturing service, it would do so.

146.   Dell and HP have a majority share of ODD purchases for the personal computer market. As the following graph demonstrates, in 2007 alone, HP and Dell made up over 50 percent of ODD purchases for the personal computer market:



147.    Thus, if Defendants stabilized (artificially increased) the sales prices to Dell and

HP, while not doing the same for other customers, Dell and HP would either demand a lower

price from Defendants or shift a larger share of their purchases of ODDs to these other

purchasing channels with lower ODD prices. The shift of some portion of Dell and HP demand to

these other channels would raise prices on existing supplies in these other channels, and

ultimately lead the Defendants to raise prices in these other channels as a response to rising

demand in those channels, and to discourage further erosion of their direct sales to Dell and HP.

As a result, under either scenario, Defendants, acting as rational economic actors, would attempt

to ensure prices of commodity products (ODDs) would closely track prices of ODDs Defendants

sold to HP and Dell.

148.    As a consequence, any conspiracy to maintain or raise prices to the largest

customers, Dell and HP, would have a broad and pervasive impact, raising the price to all

customers and market segments purchasing ODDs.

149.   Economic evidence supports this allegation. Transaction sales data from one Defendant demonstrates that ODD prices paid by different customers moved together during the conspiracy. Price indices for Dell, HP and other ODD customers are virtually indistinguishable. This is demonstrated below in a series of charts which compare the price of ODDs sold by one Defendant to Dell and HP, against the prices of ODDs that Defendant sold to other customers.

150.   The following chart compares the price of half-height CD-RW drives sold by one Defendant to Dell and HP against the price of the same products sold to the Defendant's other customers:



Price Indexes for HH CDRW

151.   The following chart compares the price of half-height combo drives sold by one Defendant to Dell and HP against the price of the same products sold to the Defendant's other customers:



152. The following chart compares the price of slim DVD-RW drives sold by one Defendant to Dell and HP against the price of the same products sold to the Defendant's other customers:



153.    Thus, even if Defendants' conspiracy to stabilize ODD prices were limited to the largest customers, Dell and HP, it had a broad and pervasive impact, raising the price to all customers and market segments purchasing ODDs.

154.    The average sales prices for various ODDs from the Defendant upon whose transaction sales data the above indices were based, are also highly correlated with the average prices in the ODD industry as a whole.

155.    The following graph depicts the average prices for half-height CD-RW drives for one Defendant against industry prices:



156.    The following graph depicts the average prices for half-height combo drives for one Defendant against industry prices:



157.    The following graph depicts the average prices for slim DVD-RW drives for one
Defendant against industry prices:



158.    Thus, regardless of whether the overt acts in furtherance of Defendants'
conspiracy went beyond sales to just HP and Dell (which Plaintiffs allege that it does), the

inflation of prices to Dell and HP alone would have been sufficient to result in an inflation of

Defendants' prices throughout the ODD market.

2.      **Defendants' Conspiracy Caused Consumers to Pay Supra-Competitive Prices**

159.    As with most high-tech information technology products, dramatic declines in

price and improvement in quality occur over time. An effective conspiracy to restrain trade

significantly slows what would otherwise be a more rapid decline in quality-adjusted price, rather

than increase the price in absolute terms. Put another way, the price is higher relative to a but-for

world of more rapid price decline.

160.    ODDs are priced in a highly integrated global market. As producers reported to

the European Union during a merger review, "With respect to the geographic product market, the

parties submit that the overall PC ODD supply market is world-wide or at least EEA-wide in

scope. Prices do not vary significantly in world regions."

161.    Price movements in global markets can be measured using two producer price

indexes for ODDs manufactured in Japan, converted to a common currency basis (dollars). These

price indexes are better measures of price trends than simple average sales prices, since they

control for differences in the mix of products being produced, and hold constant the quality and

types of products being produced, over time.

162.    One of the two Japanese producer price indexes holds the sales mix of products

constant using 2005 market shares, and measures changes in the price of this 2005 "bundle" of

ODDs from one time period to the next. A second Japanese price index updates the weights from

one year to the next, beginning from a 2005 base. The latter calculation using "chain weights" is

considered a better measure of price change for products like ODDs which are undergoing

technological and quality changes.

163.    Differences in weights as they evolve over time are likely to create some

differences in movements between the two price indexes. The following table compares the

movement in these two price indexes, converted to a common dollar basis, over time. CAGR

refers to the compound annual growth rate. As expected, the chain weighted price index shows

price declines that are slightly greater, reflecting its more accurate tracking of movements in market prices due to introduction of newer and more innovative products:

| ANNUAL RATES OF PRICE CHANGE IN ODDs | | |
|---|---|---|
| | CAGR | CAGR |
| | 2001-2004 | 2004-2009 |
| ODD Chain Weight | -22.7% | -9.5% |
| ODD Fixed Weight | -21.5% | -6.9% |

164.    Despite differences in index weights, the two indexes display a remarkably consistent pattern. This data shows a clear trend toward slower rates of price declines over the period 2004 to 2009.

165.    This ODD price index is most usefully compared to the price index for a comparable high tech product. Like ODDs, hard disk drives (with magnetic, non-removable media, HDDs) utilize precision electro-mechanical components, with a significant semiconductor content, and are also used for digital data storage in computer systems. There was also a significant increase in concentration from 2000 to 2007 in hard disks, but with no patent pool with production and pricing information-sharing, no prohibitive, entry-preempting royalty, and no price-fixing conspiracy:

| ANNUAL RATES OF PRICE CHANGE IN ODDs VERSUS HDDs | | |
|---|---|---|
| | CAGR | CAGR |
| | 2001-2004 | 2004-2009 |
| ODD Chain Weight | -22.7% | -9.5% |
| HDD | -36.1% | -31.5% |

166.    This data suggests that after declining at very high rates prior to the emergence of an effective ODD conspiracy in 2004, price declines for the two types of data storage systems changed by very different amounts during the alleged conspiracy period, from 2004 to 2009. HDD prices continued to decline at similar rates as over 2001 to 2004, while price declines in ODDs not only came to a complete halt in 2008, but prices even increased substantially during the 2008 to 2009 period.

167.   The following figure provides a graphic comparison of these price declines for optical disk storage versus rates of decline in dollars per gigabyte of hard disk storage over the 2001-2009 period. The difference in rates of decline in ODD prices before and after the start of the conspiracy is obvious and compelling, while the continuing and virtually unchanged, sharp decline in hard disk drive storage prices is equally evident:

**PRICE INDEXES FOR OPTICAL STORAGE VERSUS HARD DISK STORAGE 2001-2009**



168.   The most recent optical disk technology used by consumers, Blu-ray disc players, continues to be only a small part of the overall ODD market. Though Blu-ray player prices had declined from stratospheric 2006 levels (an average sales price of $636 per BD video player) to a less daunting ($193) price level by 2009, developments in 2008 suggest that the same collusive conduct among the Defendants that had halted price competition for the mainstream DVD

1  technology, was also being felt in the small but growing market for the newer technology Blu-ray

2  players.

3      169.    The year 2008 marked the end of a vigorous competition between Blu-ray players

4  and the competing technological approach to high definition video, HD-DVD. The HD-DVD

5  format had previously been promoted by Toshiba, with HD-DVD compatible players also

6  produced by its TSST joint venture partner Samsung, as well as LG Electronics, NEC, Sanyo,

7  Thomson, and Onkyo. Toshiba had been aggressive in promoting the format by pricing its HD-

8  DVD players several hundred dollars below prices for comparable Blu-ray players, producing

9  considerable downward pressure on latest generation video players. As one industry observer

10  noted:

11          Toshiba clearly understood the importance of penetration pricing in
        a standards war. HD-DVD players entered the market at half the
12          price of the Blu-ray players and remained priced consistently
        throughout the war. Alone, this may have tilted the market towards
13          crowning the HD-DVD format.

14          But Sony also understood this issue. The company was at a cost
        disadvantage to HD-DVD in that the Blu-ray players cost more to
15          produce. To overcome this, Sony bundled Blu-ray with PS3.

16      170.    Finally, in 2008, Toshiba gave up on its effort to establish the HD-DVD format.

17  As soon as the competitive pressure was removed, prices for Blu-ray players surged upwards. As

18  Information Week reported:

19          HD DVD has been dead less than four weeks, yet it appears prices
        already have started to rise on DVD players supporting the
20          surviving high-definition format Blu-ray.

21          The average price in January of the top 10 Blu-ray players on
        PriceGrabber.com, a comparison-shopping site, was $467. In
22          February, the month Toshiba said it would no longer lead the
        charge for HD DVD, the average price jumped to $604.

23

24          Some of the increase was due to the introduction of expensive
        players with features that went above the norm, Darren Davis, VP
        of product marketing for PriceGrabber, said Thursday. Taking
25          away that factor, however, still left an increase between $20 and
        $50 on most players in February.

26

27          Even though Blu-ray players no longer have to compete with
        cheaper HD DVD devices, manufacturers would be smart to keep
        prices low. "Consumers are not going to jump into the market yet,"

28

> Davis said. "The demise of HD DVD, if anything, is going to delay Blu-ray adoption, given the increase in prices."
>
> While raising prices could offer short-term gain for manufacturers by squeezing more money from early adopters, it would delay adoption among more price-sensitive mainstream consumers, Davis said.

171.   A blogger on the widely read Gizmodo Blog observed that:

> I suppose that it is not all that surprising to find out that without competition from the HD DVDs camp, prices for Blu-ray players have gone up. According to data collected by Pricegrabber.com, Blu-ray players have hit a high average of $400 per unit for the year – about the same price they were at this time last year. This comes after the aggressive price cuts Blu-ray manufacturers employed at the height of the HD DVD battle. While these players probably would have been $1000 without a format war (thank Toshiba for that one) these prices are not moving in the right direction.

172.   CNET News noted the immediate increase in prices after the removal of HD-DVD from the market:

> In the three short weeks since Toshiba announced that it was pulling the plug on the high-definition technology, prices for standalone players using the rival Blu-ray format have been headed north. In fact, as noted by PriceGrabber.com, Blu-ray prices are at their high point for the year, at an average of about $400 apiece for the devices.

173.   Toshiba soon found a way to capitalize on its abandonment of the competing HD-DVD alternative. In early 2010, the formation of a patent pool for Blu-ray technology was announced by its four members, Mitsubishi, Thomson, Warner Brothers, and Toshiba. Toshiba was selected to operate the new BD4C patent pool, which goes into operation alongside a second patent pool announced by Panasonic, Sony, and Philips in 2009.

### 3.   Defendants' Conspiracy Harmed Consumers by Causing Decreased Technological Innovation

174.   Defendants' conspiracy caused a second harm to consumers, a decline in the underlying rate of technological innovation – which ultimately leads to declines in quality-adjusted price as new and qualitatively superior products are introduced, then adopted by consumers. Empirical economic studies have previously found that formation of a patent pool, historically, has been associated with a slowing in the rate of innovation in the industry

1   producing the products utilizing the pooled patents. The same phenomenon seems to have

2   happened after the patent pools were formed in ODDs.

3       175.    The following figure tracks major introductions of new technological changes in

4   the ODD industry over the 1997-2005 period. The clustering of major innovations before 2003 is

5   notable, and the absence of major new innovations with an impact on the industry since 2002

6   quite remarkable:

## ODD TECHNOLOGY EVOLUTION, 1997-2005

## TECHNOLOGY INTRODUCTIONS



14      176.    The following figure catalogues the first introduction into the marketplace of

15  players based on new ODD standards. As expected, the market introductions depicted in the

16  figure lag behind the technology development by some time. The pattern is very consistent,

17  however, with a large fraction of all new player introductions occurring prior to 2003, and only

18  two new players (players for the ill-fated HD-DVD standard, and Blu-ray Java players)

19  introduced after 2003. A slackening in the pace of innovation seems to have coincided with the

20  formation of the patent pool and joint ventures:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MARKET INTRODUCTION OF PLAYERS FOR NEW OPTICAL DISK TECHNOLOGIES, 1982-2007**

<u>Year</u>

| Year | |
|------|--|
| 1982 | CD-Digital Audio |
| 1983 | |
| 1984 | |
| 1985 | CD-ROM |
| 1986 | |
| 1987 | |
| 1988 | CD-i |
| 1989 | CD-ROM XA |
| 1990 | |
| 1991 | |
| 1992 | CD-R    CD-WO    CD-MO |
| 1993 | Bridge Disc |
| 1994 | |
| 1995 | |
| 1996 | DVD-Video    CD-Extra |
| 1997 | DVD-ROM    DVD-R 1.0    CD-RW |
| 1998 | DVD-RAM 1.0 |
| 1999 | DVD-R Authoring  DVD-R General  DVD-RW  DVD-RAM 2.0  DVD-Audio  SACD  DVD+RW |
| 2000 | |
| 2001 | DVD+R |
| 2002 | DVD+R |
| 2003 | Blu-Ray Disc |
| 2004 | |
| 2005 | |
| 2006 | HD-DVD |
| 2007 | BD-Java |

177.     The scheme resulted in a slowdown of patent applications in the newest high definition video player technology. The following tables count patents filed by the five companies with the largest numbers of United States patents in Blu-ray and HD-DVD disk technology, respectively, over the years 2000 to 2007. Again, the data suggest a decline over time:

| TOP 5 FIRMS THAT FILED BLU-RAY TECHNOLOGY-RELATED PATENTS 2000-2007 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Total |
| Philips | 1 | 2 | 3 | 10 | 3 | 1 | 0 | 0 | 20 |
| LG | 0 | 0 | 0 | 13 | 11 | 1 | 0 | 0 | 25 |
| Matsushita | 0 | 0 | 1 | 20 | 23 | 4 | 8 | 0 | 56 |
| Samsung | 0 | 0 | 0 | 16 | 14 | 12 | 13 | 6 | 61 |
| Sony | 0 | 3 | 2 | 4 | 11 | 13 | 9 | 1 | 43 |
| **Total US Patents Filed** | **1** | **5** | **6** | **63** | **62** | **31** | **30** | **7** | **205** |

| TOP 5 FIRMS THAT FILED HD-DVD TECHNOLOGY-RELATED PATENTS, 2000-2007 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Total |
| General Electric | 0 | 1 | 1 | 3 | 3 | 0 | 0 | 0 | 8 |
| LG | 2 | 3 | 4 | 4 | 1 | 0 | 1 | 0 | 15 |
| Matsushita | 1 | 2 | 2 | 2 | 3 | 1 | 3 | 0 | 14 |
| Samsung | 14 | 12 | 11 | 10 | 11 | 5 | 11 | 5 | 79 |
| Target Technology Co, LLC | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 0 | 8 |
| **Total US Patents Filed** | **17** | **18** | **18** | **19** | **20** | **9** | **18** | **5** | **124** |

178.    In summary, a period of rapid introduction of new ODD product technologies occurred prior to, and right after, the formation of the ODD patent pools in 1998 and 1999. Shortly thereafter, a period of rapid and substantial increase in concentration within the ODD industry also occurred. These twin developments were followed by a paucity of new ODD technology introductions.

179.    Technological innovation is often stimulated as a by-product of price competition in high tech sectors, as introduction of new, innovative, and at least temporarily more profitable products provides an attractive alternative to competing for sales by slashing prices and margins on

more mature products. Reducing the pressure of price competition removes some of the pressure to innovate.

180.     Reduced price competition resulting from a price-fixing conspiracy further reduced rates of technological innovation that were already slowing as a consequence of patent pool formation and lessened industrial competition. Diminished rates of technical innovation make maintenance of a stable price-fixing cartel easier. A slowdown in the rate of technical innovation and a reduction in the rate at which prices are falling are mutually reinforcing. Both factors are associated with the operation of this price-fixing conspiracy, and both factors cause harm to consumers of ODDs.

### 4.     The Inflated ODD Prices Were Passed-Through to Consumers

181.     Defendants' conspiracy to raise, fix, or maintain the price of ODDs at artificial levels resulted in harm to Indirect Purchaser Plaintiffs and the proposed classes because it resulted in them paying higher prices for ODD Products than they would have in the absence of Defendants' conspiracy. The entire overcharge for the ODDs at issue was passed on to Indirect Purchaser Plaintiffs and members of proposed classes.

182.     ODDs are commodity products, with functionally equivalent products available from Defendants, which manufacture ODDs pursuant to standard specifications.

183.     An ODD is purchased by a consumer as a stand-alone device or as a substantial part of an ODD Product. When an ODD is purchased by consumers as a stand-alone device, the device itself is directly traceable to the specific manufacturing Defendant. When an ODD is purchased by a consumer as part of an ODD Product, it is a distinct, physically-discrete hardware element of the end-use product and is identifiable by a specific, discrete part or model number that permits tracing. ODDs are identifiable and traceable throughout the chain of the distribution to the end user. They do not undergo any alterations as they move through the chain of distribution.

184.     The indirect purchaser buys an ODD through one of two distribution chains, either from the direct purchaser OEM, or through a reseller such as a retailer. Thus, an ODD follows a traceable physical chain from Defendants to the OEMs, to the purchasers of ODD Products.

Tracing can help show that changes in the prices paid by direct purchasers of ODD affect prices paid by indirect-purchasers of the ODDs themselves, or ODD Products.

185.   The OEM and the retail markets of ODDs and ODD Products are subject to vigorous price competition. The direct purchaser OEMs and retailers have very thin net margins. They are therefore at the mercy of their component costs, such that increases in the price of ODDs lead to quick, corresponding price increases at the OEM and retail levels for stand-alone ODDs and ODD Products.

186.   As a result, the inflated prices of ODDs resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other members of the proposed classes by direct-purchaser manufactures, distributors, and retailers.

187.   ODDs make up a substantial component of the cost of ODD Products. The retail price of an ODD Product is determined in substantial part by the cost of the ODD it contains.

188.   Microeconomic theory teaches that the only situations in which precisely zero pass through occurs is when an industry faces a perfectly elastic demand for its product (i.e., the price was fixed, with demand dropping to zero with an infinitesimal price increase, and expanding infinitely if price were to drop infinitesimally), or if supply was perfectly inelastic (i.e., if even a very large increase in price for a product was incapable of stimulating additional supply).[48] These possibilities are considered implausible by economists. Either scenario is at odds with the nature of the computer and consumer equipment industries. Existing empirical studies of the computer and electronics industry have concluded that demand is *not* infinitely elastic. Therefore, at least a partial pass through of an increase in the cost of ODDs into the price of computer and consumer electronic equipment – and consequent harm to class members – is the predicted outcome of a successful price-fixing conspiracy.

189.   To the extent that distributors, wholesalers, and retailers selling to consumers or to others in the distribution chain price their sales as their cost plus a fixed markup, this will create an

---

[48]   The usual hypothesis that is commonly examined in empirical pass through studies is whether pass through exceeds, falls short of or equals 100 percent.

additional reason for pass through to exceed 100 percent through these channels.[49] Further, because local retailers ultimately compete with direct sales to purchasers by computer manufacturers, competitive forces would likely work to equalize end-purchaser prices between channels, after controlling for the value of differences in support across different distribution channels. This would tend to push the total pass-through rate from costs to end-purchaser pricing above 100 percent, since manufacturers could not sustain a pricing policy to distributors that did not cover their costs, and an additional fixed markup on top of distributor cost would result in a total pass-through rate to final consumers in excess of 100 percent.

190.    Thus, the extent to which input cost increases are passed through into output prices is entirely an empirical issue, and it is an area in which methods of empirical analysis are well established. Based on both theory and the published studies in this area, it is likely that the pass-through rates of ODD costs into computer and consumer electronics prices will exceed 100 percent, a situation known as "overshifting."

191.    In particular, it is undisputed that overshifting is possible in markets with many suppliers of differentiated products and easy entry and exit, an environment known as "monopolistic competition." Indeed, pass through in excess of 100 percent would actually be expected in industries where firms produce differentiated products in competitive conditions, and face economies of scale – that is, where their average cost of producing a product declines with their level of output. In particular, as noted next, in competitive industries with differentiated products and relatively easy entry and exit (monopolistic competition), when there are economies of scale, overshifting will be the rule, not the exception. Empirical studies by economists have characterized the personal computer industry as an industry which fits this description. For this reason, it is likely that pass through is greater than 100 percent, in the market conditions that prevail for most, if not all, types of mass market computer and consumer electronics equipment.

---

[49]    For example, if a wholesaler prices its product at manufacturer sales price plus 10 percent, and a retailer prices its product at wholesale plus 10 percent, the total pass through to the final consumer will be 121 percent (i.e., 110 percent times 110 percent) of manufacturer sales price. Certain distributor costs, like the costs of holding inventory, and "shrinkage," may be approximately proportional to the value of the products held, and thus be one factor creating this pricing policy.

192.    Thus, Plaintiffs and other indirect purchasers have been forced to pay supra-competitive prices for ODDs and ODD Products. These inflated prices have been passed on to them by direct purchaser manufacturers, distributors, and retailers.

**D.      Specific Characteristics of the ODD Market Made It Ripe for Collusion**

193.    The ODD industry has several characteristics that facilitate a price-fixing conspiracy, including: (1) increasing concentration in the makeup of the industry; (2) the existence of significant barriers to entry; and (3) ease of information sharing and cartel enforcement through trade group meetings.

**1.      The ODD Market Experienced a Dramatic Increase in Concentration**

194.    In the period from 2001 to 2004, the ODD industry witnessed an increase in concentration, and a reduction in competition. Significant barriers to entry facilitated this increase in concentration, which in turn enabled the collusion that is the subject of this complaint. The formation and operation of patent pools for DVD technology, created just prior to this period of rapidly increasing concentration, played a critically important role in both creating entry barriers to potential competitors, and in providing price and output monitoring mechanisms that facilitated the operation of a successful price-fixing conspiracy.

195.    The following table calculates the change in the Herfindahl-Hirschman Index ("HHI") of concentration over the period from 2001 to 2008. In 2001, an HHI well under 900 characterized the degree of concentration among producers of ODDs. By 2005, the HHI had more than doubled, to over 1950. In 2001, according to Department of Justice guidelines, the ODD industry would have been considered "unconcentrated." In 2005, it would have been considered "highly concentrated." Concentration remained at about this same level in 2008, the last year for which data is readily available.

| HERFINDAHL-HIRSCHMAN INDEX (HHI) OF CONCENTRATION FOR ODD MARKET | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2001 Entity | 2003 Entity | 2005 Entity | 2001 Mkt Share (%) | 2003 Mkt Share (%) | 2004 Mkt Share (%) | 2005 Mkt Share (%) | 2006 Mkt Share (%) | 2007 Mkt Share (%) | 2008 Mkt Share (%) |
| Hitachi/LG | Hitachi/LG | Hitachi/LG | 18.8 | 24.0 | 28.0 | 25.6 | 26.0 | 30.8 | 27.9 |
| Samsung | TSST | TSST | 13.1 | 19.0 | 18.0 | 21.8 | 18.9 | 24.2 | 23.6 |
| Toshiba | | | 5.3 | | | | | | |
| Lite-On | Lite-On | Lite-On (PLDS) | 10.6 | 16.0 | 16.0 | 26.3 | 16.9 | 11.5 | 14.5 |
| BenQ | PBDS | | 5.1 | 7.0 | 6.0 | | | | |
| Philips | | | 3.4 | | | | | | |
| Sony | Sony | Sony NEC Optiarc | 2.4 | | | 7.1 | 9.9 | 9.3 | 15.6 |
| NEC | NEC | | 3.3 | | 4.0 | | | | |
| MKE/Pana-sonic | | | 4.5 | 5.0 | 6.0 | 8.4 | 9.1 | 8.6 | 7.0 |
| Pioneer | | | 1.9 | | 4.0 | 4.4 | 5.7 | 6.0 | 6.3 |
| TEAC | | | 6.4 | 3.0 | | | | | |
| BTC | | | 4.7 | 4.0 | | | | | |
| AOpen | | | 2.4 | | | | | | |
| Mitsumi Electric | | | 2.0 | | | | | | |
| All Others | | | 16.1 | 22.0 | 18.0 | 6.4 | 13.5 | 9.6 | 5.1 |
| | | | 2001 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
| HHI upper bound | | | 847 | 1358 | 1540 | 1990 | 1609 | 1921 | 1910 |
| HHI lower bound | | | 816 | 1292 | 1468 | 1962 | 1532 | 1863 | 1878 |
| Market Share of DVD Pool Members, Affiliates (%) | | | 49 | 55 | 66 | 94 | 87 | 90 | 95 |

196.    The members or controlled subsidiaries of the two DVD patent pools (*see* pages 75-

72, *infra*), all of whom are alleged to have participated in the ODD price-fixing conspiracy,

accounted for less than half of industry sales in 2001. By 2004, this had jumped to 66 percent, and

by 2005 to 94 percent of ODD sales globally. In 2008, ODD producers affiliated with (and

controlled by) pool members continued to account for 95 percent of worldwide ODD sales.

197.   By 2004, the most significant effects of this consolidation within the ODD industry had been felt. The shrinking number of producers is all the more remarkable given the growth in the size of the ODD market from 2001 through 2004, as the following table demonstrates:

| GLOBAL ODD SALES, 2001-2009 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| Blu-ray (in millions) | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 14 |
| DVD-W (in millions) | 2 | 5 | 25 | 55 | 124 | 179 | 238 | 235 | 215 |
| Other (in millions) | 177 | 198 | 203 | 191 | 178 | 123 | 92 | 72 | 53 |
| Total Units (in millions) | 179 | 203 | 228 | 246 | 303 | 301 | 331 | 312 | 281 |
| Total $ (in billions) | 9.3 | 9.8 | 10.5 | 9.8 | 10.4 | 9.6 | 9.3 | 7.9 | 6.8 |

198.   One significant feature of this process was that the consolidations did little to change the actual pattern of outsourced manufacturing, which largely continued unchanged, as described above. Instead, the consolidation simply reduced the number of ODD firms competing horizontally and shrank the number of unique brands and products sold in the marketplace. The consolidation also reduced the number of firms developing new products in direct competition with one another in the marketplace. The net result was a significant increase in concentration, decline in competition, retardation of innovation, and facilitation of collusion by ODD producers.

   a.   **Hitachi and LG Electronics Form Hitachi LG Data Systems (HLDS)**

199.   The drive toward consolidation was kicked off in late 2000, when Japanese ODD producer Hitachi merged its optical disk operations with LG Electronics, of Korea. The joint venture, Hitachi LG Data Systems (HLDS), was dedicated to design, development, and marketing. Actual manufacturing was contracted out to the parent corporations. The joint venture also had royalty-free access to the patents of the parents. Hitachi acquired a 51 percent stake of HLDS, while LG Electronics acquired the remaining 49 percent. After implementation of the transaction, Hitachi and LG Electronics jointly controlled the operations of HLDS. The Chief Executive Officer

1   of the joint venture was Korean, from LG Electronics, while the Chief Financial Officer, from

2   Hitachi, was Japanese.

3       200.    Hitachi, however, effectively controlled the operation, through both its ownership

4   and its control of key technologies. Indeed, Hitachi's 51 percent ownership of the joint venture was

5   critical to its success, since its position as a Hitachi affiliate gave it access to the benefits of

6   Hitachi's cross-licenses with other ODD patent holders, and Hitachi's membership in the DVD6c

7   patent pool.

8       201.    As a Japanese study of the industry concluded:

9           It is very important for the industry of the catch-up countries to
            understand the reason why the percentage of Hitachi's investment to
10          HLDS is 51%, and why Mitsubishi's investment to Digitek [a similar
            joint venture between Mitsubishi and Funai Electric] is 51%. The
11          51% from Hitachi means that HLDS is consolidated subsidiary
            company of Hitachi and thus all the patent royalty issues are
12          automatically handled by Hitachi. It is said that the actual royalty fee
            of the DVD business has been significantly decreased because
13          Hitachi has established patent claim to rank with other patent
            holders, and moreover Hitachi has many cross-licensed partner firms
14          in the world.

15      202.    Even for less technologically complex consumer DVD players, which could feasibly

16   be assembled and manufactured by new entrants in Taiwan and China, this royalty load rapidly

17   became a major economic factor limiting their ability to compete successfully against the

18   incumbent patent pool members. Prior to 2005, Japanese economists studying the industry had

19   noted:

20          It will become very difficult for Chinese firms to run the DVD
            business by paying all of the royalty which have been claimed from
21          front runner countries, because the percentage of the relative amount
            of the royalty will become unreasonably higher and higher as the
22          retail price of the DVD player becomes lower and lower. It is a
            noteworthy fact that, in a case of a major DVD manufacturer in
23          Taiwan, the ratio of the royalty was estimated to be over 50% of the
            total overhead in year 2004 . . . and have become almost impossible
24          to continue the business if they would keep paying all of the claimed
            royalty.
25
        203.    The same economists noted that:
26
            According to industry analysts, total sum of the royalty claimed
27          against Chinese firms is estimated to be well over 10 dollars per a
            DVD player even though the retail price of the player in US market
28          has dropped to 30-50 dollars in 3Q/2005, while royalty claimed

against Japanese firms is estimated to be 2-4 dollars because the firms are major license holders in the DVD forum. Furthermore, the street price of Japanese brand DVD player is 50-80 dollars, which is 50% higher than that of Chinese brand products.

204.    The manufacturing cost advantages of the Chinese firms were offset by the very high royalties they needed to pay in order to sell the products abroad. Japanese firms, on the other hand, faced higher overhead costs if they chose to continue funding technological development, but paid minimal royalties. After 2005, with technological progress in semiconductors and optical devices, and economies of scale continuing to dramatically reduce costs of the materials, parts, and chips needed to manufacture a DVD drive, the costs of the royalties came to dominate the costs of manufacturing an ODD for potential competitors in ODDs without low cost access to the ODD patent pools. There is also evidence that the pace of technological development of ODDs slackened, as pool members slowed the pace of introductions of new ODD technology, further improving the cost advantage of incumbent pool members by reducing research and development costs.

205.    Hitachi's ability to manufacture at a much lower cost through its joint venture with LG Electronics, yet still avoid payment of increasingly burdensome royalties (as the fixed size of the minimum royalty increased its importance relative to a falling ODD price) by virtue of its 51 percent ownership of the joint venture giving it Hitachi's preferred position inside the patent pool, was critical to the business success of what became a very profitable joint venture.

206.    Japanese economists have noted:

> Since 2003, only three years after the joint venture company has started, HLDS has turned into one of the most profitable subsidiary companies of Hitachi group. It has been said that without moving on to the alliance, Hitachi would have been forced to withdraw from the optical storage industry. The joint venture company between Mitsubishi Electric and Funai Electric also shows similar success story that Funai is exceptionally a profitable firm among the DVD suppliers in Japan because Mitsubishi Electric is the majority (51%) among the investors and is one of the major license holders in the DVD Forum.

**b.    Philips and BenQ Form Philips BenQ Digital Storage (PBDS)**

207.    This model was quickly copied by others. In 2001, Japan's JVC, another patent pool member, formed a similar 51 percent to 49 percent joint venture with Taiwan's Lite-On. As with

HLDS, the patent pool member, JVC, held the controlling interest (though in the case of HLDS, LG Electronics later was ultimately allowed to join a patent pool).

208.   In early 2003, Taiwanese ODD producer BenQ and Philips, formed a joint venture, Philips BenQ Digital Storage (PBDS). The jointly-owned company would develop, design, and market ODDs; all manufacturing would be contracted out to BenQ. While the joint venture targeted data storage applications, it explicitly noted that it "may later include optical storage devices for consumer applications."

### c.   Toshiba and Samsung Form Toshiba Samsung Storage Technology (TSST)

209.   Also in 2003, ODD producers Samsung and Toshiba concluded an agreement to integrate their ODD operations into a single entity, Toshiba Samsung Storage Technology (TSST). As was the case with the HLDS and PBDS, the joint venture was for design, development, and marketing efforts; all manufacturing was to be contracted out to Samsung. Toshiba and Samsung jointly control the venture. Although Toshiba held the majority of shares in the joint venture (51 percent, with Samsung holding the remaining 49 percent), Samsung retained veto rights on strategic decisions. Therefore, both parents jointly retain the possibility to exercise decisive influence over the joint venture.

210.   As Korea's national investment promotion agency describes on its web site:

> Essentially, the two companies had agreed to spin-off their ODD businesses, and transfer them to the joint venture. Mirroring the Hitachi/LG deal, majority control was vested in the Japanese parent with 51 percent of the equity compared to 49 percent for the Korean partner. Again, company headquarters would be in Japan, this time, within Toshiba's head office in Kawasaki. Again the Japanese parent company would bring technical know-how to the venture, as well as international brand power supported by a global sales and service network. Manufacturing also, in the case of TSST, would be the province of the Korean partner. With TSST Korea head office at the Samsung Digital Complex in Suwon, Gyeonggi Province, production for the joint venture was consigned to the automated Samsung ODD plant in Gumi, North Gyeongsang Province. TSST operates a similarly well-appointed factory in Manaus, Brazil, and at its Samsung Electronics Phils. Mfg Corp (SEPHIL), facility at Calamba Premier International Park, Calamba City, Philippines.

HEDGING BETS

In fact, the articles of the joint venture stipulate that its purpose is the design, development, marketing and sales of ODDs, with manufacturing left out of the arrangement, in effect, outsourced to the Samsung plant. With research and development plus intellectual property rights secured under a long term agreement, TSST was given access to all necessary resources from its parent companies to compete in the global ODD market. TSST supplies ODD models to its Japanese and Korean parents who then market them under their own brands, in the same manner that an OEM operates. At the same time, as is the case with [HLDS], the parent companies are better able to respond and meet shifting demands by splitting fabrication and development costs.

### d.  Sony and NEC Form Sony NEC Optiarc

211.    Prior to 2005, Sony and NEC individually designed and manufactured ODDs. According to company reports in 2005, the optical disc drive businesses of Sony and NEC generated a combined revenue of $1.8 billion in the fiscal year from April 2004 to March 2005. According to the companies, at the time of the Sony NEC Optiarc joint venture, the companies had an estimated ODD market share of around 20 percent.

212.    In 2005, ODD producers NEC and Sony announced an agreement to merge all ODD activities of their two companies (presumably including the design and development of loaders for use in consumer products) in a joint venture, Sony NEC Optiarc, Inc. The new joint venture undertook all development, design, marketing and sales related to ODDs; all manufacturing (except a small amount of manufacturing of magneto-optical drives by Sony) was to be subcontracted out to third parties. Sony held a 55 percent ownership of the shares in the joint venture, while NEC owned the remaining 45 percent of the share capital. Sony also appointed the majority of the Board of Directors (four out of seven). NEC, however, retained the right to veto certain decisions. In addition, certain sensitive matters which require resolution by a vote of the board of directors also required an affirmative vote by at least one director appointed by NEC. Thus, both parent companies retained control of the Sony NEC Optiarc joint venture.

213.    The Sony NEC Optiarc parent companies, Sony and NEC, continue to exert substantial operational control over the subsidiary, and retain key technology development efforts

1   outside the joint venture, not unlike the 2000 HLDS venture's organizational template. Japan's

2   Nikkei economic news service reported that:

3           Sony and NEC signed the agreement in expectation of synergy in
            both technologies and marketing. The companies intend to
4           complement each other's technologies with Sony's expertise in
            optical heads and NEC's signal processing LSIs. As for marketing,
5           the companies aim to extend the reach of their products to North
            America and Europe, where Sony and NEC respectively boast solid
6           sales. However, parent Sony and NEC will separately continue their
            research and development of optical disc elemental technologies in
7           house.

8           214.    Sony NEC Optiarc's founding board of directors was composed entirely of senior

9   executives from NEC and Sony. As a February 2006 press release from Sony announcing the joint

10  venture stated:

11          Sony Corp. and NEC Corp. have announced that they reached a
            definitive agreement to establish a joint company named "Sony NEC
12          Optiarc Inc." to integrate their optical disc drive businesses. Shinichi
            Yamamura, current Deputy President, Video Business Group, Sony,
13          will become Representative Director and President of the new
            company. Eiichi Ichikawa, current General Manager, Computer
14          Storage Products Division, NEC, will become Vice President. In
            addition to these two full-time directors, the new company's board of
15          directors includes three and two adjunct members from Sony and
            NEC, respectively.

16
            215.    The executives went on to senior positions in their home companies. In addition to
17
    Sony NEC Optiarc's founding Chief Executive Officer, Yamamura, who came from Sony, and
18
    Sony NEC Optiarc's founding Vice President, Iichikawa, who came from NEC, the founding board
19
    consisted, on the Sony side, of Katsumi Ihara, previously a Representative Corporate Executive
20
    Officer, Executive Deputy President, and Group CFO at Sony; Kiyoshi Nishitani, previously
21
    Deputy President of Sony's Home Electronics Network Company; and Hidenosuke Kanai, Senior
22
    Vice President of the Planning and Control Division in Sony's Home Electronics Company. All
23
    these Sony-supplied Sony NEC Optiarc board members simultaneously continued in their careers
24
    at Sony. Ihara is currently Chief Executive Office of Sony Financial; Nishitani as of February 2008
25
    was head of Sony's video business, and Kanai was appointed President of Sony's Electronic
26
    Devices Business Group in 2009.
27

28

216.    Similarly, the NEC contingent making up the remainder of Sony NEC Optiarc's founding board of directors consisted of Shunichi Suzuki, formerly a Senior Vice President and member of the Board of Directors at NEC, and Masahiko Yamamoto, another former Senior Vice President at NEC. After a stint at Optiarc, Suzuki retired as an Executive Vice President and Member of the NEC Board in June 2007, while Yamamoto went on to become an Advisor at NEC Networks and System Integration Corp., and then served as its President, the role in which he currently continues (as of 2010) at this NEC subsidiary.

217.    In short, both Sony and NEC continued to exert significant direct control over their Sony NEC Optiarc venture through their complete control of its board of directors.

218.    Like the previously described joint ventures between patent pool members and outsiders, this one too had a majority ownership share controlled by the patent pool member (Sony), giving it the same cost advantage in royalties. In late 2008, NEC sold off its interest in Sony NEC Optiarc to Sony, the venture's name was contracted to Sony Optiarc and it became a wholly owned Sony subsidiary.

        e.      **Philips and Lite-On Form Philips & Lite-On Digital Solutions (PLDS)**

219.    In early 2006, Taiwanese ODD producer Lite-On purchased BenQ's ODD production facilities in China, and took over BenQ's manufacturing ties to PBDS. BenQ exited the ODD contract manufacturing business. In 2007, BenQ sold its interest in PBDS to Lite-On, completely exiting the ODD business. The joint venture with Philips was renamed PLDS (with Lite-On's 'L' replacing BenQ's 'B'). Philips remained the other controlling shareholder in the PLDS entity. Lite-On and Philips each gained the right to appoint members of the board of directors, which has the responsibility for the strategic management, direction and control of the PLDS joint venture. Philips has a 51 percent ownership stake in PLDS, while Lite-On retains a 49 percent ownership stake.

        **2.      Significant Barriers to Entry Exist in the ODD Market**

220.    A significant barrier preventing new firms from successfully entering or competing in the ODD industry has been very large royalties charged by patent pools on optical disk

technology that were set up in the late 1990s, and the discriminatory manner in which these now-prohibitive royalties are collected. Below is a brief history of patent pools in this industry.

### a.   The Predecessor of the DVD Patent Pools

221.   In the 1970s and early 1980s, Philips and Sony had engaged in joint research and development on optical data storage; other patents developed independently in this broad field at the two companies were pooled with the patents of the joint research and development venture. Their motivation for doing so is the subject of some controversy – by their own account, the purpose was to enable focusing of resources on difficult technical problems without worrying about their partner "free-riding" on the efforts of the joint venture through parallel patenting activity. By the account of their critics, the two companies pooled all patents in the area in order to reduce competition from products making use of technological alternatives they had already developed independently of one another.

222.   In 1982, one of the fruits of this Sony-Philips research and development effort emerged – their joint publication of the CD-Audio standard for music optical disks. A worldwide joint CD Disc Licensing Program was launched, managed by Philips.

223.   In 1984, a second outcome of their joint research and development effort surfaced, with the publication of their CD-ROM standard for read-only data storage. By 1987, this standard had been adopted by international standards bodies. In the 1980s and early 1990s, Philips and Sony developed yet another set of standards for CD-R (writeable once) and CD-RW (re-writeable) digital data disks. These data CD formats became hugely successful, and revolutionized the way in which digital data, including software programs, were stored and distributed.

224.   Facts unearthed in litigation establish that concerns over the manner in which the Philips/Sony CD patent pool operated in many respects anticipated antitrust issues that now have come to light in later ODD patent pools. A lawsuit heard by the United States International Trade Commission in 2004 established a number of facts about the effects of the Philips/Sony patent pool on CD-R/RW disk media producers that closely parallel the manner in which the later DVD patent pools operated:

a.      That the various Philips pool royalty rates have been maintained despite the fall in CD-R/RW prices to the point where those royalty rates now represent between 50 and 70 percent of today's average net selling price in the industry.

b.      That although the three-percent rate determined the relevant royalty in the early 1990s when CD-R prices were high enough to result in royalties in the order of 20 to 25 cents per disk, prices in recent years for CD-R disks have fallen to the point where only the 10-yen minimum is the relevant per-disk royalty.

c.      The patent pool royalty rates charged by Philips and its licensor-partners for CD-R/RWs are significant product price components that currently equal half of the costs of manufacturing.

d.      The two primary reasons CD-R prices have decreased are because consumption has increased greatly and because manufacturing costs have been reduced. One estimate is that the net selling price for CD-R disks has declined 82 percent since 1997.

e.      The pool licensed its patents externally in a discriminatory fashion; pool members and their affiliates and subcontractors paid no royalties to other patent pool members for licensed products.

225.    The subsequently formed DVD patent pools have a history of operating in a very similar manner. A royalty which originally was but a small portion of the price of an ODD, has since grown to be the dominant cost of producing an ODD, after scale economies and technology-driven cost reductions pushed prices downward in an initially more competitive environment. This prohibitive royalty now prevents potential industry entrants from exerting downward pressure on the prices fixed by the conspirators, and shelters them from any external competitive challenge. The members of the pool, and their affiliates and subcontractors, do not appear to be required to pay royalties to the pools, by virtue of their network of cross licenses, sheltering them from any competition external to the pools. It is no surprise, therefore, that as a result, patent pool members and their affiliates survived an initial period of intense industrial competition, then rapidly established their control over **95 percent of global ODD sales** in the first half of this decade.

1

        **b.**    **Description, Structure and Membership of the DVD Patent Pools**

2        226.    As detailed above, two patent pools govern the use of DVD technology, a large part

3 of the ODD market. These two pools are the DVD3c and the DVD6c patent pools. A "patent pool"

4 is an agreement between two or more patent owners to license one or more of their patents to one

5 another or to third parties. These patent pools act as barriers to entry into the ODD industry

6 because while licensees must pay royalties now amounting to nearly 68 percent of the average

7 selling price of a DVD recorder, the conspirators as members of these patent pools appear to pay

8 no royalties to the pools. This gives Defendants a tremendous advantage over any possible

9 competitor. In addition, the unique structure of the patent pools also acts as a vehicle for the

10 exchange of unit and revenue information, providing a systemic opportunity for facilitation and

11 enforcement of the ODD cartel.

12        227.    After the commercial success of the CD patent pool and its variants became evident

13 in the late 1990s, a great deal of interest then shifted to increasing the density of data storage in a

14 standard sized 5.25" optical disk. It might then become possible to store a reasonable amount

15 (enough to hold a movie) of high-quality digital video data on an optical disk.

16        228.    In 1995, ten titans from the consumer electronics industry formed a group to study

17 and promote a standard for the development of a DVD. Among these ten were Defendants Hitachi,

18 Sony and Toshiba. Philips also participated. Each member of this group was also a holder or

19 assignee of patents that in some way involved a use or application of DVD technology.

20        229.    Two competing camps of companies formed within the new standardization effort,

21 one led by Sony and Philips, the original developers of the CD standard, and the other by

22 Matsushita (Panasonic), Toshiba, and Time Warner. Under pressure from potential users in both

23 the computer industry and the entertainment industry, a DVD Forum was established to unify the

24 competing technological standards.

25        230.    All parties agreed to a single standard for next-generation DVD video disks, and

26 read-only data storage, but no agreement on writeable DVD data storage was reached. Sony and

27 Philips became the nucleus of a DVD "+" camp, while Pioneer, Hitachi, Matsushita (Panasonic),

28 Toshiba, Mitsubishi, JVC, and Time Warner formed a DVD "-" camp. The result was two sets of

incompatible write formats for DVDs, ultimately unified only by more complex products, "super multi" DVD drives capable of reading or writing all the incompatible formats, as well as CDs.

231.    The DVD video standard included the MPEG-2 video coding system, which utilized technology patented by different companies. An MPEG-2 patent pool was formed, in order to license the system. Unlike many later patent pools, the MPEG-2 patent pool was "open," with parties owning patents related to the MPEG-2 standard free to join, and royalties divided among the various patent owners in proportion to the number of patents contributed. Indeed, 25 companies ultimately joined in this patent pool.

232.    In theory, patent pools can have either positive or negative effects on competition and consumer welfare. To the extent that a patent pool reduces the transaction costs of locating and individually licensing patent rights for the dozens or even hundreds of patents owned by multiple parties that would be required to produce a product, a patent pool avoids the problem of "royalty stacking" (individual patent holders charging seemingly reasonable royalties that together create a socially undesirable, excessively high royalty burden), and eliminates the possibility that a "hold-out" owner of a required patent will attempt to charge an excessively high royalty. Thus, a patent pool can be an effective instrument to cut through "patent thickets."

233.    On the other hand, a patent pool can also be used as a mechanism to suppress competition between patented technologies, or downstream products using these patented technologies, and therefore be anticompetitive and harmful to consumers. Patent pools can also shelter weak patents from the challenge they would face if not part of a pool, effectively creating a competition-eliminating technology cartel. And patent pools can make it more difficult for a member to benefit from its independent investments in research and development, and therefore reduce incentives for further innovation.

234.    The MPEG patent pool is sometimes held up as a model of a "good" patent pool design. In that regard, it is important to note the MPEG template for a patent pool is significantly different from the DVD patent pools in three important dimensions. First, the MPEG licensing program was "open" to all parties who believed they had patents essential to the MPEG standard. Second, the MPEG licensing program had an independent, external administrator. Third, the

MPEG licensing program had standard, non-discriminatory licensing terms, applying to members and non-members alike. The DVD patent pools, however, lacked these three features, and the absence of these features created some of the opportunities for anticompetitive conduct that are described in this complaint.

235.    In December of 1998, core members of the DVD "+" camp formed a patent pool for their essential DVD-ROM and video patents. This consortium became known as the DVD3c patent pool. The original DVD3c patent pool was comprised of Philips Electronics/Philips IC, Sony and Pioneer. The DVD3c patent pool now consists of Philips, Sony, Pioneer Corp., Hitachi, Matsushita Electric Industrial Co., Ltd., Mitsubishi Electric Corp., Thomson Multimedia, Time Warner Inc., Toshiba Corp. and Victor Company of Japan Ltd. Thus, Defendants Pioneer, Philips, Sony, Hitachi and Toshiba are all participants in the DVD3c patent pool.

236.    In June of 1999, core members of the "-" camp formed their own, separate DVD-ROM and video patent pool, called the DVD6c patent pool. The original DVD6c patent pool was comprised of Toshiba, Hitachi, JVC, Time Warner, Matsushita and Mitsubishi. The DVD6c pool now consists of Hitachi, Mitsubishi Electric Corp., Panasonic Corp., Samsung, Sanyo Electric Co., Ltd., Sharp Corp., Toshiba, Victor Company of Japan, Ltd. and Warner Bros. Home Entertainment Inc. Thus, Defendants Hitachi, Samsung and Toshiba are all participants in the DVD6c pool.

237.    The royalties charged by the DVD patent pools are now truly huge relative to the total cost of manufacturing ODDs. Indeed, they account for the majority of manufacturing cost for a potential entrant.

238.    The DVD patent pool royalties now constitute a large barrier to entry by potential competitors. For example, the average worldwide price for a DVD burner, on an if-sold-OEM basis, was $30 in 2007, $25 in 2008, and $23 in 2009. In a December 2008 presentation, Hisashi Kato, of Japan's Mitsubishi Electric, estimated the royalty payable to four principal patent pools holding IP related to a DVD recorder to be $17 (of which $14 goes to the DVD6c and DVD3c pools). This is 68 percent of the average selling price of a DVD recorder in 2008, and presumably an even larger share of its cost.

239.     The alleged conspirators, who are members of these patent pools, appear to pay no royalties to the pools to which their parent companies belong, or to other patent owners cross-licensing their patents. This gives them an enormous – indeed, ruinous – competitive advantage relative to any potential entrant. Unlike the MPEG patent pool, and like the Philips/Sony CD patent pool, the DVD patent pools explicitly discriminate between members and non-members in offering terms for patent licenses.

240.     Although setting a high royalty is not *per se* illegal, it creates a huge barrier to the exercise of competitive pressures on price by new entrants in downstream product markets, since they can never lower prices below the floor set by the patent pool royalty, plus manufacturing cost. The incumbent firms of course can make large profits at this floor, since they can obtain the lowest possible manufacturing costs by subcontracting, and do not have to pay this large patent pool royalty, since their parents are the owners of the pools and exempt from payment of royalties.

241.     The only firms effectively left in the ODD industry are the firms who are members, or whose parents are owners, of the DVD patent pools. This is because the large royalty charged by the patent pool is a highly effective barrier keeping non-patent pool firms from entering the ODD marketplace. Competition among six such pool-related companies should still be more than enough pressure to drive prices down, though, closer to the much lower cost of making a DVD drive. What has prevented this is the impact from the price-fixing conspiracy, which has united these firms in an effort to prevent the more rapid price cuts that characteristically reflect continuing declines in production costs in this dynamic high tech industry.

### c.     The Patent Pools Facilitated Cartel Monitoring

242.     Another way in which the existence of the two patent pools facilitates price-fixing is by making it easier to monitor production and pricing by both the six conspirator firms accounting for 95 percent of industry production, and the small group of non-defendant firms producing the remainder of global output. This is because the terms of both the DVD3c and DVD6c patent pools require licensees to pay a royalty equal to the maximum of a fixed fee per unit produced, or a fixed percent of revenues from units sold. And, because the fixed fee has been such a large portion of the price of a unit in recent years, the royalty has effectively been a fixed per unit payment. Thus, *all*

1   *producers outside of the patent pools must report production statistics to the pool.* A price-fixing

2   conspiracy with access to the details of the royalty payments can easily determine whether

3   production by non-conspirators is causing unexpected shifts in industry output and prices, or

4   whether one of the six conspirators who are also members of the patent pool must be cheating on

5   cartel agreements on pricing or output.

6       243.    The model license agreement of the DVD3c pool requires licensees to report, on a

7   quarterly basis, the quantities of DVD products on which royalties are due, including specifying the

8   identities of the buyers; the trademarks used in connection with the DVD players; the net selling

9   price of the DVD players; and the quantities of DVD players sold.

10      244.    The model license agreement of the DVD6c pool requires licensees to report, on a

11  semi-annual basis, the quantities of DVD products on which royalties are due, the trademarks or

12  trade names used for such products, and a computation of the royalties due on the agreement.

13      245.    A unique feature of the DVD3c and DVD6c patent pools, which differentiates it

14  from other patent pools, is that they are administered by conspirator parents with majority

15  ownership of their joint ventures. The DVD3c pool is administered by Philips, while the DVD6c

16  pool is administered by Toshiba in Japan, Europe and Africa; Hitachi in Asia, Oceania and the

17  Middle East; and Panasonic in the Americas. Thus, the existence of the patent pools ensures that

18  sensitive competitive information such as sales volume and selling prices is received by

19  participants in the conspiracy, and not by an independent administrative entity. And circulation of

20  information from patent pool participant parent to their joint venture, or wholly owned ODD

21  business unit, and between conspirators is not difficult. Indeed, it is actually facilitated by the terms

22  of the licensing agreements. Parents and subsidiaries have numerous opportunities to meet with one

23  another while participating in patent pool administrative oversight and technical discussions, or in

24  management meetings for the joint venture subsidiaries.

25      246.    More egregiously, the model license agreement of the DVD6c specifically

26  contemplates sharing sensitive business information amongst members of the patent pool:

27              Licensee agrees that members of the DVD Patent Licensing Group
                may have access to the information contained in such reports
28              regarding the names of licensees, categories and model numbers of

the licensed products, total quantities of sales of such products and total royalties due under this Agreement.

247.     Both patent pools apparently also have "compliance" programs that require licensees to identify their suppliers and customers to the licensing administrator.

248.     The only available empirical study suggests that direct involvement by patent owners in administering a patent pool is quite rare. Of eighteen current patent pools examined, all *except* the two DVD patent pools had an independent or third party specialist pool administrator.[50] This presumably is because the patent owners in most other pools recognized the temptations (and legal antitrust dangers) of having industry participants collect detailed information on sales and unit shipments – and therefore pricing – of various licensed products by their licensees and competitors.

249.     To successfully enforce a price-fixing conspiracy, co-conspirators try to identify whether an unexpected change in price is the result of a co-conspirator cheating on cartel agreements, or the result of increased production or other events outside the control of the conspiracy. By granting pool members direct access to information on production and pricing by licensees external to the pool, the license administration arrangements in both DVD pools allow pool members to monitor external ODD sales and pricing, and therefore facilitate a more effective price-fixing conspiracy.

### 3.     Defendants' Participation in Trade and Business Organizations Provided Opportunities for Collusion

250.     During the Class Period, Defendants belonged to trade and business organizations that focused on ODDs and related industries, such as the Optical Storage Technology Association, the DVD Forum, the International Symposium of Optical Memory and the Blu-Ray Disc Association. During the Class Period, these organizations held multiple meetings and conferences attended by Defendants and their employees, which provided Defendants with the opportunity to meet, discuss, and agree upon their pricing of ODDs.

---

[50]    Although the DVD6c pool originally proposed to have a licensing agency administer its licensing program, it instead opted to have pool members divide up these duties among themselves along regional lines.

### a.    The Optical Storage Technology Association

251.    The Optical Storage Technology Association is an international trade association incorporated in 1992 to promote the use of recordable optical technologies and products. The organization's membership includes "optical product manufacturers and resellers from three continents, representing more than 85 percent of worldwide writable optical product shipments." The Optical Storage Technology Association states that its members "work to shape the future of the industry through regular meetings."

252.    From 2005 to 2008, the Optical Storage Technology Association's membership list included Defendants Pioneer Electronics (USA) Inc., Sony Corporation, Toshiba, LG Electronics, Lite-On IT Corporation, Philips Electronics, Samsung Electronics Co., Ltd., Samsung Techwin and NEC Technologies Inc., or related subsidiaries of the Defendants. On information and belief, the Optical Storage Technology Association met on multiple occasions each year from 2005 to 2008.

### b.    The DVD Forum

253.    The DVD Forum is an organization responsible for the licensing and distribution of DVD products whose "purpose is to exchange and disseminate ideas and information about the DVD Format and its technical capabilities, improvements and innovations." Defendants Pioneer, Hitachi, LG Electronics, Philips, Samsung, Sony, NEC and Toshiba are, or have been during the relevant time period, members of its steering committee. That is, each of the corporate family of Defendants involved in the cartel had a representative on the DVD Forum Steering Committee. In addition, Defendant Lite-On is a member of the organization. On information and belief, from 2005 to 2010, members of the DVD Forum met on multiple occasions each year.

254.    At the May 26, 2005 meeting in France, a representative from Sony was not in attendance, although Sony is a Steering Committee member. Toshiba took issue with Sony's absence and proposed an amendment to the Forum charter that required those committee members not making a "reasonable effort to advance the purposes of the Forum" essentially be required to withdraw as a Steering Committee member. A reasonable inference from Toshiba's reaction to Sony's absence at the Steering Committee meeting was that the presence of all parties in the ODD cartel at these trade meeting was necessary for an exchange of information and to police the

1    activities of the cartel. In fact, after Toshiba's admonition, Sony did not miss another Steering

2    Committee meeting in the following five years.

### c.   The International Symposium of Optical Memory

4    255.   The International Symposium of Optical Memory is an organization "concerned

5    with the materials, the physics, and the technology of optical memories and provides an

6    opportunity to share the latest information in these fields with the international research

7    community."

8    256.   From 2005 to 2008, the Optical Storage Technology Association's membership list

9    included Defendants Pioneer Corp., Hitachi, Hitachi Ltd., LG, LG Electronics Inc., NEC Corp.,

10   Philips, Samsung Electronics Co. Ltd., and Sony Corp. On information and belief, the International

11   Symposium of Optical Memory met on multiple occasions each year from 2005 to 2009.

### d.   The Blu-Ray Disc Association

13   257.   The Blu-Ray Disc Association is an industry consortium that develops and licenses

14   Blu-Ray Disc technology and is responsible for establishing format standards and promoting

15   business opportunities for Blu-Ray Disc. The Blu-Ray Disc Association is divided into three levels

16   of membership: the Board of Directors, Contributors, and General Members.

17   258.   The "Blu-ray Disc founder group" was started on May 20, 2002 by the

18   Massachusetts Institute of Technology and nine leading electronic companies, including

19   Defendants Sony, Philips, LG Electronics, Hitachi and Samsung. In order to enable more

20   companies to participate, it announced in May 2004 that it would form the Blu-Ray Disc

21   Association, which was inaugurated on October 4, 2004.

22   259.   The Board of Directors of the Blu-Ray Disc Association currently includes

23   Defendants Pioneer Corp., Hitachi, LG Electronics, Philips Consumer Electronics (a division of

24   Defendant Philips), Samsung and Sony. Contributors to the Blu-Ray Disc Association currently

25   include Defendants Lite-On and Toshiba.

### E.   Governmental Investigations into Price Fixing in the ODD Industry

27   260.   Defendants are currently under investigation by multiple governmental

28   organizations, including the United States Department of Justice ("DOJ") for anticompetitive

conduct in connection with the ODD industry. The United States' criminal investigation of the

ODD conspiracy is being conducted by the DOJ's Antitrust Division in the Northern District of

California.

**1.      Defendants Have Admitted that Multiple Governmental Organizations Are Investigating Price Fixing in the ODD Industry**

261.    On October 23, 2009, Sony disclosed its subsidiary's receipt of a subpoena from the

DOJ in its Form 6-K, filed with the Securities and Exchange Commission ("SEC"):

> Sony Corporation said today that its U.S. subsidiary, Sony Optiarc
> America Inc., has received a subpoena from the U.S. Department of
> Justice (DOJ) Antitrust Division seeking information about its optical
> disk drive business. Sony understands that the DOJ and agencies
> outside the United States are investigating competition in optical disk
> drives. Sony intends to cooperate fully with the DOJ and other
> agencies in this inquiry.

262.    In its Form 6-K, filed with the SEC on November 16, 2009, Hitachi admitted that its

subsidiary received a subpoena from the DOJ in June 2009 regarding price-fixing violations related

to ODDs. In its Form 20-F, filed with the SEC on June 29, 2010, Hitachi acknowledged it has also

received requests for information from the European Union and Singapore regulators for alleged

antitrust violations relating to ODDs:

> In June 2009, our subsidiary, Hitachi-LG Data Storage, received a
> grand jury subpoena in connection with an investigation conducted
> by the Antitrust Division of the U.S. Department of Justice and
> received requests for information from the European Commission,
> both in respect of alleged antitrust violations relating to optical disk
> drives. Also in June 2009, the Competition Commission of Singapore
> began an investigation of our subsidiary, Hitachi-LG Data Storage
> Korea, also in respect of alleged antitrust violations relating to
> optical disk drives.

263.    In its Form 20-F, filed with the SEC on February 22, 2010, Philips released its 2009

Annual Report and revealed for the first time that it and its subsidiary, PLDS, are also the subject

of the same international investigations:

> On October 27, 2009, the Antitrust Division of the United States
> Department of Justice confirmed that it had initiated an investigation
> into possible anticompetitive practices in the Optical Disc Drive
> (ODD) industry. Philips Lite-On Digital Solutions Corp. (PLDS), a
> joint venture owned by the Company and Lite-On IT Corporation, as
> an ODD market participant, is included in this investigation. PLDS is
> also subject to similar investigations outside the US relating to the

> ODD market. PLDS and Philips intend to cooperate with the authorities in these investigations.
>
> *     *     *
>
> These matters are in their initial stages and due to the considerable uncertainty associated with these matters, on the basis of current knowledge, the Company has concluded that potential losses cannot be reliably estimated with respect to these matters. An adverse final resolution of these investigations and litigation could have a materially adverse effect on the Company's consolidated financial position, results of operations and cash flows.

264.    On October 27, 2009, Defendant Toshiba also acknowledged that its ODD operation –TSST, its joint venture with Samsung – had received a subpoena from the DOJ in connection with its investigation into the ODD industry and that its ODD unit was also answering queries from authorities in other regions.

265.    It is significant that Defendants' anticompetitive behavior has been the subject of a criminal grand jury investigation by the DOJ. In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a detailed memorandum to that effect.[51] Following a review of the memorandum, the request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division, based on the standard that a criminal violation may have occurred. In addition, the fact that the DOJ Antitrust Division investigation is criminal, as opposed to civil, is significant as well. The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal Investigation" state: "[i]n general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations."[52] Accordingly, the existence of a criminal investigation into the ODD industry supports the existence of the conspiracy alleged herein.

---

[51]    *See* Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1 (1991) ("[i]f a Division attorney believes that a criminal violation of the antitrust laws has occurred, he should prepare a memorandum requesting authority to conduct a grand jury investigation.") (available at http://www.justice.gov/atr/public/guidelines/206542.htm).

[52]    *See* Antitrust Division Manual, Chapter III.C.5, III-20 (2009), (available at http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf).

### 2. The Department of Justice Has Admitted It Has Convened a Criminal Grand Jury to Investigate Defendants' Price Fixing in the ODD Market

266. The DOJ has confirmed that a grand jury is investigating criminal antitrust violations in the ODD industry: "The DOJ is currently assisting a grand jury investigating possible criminal antitrust violations in the optical disk drive ('ODD') industry."[53] The DOJ has further confirmed that: "The grand jury has issued subpoenas and is in the critical evidence gathering phase of its investigation."[54]

267. In light of this grand jury investigation, the DOJ requested that this Court stay discovery in these civil proceedings. In requesting this stay, the DOJ emphasized that although it has conducted many investigations into alleged criminal antitrust violations, it has rarely requested that a civil court stay discovery pending resolution of the criminal investigation. In fact, the government has only sought a stay in four matters. And of these four matters, it has declined to bring significant charges in only one instance:

> In the past decade, the Antitrust Division has conducted numerous investigations into alleged criminal antitrust violations in the Northern District of California. In only four of these matters has the government sought limited states to prevent civil litigation from impeding grand jury investigations[.] In each of these cases, the court has entered an order granting a stay. These matters are: dynamic random access memory ("DRAM"), static random access memory ("SRAM"), liquid crystal display ("TFT-LCD"), and cathode ray tube ("CRT"). In only one of these matters did the government decline to bring significant charges. The ODD investigation contains facts, issues, and concerns similar to these other investigations.[55]

268. Moreover, accompanying their motion to stay discovery in this case, the DOJ submitted a confidential declaration of Sidney A. Majalya detailing the criminal investigation into

---

[53]  *See* Memorandum of Points and Authorities in Support of the United States' Motion for a Limited Stay of Discovery at 3 (filed May 20, 2010, Ct. Rec. 68) ("DOJ Mot. to Stay"). Page references to the DOJ Mot. to Stay are to the PACER/ECF numbers found at the top right-hand corner of the page.

[54]  *See* Declaration of Sue Ann Slates in Support of Defendant United States Department of Justice, Antitrust Division's Motion for Summary Judgment, ¶ 10, *Lieff, Cabraser, Heimann & Bernstein, LLP v. U.S. Department of Justice Antitrust Division*, Case No. 3:10-cv-00013-VRW (filed Apr. 29, 2010, Ct. Rec. 15) ("Slates Decl."). Ms. Slates is the Chief of the Freedom of Information Act/Privacy Act Unit of the Antitrust Division of the DOJ in Washington, D.C. *Id.*, ¶ 1.

[55]  *See* DOJ Mot. to Stay at 3-4.

price fixing in the ODD industry, and arguing that this confidential submission "presents circumstances" that warrant a stay of discovery in this case.[56]

269. The DOJ has stated that it proceeds with a criminal proceeding in cases involving *per se* unlawful agreements, such as price-fixing, bid-rigging and horizontal market allocations:

> It is the Division's policy 'to proceed by criminal investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price-fixing, bid-rigging and horizontal customer and territorial allocations.' [footnote omitted] *Per se* violations of price-fixing, bid-rigging, and market allocations are generally prosecuted criminally, because they have been found to be unambiguously harmful, that is, *per se* illegal. Such cartel agreements have been shown to defraud customers and unquestionably raise prices or restrict output without creating any plausible offsetting benefit to consumers, unlike other business conduct that may be the subject of civil lawsuits by the Division. If proved, such activities violation Section 1 of the Sherman Act, 15 U.S.C. § 1.[57]

270. Given these statements by the DOJ, the most reasonable inference is that the government is in possession of evidence confirming that criminal antitrust violations have been committed in the ODD market, or believes that such evidence is likely to be discovered in the next year. The government's statements regarding the serious and unique nature of the grand jury investigation into the ODD industry and the Defendants support the existence of the conspiracy alleged in this complaint.

**3. Defendants' Agent Admits that the "Implied Promise" of the Grand Jury Investigation Is Criminal Indictments or Admissions of Guilt**

271. Defendants' counsel has also confirmed that indictments or plea agreements are more likely than not in the DOJ's criminal grand jury investigation. At a prior hearing before this Court, Defendants' agent, Daniel Wall, counsel for Toshiba and TSST, when arguing for all Defendants that a stay of discovery would not be harmful to Plaintiffs' rights stated:

> But the – but what we're talking about now is if there is a 12-month period of time when there isn't merits discovery into the nature of the cartel, why is that going to be beneficial? ***It's because something's going to happen in the next 12 months. The implied, you know, promise here is that within the next 12 months there's going to be***

---

[56] *See* DOJ Mot. at Stay at 5.

[57] *See* Slates Decl., ¶ 6.

1     *an indictment, there's going to be a plea agreement*, there's going
      to be something that an actually starts to reveal what it is that the
2     government thinks is going on here.

3         272.    That is, defense counsel believes that the "implied promise" of the grand jury

4   investigation is that significant criminal activities will be (or have been) uncovered and that

5   indictments or plea agreements will be forthcoming within the next twelve months. These

6   statements regarding the near certainty of indictments or admissions of criminal guilt further

7   support the existence of the conspiracy alleged in this complaint.

8         273.    This statement is admissible as a party admission under Federal Rule of Evidence

9   801(d)(2)(C) as a statement made by a person authorized by the party to make a statement

10  concerning the subject and Rule 801(d)(2)(D) as a statement by the party's agent or servant

11  concerning a matter within the scope of the agency or employment, made during the existence of

12  the relationship.

13  **F.     Defendants Have a History of Colluding to Fix Prices in Related Markets**

14        274.    Many of the Defendants have a long history of criminal collusion and are either

15  currently involved in worldwide investigations into other technology-related products, or have been

16  convicted of participating in price-fixing cartels involving technology-related products. Evidence

17  of Defendants' other price-fixing crimes are admissible pursuant to Federal Rule of Evidence

18  404(b), because the Defendants' past criminal acts tend to show a specific pattern of price-fixing

19  behavior and planning between defendants repeated throughout very similar technology industries,

20  among repeat players in these industries.

21        275.    The following chart summarizes the involvement of Defendants and their related

22  entities in the various price-fixing conspiracies:

| INDUSTRY | GOVERNMENT INVOLVED | DEFENDANTS IMPLICATED |
|---|---|---|
| LCD | Korea, Japan, United States | LG Electronics Inc. (joint venture), Koninklijke Philips Electronics N.V. (joint venture), Samsung Electronics Company, Ltd, Hitachi, Ltd. (subsidiary), Toshiba Corp. |
| DRAM | United States, European Commission | Samsung Electronics Company, Ltd, NEC Corp., Hitachi Ltd., Toshiba Corp. |

| INDUSTRY | GOVERNMENT INVOLVED | DEFENDANTS IMPLICATED |
|----------|---------------------|------------------------|
| CRT | Korea, Japan, United States, European Commission | Samsung (subsidiary), LG Electronics Inc. (joint venture), Koninklijke Philips Electronics N.V. (joint venture) |

    **1.**     **Defendants Have Been Charged With and Have Pleaded Guilty to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of LCD Panels and LCD Products Sold in the United States**

276. A number of the ODD Defendants have been implicated in a worldwide price-fixing conspiracy for thin film transistor liquid crystal displays ("TFT-LCD").

277. In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among LCD Panel manufacturers. In a December 11, 2006, filing with the SEC, LG Display Co. Ltd. ("LG Display") disclosed for the first time that officials from the Korea Fair Trade Commission and Japan Fair Trade Commission visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office. During the time period relevant to the LCD price-fixing conspiracy, LG Display was a joint venture between Defendants LG Electronics and Philips, with LG Electronics owning 37.9 percent and Philips owning 19.9 percent as of December 31, 2007.

278. On December 12, 2006, news reports indicated that in addition to LG Display, Samsung was also under investigation.

279. In November 2008, LG Display admitted and plead guilty to participating in the conspiracy from September 2001 through June 2006 to fix the price of LCD Panels sold worldwide, and to participating in meetings, conversations and communications in Taiwan, South Korea and the United States to discuss the prices of LCD Panels, agreeing to fix the prices of LCD Panels, and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. In connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, reported at the time as the second-highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the conspiracy.

280.   In addition, two LG Display executives have thus far pled guilty based on their respective roles in the global cartel. Each has been fined and has received prison sentences ranging from seven to twelve months:

- Chung Suk "C.S." Chung, an executive from LG Display. In connection with his guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

- Bock Kwon, an executive from LG Display. In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

281.   In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG Display, has been indicted for participating in the conspiracy to fix the price of LCD Panels sold worldwide from December 2001 through December 2005.

282.   As acknowledged in its Form 20-F, filed with the SEC on June 29, 2010, a subsidiary of Defendant Hitachi also plead guilty to price fixing in the LCD industry and paid a fine of $31 million to the DOJ in March 2009:

> Also in December 2006, Hitachi Displays, our subsidiary which was demerged and succeeded to our LCD operations, received a grand jury subpoena in connection with the investigation conducted by the Antitrust Division of the U.S. Department of Justice in respect of alleged antitrust violations relating to LCDs. In March 2009, Hitachi Displays pled guilty to one count of price fixing under the Sherman Act, for which it paid a fine of $31 million in June 2009.

283.   Although it has not been publicly acknowledged, it is widely believed that Samsung is in the DOJ leniency program with respect to the DOJ's investigation into the market for TFT-LCD, meaning that it has admitted its participation in the cartel. The TFT-LCD investigation is ongoing, and Toshiba as well as other entities remain under investigation. Such criminal investigation is being conducted by the San Francisco office of the DOJ's Antitrust Division.

**2.      Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the United States**

284.   Further, in 2005, Defendant Samsung agreed to plead guilty to participating in a price-fixing conspiracy involving dynamic random access memory ("DRAM") in the United States. DRAM is a common model for "dynamic" semiconductor memories for personal computers (PCs), servers and workstations. As part of its guilty plea, Samsung agreed to pay a fine of $300

million. It is believed that during the DRAM conspiracy, at least 48 Samsung officers and

employees, including senior executives with final pricing authority, had price-related contacts with

employees of Toshiba, NEC and Hitachi.

285.    A total of six Samsung executives have thus far pled guilty based on their respective

roles in the global cartel. Each has been fined $250,000, and the executives received prison

sentences ranging from seven to fourteen months. Among the Samsung individuals charged were

the vice presidents for marketing and sales for Samsung's memory division and the vice president

for marketing of memory products at Samsung Semiconductor (a United States subsidiary of

Samsung):

- Il Ung Kim – (Samsung Electronics – vice president of marketing for memory division) $250,000 fine and 14 month prison sentence.

- Sun Woo Lee (Samsung Electronics – senior manager DRAM sales) $250,000 fine and 8 month prison sentence.

- Yeongho Kang (Samsung Semiconductor – associate director of DRAM - marketing) $250,000 fine and 7 month prison sentence.

- Young Woo Lee (Samsung subsidiary in Germany – sales director) $250,000 fine and 7 month prison sentence.

- Thomas Quinn (Samsung Semiconductor – vice president of marketing for memory products) $250,000 fine and 8 month prison sentence.

- Young Hwan Park (formerly VP of sales at Samsung Electronics; currently president of Samsung Semiconductor) $250,000 fine and 10 month prison sentence.

- Young Bae Rha (Samsung Electronics – vice president of sales and marketing for memory division); Charged in October 2006 indictment and remains at large.

**3.      Defendants Have Admitted to Participating in Price-Fixing Meetings in the United States and for Fixing the Price of Dynamic Random Access Memory Sold in the European Union**

286.    In May 2010, a number of Defendants admitted to participating in a cartel to fix the

price of DRAM sold in the European Union and agreed to pay, collectively, 331 million Euros in

fines.

287.    As the European Commission found, the overall cartel was in operation between

July 1, 1998 and June 15, 2002. It involved a network of contacts and sharing of secret

1    information, mostly on a bilateral basis, through which they coordinated the price levels and

2    quotations for DRAM, sold to major PC or server OEMs in the European Economic Area.

3          288.    Several of the Defendants admitted to the participation in the DRAM price-fixing

4    cartel. Between December 2003 and February 2006, Defendants Samsung and NEC applied for

5    leniency under the European Union's Leniency Notice. Companies that are first to reveal cartels to

6    the Commission enjoy immunity from fines under the Commission's 2002 Leniency Notice.

7    Companies that cooperate in the investigation can receive significant reductions. Companies which

8    do not qualify for immunity may benefit from a reduction of fines if they provide evidence that

9    represents "significant added value" to that already in the Commission's possession and have

10   terminated their participation in the cartel. Evidence is considered to be of a "significant added

11   value" for the Commission when it reinforces its ability to prove the infringement of Europe's

12   antitrust laws.

13         289.    Both Samsung and NEC cooperated with the European Commission, supplying

14   information that provided significant added value in enabling the European Commission to prove

15   cartel infringement. The European Commission took account of their cooperation in the

16   investigation and granted a reduction of respectively 18 percent in the fine to both Samsung and

17   NEC. In total, Samsung was fined over 145 million Euros and NEC was jointly and severally liable

18   (along with its joint venture partners) for fines of approximately 21 million Euros.

19         290.    Hitachi and Toshiba each settled with the European Commission and agreed to pay

20   significant fines. Hitachi was jointly and severally liable (along with its joint venture partners) for

21   fines of over 31 million Euros, and the European Commission fined Toshiba over 17 million Euros.

### 4.    Governmental Investigations Have Revealed Defendants' Involvement in a Price-Fixing Conspiracy of Cathode Ray Tubes

23         291.    In addition, on October 7, 2009 in a cease and desist order, The Japan Fair Trade

24   Commission levied $37.4 million in fines against five companies, including a joint venture of

25   Defendants LG Electronics Inc. and Koninklijke Philips Electronics N.V., LG Philips Displays

26   Korea Co., and an arm of South Korea's Samsung group and their affiliates for alleged

27   participation in a price-fixing cartel for cathode ray tubes for televisions. Included amongst the

1    findings of the Japan Fair Trade Commission were that employees of LG Philips Display Korea

2    and Samsung, beginning around May 2003, formed an agreement to continuously hold meetings

3    about once every other month where they jointly set minimum target prices on a quarterly basis.

4          292.    In November 2009, the European Commission confirmed it had sent Statements of

5    Objections to "a number of companies active in the [CRT] industry." Although the European

6    Commission did not disclose who received the Statements of Objections, news reports confirmed

7    that Philips was among those targeted.

8          293.    In the United States, two former executives of Chunghwa, Cheng Yuan Lin and

9    Wen Jun Cheng (indicted separately in the TFT-LCD investigation), were indicted on charges by

10   the Department of Justice on charges related to the CRT investigation. More charges are

11   anticipated in the United States.

12                        IV.    TRADE AND COMMERCE

13         294.    During the Class Period, Defendants collectively controlled the vast majority of the

14   market for ODDs, both globally and in the United States.

15         295.    Defendants' unlawful activities, as described herein, took place within the flow of

16   interstate commerce to purchasers of ODD Products located in states other than the states in which

17   Defendants are located, as well as throughout the world, and had a direct, substantial and

18   reasonably foreseeable effect upon interstate and international commerce, including the United

19   States' market for ODD Products.

20         296.    A number of facts demonstrate that Defendants' price-fixing conspiracy had a

21   direct, substantial and reasonably foreseeable effect on domestic commerce. As alleged in this

22   complaint, one of the precipitating factors to the beginning of the conspiracy was the introduction

23   of electronic auctions by Dell and HP for the procurement of ODDs, among other products. In

24   response, Defendants began their illegal price-fixing activities.

25         297.    The procurement events held by Dell and HP occurred in the United States. For

26   large parts of the Class Period, HP's ODD purchasing occurred in Palo Alto, California and

27   Houston, Texas. For Dell, ODD purchasing took place in Austin, Texas during most of the Class

28

Period. As alleged above, these procurement events resulted in inflated prices due to Defendants' price and market allocation conspiracy.

298. Although Defendants' price-fixing conspiracy reaches beyond merely Dell and HP, price-fixing the auctions of these two OEMs alone had a direct, substantial and reasonably foreseeable effect on United States commerce. These two OEMs account for approximately 50 percent of the United States market for personal computers, accounting for roughly 10 million units shipped within the United States per year.

299. Products containing ODDs such as computers and Xbox game consoles are now ubiquitous across the United States. A report commissioned by hard drive manufacturer Seagate has found that seventy-six percent of Americans own a personal computer and thirty-eight percent own a videogame console.

300. According to the U.S. Census Bureau's Current Population Survey in October 2009, over 73 percent of the population had access to the Internet from their household (which would itself require access to a computer or other electronic device). The following chart provides the number of households and percentage of population by state:

| State | Individual lives in household with Internet Access | |
|---|---|---|
| | Number (in thousands) | Percent |
| **United States** | **212,719** | **73.5** |
| | | |
| Alabama | 2,742 | 61.7 |
| Alaska | 526 | 83.4 |
| Arizona | 4,638 | 74.3 |
| Arkansas | 1,729 | 63.4 |
| California | 26,388 | 75.6 |
| Colorado | 3,599 | 76.1 |
| Connecticut | 2,726 | 82.0 |
| Delaware | 638 | 76.5 |
| District of Columbia | 411 | 73.3 |
| Florida | 13,092 | 75.0 |
| Georgia | 6,737 | 73.0 |

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143-RS  
010177-12 640074 V1

- 96 -

| State | Individual lives in household with Internet Access | |
|---|---|---|
| | Number (in thousands) | Percent |
| Hawaii | 959 | 78.9 |
| Idaho | 1,139 | 77.5 |
| Illinois | 9,083 | 74.2 |
| Indiana | 4,230 | 69.5 |
| Iowa | 2,088 | 73.2 |
| Kansas | 1,994 | 75.8 |
| Kentucky | 2,658 | 65.5 |
| Louisiana | 2,724 | 65.8 |
| Maine | 978 | 77.7 |
| Maryland | 4,201 | 78.7 |
| Massachusetts | 5,095 | 81.7 |
| Michigan | 7,005 | 73.8 |
| Minnesota | 3,875 | 77.8 |
| Mississippi | 1,569 | 56.6 |
| Missouri | 3,884 | 69.5 |
| Montana | 643 | 69.6 |
| Nebraska | 1,291 | 77.0 |
| Nevada | 1,895 | 76.0 |
| New Hampshire | 1,069 | 84.7 |
| New Jersey | 6,853 | 83.0 |
| New Mexico | 1,224 | 65.0 |
| New York | 14,269 | 76.9 |
| North Carolina | 6,038 | 69.1 |
| North Dakota | 440 | 73.2 |
| Ohio | 7,936 | 72.6 |
| Oklahoma | 2,244 | 65.2 |
| Oregon | 2,951 | 80.6 |
| Pennsylvania | 8,787 | 74.3 |
| Rhode Island | 764 | 77.0 |
| South Carolina | 2,737 | 63.4 |
| South Dakota | 531 | 70.0 |
| Tennessee | 4,113 | 69.1 |
| Texas | 15,231 | 65.5 |
| Utah | 2,186 | 83.1 |
| Virginia | 5,492 | 75.4 |
| Vermont | 455 | 76.4 |

| State | Individual lives in household with Internet Access | |
|---|---|---|
| | Number (in thousands) | Percent |
| Washington | 5,119 | 81.7 |
| West Virginia | 1,150 | 66.9 |
| Wisconsin | 4,207 | 78.8 |
| Wyoming | 387 | 76.1 |

## V.    FRAUDULENT CONCEALMENT

301.    Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against the Indirect Purchaser Plaintiffs and the classes.

302.    Indirect Purchaser Plaintiffs did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until October 26, 2009 when it was first publicly reported that manufacturers of ODDs were under investigation by the antitrust authorities in the United States and elsewhere in the world for conspiring to fix prices of ODDs. This is because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination or conspiracy. Because Defendants' agreement, understanding and conspiracy were kept secret, Indirect Purchaser Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for ODD Products.

303.    Pioneer's role in the conspiracy alleged herein was not discovered, and could not have been discovered, until June 3, 2011(or a reasonable time thereafter), when the grand jury documents were first produced to the plaintiffs in this litigation. Prior to June 3, 2011, Pioneer's role as a conspirator was not publicly disclosed – the Pioneer entities did not acknowledge receiving a subpoena from the United States Department of Justice, nor did they publicly acknowledge any involvement in any criminal investigation relating to ODDs. Evidence of Pioneer's involvement in the conspiracy crystalized only after plaintiffs' review of grand jury documents on June 3, 2011, and recent deposition testimony.

304. Publicly, Pioneer stated that it maintained antitrust policies, which prohibited the type of collusion seen in this litigation. For example, in Pioneer's 2004 "Pioneer Group Code of Conduct," the company publicly stated that it maintained Fair Business Conducts [sic]:

> We maintain fair and transparent relationships with our business partners, engaging in fair transaction practices in accordance with applicable laws and regulations, such as an antitrust law.

> We do not take part in collusion, cartels, or similar activities with other companies within our industry that would unlawfully impede free competition, or any other activities that may give rise to such concerns.

305. Defendants engaged in a successful, illegal price-fixing conspiracy with respect to ODDs, which they affirmatively concealed, at least in the following respects:

a. By agreeing amongst themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

b. By agreeing amongst themselves to limit the number of representatives from each Defendant who were aware of the conspiracy, so as to avoid detection.

c. By agreeing to limit the number of written communications regarding the conspiracy, accomplished by oral communications via telephone or meeting face-to-face.

d. By agreeing to meet at locations where the conspiracy was less likely to be detected – such as in the lobby of a competitor's building rather than in the offices themselves.

306. As a further example, on at least one occasion, one of the co-conspirators had a face-to-face meeting with another co-conspirator at a location that he or she believed was far enough away from a customer's offices that they would not be seen.

307. During the Class Period, Defendants falsely stated to the public and industry sources that ODD manufacturers faced intense pricing in the ODD market:

a. For example, at an October 26, 2004 an investors' conference, Danny Liao, president of Lite-On stated that although it expected its fourth-quarter revenues to grow 10-12 percent sequentially due to seasonal effects, the company estimates its average gross margins to decrease 17-19 percent on falling OEM prices. Liao indicated that increasing competition for OEM

1    orders has pushed down quotations for 16x DVD burners to as low as $60. And he predicted that

2    some second-tier ODD makers in Taiwan will withdraw from the market in 2005.

3           b.     On November 30, 2004, Taiwanese makers of ODDs reported that OEM

4    quotations for 16x DVD burners, which had been remaining stable at $60-65 for a few months fell

5    to $55-58 due to increasing competition to meet orders from Dell, HP and other international PC

6    brands. The makers indicated that HLDS, TSST, Lite-On, BenQ and Pioneer were the main

7    competitors for 16x DVD burner OEM orders and that recently some makers had been cutting

8    prices in an attempt to receive more orders.

9           c.     On December 27, 2004, industry publications noted that "Competition in the

10   Taiwan optical-disc drive (ODD) market is heating up, with HLDS (Hitachi-LG Data Storage),

11   TSST (Toshiba-Samsung Storage Technology), NEC and Philips planning to offer additional ODD

12   lines next year. Market competition is expected to become more intense than in 2004, according to

13   Taiwan-based ODD makers."

14          d.     On July 7, 2005, Taiwan-based makers of ODDs informed industry press

15   that OEM quotations for 16x DVD burners dropped to $40 due to intense competition for orders

16   from leading vendors such as Pioneer, NEC, Lite-On, BenQ, HLDS and TSST. The price

17   represented a drop of 12-20 percent and the same sources suggested that future cuts were expected

18   to be much smaller, as the vendors' gross margins had already declined to low levels.

19          e.     On December 16, 2005, Lite-On stated that OEM prices for 16x DVD

20   burners had fallen as low as $35 and further reductions in price would depend on royalty changes.

21   Other ODD makers in Taiwan stated to the same trade publication that intensive price competition

22   is likely to push down OEM prices of 16x DVD Dual burners to $30 and that the only way to cope

23   with such price drops is to minimize production costs by expanding economy of scale.

24          f.     On July 30, 2006, it was reported that NEC had lowered its contract-

25   manufacturing quotes for 16x DVD burners from $35 to below $30, as a price war loomed among

26   the world's ODD markets, amid growing competition. Lite-On said in response that it had no plans

27   for follow suit.

28

g.      On February 8, 2007, industry journals reported that HLDS and TSST had

slashed prices for their OEM DVD burners to 10 percent lower than normal retail quotes in China

due to oversupply and weaker-than-expected Vista demand.

h.      On February 15, 2007, Lite-On indicated that OEM quotes for DVD burners

were slipping due to price competition from global leading makers such as TSST. Lite-On

indicated that the price competition may last until global demand for next-generation blue-laser

burners reached a certain level.

i.      On March 29, 2007, trade sources reported that Lite-On and TSST started

reducing quotes for 18x DVD models by 8-10 percent to clear out inventory and accelerate their

migration to 20x DVD burners.

308.    In addition, during the Class Period, Defendants gave false and pretextual reasons

for ODD Product price increases or price stabilization during the relevant period, and described

such pricing falsely as being the result of external causes rather than collusion:

a.      In August 2004, Lite-On raised its OEM quotation for half-height combo

drives by 3 to 5 percent to $35-40, according to Michael Gong, general manager of the company's

ODD unit. Gong attributed the increase in price to a shortage of pick-up heads produced by Japan-

based Sankyo. Gong also represented that Lite-On had been forced to cut its production by ten to

fifteen percent due to the short supply of pick-up heads.

b.      For example, in the latter part of 2004, after a period of decline, quotations

by Defendants to OEMs for 16x DVD-R players stabilized for a period of months. By September

of 2004, Taiwanese ODD makers were claiming that the prices of such burners would remain

stable for the remainder of the year.

c.      On December 15, 2004, leading ODD manufacturers reported that the short

supply of pick-up heads used in half-height and slim DVD burners and slip-type combo drives is

currently 20 to 30 percent short of the demand based on received orders. Michael Gong, the ODD

business general manager for Lite-On, indicated that the short supply of pick-up heads used in

ODDs is mainly attributable to growing adoption of slim-type DVD burners by main international

notebook PC brands as well as low yield rates for prisms, a key component of pick-up heads.

1          d.      On March 7, 2005, Lite-On president Danny Liao reported that the intense

2   price competition for the global ODD market seen in 2004 will slacken in 2005 because Japanese

3   players have forced out most of Taiwan's second-tier makers and almost all of China's

4   manufacturers.

5          e.      In June 2006, it was announced that Dell, HP and other PC vendors had

6   temporarily stopped their online procurement of ODDs mainly due to fewer competitors. BenQ had

7   just sold its ODD business unit to Lite-On and TSST decided not to join in such bidding. Michael

8   Gong of Lite-On confirmed the temporary stoppage of online bidding and said that it would help

9   OEM prices for ODDs to stay at a reasonable level.

10          f.      In May of 2007, ODD manufacturers reported supply capacities 10 to 20

11   percent below demand for international and notebook PC brands. Industry sources in Taiwan

12   reported that since April 2007, supply capacities from leading ODD manufacturers had been 10 to

13   20 percent below demand.

14          g.      In May of 2007, Sony NEC Optiarc, Inc. introduced its first BD-R player,

15   the BD-M100A. According to Digitimes, sources from Taiwan-based manufacturers of ODDs said

16   that since Sony NEC and Pioneer were members of the BDA, their pricing would be a reference for

17   other members who manufactured such an ODD, including Philips, LG Electronics and Samsung.

18          h.      In June of 2007, Charlie Tseng of the ODD unit of PLDS reported that while

19   aiming for large shipment volumes, PLDS would maintain steady profits and therefore would

20   maintain a minimum gross margin by refusing low-priced orders as well as not participating in

21   price-cutting competition.

22          i.      On August 23, 2007, the business division general manager of HLDS stated

23   that supply of pick-up heads was not expected to increase for the time being, and so the current

24   level of ODD prices were not expected to drop the following quarter.

25          j.      In October 2007, the component shortage of pick-up heads was intensifying,

26   and that HLDS was only able to meet 85 to 90 percent of its order volume due to a shortage of

27   main components. At the same time, Lite-On indicated its production capacity in China was

28   completely booked.

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143      - 102 -
RS
010177-12 640074 V1

1          k.     In February of 2008, prices on many ODDs that played BDs began to climb.

2   In August of 2008, personal computer vendors, including HP, Dell, Acer and Asustek Computer,

3   sought reductions in the OEM and Original Design Manufacturer ("ODM") prices of BD Combo

4   and BD-ROM drives. At the time, ODM/OEM quotations were at $120-$130 for a BD Combo

5   drive and $95-$100 for a BD-ROM drive, but computer vendors asked for the lowering of the

6   former by $20-$30 and the latter by $5-$10. Leading ODM/OEM makers, such as Pioneer, Lite-

7   On, HLDS and TSST were all steadfast in refusing to lower current quotations, however. Andy

8   Parsons, Chairman of the BDA and a Senior Vice-President of Pioneer, said in October of 2008

9   that the prices for BD players would not be coming down soon.

10          l.     In May 2008, Lite-On and Quanta announced they were planning to increase

11   their OEM pricing of ODDs by three to ten percent. Industry sources stated that the pricing

12   increases were due to an increase in the costs of key materials and components.

13          m.     In August 2008, it was reported that although PC vendors including HP,

14   Dell, Acer and Asustek Computer wanted considerably large reduction in ODM/OEM prices of BD

15   Combo and BD-ROM drives, none of the ODD manufacturers were willing to cut prices because

16   they were unable to keep down component costs and were reluctant to sacrifice profitability for

17   orders.

18          n.     In September 2008, it was reported that PC vendors including HP, Acer, and

19   Asustek Computer had asked ODD suppliers, including HLDS, TSST and Lite-On to decrease

20   quotes to less than $100 for BD Combo drives and $70-$80 for a BD-ROM drive as the main

21   condition for their adopting the devices in large volumes. The ODD suppliers were looking to

22   maintain profits in the BD segment, however, and were looking to avoid competition through

23   price-cuts, according to industry sources.

24        309.     In their filings with the SEC, Defendants repeatedly stated that they faced intense

25   price competition in the ODD market.

26        310.     For example, in its Form 20-F, filed with the SEC on August 20, 2004, Defendant

27   Hitachi stated:

28

The industrial sectors and business lines in which Hitachi is engaged are experiencing increasingly intense competition. Hitachi competes with diverse competitors ranging from huge global corporations to specialized companies. Competitors are increasingly manufacturing products, including sophisticated electronic products, in low-cost jurisdictions. Globalization of markets and commoditization of such products are making price competition in the business sectors in which Hitachi is engaged increasingly intense. *Products which are facing intense price competition or decreases in prices include computer-related products*, such as hard disk drives, disk array subsystems and *optical disk drives*, semiconductors, liquid crystal displays, digital media products and home appliances. To succeed in this competitive environment, Hitachi believes its products and services must be competitive in terms of price, engineering expertise, quality and brand value. Hitachi cannot be certain that each or any of the products or services that it offers will be competitive, and should each or any such products or services fail to be competitive, Hitachi's business results may be negatively affected.

311.    Hitachi repeated substantially the same statement in its subsequent Form 20-Fs, filed with the SEC on August 26, 2005, August 7, 2006, June 26, 2007 and July 27, 2009.

312.    In its Form 6-K, filed with the SEC on April 27, 2005, Defendant NEC stated that "increasingly harsh competition" had resulted in "a drop in average selling prices for optical disc drives." Substantially the same statement was repeated in NEC's Form 6-Ks, filed on May 31, 2005.

313.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

314.    The affirmative acts of Defendants and their co-conspirators alleged herein, among others, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. The conspirators knew their activities were illegal.

315.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing. The ODD industry is not exempt from antitrust regulation, and thus, before October 26, 2009 (and June 3, 2011 as it relates to the Pioneer defendants), Indirect Purchaser Plaintiffs reasonably considered it to be a well-regulated competitive industry.

316.    In the context of the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial. Accordingly, a reasonable person under the

1    circumstances would not have been alerted to investigate the legitimacy of Defendants' ODD

2    prices before October 26, 2009, and the involvement of the Pioneer defendants before June 3,

3    2011.

4         317.    Indirect Purchaser Plaintiffs could not have discovered the alleged contract,

5    conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the

6    deceptive practices and techniques of secrecy employed by the Defendants and their co-

7    conspirators to avoid detection of, and fraudulently conceal, their contract, combination or

8    conspiracy.

9         318.    Because the alleged conspiracy was both self-concealing and affirmatively

10    concealed by Defendants and their co-conspirators, Indirect Purchaser Plaintiffs had no knowledge

11    of the alleged conspiracy, or of any facts or information that would have caused a reasonably

12    diligent person to investigate whether a conspiracy existed, until October 26, 2009, when reports of

13    the investigations into price fixing in the ODD industry were first publicly disseminated and June

14    3, 2011 when plaintiffs first started to learn of the actions of the Pioneer defendants.

15         319.    None of the facts or information available to Indirect Purchaser Plaintiffs prior to

16    October 26, 2009, if investigated with reasonable diligence, could or would have led to the

17    discovery of the conspiracy alleged herein prior to October 26, 2009 and June 3, 2011 when

18    plaintiffs first started to learn of the actions of the Pioneer defendants.

19         320.    As a result of Defendants' fraudulent concealment of their conspiracy, the running

20    of any statute of limitations has been tolled with respect to any claims that Indirect Purchaser

21    Plaintiffs and members of the class have as a result of the anticompetitive conduct alleged in this

22    complaint.

23             **VI.    JURISDICTION AND VENUE**

24         321.    Indirect Purchaser Plaintiffs bring this action under Section 1 of the Sherman Act,

25    15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief against

26    all Defendants.

27         322.    Indirect Purchaser Plaintiffs also bring this action pursuant to state antitrust, unfair

28    competition and consumer protection laws to recover damages, restitution, disgorgement, costs of

1   suit, including reasonable attorneys' fees, for the injuries that Indirect Purchaser Plaintiffs and all

2   others similarly situated sustained as a result of Defendants' violations of those laws.

3        323.   The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over

4   Indirect Purchaser Plaintiffs' claims under Section 1 of the Sherman Act and Sections 4 and 16 of

5   the Clayton Act. The Court has supplemental jurisdiction over Indirect Purchaser Plaintiffs' state

6   law claims under 28 U.S.C. § 1367. The Indirect Purchaser Plaintiffs' state law claims are so

7   related to their claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton

8   Act that they form part of the same case or controversy.

9        324.   This Court also has subject matter jurisdiction over the state law claims pursuant to

10   the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection

11   (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of

12   Plaintiffs is a citizen of a state different from any Defendant and the aggregated amount in

13   controversy exceeds $5,000,000, exclusive of interest and costs." This Court also has jurisdiction

14   under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of a state within

15   the United States and one or more of the Defendants is a citizen or subject of a foreign state."

16        325.   This court has jurisdiction over each Defendant named in this action under both

17   Section 12 of the Clayton Act, 15 U.S.C. § 22 and California Code of Civil Procedure section

18   § 410.10. Each Defendant conducts substantial business in the state of California, and a number of

19   Defendants maintain their headquarters in this District or elsewhere in California. In addition,

20   Defendants all purposefully availed themselves of the laws of the United States and California

21   insofar as they manufactured ODDs for sale in the United States and California.

22        326.   Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22

23   and 28 U.S.C. § 1391, because each Defendant is either an alien corporation, transacts business in

24   this District, or is otherwise found within this District. In addition, venue is proper in this District

25   under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in

26   this District.

327.   Venue is also proper in this District pursuant to the April 2, 2010, Transfer Order by the United States Judicial Panel on Multidistrict Litigation, finding the Northern District of California and this Court to be the appropriate transferee forum.

## VII.   PARTIES

**A.   Indirect Purchaser Plaintiffs**

328.   Plaintiff Aaron Wagner is a resident of Phoenix, Arizona. During the Class Period and while residing in Arizona, Plaintiff Wagner indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants or their co-conspirators. Plaintiff Wagner suffered injury as a result of Defendants' conduct alleged herein. Hereinafter, Plaintiff Wagner is referred to as the "Arizona Plaintiff."

329.   Plaintiff Chris Johnson is a resident of Woodland Hills, California. During the Class Period and while residing in California, Plaintiff Johnson indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants or their co-conspirators. Plaintiff Johnson suffered injury as a result of Defendants' conduct alleged herein. Hereinafter, Plaintiff Johnson is referred to as the "California Plaintiff."

330.   Plaintiff Evan Jacobson is a resident of the District of Columbia. During the Class Period and while residing in D.C., Plaintiff Jacobson indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one of more Defendants or their co-conspirators. Plaintiff Jacobson suffered injury as a result of Defendants' conduct alleged herein. Hereinafter, Plaintiff Jacobson is referred to as the "D.C. Plaintiff."

331.   Plaintiff Lisa Melegari is a resident of Orlando, Florida. During the Class Period and while residing in Florida, Plaintiff Melegari indirectly purchased an ODD Product for her own use and not for resale that was manufactured by one or more Defendants or their co-conspirators. Plaintiff Melegari suffered injury as a result of Defendants' conduct alleged herein. Hereinafter, Plaintiff Melegari is referred to as the "Florida Plaintiff."

332.   Plaintiff Barney Gooman, Jr. is a resident of Honolulu, Hawaii. During the Class Period and while residing in Hawaii, Plaintiff Gooman indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants or their co-

1    conspirators. Plaintiff Gooman suffered injury as a result of Defendants' conduct alleged herein.

2    Hereinafter, Plaintiff Gooman is referred to as the "Hawaii Plaintiff."

3         333.    Plaintiff Benjamin Murray is a resident of Kansas City, Kansas. During the Class

4    Period and while residing in Kansas, Plaintiff Murray indirectly purchased an ODD Product for his

5    own use and not for resale that was manufactured by one or more Defendants or their co-

6    conspirators. Plaintiff Murray suffered injury as a result of Defendants' conduct alleged herein.

7    Hereinafter, Plaintiff Murray is referred to as the "Kansas Plaintiff."

8         334.    Plaintiff Thomas Stenger is a resident of Sebago, Maine. During the Class Period

9    and while residing in Maine, Plaintiff Stenger indirectly purchased an ODD Product for his own

10    use and not for resale that was manufactured by one or more Defendants or their co-conspirators.

11    Plaintiff Stenger suffered injury as a result of Defendants' conduct alleged herein. Hereinafter,

12    Plaintiff Stenger is referred to as the "Maine Plaintiff."

13         335.    Plaintiff James Ito-Adler is a resident of Belmont, Massachusetts. During the Class

14    Period and while residing in Massachusetts, Plaintiff Ito-Adler indirectly purchased an ODD

15    Product for his own use and not for resale that was manufactured by one or more Defendants or

16    their co-conspirators. Plaintiff Ito-Adler suffered injury as a result of Defendants' conduct alleged

17    herein. Hereinafter, Plaintiff Ito-Adler is referred to as the "Massachusetts Plaintiff."

18         336.    Plaintiff Sandra Steffen is a resident of Livonia, Michigan. During the Class Period

19    and while residing in Michigan, Plaintiff Steffen indirectly purchased an ODD Product for her own

20    use and not for resale that was manufactured by one or more Defendants or their co-conspirators.

21    Plaintiff Steffen suffered injury as a result of Defendants' conduct alleged herein. Hereinafter,

22    Plaintiff Steffen is referred to as the "Michigan Plaintiff."

23         337.    Plaintiff Alex Bissen is a resident of Minneapolis, Minnesota. During the Class

24    Period and while residing in Minnesota, Plaintiff Bissen indirectly purchased an ODD Product for

25    his own use and not for resale that was manufactured by one or more Defendants or their co-

26    conspirators. Plaintiff Bissen suffered injury as a result of Defendants' conduct alleged herein.

27    Hereinafter, Plaintiff Bissen is referred to as the "Minnesota Plaintiff."

28

1        338.    Plaintiff Benjamin Faber is a resident of Columbia, Missouri. During the Class

2    Period and while residing in Missouri, Plaintiff Faber indirectly purchased an ODD Product for his

3    own use and not for resale that was manufactured by one or more Defendants or their co-

4    conspirators. Plaintiff Faber suffered injury as a result of Defendants' conduct alleged herein.

5    Hereinafter, Plaintiff Faber is referred to as the "Missouri Plaintiff."

6        339.    Plaintiff Matthew Hosking is a resident of Helena, Montana. During the Class

7    Period and while residing in Montana, Plaintiff Hosking indirectly purchased an ODD Product for

8    his own use and not for resale that was manufactured by one or more Defendants or their co-

9    conspirators. Plaintiff Hosking suffered injury as a result of Defendants' conduct alleged herein.

10   Hereinafter, Plaintiff Hosking is referred to as the "Montana Plaintiff."

11       340.    Plaintiff Cindy Booze is a resident of Lincoln, Nebraska. During the Class Period

12   and while residing in Nebraska, Plaintiff Booze indirectly purchased an ODD Product for her own

13   use and not for resale that was manufactured by one or more Defendants or their co-conspirators.

14   Plaintiff Booze suffered injury as a result of Defendants' conduct alleged herein. Hereinafter,

15   Plaintiff Booze is referred to as the "Nebraska Plaintiff."

16       341.    Plaintiff Matthew Ence is a resident of Minden, Nevada. During the Class Period

17   and while residing in Nevada, Plaintiff Ence indirectly purchased an ODD Product for his own use

18   and not for resale that was manufactured by one or more Defendants or their co-conspirators.

19   Plaintiff Ence suffered injury as a result of Defendants' conduct alleged herein. Hereinafter,

20   Plaintiff Ence is referred to as the "Nevada Plaintiff."

21       342.    Plaintiff Evan Ravenelle is a resident of Manchester, New Hampshire. During the

22   Class Period and while residing in New Hampshire, Plaintiff Ravenelle indirectly purchased an

23   ODD Product for his own use and not for resale that was manufactured by one or more Defendants

24   or their co-conspirators. Plaintiff Ravenelle suffered injury as a result of Defendants' conduct

25   alleged herein. Hereinafter, Plaintiff Ravenelle is referred to as the "New Hampshire Plaintiff."

26       343.    Plaintiff Michael Reilly is a resident of Albuquerque, New Mexico. During the

27   Class Period and while residing in New Mexico, Plaintiff Reilly indirectly purchased an ODD

28   Product for his own use and not for resale that was manufactured by one or more Defendants or

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143      - 109 -
RS

010177-12 640074 V1

1    their co-conspirators. Plaintiff Reilly suffered injury as a result of Defendants' conduct alleged

2    herein. Hereinafter, Plaintiff Reilly is referred to as the "New Mexico Plaintiff."

3        344.    Plaintiff Susie Lim is a resident of New York, New York. During the Class Period

4    and while residing in New York, Plaintiff Lim indirectly purchased an ODD Product for her own

5    use and not for resale that was manufactured by one or more Defendants or their co-conspirators.

6    Plaintiff Lim suffered injury as a result of Defendants' conduct alleged herein. Hereinafter,

7    Plaintiff Lim is referred to as the "New York Plaintiff."

8        345.    Plaintiff Angela Pritchard is a resident of Lexington, North Carolina. During the

9    Class Period and while residing in North Carolina, Plaintiff Pritchard indirectly purchased an ODD

10   Product for her own use and not for resale that was manufactured by one or more Defendants or

11   their co-conspirators. Plaintiff Pritchard suffered injury as a result of Defendants' conduct alleged

12   herein. Hereinafter, Plaintiff Pritchard is referred to as the "North Carolina Plaintiff."

13       346.    Plaintiff Mike Bishop is a resident of Portland, Oregon. During the Class Period and

14   while residing in Oregon, Plaintiff Bishop indirectly purchased an ODD Product for his own use

15   and not for resale that was manufactured by one or more Defendants or their co-conspirators.

16   Plaintiff Bishop suffered injury as a result of Defendants' conduct alleged herein. Hereinafter,

17   Plaintiff Bishop is referred to as the "Oregon Plaintiff."

18       347.    Plaintiff Kimberly Wood is a resident of Enville, Tennessee. During the Class

19   Period and while residing in Tennessee, Plaintiff Wood indirectly purchased an ODD Product for

20   her own use and not for resale that was manufactured by one or more Defendants or their co-

21   conspirators. Plaintiff Wood suffered injury as a result of Defendants' conduct alleged herein.

22   Hereinafter, Plaintiff Wood is referred to as the "Tennessee Plaintiff."

23       348.    Plaintiff Benjamin Porter is a resident of North Salt Lake, Utah. During the Class

24   Period and while residing in Utah, Plaintiff Porter indirectly purchased an ODD Product for his

25   own use and not for resale that was manufactured by one or more Defendants or their co-

26   conspirators. Plaintiff Porter suffered injury as a result of Defendants' conduct alleged herein.

27   Hereinafter, Plaintiff Porter is referred to as the "Utah Plaintiff."

28

349.     Plaintiff Gail Murphy was a resident at all relevant times of Shelburne, Vermont. During the Class Period and while residing in Vermont, Plaintiff Murphy indirectly purchased an ODD Product for her own use and not for resale that was manufactured by one or more Defendants or their co-conspirators. Plaintiff Murphy suffered injury as a result of Defendants' conduct alleged herein. Hereinafter, Plaintiff Murphy is referred to as the "Vermont Plaintiff."

350.     Plaintiff John McKee is a resident of Green Bay, Wisconsin. During the Class Period and while residing in Wisconsin, Plaintiff McKee indirectly purchased an ODD Product for his own use and not for resale that was manufactured by one or more Defendants or their co-conspirators. Plaintiff McKee suffered injury as a result of Defendants' conduct alleged herein. Hereinafter, Plaintiff McKee is referred to as the "Wisconsin Plaintiff."

**B.      Defendants**

351.     Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi l-chome, Chiyoda-ku, Tokyo 100-8280, Japan. During the Class Period, Hitachi designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

352.     Defendant LG Electronics, Inc. is a Korean entity headquartered at LG Twin Towers 20, Yoido-dong, Youngdungpo-gu, Seoul, South Korea 150-721. During the Class Period, LG Electronics designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

353.     Hitachi-LG Data Storage, Inc. is a joint venture between Defendants Hitachi, Ltd. and LG Electronics, Inc., with its principal place of business located at 4F MSC Center Bldg., 22-23, Kaigan 3-chome, Minato-Ku, Tokyo 108-0022, Japan. Hitachi, Ltd. owns 51 percent of the stock in HLDS, while LG Electronics owns the remaining 49 percent. Hitachi and LG Electronics jointly control and direct the operations of Hitachi-LG Data Storage, Inc. Hitachi-LG Data Storage, Inc. was established in November of 2000 and started operation in January of 2001. Between 2001 and 2005 Hitachi-LG Data Storage, Inc. sold over 170 million optical disk drives, generating approximately $5.5 billion in total revenues. During the Class Period, Hitachi-LG Data Storage,

1   Inc. designed and/or manufactured ODDs with the intent and agreement to distribute throughout

2   the United States.

3   354.   Hitachi-LG Data Storage Korea, Inc. is a joint venture between Defendants Hitachi

4   and LG Electronics, with its principal place of business located at LG Gasan Digital Center, 459-9

5   Gasan-dong, Geumceon-gu, Seoul, 153-803 Korea. Hitachi owns 51 percent of the stock in

6   Hitachi-LG Data Storage Korea, Inc., while LG Electronics owns the remaining 49 percent. Hitachi

7   and LG Electronics jointly control and direct the operations of Hitachi-LG Data Storage Korea,

8   Inc. Hitachi-LG Data Storage Korea, Inc. was established in November of 2000 and started

9   operation in January of 2001. Between 2001 and 2005, Hitachi-LG Data Storage Korea, Inc. sold

10   over 170 million optical disk drives, generating approximately $5.5 billion in total revenues.

11   During the Class Period, Hitachi-LG Data Storage Korea, Inc. designed and/or manufactured

12   ODDs with the intent and agreement to distribute throughout the United States.

13   355.   Defendant BenQ Corporation is a Taiwanese company, with its principal place of

14   business at 16 Jihu Rd., Neihu, Taipei 114, Taiwan. During the Class Period, BenQ Corporation,

15   designed and/or manufactured ODDs with the intent and agreement to distribute throughout the

16   United States.

17   356.   Defendant BenQ America Corp. is a California corporation with its principal place

18   of business at 15375 Barranca Parkway, Suite A-205, Irvine, California 92618. BenQ America

19   Corp. is a wholly owned and controlled subsidiary of BenQ Corporation. During the Class Period,

20   BenQ America Corp. designed and/or manufactured ODDs with the intent and agreement to

21   distribute throughout the United States.

22   357.   Defendant Koninklijke Philips Electronics N.V. (translated into English as Royal

23   Philips Electronics) is a Dutch company with its principal place of business at Amstelplein 2,

24   Breitner Center, PO Box 77900, Amsterdam, 1070 MX, The Netherlands. During the Class Period,

25   Philips designed and/or manufactured ODDs with the intent and agreement to distribute throughout

26   the United States.

27   358.   Defendant Lite-On IT Corporation is a Taiwanese company with its principal place

28   of business at 12-15F, 392, Ruey Kuang Road, Taipei City, TAP 11492, Taiwan. During the Class

1    Period, Lite-On designed and/or manufactured ODDs with the intent and agreement to distribute

2    throughout the United States.

3         359.    Defendant Philips & Lite-On Digital Solutions Corp. is a Taiwanese company with

4    its principal place of business at 16F, 392, Ruey Kuang Road, Taipei City, TAP 11492, Taiwan.

5    Philips & Lite-On Digital Solutions Corp. is a joint venture established in 2007 between Philips

6    and Lite-On. During the Class Period, Philips & Lite-On Digital Solutions Corp. designed and/or

7    manufactured ODDs with the intent and agreement to distribute throughout the United States.

8         360.    Defendant Philips & Lite-On Digital Solutions USA, Inc. is a subsidiary of Philips

9    & Lite-On Digital Solutions Corp. and is a Delaware corporation with its principal place of

10   business at 42000 Christy St., Fremont, California 94538. During the Class Period, Philips & Lite-

11   On Digital Solutions USA, Inc. designed and/or manufactured ODDs with the intent and agreement

12   to distribute throughout the United States.

13        361.    Defendant Sony Corp. is a Japanese company with its principal place of business at

14   1-7-1 Konan, Minato-ku, Tokyo 108-0075, Japan. During the Class Period, Sony designed and/or

15   manufactured ODDs with the intent and agreement to distribute throughout the United States.

16        362.    Defendant NEC Corporation is a Japanese company with its principal place of

17   business at 7-1 Shiba, 5-chome, Minato-Ku, Tokyo, 108-8001, Japan. Prior to 2008, NEC owned

18   45 percent of Defendant Sony Optiarc, Inc. During the Class Period, NEC Corporation designed

19   and/or manufactured ODDs with the intent and agreement to distribute throughout the United

20   States.

21        363.    Defendant Sony NEC Optiarc, Inc. was a Japanese company with its headquarters

22   located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan. Defendant Sony NEC Optiarc,

23   Inc. was created on April 3, 2006 as a joint venture between Defendants Sony and NEC in which

24   Sony had a 55 percent interest and NEC had a 45 percent interest. Sony purchased NEC's interest

25   in Sony NEC Optiarc, Inc. in 2008 and renamed it Sony Optiarc, Inc. Sony and NEC exercised

26   joint control over Sony NEC Optiarc, Inc. During the Class Period, Sony NEC Optiarc, Inc.

27   designed and/or manufactured ODDs with the intent and agreement to distribute throughout the

28   United States.

364.    Defendant Sony Optiarc, Inc. is a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan. Prior to its formation in 2008, defendant Sony Optiarc, Inc. was a joint venture between Defendants Sony and NEC called Sony NEC Optiarc, Inc. On September 11, 2008, Sony purchased NEC's interest in Sony NEC Optiarc, Inc. The company was subsequently renamed Sony Optiarc, Inc. In 2008, Sony Optiarc, Inc. reported revenues of $1.52 billion. During the Class Period, Sony Optiarc, Inc. designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

365.    Defendant Sony Optiarc America, Inc. is a wholly owned subsidiary of defendant Sony Optiarc, Inc. Defendant Sony Optiarc America, Inc. is a Delaware corporation with its business headquarters located at 1730 N. 1st Street, San Jose, California 95112. During the Class Period, Sony Optiarc America, Inc. designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

366.    Defendant Samsung Electronics Co., Ltd. is a Korean company with its principal place of business at 1320-10, Seocho 2-dong, Seocho-gu, Seoul 137-857, South Korea. During the Class Period, Samsung designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

367.    Defendant Toshiba Corp. is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the Class Period, Toshiba designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

368.    Defendant Toshiba Samsung Storage Technology Corp. is a joint venture of Defendants Toshiba and Samsung that was established on April 1, 2004. Toshiba owns 51 percent of the stock in Toshiba Samsung Storage Technology Corp., while Samsung owns the remaining 49 percent. Toshiba Samsung Storage Technology Corp. and Toshiba share corporate headquarters, which are located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. Toshiba Corp. and Samsung Electronics Co. Ltd. jointly control Toshiba Samsung Storage Technology Corp. Toshiba Samsung Storage Technology Corp. forecasted revenue of ¥250 billion in fiscal 2004, when it was

1   established. During the Class Period, Toshiba Samsung Storage Technology Corp. designed and/or

2   manufactured ODDs with the intent and agreement to distribute throughout the United States.

3   369.   Defendant Toshiba Samsung Storage Technology Corp. Korea is a joint venture of

4   Defendants Toshiba and Samsung that was established on April 1, 2004. Toshiba owns 51 percent

5   of the stock in Toshiba Samsung Storage Technology Corp. Korea, while Samsung owns the

6   remaining 49 percent. Toshiba Samsung Storage Technology Corp. Korea is a business entity

7   organized under the laws of South Korea with its principal place of business located at Digital

8   Empire 2, 486-1, Sin-dong, Yeongton-gu, Suwon-si, Gyonggi-do, Korea 443-734. Toshiba and

9   Samsung jointly control Toshiba Samsung Storage Technology Corp. Korea. During the Class

10   Period, Toshiba Samsung Storage Technology Corp. Korea designed and/or manufactured ODDs

11   with the intent and agreement to distribute throughout the United States.

12   370.   Defendant Panasonic Corporation, is a Japanese entity with its principal place of

13   business at 1006 Oaza Kadoma, Kadoma, Osaka 571-8501, Japan. Up until October 1, 2008,

14   Panasonic Corporation was known as Matsushita Electric Industrial Co., Ltd. During the Class

15   Period, Panasonic Corporation designed and/or manufactured ODDs with the intent and agreement

16   to distribute throughout the United States.

17   371.   Defendant Panasonic Corporation of North America, formerly known as Matsushita

18   Electric Corporation of America, is a Delaware corporation with its principal place of business at 1

19   Panasonic Way, Secaucus, New Jersey. Panasonic Corporation of North America is a wholly

20   owned and controlled subsidiary of Panasonic Corporation. During the Class Period, Panasonic

21   Corporation of North America designed and/or manufactured ODDs with the intent and agreement

22   to distribute throughout the United States.

23   372.   Defendant TEAC America Inc. is a business entity organized under the laws of

24   California, with its principal place of business at 7733 Telegraph Rd., Montebello, California,

25   90640. TEAC America Inc. is a wholly owned subsidiary of Defendant TEAC Corporation. During

26   the Class Period, TEAC America Inc. designed and/or manufactured ODDs with the intent and

27   agreement to distribute throughout the United States.

28

373. Defendant TEAC Corporation is a Japanese company with its principal place of business at 47 Ochiai 1-chome, Tama-shi, Tokyo 206-8530, Japan. TEAC Corporation controls TEAC America Inc. During the Class Period, TEAC Corporation designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

374. Defendant Quanta Storage America, Inc. is a California corporation with its principal place of business in Fremont, California . Quanta America is a wholly owned and controlled subsidiary of Defendant Quanta Storage, Inc. During the Class Period, Quanta America designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

375. Defendant Quanta Storage Inc. is a Taiwanese entity with its principal place of business at 3F, No.188, Wenhua 2nd Rd., Guishan Shiang, Taoyuan County 333, Taiwan. Quanta Storage was incorporated on February 10, 1999 in Taoyuan County, Taiwan. During the Class Period Quanta Storage designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

376. Defendant Pioneer Electronics (USA) Inc. ("Pioneer USA") is a U.S. company with its principal place of business at 1925 E Dominguez Street, Long Beach, California 90810. During the Class Period, Pioneer USA designed, manufactured and distributed ODDs throughout the United States. Defendant Pioneer USA is a wholly owned subsidiary of defendant Pioneer North America, Inc.

377. Defendant Pioneer North America, Inc. ("Pioneer N.A.") is a U.S. company with its principal place of business at 1925 E Dominguez Street, Long Beach, California 90810. During the Class Period, Pioneer N.A. designed, manufactured and/or distributed ODDs throughout the United States. Defendant Pioneer N.A is a wholly owned subsidiary of defendant Pioneer Corporation.

378. Defendant Pioneer Corporation is a Japanese company with its headquarters located at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa 212-0031, Japan. During the Class Period, Pioneer Corporation designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

1    379.   Defendant Pioneer High Fidelity Taiwan Co., Ltd. is a Taiwanese company with its

2    principal place of business at 13th Floor, No. 44, Chung Shan North Road, Sec. 2, Taipei, Taiwan,

3    Republic of China. During the Class Period, Pioneer Corporation designed and/or manufactured

4    ODDs with the intent and agreement to distribute throughout the United States.

5                    **VIII.   CLASS ACTION ALLEGATIONS**

6    380.   Indirect Purchaser Plaintiffs bring this action on their own behalf and on behalf of a

7    class of persons pursuant to Federal Rules of Civil Procedure 23. The Class is defined as follows:

8              All persons and entities residing in the United States who indirectly
               purchased a new ODD Product during the Class Period for their own
9              use and not for resale that contained an ODD manufactured by one or
               more Defendants or their co-conspirators.
10

11   Excluded from the class are Defendants; the officers, directors or employees of any Defendant; any

12   entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir

13   or assign of any Defendant. Also excluded are any federal, state, or local governmental entities,

14   any judicial officers presiding over this action and the members of his/her immediate family and

15   judicial staff, and any juror assigned to this action.

16   381.   In the event California law is not applied to the claims of all Class members for

17   damages regardless of where they reside, Plaintiffs will seek certification of the following

18   subclasses (collectively, the "State Classes") for damages for claims under the antitrust statutes

19   and/or consumer protection statutes of each of the following jurisdictions:

20         a.   **Arizona Indirect Purchaser Class**: All persons and entities who, as

21   residents of Arizona, indirectly purchased a new ODD Product during the Class Period for their

22   own use and not for resale that contained an ODD manufactured by one or more Defendants or

23   their co-conspirators.

24         b.   **California Indirect Purchaser Class**: All persons and entities who, as

25   residents of California, indirectly purchased a new ODD Product during the Class Period for their

26   own use and not for resale that contained an ODD manufactured by one or more Defendants or

27   their co-conspirators.

28

1          c.     **District of Columbia Indirect Purchaser Class**: All persons and entities

2   who, as residents of the District of Columbia, indirectly purchased a new ODD Product during the

3   Class Period for their own use and not for resale that contained an ODD manufactured by one or

4   more Defendants or their co-conspirators.

5          d.     **Florida Indirect Purchaser Class**: All persons and entities who, as

6   residents of Florida, indirectly purchased a new ODD Product during the Class Period for their own

7   use and not for resale that contained an ODD manufactured by one or more Defendants or their co-

8   conspirators.

9          e.     **Hawaii Indirect Purchaser** Class: All persons and entities who, as residents

10  of Hawaii, indirectly purchased a new ODD Product during the Class Period for their own use and

11  not for resale that contained an ODD manufactured by one or more Defendants or their co-

12  conspirators.

13         f.     **Kansas Indirect Purchaser Class**: All persons and entities who, as

14  residents of Kansas, indirectly purchased a new ODD Product during the Class Period for their own

15  use and not for resale that contained an ODD manufactured by one or more Defendants or their co-

16  conspirators.

17         g.     **Maine Indirect Purchaser Class**: All persons and entities who, as residents

18  of Maine, indirectly purchased a new ODD Product during the Class Period for their own use and

19  not for resale that contained an ODD manufactured by one or more Defendants or their co-

20  conspirators.

21         h.     **Massachusetts Indirect Purchaser Class**: All persons and entities who, as

22  residents of Massachusetts, indirectly purchased a new ODD Product during the Class Period for

23  their own use and not for resale that contained an ODD manufactured by one or more Defendants

24  or their co-conspirators.

25         i.     **Michigan Indirect Purchaser Class**: All persons and entities who, as

26  residents of Michigan, indirectly purchased a new ODD Product during the Class Period for their

27  own use and not for resale that contained an ODD manufactured by one or more Defendants or

28  their co-conspirators.

j.  **Minnesota Indirect Purchaser Class**: All persons and entities who, as residents of Minnesota, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

k.  **Missouri Indirect Purchaser Class**: All persons and entities who, as residents of Missouri, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

l.  **Montana Indirect Purchaser Class**: All persons and entities who, as residents of Montana, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

m.  **Nebraska Indirect Purchaser Class**: All persons and entities who, as residents of Nebraska, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

n.  **Nevada Indirect Purchaser Class**: All persons and entities who, as residents of Nevada, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

o.  **New Hampshire Indirect Purchaser Class**: All persons and entities who, as residents of New Hampshire, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

p.  **New Mexico Indirect Purchaser Class**: All persons and entities who, as residents of New Mexico, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

q.      **New York Indirect Purchaser Class**: All persons and entities who, as residents of New York, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

r.      **North Carolina Indirect Purchaser Class**: All persons and entities who, as residents of North Carolina, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

s.      **Oregon Indirect Purchaser Class**: All persons and entities who, as residents of Oregon, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

t.      **Tennessee Indirect Purchaser Class**: All persons and entities who, as residents of Tennessee, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

u.      **Utah Indirect Purchaser Class**: All persons and entities who, as residents of Utah, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

v.      **Vermont Indirect Purchaser Class**: All persons and entities who, as residents of Vermont, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

w.      **Wisconsin Indirect Purchaser Class**: All persons and entities who, as residents of Wisconsin, indirectly purchased a new ODD Product during the Class Period for their own use and not for resale that contained an ODD manufactured by one or more Defendants or their co-conspirators.

1    382.    Excluded from the State Classes are Defendants; the officers, directors or employees

2    of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate,

3    legal representative, heir or assignee of any Defendant. Also excluded are any federal, state, or

4    local governmental entities, any judicial officer presiding over this action and the members of

5    his/her immediate family and judicial staff, and any juror assigned to this action.

6    383.    The persons in the Class and State Classes are so numerous that individual joinder

7    of all members is impracticable under the circumstances of this case. Although the precise number

8    of such persons is unknown, the exact size of the Class and State Classes is easily ascertainable, as

9    each class member can by identified by using Defendants' records and/or the records of its

10   distributors or retailers. Plaintiffs are informed and believe that there are many thousands of Class

11   and State Class members.

12   384.    Indirect Purchaser Plaintiffs' claims are typical of the claims of the Class and State

13   Classes in that Indirect Purchaser Plaintiffs are indirect purchasers of ODDs, all Class members

14   were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged

15   herein, and the relief sought is common to the Class.

16   385.    There are common questions of law and fact specific to the Class and State Classes

17   that predominate over any questions affecting individual members, including:

18       a.    Whether Defendants engaged in a contract, combination, and/or conspiracy

19   to fix, raise, maintain, or stabilize prices of ODDs sold in the United States.

20       b.    Whether Defendants engaged in a contract, combination, and/or conspiracy

21   to restrict output of ODDs sold in the United States.

22       c.    Whether Defendants' conduct caused the prices of ODDs and ODD Products

23   sold in the United States to be at artificially high and noncompetitive levels;

24       d.    Whether Indirect Purchaser Plaintiffs and the other members of the Class

25   and State Classes were injured by Defendants' conduct, and, if so, the appropriate class-wide

26   measure of damages for class members.

27

28

1        e.     Whether Indirect Purchaser Plaintiffs and the other members of the Class

2    and State Classes are entitled to, among other things, injunctive relief, and if so, the nature and

3    extent of such injunctive relief.

4        386.    These and other questions of law and fact are common to the Class and State

5    Classes, and predominate over any questions affecting only individual class members.

6        387.    Plaintiffs' claims are typical of the Class and State Classes claim, as they arise out

7    of the same course of conduct and the same legal theories as the rest of the Class and State Classes,

8    and Plaintiffs challenge the practices and course of conduct engaged in by Defendants with respect

9    to the Class and State Classes as a whole.

10       388.    Plaintiffs will fairly and adequately protect the interests of the classes. Plaintiffs

11   have retained class counsel who are able and experienced class action litigators.

12       389.    Resolution of this action on a class-wide basis is superior to other available methods

13   and is a fair and efficient adjudication of the controversy because in the context of this litigation,

14   no individual class member can justify the commitment of the large financial resources to

15   vigorously prosecute a lawsuit against Defendants. Separate actions by individual class members

16   would also create a risk of inconsistent or varying judgments, which could establish incompatible

17   standards of conduct for Defendants and substantially impede or impair the ability of class

18   members to pursue their claims. A class action also makes sense because Defendants have and

19   refused to take steps that are, upon information and belief, generally applicable to thousands of

20   individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

21                  **IX.    VIOLATIONS ALLEGED**

22                    **FIRST CLAIM FOR RELIEF**
23               **(Violations of Sherman Act, 15 U.S.C. § 1)**

24       390.    Indirect Purchaser Plaintiffs incorporate by reference all the above allegations as if

25   fully set forth herein.

26       391.    Beginning at least as early as January 1, 2004, the exact date being unknown to

27   Indirect Purchaser Plaintiffs and exclusively within the knowledge of Defendants, Defendants and

28   their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably

1  restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by

2  artificially reducing or eliminating competition in the United States.

3          392.    In particular, Defendants have combined and conspired to raise, fix, maintain or

4  stabilize the prices of ODDs sold in the United States.

5          393.    As a result of Defendants' unlawful conduct, prices for ODDs were raised, fixed,

6  maintained, and stabilized in the United States.

7          394.    The contract, combination or conspiracy among Defendants consisted of a

8  continuing agreement, understanding, and concerted action among Defendants and their co-

9  conspirators.

10         395.    For purposes of formulating and effectuating their contract, combination, or

11 conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

12 conspired to do, including:

13              a.    Participating in meetings and conversations to discuss the prices and supply

14 of ODDs.

15              b.    Communicating in writing and orally to fix prices of ODDs.

16              c.    Agreeing to manipulate prices and supply of ODDs sold in the United States

17 in a manner that deprived direct and indirect purchasers of free and open competition.

18              d.    Issuing price announcements and price quotations in accordance with the

19 agreements reached.

20              e.    Selling ODDs and ODD Products to customers in the United States at

21 noncompetitive prices.

22              f.    Providing false statements to the public to explain increased prices for

23 ODDs.

24         396.    As a result of Defendants' unlawful conduct, Indirect Purchaser Plaintiffs and the

25 other members of the Class have been injured in their businesses and property in that they have

26 paid more for ODDs and ODD Products than they otherwise would have paid in the absence of

27 Defendants' unlawful conduct.

28         397.    These violations are continuing and will continue unless enjoined by this Court.

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143      - 123 -
RS
010177-12 640074 V1

1    398.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Indirect Purchaser

2    Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendants,

3    preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**(Violations of the Cartwright Act,**
**Cal. Bus. & Prof. Code §§ 16720, et seq.)**

6    399.    Indirect Purchaser Plaintiffs incorporate by reference all the above allegations as if

7    fully set forth herein.

8    400.    By reason of the foregoing, Defendants have violated California Business and

9    Professions Code, §§ 16700, et seq. California Plaintiff on behalf of a nationwide class of Indirect

10   Purchasers alleges as follows:

11   401.    Beginning at a time currently unknown to California Plaintiff, but at least as early as

12   January 1, 2004, and continuing thereafter at least up to the filing of this complaint, Defendants

13   and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

14   trade and commerce described above in violation of section 16720, California Business and

15   Professions Code. Defendants, and each of them, have acted in violation of section 16720 to fix,

16   raise, stabilize, and maintain prices of, and allocate markets for ODDs at supra-competitive levels.

17   402.    In particular, Defendants have combined and conspired to raise, fix, maintain or

18   stabilize the prices of ODDs sold in the United States.

19   403.    As a result of Defendants' unlawful conduct, prices for ODDs were raised, fixed,

20   maintained, and stabilized in the United States.

21   404.    The contract, combination or conspiracy among Defendants consisted of a

22   continuing agreement, understanding, and concerted action among Defendants and their co-

23   conspirators.

24   405.    For purposes of formulating and effectuating their contract, combination, or

25   conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or

26   conspired to do, including:

27          a.    Participating in meetings and conversations to discuss the prices and supply

28   of ODDs.

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143      - 124 -
RS
010177-12 640074 V1

1          b.          Communicating in writing and orally to fix prices of ODDs.

2          c.          Agreeing to manipulate prices and supply of ODDs sold in the United States

3     in a manner that deprived direct and indirect purchasers of free and open competition.

4          d.          Issuing price announcements and price quotations in accordance with the

5     agreements reached.

6          e.          Selling ODDs to customers in the United States at non-competitive prices.

7          f.          Providing false statements to the public to explain increased prices for

8     ODDs.

9          406.     As a direct and proximate result of Defendants' unlawful conduct, California

10    plaintiffs and the members of the California Indirect Purchaser Class have been injured in their

11    business and property in that they paid more for ODDs and ODD Products than they otherwise

12    would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants'

13    violation of Section 16720 of the California Business and Professions Code, California Plaintiff

14    and the California Indirect Purchaser Class seek treble damages and their cost of suit, including a

15    reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions

16    Code.

17                                   **THIRD CLAIM FOR RELIEF**
                          **(Violations of California's Unfair Competition Law,**
18                        **Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

19         407.     Indirect Purchaser Plaintiffs incorporate by reference the allegations in the above

20    paragraphs as if fully set forth herein.

21         408.     By reason of the foregoing, Defendants have violated California's Unfair

22    Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* California Plaintiff on behalf of the

23    California Indirect Purchaser Class alleges as follows.

24         409.     Defendants committed acts of unfair competition, as defined by section 17200, *et*

25    *seq.*, by engaging in a conspiracy to fix and stabilize the price of ODDs as described above.

26         410.     The acts, omissions, misrepresentations, practices and non-disclosures of

27    Defendants, as described above, constitute a common and continuing course of conduct of unfair

28    competition by means of unfair, unlawful and/or fraudulent business acts or practices with the

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143     - 125 -
RS

010177-12 640074 V1

1    meaning of Section 17200, *et seq.*, including, but not limited to (1) violations of Section 1 of the

2    Sherman Act; and (2) violations of the Cartwright Act.

3           411.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures are

4    unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a

5    violation of the Sherman Act or the Cartwright Act.

6           412.    Defendants' acts or practices are fraudulent or deceptive within the meaning of

7    section 17200, *et seq.*

8           413.    Defendants' conduct was carried out, effectuated, and perfected within the state of

9    California. Defendants maintained offices in California where their employees engaged in

10   communications, meetings and other activities in furtherance of Defendants' conspiracy.

11          414.    By reason of the foregoing, the Class is entitled to application of California law to a

12   nationwide class and is entitled to full restitution and/or disgorgement of all revenues, earnings,

13   profits, compensation, and benefits that may have been obtained by Defendants as result of such

14   business acts and practices described above.

## FOURTH CLAIM FOR RELIEF
### (Violations of State Antitrust and Restraint of Trade Laws)

15

16          415.    Indirect Purchaser Plaintiffs incorporate by reference the allegations in the above

17   paragraphs as if fully set forth herein.

18          416.    In the event that the Court does not apply California law on a nationwide basis,

19   Indirect Purchaser Plaintiffs allege the following violations of state antitrust and restraint of trade

20   laws in the alternative.

21          417.    Arizona: By reason of the foregoing, Defendants have violated Arizona Revised

22   Statutes, §§ 44-1401, *et seq.* Arizona Plaintiff on behalf of the Arizona Indirect Purchaser Class

23   alleges as follows:

24                  a.      Defendants' combinations or conspiracies had the following effects:

25   (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Arizona;

26   (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels

27   throughout Arizona; (3) Arizona Plaintiff and members of the Arizona Indirect Purchaser Class

28

1   were deprived of free and open competition; and (4) Arizona Plaintiff and members of the Arizona

2   Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products;

3         b.     During the Class Period, Defendants' illegal conduct substantially affected

4   Arizona commerce.

5         c.     As a direct and proximate result of defendants' unlawful conduct, Arizona

6   Plaintiff and members of the Arizona Indirect Purchaser Class have been injured in their business

7   and property and are threatened with further injury.

8         d.     By reason of the foregoing, Defendants entered into agreements in restraint

9   of trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq*. Accordingly, Arizona Plaintiff

10   and the members of the Arizona Indirect Purchaser Class seek all forms of relief available under

11   Arizona Revised Statutes §§ 44-1401, *et seq*.

12       418.   California: By reason of the foregoing, Defendants have violated California

13   Business and Professions Code, §§ 16700, *et seq*. California Plaintiff on behalf of the California

14   Indirect Purchaser Class alleges as follows:

15         a.     Defendants' contract, combination, trust or conspiracy was entered in,

16   carried out, effectuated and perfected mainly within the State of California, and Defendants'

17   conduct within California injured all members of the class throughout the United States. Therefore,

18   this claim for relief under California law is brought on behalf of the California Indirect Purchaser

19   Class.

20         b.     Beginning at a time currently unknown to California Plaintiff, but at least as

21   early as January 1, 2004, and continuing thereafter at least up to the filing of this complaint,

22   Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in

23   restraint of the trade and commerce described above in violation of section 16720, California

24   Business and Professions Code. Defendants, and each of them, have acted in violation of section

25   16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for ODDs at supra-

26   competitive levels.

27         c.     The aforesaid violations of section 16720, California Business and

28   Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of

1    action among the defendants and their co-conspirators, the substantial terms of which were to fix,

2    raise, maintain, and stabilize the prices of, and to allocate markets for ODDs.

3             d.      For the purpose of forming and effectuating the unlawful trust, the

4    Defendants and their co-conspirators have done those things which they combined and conspired to

5    do, including but not in any way limited to the acts, practices and course of conduct set forth above

6    and the following: (1) fixing, raising, stabilizing, and pegging the price of ODDs; and (2) allocating

7    among themselves the production of ODDs.

8             e.      The combination and conspiracy alleged herein has had, *inter alia*, the

9    following effects: (1) price competition in the sale of ODDs has been restrained, suppressed, and/or

10   eliminated in the State of California; (2) prices for ODDs and ODD Products have been fixed,

11   raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California;

12   and (3) those who purchased ODDs and ODD Products directly or indirectly from Defendants and

13   their co-conspirators have been deprived of the benefit of free and open competition.

14            f.      As a direct and proximate result of Defendants' unlawful conduct, California

15   plaintiffs and the members of the California Indirect Purchaser Class have been injured in their

16   business and property in that they paid more for ODD Products than they otherwise would have

17   paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of

18   Section 16720 of the California Business and Professions Code, California Plaintiff and the

19   California Indirect Purchaser Class seek treble damages and their cost of suit, including a

20   reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions

21   Code.

22        419.   District of Columbia: By reason of the foregoing, Defendants have violated District

23   of Columbia Code Annotated §§ 28-4501, *et seq*. District of Columbia Plaintiff on behalf of the

24   District of Columbia Indirect Purchaser Class alleges as follows:

25            a.      Defendants' combinations or conspiracies had the following effects: (1)

26   price competition for ODDs was restrained, suppressed, and eliminated throughout the District of

27   Columbia; (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high

28   levels throughout the District of Columbia; (3) District of Columbia Plaintiff and members of the

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143        - 128 -
RS

010177-12 640074 V1

1    District of Columbia Indirect Purchaser Class were deprived of free and open competition; and

2    (4) District of Columbia Plaintiff and members of the District of Columbia Indirect Purchaser Class

3    paid supra-competitive, artificially inflated prices for ODD Products.

4            b.      During the Class Period, Defendants' illegal conduct substantially affected

5    District of Columbia commerce.

6            c.      As a direct and proximate result of defendants' unlawful conduct, District of

7    Columbia Plaintiff and the District of Columbia Indirect Purchaser Class have been injured in their

8    business and property and are threatened with further injury.

9            d.      By reason of the foregoing, Defendants have entered into agreements in

10   restraint of trade in violation of District of Columbia Code Annotated §§ 28-4502, *et seq.*

11   Accordingly, District of Columbia Plaintiff and the District of Columbia Indirect Purchaser Class

12   seek all forms of relief available under District of Columbia Code Annotated §§ 28-4503, *et seq.*

13          420.    Hawaii: By reason of the foregoing, Defendants have violated Hawaii Revised

14   Statutes, §§ 480-1, *et seq.* Hawaii Plaintiff on behalf of the Hawaii Indirect Purchaser Class alleges

15   as follows:

16          a.      Defendants' combinations or conspiracies had the following effects: (1)

17   price competition for ODDs was restrained, suppressed, and eliminated throughout Hawaii; (2)

18   prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels throughout

19   Hawaii; (3) Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class were deprived of

20   free and open competition; and (4) Hawaii Plaintiff and members of the Hawaii Indirect Purchaser

21   Class paid supra-competitive, artificially inflated prices for ODD Products.

22          b.      During the Class Period, Defendants' illegal conduct substantially affected

23   Hawaii commerce.

24          c.      As a direct and proximate result of Defendants' unlawful conduct, Hawaii

25   Plaintiff and members of the Hawaii Indirect Purchaser Class have been injured in their business

26   and property and are threatened with further injury;

27          d.      By reason of the foregoing, Defendants entered into agreements in restraint

28   of trade in violation of Hawaii Revised Statutes §§ 480-1, *et seq.* Accordingly, Hawaii Plaintiff and

1    the members of the Hawaii Indirect Purchaser Class seek all forms of relief available under Hawaii

2    Revised Statutes §§ 480-1, *et seq.*

3         421.   Kansas: By reason of the foregoing, Defendants have violated Kansas Statutes,

4    §§ 50-101, *et seq.* Kansas Plaintiff on behalf of the Kansas Indirect Purchaser Class alleges as

5    follows:

6              a.   Defendants' combinations or conspiracies had the following effects:

7    (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Kansas; (2)

8    prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels throughout

9    Kansas; (3) Kansas Plaintiff and the Kansas Indirect Purchaser Class were deprived of free and

10   open competition; and (4) Kansas Plaintiff and the Kansas Indirect Purchaser Class paid supra-

11   competitive, artificially inflated prices for ODD Products.

12             b.   During the Class Period, Defendants' illegal conduct substantially affected

13   Kansas commerce.

14             c.   As a direct and proximate result of Defendants' unlawful conduct, Kansas

15   Plaintiff and the Kansas Indirect Purchaser Class have been injured in their business and property

16   and are threatened with further injury.

17             d.   By reason of the foregoing, Defendants have entered into agreements in

18   restraint of trade in violation of Kansas Statutes §§ 50-101, *et seq.* Accordingly, Kansas Plaintiff

19   and the Kansas Indirect Purchaser Class seek all forms of relief available under Kansas Statutes

20   §§ 50-101, *et seq.*

21        422.   Maine: By reason of the foregoing, Defendants have violated the Maine Revised

22   Statutes, 10 M.R.S. §§ 1101, *et seq.* Maine Plaintiff on behalf of the Maine Indirect Purchaser

23   Class alleges as follows:

24             a.   Defendants' combinations or conspiracies had the following effects:

25   (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Maine; (2)

26   prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels throughout

27   Maine; (3) Maine Plaintiff and the Maine Indirect Purchaser Class were deprived of free and open

28

competition; and (4) Maine Plaintiff and the Maine Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

      b.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

      c.    As a direct and proximate result of Defendants' unlawful conduct, Maine Plaintiff and the Maine Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

      d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Revised Statutes 10, §§ 1101, *et seq*. Accordingly, Maine Plaintiff and the Maine Indirect Purchaser Class seek all relief available under Maine Revised Statutes 10, §§ 1101, *et seq*.

    423.   <u>Michigan</u>: By reason of the foregoing, Defendants have violated Michigan Compiled Laws §§ 445.773, *et seq*. Michigan Plaintiff on behalf of the Michigan Indirect Purchaser Class alleges as follows:

      a.    Defendants' combinations or conspiracies had the following effects: (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Michigan; (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Michigan Plaintiff and the Michigan Indirect Purchaser Class were deprived of free and open competition; and (4) Michigan Plaintiff and the Michigan Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

      b.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

      c.    As a direct and proximate result of Defendants' unlawful conduct, Michigan Plaintiff and the Michigan Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

      d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Compiled Laws §§ 445.773, *et seq*. Accordingly,

1    Michigan Plaintiff and the Michigan Indirect Purchaser Class seek all relief available under

2    Michigan Compiled Laws §§ 445.73, *et seq.*

3        424.    <u>Minnesota</u>: By reason of the foregoing, Defendants have violated Minnesota

4    Statutes §§ 325D.49, *et seq.* Minnesota Plaintiff on behalf of the Minnesota Indirect Purchaser

5    Class alleges as follows:

6            a.    Defendants' combinations or conspiracies had the following effects:

7    (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Minnesota;

8    (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels

9    throughout Minnesota; (3) Minnesota Plaintiff and the Minnesota Indirect Purchaser Class were

10   deprived of free and open competition; and (4) Minnesota Plaintiff and the Minnesota Indirect

11   Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

12           b.    During the Class Period, Defendants' illegal conduct substantially affected

13   Minnesota commerce.

14           c.    As a direct and proximate result of Defendants' unlawful conduct,

15   Minnesota Plaintiff and the Minnesota Indirect Purchaser Class have been injured in their business

16   and property and are threatened with further injury.

17           d.    By reason of the foregoing, Defendants have entered into agreements in

18   restraint of trade in violation of Minnesota Statutes §§ 325D.49, *et seq.* Accordingly, Minnesota

19   Plaintiff and the Minnesota Indirect Purchaser Class seek all relief available under Minnesota

20   Statutes §§ 325D.49, *et seq.*

21       425.    <u>Nebraska</u>: By reason of the foregoing, Defendants have violated Nebraska Revised

22   Statutes §§ 59-801, *et seq.* Nebraska Plaintiff on behalf of the Nebraska Indirect Purchaser Class

23   alleges as follows:

24           a.    Defendants' combinations or conspiracies had the following effects:

25   (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Nebraska;

26   (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels

27   throughout Nebraska; (3) Nebraska Plaintiff and the Nebraska Indirect Purchaser Class were

28

1    deprived of free and open competition; and (4) Nebraska Plaintiff and the Nebraska Indirect

2    Purchaser Class paid supra-competitive, artificially inflated prices for ODD products.

3           b.     During the Class Period, Defendants' illegal conduct substantially affected

4    Nebraska commerce.

5           c.     As a direct and proximate result of Defendants' unlawful conduct, Nebraska

6    Plaintiff and the Nebraska Indirect Purchaser Class have been injured in their business and property

7    and are threatened with further injury.

8           d.     By reason of the foregoing, Defendants have entered into agreements in

9    restraint of trade in violation Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Nebraska

10   Plaintiff and the Nebraska Indirect Purchaser Class seek all relief available under Nebraska

11   Revised Statutes §§ 59-801, *et seq.*

12          426.   Nevada: By reason of the foregoing, Defendants have violated Nevada Revised

13   Statutes §§ 598A.010, *et seq.* Nevada Plaintiff on behalf of the Nevada Indirect Purchaser Class

14   alleges as follows:

15          a.     Defendants' combinations or conspiracies had the following effects:

16   (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Nevada; (2)

17   prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels throughout

18   Nevada; (3) Nevada Plaintiff and the Nevada Indirect Purchaser Class were deprived of free and

19   open competition; and (4) Nevada Plaintiff and the Nevada Indirect Purchaser Class paid supra-

20   competitive, artificially inflated prices for ODD products.

21          b.     During the Class Period, Defendants' illegal conduct substantially affected

22   Nevada commerce.

23          c.     As a direct and proximate result of Defendants' unlawful conduct, Nevada

24   Plaintiff and the Nevada Indirect Purchaser Class have been injured in their business and property

25   and are threatened with further injury.

26          d.     By reason of the foregoing, Defendants have entered into agreements in

27   restraint of trade in violation of Nevada Revised Statutes §§ 598A.010, *et seq.* Accordingly,

28

1    Nevada Plaintiff and the Nevada Indirect Purchaser Class seek all relief available under Nevada

2    Revised Statutes §§ 598A.010, *et seq.*

3    427.   New Hampshire: By reason of the foregoing, Defendants have violated New

4    Hampshire Revised Statutes §§ 356:1, *et seq.* New Hampshire Plaintiff on behalf of the New

5    Hampshire Indirect Purchaser Class alleges as follows:

6    a.   Defendants' combinations or conspiracies had the following effects:

7    (1) price competition for ODDs was restrained, suppressed, and eliminated throughout New

8    Hampshire; (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high

9    levels throughout New Hampshire; (3) New Hampshire Plaintiff and the New Hampshire Indirect

10   Purchaser Class were deprived of free and open competition; and (4) New Hampshire Plaintiff and

11   the New Hampshire Indirect Purchaser Class paid supra-competitive, artificially inflated prices for

12   ODD Products.

13   b.   During the Class Period, Defendants' illegal conduct substantially affected

14   New Hampshire commerce.

15   c.   As a direct and proximate result of Defendants' unlawful conduct, New

16   Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class have been injured in their

17   business and property and are threatened with further injury.

18   d.   By reason of the foregoing, Defendants have entered into agreements in

19   restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly,

20   New Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class seek all relief available

21   under New Hampshire Revised Statutes §§ 356:1, *et seq.*

22   428.   New Mexico: By reason of the foregoing, Defendants have violated New Mexico

23   Statutes §§ 57-1-1, *et seq.* New Mexico Plaintiff on behalf of the New Mexico Indirect Purchaser

24   Class alleges as follows:

25   a.   Defendants' combinations or conspiracies had the following effects:

26   (1) price competition for ODDs was restrained, suppressed, and eliminated throughout New

27   Mexico; (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels

28   throughout New Mexico; (3) New Mexico Plaintiff and the New Mexico Indirect Purchaser Class

1    were deprived of free and open competition; and (4) New Mexico Plaintiff and the New Mexico

2    Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

3             b.     During the Class Period, Defendants' illegal conduct substantially affected

4    New Mexico commerce.

5             c.     As a direct and proximate result of Defendants' unlawful conduct, New

6    Mexico Plaintiff and the New Mexico Indirect Purchaser Class have been injured in their business

7    and property and are threatened with further injury.

8             d.     By reason of the foregoing, Defendants have entered into agreements in

9    restraint of trade in violation of New Mexico Statutes §§ 57-1-1, *et seq*. Accordingly, New Mexico

10    Plaintiff and the New Mexico Indirect Purchaser Class seek all relief available under New Mexico

11    Statutes §§ 57-1-1, *et seq*.

12         429.   <u>New York</u>: By reason of the foregoing, Defendants have violated New York

13    General Business Laws §§ 340, *et seq*. New York Plaintiff on behalf of the New York Indirect

14    Purchaser Class alleges as follows:

15             a.     Defendants' combinations or conspiracies had the following effects:

16    (1) price competition for ODDs was restrained, suppressed, and eliminated throughout New York;

17    (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels

18    throughout New York; (3) New York Plaintiff and the New York Indirect Purchaser Class were

19    deprived of free and open competition; and (4) New York Plaintiff and the New York Indirect

20    Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

21             b.     During the Class Period, Defendants' illegal conduct substantially affected

22    New York commerce.

23             c.     As a direct and proximate result of Defendants' unlawful conduct, New

24    York Plaintiff and the New York Indirect Purchaser Class have been injured in their business and

25    property and are threatened with further injury.

26             d.     By reason of the foregoing, Defendants have entered into agreements in

27    restraint of trade in violation of New York General Business Laws §§ 340, *et seq*. Accordingly,

28

1    New York Plaintiff and the New York Indirect Purchaser Class seek all relief available under New

2    York General Business Laws §§ 340, *et seq.*

3    430.    North Carolina: By reason of the foregoing, Defendants have violated North

4    Carolina General Statutes §§ 75-1, *et seq.* North Carolina Plaintiff on behalf of the North Carolina

5    Indirect Purchaser Class alleges as follows:

6    a.    Defendants' combinations or conspiracies had the following effects:

7    (1) price competition for ODDs was restrained, suppressed, and eliminated throughout North

8    Carolina; (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high

9    levels throughout North Carolina; (3) North Carolina Plaintiff and the North Carolina Indirect

10   Purchaser Class were deprived of free and open competition; and (4) North Carolina Plaintiff and

11   the North Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated prices for

12   ODD Products.

13   b.    During the Class Period, Defendants' illegal conduct substantially affected

14   North Carolina commerce.

15   c.    As a direct and proximate result of Defendants' unlawful conduct, North

16   Carolina Plaintiff and the North Carolina Indirect Purchaser Class have been injured in their

17   business and property and are threatened with further injury.

18   d.    By reason of the foregoing, Defendants have entered into agreements in

19   restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq.* Accordingly,

20   North Carolina Plaintiff and the North Carolina Indirect Purchaser Class seek all relief available

21   under North Carolina General Statutes §§ 75-1, *et seq.*

22   431.    Oregon: By reason of the foregoing, Defendants have violated Oregon Revised

23   Statutes §§ 646.705, *et seq.* Oregon Plaintiffs on behalf of the Oregon Indirect Purchaser Class

24   allege as follows:

25   a.    Defendants' combinations or conspiracies had the following effects:

26   (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Oregon; (2)

27   prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels throughout

28   Oregon; (3) Oregon Plaintiffs and the Oregon Indirect Purchaser Class were deprived of free and

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143    - 136 -
RS

010177-12 640074 V1

1   open competition; and (4) Oregon Plaintiffs and the Oregon Indirect Purchaser Class paid supra-

2   competitive, artificially inflated prices for ODD Products.

3           b.     During the Class Period, Defendants' illegal conduct had a substantial effect

4   on Oregon commerce.

5           c.     As a direct and proximate result of Defendants' unlawful conduct, Oregon

6   Plaintiffs and the Oregon Indirect Purchaser Class have been injured in their business and property

7   and are threatened with further injury.

8           d.     By reason of the foregoing, Defendants have entered into agreements in

9   restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Oregon

10  Plaintiffs and the Oregon Indirect Purchaser Class seek all relief available under Oregon Revised

11  Statutes §§ 646.705, *et seq*.

12      432.    <u>Tennessee</u>: By reason of the foregoing, Defendants have violated Tennessee Code

13  §§ 47-25-101, *et seq*. Tennessee Plaintiff on behalf of the Tennessee Indirect Purchaser Class

14  alleges as follows:

15          a.     Defendants' combinations or conspiracies had the following effects:

16  (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Tennessee;

17  (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels

18  throughout Tennessee; (3) Tennessee Plaintiff and the Tennessee Indirect Purchaser Class were

19  deprived of free and open competition; and (4) Tennessee Plaintiff and the Tennessee Indirect

20  Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

21          b.     During the Class Period, Defendants' illegal conduct had a substantial effect

22  on Tennessee commerce as products containing ODD were sold in Tennessee.

23          c.     As a direct and proximate result of Defendants' unlawful conduct,

24  Tennessee Plaintiff and the Tennessee Indirect Purchaser Class have been injured in their business

25  and property and are threatened with further injury.

26          d.     By reason of the foregoing, Defendants have entered into agreements in

27  restraint of trade in violation of Tennessee Code §§ 47-25-101, *et seq*. Accordingly, Tennessee

28

1    Plaintiff and the Tennessee Indirect Purchaser Class seek all relief available under Tennessee Code

2    §§ 47-25-101, *et seq.*

3    433.   Utah: By reason of the foregoing, Defendants have violated Utah Code §§ 76-10-

4    911, *et seq.* Utah Plaintiff on behalf of the Utah Indirect Purchaser Class alleges as follows:

5    a.   Defendants' combinations or conspiracies had the following effects:

6    (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Utah; (2)

7    prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels throughout

8    Utah; (3) Utah Plaintiff and the Utah Indirect Purchaser Class were deprived of free and open

9    competition; and (4) Utah Plaintiff and the Utah Indirect Purchaser Class paid supra-competitive,

10   artificially inflated prices for ODD Products.

11   b.   During the Class Period, Defendants' illegal conduct had a substantial effect

12   on Utah commerce.

13   c.   As a direct and proximate result of Defendants' unlawful conduct, Utah

14   Plaintiff and the Utah Indirect Purchaser Class have been injured in their business and property and

15   are threatened with further injury.

16   d.   By reason of the foregoing, Defendants have entered into agreements in

17   restraint of trade in violation of violated Utah Code §§ 76-10-911, *et seq.* Accordingly, Utah

18   Plaintiff and the Utah Indirect Purchaser Class seek all relief available under violated Utah Code

19   §§ 76-10-911, *et seq.*

20   434.   Vermont: By reason of the foregoing, Defendants have violated Vermont Stat. Ann.

21   9 §§ 2453, *et seq.* Vermont Plaintiff on behalf of the Vermont Indirect Purchaser Class alleges as

22   follows:

23   a.   Defendants' combinations or conspiracies had the following effects:

24   (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Vermont;

25   (2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels

26   throughout Vermont; (3) Vermont Plaintiff and the Vermont Indirect Purchaser Class were

27   deprived of free and open competition; and (4) Vermont Plaintiff and the Vermont Indirect

28   Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

1

        b.     During the Class Period, Defendants' illegal conduct had a substantial effect

2
on Vermont commerce.

3

        c.     As a direct and proximate result of Defendants' unlawful conduct, Vermont

4
Plaintiff and the Vermont Indirect Purchaser Class have been injured in their business and property

5
and are threatened with further injury.

6

        d.     By reason of the foregoing, Defendants have entered into agreements in

7
restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Vermont

8
Plaintiff and the Vermont Indirect Purchaser Class seek all relief available under Vermont Stat.

9
Ann. 9 §§ 2453, *et seq*.

10

    435.   <u>Wisconsin</u>: By reason of the foregoing, Defendants have violated Wisconsin

11
Statutes §§ 133.01, *et seq*. Wisconsin Plaintiff on behalf of the Wisconsin Indirect Purchaser Class

12
alleges as follows:

13

        a.     Defendants' combinations or conspiracies had the following effects:

14
(1) price competition for ODDs was restrained, suppressed, and eliminated throughout Wisconsin;

15
(2) prices for ODDs were raised, fixed, maintained and stabilized at artificially high levels

16
throughout Wisconsin; (3) Wisconsin Plaintiff and the Wisconsin Indirect Purchaser Class were

17
deprived of free and open competition; and (4) Wisconsin Plaintiff and the Wisconsin Indirect

18
Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

19

        b.     During the Class Period, Defendants' illegal conduct had a substantial effect

20
on Wisconsin commerce.

21

        c.     As a direct and proximate result of Defendants' unlawful conduct,

22
Wisconsin Plaintiff and the Wisconsin Indirect Purchaser Class have been injured in their business

23
and property and are threatened with further injury.

24

        d.     By reason of the foregoing, Defendants have entered into agreements in

25
restraint of trade in violation of Wisconsin Statutes §§ 133.01, *et seq*. Accordingly, Wisconsin

26
Plaintiff and the Wisconsin Indirect Purchaser Class seek all relief available under Wisconsin

27
Statutes §§ 133.01, *et seq*.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH CLAIM FOR RELIEF**
**(Violations of State Consumer Protection and Unfair Competition Laws)**

436.    Indirect Purchaser Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

437.    In the event that the Court does not apply California law on a nationwide basis, Indirect Purchaser Plaintiffs allege the following violations of state consumer protection and unfair competition laws in the alternative.

438.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

439.    <u>Florida</u>: By reason of the foregoing, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* Florida Plaintiff on behalf of the Florida Indirect Purchaser Class alleges as follows:

a.    Defendants' unlawful conduct had the following effects: (1) price competition for ODDs was restrained, suppressed, and eliminated throughout Florida; (2) prices for ODDs were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Florida Plaintiff and the Florida Indirect Purchaser Class were deprived of free and open competition; and (4) Florida Plaintiff and the Florida Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

b.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

c.    As a direct and proximate result of defendants' unlawful conduct, Florida Plaintiff and the Florida Indirect Purchaser Class have been injured and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*, and, accordingly, Florida Plaintiff and the Florida Indirect Purchaser Class seek all relief available under that statute.

440.   Massachusetts: By reason of the foregoing, Defendants have violated the

Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1, *et seq.* Massachusetts

Plaintiffs on behalf of the Massachusetts Indirect Purchaser Class allege as follows:

a.   Defendants were engaged in trade or commerce as defined by M.G.L.

c. 93A, § 1.

b.   Defendants agreed to, and did in fact, act in restraint of trade or commerce

in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at

artificial and noncompetitive levels, the prices at which ODDs were sold, distributed, or obtained

in Massachusetts and took efforts to conceal their agreements from the Massachusetts Plaintiffs

and members of the Massachusetts Indirect Purchaser Class.

c.   Defendants' unlawful conduct had the following effects: (1) price

competition for ODDs was restrained, suppressed, and eliminated throughout Massachusetts; (2)

the prices of ODDs were raised, fixed, maintained, and stabilized at artificially high levels

throughout Massachusetts; (3) Massachusetts Plaintiffs and members of the Massachusetts

Indirect Purchaser Class were deprived of free and open competition; and (4) Massachusetts

Plaintiffs and members of the Massachusetts Indirect Purchaser Class paid supra-competitive,

artificially inflated prices for ODDs and ODD Products.

d.   As a direct and proximate result of defendants' unlawful conduct,

Massachusetts Plaintiffs and members of the Massachusetts Indirect Purchaser Class were injured

and are threatened with further injury.

e.   Each of the Defendants or their representatives have been served with a

demand letter in accordance with M.G.L. c. 93A, § 1, or such service of a demand letter was

unnecessary due to the defendant not maintaining a place of business within the Commonwealth

of Massachusetts or not keeping assets within the Commonwealth. More than thirty days has

passed since such demand letters were served, and each Defendant served has failed to make a

reasonable settlement offer.

f.   By reason of the foregoing, Defendants engaged in unfair competition and

unfair or deceptive acts or practices, in violation of M.G.L. c. 93A, § 2. Defendants' and their co-

1    conspirators' violations of Chapter 93A were knowing or willful, entitling the Massachusetts

2    Plaintiff and the Massachusetts Indirect Purchaser Class to multiple damages.

3          441.   Missouri: By reason of the foregoing, Defendants have violated Missouri's

4    Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020. Missouri Plaintiff on behalf of

5    the Missouri Indirect Purchaser Class allege as follows:

6          a.    Missouri Plaintiff and members of the Missouri Indirect Purchaser Class

7    purchased ODDs for personal, family, or household purposes.

8          b.    Defendants engaged in the conduct described herein in connection with the

9    sale of ODD in trade or commerce in a market that includes Missouri.

10          c.    Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at

11    artificial and non-competitive levels, the prices at which ODDs were sold, distributed, or obtained

12    in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and

13    state law, violated public policy, was unethical, oppressive and unscrupulous, and caused

14    substantial injury to Missouri Plaintiff and the members of the Missouri Indirect Purchaser Class.

15          d.    Defendants concealed, suppressed, and omitted to disclose material facts to

16    Missouri Plaintiff and the members of the Missouri Indirect Purchaser Class concerning

17    defendants' unlawful activities and artificially inflated prices for ODD. The concealed,

18    suppressed, and omitted facts would have been important to Missouri Plaintiff and the members of

19    the Missouri Indirect Purchaser Class as they related to the cost of ODD they purchased.

20          e.    Defendants misrepresented the real cause of price increases and/or the

21    absence of price reductions in ODDs by making public statements that were not in accord with the

22    facts.

23          f.    Defendants' statements and conduct concerning the price of ODDs were

24    deceptive as they had the tendency or capacity to mislead Missouri Plaintiff and the members of

25    the Missouri Indirect Purchaser Class to believe that they were purchasing ODDs and ODD

26    Products at prices established by a free and fair market. Defendants' unlawful conduct had the

27    following effects: (1) ODD price competition was restrained, suppressed, and eliminated

28    throughout Missouri; (2) ODD prices were raised, fixed, maintained, and stabilized at artificially

1    high levels throughout Missouri; (3) Missouri Plaintiff and members of the Missouri Indirect

2    Purchaser Class were deprived of free and open competition; and (4) Missouri Plaintiff and

3    members of the Missouri Indirect Purchaser Class paid supra-competitive, artificially inflated

4    prices for ODD Products.

5           g.     The foregoing acts and practices constituted unlawful practices in violation

6    of the Missouri Merchandising Practices Act.

7           h.     As a direct and proximate result of the above-described unlawful practices,

8    Missouri Plaintiff and members of the Missouri Indirect Purchaser Class suffered ascertainable

9    loss of money or property.

10          i.     Accordingly, Missouri Plaintiff and members of the Missouri Indirect

11   Purchaser Class seek all relief available under Missouri's Merchandising Practices Act,

12   specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person

13   of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the

14   concealment, suppression, or omission of any material fact in connection with the sale or

15   advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri

16   Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-

17   9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

18       442.   <u>Montana</u>: By reason of the foregoing, Defendants have violated Montana's Unfair

19   Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-201, *et seq.* Montana

20   Plaintiff on behalf of the Montana Indirect Purchaser Class alleges as follows:

21          a.     Defendants' unlawful conduct had the following effects: (1) ODD price

22   competition was restrained, suppressed, and eliminated throughout Montana; (2) ODD prices were

23   raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3)

24   Montana Plaintiff and the Montana Indirect Purchaser Class were deprived of free and open

25   competition; and (4) Montana Plaintiff and the Montana Indirect Purchaser Class paid supra-

26   competitive, artificially inflated prices for ODD Products.

27          b.     During the Class Period, Defendants' illegal conduct substantially affected

28   Montana commerce and consumers.

1          c.      As a direct and proximate result of Defendants' unlawful conduct, Montana

2  Plaintiff and the Montana Indirect Purchaser Class have been injured and are threatened with

3  further injury.

4          d.      Defendants have engaged in unfair competition or unfair or deceptive acts

5  or practices in violation of Montana's Unfair Trade Practices and Consumer Protection Act, Mont.

6  Code, §§ 30-14-201, *et seq*. and, accordingly, Montana Plaintiff and the Montana Indirect

7  Purchaser Class seek all relief available under that statute.

8          443.    Nebraska: By reason of the foregoing, Defendants have violated Nebraska's

9  Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq*. Nebraska Plaintiff on behalf of the

10  Nebraska Indirect Purchaser Class alleges as follows:

11          a.      Defendants' unlawful conduct had the following effects: (1) ODD price

12  competition was restrained, suppressed, and eliminated throughout Nebraska; (2) ODD prices

13  were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska;

14  (3) Nebraska Plaintiff and the Nebraska Indirect Purchaser Class were deprived of free and open

15  competition; and (4) Nebraska Plaintiff and the Nebraska Indirect Purchaser Class paid supra-

16  competitive, artificially inflated prices for ODD Products.

17          b.      During the Class Period, Defendants' illegal conduct substantially affected

18  Nebraska commerce and consumers.

19          c.      As a direct and proximate result of Defendants' unlawful conduct, Nebraska

20  Plaintiff and the Nebraska Indirect Purchaser Class have been injured and are threatened with

21  further injury.

22          d.      Defendants' actions and conspiracy have had a substantial impact on the

23  public interests of Nebraska and its residents.

24          e.      Defendants have engaged in unfair competition or unfair or deceptive acts

25  or practices in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et*

26  *seq*. and, accordingly, Nebraska Plaintiff and the Nebraska Indirect Purchaser Class seek all relief

27  available under that statute.

28

444. <u>New Hampshire</u>: By reason of the foregoing, Defendants have violated New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq*. New Hampshire Plaintiff on behalf of the New Hampshire Indirect Purchaser Class alleges as follows:

a. Defendants' unlawful conduct had the following effects: (1) ODD price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) ODD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) New Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class were deprived of free and open competition; and (4) New Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

b. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

c. As a direct and proximate result of Defendants' unlawful conduct, New Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class have been injured and are threatened with further injury.

d. Defendants' actions and conspiracy have had a substantial impact on the public interests of New Hampshire and its residents.

e. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq*. and, accordingly, New Hampshire Plaintiff and the New Hampshire Indirect Purchaser Class seek all relief available under that statute.

445. <u>New York</u>: By reason of the foregoing, Defendants have violated New York's General Business Law, N.Y. Gen. Bus. Law § 349, *et seq*. New York Plaintiff on behalf of the New York Indirect Purchaser Class alleges as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive levels, the prices at which ODD was sold, distributed or obtained in New York and took efforts to conceal their agreements from New York Plaintiff and the New York Indirect Purchaser Class.

1          b.      The conduct of the Defendants described herein constitutes consumer-

2    oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which

3    resulted in consumer injury and broad adverse impact on the public at large, and harmed the

4    public interest of New York State in an honest marketplace in which economic activity is

5    conducted in a competitive manner.

6          c.      Defendants made certain statements about ODDs that they knew would be

7    seen by New York residents and these statements either omitted material information that

8    rendered the statements they made materially misleading or affirmatively misrepresented the real

9    cause of price increases for ODDs.

10          d.      Defendants' unlawful conduct had the following effects: (1) ODD price

11    competition was restrained, suppressed, and eliminated throughout New York; (2) ODD prices

12    were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3)

13    New York Plaintiff and the New York Indirect Purchaser Class were deprived of free and open

14    competition; and (4) New York Plaintiff and the New York Indirect Purchaser Class paid supra-

15    competitive, artificially inflated prices for ODD Products.

16          e.      During the Class Period, Defendants' illegal conduct substantially affected

17    New York commerce and consumers.

18          f.      During the Class Period, each of the Defendants named herein, directly, or

19    indirectly and through affiliates they dominated and controlled, manufactured, sold and/or

20    distributed ODD products in New York.

21          g.      New York Plaintiff and the New York Indirect Purchaser Class seek actual

22    damages for their injuries caused by these violations in an amount to be determined at trial and are

23    threatened with further injury. Without prejudice to their contention that Defendants' unlawful

24    conduct was willful and knowing, New York Plaintiff and the New York Indirect Purchaser Class

25    do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

26        446.    <u>Vermont</u>: By reason of the foregoing, Defendants have violated Vermont's

27    Consumer Fraud Act, 9 Vt. Stat. Ann. § 2451, *et seq.* Vermont Plaintiff on behalf of the Vermont

28    Indirect Purchaser Class alleges as follows:

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and noncompetitive levels, the prices at which ODDs were sold, distributed, or obtained in Vermont.

b.       Defendants deliberately failed to disclose material facts to Vermont Plaintiff and the Vermont Indirect Purchaser Class concerning Defendants' unlawful activities and artificially inflated prices for ODD Products. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' ODD prices were competitive and fair.

c.       Defendants' unlawful conduct had the following effects: (1) ODD price competition was restrained, suppressed, and eliminated throughout Vermont; (2) ODD prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Vermont Plaintiff and the Vermont Indirect Purchaser Class were deprived of free and open competition; and (4) Vermont Plaintiff and the Vermont Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ODD Products.

d.       As a direct and proximate result of the Defendants' violations of law, Vermont Plaintiff and the Vermont Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

e.       Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of ODD Products, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing ODD Products at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. Ann. § 2451, *et seq*., and, accordingly, Vermont Plaintiff and the Vermont Indirect Purchaser Class seek all relief available under that statute.

1

## PRAYER FOR RELIEF

2        WHEREFORE, Indirect Purchaser Plaintiffs pray that the Court enter judgment on their

3    behalf and on behalf of the Class herein, adjudging and decreeing that:

4        A.       This action may proceed as a class action, with Indirect Purchaser Plaintiffs as the

5    designated Class Representatives and their counsel as Class Counsel;

6        B.       Defendants have engaged in a contract, combination, and conspiracy in violation of

7    Section 1 of the Sherman Act (15 U.S.C. § 1), and that Indirect Purchaser Plaintiffs and the

8    Injunctive and State Classes have been injured in their businesses and property as a result of

9    Defendants' violations;

10        C.       Indirect Purchaser Plaintiffs and the members of the State Classes recover damages

11    sustained by them, restitution or disgorgement, as provided by the state antitrust and consumer

12    protection laws, and that a joint and several judgment in favor of Indirect Purchaser Plaintiffs and

13    the State Classes be entered against the Defendants in an amount to be trebled in accordance with

14    such laws;

15        D.       Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the

16    respective officers, directors, partners, agents, and employees thereof and all other persons acting

17    or claiming to act on their behalf be permanently enjoined and restrained from continuing and

18    maintaining the combination, conspiracy, or agreement alleged herein;

19        E.       Indirect Purchaser Plaintiffs and the members of the State Classes be awarded pre-

20    judgment and post-judgment interest, and that such interest be awarded at the highest legal rate

21    from and after the date of service of the initial complaint in this action;

22        F.       Indirect Purchaser Plaintiffs and the members of the Class recover their costs of this

23    suit, including reasonable attorneys' fees as provided by law; and

24        G.       Indirect Purchaser Plaintiffs and the members of the Class receive such other or

25    further relief as may be just and proper.

26

27

28

**JURY TRIAL DEMANDED**

Indirect Purchaser Plaintiffs demand a trial by jury of all of the claims asserted in this complaint so triable.

DATED: September 16, 2013     HAGENS BERMAN SOBOL SHAPIRO LLP

By     /s/ Jeff D. Friedman
      JEFF D. FRIEDMAN

Shana E. Scarlett (217895)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
George W. Sampson (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Lee Gordon (174168)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Ave., Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
lee@hbsslaw.com

*Interim Lead Counsel for Indirect
Purchaser Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on September 16, 2013, I electronically filed the foregoing document

3 using the CM/ECF system which will send notification of such filing to the e-mail addresses

4 registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby

5 certify that I have caused to be mailed a paper copy of the foregoing document via the United

6 States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List

7 generated by the CM/ECF system.

8
                                      /s/ Jeff D. Friedman
                                      JEFF D. FRIEDMAN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IPP FIFTH AM. CLASS ACTION COMPL – No. 3:10-md-2143
RS
            - 150 -

010177-12 640074 V1