KAIWEN TSENG (SBN 193756)
ktseng@tklg-llp.com
HSIANG "JAMES" H. LIN (SBN 241472)
jlin@tklg-llp.com
TECHKNOWLEDGE LAW GROUP LLP
100 Marine Parkway, Suite 200
Redwood Shores, CA 94065
Telephone: (650) 517-5200

JAMES B. BALDINGER
jbaldinger@cfjblaw.com
DAVID B. ESAU
desau@cfjblaw.com
CARLTON FIELDS JORDEN BURT, P.A.
CityPlace Tower
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida 33401-6350
Telephone: (561) 659-7070

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE OPTICAL DISK DRIVE ANTITRUST LITIGATION | Master File No. 3:10-md-2143 RS |
| This Document Relates to | MDL No. M 10-2143 |
| Case No. 5:13-cv-04991-RS | |
| _____ | Individual Case No. 3:13-CV-4991-RS |
| ACER INC., ACER AMERICA CORPORATION; GATEWAY, INC.; AND GATEWAY U.S. RETAIL, INC., F/K/A EMACHINES, INC. | **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| LITE-ON IT CORPORATION; NEC CORPORATION; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS & LITE-ON DIGITAL SOLUTIONS CORPORATION; PHILIPS & LITE-ON DIGITAL SOLUTIONS USA, INC.; PIONEER CORPORATION; PIONEER DIGITAL DESIGN & MANUFACTURING COMPANY; PIONEER ELECTRONICS (USA) INC.; PIONEER HIGH FIDELITY TAIWAN CO., LTD.; PIONEER NORTH AMERICA, INC.; SAMSUNG | |

1  ELECTRONICS AMERICA, INC.; SAMSUNG
   ELECTRONICS CO., LTD.; SONY
2  CORPORATION; SONY ELECTRONICS INC.;
   SONY NEC OPTIARC INC.; SONY OPTIARC
3  AMERICA INC.; SONY OPTIARC INC.;
   TOSHIBA AMERICA INFORMATION SYSTEMS,
4  INC.; TOSHIBA CORPORATION; TOSHIBA
   SAMSUNG STORAGE TECHNOLOGY
5  CORPORATION; TOSHIBA SAMSUNG
   STORAGE TECHNOLOGY KOREA
6  CORPORATION,

7                         Defendants.

**TABLE OF CONTENTS**

**Page(s)**

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE ....................................................................... 6

III.   PARTIES ............................................................................................................ 6

    A.     Plaintiffs ................................................................................................... 6

    B.     Defendants ................................................................................................ 8

        1.     Philips Defendants .................................................................... 8

        2.     Lite-On Defendant .................................................................... 9

        3.     Sony/NEC Defendants .............................................................. 9

        4.     Toshiba Defendants ................................................................ 12

        5.     Samsung Defendants .............................................................. 13

        6.     TSST Defendants ................................................................... 14

        7.     Pioneer Defendants ................................................................ 15

IV.   AGENTS AND CO-CONSPIRATORS ......................................................... 16

V.     INTERSTATE TRADE AND COMMERCE ................................................. 21

VI.   FACTUAL ALLEGATIONS UNDERLYING THE UNLAWFUL CONSPIRACY .......... 22

    A.     ODD Technology .................................................................................. 22

    B.     Evolution of ODDs and Sales ............................................................... 24

    C.     Structural Market Factors Favoring, And Acts Indicative Of, Collusion ................. 27

        1.     Market Concentration ............................................................ 28

        2.     Joint Venture or Other Collaboration .................................... 28

        3.     Barriers to Entry .................................................................... 30

        4.     Trade Associations and Business Organizations ................... 35

        5.     Standardization of ODDs ....................................................... 44

    D.     Acts of Collusion With Respect To ODDs ........................................... 45

    E.     Governmental Antitrust Investigations of the ODD Industry ................ 62

    F.     Economic Data on Pricing and Supply ................................................. 66

    G.     History of Collusion in Other Markets ................................................. 69

VII.   FRAUDULENT CONCEALMENT .............................................................. 73

VIII.  CLAIM FOR VIOLATIONS ......................................................................... 75

IX.   PRAYER FOR RELIEF ................................................................................ 83

X.     JURY TRIAL DEMAND ............................................................................... 84

i

**COMPLAINT**

Plaintiffs Acer America Corporation; Gateway, Inc.; and Gateway U.S. Retail, Inc., f/k/a eMachines, Inc. (collectively or individually, "Acer") bring this action for damages and injunctive relief under Sections 4 and 16 of the Clayton Act for defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Acer also brings this action for damages and injunctive relief under the California Cartwright Act, Cal. Bus. & Profs. Code §§ 16720 *et seq.* and under the California Unfair Competition Law, Cal. Bus. & Profs. Code §§ 17200 *et seq.* (collectively, the "California State Law Claims). Numerous other persons injured by defendants' and their co-conspirators' price-fixing conspiracy have filed Section 1 Sherman Act claims and those lawsuits have been joined for pretrial purposes in *In re Optical Disk Drive Products Antitrust Litigation*, 3:10-md-02143, in the Northern District of California.

## I.     INTRODUCTION

1.     Acer brings this action to recover for injury to its business and property and other harms arising from billions of dollars of purchases, at artificially inflated prices, over several years, of optical disk drives ("ODDs"). Defendants and their co-conspirators participated in a price-fixing conspiracy from as early as January 1, 2004, through around January 1, 2010 (the "Relevant Period"). The purpose and effect of this anticompetitive conspiracy was to fix, raise, stabilize and maintain prices for ODDs. Pursuant to this price-fixing conspiracy, defendants and their co-conspirators engaged in a series of integrated and overlapping anticompetitive acts. These anticompetitive acts included rigging bids for ODDs in procurement events conducted by Original Equipment Manufacturers ("OEMs"), sharing confidential information including pricing, sales, production, bidding strategies and rankings, pull rates, and Total Available Market ("TAM") in order to facilitate price coordination, entering agreements to set prices for ODDs sold in the United States to OEMs including Acer, and allocating customers and markets. Acer paid higher prices for ODDs than it would have paid in a competitive market as a direct result of defendants' and their co-

1

conspirators' unlawful conduct. Acer seeks to recover compensatory damages for its ODD purchases from defendants and their subsidiaries, affiliates, and co-conspirators during the Relevant Period.

2.  An ODD uses a laser light (or electromagnetic wavelength) to read and/or write data to or from an optical disc. ODDs can be internal drives manufactured to be incorporated into notebook and desktop computers, camcorders and/or game consoles, or they can be external drives that attach to computers, camcorders and/or game consoles by means of an external interface, such as a Universal Serial Bus ("USB") connection. ODDs utilize the following optical disc formats: (a) compact discs ("CDs"), such as CD-ROMs or CD-recordable/rewritable discs ("CD-R/RWs"); (b) digital versatile discs ("DVDs"), such as DVD-ROMs or DVD-recordable/rewritable discs ("DVD±R/RWs"); (c) Blu-ray products, such as Blu-ray discs ("BDs") and Blu-ray-recordable/rewritable discs ("BD-R"/"BD-RWs"); (d) High Definition DVDs ("HD-DVDs"); and (e) Super Multi-Drives or other combination drives that play various of the foregoing media. These formats are described in greater detail below.

3.  As used herein, ODDs consist of ODDs that are supplied by any of the named defendants, co-conspirators, or their affiliates or subsidiaries.[1]

4.  ODDs that are external drives are sold alone, typically with some sort of connecting interface. ODDs that are internal drives are used inside of products, such as computers, to read and write data for a variety of uses, including software programs and data compilations. For this purpose, ODDs have largely replaced "floppy" disk drives and the even-older tape drives that used magnetic disks or tapes to read, record and store data.  In consumer electronics, products with optical disk drives have also displaced many of the consumer electronic products previously used to record and play music and video, such as cassette decks and VCRs.

5.  The ODD market is one of the fastest growing markets in the electronics industry. During the Relevant Period, ODDs served as one of the principal means for recording and reading music, movies, and other digital data. During this time, defendants' and their co-conspirators' sales

---

[1] This would include ODDs manufactured by one defendant that are sold to another defendant who then sells them to a purchaser.  The sale to the first purchaser outside the conspiracy constitutes a purchase within the meaning of the antitrust laws.

SECOND AMENDED COMPLAINT

of ODDs generated billions of dollars in annual revenues and expanded exponentially with the increased utilization of computers and other products in households and businesses throughout the United States during the Relevant Period. Until very recently, in the United States and across the world, almost all forms of home entertainment and data storage were on optical discs. Most computers that are used or sold in the United States today come equipped with an ODD. During the Relevant Period, defendants and their co-conspirators controlled more than 90% of this market.

6.      Defendants, the leading manufacturers, sellers and distributors of ODDs, and their co-conspirators, coordinated and agreed for the purpose of stabilizing the prices of ODDs manufactured and sold by them. In furtherance of this agreement, *inter alia*: (a) defendants engaged in the rigging of bids (with respect to pricing, bid rankings and other matters) for certain procurement events for ODDs conducted by major OEMs situated in the United States, such as Dell Inc. ("Dell") and Hewlett-Packard Company ("HP"); (b) certain defendants colluded on pricing of ODDs sold to Microsoft Corporation ("Microsoft") for use in its Xbox game console; (c) certain defendants engaged in cooperation agreements that resulted in the setting of prices or the allocation of customers with respect to OEM and/or non-OEM sales; and (d) defendants and their co-conspirators exchanged confidential business information concerning ODDs, including, *inter alia*, prices charged and to be charged for ODDs, rebate information on ODDs, production capacity with respect to ODDs, business plans for ODDs, plans for the introduction of new ODDs, roadmaps for product rollouts and production, product quality information, product inventory and shipping information, company responses to customer initiatives, and plans for the cessation of manufacture of ODDs that had reached the ends of their respective lifecycles.  During the Relevant Period, this conduct as a whole affected billions of dollars of commerce throughout the United States.  The aforementioned agreement and coordination were facilitated by an industry structure and a commoditized product that were conducive to such conduct.  As a result of defendants' and their co-conspirators' conduct, Plaintiffs have been injured in their business and property by paying more for ODDs than they would have paid in the absence of defendants' and their co-conspirators' conspiracy.

7.      The United States Department of Justice ("DOJ") is investigating price fixing in the

3

ODD market. The DOJ's investigation already includes an application for amnesty by one group of conspirators named herein. Many of defendants and co-conspirators named in this Complaint have a sordid history of engaging in anticompetitive conduct, including price-fixing conduct for electronic component parts used in computers assembled and sold by Acer, such as Dynamic Random Access Memory ("DRAM"), Thin Film Transistor Liquid Crystal Display ("TFT-LCD") panels, and Cathode Ray Tubes ("CRTs"), among others. Through the conduct described herein defendants entered into an agreement the object of which was to stabilize the prices for and allocate markets or customers with respect to ODDs. When the prices of ODDs began to decrease, defendants' conduct kept prices of ODDs at a supracompetitive level.

8.     On November 8, 2011, the United States of America and ODD manufacturer Hitachi-LG Data Storage, Inc. ("HLDSI") entered a plea agreement in *U.S. v. Hitachi-LG Data Storage, Inc.*, No. CR11-00724-RS (N.D. Cal.). HLDSI is a joint venture between Hitachi, Ltd. and LG Electronics, Inc. In the plea agreement HLDSI admitted that it had engaged in felonious price-fixing conduct with co-conspirators in violation of Section 1 of the Sherman Act. In the plea agreement HLDSI admitted that, between approximately June 2004 and September 2009, HLDSI employees engaged in bid rigging and price fixing in the ODD industry, one purpose of which was "to rig ODD procurement events." The United States agreed not to prosecute most HLDSI employees, but explicitly carved out Young Keun Park, Sang Hun Kim, Sik Hur (aka Daniel Hur), and Woo Jin Yang (aka Eugene Yang), each of whom subsequently pled guilty to ODD-related antitrust violations. *U.S. v. Young Keun Park*, No. CR11-00911 (N.D. Cal.); *U.S. v. Kim*, No. CR11-00912 (N.D. Cal.); *U.S. v. Hur*, No. CR11-00913 (N.D. Cal.); *U.S. v. Yang*, No. CR12-00309 (N.D. Cal.).

9.     Acer brings this action to obtain injunctive relief under Section 16 of the Clayton Act, and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from defendants' and their co-conspirators' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

10.     The Court has subject matter jurisdiction over Acer's federal antitrust claims pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

SECOND AMENDED COMPLAINT

The Court has supplemental jurisdiction over Acer's California State Law Claims set forth below. Acer's California State Law Claims are so related to Acer's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

11.     The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This anticompetitive effect gives rise to Acer's antitrust claims.  During the Relevant Period, defendants' and their co-conspirators' conspiracy adversely affected the price of ODDs purchased in the United States. In particular, defendants' and their co-conspirators' conspiracy directly and adversely affected the price of ODDs purchased by Acer.

12.     This court has jurisdiction over each defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured price-fixed ODDs and products containing price-fixed ODDs they knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected commerce in the ODD market in the United States. Defendants are further subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California

13.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.

14.     In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Acer's claims occurred in this District including many of Acer's purchases of ODDs and negotiation events whereby Acer purchased some ODDs, and a substantial portion of the affected interstate trade and commerce was carried out in this District. Defendants and their co-conspirators knew that price-fixed ODDs would be sold and shipped into this District.

SECOND AMENDED COMPLAINT

## II.    JURISDICTION AND VENUE

## III.    PARTIES

**A.    Plaintiffs**

15.    Plaintiff Acer America Corporation is a California corporation, with its principal place of business in San Jose, California. During the Relevant Period, all or a significant portion of Acer America Corporation's product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to ODDs. During the Relevant Period, Acer America Corporation's negotiations for the purchase of ODDs took place in California, purchase orders for ODDs were issued in California, payments for the purchases of ODDs were issued in California, Acer America Corporation took possession of ODDs in California, invoices for ODDs sold to Acer America Corporation's customers were issued from California to Acer America Corporation's customers, payments for ODDs sold to Acer America Corporation's customers were received in California, and ODDs were distributed to Acer America Corporation's customers from California. During the Relevant Period, Acer America Corporation sold numerous products in the United States that incorporate ODDs, including without limitation desktop monitors and notebook computers. Acer America Corporation is an indirect subsidiary of Acer Inc., which is a Taiwanese multi-national corporation. During the Relevant Period, Acer America Corporation purchased ODDs indirectly from defendants and their co-conspirators.

16.    Plaintiff Gateway, Inc. is a Delaware corporation with its principal place of business in Irvine, California. Gateway, Inc. is now an indirect subsidiary of Acer Inc. During the Relevant Period, all or a significant portion of Gateway, Inc.'s product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to ODDs. During the Relevant Period, Gateway, Inc.'s negotiations for the purchase of ODDs took place in California, purchase orders for ODDs were issued in California, payments for the purchases of ODDs were issued in California, Gateway, Inc. took possession of ODDs in California, invoices for ODDs sold to Gateway, Inc.'s customers were issued from California to Gateway, Inc.'s customers, payments for ODDs sold to Gateway, Inc.'s

6

1    customers were received in California, and ODDs were distributed to Gateway, Inc.'s customers

2    from California. During the Relevant Period, Gateway, Inc. and its affiliates sold numerous products

3    in the United States that incorporate ODDs, including without limitation desktop monitors and

4    notebook computers. During the Relevant Period, Gateway purchased ODDs directly and indirectly

5    from defendants and their co-conspirators.

6          17.     Plaintiff Gateway U.S. Retail, Inc. is a Delaware corporation with its principal place

7    of business in Irvine, California, and is the successor-in-interest to eMachines, Inc. Gateway U.S.

8    Retail, Inc. is a wholly-owned subsidiary of Gateway, Inc. Prior to its acquisition in 2004 by

9    Gateway, Inc., eMachines, Inc. had its principal place of business in Irvine, California, and sold

10   numerous products in the United States that incorporate ODDs, including without limitation desktop

11   monitors and notebook computers. During the Relevant Period, all or a significant portion of

12   eMachines, Inc.'s product development, product planning, and marketing divisions, and supporting

13   finance, trade, and logistics operations were located in and had extensive operations in California

14   related to ODDs.  During the Relevant Period, eMachines, Inc.'s negotiations for the purchase of

15   ODDs took place in California, purchase orders for ODDs were issued in California, payments for

16   the purchases of ODDs were issued in California, eMachines, Inc. took possession of ODDs in

17   California, invoices for ODDs sold to eMachines, Inc.'s customers were issued from California to

18   eMachines, Inc.'s customers, payments for ODDs sold to eMachines, Inc.'s customers were received

19   in California, and ODDs were distributed to eMachines, Inc.'s customers from California. As the

20   successor-in-interest to eMachines, Inc., Gateway U.S. Retail, Inc. brings this action to recover

21   overcharges based on eMachines, Inc.' purchases of ODDs, which eMachines, Inc. purchased

22   directly and indirectly from defendants and their co-conspirators during the Relevant Period.

23         18.     Acer America Corporation; Gateway, Inc.; and Gateway U.S. Retail, Inc. are

24   sometimes referred to individually and collectively herein as "Acer."

25         19.     Acer is a leading information technology company, offering a broad range of

26   solutions, including services and products such as mobility products, notebook PCs, desktop PCs,

27   software and peripherals, including display devices and servers.

28
                                              7

                                                              SECOND AMENDED COMPLAINT

20.    During the Relevant Period, Acer purchased price-fixed ODDs directly and/or indirectly from defendants and their co-conspirators, or defendants' and their co-conspirators' subsidiaries and affiliates, or agents controlled by defendants, defendants' subsidiaries and affiliates, co-conspirators or co-conspirators' subsidiaries and affiliates. As a direct result of defendants' and their co-conspirators' unlawful conduct, Acer suffered injury to its business or property.

21.    During the Relevant Period, Acer held frequent negotiations with defendants and their co-conspirators on the price and volume of ODDs it purchased. Acer held negotiations via multiple methods, including Internet negotiations. For much of the Relevant Period, these negotiations were conducted in Asia or in California. The agreed-upon price that resulted from the negotiation process was a worldwide price that applied to all of Acer's ODD purchases for the given time period, regardless of where the ODD was to be delivered.

### B.    Defendants

#### 1.    Philips Defendants

22.    Defendant Koninklijke Philips Electronics N.V. ("Royal Philips") is a Dutch company with its principal place of business at Groenewoudsweg 1, Einhoven 5261BA, the Netherlands.  During the Relevant Period, Royal Philips controlled an integrated global enterprise comprising itself and other entities including Defendants Philips & Lite-On Digital Solutions Corporation and Philips & Lite-On Digital Solutions USA, Inc. Royal Philips manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

23.    Defendant Philips & Lite-On Digital Solutions Corporation is a business entity organized under the laws of Taiwan, with its principal place of business located at 16F, 392, Ruey Kuang Road, Neihu, Taipei, 114, Taiwan, R.O.C. Philips & Lite-On Digital Solutions Corporation, established in March of 2007, is a joint venture created by Philips & Lite-On. Philips & Lite-On Digital Solutions Corporation's operations include: design, development, sales, marketing, customer support, and service of ODDs. During a portion of the Relevant Period, Philips & Lite-On Digital Solutions Corporation manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

SECOND AMENDED COMPLAINT

24.     Defendant Philips & Lite-On Digital Solutions USA, Inc. is a business entity organized under the laws of Delaware, with its principal place of business located at 42000 Christy Street, Fremont, California 94538. Philips & Lite-On Digital Solutions USA, Inc. is a subsidiary company of Philips & Lite-On Digital Solutions Corporation. Philips & Lite-On Digital Solutions USA, Inc. serves customers in the North American and Latin American regions. During a portion of the Relevant Period, Philips & Lite-On Digital Solutions USA, Inc. manufactured, sold, and/or distributed ODDs to customers throughout the United States and imported ODDs into the United States.

25.     Defendants Royal Philips, Philips & Lite-On Digital Solutions Corporation and Philips & Lite-On Digital Solutions USA, Inc. are referred to individually and collectively herein as "PLDS." All of the entities referred to as PLDS participated in the collusive conduct described herein, either directly or as represented by other members of the PLDS group of Defendants.

26.     Upon information and belief, in October of 2007, a representative of TSST indicated that "PLDS & Lite-on are completely identical companies with different names. Sony denies purchasing product from PLDS, that's why PLDS does business with Sony as name of Lite-on, but operation and manufacturing is exactly same."

**2.     Lite-On Defendant**

27.     Defendant Lite-On IT Corporation ("Lite-On") is a business entity organized under the laws of Taiwan with its principal place of business located at 12F, 392, Ruey Kuang Road, Neihu, Taipei 114, Taiwan, R.O.C. Lite-On controls an integrated global enterprise comprising itself and other entities including Defendants Philips & Lite-On Digital Solutions Corporation and Philips & Lite-On Digital Solutions USA, Inc. During the Relevant Period, Lite-On manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

**3.     Sony/NEC Defendants**

28.     Defendant Sony Corporation ("SC") is a business entity organized under the laws of Japan, with its principal place of business located at 1-7-1, Konan, Minato-Ku, Tokyo 108-0075,

9

1   Japan. SC controls an integrated global enterprise comprising itself and other entities, including the

2   other Sony and Sony Optiarc Defendants described herein. During the Relevant Period, Sony

3   manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs

4   to be imported into the United States.

5        29.    Defendant Sony Optiarc Inc. is a Japanese company with its headquarters located at 4-

6   16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan. During the Relevant Period, Sony Optiarc Inc.

7   manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs

8   to be imported into the United States. Sony Optiarc, Inc. is now part of SC's Consumer Products &

9   Devices Group and is headed by Shinichi Yamamura, who formerly ran Sony NEC Optiarc, Inc.

10        30.    Defendant NEC Corporation ("NEC") is a business entity organized under the laws of

11   Japan with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-

12   8001, Japan. During the Relevant Period, NEC manufactured, sold, and distributed ODDs to

13   customers throughout the United States and directly caused ODDs to be imported into the United

14   States.

15        31.    Defendant Sony NEC Optiarc Inc. ("Sony NEC") was a Japanese company with its

16   headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  Sony NEC was created

17   on April 3, 2006 as a joint venture between Defendants SC and NEC in which SC had a 55% interest

18   and NEC had a 45% interest. These percentages were based on the present value of future cash flows

19   each joint venturer would receive from the joint venture, including cash flows obtained through the

20   conspiracy alleged herein. Defendant SC designated the President of Sony NEC and Defendant

21   NEC designated the Vice-President. Shinichi Yamamura, who was Deputy President of Video

22   Business Group of SC, became President of the new company. SC purchased NEC's interest in

23   Sony NEC in 2008 and renamed it Sony Optiarc Inc. During a portion of the Relevant Period, Sony

24   NEC manufactured, sold and/or distributed ODDs throughout the United States and directly caused

25   ODDs to be imported into the United States. The press release announcing Sony's purchase of

26   NEC's interests in Sony NEC said that "[a]s a result of this agreement, Sony will make Sony NEC

27   Optiarc Inc. a wholly owned subsidiary of the Sony group"; that Shinichi Yamamura, Deputy

28

SECOND AMENDED COMPLAINT

1   President of the Video Business Group of SC, would serve as Sony NEC's "Representative

2   Director and President"; and that other directors were "[s]cheduled to be elected from within the

3   Sony group."

4        32.    Defendant Sony Optiarc America Inc. is a wholly-owned and controlled subsidiary of

5   Sony Optiarc Inc. Sony Optiarc America Inc. is a Delaware corporation, with its principal place of

6   business located at 1730 N. First Street, San Jose, California 95112. Sony Optiarc America Inc. was

7   originally established as a joint venture between Sony and NEC in April of 2006 before Sony

8   announced that it would take over NEC's 45% share on September 11, 2008. During a portion of the

9   Relevant Period, Sony Optiarc America Inc. manufactured, sold and/or distributed ODDs throughout

10  the United States and imported ODDs into the United States.

11       33.    Defendant Sony Electronics Inc. ("SEI") is a Delaware corporation with its principal

12  place of business at 16530 Via Esprillo, San Diego, California 92127. SEI is a wholly-owned and

13  controlled subsidiary of Sony Corporation of America, which in turn, is a wholly-owned and

14  controlled subsidiary of defendant SC. During the Relevant Period, SEI manufactured, sold and/or

15  distributed ODDs throughout the United States and imported ODDs into the United States.

16       34.    According to SC's SEC Form 20-F for the year ending March 31, 2011, SC is divided

17  into business segments, including Consumer Products & Devices, Networked Products & Services,

18  and B2B and Disc Manufacturing. The former two segments contain ODDs. The Form 20-F states

19  that "[i]n most cases, sales of Sony's electronics products are made to sales subsidiaries of Sony

20  Corporation located in or responsible for sales in the countries and territories where Sony's products

21  and services are marketed. These subsidiaries then sell those products to unaffiliated local

22  distributors and dealers or through direct sales via the Internet. In some regions, sales of certain

23  products and services are made directly to local distributors by Sony Corporation." As the Form 20-F

24  further explains, "Sony markets its electronics products and services through Sony Electronics Inc.

25  and other wholly owned subsidiaries in the U.S." The independent accounting report in the Form 20-

26  F refers to SC and its consolidated subsidiaries as "Sony."

27       35.    Upon information and belief, a former employee of Sony Optiarc Inc. has asserted that

28

11

both Sony Optiarc Inc. and SEI are "controlled by Sony Corporation."

36.    Defendants Sony Optiarc America Inc., Sony NEC, and Sony Optiarc Inc. are referred to individually and collectively herein as "Sony Optiarc." All of the entities referred to as Sony Optiarc participated in the collusive conduct described herein, either directly or as represented by other members of the Sony Optiarc group of Defendants.

37.    Defendants SC, SEI, Sony Optiarc America Inc., Sony NEC, and Sony Optiarc Inc. are referred to individually and collectively herein as "Sony." All of the entities referred to as Sony participated in the collusive conduct described herein, either directly or as represented by other members of the Sony group of Defendants.

### 4.    Toshiba Defendants

38.    Defendant Toshiba Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 1058001, Japan. Toshiba Corporation controls an integrated global enterprise comprising itself and other entities, including Toshiba Samsung Storage Technology Corporation, Toshiba Samsung Storage Technology Corporation Korea, Toshiba America Information Systems, Inc. ("TAIS") and Toshiba America Consumer Products LLC ("TACP"). During the Relevant Period, Toshiba Corporation manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

39.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation that has its headquarters at 9740 Irvine Blvd, Irvine, California 92618. TAIS is a wholly-owned and controlled subsidiary of Toshiba America, Inc., which is in turn a wholly-owned and controlled subsidiary of Toshiba Corporation. During the Relevant Period, TAIS manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States. During the Relevant Period, TACP also manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States. TACP was merged into TAIS on July 1, 2010. Toshiba Corporation's 2009 Annual Report contains a letter from Norio Sasaki (President and CEO of Toshiba Corporation) and Atsutoshi Nishida (Toshiba Corporation's Chairman) that refers to

SECOND AMENDED COMPLAINT

the "Toshiba Group" and its "Group-wide efforts" to carry out a profitability action plan "set up with the key objectives of transforming Toshiba Group into a Group with a strongly profitable business structure . . . ." The Annual Report depicts an organization chart that shows Toshiba Corporation's board and President and CEO exercising control and reporting authority over multiple product segment subgroups, including the "Digital Products Group," which has responsibility for storage devices and personal computers. The Annual Report lists Toshiba Samsung Storage Technology Corporation and TAIS as overseas "Consolidated Subsidiaries." Toshiba Corporation's 2009 Financial Review incorporated in its Annual Report noted that the Toshiba Group comprised Toshiba Corporation and various "Consolidated Subsidiaries" that operate in its multiple business segments.

40.     Defendants Toshiba Corporation and TAIS (which now includes the merged TACP) are referred to individually and collectively herein as "Toshiba." All of the entities referred to as Toshiba participated in the collusive conduct described herein, either directly or as represented by other members of the Toshiba entities.

### 5.     Samsung Defendants

41.     Defendant Samsung Electronics Co., Ltd. ("SECL") is a business entity organized under the laws of South Korea, with its principal place of business at Samsung Main Building 250, Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea. SECL controls an integrated global enterprise comprising itself and other entities, including Toshiba Samsung Storage Technology Corp. and Toshiba Samsung Storage Technology Corp. Korea. During the Relevant Period, SECL manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

42.     Defendant Samsung Electronics America, Inc. ("SEAI") is a subsidiary of SECL, organized under the laws of New York, with its principal place of business at 85 Challenger Rd., Ridgefield Park, New Jersey 07660. During the Relevant Period, SEAI manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States.

43.     SECL's 2008 Annual Report contains an organizational chart depicting the tight control SECL exercises over its various business segments, with the "Digital Media & Communications

SECOND AMENDED COMPLAINT

Business" reporting directly to SECL's CEO. SECL touts its "board-centered corporate governance system" that ensures "accountability in management"; "the board actively supports top management in effectively managing the company to maximize corporate value." SECL runs a "Samsung Advanced Institute of Technology"—the "global hub of our R&D business." The independent auditor's report incorporated in the Annual Report refers to SECL and its "controlled subsidiaries" as "the Company." SEAI is among them.

44.     Defendants SECL and SEAI are referred to individually and collectively herein as "Samsung." All of the entities referred to as Samsung participated in the collusive conduct described herein, either directly or as represented by other members of the Samsung entities.

**6.     TSST Defendants**

45.     Defendant Toshiba Samsung Storage Technology Corporation is a business entity organized under the laws of Japan with its principal place of business located at 1-1, Shibaura 1-Chome, Minato-ku, Tokyo 105-8001, Japan (the same address as Toshiba's). Toshiba Samsung Storage Technology Corporation is a joint venture formed in 2004 and owned 51% by Toshiba and 49% by Samsung. During the Relevant Period, Toshiba Samsung Storage Technology Corporation manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

46.     Defendant Toshiba Samsung Storage Technology Korea Corporation ("TSST Korea") is a business entity organized under the laws of South Korea with its principal place of business located at 14th Floor, Building No. 102, Digital Empire 2, 486, Sin-dong, Yeongtong-gu, Suwonsi, Gyonggi-do, Korea 443-734, which is part of the Samsung Digital Complex. In its 2009 Annual Report, Toshiba lists TSST Korea as an overseas subsidiary. During the Relevant Period, TSST Korea manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States. TSST Korea's website notes that it operates through the "common relevant organization for mutual consent. We are currently responsible for the product development, marketing and sales, and have been taking advantage of the existing network of Samsung Electronics and Toshiba for manufacturing, sales and after-sales service." The website notes further that "TSST is the result of

SECOND AMENDED COMPLAINT

1   close cooperation between Samsung Electronics and Toshiba."

2       47.     Defendants Toshiba Samsung Storage Technology Corporation and TSST Korea are

3   referred to individually and collectively herein as "TSST." TSST has operated or currently operates

4   sales offices in North America and Logistics Centers in Miami, Florida and San Diego, California.

5   All of the entities referred to as TSST participated in the collusive conduct described herein, either

6   directly or as represented by other members of the TSST entities.

7                          **7.     Pioneer Defendants**

8       48.     Defendant Pioneer Corporation is a business entity organized under the laws of Japan,

9   with its principal place of business at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa 212-0031,

10  Japan. During the Relevant Period, Pioneer Corporation manufactured, sold and/or distributed ODDs

11  throughout the United States and directly caused ODDs to be imported into the United States.

12      49.     Defendant Pioneer North America, Inc. ("Pioneer N.A.") is a Delaware corporation,

13  with its principal place of business at 1925 E Dominguez Street, Long Beach, California 90810.

14  Pioneer N.A. is a wholly-owned and controlled subsidiary of Pioneer Corporation.  During the

15  Relevant Period, Pioneer N.A. designed, manufactured, sold and/or distributed ODDs throughout the

16  United States and directly caused ODDs to be imported into the United States.

17      50.     Defendant Pioneer Electronics (USA) Inc. ("Pioneer USA") is a Delaware

18  corporation, with its principal place of business at 1925 E Dominguez Street, Long Beach, California

19  90810. Pioneer USA is a wholly-owned and controlled subsidiary of Pioneer N.A. During the

20  Relevant Period, Pioneer USA designed, manufactured, sold and/or distributed ODDs throughout the

21  United States and directly caused ODDs to be imported into the United States.

22      51.     Defendant Pioneer High Fidelity Taiwan Co., Ltd. is a Taiwanese company with its

23  principal place of business at 13th Floor, No. 44, Chung Shan North Road, Sec. 2, Taipei, Taiwan,

24  R.O.C. During the Relevant Period, Pioneer High Fidelity Taiwan Co., Ltd. designed and/or

25  manufactured ODDs with the intent and agreement to distribute throughout the United States.

26      52.     Defendant Pioneer Digital Design & Manufacturing Company ("PDDMC") is a joint

27  venture owned 66% by Pioneer Corporation and 34% by Sharp Corporation.  It is a business entity

28                                      15

organized under the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa 212-0031, Japan. During the Relevant Period, PDDMC manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

53.    Defendants Pioneer Corporation, Pioneer N.A., Pioneer USA, Pioneer High Fidelity Taiwan Co., Ltd., and PDDMC are referred to individually and collectively herein as "Pioneer."

54.    The conduct alleged herein was carried out by Defendants' and the co- conspirators' officers, agents, employees, or representatives, while engaged in the usual management of their business.

55.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

56.    When Acer refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Acer is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts on behalf of every company in that family. In fact, the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, the entire corporate family was represented by their agents with respect to such conduct and was party to the agreements reached by such agents.

57.    Each of defendants named herein acted as the agent of, co-conspirator with, or joint venturer of, or for, other defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged herein. Each defendant or co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for ODDs made by its parent company.

## IV.    AGENTS AND CO-CONSPIRATORS

58.    The acts alleged against defendants and co-conspirators in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' and co-conspirators' businesses or affairs.

16

59.     Each defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other defendants or co-conspirators with respect to the acts, violations, and common course of conduct alleged by Acer. Each defendant and co-conspirator that is a subsidiary of a foreign parent acted as the United States agent for ODDs made by its parent company.

60.     Various persons and/or firms not named as defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. These co-conspirators are believed to include the Hitachi, Ltd.; HLDSI; Hitachi-LG Data Storage Korea, Inc.; LG Electronics Inc.; LG Electronics U.S.A., Inc.; Panasonic Corporation; Panasonic Corporation of North America; TEAC Corporation; TEAC America, Inc.; Quanta Storage, Inc.; Quanta Storage America, Inc.; and Sharp Corporation.

61.     Co-conspirator Hitachi, Ltd. is a business entity organized under the laws of Japan with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280, Japan. Hitachi, Ltd. controls an integrated global enterprise comprising itself and other entities including HLDSI. During the Relevant Period, Hitachi, Ltd., manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

62.     Co-conspirator HLDSI is a business entity organized under the laws of Japan with its principal place of business located at 4F MSC Center Building, 22-23 Kaigan 3-Chome, Minato-Ku, Tokyo, Japan, 108-0022. HLDSI is a joint venture formed in November 2000 and is owned 51% by Hitachi, Ltd. and 49% by LG Electronics Inc. It began operations in January 2001. During the Relevant Period, HLDSI manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

63.     Co-conspirator Hitachi-LG Data Storage Korea, Inc. is a business entity organized under the laws of South Korea with its principal place of business located at LG Gasan Digital Center, 459-9 Gasan-dong, Geumcheon-gu, Seoul, 153-803 Korea. Hitachi-LG Data Storage Korea, Inc. is part of the joint venture formed in January of 2001 and is owned 51% by Hitachi, Ltd. and 49% by LG Electronics Inc. During the Relevant Period, Hitachi-LG Data Storage Korea, Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the

17

1  United States.

2      64.    According to Hitachi, Ltd.'s SEC Form 20-F for the year ending March 31, 2011,

3  Hitachi, Ltd. views HLDSI as a "subsidiary" in connection with the international antitrust

4  investigations involving the ODD industry. Hitachi, Ltd. divides its international business into

5  multiple segments; ODDs are part of the "Digital Media & Consumer Products" segment. There is a

6  "Hitachi group global business (Americas)" headed by Tadahiko Ishigaki, a Senior Vice-President and

7  Executive Officer of Hitachi, Ltd. As part of its ongoing restructuring of operations, Hitachi, Ltd. is

8  "promoting shared services over a wide range of areas such as procurement, logistics, document

9  services, security, personnel management and financial management." In a section entitled

10  "Strengthening of Consolidated Group Management" Hitachi, Ltd. states:

11         Our consolidated group includes a number of subsidiaries and affiliates including
           publicly listed companies. We have taken and continue to take measures with a view
12         to fostering closer ties and establishing a closer capital relationship among such group
           companies and facilitating the timely implementation of business strategies and other
13         initiatives, leading to improved competitiveness and profitability. For example, we
           converted five listed consolidated subsidiaries into wholly owned subsidiaries, which
14         we believe will benefit our Social Innovation Business by establishing closer ties and
           relationships and will also enable us to reflect the net income or loss attributable to
15         noncontrolling interests in those companies as net income or loss attributable to
           Hitachi, Ltd. in our statement of operations.
16

17         * * * *

18         Furthermore, our headquarters division will focus additional attention on generating
           synergies and address issues that have group-wide implications such as the adoption
19         of a uniform advanced IT platform and coordinating production engineering,
           procurement and our brand to help in-house companies and group companies
20         strengthen competitiveness. Our headquarters division will also attempt to develop
           business fields that incorporate elements of our information and communication
21         technology and social infrastructure businesses.
22

23      65.    Hitachi, Ltd. and its subsidiaries are referred to collectively in this Form 20-F as

24  "Hitachi."

25      66.    In its SEC Form 6-K dated November 16, 2009 that is described in more detail below,

26  Hitachi, Ltd. disclosed that: (a) "a subsidiary" in Japan and "a subsidiary" in Korea are the targets of

27  investigations by various countries' antitrust agencies with respect to antitrust violations relating to

28

                                        18

ODDs; (b) these investigations may result in private actions being brought "against Hitachi" and (c) they could have a "material adverse effect on Hitachi's business." Hitachi, Ltd. reports financial data for HLDSI in its consolidated annual financial results, where it indicates that its "Optical Disk Drive operations" are conducted by HLDSI.

67.   Co-conspirators Hitachi, Ltd., HLDSI and Hitachi-LG Data Storage Korea, Inc. are referred to individually and collectively herein as "HLDS." All of the entities referred to as HLDS participated in the collusive conduct described herein, either directly or as represented by other members of the HLDS entities.

68.   Co-conspirator LG Electronics Inc. is a business entity organized under the laws of South Korea, with its principal place of business at LG Twin Tower 128, Yeoui-daero, Yeongdeungpo-gu, Seoul, Korea. During the Relevant Period, LG Electronics Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

69.   Co-conspirator LG Electronics U.S.A., Inc. ("LGUSA") is a business entity organized under the laws of Delaware, with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. LGUSA is a wholly-owned and controlled subsidiary of LG Electronics Inc. During the Relevant Period, LGUSA Electronics Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

70.   Co-conspirators LG Electronics Inc. and LGUSA are referred to individually and collectively herein as "LG."

71.   Co-conspirator Panasonic Corporation, a Japanese entity with its principal place of business at 1006, Oaza Kodoma, Kadoma-shi, Osaka 571-8501, Japan. Up until October 1, 2008, Panasonic Corporation was known as Matsushita Electric Industrial Co., Ltd. During the Relevant Period, Panasonic Corporation manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

72.   Co-conspirator Panasonic Corporation of North America ("PCNA"), formerly known as Matsushita Electric Corporation of America, is a Delaware corporation with its principal place of

19

1  business at Two Riverfront Plaza, Newark, New Jersey 07102.  PCNA is a wholly-owned and

2  controlled subsidiary of Panasonic Corporation.  During the Relevant Period, PCNA manufactured,

3  sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported

4  into the United States.

5      73.    Co-conspirators Panasonic Corporation and PCNA are referred to individually and

6  collectively herein as "Panasonic."

7      74.    Co-conspirator TEAC Corporation is a business entity organized under the laws of

8  Japan, with its principal place of business at 1-47 Ochiai, Tama-shi, Tokyo 206-8530, Japan. During

9  the Relevant Period, TEAC Corporation manufactured, sold and/or distributed ODDs throughout the

10 United States and directly caused ODDs to be imported into the United States.

11     75.    Co-conspirator TEAC America, Inc. ("TEAC America") is a California corporation

12 with its principal place of business at 7733 Telegraph Rd., Montebello, California 90640.  TEAC

13 America is a wholly-owned and controlled subsidiary of TEAC Corporation. During the Relevant

14 Period, TEAC America manufactured, sold and/or distributed ODDs throughout the United States and

15 directly caused ODDs to be imported into the United States.

16     76.    Co-conspirators TEAC Corporation and TEAC America are referred to individually

17 and collectively herein as "TEAC."

18     77.    Co-conspirator Quanta Storage, Inc. is a business entity organized under the laws of

19 Taiwan, with its principal place of business at 3F No. 188, Wenhua 2nd Rd., Guishan Shiang,

20 Taoyuan County 333, Taiwan. During the Relevant Period, Quanta Storage, Inc. manufactured, sold

21 and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into

22 the United States.

23     78.    Co-conspirator Quanta Storage America, Inc. ("Quanta America") is a California

24 corporation with its principal place of business in 2726 Bayview Dr., Fremont, CA 94538.  Quanta

25 America is a wholly-owned and controlled subsidiary of Quanta Storage, Inc. During the Relevant

26 Period, Quanta America manufactured, sold and/or distributed ODDs throughout the United States and

27 directly caused ODDs to be imported into the United States.

28

20

79.     Co-conspirators Quanta Storage, Inc. and Quanta America are referred to individually and collectively herein as "QSI."

80.     Co-conspirator Sharp Corporation ("Sharp") is a business entity organized under the laws of Japan, with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. During the Relevant Period, Sharp manufactured, sold, and/or distributed ODDs to customers throughout the United States and directly caused ODDs to be imported into the United States.

81.     Acer's investigation into the identities of co-conspirators is ongoing and Acer reserves the right to identify additional co-conspirators in discovery and expert reports in this matter. On information and belief, other partnerships, corporations, or business entities are co-conspirators with defendants in their unlawful restraint of trade.

82.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## V.     INTERSTATE TRADE AND COMMERCE

83.     During the Relevant Period, each defendant and co-conspirator, or one or more of its subsidiaries and/or affiliated joint ventures, sold ODDs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

84.     During the Relevant Period, defendants and their co-conspirators collectively imported at least tens of millions of ODDs into the United States.

85.     During the Relevant Period, defendants and their co-conspirators collectively controlled a majority of the market for ODDs, globally, in the United States, and within this District.

86.     The business activities of defendants and their co-conspirators substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

87.     Sony Optiarc had sales of $1.52 billion for the year ending in March of 2008, the last

SECOND AMENDED COMPLAINT

1  year for which Sony disclosed the unit's annual revenue.

2  88.    HLDS had revenue of $2.4 billion in 2005, the last year for which figures are

3  available, while TSST forecast revenue of 250 billion yen in fiscal 2004, when it was established.

4  89.    Samsung in 2008 estimated that the ODD market for personal computers is 313

5  million units per year and the ODD market for all other applications is 200 million units per year.

6  90.    Defendants and their co-conspirators sell their ODDs through various direct channels,

7  including to manufacturers of electronic products and devices, to resellers of ODDs such as Acer,

8  through the retail internet sites.  As noted above, some defendants also sell ODDs directly to end users,

9  either through online or brick-and-mortar stores.

10  91.    California is the worldwide center of the personal computer industry and other industries

11  that depend upon the ODD market.  Statements concerning the prices and market conditions for ODDs

12  were disseminated by defendants and their co-conspirators from and into California on a regular and

13  continuous basis.

14  **VI.    FACTUAL ALLEGATIONS UNDERLYING THE UNLAWFUL CONSPIRACY**

15  **A.    ODD Technology**

16  92.    Optical discs contain microscopic pits where data are stored. These pits are made from

17  a crystalline metal alloy and are usually pressed into the disc in a spiral arrangement, starting at the

18  center of the disc. Once a disc containing information is inserted into the ODD, the disc spins while a

19  lens inside the device guides a semiconductor laser beam over the disc and a photodiode detects the

20  light reflected from the disc's bumps and pits. The laser moves outward from the center of the disc,

21  scanning over the disc's surface. Then the photodiode reads the light's reflection as a binary code—a

22  series of ones and zeros—that the computer translates into usable data. Changes in the intensity of the

23  beams as the lasers hit the pits are detected and translated into electrical signals. The more pits that

24  can be packed onto the disc, the more data the disc can store. The pits are approximately 0.8

25  micrometers on CDs, 0.4 micrometers on DVDs, and 0.15 micrometers on BDs. Reading the

26  different disc formats requires the ODD to have lasers of different wavelengths. BD players use a

27  shorter wavelength laser, which is blue-violet, to read discs. Additional layers can be added to the

28

22

disc as well, increasing storage capacity. In addition to reading discs, ODDs can write and rewrite on the disc, depending on the technology of the drive and accompanying disc.

93.     When a recordable disc is inserted into an ODD that has the ability to record data, the ODD's laser is used to heat selectively parts of the organic photosensitive dye layer. By exposing the disc to light with the laser, the reflective properties of the disc's surface change, which causes the photodiode to recognize these changes as bumps and pits and read the new information on the disc.

94.     ODDs include half height ("HH"), slim and ultraslim models. HH ODDs are thicker and generally incorporated into desktop computer towers. Slim and ultraslim ODDs are thinner and generally incorporated into laptop computers. As laptop computers have become more popular with consumers, demand for slim and ultraslim ODDs has increased.

95.     An ODD is about the size of a thick book.  The front of the drive typically has a small Open/Close button that ejects and retracts the drive bay door. This is how media like CDs, DVDs, and BDs are inserted into and removed from the drive.  Where the ODD is intended for internal use in a computer, the sides of the drive have pre-drilled, threaded holes for easy mounting in the bay drive in the computer case. In that case, the ODD is mounted so the end with the connections faces inside the computer and the end with the drive bay faces outside. The back end of the ODD typically contains a port for a cable that connects to the motherboard and a connection for power from the power supply. Most ODDs installed in computers also have jumper settings on the back end that define how the motherboard is to recognize the drive when more than one is present. These settings vary from drive to drive. ODDs connect to the motherboard of a computer through either a Serial Advanced Technology Attachment ("SATA") or Parallel Advanced Technology Attachment ("PATA") interface. Where the ODD is intended for external use with a computer, it is connected to the computer through some type of interface, such as a USB connection.

96.     The following table provides an overview of the names, sizes and capabilities of the main optical disc media standards that existed during the Relevant Period.

23

| Overview of Optical Disc Media Standards | | |
|---|---|---|
| **Drive Standard** | **Capacity**[a] | **Capability** |
| CD-ROM | 700 MB | Read Only |
| CD-R | 700 MB | Read, Write |
| CD-RW | 700 MB | Read, Write, Rewritable |
| DVD-ROM | 4.7 GB | Read Only |
| DVD-RAM | 4.7 GB | Read, Write |
| DVD-R[b] | 4.7 GB | Read, Write |
| DVD-RW[b] | 4.7 GB | Read, Write, Rewritable |
| BD-ROM | 25 GB Single Layer; 50 GB Dual Layer | Read Only |
| BD-R | 25 GB Single Layer; 50 GB Dual Layer | Read, Write |
| BD-RW | 25 GB Single Layer; 50 GB Dual Layer | Read, Write, Rewritable |

[a]  These are standard capacities. Depending on the number of layers, or if the disc can be read double-sided, the capacity will be larger.

[b]  There are other DVD standards such as DVD+R/RW, which include other features or improvements.

97.    As explained in a May 17, 2009 article that appears on the Geeks.com website:

**The important thing to know is that the drives are pretty much backwards compatible,** so if you get a DVD±RW DL it can pretty much read and write to the formats before it (for example, a DVD±RW DL can read a CD-ROM disc, burn to a CD-RW disc, etc.).

All that alphabet soup of letters can be confusing, but all you need to know are the three basic (currently used) optical formats: CD DVD, BLU-RAY (also called BD). Each of these formats have a read-on mode (-ROM), a write only (recordable) mode (-R or +R) and a read-write (re-recordable) mode (-RW, +RW, -RAM or –RE). The DL tacked onto the end of the alphabet soup means that the drive is a Double Layer drive (it can read or write to 8.5 GB double layer discs). (emphasis in original).

**B.    Evolution of ODDs and Sales**

98.    The optical disc was invented in 1958. In 1961 and 1969, patents were registered for the analog optical disc for video recording. In 1969 Royal Philips began its first optical

24

videodisc experiments. The first ODD was invented with the creation of the audio compact disc (audio CD), which was jointly invented by Sony and Royal Philips and intended to store analog video signals and music and computer software. In 1972, Royal Philips announced a technique for storing audio recordings on an optical disc with a small diameter. At the same time, Sony was exploring optically recording audio on a larger disc but was focusing on developing an error correction technique. In 1978, Sony and Royal Philips agreed on a single format for the disc and the error correction method that would be used. The CD system was introduced to the public in Japan and Europe in 1982. Since the 1980s, several companies have created spin-offs of the CD project by covering specific CD-based applications and extending the previously established standards set by Sony and Royal Philips.

99.    The first generation of ODDs utilized CDs that could store 650 megabytes of data, but for several years, the CDs were available only in a read-only format (CD-ROMs). Once the standard of how to create a CD and an optical device that reads the information on the CD were established, CD-ROM drives began to penetrate the computer market. ODDs have been in common use in computers since the 1990s, when CD-ROM drives became affordable for the average consumer. Both HLDS and TSST stopped making CD-ROM drives and CD-RW drives at the beginning of 2008.

100.    In the mid-1990s, a consortium of manufacturers (including Hitachi, Pioneer, Royal Philips, Sony and Toshiba) developed the second generation of the optical disc, the DVD. The second generation of drives used DVDs that could store 4.7 gigabytes, but DVDs were more quickly available in both a read-only format and a format that allowed both reading and recording. The DVD was intended to store great amounts of data, including broadcast-quality digital video. ODDs using DVDs are currently the most prevalent in both consumer electronics products and computers.

101.    The third generation of ODDs uses BDs that can store in excess of 20 gigabytes, and also have both read-only and read/record formats. Toshiba developed and promoted an HD-DVD format for third generation ODDs, but in June of 2008, it announced that it would no longer develop or manufacture ODDs using HD-DVDs, and would instead use the BD format developed and

SECOND AMENDED COMPLAINT

promoted by Sony.[2] In 2006, the specifications for the third generation optical disc, the BD format, were finalized. The Blu-ray standard was developed by the Blu-ray Disc Association, an industry group which included makers of consumer electronics, computer hardware, and motion pictures. The Blu-ray format was designed to supersede the DVD format and dramatically improve on the quality and capacity of the DVD.  The BD was meant to be able to distribute high-definition video and support greater data storage capacity than the DVD. Afterwards, manufacturers began to develop ODDs for computers that could read and write both DVDs and BDs.

102.    Sony introduced the first laptop equipped with a BD drive (the Sony Vaio® AR Premium) in June of 2006; its first multimedia desktop PC (the RC300) soon followed.

103.    According to the Digital Entertainment Group ("DEG"), "[s]ales of Blu-ray Disc playback devices – including set-top box and game consoles – sold through almost 10 million units since launch.  Three million devices sold in the fourth quarter alone, bringing total units sold to 9.654 million in calendar 2008, according to numbers compiled by the DEG with input from retail tracking sources." In April of 2009, DEG reported that "[s]ales of all Blu-ray compatible devices, including set-top players, PC drives and PlayStation 3 console are now in more than 10.5 million U.S. homes." A year later, DEG was reporting that "Blu-ray Disk hardware sales saw set-top sales growth of 125 percent vs. first quarter 2009."

104.    The latest ODDs, which can read from and write and rewrite onto all kinds of optical discs and are thus fully backward compatible, are known as "super multi-drives."

105.    Throughout its history, but especially after 2000, the ODD market, which requires significant technical resources and advanced manufacturing capabilities, has been dominated by a small group of manufacturers, as discussed in further detail below.

106.    The ODD market has also consistently been faced with downward pricing pressures, including those resulting from the technological advances in ODD technology described above. As defendants and their co-conspirators improved their ability to manufacture ODDs more efficiently

---

[2] Indeed, in 2006, TSST began manufacturing BD drives using the Blu-ray format, so Toshiba had access to that technology at an early point.  Similarly, the Sony NEC joint venture manufactured both BD and HD-DVD drives.

SECOND AMENDED COMPLAINT

and at a lower cost, the price of this technology began to decline.  However, defendants and their co-conspirators, sensing that prices for ODDs were declining, colluded to fix prices and allocate markets or customers in order to prevent such prices from dropping too quickly, a phenomenon not uncommon in conspiracies involving electronic products.

107.    During the Relevant Period, ODDs were a standard component on computers in the United States. Due to the increasing popularity of personal computers during the Relevant Period, defendants and their co-conspirators shipped hundreds of millions of ODDs each year, generating billions of dollars in annual revenues. According to an analysis by IDC, an industry data source, between 2004 and 2008, worldwide ODD shipments generated more than $45 billion in revenues. Research in *Digitimes* estimated that worldwide ODD shipments increased at an annual rate of approximately 10%, exceeding 300 million units by 2007.

108.    Defendant Sony's President and CEO, Ryobi Chubachi, stated after the signing of a Memorandum of Understanding between Sony and NEC in 2005 that "[o]ptical disk drives are key components for a broad range of devices and we are strategically focused our development resources in this sector." NEC's President Akinobu Kanasugi added that "[t]he market for high value-added drives to be integrated into PCs and consumer electronics products is rapidly expanding."

109.    Notwithstanding the changes in the ODD market, defendants and their co-conspirators have remained market leaders in the industry because of their conspiratorial acts and collusive conduct. Although the market for CDs has decreased, the market for DVDs and BDs has grown exponentially as consumers have shifted to the new formats. In a 2008 consumer survey, 56% of respondents would have considered purchasing a BD player if there had been a significant price drop.

**C.    Structural Market Factors Favoring, And Acts Indicative Of, Collusion**

110.    During the Relevant Period, the ODD market exhibited several factors that contributed to the ability of defendants and their co-conspirators to carry out their conspiracy, including but not limited to: (1) market concentration; (2) joint venture or other collaborations; (3) significant barriers to entry (including patent pools); (4) common trade associations and business organizations; (5) the use of auctions for supply contracts, some of which included most favored nations clauses, whereby

27

1    defendants and their co-conspirators could and did collude; and (6) the standardization of ODDs.

2                    **1.    Market Concentration**

3         111.    The market for ODDs is large.  The global market for ODDs in 2005 was

4    approximately worth $9.23 billion and approximately 303.8 million units were shipped.  For

5    example, HLDS reported $2.4 billion in revenue in 2005, the last year for which figures are available,

6    and Sony Optiarc Inc. reported $1.52 billion in sales for the year that ended March 2008.  According

7    to some market estimates, the ODD industry currently generates yearly worldwide revenue in excess

8    of $8 billion.

9         112.    Despite its large size, the ODD market is highly concentrated and dominated by a

10   small group of suppliers. This concentrated market is conducive to and facilitates the collusive

11   conduct alleged herein. According to published reports, during the Relevant Period, the ODD

12   industry has been dominated by defendants and their co-conspirators.  According to data from IDC,

13   an industry analyst, the worldwide aggregate market share of HLDS, TSST, Sony Optiarc, PLDS and

14   Panasonic in 2008 was 84.4%.  Pioneer was responsible for another 6.3%.

15        113.    A graph from a Sony Optiarc internal presentation prepared in mid-2009 that is

16   published on the internet illustrates monthly ODD shipments by manufacturers for the third and

17   fourth quarters of 2008 and the first and second quarters of 2009.  It illustrates the market power

18   wielded by TSST, HLDS, PLDS, Panasonic, TEAC, Toshiba, and Sony Optiarc.

19                    **2.    Joint Venture or Other Collaboration**

20        114.    The ODD industry has experienced significant consolidation. As manufacturing

21   migrated toward lower-cost drive makers in Korea and Taiwan between 2001 and 2003, early

22   Japanese manufacturers still held key competitive advantages in the form of intellectual property

23   rights. To mitigate the high cost of royalty payments for licensing this intellectual property,

24   Taiwanese and Korean defendants partnered with the patent holders through strategic alliances and

25   joint ventures. These alliances include:

26                    a.       HLDSI, formed on November 1, 2000 in Tokyo, Japan, and beginning

27                             operations in January 2001;

28
                                              28

b.      JVC Lite-On IT Manufacturing & Sales Ltd., a production and marketing company founded in October of 2001 in Hong Kong;

c.      PBDS, founded in February of 2003 and specializing in the manufacture of DVD+RW ODDs;

d.      The Sony & Lite-On "Alliance", a memorandum of understanding signed in May of 2003 that led to acts of price-fixing of ODDs;

e.      TSST, established in April of 2004;

f.      The Sony-NEC joint venture, formed in 2006, which was followed by NEC's transfer of its stock to Sony in September of 2008;

g.      Lite-On's acquisition of BenQ's ODD production facilities in 2006;

h.      Philips & Lite-On Digital Solutions Corporation, formed in March of 2007; and

i.      PDDMC, the joint venture between Pioneer (which owned 66%) and Sharp (which owned 34%) that was announced in June of 2009 and anticipated to commence operations in October of 2009 (but was delayed "due to ongoing assessments of whether the joint venture conforms to antitrust laws overseas"), and which was finalized in November of 2009.

115.    The mutually beneficial nature of the business relations between and among certain defendants and co-conspirators provided the opportunity for their parent entities to conspire and created a financial incentive to do so. As Gerald Cavanagh, a Sony spokesman in Tokyo, explained when announcing the formation of Sony NEC, the joint venture was formed because "[t]here was a feeling that those two complementary strengths [of Sony and NEC] would make more sense in a joint venture than competing against each other."

116.    Similarly, on information and belief, after the formation of PLDS, the company's general manager, Tseng Huan-Xiong, stated that "[Royal] Philips and Lite-On in the future will target at making profits and avoid price wars." "While aiming for large shipment volumes, PLDS will maintain steady profits and therefore will maintain a minimum gross margin by refusing low-priced

29

1   orders as well as not participating in price-cutting competition, Tseng pointed out."

2       117.   In addition, at various points during the Relevant Period, one defendant or co-

3   conspirator produced ODDs for another defendant or co-conspirator. For example, on information

4   and belief, in November of 2004, it was reported that Lite-On would produce more non-Blu-ray

5   ODDs for Sony. As another example, in 2000, TEAC entered into an ODD co-development

6   arrangement with Royal Philips. As a third example, QSI has manufactured ODDs for PLDS/PBDS

7   and Sony Optiarc.

8       118.   These joint ventures and collaborations among defendants and their co-conspirators

9   enabled them to force out most of Taiwan's second-tier manufacturers and almost all Chinese

10   manufacturers from the ODD industry. This latter result was anticompetitive because the Chinese

11   manufacturers had lower labor costs, a market reality that normally would enable a manufacturer to

12   drive down prices on products such as ODDs.

13         **3.**    **Barriers to Entry**

14       119.   The market for the manufacture and sale of ODDs was subject to high manufacturing

15   and technological barriers to entry during the Relevant Period. Efficient manufacturing plants are

16   large and costly. Companies, such as defendants and their co-conspirators, that develop and

17   manufacture ODDs, face technological advances, causing the companies to undertake significant

18   research and development expenses.  For example, from 2002 to 2005, a time in which all or most of

19   its sales came from ODDs, Lite-On spent approximately $79.7 million in research and development.

20       120.   Another important barrier to entry is the difficulty in landing sizeable OEM

21   orders. OEMs usually require a lengthy qualification process before entering into supply

22   agreements. An analyst in 2003 noted that "local competition remains slow because of entry

23   barriers. PC OEMs, in our view, may retain two-three suppliers from Taiwan, Japan and Korea

24   on the list as a strategy to diversify country risk, which suggests a smaller pie to divide up

25   among late entrants."

26       121.   ODD sellers' strong relationships with patent holders for component technology

27   create yet another barrier to entry in the ODD market. This is especially notable in the PC

28

SECOND AMENDED COMPLAINT

market. Establishing these important relationships with patent holders is difficult for low-volume manufacturers of ODDs, and therefore, makes it difficult for them to compete effectively in the market.

122.   PLDS noted the importance of access to patents on its website with respect to BD drives:

> Philips & Lite-On Digital Solutions has a strong and long-term commitment to the Blu-ray format. **PLDS is one of the few companies in the ODD industry that has access to an extensive Blu-ray patent portfolio and a large Optical Disc Drive production facility. Combining these two aspects makes PLDS a leading company in the Blu-ray Optical Disc Drive marketplace. Other traditional ODD manufacturers will need to pay Blu-ray royalties to the original patent holders or outsource their production of BD drives to other manufacturers. The combination of access to Blu-ray patents and being a true manufacturer of Blu-ray drives, gives PLDS a competitive advantage.** (emphasis added).

123.   Defendants' and their co-conspirators' licensing structures included imposition of high licensing costs that also effectively deterred entry. In the ODD industry, these structures have often taken the form of patent pools. In such pools, industry competitors pool their various technology patents and grant a license with sublicensing rights to a license administrator (typically a member of the pool) who issues licenses to manufacturers of ODDs. The licensees pay royalties to the administrator and the resulting revenue is allocated among members of the pool, typically pursuant to a prearranged formula.

124.   For example, in 1998, Sony, Pioneer and Philips formed the **3C DVD Patent Group** to exploit jointly their various patents relating to the DVD format. LG joined the group in July of 2003, when John Koo, its Chairman and CEO, stated: "[w]e will cooperate with those companies on patent protection and patent exploitation now and in the future. LG Electronics is excited to join the most professional licensing organization in the field of optical storage patent licensing and will consider future cooperation with the same partners in other optical storage programs in which LG Electronics has important patent portfolios . . . ." Pioneer has joined the 3C DVD Patent Group as well. Philips acts as the licensor for the group. The licensing agreement imposed a DVD player license fee of 3.5% of the net selling

31

price for each player sold. As of 2006, the 3C DVD Patent Group controlled the licensing of 115 patents relating to the manufacture of DVD players.

125.   In December of 1998, core members of the DVD "+" camp formed a patent pool for their essential DVD-ROM and video patents.  This consortium became known as the **DVD3c patent pool**.  The DVD3c patent pool now consists of Philips, Sony, Pioneer, Hitachi, Matsushita Electric Industrial Co., Ltd., Mitsubishi Electric Corp., Thomson Multimedia, Timer Warner, Toshiba, Victor Company of Japan Ltd.  Thus, Pioneer Philips, Sony, Hitachi and Toshiba are all participants in the DVD3c patent pool.

126.   In June of 1999, core members of the "-" camp formed their own, separate DVD-ROM and video patent pool, called **DVD6c patent pool**.  The original DVD6c was comprised of Toshiba, Hitachi, JVC, Time Warner, Matsushita, and Mitsubishi. The DVD6c pool now consists of Hitachi, Mitsubishi Electric Corp., Panasonic Corp., Samsung, Sanyo Electric Co., Ltd., Sharp Corp., Toshiba, Victor Company of Japan, Ltd and Warner Brothers Home Entertainment Inc.  Thus, Hitachi, Samsung and Toshiba are all participants in the DVD6c pool.

127.   As a second example, commencing in June of 1999, leading developers of DVD technology and formats—including Hitachi, Panasonic, and Toshiba—commenced a worldwide joint licensing program for patents essential for DVD-Video players, DVD-ROM drives, DVD decoders and DVD-Video and DVD-ROM discs that conform to the specifications promulgated by the DVD Forum (described below), known as the **"DVD 6C Patent Pool."** The companies authorized Toshiba to act as portfolio licensor, although Hitachi and Toshiba now act as regional agents for certain world regions. Sharp and Samsung joined the DVD 6C Patent Pool in April of 2005 and November of 2006, respectively. The DVD 6C Patent Pool royalties for licenses with respect to, *inter alia,* DVD-ROM drives and DVD decoders were initially set at 4% of the net selling price or $4 for these items. As of 2006, the DVD 6C Patent Pool controlled the licensing of 377 patents.

128.   As a third example, in March of 2010, the **BD4C Licensing Group,** which includes

SECOND AMENDED COMPLAINT

Toshiba, announced that it had commenced a worldwide joint licensing program for Blu-ray and the patents needed for BD decoders, encoders, recorders, players, read-only discs, recordable discs, drives and BD/DVD hybrid discs.  Once again, Toshiba was authorized to act as the licensing agent.

129.    As a fourth example **various patent pools were established for CD, CD-R and CD-RW technology.** One was established by Sony and Philips for CD technology. A second was established by Philips, Sony and Ricoh for CD-RW technology. A third was established by Philips, Sony, and Taiyo-Yuden Co., Ltd. ("Taiyo-Yuden") with respect to CD-R technology.

130.    The royalties charged by the DVD patent pools are now truly huge relative to the total cost of manufacturing ODDs.  Indeed, they account for the majority of manufacturing cost for a potential entrant.

131.    The DVD patent pool royalties now constitute a large barrier to entry by potential competitors.  For example, the average worldwide price for a DVD burner, on an if-sold-OEM basis, was $30 in 2007, $25 in 2008, and $23 in 2009.  In a December 2008 presentation, Hisashi Kato of Japan's Mitsubishi Electric, estimated the royalty payable to four principal patent pools holding IP related to a DVD recorder to be $17 (of which $14 goes to DVD6c and DVD3c).  This 68 percent of the average selling price of a DVD recorder in 2008, and presumably an even larger share of its costs.

132.    The history of the patent pool for CD-R technology illustrates how patent pools can be used for anticompetitive collusion. To facilitate patent licensing to CD-R producers around the world, Philips, Sony and Taiyo-Yuden adopted a joint licensing arrangement whereby Sony and Taiyo-Yuden first licensed their patent rights to Philips, and then Philips bundled the rights together for licensing to other companies. In a decision entered in December of 2008, the Taiwanese Fair Trade Commission ("TFTC") **concluded that these companies engaged in unlawful "concerted action," improperly excluded competitors from the market and overcharged patent licensees.** As stated on TFTC's website:

> **After considering the unlawful acts' impact on the functioning of market mechanisms of the technology patent licensing markets and associated products at issue, as well as the respondents' motives for the violation, benefits obtained thereby, and considerable business scales and prominent market standing, the [T]FTC imposed administrative fines of NT$ 8 million on**

SECOND AMENDED COMPLAINT

**Philips, NT$ 4 million on Sony, and NT$ 2 million on Taiyo Yuden, and ordered the companies to immediately cease the illegal practices pursuant to the fore part of Article 41 of the [Taiwanese Fair Trade Law].** (emphasis added).

133.   Not surprisingly, some customers have rebelled against onerous patent pool licenses. In October of 2008, Steve Jobs of Apple, Inc. said it was holding off licensing Blu-ray technology for Macintosh notebooks because **"Blu-ray is a bag of hurt."** (emphasis added). Indeed, intellectual property licensing rights are critical to understanding the ODD industry, because high-technology licensing royalties are a meaningful part of the costs for manufacturing ODDs. Japanese companies adopted the strategy of charging high royalties in order to prevent Taiwanese and South Korean manufacturers with their superior cost controls from quickly entering the DVD-ROM drive market. One report noted that "[e]xpensive royalty payments have driven most Taiwanese companies out of the DVD-ROM drive market. Taiwan shipped only 600,000 DVD-ROM drives in 1999, out of 14.7 million units shipped worldwide." Michael Gong, General Manager of Lite-On's ODD business unit, announced cutbacks in 2002 with respect to DVD-ROM drive shipments: "[l]icensing fees for DVD-ROM drive technology costs about US$10 per unit, about one-third of a drive's manufacturing contract price. If Taiwan-based companies cannot solve this issue, they will not be able to sustain profitable operations when DVD-ROM drive prices fall further." This cost only increases when a licensee has to pay cumulative royalties to multiple patent pools. In a 2008 presentation, Hisashi Kato of Mitsubishi Corporation estimated that a DVD Recorder manufacturer would have to pay $17 per unit in royalties to four different patent pools, including the 3C DVD Patent Group and the DVD 6C Patent Pool.

134.   In response to high license royalties, Taiwanese and South Korean ODD makers sought to become part of the cartel and to tie up strategically with patent pool members (who enjoy cross-licensing privileges), procure drive kits, or sell product through such members. In exchange, members of the cartel have controlled prices to prevent low cost producers from cutting prices. A September 2003 analyst report pointed out:

34

**As a result [of intellectual property issues], optical drive makers increasingly gravitated towards strategic alliances with intellectual property holders, attempting to shield themselves under the umbrella of joint venture partners in an effort to reduce royalty requirements.** While the specifics of joint ventures remain well guarded, the most common structures involve joint ownership (LG-Hitachi, Philips-BenQ, JVC-Lite-On, and the recently formed Toshiba-Samsung) or ODD makers selling product through IP holders...Strategic alliances, which have followed the model of Hitachi-LG, are becoming the norm in the industry. (emphasis added).

135.    Because of the barrier to entry caused by onerous patent royalties, efficient Taiwanese and Korean manufacturers that could not otherwise thrive in the ODD market formed joint ventures with less efficient manufacturers holding intellectual property rights. The ODD market thus increasingly coalesced around an oligopoly consisting of Sony NEC (later Sony Optiarc), HLDS, TSST, and PBDS (later PLDS). On information and belief, an analyst report in 2003 noted that "the collective market share of this group will swell further to about 80%- 90% over the next two years." That is what happened during the Relevant Period, and the conspiracy has controlled prices for ODDs.

### 4.    Trade Associations and Business Organizations

136.    Various industry trade organizations or events facilitated defendants' and their co-conspirators' price fixing of ODDs. Defendants participated in many of these meetings and events and provided a forum at which defendants and their co-conspirators could discuss and exchange information with respect to the pricing and production of ODDs with the purpose and effect of raising, fixing and stabilizing the prices of such products, bid rigging and market allocation. In several instances, these trade association meetings preceded examples of alleged collusive pricing conduct described below. Some examples of the trade association meetings are as follows:

#### a.    CD Trade Associations

137.    **CDs21** Solutions **("CDs21")** is a trade association formed in April of 2001 that was created by the merger of the Multimedia CD Consortium, which promoted CD-i (an interactive multimedia CD player developed by Philips) and Video CD formats, and the Orange Forum, which focused on CD-R/RW standards. Hitachi, HLDS, Sony, Panasonic, Lite-On, TSST and Philips Japan Co., Ltd. were among its members. Among the stated ostensible

35

purposes of CDs21 were:

> To pursue ever more development of the industrial sector concerned by striving to closely unite the technology and the contents in the area of CD platform as well as by looking into future technologies.

> To aim for the creation of a new AV [audiovisual] culture which can further enrich the life of people.

> **To promote the development of mutual businesses by fostering an environment where the knowledge and information can be shared by all as a common property.** (emphasis added).

### b.   DVD Trade Associations

138.   The **DVD Forum** is a global group of hardware manufacturers, software firms and content providers formed in 1997 to ostensibly promote and improve standards for the DVD format and products associated with that format. Hitachi, LG, Lite-On, NEC, Philips, Panasonic, Pioneer, Samsung, Sony, TEAC, QSI, and Toshiba are all members of the DVD Forum. The stated purpose of the DVD Forum is "to exchange and disseminate ideas and information about the DVD Format and its technical capabilities, improvements and innovations."

139.   Over the years, the DVD Forum had various conferences and seminars in Taiwan, Japan, China, Europe and the United States that allowed its members to exchange competitively sensitive information on ODDs.

140.   The DVD Forum has a Steering Committee, which consists of, among others, Hitachi, LG, NEC, Panasonic, Pioneer, Sony, Samsung, Toshiba, and Sharp.

141.   The Steering Committee of the DVD Forum met regularly, including meetings held on June 9-10, September 22 and December 1, 2004; February 23, May 26, September 12, and November 16-17, 2005; February 22, May 24, September 12 and November 29, 2006; February 28, June 19, September 12, and November 15, 2007; February 27, June 11, September 17, and November 19, 2008; February 25 and September 10, 2009; and February 24, 2010.

142.   Among those present at one or more of these meetings were: (a) Yutaka Komai,

SECOND AMENDED COMPLAINT

Yukinori Kawauchi, and a Mr. Saito from Sony; (b) Young-Min Cheong, In-Sik Park, and Yong-Chae Jeong from Samsung; (c) Kiyoung Lee, Kun Suk Kim, and Jea-Yong Joo from LG; (d) Yasuo Ogasawara and Hiroshi Inada from NEC; (e) Hideki Mimura, Hiruharu Sato, Yoshihide Fujii, and Messrs. Nishioka and Kaneda from Toshiba; (f) Yoshiho Gotoh, Yoshiharu Sakurada and Messrs. Nakano, Murase and Kozuka from Panasonic; (g) Messrs. Imaide, Noguchi, and Owashi from Hitachi; (h) a Ms. Ikei and a Mr. Heijnemans from Philips; (i) Junsaku Nakajima, Akira Takahashi, Taiji Nishizawa, Masatoshi Tsujimoto, Hiroyuki Okada, and a Mr. Egawa from Sharp; and (j) Matsumi Fujita, Shinichi Tsuji, and Messrs. Inoue and Yamada from Pioneer.

143.    These meetings took place in Japan, South Korea, Taiwan, the Netherlands, France, Hawaii, and in many instances, California. For example, the September 10, 2009 Steering Committee meeting was held at the Universal Hilton Hotel in Los Angeles, California. Defendant Toshiba was the chair of that Steering Committee meeting.

144.    In April of 2001, the **Recordable DVD Council ("RDVDC")** was formed. The eight executive members of RDVDC included: Hitachi, Ltd.; Hitachi Maxell Ltd.; Matsushita Electric Industrial Co., Ltd. (now Panasonic); Samsung Electronics Co., Ltd.; and Toshiba Corporation. Its 58 general members as of August of 2001 were major Japanese and Korean companies in the ODD supply chain.

145.    Bob-Guk Koo, chairman of the RDVDC, as well as Senior Corporate Advisor and former Executive Vice-President of Samsung, stated that "[t]he Council will make its chief targets **industry outreach at major trade shows, information exchanges among Council members** and discussions aimed at expanding the recordable DVD market." (emphasis added). Mr. Koo noted that "[t]he Recordable DVD Council has held six seminars in Japan, sponsored a joint Pavilion at the Fall COMDEX in Las Vegas, and launched other promotional activities in 2001. . . . The Council's membership has grown from 58 to 87 companies since the RDVDC was established a year ago, making it the largest recordable DVD industry alliance among similar kinds of promotional groups. **This is proof that our activities have been supported by**

37

1    **the industry and we are proud of it."** (emphasis added). In August of 2003, the RDVDC

2    announced the establishment of the Compatibility Working Group to ensure interoperability of

3    products using RDVDC-supported recordable DVD formats.

4        146.    The **RAM Promotion Group ("RAMPRG")** is an organization formed at

5    COMDEX in 2003. Its members include Hitachi, TEAC, HLDS, Panasonic, LG, Toshiba,

6    and Samsung. RAMPRG is ostensibly committed to promoting the DVD-RAM format and

7    popularizing DVD-RAM related products on an international basis. RAMPRG is supported

8    by the RDVDC, and all of the founding members of the RAMPRG are also members of the

9    RDVDC. RAMPRG was launched internationally in August of 2003, with its first

10   appearance at the Internationale Funkausstellung (discussed below) in Berlin, Germany. It

11   then appeared in Tokyo, Japan in October of 2003.

12       147.    The **DVD+RW** Alliance **("Alliance")** is a group of electronic hardware, optical

13   storage and software manufacturers who in 1997 created and promoted a format standard of

14   recordable and rewritable DVDs, known as the "plus" format. As of 2004, plus format DVDs

15   were available in various forms, including DVD+R and DVD+RW. Sony and Philips were

16   members of the Alliance, which has both a Product Promotions Group and a Compatibility &

17   Convergence Group.

18                        c.      **Blu-ray Trade Associations**

19       148.    The **Blu-ray Disc Association ("BDA")** is a worldwide group inaugurated in

20   2005 to promote the BD format and products associated with that format, with members

21   including Hitachi, Pioneer, LG, NEC, Philips, Samsung, Sony, TEAC, QSI, and Toshiba.

22   Sony, LG, and Hitachi are all founding board members of the BDA. The BDA was created

23   and maintained by its members to, *inter alia,* establish standardized formats and cross license

24   technology.

25       149.    The BDA has several different committees, including a Promotion Committee. The

26   role of that committee is described as follows on BDA's website:

27            The promotion committee formulates a strategic approach to promote BD
             formats in various product categories. It creates and participates in events

28                                            38

and activities that: promote BD formats, showcase BD products, educate and train key audiences on BD formats and technology, promote compatibility of BD products and create a community for General Members of the BDA.

Current Promotion Committee groups:

–        Americas Promotion Team

–        Europe Promotion Team

–        Japan and Asia/Pacific Promotion Team

–        China Promotion Team

150.    In April of 2007, Warren Lieberfarb, the former President of Warner Home Video, said of the BDA that **"[i]t was clear to me that a cartel like consortium was being created for the purpose of forcing a** *de facto* **standard on other manufacturers.** (emphasis added).

151.    In April of 2008, Stan Glasgow, the President of Sony Electronics, stated that in order to ensure that the prices of ODDs that play BDs would not fall precipitously, the BDA would not be soon licensing to any manufacturers in China.

### d.        Multi-Format Trade Associations

152.    According to its website, the **Optical Storage Technology Association ("OSTA")** was:

incorporated as an international trade association in 1992 to promote the use of writable optical technologies and products for storage of computer data. The organization's membership includes optical product manufacturers and resellers from three continents, representing more than 85 percent of worldwide writable optical product shipments. **They work to shape the future of the industry through regular meetings of CD/DVD,** file interchange, **market development,** magneto-optical and planning committees. (emphasis added).

153.    During the Relevant Period OSTA's membership included ODD manufacturers such as Sony, LG, Panasonic, Toshiba, Philips Electronics, Samsung Electronics, and Pioneer.  OSTA works to "shape the future of the industry" through regularly scheduled meetings covering a variety of industry topics and an annual Optical Storage Symposium described below. Benefits

39

of OSTA membership for all members, as listed on its website, include:

- **Influenc[ing] the health and direction of the industry.**

- **Meet[ing] with industry peers for information exchange.**

- **Receiv[ing] early foresight into industry strategies.** (emphasis added).

154.   OSTA also plays an important role in the industry through its efforts to establish industry-wide specifications for optical disc and ODD technologies including MultiRead (as described below), MultiPlay, and Universal Disk Format.

155.   In 2005, OSTA meetings were held on February 28, March 1-2, June 13-15, September 12-14 and December 5-7. Each of these meetings occurred at the Embassy Suites Hotel, 250 Gateway Boulevard, South San Francisco, California. In 2006, OSTA meetings were held on March 2-3, June 12-14, October 5-6, and December 4-6. Each of these meetings occurred at the same location in South San Francisco, with the exception of the meetings on October 5-6, which took place in Tokyo, Japan, at the Akihabara Convention Center. In 2007, OSTA meetings were held on March 5-7, June 11-13, September 17-19, and December 3-5. Each of these meetings occurred at the same location in South San Francisco. In 2008, OSTA meetings were held on March 17-19, June 16-18, October 6-8 and December 8-10. Each of these meetings occurred at the same location in South San Francisco, with the exception of the March 2008 meetings, which occurred at the DoubleTree Hotel, San Francisco Airport, 835 Airport Blvd., Burlingame, California. The last known general meeting of the OSTA took place during March 16-18, 2009 at the Pacific Business Centers, 19925 Stevens Creek Blvd, Cupertino, California.

156.   Attendees at one or more of these various meetings included: Christopher Smith of Sony Corporation; Paul Castellana of Toshiba; Maciek Brzeski of Toshiba; Yong Cheol Park of LG; Patrick Yen of Lite-On; Frank Simonis of Philips; and Young Yoon Kim of SECL. Under the guise of an industry forum, these representatives had opportunities to meet and communicate regarding the price-fixing conspiracy for ODDs.

157.   The **International Symposium of Optical Memory ("ISOM")** is an

organization created in Japan that is concerned with the technology of optical memory and provides a forum at which its members can share information on that subject. Its members include Sony, Sharp, Pioneer, Panasonic, Toshiba, Hitachi, LG, NEC and Samsung. It has met annually since 1985. The 2004 meeting took place on October 11-15 at Jeju Island, South Korea; the 2005 meeting took place on July 10-14 in Honolulu, Hawaii; the 2006 meeting took place on October 15-19 in Kagawa, Japan; the 2007 meeting took place on October 21-25 in Singapore; the 2008 meeting took place on July 13-17 in Waikoloa, Hawaii; and the 2009 meeting took place on October 4-8 in Nagasaki, Japan.

158.   Attendees at these various meetings included: (a) T. Maeda, H. Miyamoto, M. Nakamura, M. Ojima, Hiroyuki Minemura, and T. Shintani of Hitachi; (b) Jin-Yong Kim, Yun-Sup Shin, and In-Ho Choi of LG; (c) Ryuchi Katayama, H. Inada, T. Iwanaga, Y. Yamanaka, and H. Fukuchi of NEC; (d) J.A.M.M. van Haaren of Philips; (e) Isao Ichimura, Atsushi Fukumoto, Kimihiro Saito, Masataka Shinoda, M. Takeda, K. Nishitani, M. Toishi, S. Kubota, and S. Higashino of Sony; (f) Yutaka Kahihara, Y. Honguh, H. Yamada, Hiromichi Kobori, and A. Hirao of Toshiba; and (g) Chong Sam Cheung, Dong-Ho Shin, Kyung-Guen Lee, Jooho Kim, and I.-S. Park of Samsung.

159.   Under the cover of these annual meetings, defendants who were members of ISOM had the opportunity to conspire on pricing and supply with respect to ODDs. The 2010 ISOM meeting occurred on October 24-28 in Hualien, Taiwan.

160.   The **RW Products Promotion Initiative ("RWPPI")** is a trade association formed in Tokyo, Japan in May of 2000 to promote rewritable optical discs. The founding members included Hitachi Maxell, LG, Pioneer, Sharp, Sony, and Samsung. Lite-On, NEC, TSST and Sony Optiarc subsequently joined the association. Its main activities were stated to include exchanges of various types of commercial and technical information. In January of 2001, RWPPI created a United States Liaison Office located at the Long Beach, California office of Pioneer North America, Inc. According to a January 6, 2001 press release, a goal of this office was to "facilitate the exchange of information among RWPPI members in North America."

SECOND AMENDED COMPLAINT

161.    The RWPPI held numerous meetings at the Japanese locations of Sharp and Pioneer during the Relevant Period, that provided a forum to communicate and agree upon prices for ODDs and carry out the conspiracy relating to them. The dates and locales of those meetings are set forth in the following chart.

| Date of Meeting | Meeting Location |
| --- | --- |
| 3/13/2009 | Pioneer (Meguro, Tokyo, Japan) |
| 12/5/2008 | Sharp (Makuhari, Chiba, Japan) |
| 9/19/2008 | location unknown |
| 6/18/2008 | Pioneer (Meguro, Tokyo, Japan) |
| 2/14/2008 | Pioneer (Meguro, Tokyo, Japan) |
| 12/7/2007 | Sharp (Makuhari, Chiba, Japan) |
| 9/13/2007 | location unknown |
| 6/12/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 4/18/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 2/14/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 12/6/2006 | Sharp (Makuhari, Chiba, Japan) |
| 10/20/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 8/23/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 6/21/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 4/28/2006 | location unknown |
| 2/17/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 12/7/2005 | Sharp (Makuhari, Chiba, Japan) |
| 10/28/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 8/3/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 6/16/2005 | location unknown |
| 4/15/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 2/17/2005 | location unknown |
| 12/9/2004 | Sharp (Makuhari, Chiba, Japan) |

SECOND AMENDED COMPLAINT

| 10/29/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 8/26/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 6/15/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 4/14/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 2/25/2004 | Pioneer (Meguro, Tokyo, Japan) |

162.    The RWPPI appears to have disbanded, and closed its website in March of 2009, shortly before a federal grand jury began issuing subpoenas concerning an antitrust investigation into the ODD industry.

**e.    Trade Shows**

163.    The **International Consumer Electronics Show ("CES"),** the world's largest consumer electronics show, has been held annually during the Relevant Period. The 2010 CES took place from January 7-10, 2010 at the Venetian Hotel in Las Vegas, Nevada. Members of the conspiracy had the opportunity to communicate with each other about the conspiracy during the 2010 CES.

164.    As noted above, the **Optical Storage Symposium** is a worldwide conference held annually from 2001-07 at various locations sponsored by OSTA. The 2007 event was held in South San Francisco on September 18-19, 2007. The 2006 event, held in Tokyo, Japan on October 5, 2006, included presenters from Sony, Hitachi and CDs21. The 2004 event, held in Burlingame, California on September 25, 2005 and co-sponsored by, among others, Sony and Toshiba, included presenters from Sony and Toshiba.

165.    The **Internationale Funkausstellung ("IFA")** is a worldwide exhibition of consumer electronics products that is held annually in Berlin, Germany and is attended by representatives of defendants. Recent IFA shows occurred on September 3-8, 2010; September 4-9, 2009; August 29-September 3, 2008; August 31-September 5, 2007; September 1-6, 2006; and September 2-7, 2005.

166.    The conduct of the "business" of these organizations or events gave defendants and their co-conspirators the cover needed to contact one another to communicate competitive information and reach and/or implement anticompetitive agreements.

43

1

### 5.    Standardization of ODDs

2    167.    A product is considered standard across suppliers when there is a high degree of

3    substitutability among different suppliers in the market. When products are viewed as

4    interchangeable by purchasers, it is easier to agree on a single price for the good in question

5    and to effectively monitor those prices. This makes it easier to form and sustain a conspiracy.

6    As part of the conspiracy, defendants and their co-conspirators standardized products in the

7    ODD market. For example, OSTA developed "MultiRead," which was an industry consensus

8    aimed at defining the parameters and specifications necessary for all classes of optical discs to

9    be able to be read on current and future ODDs. On March 7, 2000, OSTA announced that 17

10    ODD manufacturers, representing well over 90 percent of the ODD market at the time,

11    achieved compliance with its MultiRead specification. Those 17 manufacturers included

12    Hitachi, LG, Lite-On, Philips, Samsung, Sony, and Toshiba.

13    168.    The ODD industry has been typified by standardization of ODDs driven by

14    industry participants and a variety of industry-related organizations such as ECMA International, the

15    International Standardization Organization ("ISO"), and the International Electrotechnical

16    Commission. These organizations and their members are dedicated to "standardizing the use of

17    information communication technology and consumer electronics."

18    169.    As stated by Philips Consumer Electronics B.V., which is responsible for the

19    development of CD technology and continues to hold patents and licensing rights arising

20    therefrom:

21    
22    
23    
24    
25    

> Standardization offers many other advantages to industry as a whole.
> For example: [1] Improvements to performance, compatibility,
> reliability, safety and interoperability; [2] Economies of scale and
> lower costs—for example, by allowing manufacturers to address
> multiple regions with a single product or manufacturing line; and [3]
> **Cooperation between industry leaders, reducing the risk for
> "first-mover" companies which pioneer new products or
> technologies.** (emphasis added)

26    170.    As noted above, the ODD industry is also subject to patents and intellectual property

27    rights, which are utilized to require adoption of standardized product specifications

28

44

171.   Two competing camps of companies formed within the new standardization effort, one led by Sony and Philips, the original developers of the CD standard, and the other by Matsushita (Panasonic), Toshiba, and Time Warner.  Under pressure from potential users in both the computer industry and the entertainment industry, a DVD Forum was established to unify the competing technological standards.

172.   All parties agreed to a single standard for next-generation DVD video disks, and read-only data storage, but no agreement on writeable DVD data storage was reached.  Sony and Philips became the nucleus of a DVD "+" camp, while Pioneer, Hitachi, Matsushita (Panasonic), Toshiba, Mitsubishi, JVC and Time Warner formed a DVD "-" camp.  The result was two sets of incompatible write formats for DVDs, ultimately unified only by more complex products, "super multi" DVD drives capable of reading or writing all the incompatible formats, as well as CDs.

173.   The standardization of the ODD industry provided defendants and their co-conspirators with the mechanism to implement, enforce, and oversee their agreements to stabilize the prices of ODDs. Furthermore, as a result of this standardization, ODDs are commodity products, and buyers make decisions to purchase such products based largely, if not exclusively, on price. As one industry analyst noted in treatise on optical and magnetic storage, **"[a]s with DRAM chips, the market for magnetic and optical drives is a commodity one; brand name matters little if at all. . . . Optical drives are provided by consumer appliance companies, mostly Japanese, Korean and Taiwanese."** (emphasis added). Likewise, Kris Williams of NEC, in a 2006 e-mail, referred to **"commodity products like DVD-ROM and CD-RW."** (emphasis added).

174.   As noted above, the ODD market is also subject to patents and intellectual property rights, which are utilized to require adoption of standardized product specifications.

**D.     Acts of Collusion With Respect To ODDs**

175.   Defendants and their co-conspirators reached agreements, the object of which was to stabilize the prices for ODDs in numerous ways throughout the Relevant Period.  Defendants and their co-conspirators have been conspiring on price and market allocation with respect to ODDs in numerous

45

1  ways throughout the Relevant Period.

2      176.   Defendants and their co-conspirators participated in meetings, discussions, and

3  communications in the United States or elsewhere to discuss bidding strategies and prices of ODDs.

4  During those meetings, discussions, and communications, defendants and their co-conspirators

5  reached agreements regarding prices to charge customers for ODDs and how participants would bid

6  on ODDs, including prices and bids to Acer. Defendants and their co-conspirators submitted bids and

7  prices in accordance with the agreements reached during those meetings, discussions, and

8  communications.

9      177.   One such manifestation of the conspiracy involved regular exchanges of information

10  among defendants and their co-conspirators of confidential business information concerning ODDs,

11  prices charged and to be charged for ODDs, production capacity with respect to ODDs, business

12  plans for ODDs, plans for the introduction of new ODDs, confidential roadmaps for product rollouts

13  and production, confidential product quality information, confidential product inventory and shipping

14  information, company responses to customer initiatives, and plans for the cessation of manufacture of

15  ODDs that had reached the ends of their respective lifecycles. All of these information exchanges

16  were undertaken for the purpose of fixing the prices of, and allocating customers with respect to,

17  ODDs.

18      178.   Another of the many manifestations of this conspiracy involved bid-rigging. Several

19  OEMs in the United States, including, but not limited to, Dell and HP, conducted auctions among

20  suppliers of ODDs during the Relevant Period.  Dell's auctions began as early as 2002 and were

21  conducted from its headquarters in Austin, Texas during most of the Relevant Period.  HP's auctions

22  began in 2004 and were conducted from either Palo Alto, California or Houston, Texas during most of

23  the Relevant Period.

24      179.   These auctions can be classified into two general types: e-auctions and eRFQs

25  (Electronic Requests for Qualifications). E-auctions typically are live, real-time events that span a

26  few hours in which each competing supplier can submit multiple bids. ERFQs typically span more

27  than one day and involve multiple rounds of bidding. The OEM would provide feedback to

28

46

competing ODD suppliers during the process. OEM procurement events at which auctions typically occurred were on a quarterly basis or, at most, six times a year.

180.    These auctions were not typically "winner take all" situations. Many OEMs would fill their needs by awarding contracts to multiple vendors. Typically, three to four (and sometimes five) bids were selected on a tiered basis. Allocation was based on rank by "Total Available Market" ("TAM"). To use hypothetical examples, if the TAM was close between two suppliers, an OEM might allocate 35% of the auctioned business to the first tier supplier and another 35% to the second tier. If the TAMs were more dispersed, suppliers in the tiers below the first tier would be allocated successively lesser shares of the auctioned business.

181.    Among others, PLDS, HLDS, Sony Optiarc, TSST, QSI, Lite-On, and TEAC participated in auctions run by, *inter alia*, Dell and HP. The auctions encompassed various types of CD, DVD and BD drives for internal use within computers, as well as some external ODD players. In dozens of those auctions, they rigged their bids by: (a) agreeing to fix the prices at which they bid; (b) agreeing on how to allocate their respective positions in the tiers of successful bidders; and (c) exchanging competitively sensitive information on price, desired tier positions, prior bids and bidding outcomes, quality assessments by OEMs (which could affect whether an OEM would allow a supplier to bid for a top tier position on a particular auction), and the timing of the introduction of new products or the cessation of ones that had reached the end of their lifecycles. Panasonic also participated in the information exchanges that had the effect of limiting price competition. These agreements or information exchanges were conducted by sales managers, account managers or global account managers who typically reported to sales executives within their respective companies.[3] For many of these companies over the course of the Relevant Period, six or more people were directly involved in

---

[3] Some persons that have been identified from public sources include: (a) Kris Williams, a Major Account Executive at Sony Optiarc America, Inc. from December of 2004 to July of 2009, who specialized in serving major OEM clients such as HP and Dell (*see* http://www.linkedin.com/pub/kris-williams/4/718/b15); (b) Billy Reynolds, a Global Account Director at PLDS from April of 2003 to May of 2007, who served Dell on a dedicated basis (*see* http://www.linkedin.com/pub/billy-reynolds/6/313/60a); and (c) Luke Choi, who served as Account Manager or Global Account Manager for Dell on behalf of HLDS or LGUSA from February of 2000 to December of 2007 (Mr. Choi is also listed as an "NEO Team Leader" for HLDS from 2000 to the present ) (*see* http://kr.linkedin.com/pub/luke-choi/b/3/86a).

SECOND AMENDED COMPLAINT

collusive activity. Over the course of the Relevant Period, the collective number of collusive communications associated with bid-rigging or information exchanges was in the hundreds.

182.    OEMs sponsored meetings for all suppliers. At such meetings, representatives of defendants and their co-conspirators would congregate together at lunches, introduce themselves to each other, and exchange contact information for purposes of setting up future communications to discuss bid-rigging, as described below.

183.    The representatives of the foregoing defendants and their co-conspirators communicated on the subject of their bid-rigging efforts in several ways. Sometimes, they would communicate by cellular telephone, either before the bidding process commenced or, in e-auctions, while the live bidding process was ongoing. Sometimes they would exchange information through e-mails. During some procurement events, they would conduct face-to-face meetings. In e-auctions, defendants' and their co-conspirators' representatives would be present and participating in the United States while other defendants' and their co-conspirators' representatives were monitoring auction activity from abroad.

184.    Defendants and their co-conspirators would also have face to face meetings to discuss bid-rigging activities. Venues for such meetings included: (a) a coffee shop in Austin, Texas; (b) certain restaurants (such as T.G.I. Friday or Bennigan's) in Houston, Texas; and (c) the lobby of one defendant's office in Singapore.

185.    These bid-rigging efforts started in 2004 and continued at least into 2009. They affected prices paid for ODDs by Acer. As noted below, prior to 2004, prices for ODDs had been declining, but in that year, they stabilized and this stabilization continued during the remainder of the Relevant Period.  Representative examples of such acts of bid-rigging include the following.

186.    HP conducted a procurement event on behalf of its Business PC division that involved an auction for the supplying of ODDs ending on August 31, 2006. Account managers from one defendant and HLDS discussed the position each company wanted in the tiers of successful bidders and they agreed not to bid below $14.65 per unit, an agreement that they followed through on.

187.    In February of 2009, HP instituted an auction for the supplying of ODDs to its

48

Business PC and Consumer PC divisions. The auction closed on February 19, 2009. The respective account managers for PLDS, TSST and another defendant discussed the rigging of this bidding process. PLDS and another defendant agreed that the former would not compete against the latter for the first tier position among successful bidders. PLDS and TSST then agreed that the latter would take the second tier position, while the former would take the third tier position. During the course of this discussion, each agreed that they would not bid lower than their respective previous closing prices. The final bids by each defendant reflected these various agreements.

188.    Dell conducted an auction for the supply of ODDs that closed on December 1, 2008. QSI (operating in conjunction with Sony Optiarc for whom it assembles ODDs), PLDS, TSST, and HLDS submitted bids. QSI's account manager spoke with one defendant's global account manager and the latter agreed to seek a fourth tier position behind Sony Optiarc; the bidding reflected this agreement. After Dell asked for lower bids, QSI and this defendant also lowered their bids their bids by the same amount of five cents.

189.    In addition to what has already been discussed**,** defendants and their co-conspirators engaged in other acts of anticompetitive conduct in furtherance of the alleged conspiracy. For example, in the latter part of 2004, after a period of decline, quotations by defendants and their co-conspirators to OEMs for 16x DVD-R players stabilized for a period of months. By September of 2004, Taiwanese ODD manufacturers were claiming that the prices of such burners would remain stable for the remainder of the year.

190.    Similarly, in March of 2005, Danny Liao, President of Lite-On, said at a press conference that he expected any price competition for the global market of ODDs to slacken in 2005, because Japanese manufacturers had forced out most of Taiwan's second tier manufacturers and almost all of China's manufacturers.

191.    As another example, in May of 2007, Sony NEC introduced its first BD-R player, the BD-M100A. According to *Digitimes*, sources from Taiwan-based manufacturers of ODDs said that since Sony NEC was a member of the BDA, its pricing would be a reference for other members who manufactured such an ODD, including Philips, LG and Samsung.

49

SECOND AMENDED COMPLAINT

192.    As yet another example, beginning in February of 2008, prices on many ODDs that played BDs began to climb. In August of 2008, personal computer vendors, including HP, Dell, Acer and Asustek Computer, sought reductions in OEM and Original Design Manufacturer ("ODM") prices of BD Combo and BD-ROM drives. At the time, ODM/OEM quotations were at $120-$130 for a BD Combo drive and $95-$100 for a BD-ROM drive, but computer vendors asked for the lowering of the former by $20-$30 and the latter by $5-$10. Leading ODM/OEM manufacturers, such as Pioneer, Lite-On, HLDS and TSST, were all steadfast in refusing to lower current quotations, however. Andy Parsons, Chairman of the BDA and a Senior Vice-President of Pioneer, said in October of 2008 that the prices for BD players would not be coming down soon. In a competitive market, at least one or more of defendants and their co-conspirators in question would have broken ranks to capture market share.

193.    As noted above, throughout the Relevant Period, defendants routinely communicated with each other to share confidential business information about ODDs, including information about customers, specific products, pricing, and production. Defendants, their coconspirators and their respective employees were aware that such communications were inappropriate, and as a result took steps to conceal these communications by using cellular phones or meeting in person to insure, to the extent possible, that communications were oral and not written and that no evidence of such communications was left behind. These communications numbered at least in the hundreds.

194.    As noted above, defendants and their co-conspirators created joint ventures or other cooperation arrangements that functioned as means to fix prices for competitive products manufactured or sold by the joint venturers. For example, the joint ventures operated by the corporate defendants – HLDS, PLDS, Sony Optiarc, and TSST – in addition to being co-conspirators themselves, also provided a structure by which the individual joint venturers can collude in furtherance of the conspiracy alleged herein.

195.    In November 2011, HLDSI pled guilty in the Northern District of California to conspiring to fix prices and rig bids for ODDs and agreed to pay a $21.1 million criminal fine. HLDSI admitted that its officers and employee engaged in discussions and meetings with

50

1   representatives of other major sellers of ODDs. During these discussions and meetings, HLDSI

2   reached agreements to fix prices of ODDs and to rig ODD Internet negotiations.

3       196.   Additionally, the following HLDSI executives individually pled guilty to participating

4   in the conspiracy: Young Keun Park, Sang Hun Kim, Woo Jin Yang, and Sik Hur. Each of the

5   executives was ordered to pay a $25,000 fine and also received a jail sentence.

6       197.   Upon information and belief and review of the pleadings in the *In re Optical Disk

7   Drive Products Antitrust Litigation*, 3:10-md-02143 consolidated litigation, to date, certain

8   defendants and their co-conspirators have already produced more than 4 million documents that

9   contain information regarding defendants' and their co-conspirators' confidential information

10  exchanges and agreements.

11      198.   The patent pools described previously also facilitated the operations of the price-fixing

12  conspiracy. They restricted competition among pool members and, as reflected in the CD-R patent

13  pool involving Royal Philips, Sony, and Taiyo-Yuden described above, operated as a vehicle to

14  unlawfully fix prices. For example, licensees from the 3C DVD Patent Group and DVD 6C Patent

15  Pool, on information and belief, had to report customer, sales and pricing data to those pools, thus

16  ensuring that the co-conspirators who operated them can have access to sensitive non-public

17  commercial information that facilitated the conspiracy. For example, the license agreement for the

18  DVD 6C Patent Pool specifically required the patent licensee to agree that such information could be

19  shared among the members of the licensing group.

20      199.   The following paragraphs reflect representative actions of defendants and co-

21  conspirators in engaging in a price-fixing conspiracy, including exchanging pricing, supply, capacity,

22  quality and bid positioning information with their competitors, and are presented on information and

23  belief. These actions show an agreement to stabilize ODD prices, and actions that facilitated that

24  price stabilization.

25      200.   Defendants and co-conspirators exchanged competitively sensitive information

26  through e-mail communications, telephone calls, and face-to-face meetings. The exchanges were

27  directed by customer account managers and sales directors at defendants and co-conspirators. These

28

SECOND AMENDED COMPLAINT

account managers and sales directors exchanged personal cell phone numbers and email addresses with their rival ODD suppliers to facilitate the conspiracy, and the contacts were so important that employees, when switching jobs, would introduce their replacements to their contacts at rival ODD suppliers.

201.   A May 2006 e-mail from Eugene Yang of HLDS to Daniel Hur of HLDS requested competitors' contact information. In response, Mr. Hur acknowledged the illegal nature of the competitor contacts and explained to Mr. Yang that he should meet his competitors at "a place where it would be very unlikely for [the customer's] people to see you" and suggesting using Starbucks "but that does not meet [sic] those places are guaranteed to be safe."

202.   In October 2007, Hyun Chul Son reported to a number of HLDS employees, including Daniel Hur: "I've checked it through Freddie, SNO's DVD-ROM isn't supported from Lite-on. This model is produced by Foxconn as OEM and supply to SNO." On information and belief, the "Freddie" referred to by Mr. Son is Freddie Hsieh of Lite-On/PLDS, and SNO refers to Sony NEC Optiarc.

203.   In February 2009, internal HLDS e-mails again acknowledged that the competitor contacts were improper given government investigations in other industries, but then counseled employees to simply keep these contacts out of documents or e-mails:

> Recently in the USA & EU, investigations on collusion between suppliers are being strengthened. LG TV & LGD are under the investigation as a close example. I guess other industries also know this thru news or something. With competitor, especially T company, we need to be extremely careful about contacts, and let's be careful so that there are not should in documents / email. (since the share of T and us combined becomes more than 50%, there is a chance that the issue will grow even bigger).

Recently, HE President and CEO emphasized this again. On information and belief, the "T company" and "T" referred to in the above e-mail is TSST.

204.   In March 2009, Daniel Hur of HLDS e-mailed Eugene Yang of LG among others encouraging his colleagues to further mask their competitive contacts:

> I would like to suggest using phones where only out-going calls can be made instead of our cell phones that we use for business purposes in order

52

to avoid any unnecessary misunderstanding or misapprehension when gathering market intelligence.

205.    In October 2008, Caroline Lin of Quanta e-mailed other Quanta employees regarding an "RFQ Discussio [sic] with Amino-san." On information and belief, the e-mail subject referred to Amino Masafumi from Sony Optiarc. Quanta and Sony Optiarc were to act as partners in an upcoming ODD procurement event. Ms. Lin of Quanta reported that, "I'll have dinner w/HLDS Eugene [Yang, on information and belief] this Friday evening and get the consensus on the price protection."

206.    The following Monday, Ms. Lin reported to her colleagues at Quanta, Sally Huang and Haw Chen that "Last week, I met HLDS guy. According to what he said, their best price is around 24.65 eventually. However, the [sic] they won't go that far in the 1st round as well and might provide a higher price to see [the customer]'s feedback & then react."

207.    In July 2005, Hank Hayami of NEC e-mailed to NEC employees (including NEC employee Glenn Brower) that "when our [NEC's] top management met TSST top management last week, TSST clearly mentioned as below. . . ." The information was received by Kris Williams of NEC who stated that he had "a good contact at Toshiba, and I will contact him tomorrow. I will also provide the yield rate at Sharp factory and TSST (Samsung) drive factory on the new lead-free slim 8X DVDRW."

208.    In October 2007, Kris Williams of Sony NEC Optiarc e-mailed Vincent Chng of Sony NEC Optiarc advising the new employee that "[t]he only other piece you need to round out your job responsibilities, is the data gathering piece from other suppliers. I think that you can be more bold with Tokyo if you have good info on competitors." Later in the e- mail string, Vincent Chng requested contact from Williams' contact at HLDS. In response, Mr. Williams responded, "Jason should contact you soon. . . . I will also try to put you in contact with Matt from TSST. . . . I will give you contact info for him." On information and belief, Jason refers to Jason Kim from HLDS and Matt refers to Matthew Lee at TSST.

209.    In July 2007, Kris Williams of Sony NEC Optiarc America, Inc. compiled information about slim PATA tray-loaded DVD-RW drives, TEAC confirmed that it was paying $1.91 for one of

SECOND AMENDED COMPLAINT

1   the component parts of the drive.

2       210.   Even prior to the Relevant Period, examples exist of defendant Pioneer meeting with

3   its competitors in the ODD industry in an effort to stabilize the prices of ODDs.  As early as

4   November 2003, Yasuki Hiraoka, Team Leader at HLDS, and an HLDS employee with the last name

5   Nagasawa, had dinner with sales personnel from Pioneer.[4]  In an internal HLDS document, the

6   HLDS employees reported to their colleagues that Pioneer had provided HLDS with highly sensitive

7   business information, including: (1) targeting dates for delivery of new products to Apple such as the

8   8x dual ODD; (2) pricing on the Apple account for both 4x drives (under HLDS's price of $90) and

9   the 8x drive ($88); (3) Pioneer disclosed that it was facing production capacity restraints for its DVD-

10  W slim drive; (4) Pioneer would not be ready to launch its dual layer drive in the second quarter of

11  2004 as had previously announced; and (5) that Pioneer intended to stop their own production for

12  DVD-ROM drives and instead purchase the drives from a Taiwanese third party.

13      211.   A Panasonic document produced in this litigation discloses that in February 2005,

14  Panasonic and Pioneer both submitted bids to HP for the supply of ODDs in April and May of 2005.

15  Faced with a sharp demand by HP to lower its costs, Panasonic employee Yoshihiro Takada

16  contacted his known competitor on the account, Pioneer, to ascertain their price and bidding strategy:

17          I contacted Pioneer the other day; they finished their evaluation last Wednesday

18          and are bidding $73/April while it hasn't been decided who to use….

19  Armed with this information regarding their competitor, Panasonic refused to lower its price to HP's

20  requested $69 for the month of May 2005, and instead suggested that they would bid only $71 per

21  ODD.  In an internal Panasonic e-mail dated two days later, Panasonic employee Tosio Nakayama

22  (who had been included on the first e-mail string), instructed his colleagues to "reinvestigate/ascertain

23  whether Pioneer can actually keep up with the May price, and get back to me without delay" before

24  Panasonic would commit to the $71 price HP requested for the May supply of ODDs.  Based on the

25  "results of the investigation," only then would Panasonic respond with a price to HP.

26      212.   In an internal Panasonic e-mail document produced in this litigation and dated May

27  ─────────────

28  [4] On information and belief, Plaintiffs allege that the HLDS employee with the last name Nagasawa who met with Pioneer is Ms. Miyako Nagasawa, a team leader for HLDS's Sales Team 5.

SECOND AMENDED COMPLAINT

2005, Tina Phan, Panasonic Sr. Account Mgr. for Apple, updated colleagues on Pioneer's

qualification status at Apple and speculated on Panasonic's chances competing for Apple's business:

> My understanding is Pioneer is very aggressive on pricing as they
> are not competing well on the engineering side. For CQ4, it'll be a
> challenge as 2nd source and potentially 3rd source across the board.

In a later email, Ms. Phan reported on the exact prices that competitors, including

Pioneer, planned to quote Apple. She wrote:

> After our conference call yesterday, I checked on our competitors
> pricings: I. Pioneer's SD process — CQ2 firm quote: $76.50 —
> Conditional offer of $73 for June if qualified for Q45CIand Q88-
> CQ3 price: 72.50. ...

Based on this information, Ms. Phan concluded that Panasonic's price is "quite competitive."

213.   In September 2005, Jonae Wilson, a Global Account Manager of Pioneer

Electronics (USA) Inc.[5] e-mailed Billy Reynolds of the PLDS family direct and asked whether

PLDS had "received the official award of business for BD" from Dell. In the same e-mail, Jonae

thanked Mr. Reynolds for his time the previous week — confirming that they had directly met.

When Mr. Reynolds explained that he had not yet received the official award, Ms. Wilson

explained that Pioneer was "going to chat with Dell about the 2nd source opportunities, but didn't

want to do so until all was official for [Philips]."  Eventually Mr. Reynolds confirmed that the

PLDS defendant family had received the award.  The implication of this question was that the

Pioneer defendants did not want to approach Dell to negotiate the provision of ODDs until the

contract with PLDS was final to prevent any price competition over the supply of ODDs for that

time period.

214.   In May 2006, Yasuki Hiraoka of HLDS reported to his colleagues that he wanted to

postpone HLDS's price quotation to customer Fujitsu until HLDS could "get more underground

info."  Mr. Hiraoka then went on to report his meetings with Pioneer and Panasonic.  Regarding

Pioneer, Mr. Hiraoka reported that he "had dinner with Pioneer yesterday."  Regarding the Dell

account, Pioneer told BLDS that it had not promised Dell a rebate on the Slim-DVD-W product.

Pioneer disclosed to its competitors, HLDS, that it intended to visit the Dell Austin office the following

week, but would not be prepared to discuss rebates with Dell.  Mr. Hiraoka reported that Pioneer had "not

---

[5] Jonae.Wilson@pioneer-usa.com

SECOND AMENDED COMPLAINT

setup any plan for support like we do for our product."

215.    In November 2006, Yasuki Hiraoka of HLDS reported to his colleagues that he had met with competitors MEI (Panasonic) and TSST the previous night, and gave an extensive report and stated that "I have a [sic] appointment with Pioneer tonight so I will get updates on their activity directly."  The following day (after his meeting with Pioneer), Mr. Hiraoka reported that Pioneer had disclosed it had no plan to launch the 12.7 mm and 9.5 mm slot product to date, given that there was base demand only from Apple. Pioneer confirmed it was in a "[s]erious situation" for slim SM drives, and scared of losing business in this area.  They were curious about the TSST/Toshiba defendant's price for this product, and Mr. Hiraoka of HLDS informed Pioneer that "TSST will start to deliver from Q1/07 so [the price] will be up to them."

216.    In February 2007, Jun Okubo of Panasonic met with General Department Manager Shinichi Nojiri, Department Manager Kenichi Nakamura and Section Chief Hiro Sugawara, all of Pioneer, to discuss the Apple account.  Included in the volumes of competitive information exchanged was: (1) Pioneer's capacity for 12.7 mm SD supply to Apple for March (around 9000 units) and that Pioneer could not increase this amount for Apple; (2) that the price estimate from Pioneer for the supply of the 12.7 mm drives was "the same as the information from the other day - they haven't reduced it at all."; (3) that Pioneer didn't "have any new products this whole year (the current model is the one from last spring), so they have no ability to reduce the price further." Panasonic concluded from this last piece of information that it should not reduce its price either.

217.    An internal Panasonic e-mail document produced in this litigation reveals that in March 2007, Yoshi Takada of Panasonic provided a further report to his colleagues regarding the HP account and the consensus of the various Panasonic entities to reach agreement on a bidding strategy for the HP account.  Mr. Takada reported that Panasonic Shikoku Electronics Co., Ltd. ("PSEC") had directly spoken with Pioneer to confirm its pricing in the coming months:

> After I finished writing this e-mail, I saw Amy's update information. It seems that we need to change 2nd round strategy to go around $31.60 . Only one thing I confirmed from PSEC *(directly talked with Pioneer)* is they quote really agressive [sic] price in Apr-May, but will slow down in June and based on June price, they will consider strategic price again in July.

SECOND AMENDED COMPLAINT

Mr. Takada instructed his colleagues to "collect more information" from Panasonic's competitors including Pioneer, before deciding on their second round bidding price.  Later that month, Mr. Takada reported on his investigation and communication with competitors regarding pricing strategy and getting "behind-the-scenes information on second round bids."  Specifically, he reported Pioneer's first round results, among others, and stated that, "according to HLDS, Pioneer has made a definite statement that they'll handle all their Q2 prices aggressively," showing that Pioneer communicated with competitors about pricing strategy in between rounds of a procurement event.

218.    In June 2007, Bruce Jeong of HLDS reported extensive and detailed competitive "information from a discussion with the Japanese ODD company in Taiwan."  An employee of the "P company" [code name for defendant Pioneer] shared with Mr. Jeong Slim drive quality issues and future bidding strategies, as well as, production line and manufacturing information for Slim Slot products and small quantities of HH DVD-RW and HH BD products.  Mr. Jeong also related information he learned from Pioneer about its transactions with customers, including its bid price for Q3to Acer, its forecast of PC sales Apple, and competitive information sharing with HP.

219.    Pioneer employees met with competitors for dinner and drinks, as well, which provided the co-conspirators another opportunity to share competitive information.  For example, in September 2007, Shinichi Yamamura of Sony emailed a colleague that he went drinking with Pioneer employees, including Toshihiko Kurihara, General Manager of the Components Business Division of Pioneer.  In May 2008, Katsuhiro Nakano of Sony and Shinichi Nojiri of Pioneer arranged to meet for meal, assuring each other that senior managers on both sides would be in attendance: "Sr. executive manager" Toshihiko Kurihara of Pioneer and Shinichi Yamamura (Representative Director and President of Sony NEC Optiarc), Hidetoshi Shimizu (General Manager of Sales at Sony NEC Optiarc), and/or Yasuro Katori (Senior General Manager, Strategic Planning Division, Sony NEC Optiarc) respectively.

220.    In July 2008, Bruce Jeong again met with "competitor (P******)'s person in charge of Acer."  The Pioneer employee disclosed to Mr. Jeong that Pioneer's current pricing to Acer, including that Pioneer offered Acer pricing under $90 at the end of June, and had capacity of

57

approximately 80-100,000 per month for half-height Blu-ray combo drives.  Pioneer further informed Mr. Jeong that its slim Blu-ray drive would be priced at $95-$100 for the third and fourth quarter of 2008, and that its monthly capacity was approximately 100,000 drives.

221.   When asked about this document at deposition, Mr. Jeong of HLDS stated:[6]

> Q:   Mr. Jeong, please look at Exhibit 19.  You agree with me that this is an e-mail that you sent on July 21st, 2008, to other HLDS employees, including your superiors; correct?
>
> A:   Yes.  It seems like it.
>
> Q:   The subject was the details of consulting with the competitor?
>
> A:   Yes.
>
> Q:   Now, you state after, you say, "Dear all recipients. I hereby report on the details of consulting with Competitor," parenthesis, "P," and then you use one, two, three, four, five, six asterisks, and then say, "person in charge of Acer today"; right?
>
> A:   Yes.
>
> Q:   And if you filled in "i-o-n-e-e-r," it would fit perfectly for those asterisks; right?
>
> A:   Yes, that seems right.
>
> Q:   Do you agree with me, sir, that you spoke with Pioneer's person in charge of Acer concerning the information contained in this e-mail?
>
> Q:   So providing we are in agreement that it's likely it was Pioneer's person in charge of Acer that you were speaking with, who do you believe you had been talking to?
>
> A:   I do not recall.  I believe it was either Jane or her boss.

222.   In September 2008, Mr. Jeong of HLDS again contacted Pioneer regarding the volume of its sales to Acer.  Mr. Jeong reported to his superiors and other team members that "[a]ccording to the confirmation with other vendors," that Pioneer's fourth quarter volume of slim Blu-ray drives to Acer had been reduced to 50,000 (from 80,000 units).  Mr. Jeong also confirmed that Pioneer's current pricing to Acer on the half-height blu-ray combo drive was $85.

223.   An internal TSST-Korea document produced in this litigation reveals that in October

---

[6] Jeong, Dep. Vol. 2, 2, 223:12-124:13, April 19, 2013.

58

2008, Kenny Lee, Senior Manager of TSST, reported the results from a 12.7 DVDR HP procurement event to his colleagues.  Mr. Lee stated that the competitors, including Pioneer, reached an agreement not to "overheat each other" in auction, leading to a favorable result: "Result: 1st place $24.40, TSST M/S 36% 2nd place HLDS, 3rd QSI, 4th Pioneer because initially the atmosphere was do not overheat each other, there is no actual difference between 2nd and 3rd place in price 24.2~24.4 but fortunately we can get the 1st place supply by small price difference."

224.   In November 2008, Mr. Jeong again spoke to an employee of "Pi***" (code name for Pioneer), who informed Mr. Jeong that Pioneer had received a forecast reduction from Acer on Blu-ray drives of approximately 20 percent.  Pioneer informed Mr. Jeong that despite Acer's request for a price change, Pioneer kept the existing price on these drives.

225.   An HLDS document produced in this litigation contains a report in December 2008, from Daniel Hur at HLDS showing that Pioneer contacted HLDS to discuss HP auction. Specifically, James Park, TSST's HP cPC account and contributor to the report, writes that Pioneer "[s]uggested to line-up BD Combo in '09 Q4 (at $65)."

226.   Quanta was a key player in obtaining information from Pioneer, filling its role as it did with other ODD market participants as both a contract manufacturer of ODDs and also a competitor. Quanta's documents, produced in this litigation, show that Haw Chen, general manager of Quanta, in particular obtained information from Pioneer and used it to influence Quanta's pricing strategies.  In January 2009, Haw Chen reported to his colleagues that he had recently spoken with Pioneer:

> By the way, I confirm today that Pioneer new model is just focusing on Toshiba, VAIO and Apple.  And seems they do not plan to continue business with those 3 customers for 2nd half of FY2009 because they believe cost won't be competitive enough at that time.

In response, Ms. Huang replied, in part: "Ah, will they be participating in the HP's e-auction this time?" Later e-mails show that Mr. Chen sought out and received information regarding the upcoming HP auction.  Days after Ms. Huang's e-mail, an internal Quanta e-mail produced in this litigation asked Haw Chen to work out a deal with Pioneer not to compete: "Dear Haw: Can you work out some kind of agreement with Pioneer, not to be too extreme yeah?  They only have approximately 400k left, no reason for them to fight for 3rd place right."  Mere days later, in another email, Caroline Lin of Quanta stated

59

that Quanta assumed that Pioneer would be the #4 bidder on the auction and that Quanta's strategy would be to "stay close to the price provided by #4." She told Mr. Chen "if you got the bottom line of Pioneer will be greatly helpful." In the end, Quanta did place third in the HP procurement event as it had desired. Contemporaneous documents confirm continued meetings between Pioneer and Quanta, including an April 2009 meeting between Haw Chen of Quanta and S. Nojiri and K. Yokoyama of Pioneer where Mr. Chen explained to his colleagues the meeting was specifically "for information exchange."

227. Pioneer continued to provide HLDS with information, even when it was not in its interest to do so. For example, in February 2009, an employee of Pioneer informed Mr. Jeong that although it had qualified to supply a slim Blu-ray drive writer model to Acer, that the orders from Acer had been nearly zero.

228. And as with other conspirators, the supply of OPUs (the component part of the ODD called an optical pickup unit), became a channel for the exchange of sensitive business information. For example, in January 2009, PAVC (a division of Panasonic) informed HLDS that Pioneer had started to deliver Slim BD-W drives to Acer and Sony.[7] PAVC is the division of Panasonic which supplied OPUs to other ODD manufacturers. Panasonic's inside information regarding Pioneer (and subsequent report to HLDS) was based on Pioneer's purchase of OPUs from PAVC at the rate of 10,000 per month. Yasuki Hiraoka of HLDS reported this information to his colleagues and expressed his concern that because Pioneer was in a "severe situation," they could start "dumping" product. Mr. Hiraoka's colleague at HLDS, Bruce Jeong, reported back that he "checked with Pioneer and Acer" and that Pioneer had qualified on the BD-W model, but was supplying very little product (negating any pricing threat).

229. Similar to the incestuous relationships with other defendants, Pioneer's position as both a customer to some of the ODD manufacturers as well as ODD manufacturer itself opened channels for illegal and anticompetitive communications. For example, internal PLDS documents produced in this litigation show that in late 2008, a number of PLDS employees (including Claire

---

[7] Although the corporate relationships between the many divisions and affiliates are often unclear, on information and belief, PAVC refers to Panasonic AVC Networks Company.

SECOND AMENDED COMPLAINT

1   Lin and Charlie Tseng), met with Ken Usui, a sales manager at Pioneer,[8] regarding the possible

2   supply of ODD drives from PLDS to Pioneer. After the meeting, Claire Lin of PLDS e-mailed Mr.

3   Usui expressing PLDS's gratitude for arranging the meeting and for "share [sic] so many market

4   information with" PLDS.  Similarly, in early 2009, PLDS approached Pioneer as a supplier of a

5   particular type of ODD drive (DVD-RW).  Pioneer declined to use PLDS as a supplier at that time,

6   but Ken Usui, a sales manager at Pioneer, responded to Claire Lin (an employee of PLDS): "Let's

7   keep in touch with market trend and I am willing to share the market information."  Within days,

8   Ms. Lin responded that Charlie Tseng of PLDS would like to speak with him regarding the supply

9   of a particular type of drive and "to exchange the market trend again." And indeed, internal PLDS

10   documents reflect the exchange of sensitive business information.

11        230.    Other internal PLDS documents produced in this litigation show that in March 2009,

12   Claire Lin reported to Charlie Tseng (both of PLDS) an "Update of Pioneer" which included

13   information from Mr. Usui about the allocation of OPUs, and information regarding Pioneer's

14   production and outsourcing of certain ODD drives:

15        3) ODD
           Pioneer Taiwan commented that almost no OPU shortage impact
16         of H/H DVDROM w/Q but Usui san said they tried really hard to
           secure the allocation.  Pioneer Taiwan told us that out-sourcing
17         22X will launch in May since Pioneer's own factory made H/H
           DVDRW will stop production in May.  As for 24X, no further
18         information. Has asked for Procurement team's help to check.

19

20        231.    In June 2009, Pioneer Corporation and Sharp Corporation announced that they would

21   be establishing a joint venture to develop, design, manufacture and sell optical-disk products such as

22   optical disk drives, recorders and players.  Pioneer and Sharp planned to launch operations on the

23   joint venture on October 1, 2009.  Pioneer Corporation was to own 66 percent of the joint venture

24   and Sharp Corporation was to own 34 percent of the joint venture.  Toshihiko Kurihara, the former

25   general manager of the Components Business Division Home Entertainment Business Group of

26   Pioneer Corporation was to become the president of the newly formed joint venture.  Pioneer was

27

28   _____
     [8] ken_usui@post.pioneer.co.jp.

SECOND AMENDED COMPLAINT

1   given the authority to appoint three of the directors, and Sharp Corporation the remaining two

2   directors.

3        **E.      Governmental Antitrust Investigations of the ODD Industry**

4        232.   Recently, certain defendants and their co-conspirators disclosed and news organizations

5   reported that there is currently a worldwide investigation by antitrust enforcement authorities into

6   violations of antitrust laws and other anticompetitive practices into the market for ODDs.  In October of

7   2009, the DOJ acknowledged that it had commenced an investigation into anticompetitive conduct in

8   the optical disk drive industry, and that in connection with that investigation it had served subpoenas on

9   defendants Sony Optiarc America, HLDS, and TSST.  At the same time, at least one defendant

10  acknowledged that foreign antitrust enforcement agencies were also investigating the ODD industry.

11       233.   In and after 2009, ODD manufacturers including, HLDS, Sony, and Royal Philips

12  acknowledged in public filings by themselves or their parents that they received DOJ subpoenas

13  related to an antitrust investigation into the ODD industry or were the target of a DOJ investigation in

14  that industry.

15       234.   For example, on October 23, 2009, Sony Corporation disclosed the following in a Form

16  6-K it filed with the Securities & Exchange Commission ("SEC"):

17  
18              Sony Corporation said today that its U.S. subsidiary, Sony Optiarc America
                Inc., has received a subpoena from the U.S. Department of Justice (DOJ)
                Antitrust Division seeking information about its optical disk drive business.
19              Sony understands that the DOJ and agencies outside the United States are
                investigating competition in optical disk drives.
20  

21   Sony reiterated this disclosure in an SEC Form 20-F for the year ending on March 31, 2010.

22       235.   On October 26, 2009, news sources reported that other companies, including Toshiba,

23  Hitachi, Samsung and LG had received DOJ subpoenas. According to one of the news articles, an

24  unnamed source said "the Justice Department started a criminal antitrust probe into the market for

25  optical drives in recent months, investigating disk-drive makers for possible price-fixing, bid-rigging

26  and allocation of markets."

27       236.   Sony has acknowledged that it believes the request for information from the DOJ is

28
                                                    62

1  part of a wider review of anticompetitive conduct in the ODD market by the DOJ and competition

2  authorities in other countries.

3      237.   On October 27, 2009, Hitachi and Toshiba confirmed that, like Sony, their ODD

4  operations in the United States received subpoenas from the DOJ in a widening investigation

5  into potential antitrust violations. Additionally, they acknowledged that they were also under

6  investigation by European Union and Singaporean antitrust regulators.

7      238.   On October 27, 2009, a DOJ spokeswoman, Gina Talamona confirmed that,

8  "[t]he antitrust division is investigating the possibility of anticompetitive practices in the

9  optical drive industry."

10     239.   In Philips' 2009 Annual Report, it was disclosed:

> On October 27, 2009, the Antitrust Division of the United States
> Department of Justice confirmed that it had initiated an investigation into
> possible anticompetitive practices in the Optical Disc Drive (ODD)
> industry. Philips Lite-On Digital Solutions Corp. (PLDS), a joint venture
> owned by the Company and Lite-On IT Corporation, as an ODD market
> participant, is included in this investigation. PLDS is also subject to
> similar investigations outside the US relating to the ODD market. PLDS
> and Philips intend to cooperate with the authorities in these
> investigations.
>
> Subsequent to the public announcement of these investigations in 2007,
> the Company, PLDS and Philips & Lite-On Digital Solutions USA, Inc.,
> were named as defendants in at least two class action complaints filed in
> the United States District Court for the Northern District of California.
> Several additional complaints were filed against other ODD manufacturers
> in the Northern District of California and at least one other United States
> District Court. These actions allege anticompetitive conduct by
> manufacturers of ODDs, seek treble damages on behalf of direct
> purchasers of ODDs, and may involve joint and several liability among the
> named defendants.
>
> **These matters are in their initial stages and due to the considerable
> uncertainty associated with these matters, on the basis of current
> knowledge, the Company has concluded that potential losses cannot
> be reliably estimated with respect to these matters. An adverse final
> resolution of these investigations and litigation could have a
> materially adverse effect on the Company's consolidated financial
> position, results of operations and cash flows.** (emphasis added).

The boldfaced language quoted above is largely identical to that used by Philips in the same

SECOND AMENDED COMPLAINT

Annual report describing the criminal investigations against it with respect to TFT-LCDs and CRTs by various international competition authorities.

240.   In an SEC Form 6-K dated November 16, 2009, Hitachi stated:

> In June 2009, a subsidiary in Japan received a grand jury subpoena in connection with an investigation conducted by the Antitrust Division of the U.S. Department of Justice and received requests for information from the European Commission, both in respect of alleged antitrust violations relating to optical disk drives. Also in June 2009, the Competition Commission of Singapore began an investigation of a subsidiary in Korea, also in respect of alleged antitrust violations relating to optical disk drives. Relevant authorities in the markets in which Hitachi operates continue to investigate Hitachi and may initiate similar investigations in the future. **These investigations may result in significant penalties in multiple jurisdictions, and private parties may bring civil actions against Hitachi seeking compensation for damages resulting from the relevant violations. Such substantial legal liability or regulatory action could have a material adverse effect on Hitachi's business, results of operations, financial condition, cash flows, reputation and credibility.** (emphasis added).

In its report on Form 20-F filed with the SEC on June 29, 2010, Hitachi confirmed that the investigations are ongoing.

241.   Thus, while defendants and their co-conspirators have announced these investigations in their public SEC filings, they have not denied any allegations of anticompetitive conduct or stated that there was no plausible basis for the investigations. Furthermore, defendants and their co-conspirators have not publicly disclosed the results of any internal investigation of the conspiracy now under investigation. Defendants' and their conspirators' silence on these matters can be contrasted with other companies' denials of liability when announcing publicly antitrust or other criminal investigations.[9] In light of the

---

[9] *See, e.g.*, Goodyear Tire & Rubber Co., SEC Form 10-K, SEC Filing No. 05685725, p. 18 (March 16, 2005) ("[a]lthough the Company does not believe that is has violated the antitrust laws, it is cooperating with the Department of Justice."); Titan Corp., SEC Form 10-K, SEC Filing No. 26 04658736, p. 14, p. 82 (March 10, 2004) ("[w]e are not aware of any illegal or inappropriate conduct, and we have been and will continue to cooperate fully with the investigation."); L 3 27 Communications Holdings Inc., SEC Form 10-Q, SEC Filing No. 07824807, p. 15 (May 10, 2007) ("[t]he Company has conducted an internal investigation of this matter using outside counsel and currently believe that no criminal activity occurred.").

SECOND AMENDED COMPLAINT

requirements that public SEC filings not contain any untrue statement of material fact *(see, e.g.,* 17 C.F.R. § 240.10b-5 (Rule 10b-5); 15 U.S.C. § 7241(a)(2) (Sarbanes-Oxley Act certification requirement)), a reasonable inference from this silence is that the price fixing conspiracy under investigation is plausible.

242.   It is also significant that defendants' anticompetitive behavior has been the subject of a criminal grand jury investigation by the DOJ. In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a detailed memorandum to that effect. *See* Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1 ("[i]f a Division attorney believes that a criminal violation of the antitrust laws has occurred, he should prepare a memorandum requesting authority to conduct a grand jury investigation."). Furthermore, following a review of the memorandum, the request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division, based on the standard that a criminal violation may have occurred.  *See id*. In addition, the fact that the DOJ Antitrust Division investigation is criminal, as opposed to civil, is significant as well.  The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal Investigation" state: "[i]n general current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations."  *See* Antitrust Division Manual, Chapter III.C.5. Accordingly, the existence of a criminal investigation into the ODD industry supports the existence of the conspiracy alleged herein.

243.   The DOJ confirmed its activities in a formal motion to stay proceedings in this case filed on May 20, 2010, wherein it stated that "[t]he DOJ is currently investigating possible criminal violations in the optical disk drive (`ODD') industry." *See* Memorandum Of Points And Authorities In Support Of the United States' Motion For A Limited Stay of Discovery, p. 15 (May 20, 2010) (Dkt. No. 68). In support of that motion, it has submitted under seal to this Court a declaration describing the status of its investigation.  The DOJ's investigation has already

SECOND AMENDED COMPLAINT

1  yielded a guilty plea from HLDSI and four executives, as discussed above.

2  **F.      Economic Data on Pricing and Supply**

3  244.   ODD pricing during the Relevant Period did not behave as would be expected in a
4  competitive market.

5  245.   After introduction into a market, consumer electronics products and their component
6  parts are typically characterized by downward pricing trends. However, the ODD market has been
7  characterized by unnatural price stability and certain periods of upward pricing trends.

8  246.   The cost of manufacturing ODDs should have declined as the industry consolidation
9  and manufacturing bases shifted to lower-cost countries. In a competitive market this would be
10  reflected in downward pricing trends as well. However, prices for computer storage devices,
11  including ODDs, started to level off.

12

13

14

15

16



Producer Price Index for Computer Storage Device Manufacturing
Jan. 1999-May 2009

Source: U.S. Bureau of Labor Statistics
Producer Price Index for Exports 334112334112: Computer Storage Device Manufacturing
Note: Includes devices that allow the storage and retrieval of data from a phase change, magnetic, optical, or magnetic/optical media.

26  247.   As noted above, according to industry sources and statements by defendants and their
27  co-conspirators, firms increasingly attempted to stabilize pricing and avoid continued decreases in

28

SECOND AMENDED COMPLAINT

pricing and, presumably, profit margins.

248.    If they had acted independently, ODD makers would have had different incentives, depending on the size of their market share in an existing generation of optical disc technology. The fact that defendants and their co-conspirators uniformly held off on significant price reductions regardless of share demonstrates that they were acting conspiratorially. Because of these different incentives, stable prices cannot be explained merely as conscious parallelism.

249.    Changes in demand for ODDs are also unlikely to explain the unnatural price stabilization during the Relevant Period.  For example, ODD prices remained relatively stable between 2004 and 2006, despite a drop in sales of DVD players, as reflected in the following chart obtained from the website of DEG.

**U.S. DVD HARDWARE SALES TO CONSUMERS (in millions)**

| QUARTER | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Quarter | .030 | .094 | .358 | 1.350 | 2.220 | 3.565 | 4.858 | 6.855 | 7.741 | 7.852 | 8.350 | 6.01 |
| 2nd Quarter | .079 | .149 | .611 | 1.435 | 2.404 | 3.750 | 5.506 | 6.057 | 6.006 | 6.676 | 6.396 | 4.98 |
| 3rd Quarter | .077 | .244 | .880 | 1.550 | 2.537 | 4.740 | 6.470 | 6.593 | 6.250 | 6.831 | 6.139 | 5.39 |
| 4th Quarter | .119 | .459 | 1.701 | 5.542 | 9.501 | 13.058 | 16.900 | 17.621 | 14.343 | 12.512 | 12.633 | 8.85 |
| YEARLY TOTAL | .305 | .946 | 3.550 | 9.877 | 16.662 | 25.113 | 33.734 | 37.125 | 34.390 | 33.871 | 33.518 | 25.23 |
| TOTAL (since launch) | | | | | | | | | | | | 264.262 |

Includes set-top and portable DVD players, Home-Theater-in-a-Box systems, TV/DVD and DVD/VCR combination players
DEG: The Digital Entertainment Group

250.    Unnatural price stabilization and increases occurred in the face of reductions in the cost of producing ODDs.  During the Relevant Period, the cost of ODD primary components continued to decline, yet prices did not follow.

SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10



251.   As one news report issued at the time of the announcement of the DOJ's investigation of Sony's ODD subsidiary observed,

> Analysts have been wondering why Blu-ray prices have remained high even though the technology has been commercially available for over three years. HD-DVD has been gone for nearly two-thirds of that time and one would have expected costs to have declined by now. The fact that they haven't is causing some to question whether or not Sony is doing something to keep the prices up.

252.   Certain defendants' and their co-conspirators' use of "Minimum Advertised Price" ("MAP") policies with respect to retail pricing of their ODDs in the United States also operated as a facilitating device with respect to the conspiracy alleged in the Complaint. The effect of the use of these policies was to better ensure that such retail pricing did not undercut the price-fixing agreements defendants and their co-conspirators reached with respect to such products. For example, Samsung has in place a MAP policy applicable to BD players, among other products, where retailers are barred from promoting prices that violate the MAP "online or offline" through any publication. That includes price comparisons, auction web sites, search engines and distributors. Dealers cannot use phrases like "click for price" or "see price in-cart" that result in the MAP being undercut. Repeated violations of Samsung's MAP policy result in termination.  Sony and Toshiba, among others, also have MAP policies. Indeed, in 2000, Sony and other major distributors of music CDs entered into a consent

68

decree with the Federal Trade Commission halting the use of MAP policies between distributors and retailers of such CDs.

### G.     History of Collusion in Other Markets

253.    Many of defendants and their co-conspirators have a long history of collusion, and have been involved in antitrust investigations into other technology-related products, or have admitted to participating in anticompetitive cartels involving technology-related or other products. To the extent these prior instances of conspiratorial conduct involved consumer electronics products, the products in question were marketed through the same or related channels used for the marketing of ODDs and were overseen by the same divisions or departments within the relevant defendant or co-conspirator for at least a portion the Relevant Period.

254.    **Televisions.** In February of 1993, the Japan Fair Trade Commission ("JFTC") entered a cease and desist order against the sales subsidiaries of Sony, Toshiba, Hitachi and what is now Panasonic, finding that the subsidiaries requested large discount stores in the Akihabara district in Tokyo and the Nipponbashi shopping district in Osaka not to display discount rates larger than 10 percent of the maker's recommended retail prices for products including televisions on price tags at stores and in their handbills. The JFTC noted that similar practices had occurred in 1988 when it instructed two major industry associations, including the Japan Electronics Industry Association, to stop them, but the practices had continued.

255.    **Magnetic Videotapes**—In November of 2007, the European Commission ("EC") fined Sony and various related entities and the Hitachi Maxell Limited joint venture $110 million for fixing the prices of professional videotapes sold in Europe between 1999 and 2002.

256.    **Optical Disc Licensing Policies**—In July of 1994, the DOJ announced that it was conducting an investigation into the licensing practices of several leading companies that own and license CD manufacturing patents to determine if there have been violations of United States antitrust laws. The companies were believed to include Sony and Royal Philips. It was reported that the two companies signed a "pact" in the late 1970s, agreeing to "cross-license each other's basic patents on CD technology" and collect fees from vendors. It was further reported that the DOJ had issued

SECOND AMENDED COMPLAINT

subpoenas to several companies dealing with Royal Philips and Sony, including DiscoVision Associates, a subsidiary of Pioneer.

257.   In August of 2006, the EC initiated an investigation regarding the procedures required in order to obtain a license for BD and HD-DVD standards.

258.   As noted above, in October of 2008, it was announced that two of the major players in the ODD market, Sony and Royal Philips, were fined by the TFTC for their anticompetitive business practices in connection with their abuse of monopoly power in the licensing of the technology for CD-Rs.

259.   **Gas Insulated Switchgears**—In January of 2007, Hitachi and Toshiba were fined by the EC for their roles in a conspiracy to control prices and allocate market shares in the market for gas insulated switchgears between 1988 and 2004.

260.   **DRAM**—In October of 2005, Samsung admitted guilt and paid a $300 million fine following an investigation by the DOJ into price-fixing among manufacturers of DRAM.

261.   On May 19, 2010, the EC announced that it was fining ten companies a total of €331 million for participating in an international cartel to fix DRAM prices. Among those fined were Samsung, NEC, Hitachi and Toshiba.

262.   **SRAM**—Samsung and Toshiba have acknowledged being contacted by the DOJ as part of an investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

263.   **CRTs**—In a cease and desist order dated October 7, 2009, the JFTC levied $37.4 million in fines against five companies for alleged participation in a price-fixing cartel for CRTs, including, LG Philips Displays Korea Co. and an arm of South Korea's Samsung group and their affiliates.

264.   On November 26, 2009, the EC confirmed that it had sent a Statement of Objections to participants in the CRTs cartel in Europe.  It has been reported that "[t]he EC believes that Chunghwa Picture Tube (a unit of Tatung), LG Electronics, Matsushita (Panasonic), Philips, Samsung and Toshiba have formed cartels to boost pricing of CRT-based devices, such as computer

1    monitors or TV-sets."

2        265.   Korea's Fair Trade Commission has fined more than five manufacturers of CRTs over

3    $48 million. The European Commission imposed the biggest antitrust penalty in its history, fining

4    seven companies a combined €1.47 billion ($1.92 billion) related to price fixing of CRTs.

5        266.   In November of 2007, Hitachi Canada Ltd., a subsidiary of Hitachi, received requests

6    for information from the Canadian Competition Bureau with respect to alleged antitrust violations

7    relating to CRTs.

8        267.   Since February 10, 2009, the DOJ has issued six indictments against individuals in

9    connection with the CRT price-fixing conspiracy. In May 2011, Samsung SDI Company Ltd., a

10    Samsung subsidiary, agreed to pay a $32 million criminal fine and pled guilty to charges brought

11    under the Sherman Act. Specifically, SDI admitted to participating in a conspiracy among major CRT

12    producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares

13    of CRTs sold in the United States and elsewhere.

14        268.   TFT-LCDs—In December 2006, government authorities in Japan, Korea, the European

15    Union and the United States revealed a comprehensive investigation into anticompetitive conduct in

16    the TFT-LCD market. On December 12, 2006, news reports indicated that Samsung, Toshiba, LG

17    and Hitachi, as well as an LCD joint venture between Philips and LG Electronics—LG Display Co.,

18    Ltd.—were all under investigation for price fixing TFT-LCDs.

19        269.   In December of 2008, the DOJ announced that: (a) LG Display, a joint venture between

20    LG and Royal Philips, pled guilty to an information alleging antitrust price-fixing allegations with

21    respect to TFT-LCDs and had agreed to pay a $400 million fine and (b) Sharp pled guilty to bid-

22    rigging with respect to certain customers of TFT-LCDs and had agreed to pay a fine of $120 million.

23        270.   On March 10, 2009, the DOJ announced that it had reached an agreement with Hitachi

24    Displays, a subsidiary of Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act,

25    15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD

26    Products. In its plea agreement, Hitachi Displays admitted to reaching agreements to fix the prices of

27    LCD panels.

28

71

271.   In December of 2008, the JFTC fined Sharp and Hitachi with respect to a conspiracy involving TFT-LCDs sold for use in Nintendo game consoles.

272.   It is widely believed that Defendant SECL is in the DOJ's leniency program with respect to the investigation into the market for TFT-LCDs, meaning that it has admitted its participation in the cartel.

273.   The TFT-LCD investigation is ongoing, and Toshiba, as well as other entities, remain under investigation.  This criminal investigation is being conducted by the San Francisco office of the DOJ's Antitrust Division.

274.   In July of 2009, the EC confirmed that it had sent a Statement of Objections to participants in the TFT-LCD cartel in Europe.

275.   Similarities with ODDs—As in the TFT-LCD industry, many of defendants here are not just the major manufacturers and sellers of the ODDs, but are also vertically integrated major manufacturers of products containing ODDs. For example, the LG and Samsung entities manufactured and sold both TFT-LCD panels as well as TFT-LCD computer monitors and flat panel televisions. Here Samsung, Toshiba, and Sony manufacture and sell both ODDs and computers containing ODDs.

276.   The ODD market has a similar oligopoly structure to that of the TFT-LCD, DRAM and CRT industries. Defendants' entry into price-fixing agreements in those markets (which include many of the same foreign companies) supports the DOJ's investigation and other evidence showing the existence of an anticompetitive conduct in the ODDs market.

277.   The established illegal conduct of Hitachi, LG, Royal Philips, Sony and Samsung (as well as Sharp and Panasonic) in a wide variety of product markets across the world, including the United States, is illustrative of defendants' and their co-conspirators' respective corporate cultures which encourage illegal activities aimed at furthering the company's bottom line at the expense of consumers.

278.   For example, in November of 2007, Kim Yong Chul, the former chief lawyer for Samsung, admitted that the company "instructed me to commit crimes." Mr. Chul continued by saying that "[a] basic responsibility for all Samsung executives is to do illegal lobbying, buying people with

72

1    money." Mr. Chul also acknowledged that he fabricated court evidence on behalf of the company and

2    its executives; several Samsung executives have recently been convicted of bribery and other white

3    collar crimes.

4         279.    The facts as alleged herein show that the conduct of defendants and their co-

5    conspirators was directed both at customers in the United States and at United States import

6    commerce for ODDs. The conduct alleged herein was directed specifically at customers throughout

7    the United States, including Acer in California. The conduct of defendants and their co-conspirators

8    also had a direct, substantial, and reasonably foreseeable effect on United States commerce of ODDs.

9    Defendants and their co-conspirators collectively imported many millions of ODDs into the United

10    States, which were purchased by persons and entities in the United States, throughout the Relevant

11    Period. The collective monetary value of such commerce was in the billions of dollars.

12                       **VII.   FRAUDULENT CONCEALMENT**

13         280.    Prior to at least October 26, 2009, Acer did not have information sufficient to

14    constitute actual or constructive knowledge of the conspiracy alleged herein. Acer did not discover,

15    and could not have discovered through the exercise of reasonable diligence, sufficient facts to show

16    the existence of the conspiracy alleged herein. Defendants and their co-conspirators engaged in a

17    secret conspiracy that did not give rise to facts that would put Acer on inquiry notice that there was a

18    conspiracy to fix prices for ODDs.

19         281.    Because defendants' and their co-conspirators' agreements, understandings, and

20    conspiracies were kept secret until October 26, 2009, Acer was not aware before that time of

21    defendants' and their co-conspirators' unlawful conduct alleged herein, and did not know before that

22    time that it was paying artificially high prices for ODDs throughout the United States during the

23    Relevant Period.

24         282.    The affirmative acts of defendants and their co-conspirators alleged herein, including

25    acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

26    precluded detection, in part by the following:

27

28

SECOND AMENDED COMPLAINT

a.   Agreeing not to discuss publicly or otherwise reveal the acts and communications in furtherance of the price fixing conspiracy;

b.   Agreeing to limit the number of representatives from each defendant or co-conspirator that were aware of the price fixing conspiracy;

c.   Agreeing to limit the written communications relating to or in furtherance of the price fixing conspiracy;

d.   Agreeing to meet in furtherance of the price fixing conspiracy in locations where the conspiracy was less likely to be detected;

e.   Coordinating bidding and price negotiation to avoid detection;

f.   Giving false and pretextual reasons for ODD price stabilization and falsely describing the stabilization as the product of external causes and not collusion.

283.   By its very nature, defendants' and their co-conspirators' price-fixing conspiracy was inherently self-concealing.

284.   In the context of the circumstances surrounding defendants' and their co-conspirators' pricing practices, defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that defendants' and their co-conspirators' pricing was conspiratorial. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of defendants' and their co-conspirators' ODD prices before October 26, 2009.

285.   Acer could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

286.   Defendants and their co-conspirators also committed affirmative acts of concealment of the conspiracy, including, *inter alia*, periodically issuing press statements falsely asserting that ODDs were competitively priced. For example, in October, 2004 Lite-On President Danny Liao claimed that increasing competition for OEM orders had pushed down prices for 16x DVD burners to as little as $60, and that competition would drive some manufacturers from the market.

74

287.     Defendants and their co-conspirators also concealed their collusive conduct by claiming pretextual reasons for the price levels of ODDs in response to customer requests to lower prices or in general statements to the trade.

288.     With respect to the bid-rigging activities described above, no participating defendant advised Acer or the public of the collusive activity that was occurring with respect to bidding to supply ODDs. Instead, they made public statements that the ODD industry was intensely competitive, such as statements made in (a) Hitachi's SEC Form 20-Fs of August 30, 2004, August 26, 2005, August 7, 2006, June 26, 2007 and July 27, 2009; and (b) NEC's SEC Form 6-Ks of April 27 and May 31, 2005.

289.     As a result of defendants' and their co-conspirators' fraudulent concealment of their conspiracy, Acer is entitled to recover for any claims that Acer has as a result of the anticompetitive conduct alleged in this Complaint notwithstanding the statute of limitations.

290.     Acer's claims are also tolled by the filing of various class action lawsuits shortly after the conspiracy was made public in October 2009, by ongoing government investigations, and by any other tolling available by operation of law.

## VIII.   CLAIM FOR VIOLATIONS

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

291.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

292.     Beginning no later than January 1, 2004, the exact date being unknown to Plaintiffs and exclusively within the knowledge of defendants, defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

293.     In particular, defendants and their co-conspirators combined and conspired to raise, fix, maintain, or stabilize the prices of ODDs sold in the United States.

294.     As a result of defendants' and their co-conspirators' unlawful conduct, prices for

75

1   ODDs were raised, fixed, maintained, and stabilized in the United States.

2        295.   The contract, combination, or conspiracy among defendants and their co-conspirators

3   consisted of a continuing agreement, understanding, and concerted action among defendants and their

4   co-conspirators.

5        296.   For purposes of formulating and effectuating their contract, combination or

6   conspiracy, defendants and their co-conspirators did those things they contracted, combined, or

7   conspired to do, including:

8           A.     participating in meetings and conversations to discuss the prices and

9                 supply of ODDs;

10          B.     sharing the pricing and other discussions with other members of the

11                ODD industry to further the Conspiracy;

12          C.     communicating in writing and orally to fix target prices, floor prices,

13                and price ranges for ODDs;

14          D.     agreeing to manipulate prices and supply of ODDs sold in the United

15                States in a manner that deprived direct purchasers of free and open

16                competition;

17          E.     issuing price announcements and price quotations in accordance with

18                the agreements reached;

19          F.     selling ODDs to customers in the United States at noncompetitive

20                prices;

21          G.     exchanging competitively sensitive information, including customer

22                information, in order to facilitate their Conspiracy;

23          H.     agreeing to maintain or lower production capacity; and

24          I.     providing false statements to the public to explain increased prices for

25                ODDs.

26       297.   As a result of defendants' and their co-conspirators' unlawful conduct, Plaintiffs were

27  injured in their business and property in that they paid more for ODDs than they otherwise would

28  have paid in the absence of defendants' and their co-conspirators' unlawful conduct.

SECOND AMENDED COMPLAINT

**Second Claim for Relief**

**(Violation of the California Cartwright Act)**

298.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

299.    During the Relevant Period, Plaintiffs conducted a substantial volume of business in California.  During the Relevant Period, a substantial portion of Acer America Corporation's product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in California related to ODDs. During the Relevant Period, all or a significant portion of Acer America Corporation's product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to ODDs. During the Relevant Period, Acer America Corporation's negotiations for the purchase of ODDs took place in California, purchase orders for ODDs were issued in California, payments for the purchases of ODDs were issued in California, Acer America Corporation took possession of ODDs in California, invoices for ODDs sold to Acer America Corporation's customers were issued from California to Acer America Corporation's customers, payments for ODDs sold to Acer America Corporation's customers were received in California, and ODDs were distributed to Acer America Corporation's customers from California.

300.    During the Relevant Period, all or a significant portion of Gateway, Inc.'s product development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to ODDs. During the Relevant Period, Gateway, Inc.'s negotiations for the purchase of ODDs took place in California, purchase orders for ODDs were issued in California, payments for the purchases of ODDs were issued in California, Gateway, Inc. took possession of ODDs in California, invoices for ODDs sold to Gateway, Inc.'s customers were issued from California to Gateway, Inc.'s customers, payments for ODDs sold to Gateway, Inc.'s customers were received in California, and ODDs were distributed to Gateway, Inc.'s customers from California.

301.    During the Relevant Period, all or a significant portion of eMachines, Inc.'s product

77

1   development, product planning, and marketing divisions, and supporting finance, trade, and logistics

2   operations were located in and had extensive operations in California related to ODDs. During the

3   Relevant Period, eMachines, Inc.'s negotiations for the purchase of ODDs took place in California,

4   purchase orders for ODDs were issued in California, payments for the purchases of ODDs were

5   issued in California, eMachines, Inc. took possession of ODDs in California, invoices for ODDs sold

6   to eMachines, Inc.'s customers were issued from California to eMachines, Inc.'s customers,

7   payments for ODDs sold to eMachines, Inc.'s customers were received in California, and ODDs were

8   distributed to eMachines, Inc.'s customers from California.

9      302. Defendants and their co-conspirators engaged and participated in the conspiracy

10   through their offices and operations in California. Defendants and their co-conspirators maintained

11   offices in California during the Relevant Period. Employees at defendants' and their co-conspirators'

12   locations in California participated in meetings and engaged in bilateral communications in

13   California and intended to and did carry out defendants' and their co-conspirators' anticompetitive

14   agreement to fix the price of ODDs. Defendants and their co-conspirators also participated in the

15   conspiracy in the U.S. through their California offices by providing information obtained through

16   meetings with other defendants and co-conspirators to employees in their California offices for those

17   California employees to use in the course of fixing prices in negotiations with U.S. customers,

18   including Plaintiffs. Defendants' and their co-conspirators' conduct within California thus injured

19   Plaintiffs both in California and throughout the United States.

20      303. Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1,

21   2004, and continuing thereafter at least up to and including at least January 1, 2010, defendants and

22   their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade

23   and commerce described above in violation of the Cartwright Act, California Business and

24   Professional Code Section 16720.  Defendants and their co-conspirators have each acted in violation

25   of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, ODDs at

26   supra-competitive levels. Defendants' and their co-conspirators' conduct substantially affected

27   California commerce.

28

SECOND AMENDED COMPLAINT

304.    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, ODDs.

305.    For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

A.    to fix, raise, maintain and stabilize the price of ODDs;

B.    to allocate markets for ODDs amongst themselves;

C.    to submit rigged bids for the award and performance of certain ODDs contracts; and

D.    to allocate among themselves the production of ODDs.

306.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

A.    price competition in the sale of ODDs has been restrained, suppressed and/or eliminated in the State of California;

B.    prices for ODDs sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

C.    those who purchased ODDs from defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

307.    As a result of the alleged conduct of defendants and their co-conspirators, Plaintiffs paid supra-competitive, artificially inflated prices for the ODDs they purchased during the Relevant Period.

308.    As a direct and proximate result of defendants' and their co-conspirators' conduct, Plaintiffs have been injured in their business and property by paying more for ODDs sold by

79

1  defendants, their co-conspirators, and others than they would have paid in the absence of defendants'

2  and their co-conspirators' combination and conspiracy.  As a result of defendants' and their co-

3  conspirators' violation of Section 16720 of the California Business and Professions Code, Plaintiffs

4  are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to

5  Section 16750(a) of the California Business and Professions Code.

6  **Third Claim for Relief**

7  **(Violation of California Unfair Competition Law, Cal. Bus. & Profs. Code §§ 17200 *et seq.*)**

8      309.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every

9  allegation set forth in the preceding paragraphs of this Complaint.

10     310.    Plaintiffs believe and assert that all of their purchases of ODDs are actionable

11  pursuant to the federal and California law as alleged above.  In addition, Plaintiffs allege this Third

12  Claim for Relief under the California Unfair Competition Law.

13     311.    By reason of the foregoing, defendants and their co-conspirators have engaged in

14  unfair competition in violation of California's Unfair Competition Law, California Business and

15  Professional Code § 17200 et seq.

16     312.    Defendants and their co-conspirators committed acts of unfair competition, as defined

17  by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of ODDs as

18  described above.

19     313.    The acts, omissions, misrepresentations, practices and non-disclosures of defendants

20  and their co-conspirators, as described above, constitute a common, continuous and continuing

21  course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts

22  or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of

23  Section 1 of the Sherman Act; (2) violation of the Cartwright Act;

24     314.    Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices

25  and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether

26  they constitute a violation of the Sherman Act or the Cartwright Act.

27     315.    Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive

28

80

1    within the meaning of Section 17200, *et seq.*

2    316.   Defendants' and their co-conspirators' conduct was carried out, effectuated, and

3    perfected within the state of California**.**

4    317.   During the Relevant Period, Plaintiffs conducted a substantial volume of business in

5    California.  During the Relevant Period, a substantial portion of Acer America Corporation's product

6    development, product planning, and marketing divisions, and supporting finance, trade, and logistics

7    operations were located in and had extensive operations in California related to ODDs. During the

8    Relevant Period, all or a significant portion of Acer America Corporation's product development,

9    product planning, and marketing divisions, and supporting finance, trade, and logistics operations

10   were located in and had extensive operations in California related to ODDs. During the Relevant

11   Period, Acer America Corporation's negotiations for the purchase of ODDs took place in California,

12   purchase orders for ODDs were issued in California, payments for the purchases of ODDs were

13   issued in California, Acer America Corporation took possession of ODDs in California, invoices for

14   ODDs sold to Acer America Corporation's customers were issued from California to Acer America

15   Corporation's customers, payments for ODDs sold to Acer America Corporation's customers were

16   received in California, and ODDs were distributed to Acer America Corporation's customers from

17   California.

18   318.   During the Relevant Period, all or a significant portion of Gateway, Inc.'s product

19   development, product planning, and marketing divisions, and supporting finance, trade, and logistics

20   operations were located in and had extensive operations in California related to ODDs. During the

21   Relevant Period, Gateway, Inc.'s negotiations for the purchase of ODDs took place in California,

22   purchase orders for ODDs were issued in California, payments for the purchases of ODDs were

23   issued in California, Gateway, Inc. took possession of ODDs in California, invoices for ODDs sold

24   Gateway, Inc.'s customers were issued from California to Gateway, Inc.'s customers, payments for

25   ODDs sold to Gateway, Inc.'s customers were received in California, and ODDs were distributed to

26   Gateway, Inc.'s customers from California.

27   319.   During the Relevant Period, all or a significant portion of eMachines, Inc.'s product

28

81

development, product planning, and marketing divisions, and supporting finance, trade, and logistics operations were located in and had extensive operations in California related to ODDs. During the Relevant Period, eMachines, Inc.'s negotiations for the purchase of ODDs took place in California, purchase orders for ODDs were issued in California, payments for the purchases of ODDs were issued in California, eMachines, Inc. took possession of ODDs in California, invoices for ODDs sold to eMachines, Inc.'s customers were issued from California to eMachines, Inc.'s customers, payments for ODDs sold to eMachines, Inc.'s customers were received in California, and ODDs were distributed to eMachines, Inc.'s customers from California.

320.    Defendants and their co-conspirators engaged and participated in the conspiracy through their offices and operations in California. Defendants and their co-conspirators maintained offices in California during the Relevant Period. Employees at defendants' and their co-conspirators' locations in California participated in meetings and engaged in bilateral communications in California and intended to and did carry out defendants' and their co-conspirators' anticompetitive agreement to fix the price of ODDs. Defendants and their co-conspirators also participated in the conspiracy in the U.S. through their California offices by providing information obtained through meetings with other defendants and co-conspirators to employees in their California offices for those California employees to use in the course of fixing prices in negotiations with U.S. customers, including Plaintiffs. Defendants' and their co-conspirators' conduct within California thus injured Plaintiffs both in California and throughout the United States.

321.    By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants and their co-conspirators as result of such business acts and practices described above.

///

///

///

SECOND AMENDED COMPLAINT

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

A.    That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

      i.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

      ii.    An unreasonable restraint of trade or commerce in violation of the Cartwright Act, as alleged in the Second Claim for Relief above;

      iii.    Unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices, in violation of California Unfair Competition Law, Cal. Bus. & Profs. Code Section 17200, *et seq.*, as alleged in the Third Claim for Relief above;

B.    That Plaintiffs recover damages, as provided by federal and state laws, and that a judgment be entered in favor of Plaintiffs against defendants, jointly and severally, in an amount to be trebled if in accordance with such laws;

C.    That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    That Plaintiffs be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

E.    That Plaintiffs recover its costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and,

SECOND AMENDED COMPLAINT

F.    That Plaintiffs be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## X.    JURY TRIAL DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiffs demand a trial by jury for all issues so triable.

Dated:  July 30, 2014                    Respectfully submitted,



_____

KAIWEN TSENG (SBN 193756)
ktseng@tklg-llp.com
HSIANG ("JAMES") H. LIN (SBN 241472)
jlin@tklg-llp.com
100 Marine Parkway, Suite 200
Redwood Shores, CA 94065
Telephone: (650) 517-5200

JAMES B. BALDINGER
jbaldinger@cfjblaw.com
DAVID B. ESAU
desau@cfjblaw.com
CARLTON FIELDS JORDEN BURT, P.A.
CityPlace Tower
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida 33401-6350
Telephone: (561) 659-7368

*Attorney for Plaintiffs*
ACER AMERICA CORPORATION; GATEWAY,
INC.; AND GATEWAY U.S. RETAIL, INC., F/K/A
EMACHINES, INC.

SECOND AMENDED COMPLAINT