United States District Court
For the Northern District of California

1
2
3
4
5
6
7        IN THE UNITED STATES DISTRICT COURT
8        FOR THE NORTHERN DISTRICT OF CALIFORNIA
9        SAN FRANCISCO DIVISION
10
11
12   **IN RE OPTICAL DISK DRIVE**          CASE NO. 3:10-md-2143 RS
13   **ANTITRUST LITIGATION**              **ORDER DENYING MOTIONS FOR CLASS CERTIFICATION**
14   _____
15   This Document Relates to:
16   ALL ACTIONS
17
18
19                    I. INTRODUCTION
20        This Multi-District Litigation alleges a conspiracy among defendants to fix the prices of
21   optical disc drives between 2004 and 2009. Two groups of plaintiffs, "direct purchasers" and
22   "indirect purchasers," who are separately represented and proceeding under separate complaints,
23   seek class certification.  The central dispute in both certification motions is whether plaintiffs'
24   experts have presented a viable methodology for establishing class-wide antitrust injury and
25   damages.  Because neither group of plaintiffs has made a persuasive showing that the expert
26   analyses they proffer sufficiently address the relevant question, the motions must be denied.
27
28

**United States District Court**
For the Northern District of California

II. BACKGROUND

An optical disc[1] is a medium for storing data.  Familiar forms include CDs (compact discs) typically containing music or computer software, and DVDs (digital video disc or, officially, Digital Versatile Disc), often containing movies or other video content, and also used for computer software. When first introduced to the public, optical discs only contained files that were recorded onto them during the manufacturing process—they could be "read" but not written to, much like phonograph records of an earlier time ("read only discs"). As the technology advanced, optical discs were developed that allowed an end user to record data on a one-time basis ("recordable discs"). Eventually optical discs appeared on the market that permitted data to be recorded and re-recorded indefinitely ("rewritable discs), which are analogous to magnetic tape, or hard and floppy computer disks. In a broad sense, the technology evolved generationally from CDs to DVDs to Blu-Ray Discs, each with the same progression moving from read-only, to recordable, and then to rewritable.

Optical disc drives—ODDs—are devices that allow data to be read from and, where applicable, written to, optical discs.  ODDs are typically "backwards-compatible," – that is, an ODD that is designed to read (and perhaps write to) a more recently-developed format of optical disc usually will also be able to process older formats as well. ODDs have applications in a variety of consumer electronic devices, including desktop and laptop computers, game consoles, and camcorders.  In these applications, the ODD is typically a built-in component of the device.  ODDs are also available as stand-alone units, in a number of forms.  Where ODDs are incorporated into other products such as computers, they typically represent a relatively small percentage of the cost of the product as a whole.

During the putative class period, the prices of ODDs were generally marked by steep declines. While each generational advance in the technology was often introduced at a higher price, the overall trend was downward, and dramatically so, as has generally been the case in the high technology arena.  Plaintiffs' basic theory in this action is that defendants were highly motivated to attempt to slow, or at least stabilize, the inevitable decline in prices.  Plaintiffs are not arguing that

---

[1] Although the caption of this action is "In re Optical Disk Drive Litigation," the preferred spelling appears to be "disc," for optical media, as opposed to "disk," for magnetic media.

the alleged conspiracy drove prices upward, merely that it kept prices from falling as rapidly and/or as far as they otherwise would have.

At the center of this action are multiple instances of alleged "bid rigging" involving procurements of ODDs by Dell, HP, and Microsoft.  In connection with a now-closed Department of Justice investigation into that conduct, defendant Hitachi-LG Data Storage, Inc. ("HLDS") pleaded guilty to criminal antitrust violations and paid a $21.1 million criminal fine. Plaintiffs contend, in essence, that the bid rigging was merely one part of a vast industry-wide price-fixing conspiracy, also involving inter-competitor agreements, and exchanges on price, output, and other types of confidential information.

The parties have engaged in lengthy and voluminous discovery.  Plaintiffs contend that the documentary evidence includes references to competitors "co-working" (i.e., colluding) on various procurement events, and to express agreements on pricing or bidding for market share.  Although much of the evidence to which plaintiffs point involves the bidding events, they contend continuous illegal information exchanges occurred among all defendants relating to customer accounts other than HP and Dell.  Plaintiffs point to certain "alliances" among defendants that allegedly allocated customers and markets.  They contend "supply arrangements" existed among certain defendants that nominally were competitors in the market. Plaintiffs aver that defendants reached oral agreements at various meetings in Asia and in the United States at various points in time.

Plaintiffs argue that cumulatively the evidence is indicative of a "pervasive" industry-wide conspiracy.  At least at this juncture, however, plaintiffs have not proffered evidence or allegations that there were one or more instances in which the defendants' executive decision-makers entered into express agreements to fix prices across the board on an ongoing basis.

Both the direct purchaser plaintiffs ("DPPs") and the indirect purchaser plaintiffs ("IPPs") now move for class certification.  Defendants oppose, and also seek to strike the expert reports offered by the plaintiffs.

United States District Court

For the Northern District of California

3

<div style="float:left">**United States District Court**<br>For the Northern District of California</div>

III. LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure, which represents much more than a mere pleading standard. To obtain class certification, plaintiffs bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, amended by 273 F.3d 1266 (9th Cir. 2001). "A party seeking class certification must affirmatively demonstrate ... compliance with the Rule." *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir.2012).

If all four prerequisites of Rule 23(a) are satisfied, a court must also find that plaintiffs "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013). Relevant here is Rule 23(b)(3), which permits certification if a court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S.Ct. 1184, 1194 (2013) (quoting *Dukes*, 131 S.Ct. at 2551); see also *Mazza*, 666 F.3d at 588 ("'Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23.'" (quoting *Zinser*, 253 F.3d at 1186)). This "rigorous" analysis applies to both Rule 23(a) and Rule 23(b). *See Comcast*, 133 S.Ct. at 1432 (discussing how Congress included "addition[al] . . . procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (e.g., an opportunity

to opt out)" and how a court has a "duty to take a 'close look' at whether common questions predominate over individual ones.").

Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S.Ct. at 1194–95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. at 1195. If a court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class. *Zinser*, 253 F.3d at 1186.

## IV.  DISCUSSION

A.  DPPs

DPPs seek certification of a class consisting of:

> All individuals and entities who, during the period from January 1, 2004 until January 1, 2010 ("the Class Period"), purchased one or more Optical Disk Drives in the United States directly from the Defendants, their subsidiaries, or their affiliates. Excluded from the class are Defendants and their parents, subsidiaries, affiliates, named co-conspirators and all governmental entities.

"Optical Disk Drives" are defined to include, (a) a drive sold by a defendant or its subsidiary or affiliate as a separate unit that is to be inserted into, or incorporated in, an electronic device; (b) a drive sold by a defendant or its subsidiary or affiliate as a separate unit that is to be attached to an electronic device through an external interface such as a Universal Serial Bus connection; and (c) an internal drive sold as a component of a laptop or desktop computer by a defendant or its subsidiary or affiliate. Thus, the proposed class consists of those who purchased ODDs, either as standalone products or as products that were incorporated into desktop or notebook computers, directly from a defendant, or its subsidiary or affiliate, but not those who purchased ODDs from entities other than the alleged conspirators.[2]

---

[2] The class and product definitions in the current complaints of both the DPPs and the IPPs have been revised from those at issue during the motions to dismiss, which raised certain issues, as discussed in the prior orders.  Defendants have not renewed similar challenges to the present

**United States District Court**
For the Northern District of California

1. Rule 23(a)

    a. Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable.  To satisfy this requirement, plaintiffs need not state the "exact" number of potential class members, nor is there a specific minimum number that is required. See *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346, 350–51 (N.D.Cal.2005); *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL 891362, *5 (D.N.J.2006).   Here, there is no dispute that the number of direct purchasers of ODDs in the class period exceeds one thousand and plainly satisfies the numerosity requirement.[3]

    b. Commonality

Rule 23(a)(2) requires that there exist "questions of law or fact common to the class." Where an antitrust conspiracy has been alleged, courts have frequently held that "the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *See In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. at 351; *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL 891362 at *5.   Here, at a minimum, the existence, scope, and efficacy of the conspiracy to fix or stabilize prices of ODDs sold in the United States are all common questions that DPPs must address.

Defendants strenuously challenge whether such common questions *predominate*, and/or whether they can be answered through *common proof*, such that the requirements of Rule 23(b)(3) can be satisfied.  While those points arguably implicate whether there is commonality in the first instance, they are more appropriately addressed under subdivision (b).  For purposes of this motion,

---

definitions.  Although the two groups of plaintiffs define ODDs slightly differently, those distinctions are not material to the questions presented in these motions.

[3]  While not expressly stated in the rule, there is also a requirement of "ascertainability"—i.e., that the members of the class be sufficiently definable and identifiable. *See In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 563 (N.D. Cal. 2013). There is no real dispute that requirement is satisfied here as well.

it will be presumed that the DPPs have shown sufficient commonality exists to satisfy subdivision (a).

                    c. <u>Typicality and adequacy</u>

Rule 23(a)(3) also requires that the claims of the named plaintiffs be typical of those of the class.  "Typical" does not mean "identical to."  Rather, typicality results if the representative plaintiffs' claims "arise[ ] from the same event, practice or course of conduct that gives rise to the claims of the absent class members and if their claims are based on the same legal or remedial theory."  *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 164 (S.D.N.Y. 2000).

In evaluating typicality, the court should consider whether the named plaintiffs' "individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *See In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL 891362 at *5. In cases involving an alleged price-fixing conspiracy, the representative plaintiff's claim is often considered typical even where the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class. *See*, *e.g.*, *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 479 (W.D.Pa.1999); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374 (S.D.N.Y.1996).

Addressing a closely-related issue, Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class.  This "adequacy" requirement mandates that no conflicts of interest exist between the named plaintiffs and the absent class members. *See*, *e.g.*, *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. at 351, citing *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).[4]

---

[4]  The adequacy requirement also contains an element relating to the competence and diligence of class counsel in pursuing the claims.  *See id.*; *see also In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001).  There is no concern in this instance with the adequacy of class counsel separate and apart from the representativeness of the named plaintiffs.  *Accord*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490 (N.D. Cal. 2008) ("It does not suffice that counsel have an incentive to prove the wholesalers' claims. While counsel in this case are excellent, the test is whether the clients themselves, who ultimately control and drive the litigation, have the requisite typicality under Rule 23.")

**United States District Court**
For the Northern District of California

        In opposition to the DPPs' motion for class certification, defendants raise substantial

concerns about the typicality and adequacy of these named plaintiffs. The DPPs' reply briefing

included no direct response to those arguments.  As discussed below, the dispositive issue in this

motion is the DPPs' inability to show a viable method for proving injury on a class-wide basis.

Were the DPPs somehow able to overcome that hurdle, however, certification would still not be

warranted, at least as the class is currently defined.

        The named plaintiffs are three small companies and four individuals. All the named plaintiffs

purchased non-customized ODDs (or computers containing ODDs) from a defendant at non-

negotiable, list prices through a defendant's distribution subsidiary or retail website.  In contrast, the

putative class encompasses a myriad of other ODD purchasers whose volumes and means of ODD

purchases do not compare.  Dell and HP together accounted for almost half of defendants' dollar

value sales during the class period. Other OEMs and major distributors accounted for another

37.8%.  Such purchasers typically negotiated prices.  Dell and HP ran bidding processes, including

those that were the target of the bid-rigging at issue in the DOJ investigation.

        The circumstances here are thus remarkably similar to those in *In re Graphics Processing

Units Antitrust Litigation*, 253 F.R.D. 478 (N.D. Cal. 2008) ("*GPU*").

> Here, the representative plaintiffs' claims are not typical of the putative class.
> Significantly, the named plaintiffs each purchased a single graphics card through [a
> defendant's] website . . . .The terms of their purchases were non-negotiable . . . . By
> contrast, the putative class includes wholesale purchasers who collectively comprised
> over 99.5% of defendants' business. These wholesale customers purchased a vast
> array of products on individually negotiated terms. Unlike the representative
> plaintiffs who had no negotiating power at all, some wholesale conglomerates, such
> as Dell, Microsoft, Hewlett–Packard, Apple, Motorola, and Best Buy, likely had
> more bargaining power than defendants themselves . . . .The wholesale purchasers
> therefore came to the negotiating table in a fundamentally different position than the
> representative plaintiffs.

253 F.R.D. at 489-90.

**United States District Court**
For the Northern District of California

In light of the differences between the named plaintiffs and the larger entities in the putative class, the *GPU* court refused to certify the class as defined.

> These overwhelming disparities defeat typicality. The representative plaintiffs simply do not have the appropriate incentive to establish antitrust violations with respect to all of the absent class members. To prove their claims, the named plaintiffs will have to show that the list prices that they paid for their graphics cards were artificially inflated by defendants. Proof that defendants conspired to fix those prices would hardly prove that defendants also conspired to fix the non-list prices for the transactions entered into with absent wholesale purchasers.

*Id.*

The circumstances here are in a sense reversed, because even though the named plaintiffs have strong evidence of bid-rigging involving some of the largest purchasers, they are struggling to find a way to prove that list prices paid by ordinary purchasers such as themselves were fixed.  The disparity between the named plaintiffs and others in the class, however, is similarly acute.

Accordingly, even if the certification motion did not fall for failure to meet the requirements of Rule 23(b) as described below, the disparity between the named class members would preclude certification of the class as currently proposed.   Whether the motion could be granted in part by narrowing the class, as occurred in *GPU*, need not be considered at this juncture, given the disposition.

2.  Rule 23(b)

As noted, the DPPs seek certification under subsection (3) of Rule 23(b), which requires them to show (1) "questions of law or fact common to the members of the class predominate" and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

a.  Predominance

Predominance requires "that the common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members." *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL 891362 at \*9. Generally speaking, the test for predominance is met "when there exists generalized evidence which proves or disproves an [issue or element] on a simultaneous, class-wide basis, since such proof obviates the need to examine each

United States District Court
For the Northern District of California

1   class members' individual position."  *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.C.Cir.

2   2002). In undertaking the predominance analysis, courts must identify the issues involved in the

3   case and determine which are subject to "generalized proof," and which must be the subject of

4   individualized proof.  Here, the DPPs must satisfy the predominance requirement with respect to

5   three key elements of their claims: (1) whether there was a conspiracy to fix prices in violation of

6   the antitrust laws; (2) the fact of plaintiffs' antitrust injury, or "impact" of defendants' unlawful

7   activity; and (3) the amount of damages sustained as a result of the antitrust violations. *In re*

8   *Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, *7 (N.D. Cal. 2006);

9   *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 257.

10

11                              i.  *Existence of Antitrust Conspiracy*

12          Common issues predominate in proving an antitrust violation "when the focus is on the

13   defendants' conduct and not on the conduct of the individual class members*." In re Bulk [Extruded]*

14   *Graphite Prod. Antitrust Litig.*, 2006 WL 891362 at *9; *see also*, *In re Flat Glass Antitrust Litig.*,

15   191 F.R.D. at 484.  Not surprisingly, courts frequently find this standard satisfied in cases alleging

16   price-fixing conspiracies. *See*, *e.g.*, *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL

17   891362 at *9 (whether a conspiracy exists is a common question that predominates over other issues

18   in the case and "has the effect of satisfying the first prerequisite of FRCP 23(b)(3)").

19          Here, defendants argue at some length that the DPPs will be unable to show the existence of

20   a conspiracy operating on a class-wide basis in the first instance.  Those arguments, however,

21   largely depend on defendants' efforts to recharacterize the claims, based on their own view as to

22   what might be inferred from the evidence.  Specifically, defendants insist that at best the DPPs will

23   be able to prove limited "bid-rigging" as to which criminal convictions have already been obtained,

24   and *perhaps* some other instances of "information sharing" that might or might not be unlawful.

25          The question is not whether the DPPs would prevail on the merits were they only to prove

26   the limited wrongdoing defendants reluctantly concede might have transpired. The DPPs' theory is

27   that there was a unitary, overarching, class-wide conspiracy, effectuated primarily through bid-

28   rigging, inter-competitor agreements, and exchanges on price, output, and other types of confidential

10

United States District Court
For the Northern District of California

1    information.  Adequacy of proof aside, because the focus will be on defendants' conduct, the

2    existence or non-existence of such a conspiracy could appropriately be adjudicated on a class-wide

3    basis. *See In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 623 (N.D. Ga. 1997)

4    ("Defendants' attempts to arbitrarily redefine the anticompetitive behavior alleged by Plaintiffs is

5    unsupported by any authority or the record in this case"); *accord In re TFT-LCD (Flat Panel)*

6    *Antitrust Litig.,* 267 F.R.D. 583, 607 (N.D. Cal. 2010) ("*LCD I*") (rejecting attempts to

7    recharacterize plaintiffs' allegations on a motion for class certification).[5]

8           That said, a troubling disconnect exists between the DPPs' articulated theory of an

9    overarching conspiracy comprising innumerable acts of price-fixing carried out through various

10   improper means and the expert opinion they offer in support of class certification.  As discussed in

11   more detail below, the expert analysis focuses on attempting to show a class-wide impact resulting

12   from discrete instances of bid-rigging.  If the DPPs intend to prove the broader form of conspiracy

13   by showing the various wrongful acts and the participation of each defendant therein, then common

14   issues would predominate, and they will either succeed or fail in persuading a trier of fact that such

15   a conspiracy existed.  If, as their proffered expert testimony suggests, they intend only to establish a

16   narrower set of wrongful acts with industry-wide consequences, it is not clear that liability would

17   attach to all or even most of the defendants—the conspiracy proved might differ greatly from that

18   alleged, with different legal consequences.  Put differently, defendants' recharacterization of the

19   claims finds some support in the approach taken by the DPPs' expert.

20          Nevertheless, the mere proffer of the expert testimony does not preclude the DPPs from

21   offering other evidence to establish the existence of the conspiracy they have alleged, and because

22   the focus will be on defendants' conduct, class-wide adjudication of that question would be

23   _____

24   [5]  This is not to say that mere allegations suffice at the class certification stage.  "Rule 23 does not
     set forth a mere pleading standard. A party seeking class certification must affirmatively

25   demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in
     fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 131 S. Ct. at

26   2551.While defendants insist that the DPPs' discovery responses reveal they lack evidence of any
     overarching conspiracy and actually are relying heavily on facts reflecting bid-rigging, the DPPs'

27   theories are not so untethered from the record as to permit a determination at this juncture that they
     necessarily will fail.  *See Amgen,* 133 S. Ct. at 1191 ("[T]he office of a Rule 23(b)(3) certification

28   ruling is not to adjudicate the case . . . .").

appropriate. Indeed, the existence or non-existence of a narrower conspiracy can be determined on a class-wide basis, even if a finding of such conspiracy would not lead to the broad liabilities the DPPs seek to impose.  Accordingly, despite some questions as to how the DPPs intend to prove the conspiracy they have alleged, its existence or non-existence is a question that both predominates and is subject to common proof.

### ii.  *Antitrust Injury*

To proceed with a class action, the plaintiffs must be able to establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of defendants' alleged anti-competitive conduct. See *DRAM*, 2006 WL 1530166 at *7. This is where the heart of the battle lies in the present motion.  Defendants insist that the DPPs' proposed proof, offered in the form of expert testimony from Dr. Gary French, is fatally flawed, and, indeed, subject to their separately-briefed motion to strike.

Dr. French is an economist and a Principal Consultant to Nathan Associates, Inc.  He holds a doctorate in economics.  Defendants do not challenge his credentials or expertise to offer expert opinion in this matter.  Dr. French offers three basic categories of opinions.  First, he describes a variety of conditions in the ODD industry that he contends were conducive to defendants "reaching, monitoring and enforcing a cartel agreement as alleged."  These include such things as the small number of alleged cartel members, their "history of cooperation" in matters such as patent pools, joint ventures, and "alliances," and other similar factors.

For purposes of this motion, there is no real dispute that the factors identified by Dr. French as being "conducive" to anticompetitive activity existed in the industry.  As defendants correctly argue, however, while such industry characteristics may be preconditions for any colorable case of class-wide impact, they do not establish such impact. *See GPU*, 253 F.R.D. at 502 ("Even if Dr. Meyendorff's description of the industry is accurate, it does not suffice on its own as a method of demonstrating impact to the specific direct purchasers at issue here through common proof. Plaintiffs must show not that 'market conditions are favorable for impact' . . . but that there is a

United States District Court
For the Northern District of California

1    common, formulaic method of proving that if defendants conspired to raise prices, the direct

2    purchasers plaintiffs bought from paid an overcharge.")

3    　　　Dr. French next offers an opinion that the wrongful conduct alleged by the DPPs, "including

4    price fixing, bid rigging, allocation of customers, and exchange of commercially sensitive business

5    information" would have had class-wide impact as a result of so-called "most-favored-nation

6    clauses" in defendants' contracts with Dell and HP.  Defendants have shown there is significant

7    reason to doubt the "most-favored-nation" clauses had the results Dr. French contends they

8    produced.  Among other things, the empirical data shows that prices charged to other customers did

9    not cluster within an especially narrow range above the supposed "floor" of the prices paid by Dell

10    and HP.  In any event, Dr. French does not suggest his opinions about market conditions and the

11    most-favored nation clauses suffice to establish class-wide impact.  Rather, he offers his third set of

12    opinions in the form of an empirical correlation analysis and a regression analysis as the heart of his

13    effort to show there are reliable, economically sound, methodologies to demonstrate that all, or

14    nearly all, members of the class suffered damage as a result of defendants' alleged anti-competitive

15    conduct.

16    　　　The standard under which expert opinion like that offered by Dr. French is to be evaluated at

17    class certification has been evolving.  The *DRAM* decision suggested that courts "must avoid

18    engaging in a battle of expert testimony." 2006 WL 1530166, at *9.   Particularly in light of the

19    "rigorous analysis" required under *Dukes* and *Comcast*, however, the caution offered in *GPU* is apt.

20    "[C]ertification [should not be] automatic every time counsel dazzle the courtroom with graphs and

21    tables." 253 F.R.D. at 491. If the presumption were otherwise, "nearly all antitrust plaintiffs could

22    survive certification without fully complying with Rule 23." *Id*. at 492; *see also*, *In re High-Tech*

23    *Employee Antitrust Litig*., 289 F.R.D. 555, 567 (N.D. Cal. 2013)("conducting a thorough review of

24    Plaintiffs' theory and methodology is consistent with the requirement that the Court conduct a

25    'rigorous analysis'" to ensure that the predominance requirement is met"); *In re Rail Freight Fuel*

26    *Surcharge Antitrust Litig*.,725 F.3d 244, 255 (D.C. Cir. 2013) ("It is now clear . . . that Rule 23 not

27    only authorizes a hard look at the soundness of statistical models that purport to show

28

1   predominance—the rule commands it.").  Put another way, the inquiry must be to determine if the

2   proffered expert testimony has the requisite integrity to demonstrate class-wide impact.

3          *GPU* notes that "antitrust plaintiffs have in recent years trended toward presenting an

4   econometric formula or other statistical analysis to show class-wide impact" and that such analysis

5   has often been accepted at the certification stage. 253 F.R.D. at 491.  *GPU* concluded that "such

6   methods, where plausibly reliable, should be allowed as a means of common proof. To rule

7   otherwise would allow antitrust violators a free pass in many industries." *Id.*  Accordingly, it is

8   clear that statistical and economic methodologies, including correlation analyses and regression

9   analyses, *may* be employed to establish class-wide impact.

10         In this instance, however, the DPPs have not made a persuasive showing that Dr. French's

11  analyses are sufficient to carry their burden on this motion.  First, Dr. French's correlation analysis

12  is offered to show that supra-competitive prices paid by Dell and HP as a result of bid-rigging

13  *affected* prices paid by other purchasers.  There appears to be little dispute, however, that strong

14  correlations would arise from the long term price declines and the competitive market forces in any

15  event.  Indeed, Dr. French testified, "[w]ith or without a conspiracy I would expect to see high

16  correlation of prices across customers in this industry." [6]

17         Second, Dr. French's regression analysis is, by his own characterization, designed to

18  determine "how much lower prices would have been but for the alleged conspiracy."  To that end,

19  Dr. French applies a model in which the alleged conspiratorial overcharge is assumed to be the same

20  for all purchasers across all models of ODDs and throughout the entire class period. Whatever utility

21  such an approach might have in calculating a damages total, it cannot serve to establish that all (or

22  nearly all) members of the class suffered damage as a result of defendants' alleged anti-competitive

23  conduct. The regression analysis offered by Dr. French assumes the very proposition that the DPPs

24  are now offering it, in part, to show.

25  _____

26  [6]  It is of some note that Dr. French's analysis also omits a step of "cointegration," which the expert
offered by the IPPs, Dr. Kenneth Flamm, asserts is necessary to derive valid correlation data.

27  Because neither expert adequately demonstrates that the correlations have significance in light of the
long term price decline, it is unnecessary to determine if the differences in their approaches

28  undermine the reliability of either opinion.

**United States District Court**
For the Northern District of California

Indeed, Dr. French asserts that each class member may calculate his or her damages merely by "applying the overcharge percentage estimated on a class-wide basis to [his or her] individual purchases." While Dr. French calculates that the overcharge was about 11.48 percent in the aggregate, nothing in the regression methodology attempts to show that all or nearly all purchasers were overcharged in that amount, or in any amount at all.

Defendants attack numerous other aspects of Dr. French's methodology and calculations. Most or all of those challenges fall into the category of issues that could be raised on cross-examination at trial, and that would go to the weight a trier of fact might assign to the opinions. Defendants also offer analysis by their own expert, Dr. Januz Ordorver, purporting to show that if Dr. French's regression model is modified to allow estimates of overcharges to be made for different customers, ODD types, and time periods, it establishes a *lack* of class-wide impact, and proves that many direct purchasers incurred no statistically significant overcharge. Whether Dr. Ordover's modification to the models are analytically sound need not be decided at this juncture. Regardless of what those modifications do or do not show, Dr. French's unmodified model makes no attempt to establish, but instead simply assumes, class-wide impact.

### iii. *Damages*

In light of the DPPs' failure to show that they have a viable method for establishing antitrust injury on a class-wide basis, not surprisingly it follows that they have failed to meet their burden to show damages. Two points nevertheless bear further mention. First, assuming the DPPs were able to establish a class-wide impact, and to prove that all or virtually all purchasers paid an overcharge of approximately 11.48 percent, then the proposed method of calculating damages might very well be adequate, at least as to purchasers of standalone ODDs.

> Calculations need not be exact, see *Story Parchment Co. v. Paterson Parchment Paper Co*., 282 U.S. 555, 563, 51 S.Ct. 248, (1931), but at the class-certification stage (as at trial), any model supporting a "plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation."

*Comcast*, 133 S. Ct. at 1433.

United States District Court

For the Northern District of California

The DPPs' proposal to multiply the overcharge percentage by each class member's purchases is consistent with their apparent theory that each plaintiff should be deemed to have incurred an overcharge in that approximate percentage. The need to calculate damages individually pursuant to such a formula does not preclude class certification. *See In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 582 (N.D. Cal. 2013).

Second, however, the method the DPPs propose for calculating damages as to ODDs installed in computers appears badly flawed, even assuming they could show all or virtually all purchasers incurred an overcharge of 11.48 percent or some other specific percentage.[7] Because the DPPs would utilize a fixed average figure for the percentage of the system cost represented by an ODD, a purchaser of an expensive computer would be deemed to have suffered far more damage than a purchaser of a bargain computer, even where the ODDs installed in each were identical.[8] While this issue likely could be addressed in some way and might not preclude class certification standing alone, it serves to highlight the challenges presented by the DPPs' desire to bring what remains a very broad conspiracy claim, involving disparate products and class members who may not all be identically-situated.

In summary, while the DPPs likely have made a sufficient showing that common issues predominate and at least theoretically could be subject to common proof as to the existence of an antitrust conspiracy and damages, their present approach of attempting to show a class-wide impact is problematic, and precludes granting certification. Whether the conspiracy is seen as an

---

[7] The DPPs have shown, however, that they need not prove as a factual matter that the entire amount of any overcharge was passed on by defendants with respect to ODDs preinstalled in computers they sold. *See Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980); *In r Cathode Ray Tube (CRT) Antitrust Litig.*, 911 F. Supp. 2d 857, 871 (N.D. Cal. 2012) ("*Royal Printing* explicitly addressed the issue of apportioning damages and held that, in cases proceeding under the ownership and control exception, no apportionment is needed; plaintiffs are permitted to sue 'for the entire overcharge.'").

[8] Plaintiffs propose deeming ODDs to constitute 3.5% of the sales price of computers. Thus, for example, the damages in the case of a computer selling for $1000 would be $4.02 ($1000 x 3.5% x 11.48%) whereas the damages for a $2500 computer would be $10.05 ($2500 x 3.5% x 11.48%), even if the ODDs in the two computers were identical, and were sold at the same time.

overarching one carried out through many wrongful acts, or one centered on the bid-rigging, with alleged industry-wide consequences, the DPPs simply have not shown they possess a viable methodology for proving with generalized evidence, that all, or nearly all members of the class suffered damage as a result of defendants' alleged anti-competitive conduct.

### b. Superiority

Rule 23(b)(3) also requires that a class action be superior to other methods of adjudication. Some authority suggests that the superiority requirement is satisfied almost *a fortiori* if common questions are found to predominate in an antitrust action. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 608 (N.D. Cal. 2010). In this instance, however, even if the DPPs had met their burden to show a viable methodology for proving class-wide impact, substantial questions would remain as to whether a class action would be the superior method of proceeding. Defendants argue that the real parties in interest are a "handful" of OEMs who can bring their own actions, as Dell has already done.

The issue, of course, overlaps and is intertwined with the typicality issues discussed above. If the class were composed solely of individuals and small entities that purchased ODDs at retail list prices, then the usual presumption of the superiority of a class action for such claims likely would apply. *See In re Static Random Access (SRAM) Antitrust Litig.*, 2008 WL 4447592 (N.D. Cal. 2008) ("In antitrust cases such as this, the damages of individual direct purchasers are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress.") Even if the DPPs had satisfied the other requirements for class certification, however, the superiority requirement of Rule 23(b)(3) would stand as an additional barrier to certification of the class as presently proposed.

United States District Court
For the Northern District of California

B.  <u>The Indirect Purchasers</u>

The IPPs seek certification of a class of:

> All persons and entities residing in the United States who indirectly purchased a new
> ODD Product during the Class Period for their own use and not for resale that
> contained an ODD manufactured by one or more Defendants or their conspirators.

The IPPs propose a slightly shorter class period than do the DPPs, extending through June of 2009 rather than the remainder of that year.  Optimally, the IPPs seek a nationwide class under California's Cartwright Act.  Alternatively, they seek 24 separate state subclasses under that act, or under the antitrust and/or consumer protection statutes of those states, depending on how the relevant choice of law issues are ultimately resolved.

1.  <u>Rule 23(a)</u>

The analysis of the IPPs' ability to satisfy the requirements of Rule 23(a) largely parallels that set out above as to the DPPs.  There is no question that numerosity (including ascertainability) is present.  As to commonality, while there again is an ultimately dispositive issue under Rule 23(b)(3) as to whether common questions predominate and can be answered through common proof, the number and significance of such questions will be presumed sufficient for purposes of subdivision (a).

The named indirect purchaser plaintiffs are in a stronger position than their direct purchaser counterparts as to the requirements that their claims be typical of those of the class and that they can serve as adequate representatives.  While as noted, the named direct purchasers might be appropriate representatives were the class narrowed, there is no similar divide among indirect purchasers between large customers paying negotiated prices and individuals or small entities buying at retail.  All members of the putative indirect class are end-purchaser consumers.  Accordingly, the IPPs have adequately shown that the requirements of Rule 23(a) are satisfied.

1          2. <u>Rule 23(b)</u>

2          Again, the IPPs' challenges in satisfying Rule 23(b) have much in common with those of the

3     DPPs. Were the only question whether they can establish the *existence* of a conspiracy through

4     common proof, the fact that the focus would be on the conduct of defendants likely would suffice.

5     *See In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL 891362 at *9  (whether a

6     conspiracy exists is a common question that predominates over other issues in the case and "has the

7     effect of satisfying the first prerequisite of FRCP 23(b)(3)").  As in the case of the DPPs, there is

8     some tension between the IPPs' allegations and arguments of an overarching, multifaceted,

9     conspiracy, and the approach of their expert in attempting to show class-wide impact from a more

10    narrow set of alleged wrongs.  Once more, however, that tension would not preclude certification

11    were the existence of the conspiracy the only issue that needed to be proved on a class-wide basis.

12         The central issue for the IPPs, and where their showing falls short, is also whether antitrust

13    *injury* (or "impact") and resulting damages can be shown on a class-wide basis, under a

14    methodology of common proof. The IPPs offer the expert analyses of Dr. Kenneth Flamm, which is

15    similar, but not identical to that of the DPPs' expert Dr. French.  Dr. Flamm is a professor at the

16    University of Texas who specializes in applied economics.  His credentials and expertise to offer

17    expert opinion in this matter are not challenged.

18         Like Dr. French, Dr. Flamm relies both on market characteristics and econometric modeling

19    to support his opinions that there was class-wide[9] impact and damages, subject to common proof.

20    Again, showing the existence of industry characteristics that are conducive to class-wide impact

21    may fulfill a requisite first step, but it does not establish such impact. *See GPU*, 253 F.R.D. at 502.

22    Dr. Flamm's correlation analysis is, as alluded to above, somewhat more complex than that

23    conducted by Dr. French.  Rather than using simple averages of ODD prices, Dr. Flamm creates so-

24    called hedonic indexes and Fisher indexes, by which he attempts to account for product differences

25

26    _____

      [9]  In this instance, "class-wide" refers first to the *direct* purchasers from whom the indirect class

27    members purchases ultimately descend.  Absent a showing that all or nearly all the original

      purchasers of the ODDs at issue paid supra-competitive prices, indirect purchasers would have no

28    claim.

1   and other factors that are unrelated to the potential correlations he is seeking to uncover.  Dr. Flamm

2   also performs a "cointegration analysis," designed to eliminate any "spurious correlation"—a term

3   of art referring to variables that may track together, but without a causal relation between them.

4           Despite the additional complexity in Dr. Flamm's approach, his results ultimately track the

5   opinion of Dr. French—that there was a relatively high correlation between prices across customers

6   and across different types of ODDs.  As in the case of the DPPs, however, the IPPs have not made a

7   sufficient showing that such a correlation can serve as common proof of class-wide impact,

8   particularly in light of defendants' evidence that such correlations would exist in any event in the

9   steadily declining prices that befell the ODD industry during the relevant period.

10          Dr. Flamm's regression analysis similarly is more complex than that performed by Dr.

11  French, in that he utilizes more than one estimated overcharge coefficient.  Dr. Flamm's overcharge

12  coefficients, however, reflect aggregate estimates for all purchasers purchasing ODDs of particular

13  types in given years.  As such, class-wide impact is still being *assumed* by the models, rather than

14  demonstrated by the results.  Flamm also purports to test the validity of his models by looking to

15  specific examples in the data.  As defendants point out, though, the selectivity of the pricing data

16  examined in the analysis substantially limits the conclusions that can be drawn.  Identifying some

17  instances where the empirical data appears to match the model does not transform the analysis from

18  one that assumes class-wide impact into one that proves it.

19          Defendants have again offered numerous other criticisms of Flamm's analysis, and present

20  their own adapted version of his methodology which they contend affirmatively establishes the

21  absence of a class-wide impact.  Here, too, the soundness of defendants' alternative analysis need

22  not be conclusively determined. Whether or not defendants' analysis proves many class-members

23  were not injured, the threshold point is that the IPPs have not met their burden to show they have a

24  methodology capable of establishing impact and damages on a class-wide basis.

25          Moreover, as the IPPs recognize, their burden is two-fold.  Not only must they show that all

26  or nearly all of the original *direct* purchasers of ODDs bought at inflated prices, they must also show

27  those overcharges were passed through all stages of the distribution chain.  *See GPU*, 253 F.R.D. at

28  499. ("[I]ndirect-purchaser plaintiffs must demonstrate that defendants overcharged their direct

purchasers . . . and that those direct purchasers passed on the overcharges to plaintiffs. In so doing, they must find a way to account for the decision-making of a variety of resellers and manufacturers."). Because the IPPs have failed to show a viable method for establishing impact to all or nearly all of the underlying direct purchasers, the class cannot be certified regardless of their showing on pass-through.

In the circumstances of this case, however, the indirect purchasers would face a significant hurdle in showing pass through on a class-wide basis. As in *GPU*, it would appear "that the only way to fully assess pass-through in this action would be to conduct a wholesaler-by-wholesaler and re-seller-by-re-seller investigation, which would essentially result in 'thousands of mini-trials, rendering this case unmanageable and unsuitable for class action treatment.'" 253 F.R.D. at 505 (quoting *McCarter v. Abbott Labs., Inc.*, 1993 WL 13011463, at *5 (Ala.Cir.Ct. 1993)). Among other things, the IPPs have not presented a persuasive explanation as to why it would be reasonable to assume a uniform pass through rate given that ODDs typically make up a relatively small portion of the cost of the products into which they are incorporated, and given the existence of price points—i.e., the common practice in the industry of selling products costing in the hundreds of dollars at prices just under the next $100 mark. Thus, for example, if the overcharge paid by the direct purchaser on an ODD installed in a computer was only four dollars, it seems implausible that the retailer would then raise the price of a computer that otherwise would sell for $999 to $1003. Accordingly, even if the indirect purchasers could show that all or nearly all of the underlying direct purchases were made at prices artificially inflated by the alleged conspiracy, certification of an indirect purchaser class would not follow.[10]

---

[10]   In light of the conclusions herein, there is no need to reach the choice of law issues that would determine whether indirect purchasers could pursue a nationwide class or otherwise apply California law outside the state. Likewise, there is no need to decide whether the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA") issue raised by defendants would preclude certification or could be decided on a class-wide basis, although there is reason to conclude it would not. *See In re TFT-LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 583, 599 (N.D. Cal. 2010) ("The Court concludes that the FTAIA defense can be resolved on a class basis, and thus the possibility of this defense does not provide a basis for denying certification. Courts have emphasized that the FTAIA analysis focuses on the defendants' conduct.").

United States District Court
For the Northern District of California

C. <u>The motions to strike</u>

As reflected in the preceding discussion, plaintiffs have not made a sufficient showing that the expert reports of Drs. French and Flamm provide an adequate basis for concluding that antitrust injury may be adjudicated on a class-wide basis.  It does not follow, however, that either of those declarations should be stricken. When considering expert testimony offered pursuant to Rule 702, the trial court acts as a "gatekeeper" by "making a preliminary determination of whether the expert's testimony is reliable." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir.2002); see *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, (1993).  Expert testimony is admissible if: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.2010) (citing *Daubert*, 509 U.S. at 594, 596, 113 S.Ct. 2786).

Here, finding that plaintiffs fail to show the expert reports answer the critical questions is not equivalent to concluding the opinions are without reliable methods and principles, or are otherwise inadmissible. Accordingly, the motions to strike are denied.[11]

---

[11]  The sealing motions submitted in connection with class certification reflect that the parties have appropriately made the minimal redactions necessary to protect qualifying confidential information. The parties are requested to submit jointly a single proposed order specifying the materials that will remain sealed and identifying by docket number all of the sealing motions to which it pertains.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

## V.  CONCLUSION

The motions to certify by both the DPPs and the IPPs, as well as defendants' motions to strike are denied.  Within 20 days of the date of this order, the parties shall submit jointly a report as to their respective positions on how the litigation should proceed from this juncture.

 IT IS SO ORDERED.

Dated: 10/3/14

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE