1   David M. Stern (State Bar No. 67697)
    Michael L. Tuchin (State Bar No. 150375)
2   Robert J. Pfister (State Bar No. 241370)
    Jonathan M. Weiss (State Bar No. 281217)
3   KLEE, TUCHIN, BOGDANOFF & STERN LLP
    1999 Avenue of the Stars, Thirty-Ninth Floor
4   Los Angeles, California 90067
    Telephone:    310-407-4000
5   Facsimile:    310-407-9090
    Email:        dstern@ktbslaw.com
6                 mtuchin@ktbslaw.com
                  rpfister@ktbslaw.com
7                 jweiss@ktbslaw.com

8   Steven T. Gubner (State Bar No. 156593)
    Jason B. Komorsky (State Bar No. 155677)
9   Michael W. Davis (State Bar No. 274126)
    EZRA BRUTZKUS GUBNER LLP
10  21650 Oxnard Street, Suite 500
    Woodland Hills, California 91367
11  Telephone:  818-827-9000
    Facsimile:  818-827-9099
12  Email:      sgubner@ebg-law.com
                jkomorsky@ebg-law.com
13              mdavis@ebg-law.com

14  *Attorneys for Plaintiff Peter Kravitz, as Trustee*
    *for the RSH Liquidating Trust*

15

16              **UNITED STATES DISTRICT COURT**

17             **NORTHERN DISTRICT OF CALIFORNIA**

18               **SAN FRANCISCO DIVISION**

19

| | |
|---|---|
| 20  IN RE OPTICAL DISK DRIVE ANTITRUST LITIGATION | Case No. 3:15-cv-06325 RS |
| 21 | Master File No. 3:10-md-2143 RS |
| 22  Peter Kravitz, as Trustee for the RSH Liquidating Trust, | **FIRST AMENDED COMPLAINT FOR DAMAGES** |
| 23 | |
| 24              Plaintiff, | DEMAND FOR JURY TRIAL |
| 25          v. | |
| 26  Sony Corporation; Sony Optiarc Inc.; Sony NEC Optiarc Inc.; Sony Optiarc America Inc.; Sony Electronics Inc.; Toshiba Corporation; Toshiba America Information Systems, Inc.; Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; Toshiba | |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  Samsung Storage Technology Corp.; Toshiba
   Samsung Storage Technology Korea Corp.;
2  Lite-On IT Corp.; Lite-On Sales &
   Distribution Inc.; Koninklijke Philips
3  Electronics N.V.; Philips Electronics North
   America Corporation; Philips & Lite-On
4  Digital Solutions Corp.; and Philips & Lite-
   On Digital Solutions USA, Inc,

5
                    Defendants.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  Plaintiff Peter Kravitz, as the duly appointed trustee (the "Trustee") for the RSH

2  Liquidating Trust (the "Radio Shack Trust"), as and for his first amended complaint against

3  defendants Sony Corporation; Sony Optiarc Inc.; Sony NEC Optiarc Inc.; Sony Optiarc America

4  Inc.; Sony Electronics Inc.; Toshiba Corporation; Toshiba America Information Systems, Inc.;

5  Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; Toshiba Samsung Storage

6  Technology Corp.; Toshiba Samsung Storage Technology Korea Corp.; Lite-On IT Corp.; Lite-On

7  Sales & Distribution Inc.; Koninklijke Philips Electronics N.V.; Philips Electronics North

8  America Corporation; Philips & Lite-On Digital Solutions Corp.; and Philips & Lite-On Digital

9  Solutions USA, Inc. (collectively, "Defendants" and each a "Defendant"), alleges as follows:

## I.  INTRODUCTION

11  1.  The Trustee is the legal successor to RS Legacy Corporation (f/k/a RadioShack

12  Corporation); Atlantic Retail Ventures, Inc.; Ignition L.P.; ITC Services, Inc.; Merchandising

13  Support Services, Inc.; RS Legacy Customer Service LLC (f/k/a RadioShack Customer Service

14  LLC); RS Legacy Global Sourcing Corporation (f/k/a RadioShack Global Sourcing Corporation);

15  RS Legacy Global Sourcing Limited Partnership (f/k/a RadioShack Global Sourcing Limited

16  Partnership); RS Legacy Global Sourcing, Inc. (f/k/a RadioShack Global Sourcing, Inc.); RS Ig

17  Holdings Incorporated; RSIgnite, LLC; SCK, Inc.; RS Legacy Finance Corporation (f/k/a Tandy

18  Finance Corporation); RS Legacy Holdings, Inc. (f/k/a Tandy Holdings, Inc.); RS Legacy

19  International Corporation (f/k/a Tandy International Corporation); TE Electronics LP; Trade and

20  Save LLC; and TRS Quality, Inc. (collectively, "Radio Shack" or the "Radio Shack Companies").

21  2.  The Trustee brings this action to recover millions of dollars in damages that Radio

22  Shack suffered as a result of a six-year price-fixing conspiracy by manufacturers of Optical Disk

23  Drives ("ODDs"), which are devices that allow data to be read from and/or written to optical discs,

24  such as compact discs ("CDs"), digital versatile discs ("DVDs"), and Blu-ray discs ("BDs").

25  ODDs can be internal drives, manufactured to be incorporated into products including notebook

26  and desktop computers, camcorders, and videogame consoles, or they can be external drives that

27  connect to consumer electronics by means of an external interface, such as a Universal Serial Bus

28  ("USB") connection.  Products containing ODDs are defined herein as "ODD Products."

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

3.      Defendants and their co-conspirators – the leading manufacturers, sellers, and distributors of ODDs – colluded to fix, stabilize, and maintain the prices of ODDs from January 1, 2004 to at least January 1, 2010 (the "Conspiracy Period").

4.      Radio Shack was a leading national retailer of consumer electronics and operated more than 4,400 electronics stores in the United States.  During the Conspiracy Period, Radio Shack purchased over one billion dollars' worth of ODDs and ODD Products.  As a result of Defendants' illegal actions, Radio Shack was injured by paying substantially more for ODDs than it would have otherwise.

5.      Defendants and their co-conspirators carried out their price-fixing conspiracy through an integrated and sustained series of anticompetitive acts, including the following:

- Defendants rigged bids for ODD procurement events conducted by Original Equipment Manufacturers ("OEMs"), such as Dell Inc. ("Dell") and Hewlett-Packard Company ("HP");

- Defendants cooperated and agreed to set prices and/or allocate customers with respect to OEM and/or non-OEM sales; and

- Defendants and their co-conspirators exchanged confidential business information concerning ODDs, including but not limited to pricing and rebate information, production capacity, business plans and roadmaps for product rollouts and production, product quality information, inventory and shipping information, company responses to customer initiatives, and plans for the cessation of manufacturing of ODDs that had reached the ends of their lifecycles.

6.      During the Conspiracy Period, Defendants and their co-conspirators controlled the vast majority of the global market for ODDs, including the U.S. market.  Defendants' anticompetitive activities artificially inflated the prices of ODDs in the United States, including over one billion dollars' worth of ODDs purchased by Radio Shack, and thereby damaged Radio Shack's business to the tune of tens of millions of dollars.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

## II.  JURISDICTION AND VENUE

7.      This Court has jurisdiction over the Trustee's claims pursuant to 28 U.S.C. §§ 1331, 1337, & 1367.

8.      This Court has personal jurisdiction over Defendants because each Defendant purposely availed itself of the laws of the United States by transacting business in the United States, manufacturing ODDs intended for sale to U.S. residents, and/or marketing and selling ODDs to U.S. customers.  Each Defendant is also subject to the jurisdiction of this Court by virtue of its substantial aggregate nationwide contacts.  Further, Defendants' conspiracy was directed at and was intended to have and did have a direct, substantial, and reasonably foreseeable effect upon domestic and import trade or commerce in the United States.

9.      Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because each Defendant transacts business in this district or is otherwise found within this district.  In addition, venue is proper in this district under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Radio Shack Trust's claims occurred in this district, including many of Radio Shack's purchases of ODDs.  Further, a substantial portion of the interstate trade and commerce affected by the conspiracy was carried out in this district. Defendants and their co-conspirators knew that price-fixed ODDs would be sold and shipped into this district.

## III.  PARTIES

**A.      Plaintiff**

10.      On February 5, 2015, the Radio Shack Companies (specifically, RS Legacy Corporation (f/k/a RadioShack Corporation); Atlantic Retail Ventures, Inc.; Ignition L.P.; ITC Services, Inc.; Merchandising Support Services, Inc.; RS Legacy Customer Service LLC (f/k/a RadioShack Customer Service LLC); RS Legacy Global Sourcing Corporation (f/k/a RadioShack Global Sourcing Corporation); RS Legacy Global Sourcing Limited Partnership (f/k/a RadioShack Global Sourcing Limited Partnership); RS Legacy Global Sourcing, Inc. (f/k/a RadioShack Global Sourcing, Inc.); RS Ig Holdings Incorporated; RSIgnite, LLC; SCK, Inc.; RS Legacy Finance Corporation (f/k/a Tandy Finance Corporation); RS Legacy Holdings, Inc. (f/k/a Tandy Holdings,

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

1   Inc.); RS Legacy International Corporation (f/k/a Tandy International Corporation); TE

2   Electronics LP; Trade and Save LLC; and TRS Quality, Inc.) filed petitions under Chapter 11 of

3   the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the

4   "Bankruptcy Court").

5       11.     On October 2, 2015, the Bankruptcy Court entered its *Order Confirming the First*

6   *Amended Joint Plan of Liquidation of RS Legacy Corporation and its Debtor Affiliates, as*

7   *Modified* (the "Plan Confirmation Order"), which, among other things, provided for the

8   establishment of the Radio Shack Trust and the appointment of Peter Kravitz as trustee of the

9   Radio Shack Trust.

10      12.     Pursuant to the Plan Confirmation Order, the Trustee is the successor-in-interest to

11  the Radio Shack Companies, whose causes of action were vested in and transferred to the Radio

12  Shack Trust on October 7, 2015.

13      13.     During the Conspiracy Period, Radio Shack purchased large numbers of ODDs and

14  ODD Products manufactured by Defendants, their co-conspirators, and others.  Many of Radio

15  Shack's purchases of ODDs and ODD Products were made directly from Defendants, their

16  subsidiaries, or their affiliated companies.  Radio Shack purchased, received, and took title to

17  price-fixed ODDs at its distribution centers in several states, including California.

18  **B.    Sony Defendants**

19      14.     Defendant Sony Corporation ("Sony Corp.") is a business entity organized under

20  the laws of Japan, with its principal place of business located at 1-7-1, Konan, Minato-Ku, Tokyo

21  108-0075, Japan.  Sony Corp. controls an integrated global enterprise comprising itself and other

22  entities, including Defendant Sony Optiarc Inc. ("Sony Optiarc"), Defendant Sony NEC Optiarc

23  Inc. ("Sony NEC"), Defendant Sony Optiarc America Inc. ("Sony Optiarc America"), and

24  Defendant Sony Electronics Inc. ("SEI").  According to *Sony Corporation's Certificate of*

25  *Interested Entities or Persons* [Docket No. 21], "Sony Corporation has no parent corporation, nor

26  does any publicly held corporation own 10% or more of Sony Corporation's stock," but Sony

27  Corp. wholly owns, *inter alia*, Sony Americas Holding, Inc., which in turn wholly owns Sony

28  Corporation of America, which in turn wholly owns SEL Holdings, Inc., which in turn wholly

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

owns SEI, which in turn owns part of Sony Optiarc.  During the Conspiracy Period, Sony Corp. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

15.     Defendant Sony Optiarc is a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  According to *Sony Optiarc, Inc.'s Certificate of Interested Entities or Persons* [Docket No. 20], "Sony Optiarc, Inc. is 99% owned by Sony Corporation and 1% owned by Sony Electronics, Inc.," "Sony Electronics, Inc. is a wholly owned subsidiary of SEL Holdings, Inc.," which is "a wholly owned subsidiary of Sony Corporation of America," which is "a wholly owned subsidiary of Sony Americas Holding, Inc.," which is "a wholly owned subsidiary of Sony Corporation, which is a Japanese corporation."  During the Conspiracy Period, Sony Optiarc manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.  Sony Optiarc is now part of Sony Corp.'s Consumer Products & Devices Group.

16.     Defendant Sony NEC was a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.  Sony NEC was created on April 3, 2006 as a joint venture between Sony Corp. and NEC.  In 2008, Sony Corp. purchased NEC's interest in Sony NEC and renamed it Sony Optiarc Inc.  During a portion of the Conspiracy Period, Sony NEC manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

17.     Defendant Sony Optiarc America is a wholly-owned and controlled subsidiary of Sony Optiarc Inc.  According to *Sony Optiarc America, Inc.'s Certificate of Interested Entities or Persons* [Docket No. 19], "Sony Optiarc America, Inc. is a wholly owned subsidiary of Sony Optiarc, Inc.," which in turn "is 99% owned by Sony Corporation and 1% owned by Sony Electronics, Inc."  "Sony Electronics, Inc. is a wholly owned subsidiary of SEL Holdings, Inc.," which is "a wholly owned subsidiary of Sony Corporation of America," which is "a wholly owned subsidiary of Sony Americas Holding, Inc.," which is "a wholly owned subsidiary of Sony Corporation, which is a Japanese corporation."  Sony Optiarc America is a Delaware corporation, with its principal place of business located at 1730 N. First Street, San Jose, California 95112.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    During a portion of the Conspiracy Period, Sony Optiarc America manufactured, sold and/or

2    distributed ODDs throughout the United States and imported ODDs into the United States.

3         18.     Defendant SEI is a Delaware corporation with its principal place of business at

4    16530 Via Esprillo, San Diego, California 92127.  According to the *Rule 7.1 Disclosure Statement*

5    *and Civil Local Rule 3-16 Certification of Interested Entities or Persons for Defendant Sony*

6    *Electronics Inc.* [Docket No. 230], "Sony Electronics Inc. is a wholly owned subsidiary of Sony

7    Corporation of America," which in turn "is a wholly owned subsidiary of Sony Americas Holding

8    Inc.," which in turn "is a wholly owned subsidiary of Sony Corporation, which is a Japanese

9    corporation."  During the Conspiracy Period, SEI manufactured, sold and/or distributed ODDs

10   throughout the United States and imported ODDs into the United States.

11        19.     According to Sony Corp.'s SEC Form 20-F for the year ending March 31, 2011,

12   Sony Corp. is divided into business segments, including Consumer Products & Devices,

13   Networked Products & Services, and B2B and Disc Manufacturing.  The former two segments

14   contain ODDs.  The Form 20-F states that "[i]n most cases, sales of Sony's electronics products

15   are made to sales subsidiaries of Sony Corporation located in or responsible for sales in the

16   countries and territories where Sony's products and services are marketed.  These subsidiaries then

17   sell those products to unaffiliated local distributors and dealers or through direct sales via the

18   Internet.  In some regions, sales of certain products and services are made directly to local

19   distributors by Sony Corporation."  As the Form 20-F further explains, "Sony markets its

20   electronics products and services through Sony Electronics Inc. and other wholly owned

21   subsidiaries in the U.S."  The accounting report in the Form 20-F refers to Sony Corp. and its

22   consolidated subsidiaries collectively as "Sony."

23        20.     Defendants Sony Corp., Sony Optiarc, Sony NEC, Sony Optiarc America, and SEI

24   are referred to individually and collectively herein as "Sony."  When referring to "Sony" herein,

25   the Trustee is alleging that one or more employees or agents of entities within the Sony corporate

26   family engaged in conspiratorial acts on behalf of Sony Corp., Sony Optiarc, Sony NEC, Sony

27   Optiarc America, and/or SEI.  The Sony corporate family and each constituent member thereof

28   were represented by their agents with respect to such conduct and was party to the agreements

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   reached by such agents.  In fact, the individual participants in the conspiratorial acts did not

2   always know the corporate affiliation of their counterparts, nor did they distinguish between and

3   among the entities within a corporate family.

4   **C.      Toshiba Defendants**

5          21.     Defendant Toshiba Corporation ("Toshiba Corp.") is a business entity organized

6   under the laws of Japan, with its principal place of business located at 1-1, Shibaura 1-chome,

7   Minato-ku, Tokyo 1058001, Japan.  Toshiba Corp. controls an integrated global enterprise

8   comprised of it and other entities, including Defendant Toshiba America Information Systems, Inc.

9   ("TAIS"), Defendant Toshiba Samsung Storage Technology Corporation ("TSST"), and Defendant

10  Toshiba Samsung Storage Technology Korea Corporation ("TSST Korea," and with TSST, the

11  "Toshiba-Samsung Joint Venture").  According to *Toshiba Corporation's Rule 7.1 Disclosure*

12  *Statement and Civil Local Rule 3-16 Certification of Interested Entities or Persons* [Docket No.

13  217], Toshiba Corp. "is organized and exists under the laws of Japan," and "no publicly-traded

14  corporation owns more than 10% of the stock of Toshiba [Corp.]."  During the Conspiracy Period,

15  Toshiba Corp. manufactured, sold and/or distributed ODDs throughout the United States and

16  directly caused ODDs to be imported into the United States.

17         22.     Toshiba Corp.'s 2009 Annual Report contained an organization chart that shows

18  Toshiba Corp.'s board and President and CEO exercising control and reporting authority over

19  multiple product segment subgroups, including the "Digital Products Group," which has

20  responsibility for storage devices and personal computers.  The Annual Report listed TSST Korea,

21  TAIS, and Toshiba America Consumer Products, LLC ("TACP") (which was merged into TAIS

22  on or about July 1, 2010) as overseas "Consolidated Subsidiaries."  Toshiba Corporation's 2009

23  Financial Review incorporated into its Annual Report noted that the Toshiba Group comprised

24  Toshiba Corp. and various "Consolidated Subsidiaries" that operate in its multiple business

25  segments.

26         23.     Defendant TAIS is a California corporation that has its headquarters at 9740 Irvine

27  Blvd, Irvine, California 92618.  According to *Toshiba America Information Systems, Inc.'s Rule*

28  *7.1 Disclosure Statement and Civil Local Rule 3-16 Certification of Interested Entities or Persons*

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  [Docket No. 220], "Toshiba America, Inc. owns 100% of the stock of TAIS," and Toshiba Corp.

2  "owns 100% of the stock of Toshiba America, Inc."  During the Conspiracy Period, TAIS

3  manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into

4  the United States.  During the Conspiracy Period, TACP also manufactured, sold and/or distributed

5  ODDs throughout the United States and imported ODDs into the United States.  TACP was merged

6  into TAIS on or about July 1, 2010.

7      24.    Defendant TSST is a business entity organized under the laws of Japan with its

8  principal place of business located at 1-1, Shibaura 1- Chome, Minato-ku, Tokyo 105-8001, Japan

9  (the same address as Toshiba Corp.).  TSST is a joint venture formed in 2004 and owned 51% by

10 the Toshiba corporate family and 49% by the Samsung corporate family.  According to *Toshiba*

11 *Samsung Storage Technology Corporation's Rule 7.1 Disclosure Statement and Civil Local Rule 3-16*

12 *Certification of Interested Entities or Persons* [Docket No. 218], "TSST is organized and exists under

13 the laws of Japan, and is a wholly-owned subsidiary of Toshiba Corporation and Samsung Electronics

14 Co., Ltd." that is "51% owned by Toshiba Corporation and 49% owned by Samsung Electronics Co.,

15 Ltd."  During the Conspiracy Period, TSST manufactured, sold and/or distributed ODDs

16 throughout the United States and directly caused ODDs to be imported into the United States.

17     25.    Defendant TSST Korea is a business entity organized under the laws of South

18 Korea with its principal place of business located at 14th Floor, Building No. 102, Digital Empire

19 2, 486, Sin-dong, Yeongtong-gu, Suwonsi, Gyonggi-do, Korea 443-734, which is part of the

20 Samsung Digital Complex.  According to *Toshiba Samsung Storage Technology Korea*

21 *Corporation's Rule 7.1 Disclosure Statement and Civil Local Rule 3-16 Certification of Interested*

22 *Entities or Persons* [Docket No. 219], TSST Korea "is organized and exists under the laws of the

23 Republic of Korea, and is a wholly-owned subsidiary of [TSST]," which in turn is "51% owned by

24 Toshiba Corporation and 49% owned by Samsung Electronics Co., Ltd."  In its 2009 Annual Report,

25 Toshiba Corp. listed TSST Korea as an overseas subsidiary.  During the Conspiracy Period, TSST

26 Korea manufactured, sold and/or distributed ODDs throughout the United States and directly

27 caused ODDs to be imported into the United States.

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

26.     The Toshiba-Samsung Joint Venture operated or currently operates sales offices in North America and logistics centers in Miami, Florida and San Diego, California.

27.     Defendants Toshiba Corp., TAIS (including the merged TACP), and the Toshiba-Samsung Joint Venture are referred to individually and collectively herein as "Toshiba."  When referring to "Toshiba" herein, the Trustee is alleging that one or more employees or agents of entities within the Toshiba corporate family engaged in conspiratorial acts on behalf of Toshiba Corp., TAIS, and/or the Toshiba-Samsung Joint Venture.  The Toshiba corporate family and each constituent member thereof were represented by their agents with respect to such conduct and was party to the agreements reached by such agents.  In fact, the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between and among the entities within a corporate family.

**D.     Samsung Defendants**

28.     Defendant Samsung Electronics Co., Ltd. ("SECL") is a business entity organized under the laws of South Korea, with its principal place of business at Samsung Main Building 250, Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea.  SECL controls an integrated global enterprise comprising itself and other entities, including Defendant Samsung Electronics America, Inc. ("SEAI"), as well as the Toshiba-Samsung Joint Venture.  According to *Defendant Samsung Electronics Co., Ltd.'s F.R.C.P. 7.1 Disclosure Statement and Certification of Interested Entities or Persons Pursuant to Civil Local Rule 3-16* [Docket No. 81], SECL "is a nongovernmental corporate entity located in South Korea," and has no parent corporation.  During the Conspiracy Period, SECL manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

29.     Defendant SEAI is a subsidiary of SECL, organized under the laws of New York, with its principal place of business located at 85 Challenger Rd., Ridgefield Park, New Jersey 07660.  According to *Defendant Samsung Electronics America, Inc.'s F.R.C.P. 7.1 Disclosure Statement and Certification of Interested Entities or Persons Pursuant to Civil Local Rule 3-16* [Docket No. 216], SEAI "is a nongovernmental corporate entity" with SECL as its "parent

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  company."  During the Conspiracy Period, SEAI manufactured, sold and/or distributed ODDs

2  throughout the United States and imported ODDs into the United States.

3       30.     SECL's 2008 Annual Report contained an organizational chart depicting the tight

4  control SECL exercises over its various business segments, with the "Digital Media &

5  Communications Business" reporting directly to SECL's CEO.  The independent auditor's report

6  incorporated in the Annual Report refers to SECL and its "controlled subsidiaries," including SEAI,

7  as "the Company."

8       31.     Defendants SECL and SEAI are referred to individually and collectively herein as

9  "Samsung."  When referring to "Samsung" herein, the Trustee is alleging that one or more

10  employees or agents of entities within the Samsung corporate family engaged in conspiratorial acts

11  on behalf of SECL and/or SEAI, and/or (to the extent relevant) the Toshiba-Samsung Joint

12  Venture.  The Samsung corporate family and each constituent member thereof were represented

13  by their agents with respect to such conduct and was party to the agreements reached by such

14  agents.  In fact, the individual participants in the conspiratorial acts did not always know the

15  corporate affiliation of their counterparts, nor did they distinguish between and among the entities

16  within a corporate family.

17  **E.     Philips Defendants**

18       32.     Defendant Koninklijke Philips Electronics N.V. ("Royal Philips") is a Dutch

19  company with its principal place of business at Groenewoudsweg 1, Einhoven 5261BA, the

20  Netherlands.  Royal Philips controls an integrated global enterprise comprised of it and other

21  entities, including Defendant Philips Electronics North America Corporation ("Philips North

22  America"), Defendant Philips & Lite-On Digital Solutions Corporation ("PLDS"), and Defendant

23  Philips & Lite-On Digital Solutions USA, Inc. ("PLDS USA," and with PLDS, the "Philips-Lite-

24  On Joint Venture").  According to *Defendants Koninklijke Philips N.V., Lite-On IT Corporation,*

25  *Philips & Lite-On Digital Solutions Corporation, and Philips & Lite-On Digital Solutions U.S.A.,*

26  *Inc.'s Amended Rule 7.1 Disclosure Statement* [Docket No. 1076], Royal Philips "is a

27  nongovernmental corporate entity located in the Netherlands" that "does not have a parent

28

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

1    corporation."  Royal Philips manufactured, sold, and/or distributed ODDs throughout the United

2    States and directly caused ODDs to be imported into the United States.

3        33.    Defendant Philips North America is a Delaware corporation with its principal place

4    of business located at 3000 Minuteman Rd., Andover, Massachusetts 01810.  Philips North

5    America is a wholly-owned subsidiary of Royal Philips.  It does not appear that Philips North

6    America filed a corporate disclosure statement in the MDL proceeding, but a recent disclosure

7    statement filed in another case pending in this District avers that Royal Philips is Philips North

8    America's "ultimate parent company."  Docket No. 4 in Case No. 3:15-cv-04767-HSG.  Similarly,

9    the Philips *2014 Annual Report* lists Philips North America among the "materially wholly owned

10   subsidiaries" of the Philips Group.  During the Conspiracy Period, Philips North America

11   manufactured, sold, and/or distributed ODDs throughout the United States and directly caused

12   ODDs to be imported into the United States.

13       34.    Defendant PLDS is a business entity organized under the laws of Taiwan, with its

14   principal place of business located at 16F, 392, Ruey Kuang Road, Neihu, Taipei, 114, Taiwan,

15   R.O.C.  PLDS, established in March 2007, is a joint venture created by the Philips corporate

16   family and the Lite-On corporate family.  According to *Defendants Koninklijke Philips N.V., Lite-*

17   *On IT Corporation, Philips & Lite-On Digital Solutions Corporation, and Philips & Lite-On Digital*

18   *Solutions U.S.A., Inc.'s Amended Rule 7.1 Disclosure Statement* [Docket No. 1076], PLDS "is a

19   joint venture between [Royal Philips] and [Lite-On IT], with Philips owning 51% and Lite-On

20   owning 49%."  PLDS's operations include design, development, sales, marketing, customer

21   support, and service of ODDs.  During a portion of the Conspiracy Period, PLDS manufactured,

22   sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be

23   imported into the United States.

24       35.    Defendant PLDS USA is a business entity organized under the laws of Delaware,

25   with its principal place of business located at 42000 Christy Street, Fremont, California 94538.

26   PLDS USA is a subsidiary PLDS and serves customers in the North American and Latin

27   American regions.  According to *Defendants Koninklijke Philips N.V., Lite-On IT Corporation,*

28   *Philips & Lite-On Digital Solutions Corporation, and Philips & Lite-On Digital Solutions U.S.A.,*

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  *Inc.'s Amended Rule 7.1 Disclosure Statement* [Docket No. 1076], PLDS USA "is a wholly owned

2  subsidiary of PLDS."  During a portion of the Conspiracy Period, PLDS USA manufactured, sold,

3  and/or distributed ODDs to customers throughout the United States and imported ODDs into the

4  United States.

5       36.     Defendants Royal Philips, Philips North America, and the Philips-Lite-On Joint

6  Venture are referred to individually and collectively herein as "Philips."  When referring to

7  "Philips" herein, the Trustee is alleging that one or more employees or agents of entities within the

8  Philips corporate family engaged in conspiratorial acts on behalf of Royal Philips, Philips North

9  America, and the Philips-Lite-On Joint Venture.  The Philips corporate family and each

10  constituent member thereof were represented by their agents with respect to such conduct and was

11  party to the agreements reached by such agents.  In fact, the individual participants in the

12  conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they

13  distinguish between and among the entities within a corporate family.

14  **F.**    **Lite-On Defendants**

15       37.     Defendant Lite-On IT Corp. ("Lite-On IT") is a business entity organized under the

16  laws of Taiwan with its principal place of business located at 12F, 392, Ruey Kuang Road, Neihu,

17  Taipei 114, Taiwan, R.O.C.  Per the *Consolidated Financial Statements for the Years Ended*

18  *December 31, 2014 and 2013 and Independent Auditors' Report for Lite-On Technology*

19  *Corporation and Subsidiaries*, Lite-On IT was merged with and into Lite-On Technology

20  Corporation on June 30, 2014.  Lite-On IT controls an integrated global enterprise comprised of it

21  and other entities, including Defendant Lite-On Sales & Distribution Inc. ("Lite-On Sales"), as

22  well as the Philips-Lite-On Joint Venture.  According to *Defendants Koninklijke Philips N.V., Lite-*

23  *On IT Corporation, Philips & Lite-On Digital Solutions Corporation, and Philips & Lite-On Digital*

24  *Solutions U.S.A., Inc.'s Amended Rule 7.1 Disclosure Statement* [Docket No. 1076], Lite-On IT "is a

25  nongovernmental corporate entity located in Taiwan" and is 99% owned by Lite-On Technology

26  Corporation, into which Light-On IT subsequently merged.  During the Conspiracy Period, Lite-On

27  IT manufactured, sold, and/or distributed ODDs throughout the United States and directly caused

28  ODDs to be imported into the United States.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

38.     Defendant Lite-On Sales is a Delaware corporation with its principal place of business located at 42000 Christy Street, Fremont, California 94538.  Lite-On Sales is a wholly-owned and controlled subsidiary of Lite-On IT.  It does not appear that Lite-On Sales filed a corporate disclosure statement in the MDL proceeding, but Bloomberg (a third-party purveyor of business information and intelligence) reports that Lite-On Sales "operates as a subsidiary" of Lite-On IT, and "manufactures and markets optical storage drives for personal computers, as well as consumer electronics appliances for [the] home entertainment environment."  Similarly, in the *Consolidated Financial Statements for the Years Ended December 31, 2014 and 2013 and Independent Auditors' Report for Lite-On Technology Corporation and Subsidiaries*, Lite-On Sales is listed as an 100%-owned investee of Lite-On Technology Corporation, and its "Main Business" is listed as "Sale of optical disc drives."  The remark adjacent to that entry indicates that "Lite-On IT Corporation was dissolved after merging with the Parent Company [Lite-On Technology Corporation] in June 2014" such that "Lite-On IT's subsidiaries became directly held by the Parent Company."  During the Conspiracy Period, Lite-On Sales manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

39.     Defendants Lite-On IT and Lite-On Sales are referred to individually and collectively herein as "Lite-On."  When referring to "Lite-On" herein, the Trustee is alleging that one or more employees or agents of entities within the Lite-On corporate family engaged in conspiratorial acts on behalf of Lite-On IT and/or Lite-On Sales, and/or (to the extent relevant) the Philips-Lite-On Joint Venture.  The Lite-On corporate family and each constituent member thereof were represented by their agents with respect to such conduct and was party to the agreements reached by such agents.  In fact, the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between and among the entities within a corporate family.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**G.     Defendants' Relationships**

40.     The conduct alleged herein was carried out by Defendants and their co-conspirators' officers, agents, employees, or representatives while engaged in the usual management of their businesses.

41.     Each of Defendants named herein acted as the agent of, co-conspirator with, or joint venturer of, or for, other Defendants and co-conspirators with respect to the acts, violations of law, and common course of conduct alleged herein.  Each Defendant or co-conspirator that is a subsidiary of a foreign parent acted as the United States agent for ODDs made by its parent company.  Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

42.     When the Trustee refers to a corporate family or companies by a single name (such as "Sony," *see supra* ¶ 20; "Toshiba," *see supra* ¶ 27; "Samsung," *see supra* ¶ 31; "Philips," *see supra* ¶ 36; and "Lite-On," *see supra* ¶ 39), the Trustee is alleging conduct by one or more employees or agents of entities within the referenced corporate family.  Thus, for example, an allegation that "Philips" attended a conspiratorial meeting is an allegation that one or more employees or agents of Royal Philips, Philips North America, and/or the Philips-Lite-On Joint Venture attended such meeting, and did so on behalf of the entire Philips corporate family (including each of Royal Philips, Philips North America, and the Philips-Lite-On Joint Venture). The individuals who participated in the conspiratorial meetings, discussions and communications did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  Nonetheless, these individuals entered into agreements on behalf of, and reported these meetings, discussions and communications to, their respective corporate families.  As a result, the entire corporate family was represented by its agents with respect to such conduct and was party to the agreements reached by such agents.

43.     To the extent that subsidiaries within the corporate families distributed ODDs to direct purchasers or engaged in collusive bidding strategies, these subsidiaries played a significant role in the conspiracy.  In a conspiracy of this nature, a participating corporate family (such as Lite-On, for example) cannot pick and choose among owned and controlled affiliates to keep some

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   entities in the conspiracy (*e.g.*, Lite-On IT) and others out of the conspiracy (*e.g.*, Lite-On Sales),

2   with products sold by the former at the unlawfully agreed-upon price and those sold by the latter at

3   a market price.  Such entity-specific conduct would undercut the pricing agreements reached by

4   and through the meetings, discussions, and communications between and among the corporate

5   families.  Thus, all entities within the corporate families were active, knowing participants in the

6   alleged conspiracy.

7   **H.      Non-Defendant Co-Conspirator Hitachi**

8   44.     Various persons and/or entities not named as Defendants in this Complaint

9   participated as co-conspirators in the conspiracy alleged herein and performed acts and made

10   statements in furtherance thereof.

11   45.     By order entered September 23, 2013 [Docket No. 1006], the Court granted final

12   approval to a class action settlement to which the following are bound:  "All individuals and

13   entities who, during the period from January 1, 2004 through December 31, 2011…, purchased

14   Optical Disk Drives and Optical Disk Drive Devices in the United States directly from the

15   [settling entities], their subsidiaries, or their affiliates."  Final judgment was entered in favor of the

16   settling entities, which were Hitachi, Ltd. ("Hitachi") [Docket No. 1007], LG Electronics, Inc.

17   ("LG Electronics") and LG Electronics USA, Inc. ("LG Electronic USA") [Docket No. 1008], and

18   Hitachi-LG Data Storage, Inc. ("HLDS") and Hitachi-LG Data Storage Korea, Inc. ("HLDS

19   Korea," and with HLDS, the "Hitachi-LG Joint Venture") [Docket No. 1009].

20   46.     Co-conspirator Hitachi is a business entity organized under the laws of Japan with

21   its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280, Japan.

22   Hitachi controls an integrated global enterprise comprised of it and other entities, including Hitachi

23   America, Ltd. ("Hitachi America") and the Hitachi-LG Joint Venture.  During the Conspiracy

24   Period, Hitachi manufactured, sold and/or distributed ODDs throughout the United States and

25   directly caused ODDs to be imported into the United States.

26   47.     Co-conspirator Hitachi America is a New York business entity with its principal

27   place of business located at 50 Prospect Avenue, Tarrytown, New York 10591.  Hitachi America

28   is a wholly-owned subsidiary of Hitachi.  During the Conspiracy Period, Hitachi America

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   manufactured, sold and/or distributed ODDs throughout the United States and directly caused

2   ODDs to be imported into the United States.

3       48.     Co-conspirator HLDS is a business entity organized under the laws of Japan with its

4   principal place of business located at 4F MSC Center Building, 22-23 Kaigan 3-Chome, Minato-

5   Ku, Tokyo, Japan, 108-0022.  HLDS is a joint venture, formed in November 2000, that is owned

6   51% by Hitachi and 49% by LG.  During the Conspiracy Period, HLDS manufactured, sold and/or

7   distributed ODDs throughout the United States and directly caused ODDs to be imported into the

8   United States.

9       49.     Co-conspirator HLDS Korea is a business entity organized under the laws of South

10  Korea with its principal place of business located at LG Gasan Digital Center, 459-9 Gasan-dong,

11  Geumcheon-gu, Seoul, 153-803 Korea.  HLDS Korea is part of a joint venture formed in January

12  2001 and is owned 51% by Hitachi and 49% by LG.  During the Conspiracy Period, HLDS Korea

13  manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs

14  to be imported into the United States.

15      50.     According to Hitachi's SEC Form 20-F for the fiscal year ending March 31, 2010,

16  HLDS is a "subsidiary" of Hitachi.  In its SEC Form 6-K dated November 16, 2009, Hitachi

17  disclosed that "a subsidiary" in Japan and "a subsidiary" in Korea were targets of investigations by

18  various countries' antitrust agencies with respect to antitrust violations relating to ODDs and that

19  these investigations might result in private actions being brought "against Hitachi" and could have a

20  "material adverse effect on Hitachi's business."  Hitachi reports financial data for the Hitachi-LG

21  Joint Venture in its consolidated annual financial results, where it indicates that its "Optical Disk

22  Drive operations" are conducted by the Hitachi-LG Joint Venture.

23      51.     Co-conspirators Hitachi, Hitachi America, and the Hitachi-LG Joint Venture are

24  referred to individually and collectively herein as "Hitachi."  When referring to "Hitachi" herein,

25  the Trustee is alleging that one or more employees or agents of entities within the Hitachi

26  corporate family engaged in conspiratorial acts on behalf of Hitachi, Hitachi America, and/or the

27  Hitachi-LG Joint Venture.  The Hitachi corporate family and each constituent member thereof

28  were represented by their agents with respect to such conduct and was party to the agreements

1  reached by such agents.  In fact, the individual participants in the conspiratorial acts did not

2  always know the corporate affiliation of their counterparts, nor did they distinguish between and

3  among the entities within a corporate family.

**I.      Non-Defendant Co-Conspirator LG**

4      52.      Co-conspirator LG Electronics is a business entity organized under the laws of

5  South Korea, with its principal place of business at LG Twin Tower 128, Yeoui-daero,

6  Yeongdeungpo-gu, Seoul, Korea.  LG Electronics controls an integrated global enterprise

7  comprised of it and other entities, including LG Electronics USA.  During the Conspiracy Period,

8  LG Electronics manufactured, sold and/or distributed ODDs throughout the United States and

9  directly caused ODDs to be imported into the United States.

10      53.      Co-conspirator LG Electronics USA is a business entity organized under the laws

11  of Delaware, with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New

12  Jersey 07632.  LG Electronics USA is a wholly-owned and controlled subsidiary of LG

13  Electronics.  During the Conspiracy Period, LG Electronics USA manufactured, sold and/or

14  distributed ODDs throughout the United States and directly caused ODDs to be imported into the

15  United States.

16      54.      Co-conspirators LG Electronics and LG Electronics USA are referred to

17  individually and collectively herein as "LG."  When referring to "LG" herein, the Trustee is

18  alleging that one or more employees or agents of entities within the LG corporate family engaged

19  in conspiratorial acts on behalf of LG Electronics and/or LG Electronics USA, and/or (to the

20  extent relevant) the Hitachi-LG Joint Venture.  The LG corporate family and each constituent

21  member thereof were represented by their agents with respect to such conduct and was party to the

22  agreements reached by such agents.  In fact, the individual participants in the conspiratorial acts

23  did not always know the corporate affiliation of their counterparts, nor did they distinguish

24  between and among the entities within a corporate family.

**J.      Non-Defendant Co-Conspirator Panasonic**

25      55.      By order entered May 15, 2014 [Docket No. 1266], the Court granted final

26  approval to a class action settlement to which the following are bound:  "All individuals and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

entities who, during the period from January 1, 2004 until at least January 1, 2010… purchased one or more Optical Disk Drives in the United States directly from the [settling entities], their subsidiaries, or their affiliates." Final judgment was entered in favor of the settling entities, which were Panasonic Corporation ("Panasonic Corp.") and Panasonic Corporation of North America ("PCNA") [Docket No. 1267].

56.     Co-conspirator Panasonic Corp. is a Japanese entity with its principal place of business located at 1006, Oaza Kodoma, Kadoma-shi, Osaka 571-8501, Japan.  Until October 1, 2008, Panasonic Corp. was known as Matsushita Electric Industrial Co., Ltd. ("Matsushita"). Panasonic Corp. controls an integrated global enterprise comprised of it and other entities, including PCNA.  During the Conspiracy Period, Panasonic Corp. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

57.     Co-conspirator PCNA, formerly known as Matsushita Electric Corporation of America, is a Delaware corporation with its principal place of business at Two Riverfront Plaza, Newark, New Jersey 07102.  PCNA is a wholly-owned and controlled subsidiary of Panasonic Corp. During the Conspiracy Period, PCNA manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

58.     Co-conspirators Panasonic Corp. and PCNA are referred to individually and collectively herein as "Panasonic."  When referring to "Panasonic" herein, the Trustee is alleging that one or more employees or agents of entities within the LG corporate family engaged in conspiratorial acts on behalf of Panasonic Corp. and/or PCNA.  The Panasonic corporate family and each constituent member thereof were represented by their agents with respect to such conduct and was party to the agreements reached by such agents.  In fact, the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between and among the entities within a corporate family.

**K.     Non-Defendant Co-Conspirator NEC**

59.     By order entered August 14, 2014 [Docket No. 1389], the Court granted final approval to a class action settlement to which the following are bound:  "All individuals and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    entities who, during the period from January 1, 2004 until at least January 1, 2010 … purchased

2    one or more Optical Disk Drives in the United States directly from the [settling entity], their

3    subsidiaries, or their affiliates."  Final judgment was entered in favor of the settling entity, NEC

4    Corporation [Docket No. 1390].

5          60.    Co-conspirator NEC Corporation is a business entity organized under the laws of

6    Japan with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-

7    8001, Japan.  During the Conspiracy Period, NEC Corporation manufactured, sold, and distributed

8    ODDs to customers throughout the United States and directly caused ODDs to be imported into

9    the United States.

10         61.    Co-conspirator NEC Corporation, together with its subsidiaries and affiliates, is

11   referred to herein as "NEC."  When referring to "NEC" herein, the Trustee is alleging that one or

12   more employees or agents of entities within the NEC corporate family engaged in conspiratorial

13   acts on behalf of NEC Corporation.  The NEC corporate family and each constituent member

14   thereof were represented by their agents with respect to such conduct and was party to the

15   agreements reached by such agents.  In fact, the individual participants in the conspiratorial acts

16   did not always know the corporate affiliation of their counterparts, nor did they distinguish

17   between and among the entities within a corporate family.

18   **L.**    **Non-Defendant Co-Conspirator TEAC**

19         62.    Co-conspirator TEAC Corporation ("TEAC Corp.") is a business entity organized

20   under the laws of Japan, with its principal place of business at 1-47 Ochiai, Tama-shi, Tokyo 206-

21   8530, Japan.  TEAC Corp. controls an integrated global enterprise comprised of it and other

22   entities, including TEAC America, Inc. ("TEAC America").  During the Conspiracy Period, TEAC

23   Corp. manufactured, sold and/or distributed ODDs throughout the United States and directly

24   caused ODDs to be imported into the United States.

25         63.    Co-conspirator TEAC America is a California corporation with its principal place

26   of business at 7733 Telegraph Rd., Montebello, California 90640.  TEAC America is a wholly-

27   owned and controlled subsidiary of TEAC Corp.  During the Conspiracy Period, TEAC America

28

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

1    manufactured, sold and/or distributed ODDs throughout the United States and directly caused

2    ODDs to be imported into the United States.

3        64.    Co-conspirators TEAC Corp. and TEAC America are referred to individually and

4    collectively herein as "TEAC."  When referring to "TEAC" herein, the Trustee is alleging that one

5    or more employees or agents of entities within the TEAC corporate family engaged in

6    conspiratorial acts on behalf of TEAC Corp. and/or TEAC America.  The TEAC corporate family

7    and each constituent member thereof were represented by their agents with respect to such conduct

8    and was party to the agreements reached by such agents.  In fact, the individual participants in the

9    conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they

10   distinguish between and among the entities within a corporate family.

11   **M.    Non-Defendant Co-Conspirator Quanta**

12       65.    Co-conspirator Quanta Storage, Inc. ("Quanta Storage") is a business entity

13   organized under the laws of Taiwan, with its principal place of business at 3F No. 188, Wenhua

14   2nd Rd., Guishan Shiang, Taoyuan County 333, Taiwan.  Quanta Storage controls an integrated

15   global enterprise comprised of it and other entities, including Quanta Storage America, Inc.

16   ("Quanta America").  During the Conspiracy Period, Quanta Storage manufactured, sold and/or

17   distributed ODDs throughout the United States and directly caused ODDs to be imported into the

18   United States.

19       66.    Co-conspirator Quanta America is a California corporation with its principal place

20   of business in 2726 Bayview Dr., Fremont, CA 94538.  Quanta America is a wholly-owned and

21   controlled subsidiary of Quanta Storage.  During the Conspiracy Period, Quanta America

22   manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs

23   to be imported into the United States.

24       67.    Co-conspirators Quanta Storage and Quanta America are referred to individually

25   and collectively herein as "Quanta."  When referring to "Quanta" herein, the Trustee is alleging

26   that one or more employees or agents of entities within the Quanta corporate family engaged in

27   conspiratorial acts on behalf of Quanta Corp. and/or Quanta America.  The Quanta corporate

28   family and each constituent member thereof were represented by their agents with respect to such

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

1  conduct and was party to the agreements reached by such agents.  In fact, the individual

2  participants in the conspiratorial acts did not always know the corporate affiliation of their

3  counterparts, nor did they distinguish between and among the entities within a corporate family.

**N.      Non-Defendant Co-Conspirator Sharp**

5      68.      Co-conspirator Sharp Corporation is a business entity organized under the laws of

6  Japan, with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522,

7  Japan.  During the Conspiracy Period, Sharp Corporation manufactured, sold, and/or distributed

8  ODDs to customers throughout the United States and directly caused ODDs to be imported into

9  the United States.

10      69.      Co-conspirator Sharp Corporation, together with its subsidiaries and affiliates, is

11  referred to herein as "Sharp."  When referring to "Sharp" herein, the Trustee is alleging that one or

12  more employees or agents of entities within the Sharp corporate family engaged in conspiratorial

13  acts on behalf of Sharp Corporation.  The Sharp corporate family and each constituent member

14  thereof were represented by their agents with respect to such conduct and was party to the

15  agreements reached by such agents.  In fact, the individual participants in the conspiratorial acts

16  did not always know the corporate affiliation of their counterparts, nor did they distinguish

17  between and among the entities within a corporate family.

**O.      Non-Defendant Co-Conspirator Pioneer**

19      70.      Co-conspirator Pioneer Corporation ("Pioneer Corp.") is a business entity

20  organized under the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-

21  ku, Kawasaki-shi, Kanagawa 212-0031, Japan.  Pioneer Corp. controls an integrated global

22  enterprise comprised of it and other entities, including Pioneer North America, Inc. ("Pioneer North

23  America"), Pioneer Electronics (USA) Inc. ("Pioneer USA"), Pioneer High Fidelity Taiwan Co.,

24  Ltd. ("Pioneer Taiwan"), and Pioneer Digital Design & Manufacturing Company ("PDDMC").

25  During the Conspiracy Period, Pioneer Corp. manufactured, sold and/or distributed ODDs

26  throughout the United States and directly caused ODDs to be imported into the United States.

27      71.      Co-conspirator Pioneer North America is a Delaware corporation with its principal

28  place of business at 1925 E Dominguez Street, Long Beach, California 90810.  Pioneer North

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

America is a wholly-owned and controlled subsidiary of Pioneer Corp.  During the Conspiracy Period, Pioneer North America designed, manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

72.     Co-conspirator  Pioneer USA is a Delaware corporation with its principal place of business at 1925 E Dominguez Street, Long Beach, California 90810.  Pioneer USA is a wholly-owned and controlled subsidiary of Pioneer North America.  During the Conspiracy Period, Pioneer USA designed, manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

73.     Co-conspirator Pioneer Taiwan is a Taiwanese company with its principal place of business at 13th Floor, No. 44, Chung Shan North Road, Sec. 2, Taipei, Taiwan, R.O.C.  During the Conspiracy Period, Pioneer Taiwan designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

74.     Co-conspirator  PDDMC, a joint venture owned 66% by Pioneer and 34% by Sharp, is a business entity organized under the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa 212-0031, Japan.  During the Conspiracy Period, PDDMC manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

75.     Co-conspirators Pioneer Corp., Pioneer North America, Pioneer USA, Pioneer Taiwan, and PDDMC are referred to individually and collectively herein as "Pioneer."  When referring to "Pioneer" herein, the Trustee is alleging that one or more employees or agents of entities within the Pioneer corporate family engaged in conspiratorial acts on behalf of Pioneer Corp., Pioneer North America, Pioneer USA, Pioneer Taiwan, and/or PDDMC.  The Pioneer corporate family and each constituent member thereof were represented by their agents with respect to such conduct and was party to the agreements reached by such agents.  In fact, the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between and among the entities within a corporate family.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**P.      Non-Defendant Co-Conspirator BenQ**

76.      Co-conspirator BenQ Corporation ("BenQ Corp."), now operating under the name QISDA Corporation, is a business entity organized under the laws of Taiwan, with its principal place of business at 16 Jehu Rd., Neihu, Taipei 114, Taiwan.  BenQ Corp. controls an integrated global enterprise comprised of it and other entities, including BenQ America Corporation ("BenQ America").  In February 2003, BenQ Corp. formed a joint venture with Philips to manufacture and distribute ODDs that was called BenQ Philips Digital Storage (the "BenQ-Philips Joint Venture").  In April 2006, Lite-On acquired BenQ Corp.'s ODD business and eventually replaced BenQ Corp. in the BenQ-Philips Joint Venture, which was renamed the Philips-Lite-On Joint Venture.  During the Conspiracy Period, BenQ Corp., separately or through the BenQ-Philips Joint Venture, manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

77.      Co-conspirator BenQ America is a California corporation with its principal place of business at 15375 Barranca, Suite A205, Irvine, California 92618.  BenQ America is a wholly-owned and controlled subsidiary of Defendant BenQ Corp.  During the Conspiracy Period, BenQ America manufactured, sold and/or distributed ODDs  throughout the United States and imported ODDs into the United States.

78.      Co-conspirators BenQ Corp. and BenQ America are referred to individually and collectively herein as "BenQ."  When referring to "BenQ" herein, the Trustee is alleging that one or more employees or agents of entities within the BenQ corporate family engaged in conspiratorial acts on behalf of BenQ Corp. and/or BenQ America.  The BenQ corporate family and each constituent member thereof were represented by their agents with respect to such conduct and was party to the agreements reached by such agents.  In fact, the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between and among the entities within a corporate family.

**Q.      Other Members of the Conspiracy**

79.      On information and belief, other business entities were co-conspirators with Defendants in their unlawful restraint of trade.  The Trustee's investigation into the identities of co-

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   conspirators is ongoing, and the Trustee reserves the right to identify additional co-conspirators,

2   including in its discovery responses and expert reports in this matter.

### IV.  FACTUAL ALLEGATIONS

**A.      Relevant Background**

5          80.      Optical disc drives, or ODDs, are devices that allow data to be read from and/or

6   written to optical discs, such as compact discs ("CDs"), digital versatile discs ("DVDs"), and Blu-

7   ray discs ("BDs").  ODDs can be internal drives, manufactured to be incorporated into products

8   including notebook and desktop computers, camcorders, and videogame consoles, or they can be

9   external drives that connect to consumer electronics by means of an external interface, such as a

10  Universal Serial Bus ("USB") connection.

11         81.      The ODD market has been one of the fastest growing markets in the electronics

12  industry.  Broadly speaking, optical disc formats evolved from CDs, to DVDs, to Blu-ray discs.

13  Drives for each type of optical disc evolved from read-only technology (*i.e.*, drives that could read

14  data recorded to the disc during the manufacturing process but lacked the capability to record data

15  to the disc), to recordable, and then to rewritable (*i.e.*, allowing for multiple re-recordings).

16  During the Conspiracy Period, ODDs served as the principal means for recording, storing, and

17  playing back music, movies, and other digital data and were a standard component on computers

18  in the United States.  In large part due to the increasing popularity of personal computers,

19  Defendants and their co-conspirators shipped hundreds of millions of ODDs each year, generating

20  billions of dollars in annual revenues.

21         82.      Throughout its history, but especially after 2000, the ODD market, which requires

22  significant technical resources and advanced manufacturing capabilities, has been dominated by a

23  small group of manufacturers, as discussed in further detail below.  During the Conspiracy Period,

24  Defendants and their co-conspirators controlled more than 90% of the ODD market.

25         83.      The ODD market has consistently faced downward pricing pressures, including as

26  a result of technological advances in ODD technology.  As Defendants and their co-conspirators

27  improved their ability to manufacture ODDs more efficiently and at a lower cost, the price of this

28  technology began to decline.  However, Defendants and their co-conspirators colluded to fix

prices, rig auctions for the supply of ODDs to OEMs, and allocate markets and customers in order to stabilize ODD prices and prevent them from dropping as quickly as they would have in a competitive market.

**B.      Structural Market Factors Favoring, and Acts Indicative Of, Collusion**

84.      During the Conspiracy Period, the ODD market exhibited several factors that contributed to the ability of Defendants and their co-conspirators to carry out their conspiracy, including but not limited to: (1) market concentration; (2) joint ventures and other collaborations; (3) significant barriers to entry (including patent pools); (4) common trade associations and business organizations; (5) the use of auctions for supply contracts, some of which included most favored nations clauses, whereby Defendants and their co-conspirators could and did collude; and (6) the standardization of ODDs.

**1.      Market Concentration**

85.      In 2005, the global market for ODDs was worth approximately $9.23 billion and approximately 303.8 million units were shipped.  According to some market estimates, the ODD industry currently generates yearly worldwide revenues in excess of $8 billion.

86.      Despite its large size, the ODD market is highly concentrated and dominated by a small group of suppliers.  This concentrated market was conducive to and facilitated the collusive conduct alleged herein.  According to published reports, the ODD industry was dominated by Defendants and their co-conspirators during the Conspiracy Period.

**2.      Joint Ventures and Other Collaboration**

87.      The ODD industry has experienced significant consolidation.  As manufacturing migrated toward lower-cost drive makers in Korea and Taiwan between 2001 and 2003, early Japanese manufacturers still held key competitive advantages in the form of intellectual property rights.  To mitigate the high cost of royalty payments for licensing this intellectual property, Taiwanese and Korean Defendants partnered with the patent holders through strategic alliances and joint ventures.  These alliances included:

- The Hitachi-LG Joint Venture, formed on November 1, 2000 in Tokyo, Japan;

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

- JVC Lite-On IT Manufacturing & Sales Ltd., a production and marketing company founded in October 2001 in Hong Kong;

- PBDS, founded in February 2003 and specializing in the manufacture of DVD+RW ODDs;

- The Sony & Lite-On "Alliance," a memorandum of understanding signed in May 2003 that led to acts of price-fixing of ODDs;

- The Toshiba-Samsung Joint Venture, established in April 2004;

- The Sony-NEC joint venture, formed in 2006, which was followed by NEC's transfer of its stock to Sony in September of 2008;

- Lite-On's acquisition of BenQ's ODD production facilities in 2006;

- Philips & Lite-On Digital Solutions Corporation, formed in March 2007; and

- PDDMC, the joint venture between Pioneer and Sharp that was announced in June 2009 and finalized in November 2009.

88. The mutually beneficial nature of the business relations between and among certain Defendants and their co-conspirators provided the opportunity for their parent entities to conspire and created a financial incentive to do so. As Gerald Cavanagh, a Sony spokesman in Tokyo, explained when announcing the formation of Sony NEC, the joint venture was formed because "[t]here was a feeling that those two complementary strengths [of Sony and NEC] would make more sense in a joint venture than competing against each other."

89. Similarly, after the formation of the Philips-Lite-On Joint Venture, the venture's general manager, Tseng Huan-Xiong, stated that "Philips and Lite-On in the future will target at making profits and avoid price wars." According to a press report, Tseng stated that the Philips-Lite-On Joint Venture would maintain steady profits and a minimum gross margin by refusing low-priced orders and not participating in price-cutting competition.

90. At various points during the Conspiracy Period, one defendant or co-conspirator produced ODDs for another defendant or co-conspirator. For example, news reports in November 2004 indicated that Lite-On would produce more non-Blu-ray ODDs for Sony so that Sony could focus its efforts on Blu-rays. As another example, in 2000, TEAC entered into an ODD co-

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    development arrangement with Royal Philips.  As a third example, Quanta has manufactured

2    ODDs for the Philips-Lite-On Joint Venture and Sony.

3    91.    The joint ventures and other collaborations among Defendants and their co-

4    conspirators enabled them to force most of Taiwan's second-tier manufacturers and almost all

5    Chinese manufacturers out of the ODD industry; the latter result was particularly anticompetitive

6    because Chinese manufacturers had lower labor costs, a market reality that normally would enable

7    a manufacturer to drive down prices on products such as ODDs.

8    **3.    Barriers to Entry**

9    92.    Throughout the Conspiracy Period, the ODD market was characterized by high

10   manufacturing costs and technological barriers to entry.  Efficient manufacturing plants are large

11   and costly, and ODD manufacturers incurred significant research and development expenses.

12   93.    Another barrier to entry was the difficulty in landing sizeable OEM orders.  OEMs

13   usually required a lengthy qualification process before entering into supply agreements.

14   94.    ODD sellers' strong relationships with patent holders for component technology

15   posed yet another barrier to entry, particularly in the PC market.  Establishing these important

16   relationships with patent holders was difficult for low-volume manufacturers of ODDs, making it

17   difficult for them to compete effectively in the market.  For example, the Philips-Lite-On Joint

18   Venture noted the importance of access to patents on its website with respect to Blu-ray drives:

19           [The Philips-Lite-On Joint Venture] is one of the few companies in the ODD

20           industry that has access to an extensive Blu-ray patent portfolio and a large

21           Optical Disc Drive production facility.  Combining these two aspects makes

22           [the Philips-Lite-On Joint Venture] a leading company in the Blu-ray

23           Optical Disc Drive marketplace.  Other traditional ODD manufacturers will

24           need to pay Blu-ray royalties to the original patent holders or outsource

25           their production of BD drives to other manufacturers.

26   95.    Further, Defendants' and their co-conspirators' licensing structures imposed high

27   licensing costs that effectively deterred entry.  In the ODD industry, these structures have often

28   taken the form of patent pools whereby competitors pool their patents and grant a license with

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   sublicensing rights to a license administrator (typically a member of the pool) who issues licenses

2   to manufacturers of ODDs.  The licensees pay royalties to the administrator and the resulting

3   revenue is allocated among members of the pool, typically pursuant to a prearranged formula.

4         96.    For example, in 1998, Sony, Pioneer and Philips, core members of the DVD "+"

5   camp, formed the DVD3c Patent Group to exploit jointly their essential DVD-ROM and video

6   patents.  LG joined the group in July 2003, when John Koo, its Chairman and CEO, stated: "We

7   will cooperate with those companies on patent protection and patent exploitation now and in the

8   future.  LG Electronics is excited to join the most professional licensing organization in the field

9   of optical storage patent licensing and will consider future cooperation with the same partners in

10   other optical storage programs in which LG Electronics has important patent portfolios…."  The

11   licensing agreement imposed a DVD player license fee of 3.5% of the net selling price for each

12   player sold.  As of 2006, the DVD3c Patent Group controlled the licensing of 115 patents relating

13   to the manufacture of DVD players.  The DVD3c Patent Pool currently consists of Philips, Sony,

14   Pioneer, Hitachi, Matsushita (now Panasonic), Mitsubishi Electric Corp. ("Mitsubishi"), Thomson

15   Multimedia, Timer Warner, Toshiba, and Victor Company of Japan Ltd. ("Victor").

16         97.    In June of 1999, members of the "-" camp formed a separate DVD-ROM and video

17   patent pool, called the DVD6c Patent Pool.  The original DVD6c was comprised of Toshiba,

18   Hitachi, JVC, Time Warner, Matsushita, and Mitsubishi.  The DVD6c pool now consists of

19   Hitachi, Mitsubishi, Panasonic, Samsung, Sanyo Electric Co., Ltd., Sharp, Toshiba, Victor, and

20   Warner Brothers Home Entertainment Inc.

21         98.    Commencing in June 1999, leading developers of DVD technology and formats

22   including Hitachi, Panasonic, and Toshiba commenced a worldwide joint licensing program for

23   patents essential for DVD-Video players, DVD-ROM drives, DVD decoders and DVD-Video and

24   DVD-ROM discs that conform to the specifications promulgated by the DVD6c Patent Pool.

25   Sharp and Samsung joined the DVD6c Patent Pool in April 2005 and November 2006,

26   respectively.  The DVD6c Patent Pool royalties for licenses with respect to, *inter alia*, DVD-ROM

27   drives and DVD decoders were initially set at 4% of the net selling price or $4 for these items.  As

28   of 2006, the DVD6c Patent Pool controlled the licensing of 377 patents.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

99.     In March 2010, the BD4C Licensing Group, which includes Toshiba, announced that it had commenced a worldwide joint licensing program for patents needed for Blu-ray decoders, encoders, recorders, players, read-only discs, recordable discs, drives and BD/DVD hybrid discs.

100.     The royalties charged by DVD patent pools are enormous relative to the total cost of manufacturing ODDs.  Indeed, royalties account for the majority of the manufacturing cost for a potential entrant.  For example, the average worldwide price for a DVD burner (on an if-sold-OEM basis) was $30 in 2007, $25 in 2008, and $23 in 2009.  A working paper by Kenneth Flamm entitled "A Tale of Two Standards:  Patent Pools and Innovation in the Optical Disk Drive Industry" estimated the royalty payable to four principal patent pools holding IP related to a DVD recorder to be $17, or 68 percent of the average selling price of a DVD recorder in 2008 (and presumably an even larger share of its costs).  These costly patent pool royalties constituted a significant barrier to market entry by potential competitors.

101.     Similarly, patent pools were established by Sony and Philips for CD technology; by Philips, Sony and Ricoh for CD-RW technology; and by Philips, Sony, and Taiyo-Yuden Co., Ltd. ("Taiyo-Yuden") for CD-R technology.

102.     The history of the patent pool for CD-R technology illustrates how patent pools can be used for anticompetitive collusion.  To facilitate patent licensing to CD-R producers around the world, Philips, Sony and Taiyo-Yuden adopted a joint licensing arrangement whereby Sony and Taiyo-Yuden licensed their patent rights to Philips, which in turn bundled the rights together for licensing to other companies.  In December 2008, the Taiwanese Fair Trade Commission ("TFTC") concluded that these companies had engaged in unlawful "concerted action" and improperly excluded competitors from the market and overcharged patent licensees.  The TFTC imposed fines of NT$ 8 million on Philips, NT$ 4 million on Sony, and NT$ 2 million on Taiyo Yuden, and ordered the companies to immediately cease the illegal practices.

103.     Japanese companies adopted the strategy of charging high royalties to prevent Taiwanese and South Korean manufacturers with superior cost controls from quickly entering the DVD-ROM market.  In response to high license royalties, Taiwanese and South Korean ODD

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

makers sought to become part of the cartel and to tie up strategically with patent pool members (who enjoy cross-licensing privileges), procure drive kits, or sell product through such members. In exchange, members of the cartel controlled prices to prevent low-cost producers from cutting prices.

104.    Because of the barrier to entry posed by onerous patent royalties, efficient Taiwanese and Korean manufacturers that could not otherwise thrive in the ODD market formed joint ventures with less efficient manufacturers holding intellectual property rights.  The ODD market increasingly coalesced around an oligopoly consisting of Sony NEC (later Sony), the Hitachi-LG Joint Venture, the Toshiba-Samsung Joint Venture, and the BenQ-Philips Joint Venture (later the Philips-Lite-On Joint Venture).  On information and belief, an analyst report in 2003 predicted that "the collective market share of this group will swell further to about 80%-90% over the next two years."  That is what happened during the Conspiracy Period, and the conspiracy controlled prices for ODDs.

### 4.    Trade Associations and Business Organizations

105.    Various industry trade organizations and events facilitated Defendants' and their co-conspirators' price fixing of ODDs.  Defendants participated in many of these meetings and events, which provided a forum for discussion and the exchange of information with respect to the pricing and production of ODDs and had the purpose and effect of fixing prices of ODDs.  In several instances, these trade association meetings preceded examples of collusive pricing conduct described herein.  ODD trade associations included the following:

### b.    CD Trade Association

106.    CDs21 Solutions ("CDs21") is a trade association formed in April 2001.  Hitachi, the Hitachi-LG Joint Venture, Sony, Panasonic, Lite-On, the Toshiba-Samsung Joint Venture, and Philips Japan Co., Ltd. were among its members.  Among the stated purposes of CDs21 were:

> To pursue ever more development of the industrial sector concerned by striving to closely unite the technology and the contents in the area of CD platform as well as by looking into future technologies. . . . To promote the

development of mutual businesses by fostering an environment where the knowledge and information can be shared by all as a common property.

### c.   DVD Trade Associations

107.   The DVD Forum is a global group of hardware manufacturers, software firms and content providers formed in 1997 to promote and improve standards for the DVD format and products.  Hitachi, LG, Lite-On, NEC, Philips, Panasonic, Pioneer, Samsung, Sony, TEAC, Quanta, and Toshiba are all members of the DVD Forum.  The stated purpose of the DVD Forum is "to exchange and disseminate ideas and information about the DVD Format and its technical capabilities, improvements and innovations."

108.   Over the years, the DVD Forum has held various conferences and seminars in Taiwan, Japan, China, Europe, and the United States that allowed its members to exchange competitively sensitive information about ODDs.

109.   The DVD Forum has a Steering Committee that met regularly, including on June 9-10, September 22 and December 1, 2004; February 23, May 26, September 12, and November 16-17, 2005; February 22, May 24, September 12 and November 29, 2006; February 28, June 19, September 12, and November 15, 2007; February 27, June 11, September 17, and November 19, 2008; February 25 and September 10, 2009; and February 24, 2010.

110.   Among those present at one or more of these meetings were: (a) Yutaka Komai, Yukinori Kawauchi, and a Mr. Saito from Sony; (b) Young-Min Cheong, In-Sik Park, and Yong-Chae Jeong from Samsung; (c) Kiyoung Lee, Kun Suk Kim, and Jea-Yong Joo from LG; (d) Yasuo Ogasawara and Hiroshi Inada from NEC; (e) Hideki Mimura, Hiruharu Sato, Yoshihide Fujii, and Messrs. Nishioka and Kaneda from Toshiba; (f) Yoshiho Gotoh, Yoshiharu Sakurada and Messrs. Nakano, Murase and Kozuka from Panasonic; (g) Messrs. Imaide, Noguchi, and Owashi from Hitachi; (h) a Ms. Ikei and a Mr. Heijnemans from Philips; (i) Junsaku Nakajima, Akira Takahashi, Taiji Nishizawa, Masatoshi Tsujimoto, Hiroyuki Okada, and a Mr. Egawa from Sharp; and (j) Matsumi Fujita, Shinichi Tsuji, and Messrs. Inoue and Yamada from Pioneer.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

111.    These meetings took place in Japan, South Korea, Taiwan, the Netherlands, France, Hawaii, and in many instances, California.  For example, the September 10, 2009 Steering Committee meeting was held in Los Angeles, California and chaired by Defendant Toshiba.

112.    In April 2001, the Recordable DVD Council ("RDVDC") was formed.  Its 58 general members as of August 2001 were major Japanese and Korean companies in the ODD supply chain.  The eight executive members of RDVDC included Hitachi, Ltd.; Hitachi Maxell Ltd.; Matsushita (now Panasonic); SECL; and Toshiba Corp.

113.    Bon-Guk Koo, chairman of the RDVDC and Senior Corporate Advisor and former Executive Vice-President of Samsung, stated that "[t]he Council will make its chief targets industry outreach at major trade shows, information exchanges among Council members and discussions aimed at expanding the recordable DVD market."  Mr. Koo noted that "[t]he Recordable DVD Council has held six seminars in Japan, sponsored a joint Pavilion at the Fall COMDEX in Las Vegas, and launched other promotional activities in 2001. . . . The Council's membership has grown from 58 to 87 companies since the RDVDC was established a year ago, making it the largest recordable DVD industry alliance among similar kinds of promotional groups.  This is proof that our activities have been supported by the industry and we are proud of it."  In August of 2003, the RDVDC announced the establishment of the Compatibility Working Group to ensure interoperability of products using RDVDC-supported recordable DVD formats.

114.    The RAM Promotion Group ("RAMPRG"), formed in 2003, includes (among others) Hitachi, TEAC, the Hitachi-LG Joint Venture, Panasonic, LG, Toshiba, and Samsung. RAMPRG is ostensibly committed to promoting the DVD-RAM format and popularizing DVD-RAM related products on an international basis.  RAMPRG is supported by the RDVDC, and all of the founding members of the RAMPRG are also members of the RDVDC.

115.    The DVD+RW Alliance ("Alliance") is a group of electronic hardware, optical storage and software manufacturers who in 1997 created and promoted a format standard of recordable and rewritable DVDs, known as the "plus" format.  As of 2004, plus format DVDs were available in various forms, including DVD+R and DVD+RW.  Sony and Philips were

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

members of the Alliance, which has both a Product Promotions Group and a Compatibility & Convergence Group.

### d.     Blu-Ray Trade Associations

116.    The Blu-ray Disc Association ("BDA") is a worldwide group inaugurated in 2005 to promote the BD format and products, with members including Hitachi, Pioneer, LG, NEC, Philips, Samsung, Sony, TEAC, Quanta, and Toshiba.  Sony, LG, and Hitachi are founding board members of the BDA.  The BDA was created and maintained by its members to, *inter alia*, establish standardized formats and cross license technology.

117.    In April 2008, Stan Glasgow, the President of Sony Electronics, stated that in order to ensure that the prices of ODDs that play BDs would not fall precipitously, the BDA would not be soon licensing to any manufacturers in China.

### e.     Multiformat Trade Associations

118.    According to its website, the Optical Storage Technology Association ("OSTA"): "was incorporated as an international trade association in 1992 to promote the use of recordable optical technologies and products" and "includes optical product manufacturers and resellers from three continents, representing more than 85 percent of worldwide writable optical product shipments."

119.    During the Conspiracy Period, OSTA's membership included ODD manufacturers such as Sony, LG, Panasonic, Toshiba, Philips, Samsung, and Pioneer.  OSTA works to "shape the future of the industry" through regularly scheduled meetings covering a variety of industry topics and an annual Optical Storage Symposium described below.  Benefits of OSTA membership touted on its website include:

- •     Influenc[ing] the health and direction of the industry.

- •     Meet[ing] with industry peers for information exchange.

- •     Receiv[ing] early foresight into industry strategies.

120.    OSTA also plays an important role in the industry through its efforts to establish industry-wide specifications for optical disc and ODD technologies including MultiRead (as described below), MultiPlay, and Universal Disk Format.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

121.    In 2005, OSTA meetings were held on February 28, March 1-2, June 13-15, September 12-14 and December 5-7 in San Francisco, California.  In 2006, OSTA meetings were held on March 2-3, June 12-14, October 5-6, and December 4-6 in San Francisco, with the exception of the October 5-6 meeting, which took place in Tokyo, Japan.  In 2007, OSTA meetings were held on March 5-7, June 11-13, September 17-19, and December 3-5 in San Francisco.  In 2008, OSTA meetings were held on March 17-19, June 16-18, October 6-8 and December 8-10 in San Francisco.  The last known general meeting of the OSTA took place on March 16-18, 2009 in Cupertino, California.

122.    Attendees at one or more of these various meetings included Christopher Smith of Sony Corporation; Paul Castellana of Toshiba; Maciek Brzeski of Toshiba; Yong Cheol Park of LG; Patrick Yen of Lite-On; Frank Simonis of Philips; and Young Yoon Kim of SECL.  Under the guise of an industry forum, these representatives had opportunities to meet and communicate regarding the price-fixing conspiracy for ODDs.

123.    The International Symposium of Optical Memory ("ISOM") is an organization created in Japan that is concerned with the technology of optical memory and provides an annual forum at which its members can share information.  Its members include Sony, Sharp, Pioneer, Panasonic, Toshiba, Hitachi, LG, NEC and Samsung.  The 2004 meeting took place on October 11-15 at Jeju Island, South Korea; the 2005 meeting took place on July 10-14 in Honolulu, Hawaii; the 2006 meeting took place on October 15-19 in Kagawa, Japan; the 2007 meeting took place on October 21-25 in Singapore; the 2008 meeting took place on July 13-17 in Waikoloa, Hawaii; the 2009 meeting took place on October 4-8 in Nagasaki, Japan; and the 2010 meeting occurred on October 24-28 in Hualien, Taiwan.

124.    Attendees at these various meetings included: (a) T. Maeda, H. Miyamoto, M. Nakamura, M. Ojima, Hiroyuki Minemura, and T. Shintani of Hitachi; (b) Jin-Yong Kim, Yun-Sup Shin, and In-Ho Choi of LG; (c) Ryuchi Katayama, H. Inada, T. Iwanaga, Y. Yamanaka, and H. Fukuchi of NEC; (d) J.A.M.M. van Haaren of Philips; (e) Isao Ichimura, Atsushi Fukumoto, Kimihiro Saito, Masataka Shinoda, M. Takeda, K. Nishitani, M. Toishi, S. Kubota, and S. Higashino of Sony; (f) Yutaka Kahihara, Y. Honguh, H. Yamada, Hiromichi Kobori, and A. Hirao

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   of Toshiba; and (g) Chong Sam Cheung, Dong-Ho Shin, Kyung-Guen Lee, Jooho Kim, and I.-S.

2   Park of Samsung.

3         125.    The RW Products Promotion Initiative ("RWPPI") is a trade association formed in

4   Tokyo, Japan in May 2000 to promote rewritable optical discs.  The founding members included

5   Hitachi Maxell Ltd., LG, Pioneer, Sharp, Sony, and Samsung; Lite-On, NEC, the Toshiba-

6   Samsung Joint Venture, and Sony subsequently joined the association.  RWPPI's main stated

7   activities included the exchange of various types of commercial and technical information.  In

8   January 2001, RWPPI created a United States Liaison Office located at the Long Beach,

9   California office of Pioneer North America to "facilitate the exchange of information among

10  RWPPI members in North America."

11        126.    The RWPPI held numerous meetings at the Japanese locations of Sharp and

12  Pioneer during the Conspiracy Period, which provided a forum for Defendants and their co-

13  conspirators to communicate and agree upon prices for ODDs.  The dates and locales of those

14  meetings are set forth in the following chart.

| Date of Meeting | Meeting Location |
| --- | --- |
| 3/13/2009 | Pioneer (Meguro, Tokyo, Japan) |
| 12/5/2008 | Sharp (Makuhari, Chiba, Japan) |
| 9/19/2008 | location unknown |
| 6/18/2008 | Pioneer (Meguro, Tokyo, Japan) |
| 2/14/2008 | Pioneer (Meguro, Tokyo, Japan) |
| 12/7/2007 | Sharp (Makuhari, Chiba, Japan) |
| 9/13/2007 | location unknown |
| 6/12/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 4/18/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 2/14/2007 | Pioneer (Meguro, Tokyo, Japan) |
| 12/6/2006 | Sharp (Makuhari, Chiba, Japan) |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

| 10/20/2006 | Pioneer (Meguro, Tokyo, Japan) |
|---|---|
| 8/23/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 6/21/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 4/28/2006 | location unknown |
| 2/17/2006 | Pioneer (Meguro, Tokyo, Japan) |
| 12/7/2005 | Sharp (Makuhari, Chiba, Japan) |
| 10/28/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 8/3/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 6/16/2005 | location unknown |
| 4/15/2005 | Pioneer (Meguro, Tokyo, Japan) |
| 2/17/2005 | location unknown |
| 12/9/2004 | Sharp (Makuhari, Chiba, Japan) |
| 10/29/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 8/26/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 6/15/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 4/14/2004 | Pioneer (Meguro, Tokyo, Japan) |
| 2/25/2004 | Pioneer (Meguro, Tokyo, Japan) |

127.    The RWPPI appears to have disbanded, and closed its website in March of 2009, shortly before a federal grand jury began issuing subpoenas as part of an antitrust investigation into the ODD industry.

**f.    Trade Shows**

128.    The International Consumer Electronics Show ("CES"), the world's largest consumer electronics show, was held annually during the Conspiracy Period, providing members of the conspiracy the opportunity to communicate with each other about the conspiracy.  The 2010 CES took place from January 7-10, 2010 in Las Vegas, Nevada.

129.    As noted above, the Optical Storage Symposium is a worldwide conference held annually from 2001-2007 at various locations sponsored by OSTA.  The 2007 event was held in South San Francisco on September 18-19, 2007.  The 2006 event, held in Tokyo, Japan on

36

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    October 5, 2006, included presenters from Sony, Hitachi and CDs21.  The 2004 event held in

2    Burlingame, California on September 25, 2005 and co-sponsored by, among others, Sony and

3    Toshiba, included presenters from Sony and Toshiba.

4         130.    The Internationale Funkausstellung ("IFA") is a worldwide exhibition of consumer

5    electronics products that is held annually in Berlin, Germany and attended by representatives of

6    Defendants.  Recent IFA shows occurred on September 3-8, 2010; September 4-9, 2009; August

7    29-September 3, 2008; August 31-September 5, 2007; September 1-6, 2006; and September 2-7,

8    2005.

9         131.    The conduct of the "business" of these trade shows or events gave Defendants and

10   their co-conspirators the cover needed to share competitively sensitive information and to reach

11   and implement anticompetitive agreements.

12        **5.    Standardization of ODDs**

13        132.    A product is considered standard when there is a high degree of substitutability

14   across suppliers in the market.  When products are viewed as interchangeable by purchasers, it is

15   easier to agree for manufacturers and sellers to agree upon a single price for the product in

16   question and to effectively monitor prices, thereby facilitating the establishment and maintenance

17   of a conspiracy.

18        133.    The ODD industry has been typified by standardization of ODDs driven by

19   industry participants and a variety of industry-related organizations such as ECMA International,

20   the International Standardization Organization ("ISO"), and the International Electrotechnical

21   Commission, which are dedicated to standardizing the use of consumer electronics.

22        134.    For example, OSTA developed "MultiRead," an industry consensus aimed at

23   defining the parameters and specifications necessary for all classes of optical discs to be read on

24   current and future ODDs.  On March 7, 2000, OSTA announced that 17 ODD manufacturers,

25   representing well over 90 percent of the ODD market at the time, achieved compliance with its

26   MultiRead specification.  Those 17 manufacturers included Hitachi, LG, Lite-On, Philips,

27   Samsung, Sony, and Toshiba.

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

135.    Patents and intellectual property rights were also used to require adoption of standardized ODD product specifications.

136.    Two competing camps of companies formed within the new standardization effort, one led by Sony and Philips, the original developers of the CD standard, and the other by Matsushita (now Panasonic), Toshiba, and Time Warner.  A DVD Forum was established to unify the competing technological standards.

137.    All parties agreed to a single standard for next-generation DVD video disks, and read- only data storage, but no agreement on writeable DVD data storage was reached.  Sony and Philips became the nucleus of a DVD "+" camp, while Pioneer, Hitachi, Matsushita (Panasonic), Toshiba, Mitsubishi, JVC and Time Warner formed a DVD "-" camp.  The result was two sets of incompatible write formats for DVDs, ultimately unified only by more complex products, "super multi" DVD drives capable of reading or writing all the incompatible formats.

138.    The standardization of the ODD industry provided Defendants and their co-conspirators with a mechanism to implement, enforce, and oversee their agreements to stabilize the prices of ODDs.  ODDs are commodity products, and consumers' decisions to purchase such products are typically based largely, if not exclusively, on price (rather than brand name).

C.    Defendants' Sales of ODDs and Market Control

139.    During the Conspiracy Period, each Defendant and co-conspirator, or one or more of its subsidiaries and/or affiliated joint ventures, sold ODDs in the United States in a continuous and uninterrupted flow of interstate and foreign commerce, including through and into this district. The business activities of Defendants and their co-conspirators substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

140.    During the Conspiracy Period, Defendants and their co-conspirators collectively imported at least tens of millions of ODDs into the United States.  Defendants and their co-conspirators collectively controlled a majority of the market for ODDs globally, nationwide, and within this district.

141.    For example, Sony had more than $1 billion of ODD sales for the year ending in March 2008, the last year for which Sony disclosed the unit's annual revenue.  The Hitachi-LG

1    Joint Venture also had billions of dollars of revenue from ODDs in 2005, the last year for which

2    figures are available.  The Toshiba-Samsung Joint Venture forecast revenue in excess of 200

3    billion yen in fiscal year 2004, when it was established.

4           142.    Throughout the Conspiracy Period, Defendants and their co-conspirators sold

5    ODDs through various channels, including to manufacturers of electronic products and to resellers

6    of ODDs such as Radio Shack.  Some Defendants also sold ODDs directly to end users through

7    online or brick-and-mortar stores.

8           143.    California is the worldwide center of the personal computer industry and other

9    industries that depend upon the ODD market.  Statements concerning the prices and market

10   conditions for ODDs were disseminated by Defendants and their co-conspirators from and into

11   California on a continuous basis.

12   **D.     Acts of Collusion with Respect to ODDs**

13          144.    Defendants and their co-conspirators reached understandings and agreements to

14   stabilize the prices for ODDs in numerous ways throughout the Conspiracy Period.

15          145.    Defendants and their co-conspirators participated in meetings, discussions, and

16   communications in the United States or elsewhere to discuss bidding strategies and prices of

17   ODDs.  During those meetings, discussions, and communications, Defendants and their co-

18   conspirators reached agreements and understandings regarding prices to charge customers for

19   ODDs and how participants would bid on ODDs, including prices and bids to Radio Shack.

20   Defendants and their co-conspirators submitted bids and prices in accordance with the agreements

21   reached during those meetings, discussions, and communications.

22          146.    One manifestation of the conspiracy involved regular exchanges of information

23   among Defendants and their co-conspirators of confidential business information concerning

24   ODDs, including prices charged and to be charged, production capacity, business plans,

25   confidential roadmaps for product rollouts and production, product quality information, inventory

26   and shipping information, company responses to customer initiatives, and plans for the cessation

27   of manufacture of ODDs that had reached the ends of their respective lifecycles.  All of these

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    information exchanges were undertaken for the purpose of fixing the prices of, and allocating

2    customers with respect to, ODDs.

3         147.    Another of the many manifestations of Defendants' conspiracy involved bid-

4    rigging.  Several OEMs in the United States, including but not limited to Dell and HP, conducted

5    auctions among suppliers of ODDs during the Conspiracy Period.  Dell's auctions began as early

6    as 2002 and were conducted from its headquarters in Austin, Texas during most of the Conspiracy

7    Period.  HP's auctions began in 2004 and were conducted from either Palo Alto, California or

8    Houston, Texas during most of the Conspiracy Period.

9         148.    These auctions can be classified into two general types: e-auctions and eRFQs

10   (Electronic Requests for Qualifications).  E-auctions were typically live, real-time events that

11   spanned a few hours in which each competing supplier could submit multiple bids.  ERFQs

12   typically spanned more than one day and involved multiple rounds of bidding.  The OEM would

13   provide feedback to competing ODD suppliers during the process.  ODD auctions typically

14   occurred on a quarterly basis or, at most, six times a year.

15        149.    These auctions were not typically "winner takes all" situations.  Many OEMs filled

16   their needs by awarding contracts to multiple vendors.  Typically, three to four (and sometimes

17   five) bids were selected on a tiered basis.  Allocation was based on rank by "Total Available

18   Market" ("TAM").  To use hypothetical examples, if the TAM was close between two suppliers,

19   an OEM might allocate 35% of the auctioned business to the first tier supplier and another 35% to

20   the second tier.  If the TAMs were more dispersed, suppliers in the tiers below the first tier would

21   be allocated successively lesser shares of the auctioned business.

22        150.    Among others, the Philips-Lite-On Joint Venture, the Hitachi-LG Joint Venture,

23   Sony, the Toshiba-Samsung Joint Venture, Quanta, Lite-On, and TEAC participated in auctions

24   run by, *inter alia*, Dell and HP.  The auctions encompassed various types of CD, DVD and Blu-

25   ray drives for internal use within computers, as well as some external ODD players.  In dozens of

26   those auctions, Defendants rigged their bids by: (a) agreeing to fix the prices at which they bid; (b)

27   agreeing to allocate their respective positions in tiers of successful bidders; and (c) exchanging

28   competitively sensitive information on price, desired tier positions, prior bids and bidding

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

outcomes, quality assessments by OEMs (which could affect whether an OEM would allow a supplier to bid for a top tier position on a particular auction), and the timing of the introduction of new products or the cessation of ones that had reached the end of their lifecycles.  Panasonic also participated in the information exchanges that had the effect of limiting price competition.  These agreements or information exchanges were conducted by sales managers, account managers, or global account managers who typically reported to sales executives within their respective companies.  For many of these companies over the course of the Conspiracy Period, six or more people were directly involved in collusive activity.  The total number of collusive communications associated with bid-rigging or information exchanges during the Conspiracy Period was in the hundreds.

151.    OEMs sponsored meetings for all suppliers.  At such meetings, representatives of Defendants and their co-conspirators would congregate at lunches and exchange contact information for purposes of setting up future communications to discuss bid-rigging, as described below.

152.    The representatives of the foregoing Defendants and their co-conspirators communicated on the subject of their bid-rigging efforts in several ways.  Sometimes they communicated by cellular telephone, either before the bidding process commenced or, in e-auctions, while the live bidding process was ongoing.  Sometimes they exchanged information through e-mails.  During some procurement events, they conducted face-to-face meetings at venues including a coffee shop in Austin, Texas, restaurants in Houston, Texas, and the lobby of one defendant's office in Singapore.

153.    Defendants' and their co-conspirators' bid-rigging efforts started in 2004 and continued at least into 2009 and affected prices paid for ODDs by Radio Shack.  As noted below, prior to 2004, prices for ODDs had been declining, but in that year, they stabilized, which stabilization continued during the remainder of the Conspiracy Period.  Representative examples of Defendants' and their co-conspirators' bid-rigging include the following:

154.    HP conducted a procurement event on behalf of its Business PC division that involved an auction for the supply of ODDs ending on August 31, 2006.  Account managers from

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   a conspirator and the Hitachi-LG Joint Venture discussed the position each company wanted in the

2   tiers of successful bidders and agreed not to bid below $14.65 per unit, an agreement that they

3   followed through on.

4       155.    In February 2009, HP instituted an auction for the supply of ODDs to its Business

5   PC and Consumer PC divisions.  The auction closed on February 19, 2009.  Account managers for

6   the Philips-Lite-On Joint Venture, the Toshiba-Samsung Joint Venture, and another defendant

7   discussed the rigging of this bidding process.  The Philips-Lite-On Joint Venture and another

8   conspirator agreed that the former would not compete against the latter for the first tier position

9   among successful bidders.  The Philips-Lite-On Joint Venture and the Toshiba-Samsung Joint

10  Venture then agreed that the latter would take the second tier position, while the former would

11  take the third tier position.  During the course of this discussion, each agreed that they would not

12  bid lower than their respective previous closing prices.  The final bids by each defendant reflected

13  these various agreements.

14      156.    Dell conducted an auction for the supply of ODDs that closed on December 1,

15  2008.  Quanta (operating in conjunction with Sony), the Philips-Lite-On Joint Venture, the

16  Toshiba-Samsung Joint Venture, and the Hitachi-LG Joint Venture submitted bids.  Quanta's

17  account manager spoke with one defendant's global account manager, who agreed to seek a fourth

18  tier position behind Sony; the bidding reflected this agreement.  After Dell asked for lower bids,

19  Quanta and this defendant lowered their bids their bids by the same amount.

20      157.    Defendants and their co-conspirators engaged in additional acts of anticompetitive

21  conduct in furtherance of their conspiracy.  For example, in the latter part of 2004, after a period

22  of decline, quotations by Defendants and their co-conspirators to OEMs for 16x DVD-R players

23  stabilized for a period of months.  By September 2004, Taiwanese ODD manufacturers were

24  claiming that the prices of such burners would remain stable for the remainder of the year.

25      158.    In March 2005, Danny Liao, President of Lite-On, said at a press conference that he

26  expected any price competition for the global market of ODDs to slacken in 2005 because

27  Japanese manufacturers had forced out most of Taiwan's second tier manufacturers and almost all

28  of China's manufacturers.

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

159.    In May 2007, Sony NEC introduced its first BD-R player, the BD-M100A. According to Digitimes, sources from Taiwan-based manufacturers of ODDs said that since Sony NEC was a member of the BDA, its pricing would be a reference for other members who manufactured such an ODD, including Philips, LG and Samsung.

160.    Beginning in February 2008, prices on many ODDs that played BDs began to climb.  In August 2008, personal computer vendors, including HP, Dell, Circuit City and Asustek Computer, sought reductions in OEM and Original Design Manufacturer ("ODM") prices of BD Combo and BD-ROM drives.  However, leading manufacturers, such as Pioneer, Lite-On, the Hitachi-LG Joint Venture, and the Toshiba-Samsung Joint Venture, were all steadfast in refusing to lower their prices.  Andy Parsons, Chairman of the BDA and a Senior Vice-President of Pioneer, said in October 2008 that the prices for BD players would not be coming down soon.  In a competitive market, at least one or more of Defendants and their co-conspirators would have broken ranks to capture market share.

161.    As noted above, throughout the Conspiracy Period, Defendants routinely communicated with each other to share confidential business information about ODDs, including information about customers, specific products, pricing, and production.  Defendants, their co-conspirators, and their respective employees were aware that such communications were inappropriate and took steps to conceal their communications by using cellular phones or meeting in person to ensure, to the extent possible, that communications were not in writing and that no evidence of such communications was left behind.  These communications numbered at least in the hundreds.

162.    As discussed above, Defendants and their co-conspirators created joint ventures or other cooperation arrangements that functioned as means to fix prices for competitive products manufactured or sold by the joint venturers.  For example, the joint ventures operated by Hitachi, LG, Philips, Lite-On, Sony, Toshiba, and Samsung provided a structure for collusion in furtherance of the conspiracy alleged herein.

163.    Upon information and belief, and based upon review of the pleadings in the *In re Optical Disk Drive Products Antitrust Litigation*, Master File No. 3:10-md-02143 consolidated

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   litigation, to date, certain Defendants and their co-conspirators have already produced more than 4

2   million documents that contain information regarding Defendants' and their co-conspirators'

3   confidential information exchanges and agreements.

4         164.    The patent pools described previously also facilitated the operations of the price-

5   fixing conspiracy by restricting competition among pool members.  For example, on information

6   and belief, licensees from the DVD3c Patent Pool and DVD6c Patent Pool were required to report

7   customer, sales and pricing data to pool members, ensuring that Defendants and their co-

8   conspirators had access to sensitive non-public commercial information that facilitated the

9   conspiracy.  The license agreement for the DVD6c Patent Pool specifically required the patent

10  licensee to agree that such information could be shared among the members of the licensing group.

11        165.    Defendants' and their co-conspirators' exchanges of competitively sensitive

12  information were directed by customer account managers and sales directors, who exchanged

13  personal cell phone numbers and email addresses with their rival ODD suppliers to facilitate the

14  conspiracy.  Before switching jobs, these employees would introduce their replacements to their

15  contacts at rival ODD suppliers.

16        166.    A May 2006 e-mail from Eugene Yang of the Hitachi-LG Joint Venture to Daniel

17  Hur of the Hitachi-LG Joint Venture requested competitors' contact information.  In response, Hur

18  acknowledged the illegal nature of the competitor contacts, explained to Yang that he should meet

19  his competitors at "a place where it would be very unlikely for people to see you," and suggested

20  using Starbucks, but cautioned "that does not meet [sic] those places are guaranteed to be safe."

21        167.    In October 2007, Hyun Chul Son reported to a number of the Hitachi-LG Joint

22  Venture employees, including Hur: "I've checked it through Freddie, SNO's DVD-ROM isn't

23  supported from Lite-on.  This model is produced by Foxconn as OEM and supply to SNO."  On

24  information and belief, the "Freddie" referred to by Son is Freddie Hsieh of the Philips-Lite-On

25  Joint Venture, and SNO refers to Sony NEC.

26        168.    In February 2009, a Hitachi-LG Joint Venture employee acknowledged that

27  competitor contacts were improper given government investigations in other industries and

28  counseled employees to keep these contacts out of documents or emails:

> Recently in the USA & EU, investigations on collusion between suppliers are being strengthened.  LG TV & LGD are under the investigation as a close example.  I guess other industries also know this thru news or something.  With competitor, especially T company, we need to be extremely careful about contacts, and let's be careful so that there are not should in documents / email. (since the share of T and us combined becomes more than 50%, there is a chance that the issue will grow even bigger).

On information and belief, the "T company" and "T" referred to in the above e-mail is the Toshiba-Samsung Joint Venture.

169.     In March 2009, Daniel Hur of the Hitachi-LG Joint Venture emailed Eugene Yang of LG, among others, encouraging his colleagues to conceal their competitive contacts:

> To avoid unnecessary misunderstanding for industry information-gathering purposes, we should purchase and use an outgoing call-only phone instead of using our business cell phones.

170.     In an email sent on or around April 14, 2009, Yang of LG informed Hur of the Hitachi-LG Joint Venture and others that "The Houston office has purchased a Prepaid Phone for security purposes.  We . . . will use pre paid phones also for confidential conversations in the future."

171.     In October 2008, Caroline Lin of Quanta emailed other Quanta employees regarding an "RFQ Discussio [sic] with Amino-san."  On information and belief, the email subject referred to Amino Masafumi from Sony.  Quanta and Sony were to act as partners in an upcoming ODD procurement event.  Lin reported: "I'll have dinner w/HLDS Eugene [Yang, on information and belief, of the Hitachi-LG Joint Venture] this Friday evening and get the consensus on the price protection."

172.     The following Monday, Lin reported to her colleagues at Quanta, Sally Huang and Haw Chen:  "Last week, I met [the Hitachi-LG Joint Venture] guy. According to what he said,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    their best price is around 24.65 eventually. However, the [sic] they won't go that far in the 1st

2    round as well and might provide a higher price to see [the customer]'s feedback & then react."

3        173.    In July 2005, Hank Hayami of NEC emailed other NEC employees, including

4    Glenn Brower, and stated that "when our [NEC's] top management met [the Toshiba-Samsung

5    Joint Venture's] top management last week, [the Toshiba-Samsung Joint Venture] clearly

6    mentioned as below. . . ."  The information was received by Kris Williams of NEC, who stated

7    that he had "a good contact at Toshiba, and I will contact him tomorrow.  I will also provide the

8    yield rate at Sharp factory and TSST (Samsung) drive factory on the new lead-free slim 8X

9    DVDRW."

10       174.    In October 2007, Kris Williams of Sony NEC Optiarc emailed Vincent Chng of

11   Sony NEC Optiarc, advising him that "[t]he only other piece you need to round out your job

12   responsibilities, is the data gathering piece from other suppliers.  I think that you can be more bold

13   with Tokyo if you have good info on competitors."  Later in the email chain, Chng requested

14   contact from Williams' contact at the Hitachi-LG Joint Venture.  Williams responded, "Jason

15   should contact you soon …. I will also try to put you in contact with Matt from TSST. . . . I will

16   give you contact info for him."  On information and belief, Jason refers to Jason Kim from the

17   Hitachi-LG Joint Venture and Matt refers to Matthew Lee at the Toshiba-Samsung Joint Venture.

18       175.    In July 2007, Williams compiled information about slim PATA tray-loaded DVD-

19   RW drives.  TEAC confirmed that it was paying $1.91 for one of the component parts of the drive.

20       176.    As early as November 2003, Yasuki Hiraoka, Team Leader at the Hitachi-LG Joint

21   Venture, and a Hitachi-LG Joint Venture employee with the last name Nagasawa had dinner with

22   sales personnel from Pioneer.  In an internal document, the Hitachi-LG Joint Venture employees

23   reported to their colleagues that Pioneer had provided the Hitachi-LG Joint Venture with highly

24   sensitive  business information, including: (1) target dates for delivery of new products to Apple

25   such as the 8x dual ODD; (2) pricing on the Apple account for both 4x and 8x drives; (3) the

26   disclosure that Pioneer was facing production capacity restraints for its DVD-W slim drive; (4)

27   that Pioneer would not be ready to launch its dual layer drive in the second quarter of 2004 as it

28

had previously announced; and (5) Pioneer's intention to stop its production of DVD-ROM drives and to instead purchase the drives from a Taiwanese third party.

177. In February 2005, Panasonic and Pioneer both submitted bids to HP for the supply of ODDs in April and May 2005. Faced with a sharp demand by HP to lower its costs, Panasonic employee Yoshihiro Takada contacted his known competitor on the account, Pioneer, to ascertain Pioneer's price and bidding strategy: "I contacted Pioneer the other day; they finished their evaluation last Wednesday and are bidding $73/April while it hasn't been decided who to use." Armed with this information, Panasonic refused to lower its price to HP's requested $69 for May 2005, and instead suggested that it would bid only $71. In an email two days later, Panasonic employee Tosio Nakayama instructed his colleagues to "reinvestigate/ascertain whether Pioneer can actually keep up with the May price, and get back to me without delay" before Panasonic would commit to the $71 price HP requested for the May supply of ODDs. Based on the "results of the investigation," only then would Panasonic respond with a price to HP.

178. In an internal email sent in May 2005, Tina Phan, Panasonic Senior Account Manager for Apple, updated colleagues on Pioneer's qualification status at Apple and speculated on Panasonic's chances competing for Apple's business:

> My understanding is Pioneer is very aggressive on pricing as they are not competing well on the engineering side. For CQ4, it'll be a challenge as 2nd source and potentially 3rd source across the board.

179. In a later email, Phan reported on the exact prices that competitors, including Pioneer, planned to quote Apple: "After our conference call yesterday, I checked on our competitors pricings: I. Pioneer's SD process - CQ2 firm quote: $76.50 - Conditional offer of $73 for June if qualified for Q45CIand Q88- CQ3 price: 72.50." Based on this information, Phan concluded that Panasonic's price was "quite competitive."

180. In September 2005, Jonae Wilson, a Global Account Manager at Pioneer Electronics (USA) Inc. emailed Billy Reynolds of the Philips-Lite-On Joint Venture and asked whether the Philips-Lite-On Joint Venture had "received the official award of business for BD" from Dell. In the same email, Wilson thanked Reynolds for his time the previous week, thus

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1 | confirming that they had directly met.  When Reynolds explained that the Philips-Lite-On Joint

2 | Venture hadn't received the official award, Wilson explained that Pioneer was "going to chat with

3 | Dell about the 2nd source opportunities, but didn't want to do so until all was official for

4 | [Philips]."  Eventually Reynolds confirmed that the Philips-Lite-On Joint Venture had received the

5 | award.  The implication of this question was that Pioneer did not want to approach Dell to

6 | negotiate the provision of ODDs until the contract with the Philips-Lite-On Joint Venture was

7 | final, in order to prevent any price competition over the supply of ODDs for that time period.

8 |      181.    In May 2006, Yasuki Hiraoka of the Hitachi-LG Joint Venture reported to his

9 | colleagues that he wanted to postpone the joint venture's price quotation to customer Fujitsu until

10 | the joint venture could "get more underground info."  Hiraoka then went on to report his meetings

11 | with Pioneer and Panasonic.  Regarding Pioneer, Hiraoka reported that he "had dinner with

12 | Pioneer yesterday."  Regarding the Dell account, Pioneer told the Hitachi-LG Joint Venture that it

13 | had not promised Dell a rebate on the Slim-DVD-W product.  Pioneer disclosed to its competitor,

14 | the Hitachi-LG Joint Venture, that it intended to visit the Dell Austin office the following week,

15 | but would not be prepared to discuss rebates with Dell.  Hiraoka reported that Pioneer had "not

16 | setup any plan for support like we do for our product."

17 |      182.    In November 2006, Yasuki Hiraoka of the Hitachi-LG Joint Venture reported to his

18 | colleagues that he had met with competitors MEI (Panasonic) and the Toshiba-Samsung Joint

19 | Venture the previous night, gave an extensive report, and stated: "I have a [sic] appointment with

20 | Pioneer tonight so I will get updates on their activity directly."  The following day, after his

21 | meeting with Pioneer, Hiraoka reported that Pioneer had disclosed that it had no plan to launch the

22 | 12.7 mm and 9.5 mm slot product to date, given that there was base demand only from Apple.

23 | Pioneer confirmed it was in a "[s]erious situation" for slim SM drives and scared of losing

24 | business in this area.  Hiraoka informed Pioneer that the Toshiba-Samsung Joint Venture "will

25 | start to deliver from Q1/07 so [the price] will be up to them."

26 |      183.    In February 2007, Jun Okubo of Panasonic met with General Department Manager

27 | Shinichi Nojiri, Department Manager Kenichi Nakamura and Section Chief Hiro Sugawara of

28 | Pioneer to discuss the Apple account.  Among the competitive information exchanged was:

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

(1) Pioneer's capacity for 12.7 mm SD supply to Apple for March (around 9000 units) and that Pioneer could not increase this amount for Apple; (2) the price estimate from Pioneer for the supply of the 12.7 mm drives was "the same as the information from the other day - they haven't reduced it at all"; and (3) Pioneer didn't "have any new products this whole year (the current model is the one from last spring), so they have no ability to reduce the price further."  Panasonic concluded from this last piece of information that it should not reduce its price either.

184.    An internal Panasonic email produced in the consolidated multidistrict litigation reveals that in March 2007, Yoshi Takada provided a further report to his colleagues regarding the HP account and the consensus of the various Panasonic entities to reach agreement on a bidding strategy for the HP account.  Takada reported that Panasonic Shikoku Electronics Co., Ltd. ("PSEC") had directly communicated with Pioneer to confirm its pricing in the coming months:

> After I finished writing this e-mail, I saw Amy's update information.  It seems that we need to change 2nd round strategy to go around $31.60.  Only one thing I confirmed from PSEC (directly talked with Pioneer) is they quote really agressive [sic] price in Apr-May, but will slow down in June and based on June price, they will consider strategic price again in July.

185.    Takada instructed his colleagues to "collect more information" from Panasonic's competitors, including Pioneer, before deciding on their second round bidding price.  Later that month, Takada reported on his investigation and communication with competitors regarding pricing strategy and getting "behind-the-scenes information on second round bids."  Specifically, he reported Pioneer's first round results, among others, and stated that, "according to [the Hitachi-LG Joint Venture], Pioneer has made a definite statement that they'll handle all their Q2 prices aggressively," showing that Pioneer communicated with competitors about pricing strategy in between rounds of a procurement event.

186.    In June 2007, Bruce Jeong of the Hitachi-LG Joint Venture reported extensive and detailed competitive "information from a discussion with the Japanese ODD company in Taiwan." An employee of the "P company" (*i.e.*, Pioneer) shared with Jeong slim drive quality issues and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   future bidding strategies, as well as production line and manufacturing information for Slim Slot

2   products and small quantities of HH DVD-RW and HH BD products.  Jeong also related

3   information he learned from Pioneer about its transactions with customers, its forecast of PC sales

4   to Apple, and competitive information sharing with HP.

5       187.   Pioneer employees met with competitors to share nonpublic information.  For

6   example, in September 2007, Shinichi Yamamura of Sony emailed a colleague that he went

7   drinking with Pioneer employees, including Toshihiko Kurihara, General Manager of the

8   Components Business Division.  In May 2008, Katsuhiro Nakano of Sony and Shinichi Nojiri of

9   Pioneer arranged to meet for meal, assuring each other that senior managers on both sides would

10  be in attendance: Toshihiko Kurihara of Pioneer and Shinichi Yamamura (Representative Director

11  and President of Sony NEC Optiarc), Hidetoshi Shimizu (General Manager of Sales at Sony NEC

12  Optiarc), and/or Yasuro Katori (Senior General Manager, Strategic Planning Division, Sony NEC

13  Optiarc).

14      188.   In October 2008, Kenny Lee, Senior Manager of the Toshiba-Samsung Joint

15  Venture, reported the results from a 12.7 DVDR HP procurement event to his colleagues.  Lee

16  stated that the competitors, including Pioneer, reached an agreement not to "overheat each other"

17  in auction, leading to a favorable result:  "Result: 1st place $24.40, TSST M/S 36% 2nd place

18  HLDS, 3rd Quanta, 4th Pioneer because initially the atmosphere was do not overheat each other,

19  there is no actual difference between 2nd and 3rd place in price 24.2~24.4 but fortunately we can

20  get the 1st place supply by small price difference."

21      189.   The supply of OPUs, a component of ODDs, also became a channel for the

22  exchange of sensitive business information.  For example, in January 2009, PAVC, a division of

23  Panasonic that supplied OPUs to other ODD manufacturers, informed the Hitachi-LG Joint

24  Venture that Pioneer had started to deliver Slim BD-W drives to Sony.  Panasonic's inside

25  information regarding Pioneer (and subsequent report to the Hitachi-LG Joint Venture) was based

26  on Pioneer's purchase of OPUs from PAVC at the rate of 10,000 per month.  Yasuki Hiraoka of

27  the Hitachi-LG Joint Venture reported this information to his colleagues and expressed his concern

28  that because Pioneer was in a "severe situation," they could start "dumping" product.  Hiraoka's

1   colleague at the Hitachi-LG Joint Venture, Bruce Jeong, reported back that he "checked with

2   Pioneer and that Pioneer had qualified on the BD-W model, but was supplying very little product,"

3   negating any pricing threat.

4       190.    Pioneer's dual role as an ODD manufacturer and a customer of other ODD

5   manufacturers opened channels for illegal and anticompetitive communications.  Internal Philips-

6   Lite-On Joint Venture documents produced in the consolidated multidistrict litigation show that in

7   late 2008, a number of joint venture employees including Claire Lin and Charlie Tseng met with

8   Ken Usui, a sales manager at Pioneer, regarding the possible supply of ODDs from the Philips-

9   Lite-On Joint Venture to Pioneer.  After the meeting, Lin emailed Usui expressing joint venture's

10   gratitude for arranging the meeting and for "share [sic] so many market information with" the

11   Philips-Lite-On Joint Venture.  In early 2009, the Philips-Lite-On Joint Venture approached

12   Pioneer as a supplier of a particular type of ODD.  Pioneer declined to use the Philips-Lite-On

13   Joint Venture as a supplier at that time, but Usui responded to Lin: "Let's keep in touch with

14   market trend and I am willing to share the market information."  Within days, Lin responded that

15   Charlie Tseng of the Philips-Lite-On Joint Venture wanted to speak with Usui regarding the supply

16   of a particular type of drive and "to exchange the market trend again."

17       191.    Other internal Philips-Lite-On Joint Venture documents show that in March 2009,

18   Lin provided to Tseng an "Update of Pioneer" that included information from Usui about the

19   allocation of OPUs and information regarding Pioneer's production and outsourcing of certain

20   ODDs:

21           Pioneer Taiwan commented that almost no OPU shortage impact of H/H

22           DVDROM w/Q but Usui san said they tried really hard to secure the

23           allocation.  Pioneer Taiwan told us that out-sourcing 22X will launch in

24           May since Pioneer's own factory made H/H DVDRW will stop production

25           in May.  As for 24X, no further information.  Has asked for Procurement

26           team's help to check.

27

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**E.      Governmental Antitrust Investigations of the ODD Industry**

192.      In October 2009, it was reported that the United States Department of Justice ("DOJ") had commenced an investigation into anticompetitive conduct in the ODD industry and had served subpoenas on Sony Optiarc America, the Hitachi-LG Joint Venture, and the Toshiba-Samsung Joint Venture.  Around the same time, at least one Defendant acknowledged that foreign antitrust enforcement agencies were also investigating the ODD industry.

193.      Beginning in 2009, certain ODD manufacturers including the Hitachi-LG Joint Venture, Sony, and Philips disclosed in SEC filings that they had received DOJ subpoenas related to an ODD antitrust investigation or were a target of the investigation.  Sony has acknowledged that it believes the request for information from the DOJ is part of a wider review of anticompetitive conduct in the ODD market by the DOJ and competition authorities in other countries.

194.      On or around October 26, 2009, news sources reported that other companies, including Toshiba, Hitachi, Samsung and LG, had received DOJ subpoenas.  On or around October 27, 2009, Hitachi and Toshiba confirmed that, like Sony, their ODD operations in the United States had received a DOJ subpoena in a widening investigation into potential antitrust violations.  They also acknowledged that they were under investigation by European Union and Singaporean antitrust regulators.

195.      It is significant that Defendants' anticompetitive behavior has been the subject of a criminal grand jury investigation by the DOJ.  In order to institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a detailed memorandum to that effect.  *See* Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1 ("[i]f a Division attorney believes that a criminal violation of the antitrust laws has occurred, he should prepare a memorandum requesting authority to conduct a grand jury investigation.").  The request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division based upon the belief that a criminal violation may have occurred.  *See id.*  The fact that the DOJ Antitrust Division investigation is criminal, as opposed to civil, is also significant.  The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

Investigation" state: "[i]n general current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations."  Antitrust Division Manual, Chapter III.C.5. Accordingly, the existence of a criminal investigation into the ODD industry supports the existence of the conspiracy alleged herein.

196.    The DOJ confirmed its activities in a motion to stay proceedings in the main MDL case filed on May 20, 2010, stating that "[t]he DOJ is currently investigating possible criminal violations in the optical disk drive (`ODD') industry."  *See* Memorandum of Points and Authorities In Support Of the United States' Motion For A Limited Stay of Discovery at 15 (May 20, 2010) (Dkt. No. 68).  In support of that motion, the DOJ submitted under seal a declaration regarding the status of its investigation.

197.    The DOJ's investigation has already yielded a guilty plea from the Hitachi-LG Joint Venture and four of its executives.  In November 2011, the Hitachi-LG Joint Venture pled guilty to conspiring to fix prices and rig bids for ODDs and agreed to pay a $21.1 million criminal fine.  The Hitachi-LG Joint Venture admitted that its officers and employees engaged in discussions and meetings with representatives of other major sellers of ODDs and reached agreements to fix prices of ODDs and to rig ODD negotiations.

198.    Additionally, the following Hitachi-LG Joint Venture executives individually pled guilty to participating in the conspiracy: Young Keun Park, Sang Hun Kim, Woo Jin Yang, and Sik Hur.  Each was ordered to pay a $25,000 fine and also received a jail sentence.

**F.    Economic Data on Pricing and Supply**

199.    During the Conspiracy Period, ODD pricing did not behave as would be expected in a competitive market.  After introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends.  However, the ODD market has been characterized by unnatural price stability and certain periods of upward pricing trends.

200.    The cost of manufacturing ODDs should have declined as manufacturing bases shifted to lower-cost countries.  In a competitive market this would be reflected in downward

pricing trends as well.  Instead, prices for computer storage devices, including ODDs, leveled off during the Conspiracy Period, as shown in the chart below.



**Producer Price Index for Computer Storage Device Manufacturing**
**Jan. 1999-May 2009**

Source: U.S. Bureau of Labor Statistics
Producer Price Index for Exports 334112334112: Computer Storage Device Manufacturing
Note: Includes devices that allow the storage and retrieval of data from a phase change, magnetic, optical, or magnetic/optical media.

201.    If they had acted competitively, ODD makers would have had different incentives depending on the size of their market share in an existing generation of optical disc technology. Because of these different incentives, stable prices cannot be explained merely as conscious parallelism.  The fact that Defendants and their co-conspirators uniformly held off on significant price reductions regardless of share indicates that they were acting conspiratorially.

202.    Changes in demand for ODDs are also unlikely to explain the unnatural price stabilization during the Conspiracy Period.   For example, ODD prices remained relatively stable between 2004 and 2006, despite a drop in sales of DVD players, as reflected in the following chart obtained from the website of DEG.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**U.S. DVD HARDWARE SALES TO CONSUMERS (in millions)**

| QUARTER | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st Quarter | .030 | .094 | .358 | 1.350 | 2.220 | 3.565 | 4.858 | 6.855 | 7.741 | 7.852 | 8.350 | 6.01 |
| 2nd Quarter | .079 | .149 | .611 | 1.435 | 2.404 | 3.750 | 5.506 | 6.057 | 6.006 | 6.676 | 6.396 | 4.98 |
| 3rd Quarter | .077 | .244 | .880 | 1.550 | 2.537 | 4.740 | 6.470 | 6.593 | 6.250 | 6.831 | 6.139 | 5.39 |
| 4th Quarter | .119 | .459 | 1.701 | 5.542 | 9.501 | 13.058 | 16.900 | 17.621 | 14.343 | 12.512 | 12.633 | 8.85 |
| YEARLY TOTAL | .305 | .946 | 3.550 | 9.877 | 16.662 | 25.113 | 33.734 | 37.125 | 34.390 | 33.871 | 33.518 | 25.23 |
| TOTAL (since launch) | | | | | | | | | | | | 264.262 |

Includes set-top and portable DVD players, Home-Theater-in-a-Box systems, TV/DVD and DVD/VCR combination players
DEG: The Digital Entertainment Group

203.    Additionally, during the Conspiracy Period, the cost of ODD primary components continued to decline, yet prices did not follow.

204.    As one news report issued at the time of the announcement of the DOJ's investigation of Sony's ODD subsidiary observed:

> Analysts have been wondering why Blu-ray prices have remained high even though the technology has been commercially available for over three years. HD-DVD has been gone for nearly two-thirds of that time and one would have expected costs to have declined by now. The fact that they haven't is causing some to question whether or not Sony is doing something to keep the prices up.

205.    Defendants' and their co-conspirators' use of "Minimum Advertised Price" ("MAP") policies with respect to retail pricing of their ODDs in the United States also facilitated the conspiracy by ensuring that retail pricing did not undercut the price-fixing agreements Defendants and their co-conspirators had reached.  For example, Samsung's MAP policy applicable to BD players, among other products, barred retailers from promoting prices that violated the MAP "online or offline" through any publication.  Repeated violations of Samsung's MAP policy would result in termination.  Sony and Toshiba, among others, also have MAP policies.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

### G.   Defendants' History of Collusion in Other Markets

206.   Many of Defendants and their co-conspirators have been implicated in antitrust investigations into other technology-related products and/or have admitted to participating in anticompetitive cartels involving other products.  To the extent that these prior instances of conspiratorial conduct involved consumer electronics products, the products in question were marketed through the same or related channels used for the marketing of ODDs and were overseen by the same divisions or departments within the relevant defendant or co-conspirator for at least a portion of the Conspiracy Period.

#### 1.   Televisions

207.   In February 1993, the Japan Fair Trade Commission ("JFTC") entered a cease-and-desist order against subsidiaries of Sony, Toshiba, Hitachi and what is now Panasonic, finding that the subsidiaries had requested that large discount stores in Tokyo and Osaka not display discount rates larger than 10 percent of the maker's recommended retail prices for products including televisions.  The JFTC noted that similar practices had occurred in 1988 when it instructed two major industry associations, including the Japan Electronics Industry Association, to stop them, but the practices had continued.

#### 2.   Magnetic Videotapes

208.   In November 2007, the European Commission ("EC") fined Sony and various related entities and the Hitachi Maxell Ltd. joint venture $110 million for fixing the prices of professional videotapes sold in Europe between 1999 and 2002.

#### 3.   Optical Disc Licensing Policies

209.   In July 1994, the DOJ announced it was investigating the licensing practices of several leading companies that owned and licensed CD manufacturing patents, believed to include Sony and Royal Philips.  It was reported that the two companies had signed a "pact" in the late 1970s agreeing to "cross-license each other's basic patents on CD technology" and collect fees from vendors.  It was further reported that the DOJ had issued subpoenas to several companies dealing with Royal Philips and Sony, including DiscoVision Associates, a subsidiary of Pioneer.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

210.   In August 2006, the EC initiated an investigation regarding the procedures required in order to obtain a license for BD and HD-DVD standards.

211.   As noted previously, in October 2008, it was announced that two of the major players in the ODD market, Sony and Royal Philips, had been fined by the TFTC for their abuse of monopoly power in the licensing of CD-R technology.

**4.   Gas Insulated Switchgears**

212.   In January 2007, Hitachi and Toshiba were fined by the EC for their roles in a conspiracy to control prices and allocate market shares for gas insulated switchgears between 1988 and 2004.

**5.   DRAM**

213.   In October 2005, Samsung admitted guilt and paid a $300 million fine following an investigation by the DOJ into price-fixing among DRAM manufacturers.

214.   On May 19, 2010, the EC announced that it was fining ten companies – including Samsung, NEC, Hitachi, and Toshiba – a total of €331 million for participating in an international cartel to fix DRAM prices.

**6.   SRAM**

215.   Samsung and Toshiba have acknowledged being contacted by the DOJ as part of an investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

**7.   CRTs**

216.   In a cease-and-desist order dated October 7, 2009, the JFTC levied $37.4 million in fines against five companies for alleged participation in a price-fixing cartel for CRTs, including LG Philips Displays Korea Co. and an arm of South Korea's Samsung group.

217.   On November 26, 2009, the EC confirmed that it had sent a Statement of Objections to participants in the CRT cartel in Europe.  It has been reported that "[t]he EC believes that Chunghwa Picture Tube (a unit of Tatung), LG Electronics, Matsushita (Panasonic), Philips, Samsung and Toshiba have formed cartels to boost pricing of CRT-based devices, such as computer monitors or TV-sets."

218.    Korea's Fair Trade Commission fined more than five manufacturers of CRTs over $48 million.  The EC imposed the biggest antitrust penalty in its history, fining seven companies a combined €1.47 billion ($1.92 billion) related to price fixing of CRTs.

219.    In November 2007, Hitachi Canada Ltd., a subsidiary of Hitachi, received requests for information from the Canadian Competition Bureau with respect to alleged antitrust violations relating to CRTs.

220.    Since February 10, 2009, the DOJ has issued six indictments against individuals in connection with the CRT price-fixing conspiracy.  In May 2011, Samsung SDI Company Ltd. ("SDI"), a Samsung subsidiary, agreed to pay a $32 million criminal fine and pled guilty to charges brought under the Sherman Act.  Specifically, SDI admitted to participating in a conspiracy among major CRT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CRTs sold in the United States and elsewhere.

**8.      TFT-LCDs**

221.    In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the TFT-LCD market.  News reports indicated that Samsung, Toshiba, LG, Hitachi, and a joint venture between Philips and LG Electronics-LG Display Co., Ltd. were all under investigation for price fixing TFT-LCDs.

222.    In December 2008, the DOJ announced that: (a) LG Display, a joint venture between LG and Royal Philips, pled guilty to antitrust price-fixing allegations with respect to TFT-LCDs and agreed to pay a $400 million fine and (b) Sharp pled guilty to bid-rigging with respect to certain customers of TFT-LCDs and agreed to pay a fine of $120 million.

223.    On March 10, 2009, the DOJ announced that Hitachi Displays, a subsidiary of Hitachi, Ltd., had agreed to plead guilty to violations of the Sherman Act and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD products.  In its plea agreement, Hitachi Displays admitted to agreeing to fix the prices of LCD panels.

224.    In December 2008, the JFTC fined Sharp and Hitachi with respect to a conspiracy involving TFT-LCDs sold for use in Nintendo game consoles.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

225. It is widely believed that Defendant SECL is in the DOJ's leniency program with respect to the investigation into the market for TFT-LCDs, meaning that it has admitted its participation in the cartel. The TFT-LCD investigation is ongoing, and Toshiba and other entities remain under investigation.

226. In July 2009, the EC confirmed that it had sent a Statement of Objections to participants in the TFT-LCD cartel in Europe.

227. As in the TFT-LCD industry, many of Defendants are vertically integrated major manufacturers of ODD Products. For example, the LG and Samsung entities manufactured and sold both TFT-LCD panels as well as TFT-LCD computer monitors and flat panel televisions. Similarly, Samsung, Toshiba, and Sony manufacture and sell both ODDs and computers containing ODDs. Additionally, the ODD market has a structure similar to that of the TFT-LCD, DRAM and CRT industries. Defendants' price-fixing agreements in those markets is suggestive of similar anticompetitive conduct in the ODD market.

228. The established illegal conduct of Sony, Samsung, Sharp, Panasonic, Hitachi, LG, and Royal Philips in a wide variety of technology products markets across the world, including the United States, is illustrative of Defendants' and their co-conspirators' respective corporate cultures which encourage illegal activities aimed at furthering the company's bottom line at the expense of consumers.

229. In November 2007, Kim Yong Chul, the former chief lawyer for Samsung, admitted that the company "instructed me to commit crimes." Chul further stated that "[a] basic responsibility for all Samsung executives is (sic) to do illegal lobbying, buying people with money." Chul acknowledged that he had fabricated court evidence on behalf of the company and its executives. Several Samsung executives have recently been convicted of bribery and other white collar crimes.

**H.     Injury to Radio Shack Caused by the Conspiracy**

230. A former leading retailer of consumer electronics, Radio Shack purchased over one billion dollars' worth of ODDs and ODD Products during the relevant period.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

231.   Based upon information currently available, the Trustee is informed and believes that Radio Shack's purchases of ODDs or ODD Products during the relevant period: (1) from the Toshiba corporate family totaled approximately one hundred one million dollars ($101,000,000); (2) from the Sony corporate family totaled approximately one hundred eight million dollars ($108,000,000); (3) from the Samsung corporate family totaled approximately thirty million dollars ($30,000,000); and (4) from the Philips and Lite-On corporate families totaled approximately thirty nine million dollars ($39,000,000).

232.   Based upon information currently available, the Trustee is informed and believes that Radio Shack's purchases of ODDs or ODD-containing goods during the relevant period: (1) from the LG corporate family totaled approximately thirty million dollars ($30,000,000); and (2) from the Panasonic corporate family totaled approximately ten million dollars ($10,000,000).

233.   As a direct and proximate result of Defendants' and their co-conspirators' conspiracy, the Trustee has been damaged in an amount to be determined according to proof.

## I.   Fraudulent Concealment and Tolling

234.   Prior to at least October 26, 2009, Radio Shack did not discover, and could not have discovered through the exercise of reasonable diligence, sufficient facts to show the existence of the conspiracy alleged herein.

235.   The statute of limitations relevant to the Trustee's claims was equitably tolled by the doctrine of fraudulent concealment until at least October 26, 2009, the date that the DOJ's investigation into the ODD price-fixing conspiracy was made public.

236.   The acts of Defendants and their co-conspirators in furtherance of the conspiracy were concealed and carried out in a manner that precluded detection.  Defendants and their co-conspirators concealed their unlawful conduct by (among other things):

- Agreeing not to discuss publicly or otherwise reveal their acts and communications in furtherance of the price-fixing conspiracy;

- Agreeing to limit the number of representatives of each Defendant or co-conspirator that were aware of the conspiracy;

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT

- Agreeing to limit written communications relating to or in furtherance of the conspiracy;

- Agreeing to meet in locations where the conspiracy was less likely to be detected;

- Coordinating bidding and price negotiation covertly in order to avoid detection;

- Giving false and pre-textual reasons for ODD price stabilization and falsely describing the stabilization as the product of external causes and not collusion;

- Publicly announcing, falsely, that ODDs were competitively priced.

Indeed, by its very nature, Defendants' price-fixing conspiracy was inherently self-concealing. In light of Defendants' concealment, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of ODD prices before at least October 26, 2009.

237. Additionally, the statute of limitations relevant to the Trustee's claims has been tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), as a result of the filing of direct purchaser class actions relating to Defendants' and their co-conspirators' illegal conspiracy to fix ODD prices.

238. On October 27, 2009, a class action complaint on behalf of direct purchasers of ODDs, captioned *CMP Consulting Services, Inc. v. Sony Corp.*, *et al.*, No. 09-5114 ("*CMP*"), was filed in this Court. In the following weeks, four other class action complaints on behalf of direct purchasers of ODDs were filed in this District and in the Central District of California: *Nikkel v. Sony Corp., et al.*, No. 09-5135 (N.D. Cal., filed Oct. 29, 2009) ("*Nikkel*"); *Univisions-Crimson Holding, Inc. v. Sony Corp., et al.*, No. 09-5186 (N.D. Cal., filed Nov. 2, 2009) ("*Univisions*"); *KI, Inc. v. Sony Corp., et al.*, No. 09-5197 (N.D. Cal., filed Nov. 3, 2009) ("*KI*"); and *Saed v. Sony Optiarc America Inc., et al.*, No. 09-8289 (C.D. Cal., filed Nov. 12, 2009) ("*Saed*," and together with *CMP*, *Nikkel*, *Univisions*, and *KI*, the "Individual Class Action Complaints"). Radio Shack was a member of the class in each of the Individual Class Action Complaints, and the filing of these actions tolled the statute of limitations for the Trustee's claims.

239. Pursuant to the Transfer Order of the United States Judicial Panel on Multidistrict Litigation dated April 2, 2010 [Docket No. 1], *Saed* was transferred to this District and the Individual Class Action Complaints were consolidated for pretrial proceedings. On August 26,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1   2010, the *Consolidated Direct Purchaser Class Action Complaint* [Docket No. 159] was filed; on

2   September 23, 2011, the *Second Consolidated Direct Purchaser Class Action Complaint* was filed

3   [Docket No. 407]; and on April 17, 2013, the *Third Consolidated Direct Purchaser Class Action*

4   Complaint was filed [Docket No. 839] (collectively, the "Consolidated Class Action

5   Complaints"). The Trustee is a member of the direct purchaser class as defined in each of the

6   Consolidated Class Action Complaints and the Preliminary Settlement Order. As such, the statute

7   of limitations applicable to the Trustee's claims was tolled by the filing of the Consolidated Class

8   Action Complaints.

9   **FIRST CAUSE OF ACTION**

10   **(Violation of Section 1 of the Sherman Act)**

11   240.   The Trustee re-alleges paragraphs 1 through 239 as if fully set forth herein.

12   241.   Beginning at a time presently unknown to the Trustee, but no later than January 1,

13   2004, Defendants and their co-conspirators entered into a continuing agreement, understanding,

14   and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for

15   ODDs in the United States, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

16   242.   In formulating and carrying out the alleged agreement, understanding, and

17   conspiracy, Defendants and their co-conspirators unlawfully restrained trade in the United States

18   and damaged the competitive process, including by engaging in the following anticompetitive

19   acts:

20   • Participating in meetings and conversations to discuss the prices and supply of

21   ODDs;

22   • Sharing these pricing and other discussions with other members of the ODD

23   industry to further the conspiracy;

24   • Communicating in writing and orally to fix target prices, floor prices, and price

25   ranges for ODDs;

26   • Agreeing to manipulate the prices for and supply of ODDs sold in the United States

27   in a manner that deprived ODD purchasers of free and open competition;

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

- Issuing price announcements and price quotations in accordance with the agreements reached;

- Selling ODDs to customers in the United States, including Radio Shack, at noncompetitive prices;

- Exchanging competitively sensitive information, including customer information, in order to facilitate the conspiracy;

- Agreeing to maintain or lower production capacity; and

- Providing false statements to the public regarding prices for ODDs.

243.    As a result of Defendants' and their co-conspirators' unlawful conduct, Radio Shack was injured in its business and property in that it paid more for ODDs than it otherwise would have paid in the absence of the conspiracy.

## V.  PRAYER FOR RELIEF

WHEREFORE, the Trustee requests:

A.    That the unlawful agreement, conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be a restraint of trade or commerce in violation of section 1 of the Sherman Act;

B.    That the Trustee recover trebled damages, as provided by applicable law, and that a judgment be entered in favor of the Trustee against Defendants, jointly and severally, in such amount;

C.    That the Trustee obtain penalties, punitive or exemplary damages, and/or full consideration, where applicable law so permits;

D.    That the Trustee be awarded pre- and post-judgment interest at the highest rate for the largest term permitted by law or equity;

E.    That the Trustee recover costs and disbursements of suit, including reasonable attorneys' fees as provided by law; and

F.    That the Trustee be awarded such other further relief as the Court may deem just and proper.

## VI.  JURY DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), the Trustee demands a trial by jury as to all issues so triable.


DATED: December 23, 2016          Respectfully submitted,

KLEE, TUCHIN, BOGDANOFF & STERN LLP


/s/ Robert J. Pfister
Robert J. Pfister

*Attorneys for Plaintiff Peter Kravitz, as Trustee for the RSH Liquidating Trust*

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

MDL NO. 3:10-md-2143-RS
FIRST AMENDED COMPLAINT