UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPTICAL DISK DRIVE ANTITRUST LITIGATION<br><br>This Document Relates to:<br>ALL INDIRECT PURCHASER ACTIONS | Case No. 10-md-02143-RS<br><br>**ORDER GRANTING SUMMARY JUDGMENT AGAINST THE INDIRECT PURCHASER PLAINTIFFS[1]**<br><br>Re: Dkt. Nos. 2341, 2373, 2375, 2383, 2398 |

**INTRODUCTION**

Indirect Purchaser Plaintiffs ("IPPs") are a class of purchasers of products containing optical disc drives ("ODDs") who allege injury from an anticompetitive conspiracy to fix, raise, stabilize, and maintain the prices of ODDs from 2003 to 2008.[2] IPPs bring suit on their own behalf and on behalf of a class of similarly situated persons for injunctive relief under the Sherman Act, and compensatory damages under the Cartwright Act and California's Unfair Competition Law ("UCL"). Now that fact and expert discovery have closed, Defendants[3] move for summary

---

[1] This is one of several orders issued contemporaneously addressing the dispositive motions in the *In re Optical Disk Drive Antitrust Litigation*, No. 10-md-02143. *See also* Summary of Rulings.
[2] The certified class definition is as follows:
    All persons and entities who, as residents of [the United States or State] and during the period April 2003 to December 2008, purchased new for their own use and not for resale: (i) a computer with an internal ODD; (ii) a stand-alone ODD designed for internal use in computers; or (iii) an ODD designed to be attached externally to a computer. ODD refers to a DVD-RW, DVD-ROM, or COMBO drive manufactured by one or more Defendants or their coconspirators. Excluded from the class are any purchases of Panasonic-branded computers.
*See* Order Granting Renewed Motion for Class Certification. The class includes plaintiffs from 23 states plus the District of Columbia, proceeding under California law.
[3] The moving defendants are Samsung Electronics Co., Ltd. ("Samsung"); BenQ Corporation;

judgment on all claims on the grounds that (1) the evidence does not support the conspiracy alleged; (2) IPPs cannot show that they suffered injury and damages; (3) IPPs cannot show that any claimed injuries resulted from Defendants' anticompetitive conduct; and (4) the FTAIA bars claims for ODDs originally sold in foreign commerce. Each of these arguments is addressed below. This Order also addresses the individual arguments raised by the BenQ Defendants regarding withdrawal and statute of limitations, neither of which is convincing. Because IPPs ultimately fail to show evidence of pass-through, a necessary element of their theory of damages, Defendants' Motion for Summary Judgment against the IPPs will be granted.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. In contrast, on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Only disputes over material facts are relevant. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the

---

BenQ America Corp. (collectively, "BenQ"); Toshiba Corporation; Toshiba Samsung Storage Technology Corporation; and Toshiba Samsung Storage Technology Corporation Korea.

1 court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322.

## DISCUSSION

### I. Sufficiency of the Evidence Supporting the Alleged Conspiracy

#### A. Claims Under the Sherman and Cartwright Acts

Section 1 of the Sherman Antitrust Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1. In order to establish a claim under Section 1, plaintiffs must demonstrate "(1) the parties to the agreement intend to harm or restrain competition, (2) the agreement actually injures competition and (3) the restraint is unreasonable as determined by balancing the restraint and any justifications or procompetitive effects of the restraint." *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Syst., Inc.*, 723 F.3d 1019, 1024 (9th Cir. 2014) (internal quotation marks and citation omitted). Horizontal price-fixing is a *per se* violation of the Sherman Act. *Hui Hsiung*, 778 F.3d 738, 750 (9th Cir. 2015). "A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act." *Marin Cty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976).

When concerted price-fixing is alleged under the Sherman or Cartwright Acts, plaintiffs bear the burden of presenting sufficient evidence to prove that an agreement to fix prices existed. *See, e.g.*, *In re Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 896 (N.D. Cal. 2009). To survive summary judgment, plaintiff must establish that there is a genuine issue of material fact as to whether defendants entered into an illegal conspiracy that caused plaintiff to suffer a cognizable injury. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Plaintiff can establish a genuine issue of material fact by producing either direct evidence of a defendant's

3

1  price-fixing conduct or circumstantial evidence from which a reasonable fact finder could

2  conclude the same. *In re Citric Acid Litig.*, 191 F.3d at 1093; *see also Sun Microsystems*, 622 F.

3  Supp. 2d at 896 (citing *Movie 1 & 2 v. United Artists Commc'ns*, 909 F.2d 1245, 1251–52 (9th Cir.

4  1990); *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142–43, (1966)).

Direct evidence of a conspiracy "must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001). In the absence of direct evidence, plaintiff "must present evidence from which an inference of conspiracy is more probable than an inference of independent action." *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 525 (9th Cir. 1987). "[A]n inference of conspiracy is sustainable only if reasonable in light of the competing inferences of independent action, and to survive a motion for summary judgment . . . , a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *In re Citric Acid Litig.*, 191 F.3d at 1094 (citing *Matsushita*, 475 U.S. at 588).

The Ninth Circuit "has outlined a two-part test to be applied whenever a plaintiff rests its case entirely on circumstantial evidence." *Id.* at 1094. "First, the defendant can 'rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice.' The burden then shifts back to the plaintiff to provide specific evidence tending to show that defendant was not engaging in permissible competitive behavior." *Id.* (internal citations omitted); *see also In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1972 (9th Cir. 2007). While evidence of market allocation or agreements on specific prices would certainly be probative of a conspiracy, simply "[g]athering competitors' price information can be consistent with independent competitor behavior." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, at 126 (3d Cir. 1999); *see also Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982) (finding that "evidence of roughly a dozen isolated communications regarding prices over a seven-year period" were "no more than idle 'shop talk' such as often occurs between persons in the same field of endeavor" and did not present any "pattern from which an unlawful price fixing conspiracy could be inferred").

**B. IPPs' Evidence of the Alleged Conspiracy**

Defendants contend that IPPs cannot point to any direct or circumstantial evidence supporting the overarching, industry-wide conspiracy. Instead, they argue that the only anticompetitive conduct evidenced by the record is that reflected by the admissions in the HLDS and PLDS guilty pleas. Otherwise, they attempt to align IPPs' remaining evidence with permissible business conduct.

In opposition, IPPs submit several categories of evidence. First, IPPs claim direct evidence shows that Defendants' goal was not only to rig the specific bids confessed to, but to stabilize industry ODD prices. IPPs concede, as they must, that they do not have evidence of a single meeting of all of the Defendants, such as the "crystal meetings" in the *TFT-LCD (Flat Panel)* case. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009). Instead, they focus attention on a memo written on April 15, 2003, by David Kim (Samsung) after a meeting with Jin-Sung "Luke" Choi (HLDS). *See* Friedman Decl. [Dkt. No. 2535] Ex. 6, at TSSTK-0222459PCT. The memo refers to "[f]uture price negotiations," and states: "[a]vert a large-scale decline on price for products other than for which intense competition is anticipated, and aim for waging collective action." *Id.* David Kim's notes from June 2003 show that the "collective action" came to fruition at a June 2003 Dell auction: "With a continued intense skirmish with HLDS ensuing, colluded with HLDS for a tie at $52.10." Friedman Decl. [Dkt. No. 2535] Ex. 42, at TSSTK-0222485PCT. These two documents are highly probative of the broader conspiracy that IPPs suggest, encompassing sales events other than those explicitly admitted in the criminal case guilty pleas. IPPs also point to several additional documents that support the contention that Defendants' goals were not simply to rig certain, specific bidding events, but rather to stabilize industry prices in a declining market.[4]

---

[4] *See, e.g.*, Friedman Decl. [Dkt. No. 2535] Ex. 43 (January 21, 2005 email between Samsung and HLDS executives stating, "[W]e have common interests to cooperate in the ODD industry; I would like to have a meeting as well."); Ex. 44 (minutes from January 25, 2005 TSST meeting state, "A bilateral effort to raise market prices in a bid to maintain stability has been suggested."); Ex. 45 (February 2, 2005 email to Samsung/TSST employees titled "January HLDS Meeting Report" states in a section titled "Information Sharing between HLDS / TSST-K," "It is agreed that both companies will maintain co-response strategy for HP," including "cessation of price competition for CD/DVD/RW, etc."); Ex. 50 (minutes from March 17, 2005 meeting between

5

Defendants contest that these documents can qualify as direct evidence of the several year, industry-wide, overarching conspiracy as alleged. While they are correct that even this evidence requires inferences, they are plausible ones, especially when considering the additional evidence that IPPs proffer. IPPs argue that the evidence of Defendants' collusion with respect to the rigged bids does not suggest that Defendants were involved only in a series of "mini-conspiracies,"[5] as Defendants suggest, but rather, the evidence supports the existence of a single overarching conspiracy to stabilize industry ODD prices. In addition to the evidence of the individually rigged events, IPPs point to evidence that suggests Defendants' collusion extended beyond individual auction events, and instead was aimed at an ongoing conspiracy. For example, one email circulated among TSST employees dated November 23, 2004 recounts the results of a Dell auction and notes, "[p]assive response by all vendors in forming empathy regarding the prevention of further price reductions." Friedman Decl. [Dkt. No. 2535] Ex. 57, at TSSTK-0110076PCT. Another September 22, 2005 email from Duha Hwang, a product manager at LG Electronics, summarizes a phone call with TSST regarding DVDRW pricing and states, "a price Freeze will be in effect until next June," and also notes that if either party implements "an additional cut . . . without prior notice to the counterparty, the perpetrator will treat the other at Pebble Beach." *Id.* Ex. 58, at HLDS_CIV 0019892PCT.[6]

---

TSST/HLDS stating, "We suggested having a three-party meeting of Liteon/HLDS/TSST at Taiwan and maintain cooperative system in the future."); Ex. 52 (July 26, 2005 email from TSST President/CEO reporting meeting with Lite-On President where he "received his agreement on avoiding further excessive price competition" and agreed that "SONY-LITEON, HLDS and [TSST] . . . should not provide unnecessary competition."); Ex. 54 (June 6, 2005 business report by TSST-K reporting May 31, 2005 meeting with BenQ Vice President stating, "It is agreed to make an effort to stabilize the price in the future to realize reasonable profit.").
[5] IPPs also provide evidence of individually rigged events or singular acts of collusion. *See* Opp. [Dkt. No. 2541] at 8 n.32–9 n.33.
[6] While other documents that IPPs invoke are not necessarily as suggestive, they are sufficient to raise a genuine issue of material fact. *See* Friedman Decl. [Dkt. No. 2535] Ex. 56 (October 5, 2004 TSST email detailing auction results and stating, "consensus with us naturally formed" by HLDS); Ex. 57 (November 23, 2004 TSST email detailing auction results and noting, "HLDS: Because it looked like they didn't want to further decrease the price, a bond of empathy with our company was formed . . . ."); Ex. 58 (TSST email chain including March 29, 2005 email relating phone call with HLDS director and stating, "Decided that the 3 companies [including Lite-On] will move in the same direction regarding Warranty in the future also," but also evidencing competition with other parties such as Sony and incomplete information between TSST and HLDS); Ex. 60 (October 28, 2008 TSST email noting after an RFQ, "a mood was generated restraining cutthroat competition"); Ex. 61 (May 7, 2008 email from HLDS's Eugene Yang stating

While these documents are certainly probative and relevant to this inquiry, Defendants are correct that they are not direct evidence of the conspiracy as charged, but instead require inferences and are therefore more properly characterized as circumstantial evidence. That being said, these documents, taken together, raise a genuine issue of material fact as to whether Defendants communicated regularly to establish agreements only with respect to individual auctions or events, or alternatively had longstanding agreements and forged relationships and a culture of collusion.

IPPs also claim substantial circumstantial evidence shows that the conspiracy was plausible, purposeful, and industry-wide, rather than limited to particular defendants acting independently. IPPs argue that the consolidated market, high barriers to entry, and motive to collude render the conspiracy plausible. *See Todd v. Exxon Corp.*, 275 F.3d 191, 208 ("Generally speaking, the possibility of anticompetitive collusive practices is most realistic in concentrated industries."). IPPs' expert report by economist Dr. Kenneth Flamm shows that the three joint ventures formed by TSST, HLDS, and PLDS controlled 66 percent of the ODD market by the end of the class period, and together with BenQ, Sony NEC Optiarc, Panasonic, and Pioneer, controlled 95 percent. *See* Friedman Decl. [Dkt. No. 2535] Ex. 3, at 9. A second expert report by economist Dr. Luís Cabral found that no "meaningful" competitors entered the industry during the relevant time period due to the high barriers to entry. *Id.* Ex. 76, at 12–15. Moreover, IPPs point to several documents indicating Defendants' frustration with Dell and HP's online auctions and methods to increase competition, suggesting that Defendants had a strong motive to collude in order to "devise a fundamental measure to eliminate not only HP, but also the Environmental Threat, namely, the Auction." *Id.* Ex. 81, at HLDS_CIV0021653PCT (email from HLDS's Daniel Hur dated September 13, 2005). The combination of market conditions plus the incentives for Defendants to collude certainly lends plausibility to the conspiracy.

Next, IPPs contend that Defendants did not act independently, and point to circumstantial evidence that shows regular discussions on pricing and production directly between competitors.

---

they should "wrap up [a procurement event] at a similar level rather than engaging in a Ranking competition," such that "limited competition is more likely to occur than free competition.").

7

These communications themselves only express an intent to share pricing information but not necessarily to form an agreement to fix prices. Taken in combination with the previous evidence, however, which does suggest various agreements made, it can be inferred that such information exchanges facilitated collusive activity. *See In re Citric Acid Litig.*, 191 F.3d at 1103 ("[T]he reciprocal exchange of price information pursuant to an agreement by the defendants was concerted action sufficient to establish a price-fixing conspiracy.") (citing *United States v. Container Corp. of Am.*, 393 U.S. 333 (1069)). Several emails similarly imply ongoing relationships and established channels of communication rather than independent, isolated points of contact. For example, minutes from a TSSTK "Market Sensing" workshop contain a section on "Competitor Contact," and indicate TSSTK's intent to "Pursue Meeting with LG & HLDS in alternate months" to exchange information on customers, performance, and the market. Friedman Decl. [Dkt. No. 2535] Ex. 88, at TSSTK-0069679PCT.

Another TSST email titled "Roadmap of Competitor Companies" discusses that TSSTK's product planning department "regularly exchange[d] information with the HLDS product planning division." *Id.* Ex. 89, at T-ODD-00058935PCT. A number of other documents corroborate that Defendants indeed met regularly, and that competitors made 2,527 phone calls to each other during the relevant time period.[7] While Defendants paint these communications as evidence only of exchanges of pricing information, rather than agreements to fix prices, IPPs suggest that such information sharing was crucial to, and the basis of, the conspirators' collusive activity: Defendants often shared pricing information immediately after the close of a procurement event, because such pricing reflected ODD prices for the next three months and that information could be used for future negotiations and transactions. *Id.* Ex. 115. Moreover, these exchanges were communicated to, and encouraged by, senior executives.[8]

---

[7] *See, e.g.*, Friedman Decl. [Dkt. No. 2535] Ex. 87, at SEC-ODD-000290567PCT (internal TSST strategy document indicating intention to "[h]old regular information exchange meeting" to "Establish strategy" with HLDS/LG); Opp. [Dkt. No. 2541] at 13 n.51 (collecting exhibits evidencing numerous meetings between executives at HLDS and Lite-On/PBDS/PLDS); Opp. [Dkt. No. 2541] at 11, 16–18 (describing phone calls' frequency and content).
[8] Friedman Decl. [Dkt. No. 2535] Ex. 116 (April 8, 2004 email from TSST/Samsung Senior Manager Brian Park directing employees to "show [him] competitor's prices and competition status" when submitting next month's "pricing idea" for HP); Ex. 117 (November 8, 2007 email

8

While IPPs have persuasively shown that the alleged conspiracy was plausible and purposeful, they are less convincing in their argument that the conspiracy was industry-wide. Their best evidence comprises documents containing price tables, which IPPs claim show that Defendants targeted not only Dell and HP, but also Lenovo, IBM, and Acer. IPPs submit TSSTK/Samsung emails with attached price charts, containing competitors' pricing information for various OEMs, including Dell, FSC, Gateway, HP, COMPAQ, IBM, and others. *See* Friedman Decl. [Dkt. No. 2535] Ex. 125, at TSSTK-0179349PCT; Ex. 126; Ex. 127, at TSSTK-0133589PCT. Additional price charts, though only displaying pricing information for Dell, are attached to an email in which the sender writes that the data should be used "as necessary in determining prices going forward and to share the status (our company and competitors) of prices for the OEM business." *Id.* Ex. 123 at TSSTk-0177500PCT. IPPs ask for an inference from this email that even the charts containing only Dell prices were used throughout the conspiracy period to set pricing for all other customers as well.

In another document, TSSTK/Samsung employees discuss the "Dell-IBM selling Gap," with Dell prices listed for comparison with Gateway and Lenovo proposed pricing and strategy. *Id.* Ex. 129 at TSSTK-0089380PCT; *see also id.* Ex. 128 at HLDS_CIV 0038599 (HLDS email to IBM team discussing "consensus with TSST and Lite-on for the price gap b/w IBM and Lenovo"). While it is true that these few documents mention other customers evidently in passing, these references are few and far between in a vast expanse of documents and communications supporting the pending motions. Instead, the overwhelming amount of evidence suggests that Defendants' actions were aimed only at Dell and HP.

Defendants are correct that the case advanced by IPPs relies mostly on circumstantial evidence, and requires the drawing of multiple inferences to arrive at the conclusion of an

---

from Bryan Park directing employees to "continue to provide feedback on competitor status shifts" after a Dell auction); Ex. 118 (August 21, 2004 email from TSST/Samsung Director of Sales & Marketing Team David Kim, directing employees, "Going forward, there is a need for competitor meetings to be regularized or held frequently (for product launches, supply, prices, MPA, COMPLAINT, etc.). Hopefully, we can mutually discuss the directions we are pursuing and with which to gauge our strategy."); Ex. 119 (February 25, 2007 email from David Kim directing employees to update an attached form with "prices by customer and competitor prices by this weekend").

overarching conspiracy among Defendants. While less compelling than the evidence from previous cases relied upon by IPPs, the requested inferences with respect to the existence of an agreement to fix prices among Defendants are nonetheless plausible, and IPPs present sufficient evidence to create a genuine issue of material fact as to the existence of the conspiracy among Defendants targeting Dell and HP. IPPs have marshaled the evidence they do have to present a coherent narrative, suggesting a culture of collusion and longstanding relationships between competitors, not just among lower level employees, but also senior executives and managers with pricing authority. While any IPP recovery must be limited to downstream purchasers of only Dell and HP products, Defendants' motion for summary judgment cannot be granted to the extent it is based on insufficiency of the evidence of conspiracy.[9]

## II. BenQ Defendants' Withdrawal Defense

### A. BenQ Defendants' Evidence of Withdrawal

The BenQ Defendants alone raise the issue of withdrawal, arguing that they exited the ODD industry and thus are entitled to partial summary judgment for those damages incurred after their exit. While a co-conspiring defendant is jointly and severally liable for any actions taken in furtherance of a conspiracy, a defendant's liability ends once he withdraws from the conspiracy. *See United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992) ("[A] defendant cannot be held liable for substantive offenses committed . . . after withdrawing from a conspiracy."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 820 F. Supp. 2d 2055, 1059 (N.D. Cal. 2011). Because withdrawal is an affirmative defense, the burden of proof lies with the defendant. *See United States v. Brown*, 332 F.3d 363, 374 (6th Cir. 2003); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 8669891, at *2 (N.D. Cal. Aug. 22, 2016).

"To withdraw from a conspiracy a defendant must either disavow the unlawful goal of the conspiracy, affirmatively act to defeat the purpose of the conspiracy, or take definite, decisive, and positive steps to show that the [defendant's] disassociation from the conspiracy is sufficient."

---

[9] While plaintiffs appear to have advanced a Sherman Act claim for injunctive relief, no class has been certified to pursue this claim, nor have IPPs presented any evidence of ongoing conspiratorial activity sufficient to grant injunctive relief.

10

*Lothian*, 976 F.2d at 1261 (internal quotation marks and citation omitted). At a minimum, "affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators [are] sufficient to establish withdrawal or abandonment." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464–65 (1978); *United States v. Greenfield*, 44 F.3d 1141, 1149–50 (2d Cir. 1994) ("[T]hough the cessation of conspiratorial activity is generally considered insufficient to demonstrate withdrawal from a conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators is sufficient to establish withdrawal." (internal quotation marks omitted)).

In *In re Cathode Ray Tube (CRT) Antitrust Litig.*, certain defendants raised the withdrawal defense on the grounds that they had exited from the CRT industry, having ceased production and sales of CRTs and selling or transferring their production lines to alleged conspirators or other subsidiaries. 2016 WL 8669891, at *6. However, one of the defendants continued to work with the subsidiary to which they had transferred certain CRT products through strategy development for North American sales, exchange of production plans, and discussion of market forecasts. *Id.* at *6–*7. The court in that case concluded that there was a genuine dispute of material fact as to whether that defendant had withdrawn from the conspiracy because of the lack of any affirmative action to withdraw in combination with its failure to sever completely all ties to the industry. *Id.* at *7–*8. On the other hand, with respect to those defendants that exited the industry and cut all ties, the court concluded that they had "ma[d]e out a prima facie case of withdrawal." *Id.* at *8 ("[T]he authority on this issue is clear that a defendant has withdrawn if it severs all ties to the conspiracy and to the business through which it participated in the conspiracy.") (citing *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999); *United States v. Steele*, 685 F.2d 793, 804 (3d Cir. 1982); *Krause v. Perryman*, 827 F.2d 346, 351 (8th Cir. 1987)).

BenQ Corporation contends that it is entitled to partial summary judgment on the grounds that it withdrew from the alleged conspiracy when it transferred its stock in PBDS to Lite-On by no later than March 5, 2007. *See* Kaas Decl. [Dkt. No. 2383-2] Ex. A-11. BenQ proffers evidence that it had begun the process of exiting from the ODD industry as early as April 10, 2006, when it

11

entered an agreement with Lite-On to sell its ODD manufacturing assets to Lite-On and cease production and sales of ODDs. *Id.* Ex. A-6, at ODD-BENQ-0000050–59. On October 5, 2006, Philips and Lite-On entered a term sheet evidencing Lite-On's replacement of BenQ as the minority shareholder of PBDS. *Id.* Ex. A-11, at ODDCIV-005383308. By December 1, 2006, BenQ and Lite-On entered into a sales agreement, in which PBDS purchased all of BenQ's shares in PBDS. *Id.* Ex. A-12, at ODDCIV-005383799–ODDCIV-005383803. After the stock was officially transferred no later than March 5, 2007, BenQ contends that it exited the industry, and communicated this transfer to customers and other ODD suppliers throughout the industry. *See id.* Ex. A-14; Ex. A-15. BenQ America Corp. too claims that it withdrew from the industry as early as June 14, 2006, the date when its parent sold its ODD business line and ceased manufacturing and sales of ODDs. Mot. [Dkt. No. 2383] at 19.

In response, IPPs argue that neither of the BenQ defendants took the affirmative steps necessary to fulfill its burden, and the record shows both entities continued to participate in, and benefit from, the conspiracy after March 5, 2007. IPPs' first contention rests on the mistaken premise that exiting an industry through sale of a business is not an affirmative act sufficient to establish withdrawal, for which they rely upon *United States v. Smith*, 623 F.2d 627, 631 (9th Cir. 1980). That case, which dealt with co-conspirators to a murder, is inapposite. Instead, as discussed above, cases arising in the antitrust context have held that the full exit from an industry suffices to establish a prima facie case of withdrawal.

Turning to the evidence of each entity's participation in the conspiracy after their alleged dates of exit, IPPs point to evidence in the record that they contend creates a genuine issue of material fact. With respect to BenQ Corp., at deposition, in response to the question, "Was BenQ still selling optical disk drives in June of 2007," BenQ's Alpha Tsai testified that "[t]he BenQ brand operation, they get the drive from PBDS Lite-On." Friedman Decl. [Dkt. No. 2535] Ex. 154, at 234:12–16. While IPPs interpret this to mean that BenQ was still selling ODDs, this statement does not necessarily support that inference, but instead implies that BenQ was a purchaser of ODDs rather than a seller. IPPs also point to a 2006 Annual Report, updated on April 27, 2007, in which BenQ writes with respect to ODDs: "Now completely outsourced to

Lite-On IT Corporation, the storage business is now focused on brand strategies and new product launches. In the future, BenQ will focus on the development of a new generation of multiple DVD optical rewritable drives and Blu-ray multiple drives." *Id.* Ex. 288, at 10. BenQ states that despite this annual report, no such future development ever occurred. Nonetheless, the report does raise a genuine issue of material fact as to whether BenQ truly intended to exit the business, or if it intended to develop and manufacture different types of ODDs. Even if those plans never came to fruition, their existence is sufficient to raise a question of fact as to whether BenQ actually exited the industry when it claims it did. Thus, BenQ is not entitled to partial summary judgment based on its alleged withdrawal.

With respect to BenQ America Corp., IPPs point to its admission of continued sales of ODDs after the date of its alleged exit from the industry. *See* Mot. [Dkt. No. 2383] at 19–20. BenQ America Corp. argues that these sales, which represented an overall loss and constituted fulfillment of already-pending orders or inventory clearance, cannot negate its withdrawal because they could not have been in furtherance of the price-fixing conspiracy. The relevant question, however, is not whether BenQ took affirmative acts in furtherance of the alleged conspiracy, but rather whether BenQ took affirmative acts to show its complete disassociation from it and the industry. *See, e.g.*, *CRT*, 2016 WL 8669891, at *7 (refusing to grant summary judgment where "defendant fail[ed] to sever all ties with the conspiracy *and* the business through which it participated in the conspiracy") (internal quotation marks omitted) (emphasis added). These sales, regardless of whether BenQ made a profit or sustained a loss, show that BenQ America Corp. failed to exit the industry fully and to sever all ties. Thus, it is not entitled to partial summary judgment based on withdrawal.

### B. BenQ America Corp.'s Statute of Limitations Argument

BenQ America Corp. argues that it is entitled to summary judgment based on the statute of limitations. All of IPPs' claims are subject to a four-year state of limitations after the cause of action accrues.[10] "[A] cause of action accrues and the statue begins to run when a defendant

---

[10] *See* 15 U.S.C. § 15b (four year statute of limitations applicable to Sherman Act); Cal. Bus. & Prof. Code § 16750.1 (four year statute of limitations applicable to Cartwright Act); Cal. Bus. &

13

commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Because a defendant cannot take an overt act in furtherance of a conspiracy after withdrawal from that conspiracy, withdrawal also triggers the running of the statute of limitations. *See Morton's Mtk., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 837 (9th Cir. 1999). BenQ America Corp. contends that because it withdrew from the conspiracy as of June 14, 2006, and IPPs did not file suit until August 26, 2010, more than four years later, the statute of limitations bars IPPs' claims against BenQ America Corp. As discussed, however, BenQ America Corp. has failed to establish its withdrawal as a matter of law, and thus, the statute of limitations does not bar IPPs' claims against it. For these reasons, BenQ America Corp.'s motion for summary judgment based on the statute of limitations is denied.

## III. Sufficiency of the Evidence of Causation, Injury, and Damages

As purchasers of the allegedly price-fixed goods, "indirect-purchaser plaintiffs must demonstrate that defendants overcharged their direct purchasers for [] products and that those direct purchasers passed on the overcharges to plaintiffs." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. July 18, 2008). Where distribution chains involve multiple stages, "[plaintiffs] must find a way to account for the decision-making of a variety of resellers and manufacturers." *Id.* In support of their theory of 100% pass-through of inflated pricing from direct action purchasers down to retail customers (the indirect purchasers themselves), IPPs present the expert opinion of Dr. Kenneth Flamm, whose theory also supported their motion for class certification. Defendants maintain that IPPs have nonetheless not met their burden because (1) the evidence shows OEMs and retailers often did not pass on changes in ODD costs, (2) IPPs do not analyze pass-through for most links in the distribution chain, and (3) Dr. Flamm's analysis is too deeply flawed to create a genuine issue of disputed fact.

IPPS prevailed at class certification based on the theories, supported by Dr. Flamm's opinion, that (1) the price-fixing in this case does not involve collusion to increase prices, but rather to slow the decline in prices that otherwise naturally would have occurred, and (2)

---

Prof. Code § 17208 (four year statute of limitations applicable to UCL).

14

manufacturers would not pass on the cost by adjusting the dollar amount of the finished product, but rather adjusting the quality of the finished product or its component parts. *See* Order Granting Indirect Purchasers' Renewed Mot. for Class Cert. at 15–17. Dr. Flamm's report purports to calculate the pass-through of the overcharge at 100% from retailer to consumer. While the Order granting certification noted as an open question whether IPPs could prove their theory with substantive evidence, once the merits were reached, a sufficient showing had been made to certify the class. *See id.* at 19.

Now, at the summary judgment stage, the merits issue is front and center and the question recurs, are there disputed issues of fact on whether the theory of pass-through played out in the real world. IPPs' theory involves three separate cost variables: first, the cost of the component parts, which at least for ODDs they claim was rigged; second, the cost of the finished product, the computers, which generally was stable across the industry; and third, the manufacturers' and the retailers' (and any other links in the distribution chain's) profit margins. They must proffer evidence not only as to the calculation of the overcharge on ODDs, that this overcharge resulted in offsetting with other lower quality component parts, and that the offsetting would have occurred at 100% of the value of the overcharge, meaning that no link in the supply chain would have swallowed any portion of the overcharge. This theory of pass-through is not only crucial to the elements of injury and damages, but also to causation, as it establishes the necessary link between Defendants' conduct and IPPs' injury as alleged.

IPPs again rest their argument on the expert report of Dr. Flamm. *See* Expert Report of Dr. Kenneth Flamm [Dkt. No. 2458-2] ("Flamm Report"). Dr. Flamm's report details the multivariate regression analysis and hedonic analysis used to calculate the ODD overcharges and then pass-through. While he displays in theory how pass-through could have worked, his expert report does not identify and cannot substitute the necessary record evidence to support that it actually occurred in this case. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, . . . it cannot support a jury's verdict. Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.") (citation omitted). Instead, his report identifies

15

"[d]ocumentary [e]vidence of [i]mpact on Indirect Purchasers." *See* Flamm Report at 69. Evidence of impact, however, is not evidence that pass-through occurred in the first place; even if evidence of impact could support the pass-through theory, the evidence that Dr. Flamm points to is often tangentially related and at best, of uncertain application to the pass-through issue. For example, Dr. Flamm points to an email from Becky Lin of HP in which she writes to PLDS' team about their product quote being the same as last quarter, explaining that "[c]ost reduction is the main focus for HP" and requesting "more aggressive & competitive pricing." *See* Flamm Report at 69 n.126. That HP employees pushed for lower prices is not evidence of overcharge, pass-through, nor impact; this type of email is wholly consistent with what any seller in a competitive market would desire. As Defendants argue, Dr. Flamm does not point to any evidence suggesting that manufacturers even once actually reduced the quality of a computer's configuration to offset the cost of an ODD. Dr. Flamm next points to an email in which an HLDS employee is instructed to tell Panasonic, a competitor, "not to follow Apple's threat that 'HLDS price is much less.'" *Id.* While this email does show evidence of price information sharing and supports the existence of the conspiracy, it does not support pass-through or impact.

His report also presents "[e]mpirical [s]tudies in the [e]conomics [l]iterature," which he claims "[p]rovide [b]road [s]upport for [p]ass-[t]hrough." *See* Flamm Report at 75. These empirical studies obviously do not substitute for record evidence of real world events. Nor can the stipulations of certain defendants in other cases relating to pass-through rates for other products constitute proof of pass-through of ODD overcharge in this case. *See* Flamm Report at ¶ 205. Those cases did not relate to or discuss ODD products, but instead separate, unrelated component parts of computers—parts which happen to represent a far larger proportion of the cost of the finished product than the ODDs in this litigation.

When asked at oral argument about evidence of pass-through, IPPs pointed to the deposition testimony of certain retailers and direct action purchasers, which is also described in Dr. Flamm's report. IPPs emphasized in particular the deposition testimony of Stephen M. Deason, a corporate representative for retailer Circuit City, arguing that his deposition testimony shows that absent collusion, the market would have either lowered the actual price of finished

products containing ODDs or provided a better quality finished product at the same price point. *See* Flamm Report at 98–99. While his deposition testimony is consistent with Dr. Flamm's theory, it cannot stand in for record evidence showing actual proof that this occurred. He only provides a general discussion of how pricing worked, but does not point to specific instances or any documents showing such decision-making or lower quality sacrifice actually occurring. This evidence also does not speak to the pricing practices or policies of HP or Dell, manufacturers and not retailers. Even if no evidence existed to the contrary, this single piece of secondary evidence from the deposition testimony of one corporate representative falls woefully short of meeting IPPs' burden to show proof of pass-through.

Defendants, for their part, point to declarations from both Dell and HP representatives that they in fact did not pass on costs with any consistency or uniformity. *See* Simmons Decl. [Dkt. No. 2375-3] Ex. 21 ¶ 14; Ex. 22 ¶ 21. While only Dell and HP are relevant here, Defendants also show that these declarations are consistent with deposition testimony from other manufacturers and retailers in the industry. *See id.* Ex. 23 (Newegg Rep. Dep.), at 50:6–52:4; Ex. 24 (Walmart Rep. Decl.), at ¶ 13; Ex. 25 (TigerDirect, Inc. Rep. Dep.), at 91:2–23; Ex. 26 (Fry's Electronics, Inc. Rep. Decl.), at ¶ 21; Ex. 27 (ASI Computer Technologies, Inc. Rep. Decl.), at ¶¶ 16–18; Ex. 28 (Sears, Roebuck & Co. Rep. Decl.), at ¶ 9; Ex. 29 (Best Buy Rep. Dep.), at 99:7–10.

In short, IPPs are unable to meet their burden of showing a genuine issue of material fact as to pass-through, which underlies their theory of causation, injury, and damages. While Dr. Flamm's report conveniently theorizes 100% pass-through at every stage in the distribution chain, his opinion does not point to, and cannot substitute for, evidence showing the disputed facts required to survive summary judgment. Defendants' motion for summary judgment against IPPs' claims must be granted.[11]

---

[11] IPPs have also moved for summary judgment against defendant Quanta Storage Inc. ("Quanta") [Dkt. No. 2341]. Quanta has failed to respond to that motion, nor has Quanta joined any of Defendants' motions. Nonetheless, because IPPs cannot carry their crucial burden to show pass-through, their claims against Quanta must be dismissed along with those of its co-defendants.

17

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment against the Indirect Purchaser Plaintiffs is granted.

**IT IS SO ORDERED.**

Dated: 12/18/17

_____
RICHARD SEEBORG
United States District Judge