# ATTACHMENT A

Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Attorneys for Plaintiff Aaron Wagner

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPTICAL DISK DRIVE PRODUCTS ANTITRUST LITIGATION | MDL DOCKET No. M:10-cv-2143 VRW |
| | HAGENS BERMAN'S *IN CAMERA* SUBMISSION IN SUPPORT OF APPOINTMENT AS INTERIM LEAD COUNSEL FOR INDIRECT PURCHASERS |
| This Document Relates to: | |
| ALL INDIRECT PURCHASER ACTIONS | |

\*　　\*　　\*　　**FILED UNDER SEAL**　　\*　　\*　　\*

010177-11  369602 V1

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................................1

II.     PROPOSAL...........................................................................................................................1

        A.      Hagens Berman Has Independently Prepared This Proposal .......................................1

        B.      Hagens Berman Has Evaluated the ODD Market and Potential Size of
                This Case .....................................................................................................................2

                1.      Estimated ODD Sales Revenues from the Relevant Market ...........................3

                        a.      ODD Units Sold into Computer and Information
                                Technology Applications....................................................................3

                        b.      ODDs Sold into Consumer Electronic Applications ..........................5

                        c.      Total ODD Units Sold in the United States.........................................6

                2.      Pricing Behavior over the Conspiracy Period .......................................................6

                3.      Evolution of Industry Concentration ......................................................................8

                4.      Pass Through of Price Increases in ODD Components into
                        Finished Goods Is Likely to Be Approximately 100 Percent...........................8

        C.      Hagens Berman's Proposed Attorneys' Fees, Costs and Leadership
                Structure ......................................................................................................................9

                1.      Hagens Berman's Proposal for Attorneys' Fees and Costs...........................10

                2.      Hagens Berman's Proposed Structure for Plaintiffs' Counsel .......................11

        D.      A Myriad of Other Qualitative Factors Support Hagens Berman's Request
                to be Appointed Lead Counsel for Indirect Purchasers...............................................11

                1.      Defendants from Which Recovery Will Be Sought ......................................11

                2.      Hagens Berman's Knowledge and Experience in Prosecuting
                        Antitrust Litigation .......................................................................................11

                        a.      Hagens Berman Has Extensive Experience in Antitrust
                                Class Actions....................................................................................12

                        b.      Experienced Antitrust Attorneys Will Be Involved in
                                Prosecuting This Litigation ...............................................................15

                                (1)     Steve W. Berman.....................................................................15

                                (2)     Anthony D. Shapiro.................................................................16

                                (3)     Jeff D. Friedman......................................................................17

                                (4)     George W. Sampson.................................................................17

(5)    Shana E. Scarlett ................................................................. 18

3.    Hagens Berman Is Qualified to Complete the Work Necessary ..................... 19

4.    Hagens Berman Has Malpractice Insurance ...................................................... 19

III.    CONCLUSION .............................................................................................................. 19

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Amino Acid Lysine Antitrust Litig.*
918 F. Supp. 1190 (N.D. Ill. 1996)......................................................................................9

*In re Auction Houses Antitrust Litig.*
197 F.R.D. 71 (S.D.N.Y. 2000).............................................................................................1

*In re Cal. Micro Devices Sec. Litig.*
1995 U.S. Dist. LEXIS 11587 (N.D. Cal. Aug. 4, 1995) ......................................................12

*In re Oracle Sec. Litig.*,
131 F.R.D. 688 (N.D. Cal. 1990) ............................................................................................9

*In re Synthroid Mktg. Litig.*
264 F.3d 712 (7th Cir. 2001) ...............................................................................................10

*In re Wells Fargo Sec. Litig.*
156 F.R.D. 223 (N.D. Cal. 1994) ............................................................................................9

*In re Wells Fargo Sec. Litig.*
157 F.R.D. 467 (N.D. Cal. 1994) ............................................................................................9

*Wenderhold v. Cylink Corp.*
188 F.R.D. 577 (N.D. Cal. 1999) .....................................................................................10, 11

*Wenderhold v. Cylink Corp.*
189 F.R.D. 570 (N.D. Cal. 1999) ...............................................................................*passim*

## I.    INTRODUCTION

Hagens Berman Sobol Shapiro LLP ("Hagens Berman") submits this application in support of its request to be appointed interim lead counsel for the Indirect Purchaser class.  Hagens Berman was one of seven firms previously agreed to by a majority of the Indirect Purchaser cases on file to be appointed interim lead counsel.  After the Court invited all Plaintiffs' counsel to make attorneys' fees proposals, Hagens Berman informed all counsel who approached Hagens Berman that: (1) any and all counsel interested in seeking lead counsel status should apply to the Court; (2) Hagens Berman would not discuss any potential bid with other counsel; and (3) Hagens Berman would not make any representations – explicit or implicit – regarding what firms, if any, Hagens Berman would invite to assist in this matter if the Court selected Hagens Berman as lead interim counsel for the Indirect Purchaser class.  *See e.g., In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 73 n.9 (S.D.N.Y. 2000).

In making this bid, Hagens Berman has tried to scrupulously follow this Court's (and other courts') procedures and previous opinions concerning the submission of bids for appointment of lead counsel.  While there has been controversy regarding employing a bidding process to select lead counsel in class actions, when the process is used, there should be little question that its purpose will be defeated if counsel attempt to share information, make promises regarding potential future work if appointed lead counsel, or in any way stunt the competitive bidding process.

Hagens Berman believes the qualitative and quantitative information provided below will demonstrate the Court's selection of our firm in this matter will be in the best interests of the class of Indirect Purchasers in this case.

## II.    PROPOSAL

### A.    Hagens Berman Has Independently Prepared This Proposal

As attested to in the accompanying Berman Declaration, Hagens Berman prepared this proposal independently of any other firm, entity or person not affiliated with the firm, except consulting with economic experts regarding characteristics of the optical disk drive ("ODD")

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF    - 1 -
INTERIM LEAD COUNSEL – 10-CV-02143 VRW
010177-11  369602 V1

market and possible outcomes of this case.[1]  *See* section B, *infra*; Berman Decl., ¶ 2.  Hagens Berman did not disclose any part of the proposal to anyone outside the firm prior to filing this submission with the Court.  *Id.*, ¶ 3.  Hagens Berman prepared this proposal without direct or indirect consultation with other firms that have filed actions on behalf of the proposed class in this matter, or entered an appearance in any fashion.  *Id.*, ¶ 4.  When approached, Hagens Berman informed other firms that it would not:  (1) participate in a joint submission; (2) make any representations to any firm regarding potential future work on this matter if selected; and (3) discuss the terms of its contemplated submission to the Court.  *Id.*, ¶ 5.

**B.        Hagens Berman Has Evaluated the ODD Market and Potential Size of This Case**

**CONFIDENTIAL ATTORNEY-WORK PRODUCT**

*        *        *

**The analyses and discussion included in Section B are preliminary in nature only, and are subject to revision based on discovery and the identification of relevant facts.  Hagens Berman considers this material to be confidential attorney-work product.  Accordingly, Hagens Berman respectfully requests that if this Court determines that information related to the lead counsel submissions should be made public, Hagens Berman be provided the opportunity to redact information contained in this Section B.**

*        *        *

In preparing this submission, Hagens Berman has independently evaluated the case, including specifically the range and probability of recovery.  *See Wenderhold v. Cylink Corp.*, 189 F.R.D. 570, 573 (N.D. Cal. 1999).  In making this proposal, Hagens Berman has consulted with one of the preeminent economists in the field, reviewed relevant industry information and examined the potential existence of antitrust injury and possible scope of damages in this case.

Based on the publicly available information and economic analysis of the market, damages can be estimated to be in the range of $1 billion to $1.4 billion.  This estimate is obviously

---

[1]        "Berman Declaration" or "Berman Decl." refers to the Declaration of Steve W. Berman in Support of *In Camera* Submission of Hagens Berman in Support of Appointment as Interim Lead Counsel for Indirect Purchasers, filed concurrently herewith.

preliminary, not based on actual transaction data which is in Defendants' exclusive possession, and does not account for potential treble damages available in antitrust cases.

The market in this case concerns ODDs, devices which read data stored on optical disks such as compact disks ("CD") or digital video disks ("DVD").  ODDs are used in CD players, DVD players, personal computers, game consoles and other electronic hardware devices, e.g., in living room entertainment.  The Defendants named in this case are alleged to have engaged in a long-running conspiracy, for the purpose and effect of fixing, raising and maintaining prices for ODDs sold throughout the U.S.  During this period, class members have paid supra-competitive prices for ODDs.

In examining the possible existence of antitrust injury and scope of damages in this case, Hagens Berman has examined four issues: (1) an estimation of ODD sales revenues from the U.S. market; (2) a very preliminary analysis of ODD pricing trends during at least part of the conspiracy period; (3) the evolution of industry concentration; and (4) likely pass-through rates from ODD components into finished goods.

### 1. Estimated ODD Sales Revenues from the Relevant Market

Hagens Berman has analyzed two different methodologies to estimate Defendants' revenues from sales of ODDs sold as components into U.S. sales channels or as components included in consumer electronics sold into the U.S. market.  Both methodologies yield similar estimates.  The first methodology uses publicly-available market information from units sold into computer and information technology ("IT") applications.  The second methodology uses official U.S. import statistics.  Both approaches likely exclude ODDs sold to non U.S.-based computer manufacturers, which are then embedded in computer systems shipped to the U.S., making both methodologies in all likelihood biased downward.

#### a. ODD Units Sold into Computer and Information Technology Applications

**Methodology 1**: Hagens Berman analyzed consulting firm Techno Systems Research's estimates worldwide of ODD units sold for use in IT applications, and revenues, as reported in various Samsung corporate presentations.  These estimates have been multiplied by 30 percent

(approximate U.S. global market share in IT markets). The 30 percent estimate was arrived at based on the Industry and Technology Intelligence Services of Taiwan's Ministry of Economic Affairs, which estimates the share of Taiwanese information technology hardware sales going to the U.S. was 36 percent in 2002, 32.8 percent in 2003, 30 percent in 2004, 32.4 percent in 2005.[2] More specifically, the Taiwanese ODD sales share going to the U.S. was 28 percent in 2005 and 26 percent in 2006.[3] Another source shows 39 percent of all global ODD sales going into North America in 2001 and 38 percent in 2002.[4] Adopting this methodology results in the following chart:

**United States Optical Disc Drive Units and Revenues (IT Applications Only)**
**based on 30% Worldwide Sales**

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008(e) | 2009(f) | 2010(f) | 2001-2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ODD Revenues | $ 2,790,000,000 | $ 2,940,000,000 | $ 3,150,000,000 | $ 2,940,000,000 | $ 2,970,000,000 | $ 2,601,000,000 | $ 2,445,000,000 | $ 2,472,000,000 | $ 2,559,000,000 | $ 2,697,000,000 | $ 24,867,000,000 |
| ODD Units | 53,700,000 | 60,900,000 | 68,400,000 | 73,800,000 | 82,800,000 | 83,400,000 | 88,800,000 | 93,900,000 | 98,100,000 | 101,100,000 | 703,800,000 |

Using this method, sales of ODDs into the U.S. IT applications market are $2.5 to $3.2 billion annually or almost $25 billion over the 2001-2009 period.

**Methodology 2**: Hagens Berman assumed all ODDs sold as components in U.S. sales channels, or incorporated into computer equipment sold in U.S. markets, are reported as an import in U.S. official import statistics. This is a downward biased estimate for two reasons: computer equipment sold in the U.S. may incorporate ODDs not sold to U.S. parties, and one U.S. import classification that includes ODDs has been excluded because it also includes other miscellaneous computer data storage components. Hagens Berman then added together these two ODD import classification items from official U.S. trade data available through the U.S. International Trade

---

[2] Industry and Technology Intelligence Service, Taiwan Industrial Outlook: Information Hardware Industry 95 (2004), http://www.itis.org.tw/itisdata/English/2004T08.pdf (last visited May 12, 2010); Industry and Technology Intelligence Service, Taiwan Industrial Outlook: Information Hardware Industry 8-5 (2005), http://www.itis.org.tw/itisdata/English/ITISPO-0453-S402(94)0828.pdf (last visited May 12, 2010); Industry and Technology Intelligence Service, Taiwan Industrial Outlook: IT Hardware Industry 8-9 (2006), http://www.itis.org.tw/itisdata/English/2006T08IT%20Hardware%20Industry.pdf (last visited May 12, 2010).

[3] Industry and Technology Intelligence Service, Taiwan Industrial Outlook: Information Technology Industry 120 (2007), http://www.itis.org.tw/itisdata/English/ITISPO-0453-S602(96)e2-6.pdf (last visited May 12, 2010).

[4] Y.C. Lee, *Trends of DVD World Market*, http://ettrends.etri.re.kr/PDFData/17-6_182_192.pdf (last visited May 12, 2010).

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF
INTERIM LEAD COUNSEL – 10-CV-02143 VRW     - 4 -
010177-11  369602 V1

Commission's ("ITC") online trade database, which resulted in the following estimate of ODD shipments and revenues in the U.S. market:

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2001-2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ODD Value | $ 4,064,852,481 | $ 4,037,775,042 | $ 3,706,581,409 | $ 3,444,123,968 | $ 2,976,427,146 | $ 3,003,809,729 | $ 3,062,724,993 | $ 2,892,719,555 | $ 2,246,366,028 | | $ 29,435,380,351 |
| ODD Units | 56,459,771 | 62,531,203 | 64,629,353 | 68,502,711 | 71,465,412 | 92,820,020 | 113,626,777 | 135,784,325 | 117,403,831 | | 783,223,403 |
| Average Value | $72.00 | $64.57 | $57.35 | $50.28 | $41.65 | $32.36 | $26.95 | $21.30 | $19.13 | | |

This method estimates U.S. imports of ODDs for IT applications from $2.2 to $4.1 billion annually, or $29.4 billion over the 2001-2009 period.[5]

### b.    ODDs Sold into Consumer Electronic Applications

U.S. import data show the following quantities of imports of consumer electronic equipment containing ODDs:

**United States Unit Sales of Game Consoles Using Optical Discs [Partial] from NPD data**

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2001-2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Game Console Units Incorporating ODDs [Partial] | | | | | | | 23,770,000 | 20,952,800 | 20,499,100 | | 65,221,900 |

Because the U.S. import classification does not break out game consoles containing ODDs, Hagens Berman needed to employ some partial data available from consulting firm NPD from 2007 on, to partially cover this segment of the market.  NPD is a market research group that provides consumer market research and point-of-sale data.  The NPD data showing game consoles with ODDs shipped from 2007 to 2009 are:

**United States Unit Sales of Consumer Products Including Game Consoles [Partial]**

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2001-2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ITC Consumer Products + Game Consoles | 36,614,426 | 43,580,637 | 43,296,477 | 46,763,941 | 43,950,383 | 41,646,681 | 85,818,681 | 70,821,075 | 58,098,370 | | 470,590,671 |

Adding these two sources together, the following chart reflects a (partial) estimate of consumer electronic goods containing ODDs:

**United States Optical Disc Drive Units and Revenues for Consumer Products Including Game Consoles [Partial]**
**(ITC and NPD data)**

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2001-2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Units | 36,614,426 | 43,580,637 | 43,296,477 | 46,763,941 | 43,950,383 | 41,646,681 | 85,818,681 | 70,821,075 | 58,098,370 | | 470,590,671 |
| Revenues | $2,636,075,877 | $2,814,096,002 | $2,483,111,919 | $2,351,159,650 | $1,830,467,486 | $1,347,755,641 | $2,313,178,514 | $1,508,756,689 | $1,111,634,974 | | |

---

[5]    These figures are higher than those produced using methodology 1 during the earlier years, and somewhat lower in the later years, and probably downward biased.  However, these estimates do not rely on an assumed constant U.S. global market share.  Furthermore, there is comparable U.S. ITC data available for consumer electronic equipment imports containing ODDs, which allow a rough estimate the value of consumer use ODDs sold into the U.S. market.  Note that both methodologies give roughly similar estimates.

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF
INTERIM LEAD COUNSEL – 10-CV-02143 VRW          - 5 -
010177-11  369602 V1

Multiplying this (partial) total of consumer electronic ODDs shipped by the average unit value of IT application ODDs from the ITC import data, an estimate of consumer electronic ODD units shipped and revenues is as follows:

**United States Optical Disc Drive Units and Revenues for Consumer Products Including Game Consoles [Partial] (ITC and NPD data)**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2001-2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Units | 36,614,426 | 43,580,637 | 43,296,477 | 46,763,941 | 43,950,383 | 41,646,681 | 85,818,681 | 70,821,075 | 58,098,370 | 470,590,671 |
| Revenues | $2,636,075,877 | $2,814,096,002 | $2,483,111,919 | $2,351,159,650 | $1,830,467,486 | $1,347,755,641 | $2,313,178,514 | $1,508,756,689 | $1,111,634,974 |  |

### c.        Total ODD Units Sold in the United States

Adding this last set of estimates to the estimates given above, Hagens Berman has an estimate of total ODD units sold into the U.S. market, and the value of those units:

**Total United States Optical Disc Drive Units and Revenues (IT Applications and Consumer Products)**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2001-2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $6,700,928,358 | $6,851,871,044 | $6,189,693,328 | $5,795,283,618 | $4,806,894,632 | $4,351,565,370 | $5,375,903,507 | $4,401,476,244 | $3,358,001,002 | $ 47,831,617,104 |
| Units | 93,074,197 | 106,111,840 | 107,925,830 | 115,266,652 | 115,415,795 | 134,466,701 | 199,445,458 | 206,605,400 | 175,502,201 | 1,253,814,074 |

The total sales by the Defendants of ODDs into the U.S. market ranged from $3.4 to $6.9 billion annually, for a total of almost $48 billion dollars over the 2001-2009 period.  Over the conspiracy period, ODD sales value ranged from $3.4 to $5.4 billion annually.  As previously noted, there is reason to believe that these numbers underestimate the true volume of relevant sales.

### 2.        Pricing Behavior over the Conspiracy Period

As would be typical with most high tech IT products, normal behavior over time would show significant declines in price and improvement in quality.  An effective price-fixing conspiracy might be expected to significantly slow what would otherwise be even more rapid decline in quality-adjusted price, rather than increase the price in absolute terms.  Put another way, the price would be higher relative to a but-for world of more rapid price decline.

Improvements in quality adjusted prices for ODDs can be approximated by calculating the weighted average writeable capacity per disk for an ODD, based on the breakdown of global ODD shipments by type of drive (CD, DVD, Blue Ray).  The U.S. ITC average import price for an ODD used in IT applications could then be divided by this average drive capacity, to produce an estimate of average price per megabyte of writable disk capacity in every year.

Hagens Berman has used this price index in order to compare it to a price index for a comparable high tech product.  Like ODDs, hard disk drives (with magnetic media) are precision

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF
INTERIM LEAD COUNSEL – 10-CV-02143 VRW
010177-11 369602 V1

- 6 -

electro-mechanical components, with significant semiconductor content, and are also used for digital data storage in computer systems.  Hagens Berman's consultants have calculated an index of price per megabyte of storage capacity based on annual data from the Gartner Group.  The following figure shows the two indexes, with 2001 given a base value of 100:



The above figure shows that from 2001 through 2006, both quality-adjusted hard disk and optical disk prices declined at very similar rates – roughly 30 percent annually.  After 2006, however, the rate of price decline for hard disks was significantly greater than that for optical disks, ***by more than a full ten percentage points*** of decline annually.  The following table displays compound annual rates of decline in price for these two sub-periods:

|  | Compound Annual Rates of Decline for 2001-2006 | Compound Annual Rates of Decline for 2006-2009 |
| --- | --- | --- |
| ODD | -29.7% | -28.5% |
| HDD | -30.9% | -38.9% |

These data suggest that after moving together very closely for five years, in late 2005 prices the two types of data storage systems started and continued to decline at significantly different rates during the alleged conspiracy period, from 2006-2009.

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF
INTERIM LEAD COUNSEL – 10-CV-02143 VRW
010177-11  369602 V1

- 7 -

### 3. Evolution of Industry Concentration

From 2001 through 2005, there was a significant increase in concentration in the global ODD industry.  In 2006, the 2007 Taiwan Industrial Outlook noted that "[w]ith the ongoing merger and acquisition activity in the optical disc drive industry, the concentration ratio in this industry has been rising."  The following table shows this increase in concentration:

**ODD Market Shares**

| 2001 Entity | 2006 Entity | 2001[1] | 2006[2] | 2007 Forecast[2] |
|---|---|---|---|---|
| Hitachi / LG | Hitachi / LG | 19% | 28% | 27% |
| Samsung | TSST | 13% | 21% | 27% |
| Toshiba | | 5% | | |
| LiteOn | LiteOn (PLDS) | 11% | 13% | 12% |
| BenQ | | 5% | | |
| Philips | | 3% | | |
| Sony | Sony NEC Optiarc | 2% | 8% | 8% |
| NEC | | 3% | | |
| TEAC | | 6% | | |
| Behavior Tech | | 5% | | |
| MKE/Panasonic | | 5% | 10% | 11% |
| All Others | | 22% | 20% | 16% |

**Sources:**
[1]  Y.C. Lee, " Trends of DVD World Market," (in Korean), p. 88, available at ettrends.etri.re.kr/PDFData/17-6_182_192.pdf
[2]  www.stephenz.com/storageEvent/pdfs/SSI_NYC_Storage_Event_ODD.pdf, p. 8.

### 4. Pass Through of Price Increases in ODD Components into Finished Goods Is Likely to Be Approximately 100 Percent

Pass through of price increases in the ODD market is expected to be approximately 100 percent.  The extent to which input cost increases are passed through into output prices is entirely an empirical issue, and it is an area in which methods of empirical analysis are well established.  Based on both theory and the published studies in this area, a competent and well-trained professional economist would readily accept that pass-through rates of ODD costs into computer and consumer electronics prices approximate 100 percent.

\*        \*        \*

As demonstrated above, Hagens Berman and its consultants have performed a robust, albeit preliminary, review of publicly available industry information to examine the possible scope of

damages and existence of injury in this case.  Hagens Berman's submission regarding the appointment of lead counsel, is thus, well-supported by the facts of this case.

**C.**      **Hagens Berman's Proposed Attorneys' Fees, Costs and Leadership Structure**

Employing bidding procedures for the position of lead counsel fosters competition amongst counsel by attempting to replicate the private marketplace for legal services.  *See In re Oracle Sec. Litig.*, 131 F.R.D. 688, 690 (N.D. Cal. 1990).  In the competitive bidding process, the Court's task is to "approximate as closely as possible the attorney selection and fee bargain that the class itself would strike if it were able to do so."  *In re Wells Fargo Sec. Litig.*, 156 F.R.D. 223, 225 (N.D. Cal. 1994).[6]  The Court stands "in the position of an intermediary acting for the class members in establishing rates."  *In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190, 1194 (N.D. Ill. 1996).

Hagens Berman proposes a declining percentage of attorneys' fees as recovery to the class increases, depending on the stage of recovery, in recognition of this Court's expressed rationale that "increasing amounts of recovery do not require correspondingly increased levels of attorney effort."  *Wenderhold*, 189 F.R.D. at 572.  In addition, Hagens Berman's proposal includes both attorneys' fees and costs, recognizing that this Court believes such a proposal provides the proper incentive for lead counsel to minimize expenses to the class.  *Id.* at 573.  And finally, consistent with this Court's previously expressed desire to avoid "unnecessary duplication of effort" (*see In re Wells Fargo Sec. Litig.*, 157 F.R.D. 467, 468 (N.D. Cal. 1994)), Hagens Berman proposes that only one firm should be selected as lead counsel to represent the Indirect Purchaser class.  If selected, Hagens Berman will seek support and expertise from other firms involved in this case – at a minimum two and at a maximum four – as it deems necessary and efficient to represent the interests of the class.  All payment to such counsel will be made from Hagens Berman's award of attorneys' fees, consistent with the terms proposed in this submission.

---

[6]      All internal citations and quotations omitted and all emphasis added, unless otherwise indicated.

### 1.      Hagens Berman's Proposal for Attorneys' Fees and Costs

In considering competitive bids from counsel, "[j]udges don't look for the lowest bid; they look for the best bid -- just as any private individual would do in selecting a law firm, an advertising firm, or a construction company." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 720 (7th Cir. 2001).  But the relationship between attorneys' fees and recovery to the class is a complex one, where courts often strive to align the interests of counsel and the class.  This Court has previously expressed its belief "that a 'percentage of recovery fee' calculation holds the best promise of harmonizing the interests of the class and its future counsel." *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 587 (N.D. Cal. 1999).  Based on this Court's rulings in other cases, Hagens Berman submits the following chart proposing percentage-based attorneys' fees (including costs) based on recovery from each defendant at various stages of the case and over various recoveries for the class:

| HAGENS BERMAN'S PROPOSED ATTORNEYS' FEES AND COSTS | | | |
|---|---|---|---|
| | **From Pleading Through Decision on Motion to Dismiss** | **After Motion to Dismiss Through Adjudication of Class Certification** | **After Adjudication of Summary Judgment** | **Through Trial Verdict and Final Appellate Determination** |
| First $5,000,000 | 0% | 0% | 0% | 0% |
| $5,000,001-$25,000,000 | 5% | 14% | 14% | 14% |
| $25,000,001-$50,000,000 | 4% | 13% | 13.25% | 14% |
| $50,000,001-$75,000,000 | 3% | 12% | 13% | 14% |
| $75,000,001-$100,000,000 | 2.5% | 11.5% | 12.5% | 13.5% |
| $100,000,001-$200,000,000 | 2% | 10% | 11% | 12% |
| $200,000,001-$400,000,000 | 1.5% | 7% | 8% | 9% |
| $400,000,001 and above | 1% | 5% | 6% | 7% |

In accord with this Court's prior rulings, this proposal includes both attorneys' fees and costs, which this Court believes creates an incentive for counsel to minimize expenses in the case, to the benefit of the class. *See, e.g., Wenderhold*, 189 F.R.D. at 573.

### 2.      Hagens Berman's Proposed Structure for Plaintiffs' Counsel

Hagens Berman makes this proposal as the sole proposed lead counsel. Hagens Berman proposes to select, subject to the Court's approval, the appointment of at least two, but no more than four, firms to assist in prosecuting this litigation, as Hagens Berman determines is necessary and efficient for prosecuting this matter on behalf of the class. These firms will be paid from lead counsel's fees. *See Wenderhold*, 188 F.R.D. at 587-88.

### D.      A Myriad of Other Qualitative Factors Support Hagens Berman's Request to be Appointed Lead Counsel for Indirect Purchasers

### 1.      Defendants from Which Recovery Will Be Sought

Hagens Berman submits its proposal to be appointed lead against each defendant named in these consolidated cases. Hagens Berman has reviewed all pleadings filed in the various consolidated cases. If appointed lead counsel for indirect purchasers, Hagens Berman intends to file a consolidated pleading, naming the appropriate corporate entity or entities for each corporate family group.[7]  A chart listing each of the defendants named in the cases consolidated before this Court is attached as Exhibit B to the Berman Declaration.

### 2.      Hagens Berman's Knowledge and Experience in Prosecuting Antitrust Litigation

In compliance with this Court's prior rulings, Hagens Berman presents the background and experience of those lawyers in the firm who, it is anticipated, will be engaged in representing the class in the present litigation. *Wenderhold*, 189 F.R.D. at 573.

---

[7]     For example, while the *Wagner* complaint names Samsung Electronics Co., several other complaints name Samsung Electronics Co., Ltd. Similarly, while the *Wagner* complaint names Sony NEC Optiarc Inc., other complaints name NEC Corporation. Sony NEC Optiarc Inc. was a joint venture between Sony Corporation and NEC Corporation for much of the relevant time period. As lead counsel, Hagens Berman will determine the correct corporate entities to be named.

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF
INTERIM LEAD COUNSEL – 10-CV-02143 VRW                - 11 -
010177-11  369602 V1

**a.  Hagens Berman Has Extensive Experience in Antitrust Class Actions**

Hagens Berman has extensive, nationwide experience in antirust and other complex class actions.  Since its founding in 1993, Hagens Berman has represented plaintiffs in a broad spectrum of complex, multi-party antitrust cases as well as cases involving securities fraud, ERISA, consumer protection, and violations of civil and human rights.  Hagens Berman's work includes many landmark cases.  Hagens Berman has forty-seven lawyers with offices in Seattle, Los Angeles, Phoenix, Chicago, Berkeley, Boston and Washington, D.C.  The firm has been recognized by courts throughout the country for its ability and experience in handling major complex litigation.

To provide the Court further detail on the breadth and level of Hagens Berman's experience (*see In re Cal. Micro Devices Sec. Litig.*, No. C-94-2817, 1995 U.S. Dist. LEXIS 11587, at *8 (N.D. Cal. Aug. 4, 1995)), Hagens Berman includes the following chart listing its recent antitrust experience:

| HAGENS BERMAN'S RECENT ANTITRUST EXPERIENCE | | | | | |
|---|---|---|---|---|---|
| **Title** | **Court** | **Docket Number** | **Date Filed** | **Position of Hagens Berman** | **Amount of Recovery on Behalf of the Class** |
| *In re Visa Check/ Mastercard Antitrust Litig.* | USDC E.D.N.Y. | 96-cv-05238 | 08/01/2002 | Co-lead counsel. | Settled for over $3 billion in cash and over $20 billion in injunctive relief, making it the largest antitrust settlement in history. |
| *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* | USDC N.D. Cal. | 02-cv-1486 PJH | 10/23/2002 | Co-lead counsel for direct purchasers. | Over $325 million in settlement funds. |
| *In re Intel Corp. Microprocessor Antitrust Litig.* | D. Del. | MDL 1717 | 06/29/2005 | Co-lead Counsel. | Litigation pending. |
| *McDonough, et al. v. Toys "R" Us, Inc. et al.* | USDC E.D. Pa. | 06-0242-AB | 01/19/2006 | Co-lead counsel. | Litigation pending; class certified at 638 F. Supp. 2d 461 (E.D. Pa. 2009). |
| *In re Live Concert Litig.* | USDC C.D. Cal. | 06-ML-1745-SVW | 04/19/2006 | Lead counsel. | Litigation pending; class certified at 247 F.R.D. 98 (C.D. Cal. |

| HAGENS BERMAN'S RECENT ANTITRUST EXPERIENCE | | | | | |
|---|---|---|---|---|---|
| Title | Court | Docket Number | Date Filed | Position of Hagens Berman | Amount of Recovery on Behalf of the Class |
| | | (RCx) | | | 2007). |
| *In re Static Random Access Memory (SRAM) Antitrust Litig.* | USDC N.D. Cal. | 07-cv-01819-CW | 02/20/2007 | Executive Committee Member for direct purchasers. | Over $35 million in settlement funds to date. |
| *In re eBay Sellers Antitrust Litig.* | USDC N.D. Cal. | 07-cv-1882-JF | 04/04/2007 | Co-lead counsel. | Appeal pending. |
| *In re TFT-LCD Antitrust Litig.* | USDC N.D. Cal. | M 07-1827 | 04/20/2007 | One of eight "Tier 1" firms representing direct purchasers. | Litigation pending; class certified on March 28, 2010. |
| *Barton v. Fidelity Nat'l Financial, Inc.* | USDC N.D. Cal. | 08-cv-01341-JSW | 03/10/2008 | Co-lead counsel. | Litigation pending. |
| *Pecover v. Electronic Arts, Inc.* | USDC N.D. Cal. | 08-cv-2820-VRW | 06/05/2008 | Co-lead counsel for indirect purchasers. | Litigation pending. |

In addition to this extensive experience in prosecuting antitrust class actions, Hagens Berman has experience in defending such cases. In the wake of the Department of Justice antitrust litigation against Microsoft, Hagens Berman represented the company in twenty-three antitrust class actions across the country. Hagens Berman thus has learned about all aspects of how corporations respond to private, civil antitrust enforcement actions like this one.

So well known and respected are Hagens Berman and its managing partner, Steve Berman, that recently Mr. Berman was appointed interim co-lead counsel in the *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liability Litig.*, Case No. 8:10-ML-02151 (C.D. Cal.), *sua sponte* by Judge Selna without an application by Hagens Berman.

A representative sample of Hagens Berman's extensive expertise is summarized below. A more complete summary of Hagens Berman's experience, and a representative sampling of its

other complex litigation experience, is set forth in the firm résumé submitted herewith (Berman Decl., Ex. A), or on the law firm's website, www.hagens-berman.com.

- *In re Pharm. Indus. Average Wholesale Price Litig*, MDL No. 1456 (D. Mass.*).*  The Court appointed Hagens Berman co-lead counsel after the consolidation of numerous nationwide actions against pharmaceutical manufacturers involving claims that since the early 1990s most of the nation's major pharmaceutical companies have engaged in fraudulent reporting of fictitious Average Wholesale Prices ("AWP"s).  The fictitious AWPs resulted in inflated drug prices and billions of dollars in illegal profits reaped at the expense of American consumers.  In this role, Hagens Berman has negotiated and settled with several defendants and served as lead trial counsel in a month-long trial against several defendants.  Mr. Berman served as lead trial counsel in that trial and obtained a verdict in favor of plaintiffs, which was challenged by defendants.  The First Circuit affirmed the verdict, *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009).

- *In re Bextra Celebrex Sales, Mktg. and Prods. Liab. Litig.*, 05-cv-01699-CRB (N.D. Cal.) (Breyer, J.).  This MDL case consolidated thousands of misleading marketing and personal injury claims related to the drugs Bextra and Celebrex.  The Court appointed Hagens Berman as lead counsel for the purchaser related claims, i.e., the economic loss claim.  In this role, Hagens Berman worked on a daily basis with liaison counsel for the personal injury claims, Lieff Cabraser, and multiple other firms across the country to prosecute all claims efficiently and expeditiously through pleadings, motions to dismiss, discovery, expert witness development, a multi-day *Daubert* hearing, case strategy, trial preparation and ultimately mediation and settlement.  In granting final approval to the purchaser settlement, Judge Breyer commented:  "The attorneys on both sides were sophisticated, skilled, professional counsel whose object was to zealously pursue their clients' interest, but not at the cost of abandoning the appropriate litigation goals, which were to see, whether or not, based upon the merits of the cases, a settlement could be achieved."  Transcript of Proceedings, Sept. 25, 2009, at 29.

- *New England Carpenters, et al. v. McKesson.*  As an outgrowth of the *Average Wholesale Price* MDL, Hagens Berman discovered that McKesson and First Data had conspired to increase the list price on most brand-name drugs in the United States by 4%.  Hagens Berman successfully obtained a nationwide class on behalf of all purchasers of over 400 brand-name drugs.  This may be one of the largest classes ever certified.  The case settled for $350 million and a rollback of the price of brand-name drugs that took effect in Sept. 2009.  Mr. Berman was lead counsel and argued all motions.

- *Attorney General Tobacco Litig.*  Hagens Berman played a major role in representing state government in the historic litigation against the tobacco industry.  The firm represented thirteen states in pursuing innovative claims against the tobacco companies and helped achieve the largest recovery in litigation history ($260 billion).  Mr. Berman was actively involved in every aspect of the case and in negotiating the nationwide settlement.  Hagens Berman was also one of only two law firms who took a case to trial against the tobacco industry.  Mr. Berman served as lead or co-lead trial counsel in the Washington State case and in all the other state cases in which Hagens Berman was counsel.

- *Kaiser Found. Health Plan, et al. v. Pfizer, Inc., et al.*, Civ. Action No. 04-cv-10739 (D. Mass).  Hagens Berman served as *co-lead trial counsel* for plaintiffs in this case against Pfizer, Warner Lambert and Parke Davis related to Pfizer's fraudulent and unlawful promotion of the drug Neurontin.  A jury returned a $47 million RICO verdict against the three defendants.  Post-trial briefing is underway and a final judgment has not yet been entered.  With interest and trebling, the final judgment is expected to exceed $200 million.

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF
INTERIM LEAD COUNSEL – 10-CV-02143 VRW
010177-11  369602 V1

- 14 -

- *In re Schwab Corp. Sec. Litig*, Case No. 08-cv-01510 WHA (C.D. Cal.).  Judge Alsup appointed Hagens Berman as lead counsel in this federal class action on behalf of investors in Schwab's YieldPlus Fund.  The case alleges that Schwab marked the fund as a money market alternative and a safe place to invest cash when actually fund managers over-concentrated fund assets in risky mortgage-backed securities.  Hagens Berman recently negotiated a settlement of the federal securities class claims for $235 million (approval pending).

- *In re Expedia Hotel Taxes and Fees Litig.*, Master File No. 05-2-02060-1-SEA (King County Superior Court, State of Washington).  Hagens Berman was lead counsel in this nationwide class action on behalf of consumers who booked hotel reservations through Expedia.  Plaintiffs alleged that Expedia engaged in deceptive trade practices in connection with its charges for taxes and service fees.  The case resulted in the largest summary judgment award in state history, $184 million, and subsequently settled, resulting in recoveries for Expedia users across the country.

- *In re Tremont Sec. Law, State Law and Ins. Litig*, 08 Civ. 11117 (TPG) (S.D.N.Y.) (Madoff litigation).  The Southern District of New York appointed Hagens Berman as interim co-lead counsel on behalf of the putative plaintiff State Law Class in this consolidated case which is comprised of three groups of cases:  the Securities Action, the State Law Action and the Insurance Action.  The State Law Action arises out of the multi-billion dollar Ponzi scheme orchestrated by convicted swindler Bernard L. Madoff.

      **b.**      **Experienced Antitrust Attorneys Will Be Involved in Prosecuting This Litigation**

      **(1)**      **Steve W. Berman**

Mr. Berman helped to found the firm in 1993, and is the managing partner.  He has served as lead or co-lead counsel in securities, consumer, products liability, antitrust, employment class actions, and complex litigations in the Northwest and throughout the country.  Mr. Berman's successes include obtaining a settlement of $92 million in the *Boeing Sec. Litig.*, representing stock and bondholders in the *Bonneville Pacific Sec. Litig.*, and gaining approval of a $290 million settlement in the *Louisiana Pacific Siding Litig.*, the largest product liability settlement in Pacific Northwest history.  In the *WPPSS Sec. Litig.*, Mr. Berman represented bond purchasers in the largest securities trial in U.S. history.  In addition to being a member of the trial team, the lead counsel designated him as a core group member alongside a group of class plaintiffs and Chemical Bank attorneys charged with prosecuting the case.  The case resulted in a settlement exceeding $850 million, the largest recovery in a securities class action at the time.  Perhaps most notable is Mr. Berman's role as a special assistant attorney general for the states of Washington, Arizona, Illinois, Indiana, New York, Alaska, Idaho, Ohio, Oregon, Nevada, Montana, Vermont, and Rhode Island in the landmark Tobacco Litigation.

Other notable actions led by Mr. Berman include the *Morrison Knudsen Sec. Litig.*, *Contact Lens Disposable Antitrust Litig.* and *Piper Jaffray Closed-End Funds Litig.* in which he obtained a settlement valued at nearly $60 million.  Mr. Berman's cases have also involved corporate entities such as Egghead, Foodmaker, SuperMac, Immunex, Digital Systems, and Aldus.  Recently, Mr. Berman successfully tried consumer class actions against AstraZeneca and Bristol Myers Squibb, and leads the *Average Wholesale Price Litig.* (over $200 million in pending settlements) and the *McKesson Litig.* ($350 million in pending settlements).

In April 2000, the National Law Journal listed Mr. Berman as the top litigator in the state and, in June, named him as one of the 100 most powerful lawyers in the nation.  In January 2001, Seattle Magazine featured him in an issue profiling the top lawyers in Seattle.  In June 2006, the National Law Journal once again named Mr. Berman as one of the nation's 100 most influential lawyers in America.  Mr. Berman was also named as a finalist for the Trial Lawyer of the Year.

### (2) Anthony D. Shapiro

Mr. Shapiro is a named partner at Hagens Berman where he concentrates on antitrust matters and general commercial disputes, and leads the firm's Personal Injury Group.  Mr. Shapiro has also played a prominent role in a number of notable antitrust class actions including *Brand Name Prescription Drug Antitrust Litig.*, *Carbon Dioxide Antitrust Litig.*, *Carpet Antitrust Litig.*, *Infant Formula Antitrust Litig.*, *Baby Food Antitrust Litig.*, *Scouring Pads Antitrust Litig.*, *Medical X-Ray Film Antitrust Litig.*, *High Fructose Corn Syrup Antitrust Litig.*, *Visa/MasterCard Antitrust Litig.*, *Commercial Tissue Prods. Antitrust Litig.*, *Flat Glass Antitrust Litig.*, *Lease Oil Antitrust Litig.*, and *Bromine Antitrust Litig.*  Recently, Mr. Shapiro served as lead counsel in *In Re DRAM Antitrust Litig.*, where, on behalf of a class of direct purchasers, he and others were able to secure in excess of $325 million from domestic and foreign DRAM chip manufacturers. Currently, Mr. Shapiro serves on the plaintiffs' executive committee in a number of prominent antitrust class actions including *In Re LCD Antitrust Litig.* and *In Re SRAM Antitrust Litig.*

Mr. Shapiro has extensive trial experience, as prior to leading the Hagens Berman personal injury litigation practice, Mr. Shapiro was a member of the Washington state prosecuting attorney's office, where he represented the state in more than fifty serious felony jury trials,

including some of the state's most difficult and high-profile cases.  Mr. Shapiro was given an AV rating by Martindale-Hubbell, the highest rating a lawyer can obtain, indicating a very high to preeminent legal ability and exceptional ethical standards as established by confidential opinions from members of the Bar.  Mr. Shapiro is a frequent instructor at the National Institute of Trial Advocacy (NITA) and has taught trial practice at the University of Washington Law School since 2004.

### (3)   Jeff D. Friedman

Mr. Friedman is a partner at Hagens Berman's Berkeley office where he specializes in class actions against large corporations involving securities fraud, consumer protection and privacy rights violations.  Mr. Friedman's current focus is on antitrust litigation, including *In re eBay Seller Antitrust Litig.*, a class action on behalf of more than 15 million eBay sellers who claim eBay is monopolizing and attempting to monopolize the online auction and person-to-person payment system markets.  Mr. Friedman is also working on *Pecover v. Elec. Arts Inc.*, currently pending before this Court, with class certification scheduled to be argued on August 11, 2010.

Prior to joining Hagens Berman, Mr. Friedman was general counsel to a public company in the fiber optic technology field.  Mr. Friedman also was an Assistant U.S. Attorney in the Criminal Division of the U.S. Attorney's Office for the Central District of California (Los Angeles).  Mr. Friedman has extensive trial experience, including numerous federal cases and prosecuted matters involving investor, bank, and real estate fraud, tax evasion, narcotics trafficking, and money laundering.  Prior to joining the U.S. Attorney's office, Mr. Friedman clerked for the Honorable Manuel L. Real, United States District Court Judge, Central District of California.

### (4)   George W. Sampson

Mr. Sampson is a partner at Hagens Berman in the Seattle office where he has worked since 1994.  Mr. Sampson specializes in complex antitrust class actions, including both section 1 and section 2 claims.  Mr. Sampson has been instrumental in many recent antitrust victories, including certification of a class in *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461 (E.D. Pa. 2009), one of the first cases to certify allegations of vertical price fixing since the Supreme Court's decision in *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007) (holding

vertical price fixing is no longer *per se* illegal but instead analyzed under the rule of reason).  Mr. Sampson was also a key team member in the certification of a class in *Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litig.)*, 247 F.R.D. 98 (C.D. Cal. 2007), a definitive 125 page opinion regarding the governing standards for class certification in the Ninth Circuit.

Prior to joining Hagens Berman, Mr. Sampson served as chief of the Antitrust Bureau for the New York Attorney General's Office.  Mr. Sampson oversaw a twenty-two person staff and managed case selection and investigation for all civil and criminal prosecutions.  He also served as attorney general liaison to the federal-state Executive Working Group-Antitrust.  His position as chief involved a heavy trial practice, primarily in federal courts and often in conjunction with several states.  During his ten years with the Antitrust Bureau, Mr. Sampson's notable cases included winning a $7.8 million jury verdict in a highway bid rigging trial, serving as lead counsel for New York and obtaining a $30 million settlement in insurance antitrust litigation, and negotiating a $15 million return to consumers in a resale price maintenance settlement with Nintendo.  Mr. Sampson sits on the Executive Committee of the Antitrust and Consumer Protection of the Washington State Bar Association and frequently speaks on antitrust issues.

### (5)	Shana E. Scarlett

Ms. Scarlett is an associate at Hagens Berman's Berkeley office where she specializes in the prosecution of class actions, including antitrust, securities fraud, consumer protection and privacy rights violations.  Ms. Scarlett has extensive antitrust experience, including the *In re eBay Seller Antitrust Litig.*, where Ms. Scarlett was one of the team members responsible for drafting the plaintiffs' class certification motion and responding to defendant's motion for summary judgment.  Ms. Scarlett is also one of the primary attorneys involved in *Pecover v. Elec. Arts Inc.*, currently pending before this Court, where plaintiffs allege Electronic Arts violated Section 2 of the Sherman Act by engaging in anticompetitive, exclusionary behavior by executing a licensing lockout strategy with representatives of the National Football League, current and former NFL Players, the Arena Football League, and NCAA Football.  Plaintiffs seek to certify a class of indirect purchasers and have presented exhaustive briefs concerning issues of antitrust injury to indirect purchasers and the application of state antitrust law to indirect purchasers in multiple states.

Ms. Scarlett received her law degree from Stanford Law School and was selected as a "Northern California Rising Star 2009" and "Northern California Rising Star 2010" by Super Lawyers Magazine.

### 3.    Hagens Berman Is Qualified to Complete the Work Necessary

Previously, in appointing lead counsel, this Court has considered the qualifications of counsel to complete the work necessary in complex litigation. *Wenderhold*, 189 F.R.D. at 574. Hagens Berman is a well-established and successful law firm that has the substantial resources and personnel necessary to pursue a case of this magnitude as it has demonstrated in numerous similar large-scale complex cases since its founding. Hagens Berman has more than forty-five lawyers nationwide in offices in Seattle, Los Angeles, Boston, Chicago, Phoenix, the Bay Area and Washington, D.C. The firm's resources are not merely financial, but also include substantial expertise and work-product, discussed above, that they have developed which will be an obvious benefit to the Plaintiffs in this action.

### 4.    Hagens Berman Has Malpractice Insurance

Another factor previously considered by this Court is the firm's insurance coverage for malpractice. *Id*. at 573. Hagens Berman currently has in place malpractice insurance. Berman Decl., ¶ 6. If this Court so requires, Hagens Berman will produce, upon request, a copy of this insurance policy *in camera* for the Court's review. *Id.*

### III.    CONCLUSION

For all the reasons stated above, Hagens Berman respectfully requests that this Court appoint it as interim lead counsel for the Indirect Purchaser class.

DATED: May 13, 2010                      HAGENS BERMAN SOBOL SHAPIRO LLP

By _____ /s/ Steve W. Berman_____
          STEVE W. BERMAN

1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF
INTERIM LEAD COUNSEL – 10-CV-02143 VRW              - 19 -
010177-11  369602 V1

Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Attorneys for Plaintiff Aaron Wagner

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF
INTERIM LEAD COUNSEL – 10-CV-02143 VRW
010177-11  369602 V1

- 20 -

**CERTIFICATE OF SERVICE**

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a resident of the United States and employed in the City and County of Berkeley, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 715 Hearst Avenue, Suite 202, Berkeley, California 94710.

2.    I hereby certify that on May 13, 2010, I caused the foregoing to be lodged with the Clerk of the Court via hand-delivery; and a courtesy copy of same to be hand-delivered to the chambers of the presiding judge in the above-captioned litigation.  This document was filed *in camera* and lodged under seal.  A copy was not served upon the other parties in this action.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 13th day of May 2010, at Berkeley, California.

_____
BRIAN R. MILLER

HAGENS BERMAN'S SUBMISSION RE APPOINTMENT OF
INTERIM LEAD COUNSEL – 10-CV-02143 VRW                    - 21 -
010177-11  369602 V1