Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com

*Lead Counsel for Indirect
Purchaser Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE OPTICAL DISK DRIVE PRODUCTS ANTITRUST LITIGATION | No.  3:10-md-2143 RS (JCS) |
| | INDIRECT PURCHASER PLAINTIFFS' NOTICE OF RENEWED MOTION AND RENEWED MOTION FOR ATTORNEYS' FEES |
| | Date:      November 5, 2020 |
| | Time:      1:30 p.m. |
| | Dept:      Courtroom 3, 17th Floor |
| | Judge:    Hon. Richard Seeborg |
| | DATE ACTION FILED: Oct. 27, 2009 |
| This Document Relates to: | |
| ALL INDIRECT PURCHASER ACTIONS | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.    FACTS .......................................................................................................... 1

    A.    Appointment of lead counsel. ............................................................. 1

    B.    Settlements, fee awards, and reimbursed expenses. ........................... 2

    C.    Ninth Circuit rulings. ......................................................................... 2

III.    ARGUMENT ............................................................................................... 2

    A.    Legal standards. ................................................................................. 2

    B.    An upward adjustment of fees from Hagens Berman's fee bid is justified. ............................................................................................ 3

        1.    The "starting point" is the fee bid determined from the fee grid in Hagens Berman's application to be appointed class counsel. ............. 3

        2.    This Court's cumulative fee award to Hagens Berman is justified by a number of events that were not contemplated when the bid was made in 2010. ............................................. 4

    C.    In light of the foregoing important factors that were not reasonably contemplated at the time of Hagens Berman's fee bid, this Court's fee award of $47,780,000 is a reasonable variance from the fee bid. .............. 18

        1.    The fee request is reasonable in light of fee awards in other antitrust cases and, in particular, the fee awarded to counsel for direct purchasers in this litigation. .................................. 19

        2.    The fee request is reasonable in light of the factors applied to determine the reasonableness of a fee request. ................................ 20

    D.    Using lodestar as a cross-check further supports the requested fees. ............... 21

        1.    Hagens Berman achieved exceptional results for the Class. ................ 22

        2.    Hagens Berman expended significant resources on behalf of the Class. ................................................................................. 22

        3.    This case presented novel and difficult questions, requiring extraordinary skill by Hagens Berman. .............................................. 23

        4.    Hagens Berman has forgone other employment. .............................. 23

        5.    The requested fee is reasonable when compared to fees in similar litigation. ............................................................................ 24

6.    The reputation and ability of Hagens Berman support the requested fee. ........................................................................... 24

IV.    CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*In re Bluetooth Headset Prod. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ................................................................. 19, 22

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ................................................... 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) .................................................... 24

*Dyer v. Wells Fargo Bank, N.A.*,
  303 F.R.D. 326 (N.D. Cal. 2014) .............................................................. 24

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) .......................................................... 9

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  2007 WL 2416513 (N. D. Cal. Aug. 16, 2007) ................................................... 19

*Fischel v. Equitable Life Assur. Soc'y of U.S.*,
  307 F.3d 997 (9th Cir. 2002) ................................................................... 3

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) .............................................................. 10

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ......................................................... 10

*Kerr v. Screen Extras Guild, Inc.*,
  526 F.2d 67 (9th Cir. 1975) ................................................................ 22, 24

*Lane v. Facebook, Inc.*,
  2010 U.S. Dist. LEXIS 57765 (N.D. Cal. May 24, 2010) ......................................... 24

*In re Netflix Privacy Litig.*,
  2013 U.S. Dist. LEXIS 37286 (N.D. Cal. Mar. 18, 2013) ........................................ 24

*Noll v. eBay, Inc.*,
  309 F.R.D. 593 (N.D. Cal. 2015) .............................................................. 24

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) .............................................................. 20, 21

*In re Optical Disk Drive Prods. Antitrust Litig.*,
  2017 WL 6503743 (N.D. Cal. Dec. 18, 2017) ..................................................... 15

*In re Optical Disk Drive Prods. Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014) ........................................................................... 12

*In re Optical Disk Drive Prods. Antitrust Litig.*,
   801 F.3d 1072 (9th Cir. 2015) ............................................................................... 13

*In re Optical Disk Drive Prods. Antitrust Litig.*,
   2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ...................................................... 15

*In re Optical Disk Drive Prods. Antitrust Litig.*,
   804 Fed App'x 445 (9th Cir. 2020) ................................................................... 2, 3

*In re Optical Disk Drive Prods. Antitrust Litig.*,
   959 F.3d 922 (9th Cir. 2020) ........................................................................*passim*

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009) ................................................................... 11, 12

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ............................................................................ 3, 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010) ................................................................... 10, 11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 1109 (N.D. Cal. 2008) .................................................................... 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) ..................................................... 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2013 WL 149692 (N.D. Cal. Jan. 14, 2013) ........................................................ 19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 U.S. Dist. LEXIS 21696 (N.D. Cal. Feb. 21, 2012) ...................................... 6

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ....................................................... 19

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ................................................................. 21, 22, 24

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005) .................................................................................. 24

## FEDERAL RULES

Federal Rule of Appelate Procedure 27-3 .................................................................. 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### NOTICE OF RENEWED MOTION AND RENEWED MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on November 5, 2020 at 1:30 p.m., or as soon thereafter as the matter may be heard by the Honorable Judge Richard Seeborg of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Indirect Purchaser Plaintiffs ("IPPs") will and hereby do move the Court for an award of attorneys' fees of $47,780,000. IPPs do not seek reimbursement of any expenses. This motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities, the declarations in support of the motion, argument by counsel at the hearing before this Court, any papers filed in reply, such oral and documentary evidence as may be presented at the hearing of this motion, and all papers and records on file in this matter.

## I.    INTRODUCTION

In this renewed motion for fees, Hagens Berman Sobol Shapiro LLP ("Hagens Berman") respectfully requests that the Court reaffirm its award of $47,780,000 in fees. The Ninth Circuit vacated the award, instructing this Court to use the fee grid submitted by Hagens Berman in its bid to be appointed class counsel as "the starting point for determining a reasonable fee."[1] An award of $47,780,000 is a reasonable variance from $25,855,000.00, which is the fee as calculated under the fee grid submitted by Hagens Berman more than ten years ago. As shown below, Hagens Berman faced substantial difficulties that "the bid did not contemplate,"[2] which resulted in hard-fought litigation for a decade and justifies an upward variance. As a result of Hagens Berman's extensive efforts, the class of indirect purchasers has benefitted from total settlements of $205,000,000, even though this Court eventually determined that there is no evidence that the class paid *any* increased prices as a result of the alleged antitrust conspiracy and even though the direct purchaser class in this litigation obtained only $74.9 million in settlements. Indeed, this Court has already explained that its "approval of fees at a higher rate than specified in the bid . . . was predicated in part on the fact that the amount was still substantially lower than would have been justified in the absence of the bid."[3]

## II.    FACTS[4]

### A.    Appointment of lead counsel.

On May 13, 2010, Hagens Berman submitted its application for appointment as lead counsel for the indirect purchasers in this litigation.[5] On June 4, 2010, Judge Walker appointed Hagens Berman as class counsel.[6]

---

[1] *In re Optical Disk Drive Prods. Antitrust Litig.* ("*ODD I*"), 959 F.3d 922, 934 (9th Cir. 2020).

[2] *Id.* at 935.

[3] Order Granting Final Approval of Indirect Purchaser Plaintiffs' Settlement with Defendants Samsung Electronics Co., Ltd., Toshiba Corporation, and Toshiba Samsung Storage Technology Corporation, Granting Motion for Attorney Fees and Expenses, and Denying Objections ("Third Approval Order") at 20, Feb. 21, 2019, ECF No. 2889.

[4] Additional relevant facts are discussed throughout this brief.

[5] Hagens Berman's *In Camera* Submission in Support of Appointment as Interim Lead Counsel for Indirect Purchasers, May 13, 2010, ECF No. 114 ("HB Submission"). That submission was originally filed *in camera* and then publicly filed on July 31, 2020. ECF No. 2937-1.

[6] Order, June 4, 2010, ECF No. 96.

1

**B.      Settlements, fee awards, and reimbursed expenses.**

In connection with three rounds of settlements that totaled $205 million, this Court awarded

Hagens Berman fees and ordered the reimbursement of expenses in the following amounts:

| Date | Settlement amount | Fees Awarded | Expenses reimbursed |
|------|-------------------|--------------|---------------------|
| Dec. 19, 2016[7] | $124.5 million | $31.125 million | $3,704,323.97 |
| Nov. 17, 2017[8] | $55.5M | $11.655 million | $1,368,718.95 |
| Feb. 21, 2019[9] | $25M | $5 million | $0 |
| **Total** | **$205M** | **$47.78 million** | **$5,073,042.92** |

**C.      Ninth Circuit rulings.**

The Ninth Circuit affirmed this Court's final approval of all three rounds of settlements.[10] In

two additional opinions, the Ninth Circuit vacated this Court's orders awarding fees and expenses,

and ordered this Court to conduct further proceedings consistent with those opinions.[11]

### III.      ARGUMENT

**A.      Legal standards.**

In remanding to this Court for further consideration, the Ninth Circuit held that "when class

counsel secures appointment as interim lead counsel by proposing a fee structure in a competitive

bidding process, that bid becomes the starting point for determining a reasonable fee. The district

court may adjust fees upward or downward depending on circumstances not contemplated at the time

---

[7] Order Granting Final Approval of Indirect Purchaser Plaintiffs' Settlements with Panasonic, Sony, NEC and HLDS Defendant Families, Granting Motion for Attorney Fees, Expenses and Service Awards, and Overruling Objections, Dec. 19, 2016, ECF No. 2133.

[8] Order Granting Final Approval of Indirect Purchaser Plaintiffs' Settlements with PLDS, Pioneer, and TEAC Defendant Families, Granting Motion for Attorney Fees, Expenses and Service Awards, and Denying Objections, Nov. 7, 2017, ECF No. 2691.

[9] Third Approval Order.

[10] *In re Optical Disk Drive Prods. Antitrust Litig.* ("*ODD II*"), 804 Fed App'x 445 (9th Cir. 2020).

[11] *ODD I*, 959 F.3d at 922 (vacating awards for first two rounds of settlements); *ODD II*, 804 Fed. App'x at 443 (remanding awards for third round of settlements).

of the bid, but the court must provide an adequate explanation for any variance."[12] The Court stated that "district courts assume a fiduciary role that requires close scrutiny of class counsel's requests for fees and expenses from the common fund."[13] As the Ninth Circuit has explained, a court's fiduciary duty to the class is to "'look out for the interests of the beneficiaries, to make sure that they obtain sufficient financial benefit after the lawyers are paid.'"[14]

**B.      An upward adjustment of fees from Hagens Berman's fee bid is justified.**

      **1.      The "starting point" is the fee bid determined from the fee grid in Hagens Berman's application to be appointed class counsel.**

As required by the Ninth Circuit, the "starting point" for assessing Hagens Berman's fee request is the fee calculated from the fee grid in Hagens Berman's submission to be appointed class counsel. In text immediately preceding the fee grid Hagens Berman explained that the grid proposed "percentage-based attorneys' fees (including costs) based on recovery from each defendant at various stages of the case and over various recoveries for the class…."[15] As the Ninth Circuit explained, that "text above the grid" provided for calculating the proposed fee by treating individual settlements "as separate awards."[16] Total fees under the grid are $25,855,000.00.[17] In comparison, attorneys for the direct purchaser plaintiffs in this litigation received $26,072,124.65 in fees and expenses, based on cumulative settlements of $74.9 million, which is only 36% of the $205 million in settlements that Hagens Berman procured for the indirect purchasers.[18]

---

[12] *ODD I*, 959 F.3d at 934-35. *See also ODD II*, 804 Fed. App'x at 444 ("We vacate and remand the third-round fee award for further findings consistent with the standard set forth in the concurrently filed opinion addressing the first- and second-round fee awards.").

[13] *ODD I*, 959 F.3d at 930.

[14] *Staton v. Boeing Co.*, 327 F.3d 938, 970 (9th Cir. 2003) (quoting *In re Coordinated Pre-trial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 608 (9th Cir.1997)). *Accord*, *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002) ("Because the attorneys seek fees on their own behalf, which may be contrary to their clients' interests, the district court must 'look out for the interests of the beneficiaries, to make sure that they obtain sufficient financial benefit after the lawyers are paid.'") (quoting *Petroleum Prods*, 109 F.3d at 608).

[15] *See* HB Submission at 10 (setting forth fee grid).

[16] *ODD I*, 959 F.3d at 936.

[17] *See* Declaration of Steve W. Berman in Support of Indirect Purchaser Plaintiffs' Renewed Motion for Attorneys' Fees ("Berman Decl."), concurrently filed herewith, ¶ 6.

[18] In two orders, this Court awarded lawyers for the direct purchaser plaintiffs $22,480,000 in attorneys' fees and expenses of $3,602,124.65. *See* Order Granting Direct Purchaser Plaintiffs'

**2.      This Court's cumulative fee award to Hagens Berman is justified by a number of events that were not contemplated when the bid was made in 2010.**

Numerous events that were not contemplated when Hagens Berman submitted its fee bid justify a cumulative fee award of $47,780,000, compared to the "starting point" of $25,855,000.00. In remanding this matter, the Ninth Circuit stated that it did "not endeavor to create a comprehensive list of circumstances that may warrant departure from a fee bid, but we note that a district court would likely not abuse its discretion by departing from a bid based on circumstances the bid did not contemplate."[19] Indeed, when Judge Walker appointed Hagens Berman class counsel in 2010, he stated that he "understood fully that counsel, at this early stage of litigation, have limited information concerning the probability of a recovery and the amount or range of such recovery."[20] Judge Walker further explained that "plaintiffs' counsel in a fraud-on-the-market securities class action typically have more readily available information to size up potential recovery than do counsel here," so that "experienced counsel are nevertheless able to make reasonably astute estimates of the value of such litigation."[21] The court then stated that "potential recovery by indirect purchaser plaintiffs in this litigation is subject to a greater variety of imponderables. Nonetheless, Hagens Berman has presented a very impressive array of possible recovery scenarios that suggest a high level of analysis of potential recoveries."[22] Indeed, as shown in the following subsections, numerous imponderables existed at the time of the leadership application that justify Hagens Berman's fee request.

---

Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Incentive Awards, Mar. 16, 2015, ECF Nos. 1658; Order Granting Direct Purchaser Plaintiffs' Second Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Incentive Awards, Apr. 14, 2016, ECF No. 1851.

[19] *ODD I*, 959 F.3d at 935.

[20] Order at 7, June 4, 2010, ECF No. 96.

[21] *Id*. at 7-8.

[22] *Id*. at 8.

a.      **Hagens Berman could not have predicted the substantive expert work and amount of analysis required for class certification and the merits phase.**

This litigation was exceedingly hard-fought.[23] Multiple *Daubert* motions were filed against plaintiffs' experts, Dr. Flamm and Dr. Cabral.[24] Each motion took large amounts of attorney time to review, research, address with both Dr. Flamm and Dr. Cabral, non-testifying consultants and other experts, and draft responses. In addition to the *Daubert* motions, four separate defense experts filed seven expert reports in indirect purchaser litigation alone. Each report took large amounts of time to review, research, depose each expert (sometimes more than once), and address through testimony or a response by Dr. Flamm.[25]

Not only were the challenges to indirect purchasers' work more numerous than prior pieces of litigation, the amount of expert work itself was more intensive than anticipated, even beyond the sheer numbers.[26] Additional (and novel) analysis performed by the indirect purchasers here included:

- A Granger Causality test analysis, an analysis for which its inventor received the Nobel Prize in 2003, demonstrating antitrust impact by demonstrating that prices paid by Dell and HP for ODDs impacted the prices that other customers paid, and vice versa.[27]

---

[23] *See* Berman Decl., ¶ 7 (setting forth the facts in this paragraph).

[24] Defendants' Notice of Motion and Motion to Strike the Proposed Expert Testimony of Dr. Kenneth Flamm, Oct. 21, 2013, ECF No. 1034 (submitted under seal); Defendants' Joint Motion and Notice of Motion to Strike Testimony of Dr. Kenneth Flamm, July 21, 2017, ECF No. 2415 (submitted under seal); Defendants' Joint Motion and Notice of Motion to Strike Testimony of Dr. Kenneth Flamm, Aug. 10, 2017, ECF No. 2458 (submitted under seal); Defendants' Joint Notice of Motion and Motion to Exclude Certain Testimony of Indirect Purchaser Plaintiffs' Expert Witness Dr. Luis Cabral, July 21, 2017, ECF No. 2406 (submitted under seal); Defendants' Joint Notice of Motion and Motion to Exclude Certain Testimony of Indirect Purchaser Plaintiffs' Expert Witness Dr. Luis Cabral, Aug. 10, 2017, ECF No. 2460 (submitted under seal).

[25] Declaration of Dr. Janusz Ordover in Support of Defendants' Opposition to Class Certification, Oct. 21, 2013, ECF No. 1029 (submitted under seal); Declaration of Dr. Michelle M. Burtis in Support of Defendants' Opposition to Class Certification, Oct. 21, 2013, ECF No. 1035 (submitted under seal); Declaration of Dr. Michelle M. Burtis in Support of Defendants' Opposition to Indirect Purchaser Plaintiffs' Revised Motion for Class Certification, Aug. 14, 2015, ECF No. 1662 (submitted under seal); Declaration of Dr. Janusz Ordover in Support of Defendants' Opposition to Indirect Purchaser Plaintiffs' Revised Motion for Class Certification, Aug. 14, 2015, ECF No. 1664 (submitted under seal); [Corrected] Report of Dr. Andres V. Lerner, served April 3, 2017; Expert Report of Edward A. Snyder, Ph.D., served April 3, 2017; Updated Expert Report of Edward A. Snyder, Ph.D., served April 21, 2017.

[26] *See* Berman Decl., ¶ 8 (setting forth the facts in this paragraph).

[27] *See* Reply in Support of Revised Motion for Class Certification on Behalf of Indirect Purchaser Class ("Rev. Class Cert. Reply") at 1-2, Sept. 18, 2015, ECF No. 1677-2.

- Multiple co-integration analyses demonstrating that the prices of ODDs moved together in the market.

- Component level pass-through on ODDs, previously not required by any court. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 U.S. Dist. LEXIS 21696, at *50, (N.D. Cal. Feb. 21, 2012) (holding plaintiffs "need not reconstruct each LCD product sold to a class member and determine the price of its constituent parts to establish that the class member paid an overcharge attributable to the conspiracy").

- Hedonic pass-through regressions showing quality adjusted pricing paid by the consumer to demonstrate pass-through at initial price points.

The foregoing analyses, though well accepted in economic literature and practice, were novel for use in a price-fixing indirect purchaser action. Each took from dozens to hundreds of hours of attorney time as attorneys discussed criticisms from the court, defendants and defense experts with their own experts and planned responses to the many challenges. For months, if not years, weekly calls were held with economists to review strategy, data, discovery, and to coordinate the drafting of expert reports.

And even for those analyses that were commonly undertaken in indirect purchaser actions to demonstrate pass-through, the amount of analyses undertaken in *ODD* far exceeded the evidentiary record in other cases.[28] In *ODD,* indirect purchasers measured pass-through on *278 million ODD products* on one of the largest datasets of computer data ever collected. In contrast, in *TFT-LCD*, indirect purchaser's expert performed pass-through studies on only 2.8 million LCD panels.[29] This means that *ODD* measured 100 times the number of products as *TFT-LCD* in an attempt to prove pass-through. In *CRT*, the indirect purchasers' expert measured pass-through for 131 million individual CRTs, still only half the number measured in *ODD*.[30] And in *DRAM*, plaintiffs' expert

---

[28] *See* Berman Decl., ¶ 9 (setting forth the facts in this paragraph).

[29] Declaration of Janet S. Netz, Ph.D., in Support of Indirect Purchaser Plaintiffs' Motion for Class Certification (Redacted) at 114, *In re TFT-LCD (Flat Panel) Antitrust Litig*., No. 07-md-01827 SI (N. D. Cal. June 2, 2009), ECF No. 1023-7.

[30] Indirect Purchaser Plaintiffs' Notice of Motion and Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives at 17, *In re Cathode Ray Tube (CRT) Antitrust Litig*., No. 07-cv-5944 JST (N.D. Cal. Sept. 23, 2015, ECF No. 4071.

used 12,703 products to measure pass-through in the five-year class period.[31] The order of magnitude of econometric measurements undertaken in *ODD* versus this starting point of *DRAM* is staggering and could not reasonably have been contemplated when Hagens Berman submitted its leadership application in May 2010.

### b. The extent of work required to obtain class certification was not reasonably contemplated when Hagens Berman made its fee bid.

The Ninth Circuit stated on appeal that "[w]ithout more," a "second class certification motion" does not justify a variance from the fee bid.[32] The Court further stated that "it is not unusual for interim class counsel to have to take more than one run at class certification."[33] Under the circumstances, there is "more" that justifies an upward variance from the fee bid because of the extensive class certification work.

### (1) Hagens Berman's effort in obtaining class certification by means of a renewed motion is rarely duplicated and provided great value to the indirect purchaser class.

As explained by Professor Joshua P. Davis, it is rare in antitrust cases for plaintiffs to move for class certification, to have class certification denied, and then to succeed under a renewed motion for class certification other than in the settlement context.[34] This is apparent from an analysis of antitrust disputes that Professor Davis has undertaken, wholly apart from this litigation. He has analyzed 100 disputes that were randomly sampled from all of the antitrust disputes filed in federal court pending as of January 1, 2009, that ended by January 1, 2020, and that involved at least one proposed class action. The court denied class certification in whole or in part in 51 of the 100 cases, and in over half of those 51 cases, plaintiffs failed to obtain any class recovery at all.[35] Moreover, Professor Davis identified only two antitrust disputes in which a court denied class certification and

---

[31] Declaration of Michael J. Harris in Support of Indirect Purchaser Plaintiffs' Motion for Class Certification (Redacted), Ex. 3, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 02-md-01486-PJH (N.D. Cal. July 10, 2007), ECF No. 1624.

[32] *ODD I*, 959 F.3d at 935.

[33] *Id.*

[34] *See* Expert Report of Professor Joshua P. Davis ("Davis Report"), ¶¶ 50–52, concurrently filed herewith.

[35] *Id.*

1    class counsel then succeeded in obtaining class certification for purposes of litigation. As Professor

2    Davis notes, it is much more common for a court to deny class certification in a litigation context and

3    then to grant class certification only as part of a settlement.[36]

4         Moreover, Professor Davis explains that, as the Court and parties know, certifying a class for

5    litigation purposes greatly enhances the value of a case. And that was certainly true here. Prior to the

6    certification of a litigation class, defendants offered very little recovery through settlements with the

7    indirect purchaser class. One need look no further than the Panasonic settlement itself. Panasonic and

8    indirect purchasers reached this agreement while the second motion for class certification was

9    pending. The settlement contained a high-low bracket depending on the outcome of the second class

10   certification motion. If the court denied certification, the class would have received $5 million. If

11   certification were granted, the class would receive $16.5 million.[37] Panasonic, a sophisticated litigant

12   valued the certification of the class at over three times the value of no-certification.

13        And counsel for the indirect purchasers' ultimate success on the renewed motion for class

14   certification explains why Hagens Berman obtained such a large recovery compared to the direct

15   purchasers, despite a clear general pattern to the contrary.[38] Indeed,  Professional Davis's empirical

16   research shows that, in antitrust cases in federal court, direct purchaser classes generally recover

17   significantly more than indirect purchaser classes, in part because of the need to prove pass-through

18   for indirect purchasers and in part because direct purchaser classes tend to be nationwide, while

19   indirect purchaser classes usually include only a subset of states (such as the 24 states certified in this

20   matter).[39]

21        Nonetheless, the indirect purchaser class in this litigation recovered $205 million in contrast

22   to the direct purchaser class recovery of $74.9 million. As Professor Davis shows in detail, direct

23

24

25        [36] *Id.*, ¶ 3(b)(ii).

26        [37] Declaration of Shana E. Scarlett in Support of Motion for Preliminary Approval of Settlements
     with Panasonic and NEC Defendant Families, Ex. A at 9, Dec. 17, 2015, ECF No. 1761-2.

27        [38] Davis Report, ¶ 52.

28        [39] *Id.*, ¶¶ 42–49.

purchasers in antirust cases average recoveries two-and-a-half times larger than indirect purchasers.[40] Here, in contrast, the indirect purchasers recovered over two-and-a-half times more than the direct purchasers. That flips the average ratio. Using the direct purchaser recovery as a baseline indicates that the indirect purchasers recovered here over 6 times the amount one would ordinarily expect.[41] And this disparity can be attributed in large part to Hagens Berman's efforts in prevailing on its renewed motion for class certification.

> **(2)** **In its renewed motion for class certification, Hagens Berman presented extensive expert analyses that had never been presented in similar class actions in this District.**

Hagens Berman filed its application to be appointed in May 2010.[42] At that time, several class actions claiming price-fixing of component parts had been brought in this District: *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 02-md-01486 (J. Hamilton) (filed 2002); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819 (J. Wilken) (filed 2007); *In re Flash Memory Antitrust Litig.*, No. 07-cv-00086 (J. Armstrong) (filed 2007); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 08-md-1827-SI (J. Illston) (filed 2007); and *In re Graphics Processing Units (GPU) Antitrust Litig.*, No. 07-md-1826 (J. Alsup) (filed 2007). Of those five cases, one case (*DRAM*) was on appeal from the granting of a motion to dismiss, two cases (*SRAM* and *LCD*) had been certified as class actions, and class certification had been denied in two (*Flash* and *Graphics*).

*DRAM* had no effect on Hagens Berman's fee bid.[43] In *DRAM*, Judge Hamilton held that the indirect purchasers' claims under state laws for price-fixing of component parts were too remote to provide standing.[44] That holding did not affect Hagens Berman's bid, for two reasons. First, this litigation would have ended quickly if that ruling had been applied. Second, no other court in this

---

[40] *Id.*, ¶¶ 44-48.

[41] *Id.*, ¶ 44.

[42] *See* Berman Decl., ¶ 10 (setting forth the facts in this paragraph).

[43] *See id.*, ¶ 8 (setting forth the facts in this paragraph).

[44] *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007).

1    District has agreed with that ruling. In particular, Hagens Berman knew at the time of their bid that

2    both Judge Alsup in *Graphics* and Judge Illston in *TFT-LCD* disagreed with it.[45]

3         The four cases other than *DRAM* presented Hagens Berman with what it reasonably believed

4    was a pathway to certification of an indirect purchaser class in this case.[46] On August 7, 2018, Judge

5    Alsup denied class certification in *Graphics* because "the market for GPU products is highly

6    heterogeneous."[47] The court explained that "each graphics product not only varied as to performance

7    level but also as to its ultimate application. Many of the graphics products sold were particularly

8    customized to the needs of a specific purchaser, meaning they could not be interchanged with any

9    other GPU product sold by defendants. . . . In short, these products were *not* fungible

10   commodities."[48]

11        When making its bid in this case, Hagens Berman reasonably believed it could distinguish

12   *Graphics* and successfully rely on the certification of classes in *TFT-LCD* and *SRAM*.[49] In *TFT-LCD*,

13   Judge Illston distinguished *Graphics* in certifying a class of indirect purchasers of component parts.

14   Unlike in *Graphics*, the plaintiffs in *TFT-LCD* "submitted considerable evidence—disputed by

15   defendants—that TFT–LCD panels are fungible, interchangeable, and largely homogenous."[50]

16   Similarly here, Plaintiffs explained in their reply brief in support of their initial motion for class

17   certification that "defendants admit that from a consumer's perspective, ODDs were highly

18   interchangeable."[51]

19        Moreover, making its application for leadership in May 2010, Hagens Berman reasonably

20   relied on the expert analyses approved for class certification in *TFT-LCD* and *SRAM*.[52] In *TFT-LCD*,

21   _____

22        [45] *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007);
     *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 1109, 1123 (N.D. Cal. 2008).

23        [46] *See* Berman Decl., ¶ 12 (setting forth the facts in this paragraph).

24        [47] *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491 (N.D. Cal. 2008).

     [48] *Id.*

25        [49] *See* Berman Decl., ¶ 13 (setting forth the facts in this paragraph).

26        [50] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 605 (N.D. Cal. 2010).

27        [51] *See* Indirect Purchaser Plaintiffs' Reply in Support of Motion for Class Certification at 11,
     March 7, 2014, ECF No. 1159.

28        [52] *See* Berman Decl., ¶ 14 (setting forth the facts in this paragraph).

1    Judge Illston explained that the plaintiffs' expert report "is supported by defendants' transactional

2    data as well as industry data, and courts have accepted multiple regression analyses as means of

3    proving antitrust injury and damages on a class-wide basis. Defendants' challenges to plaintiffs'

4    evidence and [expert] analyses go to the merits of plaintiffs' claims, and will be resolved by the trier

5    of fact."[53] Similarly, in certifying a class of indirect purchasers of component parts in *SRAM*, Judge

6    Wilken explained in part that the plaintiffs' expert model "uses end-use purchase price information

7    and analyzes market supply and demand to determine the presence of pass-through" and that "the use

8    of averaged and aggregated data is not fatal to IP Plaintiffs' econometric models."[54] Finally, Hagens

9    Berman reasonably believed they could distinguish the denial of class certification in *Flash* on

10   March 31, 2010. In *Flash*, the plaintiffs had performed only an "illustrative" regression analysis of

11   pass-through using data relating to five entities.[55] Judge Armstrong criticized the indirect purchasers

12   for not attempting to assess whether pass-through rates varied by products or by customers.[56]

13          In summary, Hagens Berman reasonably believed at the time of its fee bid that *GPU*, *SRAM*,

14   and *TFT* left a viable pathway to recovery for an indirect purchaser class, one where class counsel

15   sought data to confirm the predictions of economic theory, that overcharges due to a cartel will be

16   passed on to the end-consumer.[57] Class counsel would need to collect real-world data from market

17   participants, and, using one consistent regression model, measure pass-through to the end consumer.

18   Indeed, in the later-filed *Cathode Ray* litigation, Judge Conti certified a class of indirect purchasers,

19   relying on *TFT-LCD*, while distinguishing *Graphics* and *Flash*.[58]

20

21          [53] *TFT-LCD*, 267 F.R.D at 606.

22          [54] *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 613, 614 (N.D. Cal. 2009).

23          [55] *In re Flash Memory Antitrust Litig.*, No. C 07-00086 SBA, 2010 WL 2332081, at *12 (N.D. Cal. June 9, 2010).

24          [56] *Id.*

25          [57] *See* Berman Decl., ¶ 15 (setting forth the facts in this paragraph).

26          [58] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944 SC, 2013 WL 5391159, at *8 (N.D. Cal. Sept. 24, 2013) ("Defendants point to two cases in which Dr. Netz's models were rejected as proof of why they should be rejected in this case. . . . In *Flash Memory*, the court rejected Dr.
27   Netz's regression analysis for not accounting for variances in price trends based on particular chips, categories of chips, or categories of consumers. 2010 WL 2332081, at *10. In *GPU*, the court
28   rejected Dr. Netz's analysis for not accounting for variable factors that would impact prices. Both

1   Despite those reasonable expectations, this Court denied the motion for class certification on

2   October 3, 2014.[59] In particular, this Court held that plaintiffs had not "presented a persuasive

3   explanation as to why it would be reasonable to assume a uniform pass through rate given that ODDs

4   typically make up a relatively small portion of the cost of the products into which they are

5   incorporated, and given the existence of price points —i.e., the common practice in the industry of

6   selling products costing in the hundreds of dollars at prices just under the next $100 mark."[60] As to

7   the first point, Judge Wilkens had stated in *SRAM* that "Defendants also argue that, because SRAM

8   is a relatively small portion of the price of an overall product, any price increase in SRAM will have

9   a de minimis effect. This argument has no merit. Defendants may not shield themselves from

10  liability by fixing prices on a relatively inexpensive item."[61] This Court's differing view presented an

11  additional challenge to obtaining class certification.

12  And the "price point" issue introduced a new concept into a pass-through analysis that was

13  not addressed by *Graphics*, *SRAM*, *TFT-LCD*, or *Flash*.[62] It meant that indirect purchasers would

14  have to show pass-through at the initial price point. Because traditional regression models used to

15  measure pass-through require a change in costs against price, these previously employed models

16  would not be sufficient. Using hedonic regression models, indirect purchasers eventually established

17  a methodology common to the class sufficient to have a class certified on February 8, 2016.[63]

18

19

20

21

---

22  cases are inapposite here. The IPPs have submitted evidence that CRTs are not so variable as flash
    memory or graphics processing units, which were highly customized and not generally

23  interchangeable. Rather, CRT prices, as Dr. Netz found, depend on a small set of variables, for which
    her model accounts. The IPPs' case, again, is much more like *TFT-LCD*, in which Judge Illston

24  considered and rejected an identical argument about averages.").

    [59] *See* Berman Decl., ¶ 16 (setting forth the facts in this paragraph).

25  [60] *In re Optical Disk Drive Prods. Antitrust Litig.*, 303 F.R.D. 311, 324–25 (N.D. Cal. 2014).

26  [61] *SRAM*, 264 F.R.D. at 614.

    [62] *See* Berman Decl., ¶ 17 (setting forth the facts in this paragraph).

27  [63] Order Granting Indirect Purchasers' Renewed Motion for Class Certification, Feb. 8, 2016,
    ECF No. 1783.

28

In short, in light of existing case law, Hagens Berman could not have foreseen the extensive work required to obtain class certification by means of a renewed motion, which resulted in great benefits to the class of indirect purchasers.[64]

        **c.**      **Novel litigation regarding the discoverability of the FBI recordings was not contemplated.**

Also unforeseen at the outset of this litigation was the time that would be expended on subpoenaing and litigating the production of a set of secret recordings and transcripts made as a part of the earlier Department of Justice criminal antitrust investigation into the ODD industry.[65] The indirect and direct purchasers subpoenaed the DOJ for these recordings after the announcement of the closure of the criminal investigation. After negotiating a protective order that would apply to the recordings, the DOJ agreed to produce them.[66] If this were the end of the saga, this would have been reasonable and foreseeable. But rather than allow production, one of the participants on the tape (John Doe) moved to quash the production, arguing it might destroy his professional reputation.[67] Magistrate Judge Spero disagreed and ordered the production of the materials. This Court overruled the objections of John Doe and one of the defendants.[68] Alongside the objections over this production were many hours spent negotiating the terms of a protective order with a defendant and individual who had no intention of agreeing that these materials would be produced, leading to many wasted hours.

After this Court ordered production of the materials, John Doe filed an emergency motion for injunction relief to the Ninth Circuit.[69] Doe asked for a stay of production of the materials pending

---

[64] Berman Decl., ¶ 18.

[65] *Id.*, ¶ 19 (setting forth the facts in this paragraph).

[66] *In re Optical Disk Drive Prods. Antitrust Litig.*, 801 F.3d 1072, 1075 (9th Cir. 2015).

[67] *Id.* How the reputational harm to John Doe might come to pass remained and continues to remain unclear, given that he continued to be employed by one of the defendants and had since been promoted within the company. A more cynical person might believe that the defendants in the case did not wish the materials to be used against them at trial, and launched a years-long campaign to ensure the evidence stayed out of the hand of the indirect purchasers.

[68] *Id.* at 1079.

[69] Interested Non-party Appellant John Doe 1's Emergency Motion for Injunction Under Circuit Rule 27-3, *In re Optical Disk Drive Antitrust Litig.*, No. 14-17502 (9th Cir. Dec. 22, 2014), ECF No. 3-1.

1   the Ninth Circuit's ruling. In addition to opposing the emergency request for relief, indirect

2   purchasers' counsel took the lead on briefing to and arguing before the Ninth Circuit. It resulted in an

3   order to produce the materials and recordings which were then used in deposition and were certain to

4   become a centerpiece of any trial.[70] Indirect purchasers (Hagens Berman) took the lead on every

5   brief and oral argument where these records were at issue.

6       This discovery dispute went far beyond any path that reasonable plaintiffs' counsel could

7   have foreseen in 2010, resulting in the investment of far more time and energy than in other cases by

8   class counsel, all for the benefit of the class.[71] To the extent there were criminal prosecutions in prior

9   component cases in this District, Hagens Berman is unaware of any evidentiary material similar to

10  the recordings compelled in *ODD*. And in any event, an extensive battle of the type waged by the

11  defendants to keep these recordings out of the hands of civil counsel was not reasonably foreseeable.

12          **d.**    **Defendants' use of the criminal proceedings to attack both the**
13                  **composition and the impact on the class was an unforeseen and**
                        **unprecedented event.**

14       Although the FBI recordings were an important piece of evidence, the role of the criminal

15  proceedings also acted as an unpredictable force on these proceedings, unseen at the time of the May

16  2010 leadership application.[72] Only one day before the leadership applications were due, on May 12,

17  2010, the DOJ intervened and disclosed to Judge Walker (then the assigned judge) and litigants that

18  there was a pending criminal investigation into the ODD industry.[73] The DOJ stated that there was

19  currently a grand jury sitting in the Northern District of California. Although it had been previously

20  disclosed in news reports, the DOJ's request to intervene in the proceedings indicated to the litigants

21  the overlapping nature of the cases and increased the likelihood of an indictment or a guilty plea.

22  Certainly the existence of a criminal investigation factored into Hagens Berman's leadership

23  application.

24

25       [70] Berman Decl., ¶ 20.

26       [71] *See id.*, ¶ 21 (setting forth the facts in this paragraph).

        [72] *See id.*, ¶ 22 (setting forth the facts in this paragraph).

27       [73] Memorandum of Points and Authorities in Support of the United States' Motion to Intervene
28  Under Fed. R. Civ. P. 24(b)(1)(B), May 12, 2010, ECF No. 43.

What was not known at the time, and what could not be known, was that the defendants would use the existence of what became a very narrowly charged criminal conspiracy (or set of conspiracies) to undermine the class proceedings.[74] The government action focused on the impact of defendants' alleged bid-rigging and price fixing of auctions and contracts with three customers—Dell, HP, and Microsoft.[75] The rigged procurements were limited in time, essentially fourteen discrete events from June 2004 to October 2008.[76] The indirect purchasers, in contrast, alleged that the conspiracy was industry-wide, harming all purchasers of computers in the states providing for standing for indirect purchasers, and not just purchasers of Dell and HP computers alone. The class period also covered all of 2003 to 2008, not just the rigged bids themselves.[77] In the end, the government obtained total fines of $21.2 million and incarceration totaling slightly less than 2-½ years.[78]

The narrow focus of the government investigation impacted these proceedings from the start.[79] In its second motion to dismiss order, this Court held the indictments and guilty pleas "serve to tip the DOJ investigation from a 'non-factor,' as it was described in the prior order, to an item of relevance as to the plausibility of plaintiffs' conspiracy claims, albeit well short of dispositive on the breadth of the claimed conspiracy."[80] Because of the greater scope of the civil allegations, it also required an extraordinary amount of independent litigation. The early production of documents produced to the DOJ was limited in scope and time period, meaning that the bulk of the 2.9 million documents produced in this litigation were ones pursued by the civil plaintiffs. The documents

---

[74] *See* Berman Decl., ¶ 23 (setting forth the facts in this paragraph).

[75] *See United States of America v. Young Keun Park*, No. 3:11-cr-00911-RS, Plea Agreement at 4, Mar. 28, 2012, ECF No. 8.

[76] *See United States of America v. HLDS*, No. 3:11-cr-00724-RS, Plea Agreement at 4, Oct. 28, 2011, ECF No. 5-1.

[77] *See In re Optical Disk Drive Prods. Antitrust Litig.*, 10-md-02143-RS, 2017 WL 6503743, at *1 (N.D. Cal. Dec. 18, 2017), *aff'd*, 785 Fed. App'x 406 (9th Cir. 2019).

[78] Davis Report, ¶ 67.

[79] *See* Berman Decl., ¶ 24 (setting forth the facts in this paragraph).

[80] *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 10-md-2143 RS, 2012 WL 1366718, at *2 (N.D. Cal. Apr. 19, 2012).

produced to the civil plaintiffs also spanned multiple countries and continents. Indeed, after the civil plaintiffs procured documents from defendants Toshiba Corporation, Toshiba Samsung Storage Technology Corporation, Toshiba Samsung Storage Technology Corporation Korea, and Toshiba American Information Systems, Inc., the Department of Justice itself subpoenaed those documents from plaintiffs.

The criminal action was closed in approximately April 2014.[81] Yet civil litigation over the merits of this case continued to 2019, the point at which the indirect purchasers lost their appeal from the order granting  the motions for summary judgment on behalf of the class—a full five years after the criminal proceedings had ended. During this time, the indirect purchasers undertook an enormous effort to build evidence to support recovery for the class. The plaintiffs deposed 66 of defendants' current and former employees, with Hagens Berman attorneys taking the lead in 50 of those depositions. Some of the depositions lasted nearly a week, with extra time for translation and the defendants themselves questioning the employees of their co-conspirators. Plaintiffs' experts were deposed for a total of 10 days, and Hagens Berman deposed 13 separate entities to build evidence on pass-through and to gain access to defendants' phone records. All of this evidence was separate from, and in addition to, the criminal prosecutions undertaken by the Department of Justice. The narrow focus of the criminal proceedings, requiring enormous effort by indirect purchasers to overcome the perception of this Court that the conspiracy was so limited in scope, was also unforeseen at the time of the leadership application in May 2010.

e.    **The amount of contested discovery in *ODD* versus prior *per se* price-fixing cases in this District was not contemplated.**

The resistance of the defendants to discovery in *ODD* far exceeded that of other price-fixing cases in this District (or elsewhere).[82] The contentiousness of discovery is shown by the number of discovery hearings required before a magistrate or special master. Hagens Berman led or argued 29 distinct discovery disputes in front of Magistrate Judge Spero over eight years of discovery. Compare that to the six discovery disputes involving IPP counsel in the *SRAM* litigation over four

---

[81] *See* Berman Decl., ¶ 25 (setting forth the facts in this paragraph).

[82] *See id*., ¶ 26 (setting forth the facts in this paragraph).

years, and the 15 discovery disputes over five years in the *LCD* litigation. That is nearly five times as many disputes as *SRAM* and twice as many disputes as the *LCD* litigation. And discovery in *ODD* lasted eight years, twice the length in *SRAM* and nearly so in *LCD*.

The discovery necessary to address a rising bar for pass-through also was unforeseen based on the prior cases.[83] For example, in *DRAM*, the indirect purchasers' counsel subpoenaed 30 non-parties;[84] in *LCD*, approximately 50 non-party subpoenas received subpoenas;[85] and in *CRT*, again, 51 non-parties were subpoenaed.[86] In *ODD*, indirect purchasers subpoenaed **one hundred** non-parties to obtain data used for the pass-through analysis.



This means ODD doubled the number of subpoenas served in prior similar cases. And the size of datasets utilized was enormous. Subpoenas to Dell and HP resulted in the production of multiple large and unique datasets. The Dell dataset alone was 3 million observations for over 7 million

---

[83] *See id.*, ¶ 27 (setting forth the facts in this paragraph).

[84] Declaration of Terry Gross in Support of Joint Motion for Attorneys' Fees, ¶ 10, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 02-md-01486-PJH (N.D. Cal. Feb. 28, 2014), ECF No. 2182.

[85] Declaration of Craig C. Corbitt in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees and Incentive Awards, ¶ 14, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-01827 SI (N.D. Cal. Sept. 7, 2012), ECF No. 6662-1.

[86] Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses and Incentive Awards, ¶ 28, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944 JST (N.D. Cal. Sept. 23, 2015), ECF No.4071-1.

computers.[87] This level of defendants' zealous litigation in discovery and the number of non-party subpoenas were not foreseeable at the outset of the case.

### f.    The length of this litigation far exceeded the norm.

Because of all the foregoing, it took more than nine years from the date this case was filed on October 27, 2009, until this Court approved the third group of settlements on February 21, 2019, and it took more than ten years until the Ninth Circuit affirmed approval of the settlements on May 15, 2020. As Professor Davis explains, fewer than 10% of antitrust class actions last more than eight years before final approval.[88]

**C.    In light of the foregoing important factors that were not reasonably contemplated at the time of Hagens Berman's fee bid, this Court's fee award of $47,780,000 is a reasonable variance from the fee bid.**

This Court has already determined that Hagens Berman's fee request is a reasonable variance from the fee bid. In the third order granting Hagens Berman's request for fees, this Court explained that in its previous two orders, it "determined that recovery at a higher percentage rate than specified in the bid was appropriate. The approval of fees at a higher rate than specified in the bid, however, was predicated in part on the fact that the amount was still substantially lower than would have been justified in the absence of the bid."[89] This Court then explained that the third fee request "itself (20%) still reflects a rate that is lower than might otherwise be supportable under the law and the facts but for the bid[.]"[90] The Court made those findings, while awarding Hagens Berman slightly more than $5 million in reimbursed expenses in connection with the first two fee requests but none for the third fee request. Now that Hagens Berman no longer seeks reimbursement of expenses, this Court's finding that its fee requests were reasonable should be reaffirmed.

---

[87] Indirect Purchaser Plaintiffs' Revised Motion for Class Certification at 31, May 20, 2015, ECF No. 1623-1 (filed under seal).

[88] Davis Report, ¶¶ 55, 56; *id.*, Figure 3 (from 2018 Antitrust Report).

[89] Third Approval Order at 20.

[90] *Id.*

1

       **1.**      **The fee request is reasonable in light of fee awards in other antitrust cases and, in particular, the fee awarded to counsel for direct purchasers in this litigation.**

2

3

      Hagens Berman's request for fees of $47,780,000 constitutes 23.3% of the $205 million

4

settlement fund. That percentage is somewhat misleading, because Hagens Berman is absorbing all

5

of expenses, which total $5,723,311.54, as set forth in their three fee requests. When those expenses

6

are deducted from the requested fee award, Hagens Berman's net proceeds would be $42,056,688.46,

7

which is 20.5% of the total settlements. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935,

8

942 (9th Cir. 2011) ("where awarding 25% of a 'megafund' would yield windfall ***profits*** for class

9

counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or

10

employ the lodestar method instead") (emphasis added).

11

      An award of 23.3% (or 20.5% after deduction of expenses) is a reasonable variance from the

12

fee bid. Courts in this District frequently award fees from 25% to 30% percent in large electronic

13

antitrust class actions such as this, in addition to reimbursing expenses.[91] And Professor Davis's

14

empirical research shows that, absent a bid, the median attorneys' fee award in an antitrust class

15

action of this size is between 28% and 30% percent for settlements between $100 and $250 million,

16

in addition to reimbursement of expenses.[92] So awarding Hagens Berman 23.3% (or 20.5% after

17

deducting expenses) as a fee is much less than it could have been awarded without a fee bid and,

18

therefore, is a reasonable variance from the bid, particularly when counsel for the direct purchaser

19

plaintiffs in this litigation received a fee award of 30%, plus expenses, for total settlements of $74.9

20

million. Indeed, the total fees and expenses awarded to attorneys for the direct purchasers amount to

21

***34.8%*** of the total settlements.

22

23

---

24

    [91] *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No07-md-1827 SI, 2013 WL 1365900

25

(N.D. Cal. Apr. 3, 2013), at *8 (28.6%); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827 SI, 2013 WL 149692 (N.D. Cal. Jan. 14, 2013) (30%); *In re TFT-LCD (Flat Panel) Antitrust*

26

*Litig.*, No. 07-md-1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) (30%); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, (N.D. Cal. June 30, 2011), ECF No. 1370 (30%); *In re*

27

*Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486-PJH, 2007 WL 2416513, at *1 (N. D. Cal. Aug. 16, 2007) (25%).

28

    [92] Davis Report, ¶¶ 30-36.

**2.      The fee request is reasonable in light of the factors applied to determine the reasonableness of a fee request.**

When considering the reasonableness of a fee request under the percentage-of-recovery method, courts consider numerous factors.[93] Hagens Berman discussed these standards in detail in their three fee motions, which this Court granted. Those factors continue to support Hagens Berman's fee request, particularly now that the firm no longer seeks reimbursement of expenses. Rather than repeat its discussion of those factors, Hagens Berman highlights some of them below.

**a.      Hagens Berman achieved exceptional results for the Class.**

Recovery of $205 million for the indirect purchaser class is exceptional. Considering each settling defendant's market share, the percentage of recovery is as follows:[94]

| Defendant Family | Contribution to Settlement Fund | Percent Share of ODD Market | Damages Attributed to Defendant Family | Percent Recovery for IPPs |
|---|---|---|---|---|
| HLDS | $73,000,000.00 | 26% | $283,483,200 | 26% |
| NEC/Sony (Joint Venture) | $35,000,000 | 10% | $107,380,000 | 33% |
| Panasonic | $16,500,000 | 12% | $128,856,000 | 13% |
| PLDS | $40,000,000 | 18% | $193,284,000.00 | 21% |
| Pioneer | $10,500,000 | 6% | $64,428,000.00 | 16% |
| TEAC | $5,000,000 | 2.5% | $26,800,000 | 19% |
| SEC/Toshiba Corp./TSST/TSSTK Samsung | $25,000,000 | 19% | $204,022,000 | 12% |
| **Total** | **$205,000,000** | **93.5%** | **$1,008,253,200** | **20%** |

These settlements represent recovery of 20% of the estimated damages attributable to the market share of these defendants, and more than 19% of total estimated damages ($1.074 billion) suffered by indirect purchasers, which includes the estimated damages caused by non-settling defendants.[95] Measured against the direct purchaser settlements in this case, the indirect purchaser settlements are superior. The total indirect purchaser settlements of $205 million are more than 2.7 times higher than the total settlements ($74.9 million) recovered by the direct purchasers. Despite

---

[93] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954-55 (9th Cir. 2015).

[94] Berman Decl., ¶ 28.

[95] *Id.*, ¶ 29.

these superior results, Hagens Berman requests fees that constitute 23.3% of the total settlements (or 20.5% after expenses are deducted), versus the 30% awarded to the direct purchaser attorneys (or 34.8% when fees and expenses are taken into account).

**b.      This case posed a substantial risk for Hagens Berman.**

The risks associated with this case play an important role in determining a fair fee award.[96] As the Ninth Circuit explained, this Court cited "factors that amply supported its determination that this litigation was very risky. Indeed, the last two non-settling defendants ultimately prevailed over the class at the summary judgment stage. . . . Overall, the district court did not err in assessing the *Vizcaino* risk factor."[97]

**c.      The burdens on Hagens Berman support the request for attorneys' fees.**

The Ninth Circuit instructs courts to consider the burdens class counsel experienced while litigating the case (such as cost, duration, foregoing other work). This litigation took over ten years from inception until the Ninth Circuit affirmed this Court's orders approving the settlements. And Hagens Berman expended more that $5 million in out-of-pocket costs during that time.

**D.      Using lodestar as a cross-check further supports the requested fees.**

Hagens Berman invested $30,031,834.70 in attorneys' fees in this litigation.[98] The multiplier for an award of $47,780,000 in fees is 1.59 for more than eight years of hard-fought litigation. And

---

[96] *Online DVD-Rental*, 779 F.3d at 955.

[97] *ODD I*, 959 F.3d at 935.

[98] Attached as Exhibit A to the Berman Declaration are summaries by individual of the hours, billing rate, and lodestar for each biller's work on this matter between March 2, 2010 and August 28, 2020, inclusive. The total lodestar when Hagens Berman moved for its final set of fees in February 2019 was $30,031,834.70. *See* Third Approval Order at 13. Since that point in time, Hagens Berman has incurred an additional $1,913,325.80 in lodestar. Berman Decl., ¶ 3. Hagens Berman's detailed billing records for the ten years of this case are attached as an exhibit for this Court. *Id.*, ¶ 2. Since the Court's award of attorneys' fees in February 2019, attorneys at Hagens Berman have continued to vigorously represent the interests of the class, including briefing and arguing against this Court's granting of BenQ's motion for summary judgment, defending the reasonableness of the settlements on behalf of the class against objectors, and continuing to respond to inquiries from class members on a near-weekly basis about the timing of distribution. *Id.*, ¶ 3. In addition to these tasks, Hagens Berman is not requesting any reimbursement for the time that it spent moving for attorneys' fees and for litigating the issue of attorneys' fees twice before the Ninth Circuit, and now moving for attorneys' fees for the fourth time before this Court. *Id.* This time is not inconsequential and takes our attorneys away from other litigation and work on behalf of other classes that is important and valuable. *Id.*

when Hagens Berman's expenses are deducted from that award, to reflect its true proceeds, the multiplier is 1.42. In contrast, if Hagens Berman were awarded only $25,855,000.00, as calculated under the fee grid, the multiplier would be only 0.86 despite the exceptional results that Hagens Berman obtained for the indirect purchaser class. Moreover, a lodestar multiplier of 1.59 (or 1.42 after expenses are deducted) is conservative and at the low end of the range of multipliers surveyed by the Ninth Circuit in *Vizcaino*, which looked at common fund settlements between $50-200 million. *Vizcaino* found that in 20 of the 24 cases it surveyed, the multiplier was between 1.0 and 4.0.[99] The cases *Vizcaino* surveyed involved common funds of $50-200 million.[100] The settlements in this case equal $205 million, but Hagens Berman has requested a fee award that would result in a lodestar multiplier near the bottom of the range surveyed in *Vizcaino*, which would constitute a reasonable variance from the fee calculated under the fee grid.

And the lodestar multiplier of 1.59 (or 1.42 after expenses are deducted) is justified under the "reasonableness" factors applied by the Ninth Circuit.[101] These are called *Kerr* reasonableness factors after *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). Foremost is the "benefit obtained for the class."[102] Here, there can be no dispute regarding the exceptional results achieved for the class. But the other factors also support the multiplier requested by Hagens Berman.

### 1. Hagens Berman achieved exceptional results for the Class.

The first factor, the results for the class, strongly supports an upwards adjustment from lodestar. As outlined above, the results achieved on behalf of the class dwarf those of the direct purchasers and are excellent by any measure.

### 2. Hagens Berman expended significant resources on behalf of the Class.

Hagens Berman was appointed as sole lead counsel on behalf of the IPP class. As a result, Hagens Berman staffed this case entirely with its own resources during a decade of litigation. That commitment of time, personnel, and more than $5 million in expenses supports the award.

---

[99] *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002).

[100] *Id.* at 1052-54.

[101] *In re Bluetooth*, 654 F.3d at 941.

[102] *Id.* at 942.

### 3.   This case presented novel and difficult questions, requiring extraordinary skill by Hagens Berman.

The third and fourth factors—the novelty of the questions presented by the litigation and the skill required to perform the legal services properly—both support the requested award. Hagens Berman faced a parade of novel legal arguments from the defendants. Defendants claimed that "no case has certified a class" on the same basis and record as this case.[103] Regarding this Court's choice-of-law analysis, defendants argued to the Ninth Circuit that "[n]either this Court nor the California Supreme Court has ever addressed whether the Cartwright Act can be applied across-the-board to all jurisdictions with '*Illinois Brick* repealer' statutes."[104] In litigating against TSST-Korea and the TSST-Korea employee "John Doe," Hagens Berman addressed the unique issue of whether the DOJ recordings were "grand jury" materials. Hagens Berman also faced a parade of complex, challenging, and novel issues in opposing defendants' summary judgment motions, *Daubert* motions, and motion for decertification. These issues included defending against myriad challenges to the methods and conclusions of plaintiffs' experts, demonstrating that fact disputes precluded summary judgment on the issue of the existence of the alleged conspiracy, fending off the decertification motion, and showing that proper application of the Foreign Trade Antitrust Improvements Act (FTAIA) would not reduce the amount of IPPs' damages should they succeed on the merits. All of these issues have required advocacy and skill beyond routine litigation.

### 4.   Hagens Berman has forgone other employment.

Hagens Berman dedicated a core team of individuals to the litigation of this action. Rather than the sprawling involvement of many firms, from the beginning of the case, Hagens Berman has dedicated an efficient and streamlined team to this litigation. The consequence of dedicating a team of experienced antitrust attorneys has meant that many of these professionals worked nearly exclusively on this case for some number of years. Ten attorneys dedicated over a thousand hours

---

[103] Petition for Permission to Appeal the District Court's Order Granting Class Certification at 1, *Wagner, et al. v. Hitachi Ltd., et al.*, No. 16-80026 (9th Cir. Feb. 22, 2016), ECF No. 1.

[104] *Id.* at 20.

each to this litigation, and many of those attorneys have devoted many thousands of hours. Hagens

Berman's choice to commit the resources of its firm supports the fee request.

### 5. The requested fee is reasonable when compared to fees in similar litigation

For reasons discussed above, the sixth and eighth *Kerr* factors—the customary fee and

awards in similar cases—support the fee request. Hagens Berman request a multiplier of 1.59 (or

1.42 after expenses are deducted), which is well within the range of other similar cases.[105]

### 6. The reputation and ability of Hagens Berman support the requested fee.

Hagens Berman is one of the most well-respected class action litigation firms in the country

and has litigated some of the largest class actions in history, including the tobacco litigation,[106] *In re*

*Visa MasterCard Litigation*,[107] and the *In re Toyota Motor Corp. Unintended Acceleration*

*Litigation*.[108] Hagens Berman has over 70 lawyers in offices across the country. Since its founding in

1993, the firm has been recognized in courts throughout the United States for its ability and

experience in handling major class litigation efficiently and obtaining outstanding results for its

---

[105] *See, e.g.*, *Vizcaino*, 290 F.3d at 1050-51 (upholding a 28% fee award that constituted a 3.65 multiple of lodestar); *id.* at 1052-54 (noting district court cases in the Ninth Circuit approving multipliers as high as 6.2, and citing only 3 of 24 decisions with approved multipliers below 1.4); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 96 (2d Cir. 2005) (finding 3.5 multiplier reasonable); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 4126533, at *10 (N.D. Cal. Aug. 3, 2016) (finding that a multiplier of 1.96 "is well within the range of acceptable multipliers"); *Noll v. eBay, Inc.*, 309 F.R.D. 593, 610 (N.D. Cal. 2015) (lodestar cross check, with 1.6 multiplier, confirmed reasonableness of the percentage-based calculation); *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (2.83 multiplier found appropriate); *In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 U.S. Dist. LEXIS 37286, at *31 (N.D. Cal. Mar. 18, 2013) (finding that a lodestar multiplier of 1.66 confirms the reasonableness of the percentage-based attorneys' fees calculation, 25% of the settlement fund); *Lane v. Facebook, Inc.*, No. C 08-3845 RS, 2010 U.S. Dist. LEXIS 57765, at *10 (N.D. Cal. May 24, 2010) (finding that a multiplier of 2 should be applied).

[106] In the historic litigation against Big Tobacco, Hagens Berman represented 13 states and advanced groundbreaking legal claims to secure a global settlement worth $260 billion, the largest recovery in history. Only two firms went to trial, and Hagens Berman served as co-lead trial counsel.

[107] *In re Visa-MasterCard Litig.*, No. CV-96-5238 (E.D.N.Y.). Hagens Berman was co-lead counsel in a case alleging antitrust violations by Visa and MasterCard. The case settled for $3 billion in cash and changes in practices valued at $20 billion.

[108] *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, No. 8:10ML2151 JVS (C.D. Cal.). Hagens Berman recovered $1.6 billion for the class.

clients. Hagens Berman previously provided the Court with short biographies of attorneys who billed the majority of time in the case, along with the firm resume.[109]

## IV. CONCLUSION

This Court must act as a fiduciary to "'make sure that [class members] obtain sufficient financial benefit after the lawyers are paid.'"[110] Here, the indirect purchaser class will obtain exceptional financial benefits if this Court reaffirms the award of $47,780,000 in attorneys' fees, because Hagens Berman obtained an exceptional result of $205,000,000 in settlements even though this Court eventually entered summary judgment, which the Ninth Circuit affirmed, on the ground that the class did not suffer *any* pass-through damages. Moreover, when it submitted its fee bid, Hagens Berman could not have contemplated many factors that made this decade-long litigation so difficult, which justifies an upward variance from a fee calculated under Hagens Berman's fee grid.

DATED: September 28, 2020             HAGENS BERMAN SOBOL SHAPIRO LLP


By _____s/ Steve W. Berman_____
              STEVE W. BERMAN

Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Shana E. Scarlett
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com

*Lead Counsel for Indirect Purchaser Class*

---

[109] *See* Declaration of Jeff D. Friedman in Support of Indirect Purchaser Plaintiffs' Third Motion for Attorney Fee and Expenses, ¶¶ 17-35, Dec. 3, 2018, ECF No. 2874-1; Ex. 1 thereto.

[110] *Staton*, 327 F.3d at 970 (internal citation omitted).