# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN RE OPTICAL DISK DRIVE | ) | No. 3:10-md-2143 RS (JCS) |
| PRODUCTS ANTITRUST | ) | |
| LITIGATION | ) | **DECLARATION OF** |
| | ) | **PROFESSOR JOSHUA P. DAVIS** |
| | ) | |
| | ) | |

I, Joshus P. Davis, declare:

EXECUTIVE SUMMARY

I am a professor at the University of San Francisco School of Law ("USF"), where I also serve as the director of the Center for Law and Ethics. A primary area that I research is private enforcement of the antitrust laws. I have undertaken extensive empirical, doctrinal, and theoretical analyses of private antitrust enforcement. I also have substantial practical experience in litigating antitrust class actions, both as a partner at Lieff, Cabraser, Heiman & Bernstein, LLP, before I became a professor at USF in 2000 and since then as law firms regularly retain me to do work in antitrust class actions.

ASSIGNMENT AND SUMMARY OF OPINION

1. I have been asked by counsel for the indirect purchaser class to offer an expert opinion based on my research and practice experience in antitrust class action litigation.

2. In particular, I have been asked to analyze any empirical evidence that I and others have gathered on private enforcement of the antitrust laws and that may prove useful to the Court in determining the amount of attorneys' fees to award class counsel in this case.

3. Toward that end, this Declaration presents the following empirical and other evidence:

   a. From 2009 through 2019, a typical (median) attorneys' fee award in a federal antitrust class action with a settlement of this size—between $100 and $250 million—is 28-30% of the class recovery, in addition to reimbursement of expenses.

   b. As discussed in more detail below, various characteristics of the litigation on behalf of the indirect purchaser class make it unlike many other similar antitrust actions:

      i. Unusual Result as Compared to the Direct Purchaser Action. The total recovery that class counsel for the indirect purchasers obtained in settlement was unusually high, more than 6 times higher than would ordinarily be expected by comparison to the recovery in the related direct purchaser action.

      ii. Exceptional Results in Obtaining Class Certification. The indirect purchaser plaintiffs faced difficulties in proving their case that class counsel would not normally anticipate, especially in showing that the anticompetitive conduct at issue harmed class members. In particular, it is rare for plaintiffs' counsel in an antitrust case to move unsuccessfully for class certification and then later to succeed on a renewed motion for purposes of litigation. As described below, I have found only 2 out of 100

randomly selected federal antitrust disputes involving proposed class actions where that occurred. (It is much more common for a court to deny class certification in the litigation context and then to grant it in the settlement context.)

  iii. <u>Delayed Resolution of the Fee Award</u>. Almost two-thirds of antitrust class action settlements are finally approved within five years of when they are filed. This action was pending for about nine years before it reached the final settlement and the appeal of the final settlement was pending more than ten years after the initial filing.

  iv. <u>High Costs</u>. From 2009 through 2019, the typical costs incurred by class counsel in antitrust litigation settling for a total recovery between $100 and $250 million was 1-2%. Class counsel's expenses were approximately 2.5% of the class recovery in this case, greater than is usual.

 c. Private antitrust enforcement plays a crucial role in compensating victims of antitrust violations and in deterring such violations. Private actions often involve allegations of a broader course of conduct and greater harm than government actions, result in more significant sanctions than government enforcement, and often require many years of difficult and risky litigation. The litigation in this case on behalf of the indirect purchasers provides a good example. Awarding appropriate attorneys' fees and costs plays a crucial role in creating the incentives necessary to safeguard markets from illegal, anticompetitive conduct.

RELEVANT EXPERIENCE AND EXPERTISE

4. I am a full professor at the University of San Francisco School of Law ("USF"), where I also serve as the director of the Center for Law and Ethics. A copy of my resume is attached as Exhibit I. My expert testimony in the last four years is listed in Appendix B. And my publications in the last ten years are listed in Appendix C.

5. I have conducted various theoretical, doctrinal, and empirical analyses of private enforcement of the U.S. antitrust laws, including through class actions.

6. In recent years, I have collaborated on empirical research on antitrust class actions, resulting in a publication, "2018 Antitrust Annual Report: Class Action Filings in Federal Court" (hereinafter "2018 Antitrust Report") (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3386424). The publication is the first of which I am aware that attempts to provide a systematic empirical analysis of proposed antitrust class actions filed in federal court. I rely on this research as a basis for my opinions, as explained below.

7. Again in collaboration, I just completed, "2019 Antitrust Annual Report: Class Action Filings in Federal Court" (hereinafter "2019 Antitrust Report") (available at

https://ssrn.com/abstract=3696575). The new publication expands upon and updates the *2018 Report*, adding years of data and also gathering data on topics that were not addressed in the *2018 Report*. I also rely on this research as a basis for my opinions, as explained below.

8. I am in the process of analyzing 100 randomly selected proposed antitrust class action disputes filed in federal court that were pending as of Jan. 1, 2009 and ended by Jan. 1, 2020 as part of an academic study. That study is unrelated to this litigation. We chose the cases by using random numbers from the universe of over 200 such disputes that occurred during the relevant period. For the past two years, I have supervised the coding of these cases to allow statistical analyses of the factors that predict success in antitrust class litigation, the considerations that affect attorneys' fee awards, and other related issues. I rely on this research as well.

9. I have published numerous articles on antitrust law and class action procedure and I address these topics regularly at professional and academic conferences. My relevant publications include:

a) *Unintended Consequences: Abolishing the Direct Purchaser Rule as a Threat to Private Antirust Enforcement* (anticipated publication in the Antitrust Law Journal 2020/21) (with Anupama Reddy).

b) *AI and Interdependent Pricing: Combination Without Conspiracy?*, 30 Competition 1 (2020) (with Anupama Reddy).

c) *2019 Antitrust Annual Report: Class Action Filings in Federal Court* (with Rose Kohles) (available at https://ssrn.com/abstract=3696575).

d) *2018 Antitrust Annual Report: Class Action Filings in Federal Court* (with Rose Kohles) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3386424).

e) *Writing Better Jury Instructions: Antitrust as an Example*, 119 W. VA. L. REV. 235 (2016-17) (with Shannon Wheatman and Cristen Stephansky).

f) *Deactivating Actavis*, 67 Rutg. L. J. 557 (2015).

g) *Classwide Recoveries*, 82 GEO. WASH. L. REV. 890 (2014).

h) *The Puzzle of Class Actions with Uninjured Members*, 82 GEO. WASH. L. REV. 858 (2014) (with Eric Cramer and Caitlin May).

i) *Defying Conventional Wisdom: The Case for Private Antitrust Enforcement*, 48 GA. L. REV. 1 (2013) (with Robert H. Lande).

j) *Towards an Empirical and Theoretical Assessment of Private Antitrust Enforcement*, 36 SEATTLE UN. L. REV. 1269 (2013) (with Robert H. Lande).

k) *The Extraordinary Deterrence of Private Antitrust Enforcement: A Reply to Werden, Hammon, and Barnett*, 58 Antitrust L. Bull 173 (2013) (with Robert H. Lande).

l) *Comparative Deterrence from Private Enforcement and Criminal Enforcement of the U.S. Antitrust Laws*, 2011 B.Y.U. L. REV. 315 (with Robert H. Lande).

m) *Antitrust, Class Certification, and the Politics of Procedure*, 18 GEO. MASON L. REV. 969 (2010) (with Eric Cramer).

n) *Applying Litigation Economics to Patent Settlements: Why Reverse Payments Should Be* Per Se *Illegal*, 41 RUTG. L. J. 255 (2009).

o) *Of Vulnerable Monopolists?: Questionable Innovation in the Standard for Class Certification in Antitrust Cases*, 41 RUTG. L. J. 355 (2009) (with Eric L. Cramer).

p) *Of Myths and Evidence: An Analysis of 40 US Cases for Countries Considering a Private Right of Action for Competition Law Violations*, 2 GLOBAL COMP. L. REV. 126 (2009) (with Robert H. Lande).

10. My article with Robert H. Lande, *Defying Conventional Wisdom: The Case for Private Antitrust Enforcement* was the winner of the Award for the Best Academic Article on Private Antitrust Enforcement in 2014 from the Institute of Competition Law and George Washington University School of Law.

11. I have extensive practical experience in litigating antitrust class actions. Before joining the full-time faculty of the USF in August, 2000, I was a partner at Lieff, Cabraser, Heimann & Bernstein, LLP, specializing in the prosecution of antitrust class actions. While there I also participated in the prosecution of consumer, employment discrimination, and environmental cases, many of them class actions.

12. During my time at USF, I have continued to participate in antitrust class action litigation. I have been asked to work with econometric and economic experts, to take and defend their depositions, to draft briefs in support of class certification, and to argue for class certification. In recent years, for example, I argued the class certification motions in:

a) *In re Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal.) (direct purchaser class certified);

b) *In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521-WHO (N.D. Cal.) (indirect purchaser class certified);

c) *In re Restasis Antitrust Litig.*, No. 1:18-md-02819-NG-LB (indirect purchaser class certified);

d)  *Cung Le et al. v. Zuffa, LLC*, No. 2:15-cv-01045-RFB-PAL (D. Nev.) (class certification decision for direct sellers in monopsony case pending).

COMPENSATION

13. I am being paid a flat fee of $30,000 for preparing this Declaration. My compensation is not contingent.

MATERIALS CONSIDERED

14. In rendering my opinion in this case, I considered the materials listed in Appendix A, in addition to my publications listed above and any other materials cited in this Declaration.

BACKGROUND

15. This action was filed on Oct. 27, 2009.

16. The Court denied the indirect and direct purchaser plaintiffs' initial motions for class certification on Oct. 3, 2014.

17. The Court granted the indirect purchaser plaintiffs' renewed motion for class certification on Feb. 8, 2016.

18. On the dates below, the trial court awarded the following in attorneys' fees and costs to class counsel for the indirect purchasers in this case:

| Date | Class recovery ($s) | Fee Award | | Costs ($s; %) |
|------|---------------------|-----------|---|---------------|
| | | $s; % | Lodestar; multiplier | |
| 12/19/16 | $124.5M | $31.125M; 25% | $24.2M; 1.29 | $3.7M; 3% |
| 11/7/2017 | $55.5M | $11.655M; 21% | $28M (cum.); 1.53 (cum.) | $1.4M; 2.5% |
| 2/21/19 | $25M | $5M; 20% | $30M (cum.); 1.59 (cum.) | $0 (out of $0.65M); 0% |
| **Total** | **$205M** | **$48M; 23%** | **$30M; 1.59** | **2.5%** (out of 2.8%) |

19. On Dec. 18, 2017, after the first two rounds of settlements and before the third round, the Court granted summary judgment in favor of the remaining non-settling defendants.

20. Some of the non-settling defendants that moved for summary judgment entered settlement agreements that were finally approved on Feb. 21, 2019, in amounts reflected in the table above.

21. On Nov. 20, 2019, the Ninth Circuit affirmed summary judgment in favor of the remaining non-settling defendants.

22. On May 15, 2020, the Ninth Circuit vacated and remanded the fee and cost awards to indirect purchaser class counsel.

ANALYSIS

23. I rely on my empirical work and practical experience prosecuting antitrust class actions to provide an empirical context relevant to awarding attorneys' fees on remand in this action.

24. In particular, my empirical analyses and the record suggest that in the absence of a bid, in an antitrust class action of this size from 2009 through 2019, the typical (median) fee award was 28-30% of the class recovery in attorneys' fees in addition to reimbursement of expenses.

25. In key regards, however, this action is unusual. As discussed below, that is true based on the result class counsel obtained for the indirect purchaser class as compared to the direct purchaser class, the challenges the indirect purchaser class faced that would not ordinarily be expected, and the duration of the litigation before obtaining a final award of fees and expenses. Given those circumstances, and as further discussed below, a typical court might award one third (33 1/3%) of the class recovery in fees in addition to expenses (2.5% in this case). The combined award of fees and expenses could then be approximately 36% of the class recovery.

26. Before the Ninth Circuit's recent ruling on appeal, this Court in total awarded class counsel 25.5% of the indirect purchaser class recoveries, 23% in attorneys' fees and 2.5% in reimbursement of costs.

27. My understanding is that class counsel submitted a bid that, if applied by the Court, would have resulted in an award of approximately 13% of the indirect purchaser class recovery to counsel. Declaration of Steve W. Berman in Support of Indirect Purchasers Plaintiffs' Renewed Motion for Attorneys' Fees ("Berman Declaration"), at ¶3.

28. The Court's total award of fees and costs in this case approximates the average of the amount class counsel might have received in the absence of a bid and the amount they would have received under their bid. As noted above, the potential award of fees and costs without the bid could be about 36% of the total settlement amount. The award under the bid would have been about 13%. Averaging the two yields 24.5%. That percentage is close to the Court's actual award in this case of 25.5%.

29. It is also important to note that class counsel ordinarily receive of an award of fees in addition to costs. In effect, then, an award of $48 million to indirect purchaser class counsel in this case would be represent $5.1 in costs and $42.9 million in fees. The fee portion—$42.9 million—would thus constitute 21% of the $205 million recovery. A 21% fee award is lower than the mid-point between class counsel's bid of about 13% and a potential award of 33 1/3% in the absence of a bid.

30. Along similar lines, the multiplier class counsel would receive on their lodestar with a total award of $48 million would in effect be about 1.4. Their lodestar is $30 million. The award less costs is $42.9 million. $42.9 million divided by $30 million yields a multiplier of approximately 1.4.

TYPICAL FEE AND COST AWARDS IN ANTITRUST CLASS ACTIONS

31. My empirical research shows that, in the absence of a bid, the typical (median) attorneys' fee award in an antitrust class action of this size would have been between 28 and 30%, in addition to reimbursement of expenses.

32. Specifically, my research shows that the typical (median) attorneys' fee award for all antitrust cases settled in federal court from 2009 through 2019 was 30% of the class recovery, in addition to reimbursement of expenses. *2019 Antitrust Report*.

33. For antitrust class actions settlements between $100 and $250 million, the typical (median) fee award for settlements varied slightly between the *2018 Antitrust Report* and the *2019 Antitrust Report*. They were as follows:
    • 30% plus reimbursement of expenses. *2018 Antitrust Report*.
    • 28% plus reimbursement of expenses. *2019 Antitrust Report*.

34. The empirical evidence also shows that the percentage fee award in antitrust class actions does not decrease significantly unless recoveries are far in excess of $250 million. Indeed, the typical (median) attorneys' fee awards in antitrust class actions do not decrease dramatically below 30% until they reach a total of $1 billion of more. At that point, the typical (median) attorneys' fee award drops to 14% of the class recovery.

35. The typical (median) fee and cost award for a settlement of approximately $200 million in an antitrust class action runs between 28 and 30% of the class recovery and costs typically run between 1 and 2%.

36. The *2018 Antitrust Report* suggests that a typical (median) fee award, when combined with the typical (median) reimbursement of costs, totaled 32% for recoveries between $100 and $250 million. The following is a summary of the typical (median) attorneys' fee and cost awards for the years 2013 through 2018 from the *2018 Antitrust Report*:

Figure 12:  **Attorneys' Fees and Expenses**
            2013 - 2018



37. The *2019 Antitrust Report* reveals that a typical (median) fee and cost award totaled 29% for recoveries between $100 and $250 million. The following is a summary of the typical (median) attorneys' fee and cost awards for the years 2009 through 2019 from the *2019 Antitrust Report*:

**Class Recovery by Settlement Size - Median**
2009 - 2019

| Settlement Amount | Class Recovery | Attys Fees | Expenses | Total |
|---|---|---|---|---|
| $1B + | 85% | 14% | 1% | 100% |
| $500-$999M | 72% | 28% | 1% | 100% |
| $250-$499M | 74% | 25% | 1% | 100% |
| $100-$249M | 71% | 28% | 1% | 100% |
| $50-$99M | 68% | 30% | 2% | 100% |
| $10-$49M | 65% | 31% | 4% | 100% |
| <$10M | 64% | 30% | 6% | 100% |
| All Settlements | 67% | 30% | 3% | 100% |

38. The fee and cost awards in antitrust cases may be higher than in other doctrinal areas. That is my experience, although I have not done comparable empirical analyses outside

of the antitrust context. A likely explanation for the difference is that antitrust class actions tend to be particularly challenging, risky, protracted, and costly.

39. Prosecuting antitrust class actions requires a mastery of doctrine, economics and statistics, as well as an ability to translate technical concepts into language that, ultimately, a jury can understand.

40. As the U.S. Supreme Court has recognized, tracing the effects of an antitrust violation down the chain of distribution can be particularly difficult, a task relevant in indirect purchaser actions. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968); Joshua P. Davis & Anupama Reddy, "Unintended Consequences: Abolishing the Direct Purchaser Rule as a Threat to Private Antitrust Enforcement" (anticipated publication in the Antitrust Law Journal 2020/21).

41. The above analysis is consistent with the Ninth Circuit's opinion in this action. It noted that the litigation in this case qualifies as a "megafund" but that such a designation does not necessarily mean the attorneys' fee awards must be reduced from an ordinary amount. *In re Optical Disk Drive Products Antitrust Litigation*, 959 F.3d 922, 933 (9th Cir. 2020). The lack of a mandatory reduction of attorneys' fees in megafund cases makes sense, particularly as applied to antitrust class actions. As noted above, courts in antitrust class actions do not award significantly less in fees than the median amount until the total recovery in settlements in litigation exceeds $1 billion.

LARGER RECOVERIES BY DIRECT PURCHASERS THAN INDIRECT PURCHASERS ARE THE NORM

42. My empirical research shows that, in antitrust cases in federal court, direct purchaser classes generally recover significantly more than indirect purchaser classes.

43. A key reason is that indirect purchasers often have difficulty establishing that the harmful effects of any anticompetitive conduct were passed through to them.

44. Further, direct purchaser classes tend to be nationwide. Indirect purchaser classes, in contrast, often include only a subset of the nation, as not all states authorize antitrust claims. In this case, the indirect purchaser class included only 24 states.

45. The indirect purchaser class in this litigation recovered $205 million in contrast to the direct purchaser class recovery of $74.9 million. As shown below, on the whole direct purchasers average a recovery two-and-a-half times larger than indirect purchasers. Here, in contrast, the indirect purchasers recovered over two-and-a-half times more than the direct purchasers. That flips the average ratio. Using the direct purchaser recovery as a baseline indicates that the indirect purchasers recovered over 6 times the amount one would ordinarily expect.

46. The *2019 Antitrust Report* supports these points. Dividing the number of settlements in the table below by the aggregate amount recovered shows that from 2009 through 2019

the average recovery in an indirect purchaser class action was $12 million and the average recovery in a direct purchaser class action was $30 million.

47. The following summarizes the basis for this analysis from the *2019 Antitrust Report*:

| Recoveries by Class Type | # of Settlements | % of Settlements | Aggregate Amount | % of Amount |
|---|---|---|---|---|
| Direct Purchaser Classes | 669 | 69% | $20,202,853,745 | 84% |
| Indirect Purchaser / End Payor Purchaser Classes | 289 | 30% | $3,510,556,401 | 15% |
| Class of Direct & Indirect Purchasers | 5 | 1% | $294,025,769 | 1% |
| Other Classes | 6 | 1% | $109,100,000 | 0% |
| Total | | 100% | $24,116,535,915 | 100% |



48. Note that the above analysis *understates* the difference in difficulty between direct and indirect purchaser class actions. Many disputes give rise to a successful direct purchaser action but no indirect purchaser action or an unsuccessful indirect purchaser action, in part as a result of the difficulties of prosecuting the latter. For the years 2009 through 2019, direct purchaser classes were thus able to obtain recoveries from 669 settlements whereas indirect purchasers were able to obtain recoveries only from 289 settlements.

49. This disparity reflects a combination of indirect purchaser plaintiffs bringing fewer actions because of their poorer prospects for success and indirect purchaser plaintiffs succeeding in fewer cases than direct purchaser plaintiffs. If the analysis were to include the indirect purchaser actions that were never brought or that failed to obtain any

recovery at all, we would find that direct purchaser actions recover much more on average than two-and-a-half times the amount recovered by indirect purchaser actions.

SUCCESSFUL RENEWED MOTIONS FOR CLASS CERTIFICATION IN ANTITRUST CASES ARE UNUSUAL

50. In antitrust cases, it is rare for plaintiffs to move for class certification, to have class certification denied, and then to succeed under a renewed motion for class certification other than in the settlement context. This is apparent from the analysis I am currently undertaking of antitrust disputes. It involves 100 disputes that were randomly sampled from all of the antitrust disputes filed in federal court that were pending as of Jan. 1, 2009, that ended by Jan. 1, 2020, and that involved at least one proposed class action. The court denied class certification in whole or in part in 51 of the 100 cases. In over half of those 51 cases, plaintiffs failed to obtain any class recovery at all.

51. After analyzing the relevant data from the 100 cases, I identified only 2 antitrust disputes in which a court denied class certification and class counsel then succeeded in obtaining class certification for purposes of litigation. (It is much more common for a court to deny class certification in a litigation context and then to grant class certification only as part of a settlement.)

52. As the Court no doubt knows, certifying a class for litigation purposes greatly enhances the value of a case. Counsel for the indirect purchasers' ultimate success on the renewed motion for class certification can thus help to explain why they obtained such a large recovery compared to the direct purchasers, despite a clear general pattern to the contrary.

DURATION

53. Antitrust class actions can take a long time to reach a resolution, and this litigation falls toward the lengthier end of the spectrum. Almost two-thirds of settlements reach final approval in antitrust class actions within five years.

54. The first indirect purchaser settlement in this case was not finally approved until 7 years after the litigation commenced, longer than almost two-thirds of antirust class actions as shown in the table below.

55. Fewer than 10% of antitrust class actions last more than 8 years before final approval. *2018 Antitrust Report*. This case has now been pending for more than 10 years and the amount of counsel's award of attorneys' fees and costs has not yet been finally resolved.

56. The following table from the *2018 Antitrust Report* shows the percentage of cases that take each of various amounts of time to reach final settlement approval:

Figure 3:  **Percentage of Cases Settled by Number of Years from Filing to Final Approval**
           2013 - 2018

| Percentage of Cases Settled by Number of Years from Filing to Final Approval | | | | | |
|---|---|---|---|---|---|
| Year | ≤2 Years | 3-5 Years | 6-8 Years | 9-11 Years | 12+ Years |
| 2013 | 8.5% | 38.3% | 46.8% | 6.4% | 0.0% |
| 2014 | 6.2% | 23.1% | 41.5% | 3.1% | 26.2% |
| 2015 | 21.2% | 39.4% | 25.0% | 13.5% | 1.0% |
| 2016 | 28.3% | 44.7% | 19.7% | 6.6% | 0.7% |
| 2017 | 5.5% | 82.4% | 7.7% | 3.3% | 1.1% |
| 2018 | 11.1% | 58.5% | 26.9% | 1.8% | 1.8% |
| All Years | 15.4% | 50.3% | 25.1% | 5.6% | 3.7% |

COSTS

57. Antitrust class actions often require a greater commitment of financial resources by class counsel than many other forms of class action litigation. The commitment in this case was larger than typical for an antitrust case given the size of the recovery. Class counsel incurred $5 million in costs, an amount they would recover only if they obtained a successful resolution. That is a large than typical amount—2.5% of the class recovery as opposed to 1-2% that is typical of antitrust class actions recoveries between $100 and $250 million. *See supra* figures in paragraph 36 and 37. The exceptional duration of this litigation has also made the burden of carrying those costs higher than usual.

UNPREDICTABLE CHALLENGES IN THE LITIGATION

58. Based on my research and my experience as a plaintiffs' class action practitioner, I am aware that there are certain forms of evidence that are difficult to predict at the outset of litigation, even after extensive pre-filing research and investigation.

59. As discussed above, some of the challenges in this litigation were not reasonably foreseeable at the time that class counsel submitted their bid. They include:

a) The difficulty of establishing that the alleged anticompetitive conduct caused harm to the indirect purchaser class members.

b) That this difficulty would necessitate a rare successful renewed motion to obtain class certification for litigation purposes.

c) That the same difficulty would result in summary judgment granted in favor of defendants in this Court and affirmed in the Ninth Circuit.

d) That the litigation would last so long before producing final settlements.

IMPORTANCE OF INCENTIVES FOR PRIVATE ANTITRUST ENFORCEMENT

60. The award of sufficient fees and costs to plaintiffs' class counsel is important to ensure the U.S. maintains sufficient private enforcement of the antitrust laws.

61. My co-author, Robert H. Lande, and I have documented the essential role that private class actions play in antitrust enforcement. *See, e.g.*, my articles with Robert H. Lande: *The Extraordinary Deterrence of Private Antitrust Enforcement: A Reply to Werden, Hammon, and Barnett*, 58 Antitrust L. Bull 173 (2013); *Comparative Deterrence from Private Enforcement and Criminal Enforcement of the U.S. Antitrust Laws*, 2011 B.Y.U. L. REV. 315.

62. Professor Lande and I have shown that damages from private antitrust class actions likely have a greater deterrent effect than federal criminal sanctions, including not only monetary fines but also prison time.

63. Private plaintiffs often pursue broader theories of liability than government prosecutors, whether measured by the temporal duration of an antitrust violation, the number of alleged participants in the violation, the number of products involved, or the total harm caused.

64. Relatedly, private plaintiffs often do an extraordinary amount of work investigating and proving antitrust violations, work that provides valuable compensation and deterrence.

65. Private litigation—even when related to government litigation—can also be risky. There is no guarantee private litigation will succeed just because government litigation did, often because private plaintiffs' claims involve elements—fact of damage, amount of damages—that government claims do not and because private plaintiffs often pursue challenging theories of broader liability.

66. This litigation provides an example of the contributions of private antitrust enforcement, including: deterrence effects; the scope of the alleged antitrust violation; the work required; and the risks involved.

67. <u>Deterrence effects</u>. The deterrence effects of the indirect purchaser action in this case— even without the direct purchaser action—were very likely greater than the deterrence effects of government enforcement. The indirect plaintiffs recovered $205 million. The government obtained total fines of $21.2 million and incarceration totaling slightly less than 2 ½ years (29 months). Relying on various economic and other studies, my analysis with Robert H. Lande indicated that a year of incarceration has equivalent deterrence effects to no more than a sanction of $2 million (and likely much less). *Comparative Deterrence from Private Enforcement and Criminal Enforcement of the U.S. Antitrust Laws*, 2011 B.Y.U. L. REV. 315. Using this analysis, the deterrence effects from the criminal enforcement in this case were the equivalent of about $26 million, much less than the indirect purchaser recovery of $205 million. Indeed, as long as the deterrence effect of a year of incarceration is less than $73.5 million—a far higher figure than is

realistic—the deterrence effects of the indirect class action were greater than from the government action.

68. <u>Scope</u>. The indirect purchaser litigation also pursued liability for a broader scope of conduct than the government enforcement action. The government action focused on the impact of defendants' alleged bid rigging and price fixing of auctions and contracts with three customers, HP, Dell and Microsoft. *See United States of America v. Young Keun Park,* Case No. 3:11-cr-00911-RS, Plea Agreement, ECF No. 8 (filed Mar. 28, 2012), at 4. The rigged procurements were limited in time, essentially fourteen discrete events from June 2004 to October 2008. *See United States of America v. HLDS,* Case No. 3:11-cr-00724-RS, Plea Agreement, ECF No. 5-1 (filed Oct. 28, 2011), at 4. The indirect purchasers, in contrast, alleged that the conspiracy was industry-wide, harming all purchasers of computers in the states providing for standing for indirect purchasers, and not just purchasers of Dell and HP computers alone. The class period also covered all of 2003 to 2008, not just the rigged bids themselves. *See In re Optical Disk Drive Antitrust Litig.,* 10-MD-02143-RS, 2017 WL 6503743, at *1 (N.D. Cal. Dec. 18, 2017), *aff'd sub nom. In re Optical Disk Drive Products Antitrust Litig.,* 785 Fed. Appx. 406 (9th Cir. 2019) (unpublished).

69. <u>Work and Resources</u>. The indirect purchaser action also required an extraordinary amount of independent litigation, as explained in the Berman Declaration. The early production of documents produced to the Department of Justice were limited in scope and time period, meaning that the bulk of the 2.9 million documents produced in this litigation were ones pursued by the civil plaintiffs. The documents produced to the civil plaintiffs also spanned multiple countries and continents. Indeed, after the civil plaintiffs procured documents from defendants Toshiba Corporation, Toshiba Samsung Storage Technology Corporation, Toshiba Samsung Storage Technology Corporation Korea, and Toshiba American Information Systems, Inc., the Department of Justice itself subpoenaed those documents from plaintiffs.

70. The criminal action was closed in approximately April 2014. *See* Administrative Motion for Leave to File Supplementary Material, ECF No. 1239 (filed April 25, 2014). Yet civil litigation over the merits of this case continued to 2019, the point at which the indirect purchasers lost their appeal of the order granting the motions for summary judgment on behalf of the class—a full five years after the criminal proceedings had ended. During this time, the indirect purchasers undertook an enormous effort to build evidence to support recovery for the class. The plaintiffs deposed 66 of defendants' current or former employees, with Hagens Berman attorneys taking the lead in 50 of those depositions. Some of the depositions lasted nearly a week, with extra time for translation and the defendants' themselves questioning the employees of their co-conspirators. Plaintiffs' experts were deposed for a total of 10 days, and Hagens Berman deposed 13 separate entities to build evidence on pass-through and to gain access to defendants' phone records.  All of this evidence was separate from, and in addition to, the criminal prosecutions undertaken by the Department of Justice. The foregoing is set forth in the Berman Declaration.

71. <u>Risk</u>. This litigation was also risky. The indirect purchaser plaintiffs ultimately lost at summary judgment in this Court as affirmed on appeal. The plaintiffs also were initially unsuccessful in moving for class certification. There was a real risk that the plaintiffs and their attorneys could have failed to obtain any recover at all.

72. The best evidence is that in our current system American antitrust law is under-enforced, not over-enforced. Joshua P. Davis & Robert H. Lande, *Defying Conventional Wisdom: The Case for Private Antitrust Enforcement*, 48 GA. L. REV. 1 (2013). As a matter of policy, it is essential if we are to maintain free markets and the benefits of competition that private antitrust class action lawyers receive sufficient compensation when they obtain recoveries for their clients. Otherwise, they will lose the means and incentive to continue to bring such claims.

73. These points are in no way meant to denigrate the valuable contributions of federal and state government antitrust enforcers.  To the contrary, government and private enforcers complement each other's work, together safeguarding our markets and providing crucial—although insufficient—incentives for businesses to compete for the benefit of society as a whole. *See*, *e.g.*, John M. Connor & Robert H. Lande, *Cartels as Rational Business Strategy: Crime Pays*, 34 Cardozo L. Rev. 427 (2012).

CONCLUSIONS

74. In sum, the following are my conclusions:

   a. A typical (median) attorneys' fee award in a federal antitrust class action given the size of the total indirect purchaser settlement in this case would be 28-30% of the class recovery, in addition to reimbursement of expenses.

   b. Various characteristics of the litigation on behalf of the indirect purchaser class make it unlike many other similar antitrust actions:

      i. <u>Unusual Result as Compared to the Direct Purchaser Action</u>. The total indirect purchaser recovery in this action was more than 6 times higher than would ordinarily be expected based on the direct purchaser recovery.

      ii. <u>Exceptional Results in Obtaining Class Certification</u>. The indirect purchaser plaintiffs faced difficulties in proving their case that class counsel would not normally anticipate, especially in showing that the anticompetitive conduct at issue harmed class members. That created significant challenges, including for their ultimately successful motion for class certification.

    iii.  <u>Delayed Resolution of the Fee Award</u>. Resolution of this action has taken significantly longer than is typical for an antitrust class action, a result that is unsurprising given the challenges and complexities of the litigation.

    iv.  <u>High Costs</u>. From 2009 through 2019, the typical costs incurred by class counsel in antitrust litigation settling for a total recovery between $100 and $250 million was 1-2%. Class counsel's expenses in this case of approximately 2.5% of the class recovery were unusually high.

75. Private antitrust enforcement plays a crucial role in compensating victims of antitrust violations and in deterring such violations, as the record indicates was true for this indirect purchaser litigation.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge. Executed this 28th day of September, 2020 at San Francisco, California.

Joshua P. Davis

**APPENDIX A**

**MATERIALS CONSIDERED**

| PLEADINGS |
|---|
| Plea Agreement, *United States of America v. Young Keun Park*, 11-cr-00911, March 28, 2012, ECF No. 8 (N.D. Cal.) |
| April 17, 2012 Plea Agreement, *United States of America v. Sang Hun Kim*, 11-cr-00912, ECF No. 8 (N.D. Cal.) |
| Plea Agreement, *United States of America v. Sik Hur aka Daniel Hur*, 11-cr-00913, April 10, 2012, ECF No. 6 (N.D. Cal.) |
| Plea Agreement, *United States of America v. Woo Jin Yang aka Eugene Yang*, 12-cr-00309, May 8, 2012, ECF No. 8 (N.D. Cal.) |
| Plea Agreement, *United States of America v. Hitachi-LG Data Storage, Inc.*, 11-cr-00724, October 28, 2012, ECF No. 5-1 (N.D. Cal.) |
| Order, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143 VRW, June 4, 2010, ECF No. 96 (N.D. Cal.) |
| Order Denying Motions to Dismiss, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143-RS, April 19, 2012, ECF No. 531 (N.D. Cal.) |
| Administrative Motion for Leave to File Supplementary Material, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143-RS, April 25, 2014, ECF No. 1239 (N.D. Cal.) |
| Order Denying Motions for Class Certification, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143-RS, October 3, 2014, ECF No. 1444 (N.D. Cal.) |
| Order Granting Indirect Purchasers' Renewed Motion for Class Certification, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143-RS, February 8, 2016, ECF No. 1783 (N.D. Cal.) |
| Order Granting Final Approval of Indirect Purchaser Plaintiffs' Settlements with Panasonic, NEC, Sony and HLDS Defendant Families, Granting Motion for Attorney Fees, Expenses and Service Awards, and Overruling Objections [As Modified by Court], *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143-RS, December 19, 2016, ECF No. 2133 (N.D. Cal.) |
| Order Granting Final Approval of Indirect Purchaser Plaintiffs' Settlements with PLDS, Pioneer, and TEAC Defendant Families, Granting Motion for Attorney Fees, Expenses and Service Awards, and Denying Objections [As Modified by Court], *In re Optical Disk Drive* |

| |
|---|
| *Products Antitrust Litigation*, 10-md-2143-RS (JCS), November 7, 2017, ECF No. 2691 (N.D. Cal.) |
| Order Granting Summary Judgment Against the Indirect Purchaser Plaintiffs, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143-RS, December 18, 2017, ECF No. 2711 (N.D. Cal.) |
| Indirect Purchaser Plaintiffs' Notice of Motion and Third Motion for Attorneys' Fees and Expenses, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143-RS (JCS), December 3, 2018, ECF No. 2874 (N.D. Cal.) |
| Order Granting Final Approval of Indirect Purchaser Plaintiffs' Settlement with Defendants Samsung Electronics Co., Ltd, Toshiba Corporation and Toshiba Samsung Storage Technology Corporation, Granting Motion for Attorney Fees and Expenses, and Denying Objections, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143-RS (JCS), February 21, 2019, ECF No. 2889 (N.D. Cal.) |
| Hagen Berman's In Camera Submission in Support of Appointment as Interim Lead Counsel for Indirect Purchasers, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143 VRW, July 31, 2020, ECF No. 2937-1 (N.D. Cal.) |
| Declaration of Steve W. Berman in Support of Indirect Purchaser Plaintiffs' Renewed Motion for Attorneys' Fees, *In re Optical Disk Drive Products Antitrust Litigation*, 10-md-2143-RS (JCS), September 28, 2020 (N.D. Cal.) |
| **CASE LAW** |
| *In re: Optical Disk Drive Products Antitrust Litigation*, 785 Fed.Appx. 406 (9th Cir. 2019) |
| *In re Optical Disk Drive Products Antitrust Litigation*, 959 F.3d 922 (9th Cir. 2020) |
| *In re Optical Disk Drive Products Antitrust Litigation*, 804 Fed.Appx. 443 (9th Cir. 2020) |

**<u>APPENDIX B</u>**

**<u>EXPERT TESTIMONY IN THE LAST FOUR YEARS</u>**

I testified at deposition in <u>Successfulmatch.com v. Kronenberger et al.</u>, Case No. CGC-16-550648 (S.F. Sup. Ct.) (legal malpractice/fraud case).

## APPENDIX C

## PUBLICATIONS IN THE LAST TEN YEARS

*AI and Interdependent Pricing: Combination Without Conspiracy?*, 30 Competit. 1 (2020) (with Anupama Reddy).

*Procedural Self-Inflicted Wounds?*, 24 Lewis & Clark L. Rev. 497 (2020) (with Brian J. Devine)

*Artificial Wisdom? A Potential Limit on AI in Law (and Elsewhere)*, 72 Okla. L. Rev. 51 (2019).

*2019 Antitrust Annual Report: Class Action Filings in Federal Court* (with Rose Kohles) (available at https://ssrn.com/abstract=3696575).

*2018 Antitrust Annual Report: Class Action Filings in Federal Court* (with Rose Kohles) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3386424).

*Law Without Mind: AI, Ethics, and Jurisprudence*, 55 Cal. W. L. Rev. 165 (2018).

*Writing Better Jury Instructions: Antitrust as an Example*, 119 W. Va. L. Rev. 235 (2016-17) (with Shannon Wheatman and Cristen Stephansky).

*Legal Ethics, Legal Dualism, and Fidelity to Law*, 2016 J. of Prof. Lawyer 1.

*Deactivating Actavis*, 67 Rutg. L. J. 557 (2015).

*American Legal Realism and Practical Guidance* in Practical Normativity:  Essays on Reasons and Intentions in Law and Practical Reason (Cambridge University Press 2015) (with Manuel Vargas).

*Classwide Recoveries*, 82 Geo. Wash. L. Rev. 890 (2014).

*The Puzzle of Class Actions with Uninjured Members*, 82 Geo. Wash. L. Rev. 858 (2014) (with Eric Cramer and Caitlin May).

*Legality, Morality, Duality*, 2014 Utah L. Rev. 55.

*Defying Conventional Wisdom: The Case for Private Antitrust Enforcement*, 48 Ga. L. Rev. 1 (2013) (with Robert H. Lande).

*Towards an Empirical and Theoretical Assessment of Private Antitrust Enforcement*, 36 Seattle Un. L. Rev. 1269 (2013) (with Robert H. Lande).

*The Extraordinary Deterrence of Private Antitrust Enforcement: A Reply to Werden, Hammon, and Barnett*, 58 Antitrust L. Bull 173 (2013) (with Robert H. Lande).

*From Four Part Tests to First Principles:  Putting Free Speech Jurisprudence in Perspective*, 86 ST. JOHN'S L. REV. 833 (2012) (with Joshua Rosenberg).

*Comparative Deterrence from Private Enforcement and Criminal Enforcement of the U.S. Antitrust Laws*, 2011 B.Y.U. L. REV. 315 (with Robert H. Lande).

*The Inherent Structure of Free Speech Law*, 19 WM. & MARY BILL RTS. J. 131 (2010) (with Joshua Rosenberg).

*Antitrust, Class Certification, and the Politics of Procedure*, 18 GEO. MASON L. REV. 969 (2010) (with Eric Cramer).

**EXHIBIT I**

**Joshua P. Davis**
**University of San Francisco School of Law**
**2130 Fulton St., San Francisco, CA 94117**
**davisj@usfca.edu**
**+01-415-215-0962**

## LEGAL EXPERIENCE

**University of San Francisco, School of Law**                    2000 to Present
    San Francisco, CA
    *Professor* – Civil Procedure, Remedies, Legal Ethics, and
      Jurisprudence
    *Former Associate Dean for Academic Affairs*
    *Former Associate Dean for Faculty Scholarship*
    *Dean's Circle Scholar* (award for scholarly productivity)
    *Director***,** Center for Law and Ethics

**Joseph Saveri Law Firm**                                        2012 to Present
    San Francisco, CA
    *Of Counsel*

**Lieff, Cabraser, Heimann, & Bernstein, LLP**                    1997 to 2000
    San Francisco, CA
    *Partner, Associate* – Represented plaintiffs in antitrust,
      consumer, employment discrimination and environmental
      class actions and complex litigation

**Willamette University College of Law**                          1996 to 1997
    Salem, OR
    *Visiting Assistant Professor of Law*

**Georgetown University Law Center**                              1994 to 1996
    Washington, D.C.
    *Fellow***,** Center for Applied Legal Studies
        Social Security disability, consumer protection, and
        political asylum cases
    *Adjunct Professor of Law***,** Legal Scholarship Workshop

**Chambers of Judge Patrick E. Higginbotham**                     1993 to 1994
    **U.S. Court of Appeals for the Fifth Circuit**
    Dallas, TX
    *Law Clerk*

1

**EDUCATION**

**Georgetown University Law Center,** LL.M.                    1994 to 1996
     Honors:  Fellowship

**New York University School of Law**, J.D.                    1990 to 1993
     New York, N.Y.
     Honors:
          *Frank H. Sommer Memorial Award* (faculty selection
            as top student in class for scholarship and achievement)
          *Senior Articles Editor,* N.Y.U. Law Review
          *Order of the Coif*

**Brown University**, A.B.                    1985 to 1989
     Providence, R.I.

**AWARDS**

**2016 CLAY Attorney of the Year Award in Antitrust**

**Writing Award Winner:** "Defying Conventional Wisdom: The Case for Private Antitrust Enforcement" in the Academic category, Private Enforcement section, George Washington University School of Law and Institute of Competition Law (2014)

**Jerry S. Cohen Award for Antitrust Writing Finalist**, American Antitrust Institute (2008)

**SERVICE**

**Bay Area Civil Procedure Forum**                    2009 to Present
     *Co-Organizer*
     Forum for scholarly presentations on civil procedure
     (sponsored by USF, Berkeley, Hastings, and Stanford)

**American Antitrust Institute**                    2007 to Present
     Non-partisan, non-profit think tank supporting
     competition in the marketplace
     *Board Member*
     *Senior Fellow*
     *Reporter*, Civil Antitrust Enforcement Jury Instruction Project

**Canal Alliance**                    2012 to Present
     Community resource center helping low-income, Spanish-
     speaking immigrants from the greater Marin area
     *Vice President*, *Board of Directors*

**Café Puente**                                                   2019 to Present
     Non-profit creating opportunities for native Spanish-
     speakers and Spanish learners to speak Spanish and celebrate
     Latinx culture together.
     *President, Board of Directors*

**Testimony Before Congress on the "Open Access to Courts**   Dec. 16, 2009
     **Act of 2009," H.R. 4115,**
     Witness, House of Representatives, Committee on the
     Judiciary, Subcommittee on Courts and Competition Policy

**Multijurisdictional Practice in California**                 2001 to 2004
     *Reporter*, **California Supreme Court Implementation**
     **Committee on Multijurisdictional Practice**
     *Reporter*, **California Supreme Court Advisory Task Force on**
     **Multijurisdictional Practice**
     Formulated rules on multijurisdictional practice codified
     at California Supreme Court Rules 9.45 to 9.48

## RECENT AND FORTHCOMING PUBLICATIONS

UNNATURAL LAW: AI, CONSCIOUSNESS, ETHICS AND LAW (work in progress) (under
submission with publisher).

Class Action Ethics (work in progress).
     Presented at the Impact Fund's 14th Annual Class Action Conference on Feb. 19,
     2016 in San Francisco, CA.

Unintended Consequences: Abolishing the Direct Purchaser Rule as a Threat to Private
Antirust Enforcement (forthcoming in the Antitrust Law Journal 2020/21) (with
Anupama Reddy).

AI and Interdependent Pricing: Combination Without Conspiracy?, 30 Competition 1
(2020) (with Anupama Reddy).
     Presented at the Southeastern Law Schools Association (SEALS) Conference by
     Zoom on July 31, 2020.

Procedural Self-Inflicted Wounds?, 24 Lewis & Clark L. Rev. 497 (2020) (with Brian
Devine).
     Presented at the Pound Civil Justice Institute "Symposium on Class Actions, Mass
     Torts, and MDLs: The Next 50 Years" at Lewis & Clark Law School on Nov. 1-2,
     2019.

Artificial Wisdom? A Potential Limit on AI in Law (and Elsewhere), 72 Okla. L. Rev. 51
(2019).
     Presented at Conference on Technology and Law, University of Oklahoma
     College of Law, Feb. 8-9, 2019.

3

<u>2019 Antitrust Annual Report: Class Action Filings in Federal Court</u> (with Rose Kohles) (available at https://ssrn.com/abstract=3696575).

<u>2018 Antitrust Annual Report: Class Action Filings in Federal Court</u> (with Rose Kohles) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3386424).

<u>Law Without Mind: AI, Ethics, and Jurisprudence</u>, 55 Cal. W. L. Rev. 165 (2018).
        Presented at AI: Real-World Ethics, California Western School of Law on Feb.
        17, 2018.

<u>Legal Ethics, Legal Dualism, and Fidelity to Law</u>, 2016 J. OF PROF. LAWYER 1.
        Presented at the International Legal Ethics Conference in New York, New York,
        July 2016.

<u>Writing Better Jury Instructions: Antitrust as an Example</u>, 119 W. VA. L. REV. 235 (2016-17) (with Shannon Wheatman and Cristen Stephansky).

<u>Deactivating *Actavis*</u>, 67 Rutg. L. J. 557 (2015).

<u>American Legal Realism and Practical Guidance</u> in PRACTICAL NORMATIVITY: ESSAYS ON REASONS AND INTENTIONS IN LAW AND PRACTICAL REASON (Cambridge University Press 2015) (with Manuel Vargas).

<u>Classwide Recoveries</u>, 82 GEO. WASH. L. REV. 890 (2014).

<u>The Puzzle of Class Actions with Uninjured Members</u>, 82 GEO. WASH. L. REV. 858 (2014) (with Eric Cramer and Caitlin May).

<u>LEGALITY, Morality, Duality</u>, 2014 UTAH L. REV. 55.

<u>Defying Conventional Wisdom: The Case for Private Antitrust Enforcement</u>, 48 GA. L. REV. 1 (2013) (with Robert H. Lande) (winner of the Award for the Best Academic Article on Private Antitrust Enforcement in 2014 from the Institute of Competition Law and George Washington University School of Law).

<u>The Extraordinary Deterrence of Private Antitrust Enforcement: A Reply to Werden, Hammon, and Barnett</u>, 58 Antitrust L. Bull 173 (2013) (with Robert H. Lande).

<u>Towards an Empirical and Theoretical Assessment of Private Antitrust Enforcement</u>, 36 SEATTLE UN. L. REV. 1269 (2013) (with Robert H. Lande).

<u>From Four Part Tests to First Principles: Putting Free Speech Jurisprudence in Perspective</u>, 86 ST. JOHN'S L. REV. 833 (2012) (with Joshua Rosenberg).

<u>Comparative Deterrence from Private Enforcement and Criminal Enforcement of the U.S. Antitrust Laws</u>, 2011 B.Y.U. L. REV. 315 (with Robert Lande).

4

The Inherent Structure of Free Speech Law, 19 WM. & MARY BILL RTS. J. 131 (2010) (with Joshua Rosenberg).

Antitrust, Class Certification, and the Politics of Procedure, 18 GEO. MASON L. REV. 969 (2010) (with Eric Cramer).

Applying Litigation Economics to Patent Settlements: Why Reverse Payments Should Be Per Se Illegal, 41 RUTG. L. J. 255 (2009).

Of Vulnerable Monopolists?: Questionable Innovation in the Standard for Class Certification in Antitrust Cases, 41 RUTG. L. J. 355 (2009) (with Eric L. Cramer).

Government as Patron or Regulator in the Student Speech Cases, 83 ST. JOHN'S L. REV. 101 (2009) (with Joshua Rosenberg).

Of Myths and Evidence:  An Analysis of 40 US Cases for Countries Considering a Private Right of Action for Competition Law Violations, 2 GLOBAL COMP. L. REV. 126 (2009) (with Robert Lande).


**REPRESENTATIVE SYMPOSIA ORGANIZED**

American Antitrust Institute Annual Conference on Private Antitrust Enforcement (13 annual conferences to date, next to occur in 2020).

Jurisprudence and Legal Ethics (2017) (participants included Tim Dare, Scott Hershovitz, Kate Kruse, Amy Salyzyn, Manuel Vargas, Bradley Wendel, Alice Woolley).

After Actavis: Litigating Reverse Payment Cases (co-sponsored with the American Antitrust Institute and Rutgers-Camden School of Law) (2015) (participants included Professors Michael Carrier, Thomas Cotter, Aaron Edlin, Shubha Ghosh, Herbert Hovenkamp, and Mark Lemley)

Class Actions (2013) (co-sponsored with George Washington University School of Law) (participants included Professors Robert Bone, Howard Erichson, Brian Fitzpatrick, Myriam Gilles, Geoffrey Hazard, Deborah Hensler, Samuel Issacharoff, Robert Klonoff, Richard Marcus, Arthur Miller, Linda Mullenix, William Rubinstein, Edward Sherman, Jay Tidmarsh, and Roger Trangsrud).

Lawyers, Drugs, and Money:  A Prescription for Antitrust Enforcement in the Pharmaceutical Industry (2009) (participants included Professors Michael Carrier, Robin Feldman, and C. Scott Hemphill).

<u>The Uncertain Future of Antitrust:  Responding to the Antitrust Modernization Commission</u> (2005) (participants included Commissioner W. Stephen Cannon and Professors Stephen Calkins, Herbert Hovenkamp, and Robert Lande, and assistant attorneys general Kathleen Foote (California) and J. Thomas Prud'homme (Texas)).

<u>Soaring Prices for Prescription Drugs – Incentive for Innovations or Antitrust Violations?</u> (2004) (participants included Professors Herbert Hovenkamp, Mark Lemley, James Langenfeld, and Cris Leffler).

<u>Mandatory Arbitration Clauses</u> (2003) (participants included Professors Jay Folberg, Jean Sternlight, Stephen Ware, and David Schwartz).

<u>Teaching Values in Law School</u> (2002) (participants included Professors Christopher Eisgruber, Joshua Rosenberg, Paul Tremblay, and W. Bradley Wendel).

<u>Christopher Eisgruber's</u> *Constitutional Self-Government* (2001) (participants included Professors Rebecca Brown, John Denvir, Roderick Hills, Mark Tushnet, Jeremy Waldron, and Christopher Eisgruber).

**HOBBIES**

Travel, Triathlons, Bicycling, Running, Swimming.